**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KASPERSKY LAB, INC. | ) |
| | ) |
| and | ) |
| | ) |
| KASPERSKY LABS LIMITED | ) |
| | ) |
| Plaintiffs, | ) Civ. Act. No. 17-cv-02697-CKK |
| | ) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) |
| | ) |
| and | ) |
| | ) |
| KIRSTJEN NIELSEN, in her official capacity as | ) |
| Secretary of Homeland Security | ) |
| | ) |
| Defendants. | ) |
| | ) |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' APPLICATION FOR**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

I.  Plaintiffs Have Standing to Challenge their Own Debarment..................................... 2

    A.  The enactment of the NDAA does not preclude the redress of Plaintiffs' injuries. .................................................................................................. 2

        1.  Plaintiffs have challenged the NDAA as an unconstitutional Bill of Attainder................................................................................. 2

        2.  The NDAA ban does not yet have legal effect. ....................................... 3

    B.  Plaintiffs' injuries fairly trace to the BOD and are likely to be redressed by rescission of the BOD............................................................................ 3

        1.  The loss of Plaintiffs' legal right to sell to the U.S. Government would be redressed by a favorable decision rescinding the BOD. ................... 4

        2.  Plaintiffs' reputational injury is fairly traceable to the BOD, and likely would be redressed by rescission.................................................. 6

II. Defendants Have Failed to Articulate Sufficient Due Process or Produce an Adequate Administrative Record.................................................................... 9

    A.  DHS's decision was final upon issuance of the BOD in September 2017; the "Final Decision" issued in December is an illusion which Defendants continue through their Response........................................................... 9

    B.  Plaintiffs suffered injury long before the Final Decision. ................................ 11

    C.  Defendants seek to retroactively demonstrate due process where none exists. ........................................................................................................ 13

    D.  Defendants' administrative process falls well short of what would have been required to debar Plaintiffs under the Federal Acquisition Regulations. ..... 15

III. Defendants Overstate the Degree of Discretion Granted to DHS Under FISMA and the Degree of Deference Afforded under the APA. ....................................... 17

    A.  Binding Operational Directives issued under FISMA are subject to APA review. .................................................................................................. 17

    B.  There is no suggestion in the record of any operational urgency for the BOD. ........................................................................................................ 20

C.      The BOD is based on news reports and not on any highly technical or
        classified information.......................................................................................... 21

IV.     Plaintiffs have Established Remaining Elements for Preliminary Injunction. ......... 24

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. United States,*
618 F.3d 125 (2d Cir. 2010) ..................................................................................... 4, 5

*Advantage Media, L.L.C. v. City of Eden Prairie,*
456 F.3d 793 (8th Cir. 2006) ..................................................................................... 2

*Arent v. Shalala,*
70 F.3d 610-614 (D.C. Cir. 1995) ............................................................................. 19

*Cobell v. Kempthorne,*
455 F.3d 301 (D.C. Cir. 2006) ................................................................................... 17

*Common Cause v. Dept. of Energy,*
702 F.2d 245 (D.C. Cir. 1983) ................................................................................... 5

*Delta Air Lines v. Export-Import Bank of the US,*
718 F. 3d 974 (D.C. Cir. 2013) ................................................................................. 18, 20

*Delta Const. Co. v. EPA,*
783 F.3d. 1291 (D.C. Cir. 2015) ................................................................................ 2

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014), ................................................................................. 3

*\*Foretich v. United States,*
351 F.3d 1198 (D.C. Cir. 2003) ................................................................................. 6, 7, 8

*Gonzalez v. Freeman,*
334 F.2d 570 (D.C. Cir. 1964) ................................................................................... 1, 25

*Hi-Tech Furnace Systs., Inc. v. FCC,*
224 F.3d 781 (D.C. Cir. 2000) ................................................................................... 18

*Holy Land Foundation v. Ashcroft,*
333 F. 3d 156 (D.C. Cir. 2003) ................................................................................. 22

*Huntington Branch, NAACP v. Huntington,*
689 F.2d 391 (2d Cir. 1982) ..................................................................................... 5, 6

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese,*
761 F.2d 798 (D.C. Cir. 1985) ................................................................................... 6

*Kirwa v. DOD,*
2017 U.S. Dist. LEXIS 176826 (D.D.C. Oct. 25, 2017) ........................................... 18

*Larson v. Valente,*
  456 U.S. 228 (1982) ........................................................................................................... 8

*McBryde v. Committee to Rev. Cir. Council Conduct,*
  264 F.3d 52 (D.C. Cir. 2001) ............................................................................................. 9

*McConnell v. FEC,*
  540 U.S. 93 (2003) ............................................................................................................. 2

*Nat'l Conference on Ministry to the Armed Forces v. James,*
  278 F. Supp. 2d 37 (D.D.C. 2003) .................................................................................... 24

*Nat'l Council of Resistance of Iran v. Dep't of State,*
  251 F.3d 192 (D.C. Cir. 2001) .......................................................................................... 12

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
  366 F.3d 930 (D.C. Cir. 2004) ............................................................................................ 5

*Nicopure Labs, LLC v. FDA*
  266 F. Supp 3d 360 (D.D.C. 2017) ................................................................................... 19

*Open Cmtys. All. v. Carson,*
  2017 U.S. Dist. LEXIS 211319 (D.D.C. Dec. 23, 2017) ................................................. 25

*Paracha v. Obama,*
  194 F. Supp. 3d 7 (D.D.C. 2016) ....................................................................................... 2

*People's Mojahedin Organization v. State,*
  182 F. 3d 17 (D.C. Cir. 1999) .......................................................................................... 22

*Physician's Education Network, Inc. v. Department of Health, Education & Welfare,*
  653 F.2d 621 (D.C. Cir. 1981) ........................................................................................... 3

*Qualls v. Rumsfeld,*
  357 F. Supp. 2d 274 (D.D.C. 2005) .................................................................................. 24

*Renal Physicians Ass'n v. DOH,*
  489 F.3d 1267 (D.C. Cir. 2007) ......................................................................................... 5

*Scenic Am., Inc. v. U.S. Dept. of Transp.,*
  836 F.3d 42 (D.C. Cir. 2016) ............................................................................................. 5

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ....................................................................................................... 4

*St. John's United Church of Christ v. FAA,*
  520 F.3d 460 (D.C. Cir. 2008) ........................................................................................... 5

*Texas v. EPA,*
  726 F.3d 180 (2013) ........................................................................................................... 3

v

*U.S. Ecology, Inc. v. DOI*,
   231 F.3d 20 (D.C. Cir. 2000) .................................................................................. 5

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
   266 F. Supp. 3d 1 (D.D.C. 2017) ..................................................................... 17, 19

*Watervale Marine Co. v. DHS.*,
   55 F. Supp. 3d 124 (D.D.C. 2014) ......................................................................... 17

*White v. United States*,
   601 F.3d 545 (6th Cir. 2010) ................................................................................. 2

*Wisconsin Gas Co. v FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ......................................................................... 24, 25

*Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*,
   492 F.3d 471 (D.C. Cir. 2007) ................................................................................ 3

*Zevallos v. Obama*,
   793 F. 3d 106 (D.C. Cir. 2015) ............................................................................ 22

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 706 et seq ................................................ *passim*

Federal Inforamation Security Modernization Act of 2014, 44 U.S.C. § 3551 et seq.
   (2014) .................................................................................................. *passim*

National Defense Authorization Act for Fiscal Year 2018, Public Law No. 115-91 ......... *passim*

**Other Authorities**

48 C.F.R. Part 9.406-3(c) ...................................................................................... 16

48 C.F.R. Part 9.406-3(d)(1) ................................................................................. 16

82 Fed. Reg. 43,782 (Sept. 19, 2017) ..................................................................... 14

Fifth Amendment of the Constitution ...................................................................... 14

Defendants' Opposition in Response to Plaintiffs' Application for Preliminary Injunction ("Response" or "Resp.") warrants the following reply.

## INTRODUCTION

"[T]he power of debarment is tantamount to one of life or death over a business." *Gonzalez v. Freeman*, 334 F.2d 570, 575 n.5 (D.C. Cir. 1964) (J. Burger)(quotation omitted). DHS exercised this power against Plaintiffs:  Binding Operational Directive 17-01 (the "BOD") bars Plaintiffs from contracting with the federal government, publicly labels them an information security threat, and results in irreparable reputational and financial harm.  Indeed, Defendants do not dispute that the BOD deprived Plaintiffs of their liberty interests.

Nevertheless, Defendants argue that the Court should not reach this issue, claiming that the National Defense Authorization Act for Fiscal Year 2018 ("NDAA") precludes standing because it effects an independent debarment of Plaintiffs' products. Plaintiffs have challenged the NDAA by separate lawsuit, and its effects are no longer inevitable. Presently, the BOD is the only legal bar to Plaintiffs' exercise of their rights and the only provision formally labeling Plaintiffs as an information security threat.   And, this Circuit's case law makes clear that rescission of the BOD need not redress *every* reputational injury suffered by Plaintiffs—only the discrete one stemming from the BOD.  Defendants' irreparable harm arguments are premised on the same theories and are likewise unavailing.

Defendants' claim that Plaintiffs received adequate due process for the deprivation of their liberty rights mischaracterizes the record and ignores this Circuit's holdings.  The only purported process occurred *after* DHS issued the BOD.   Since the BOD effected the deprivation *at the time it was issued*, this was a deprivation of due process.  Nor was the "process" afforded

after this deprivation constitutionally adequate. Simply put, the "Final Decision" was a foregone conclusion.

## I.   Plaintiffs Have Standing to Challenge their Own Debarment.

### A.   The enactment of the NDAA does not preclude the redress of Plaintiffs' injuries.

Defendants argue that Plaintiffs lack standing on the grounds that enactment of Section 1634 of the NDAA has essentially duplicated the effect of the BOD.   Defendants rest their argument on cases providing that where an independent and *unchallenged* action will cause *the same harm*, the injury is not redressable.   See Resp. at 15-16.   Neither predicate exists here.

#### 1.   Plaintiffs have challenged the NDAA as an unconstitutional Bill of Attainder.

First, concurrent with this filing, Plaintiffs *are* challenging the NDAA. Kaspersky Lab has filed a Complaint in this Court challenging the NDAA as an unconstitutional bill of attainder. *See* Complaint, *Kaspersky Lab, Inc., et al, v. United States*, 18-cv-325 (D.D.C. Feb. 12, 2018). As a result, Defendants' cited cases are now inapposite, as the plaintiffs in those cases failed because they challenged only one governing rule, regulation, or label, leaving another unchallenged rule that deprived them of the same right.   In other words, these were all half-measures; to exercise the right at issue, the petitioner had to invalidate two regulations, but challenged only one and a favorable ruling would leave them in precisely the same position.[1]

Here, Plaintiffs are not asking for a half-measure and—if successful—would not obtain a hollow

---

[1]  Plaintiffs' inapplicable authority turning on the existence of some *unchallenged* law, rule, or label include *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (unchallenged provisions of code bar proposed sign); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (unchallenged state law barred cockfighting); *Delta Const. Co. v. EPA*, 783 F.3d. 1291, 1296 (D.C. Cir. 2015) (unchallenged NHTSA rule caused same harm as EPA regulation); *Paracha v. Obama*, 194 F. Supp. 3d 7, 10 (D.D.C. 2016) (unchallenged Executive decision caused same harm as statute); *McConnell v. FEC*, 540 U.S. 93 (2003)(unchallenged provision of same statute). *See* Resp. at 15-16.

victory; they are seeking to invalidate both federal actions.[2]  In short, Defendants cannot avoid their constitutional obligations in this case by citing to the NDAA.

### 2.  The NDAA ban does not yet have legal effect.

Second, the NDAA is not yet legally effective. It has an October 1, 2018 "Effective Date."  Today, the BOD is the *only* action that deprives Plaintiffs their legal ability to sell to the Government.  Defendants attempt to conflate this by stating that the October 1 date "is a deadline, not a start date."  Resp. at 19. In reality, the October 1, 2018, date is both a deadline and a start date. It is the effective date.

Defendants cannot have it both ways, arguing that the BOD "is the operative prohibition on agency use of Kaspersky [Lab] products" until October 1, 2018 (Final Information Memorandum at AR0756-AR0757) in order to sustain the BOD—while also arguing that the NDAA has complete and immediate effect "…[e]ven without being in force … by making the prospect of doing business with Kaspersky [Lab] during the implementation period a practical (if not legal) impossibility." Resp. at 19.

### B.  Plaintiffs' injuries fairly trace to the BOD and are likely to be redressed by rescission of the BOD.

With that background, it is clear that Plaintiffs meet the three elements of standing to challenge their own debarment.  Defendants do not and cannot dispute Plaintiffs' injuries-in-fact:

---

[2] Defendants' other cases at Resp. 15-16 are inapposite because they involve: (1) challenges to the wrong regulations—*see Texas v. EPA*, 726 F.3d 180, 199 (2013) (challenged rules instead of Act), (2) challenges seeking the wrong relief—*Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 477 (D.C. Cir. 2007) (challenging only agency's decision to switch to new rule when both old and new rule had same result for petitioner), (3) challenges where the harm could not be undone—*Physician's Education Network, Inc. v. Department of Health, Education & Welfare*, 653 F.2d 621, 623 (D.C. Cir. 1981) (harm from Congress relying on report no longer redressable where Congress had already relied on report), and (4) mismatch between object of challenge and claimed injury—*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th 2014) ("claimed injury arises from the Secretary's decision to let its permit expire, not the designation in the notice").

their loss of the legal right to sell to the government, and their reputational harm—either or both of which establish standing.  Rather, Defendants argue that those injuries are not "fairly traceable to the [BOD]" and are not "likely to be redressed by [rescission of the BOD]."  Resp. at 25, 14; *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  These arguments lack merit.

### 1.   The loss of Plaintiffs' legal right to sell to the U.S. Government would be redressed by a favorable decision rescinding the BOD.

Defendants attack the redressability element of Plaintiffs' first injury—the deprivation of Plaintiffs' legal right to sell to the government—arguing that the BOD will have no practical effect on Plaintiffs because it is unlikely that Plaintiffs would be able to submit a winning bid for government work.  Resp. at 17-19.  This misses the point.  The injury is Plaintiffs' deprivation of a *right* to apply for a contract with the government.  Defendants do not dispute traceability—*i.e.,* that the BOD caused Plaintiffs' debarment, and hence, their loss of the right to sell to the government. That certain government officials may believe Plaintiffs would not be able to submit a successful bid does not diminish the right to submit the bid in the first place.  What matters is that rescission of the BOD restores the loss of this legal right.  *See generally, e.g.*, *ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010) (holding that plaintiff ACORN had standing to challenge a federal appropriations law singling ACORN out by name and cutting off its right to receive federal funds—although there was no assertion that ACORN would receive federal funds, or even would apply to government agencies for money, if the court invalidated the law:  "if the plaintiffs are not and never will be interested in applying for grants or funding from the Department of Defense, the fact that the Defense Department's appropriations law specifically prohibits ACORN and its affiliates from being eligible for federal funds affects the plaintiffs' reputation with other agencies, states, and private donors.")  *Id.* at 134.

Defendants' cases on redress for the loss of a legal right are irrelevant here.  Defendants' so-called "status quo" cases (see Resp. at 17-19) stand for the notion that "[w]hen the existence of one or more of the essential elements of standing—in this case redressability—depends on the unfettered choices made by *independent actors not before the courts* and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes substantially more difficult to establish standing."  *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50 (D.C. Cir. 2016)(emphasis added, internal quotations omitted).  For example, in *Renal Physicians Ass'n v. DOH*, 489 F.3d 1267 (D.C. Cir. 2007)(cited at Resp. at 17, 19, 24, 25), plaintiff's claimed injury—loss of income for doctors caused by the challenged regulatory safe-harbor—would not be redressed by invalidation of the challenged regulatory safe-harbor, because there was no showing that the relevant third parties (dialysis facilities and hospitals) would actually pay more money to doctors.[3]  Clearly, this rule has no applicability here. Plaintiffs are not challenging the BOD in order to force federal agencies to buy their products again—but are simply seeking to recover the legal *right* to sell to those agencies.

Defendants' cases purporting to instruct the Court on how to assess the redressability element are similarly unhelpful.  Defendants quote *Common Cause v. Dept. of Energy*, 702 F.2d 245 (D.C. Cir. 1983), claiming that redressability turns on whether judicial intervention "will produce tangible, meaningful results in the real world"—but that case involved a lawsuit to require the government to develop an energy conservation plan for government buildings.  How that has application to the debarment context is unclear.  Defendants also cite to *Huntington Branch, NAACP v. Huntington*, 689 F.2d 391, 394 (2d Cir. 1982) (cited at Resp. at 22), but omit the Second Circuit's holding that plaintiffs *had* standing and the reason why: "[D]ismissal of a

---

[3] *See also, Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004)(applying same rule) and *St. John's United Church of Christ v. FAA*, 520 F.3d 460 (D.C. Cir. 2008)(same); *U.S. Ecology, Inc. v. DOI*, 231 F.3d 20 (D.C. Cir. 2000)(same).

complaint because of a lack of committed financing may well prevent any litigant from challenging a zoning ordinance." Like the zoning ordinance in *Huntington*, the problematic laws and regulations at issue may make government officials reluctant to buy Plaintiffs' products, but that does not mean that Plaintiffs lack standing to challenge those official acts.[4]

Simply put, the loss of Plaintiffs' legal right to sell to the government will be "likely redressed" by a favorable decision in this case. Rescission and remand of DHS's determination, which is in violation of Plaintiffs' procedural due process rights and the APA, will erase an improper legal decision. This relief would remove the operative debarment, reinstating Kaspersky Lab's right to sell to the federal government. To be sure, there are additional harms— some which will also be alleviated by this decision, some which may not. But that does not deprive Plaintiffs of standing to challenge the deprivation of their legal right to sell to the government.

### 2. Plaintiffs' reputational injury is fairly traceable to the BOD, and likely would be redressed by rescission.

Defendants also attack traceability and redressability of Plaintiffs' reputational injury, arguing that (1) "Kaspersky Lab's … reputational injury is not fairly traceable to the BOD" because of other factors harming the company's reputation (Resp. at 25), and that (2) "rescinding the BOD would not relieve … the reputational harm." (*Id.* at 22-23). But *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003)—the seminal D.C. Circuit case concerning the traceability and redressability of reputational injuries by government action—unequivocally rejects these arguments.

---

[4] Defendants also cite *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985), which involved a union's challenge to an immigration policy that allowed foreign workers to come to the United States. There, the court denied relief to such "an abstract 'injury,'" disallowing the action "just because one disagrees with it, or even finds it odious, distasteful and offensive."

In *Foretich*, the D.C. Circuit held that plaintiff, Dr. Foretich—accused by his ex-wife of sexually molesting their daughter and sullied by the media and certain lawmakers—had standing based on reputational injury to challenge as an unconstitutional bill of attainder the Elizabeth Morgan Act, a federal law singling out Dr. Foretich and restricting his child visitation rights— even though the legal effect of the Act had become moot, as the child was now an adult. *Id*. at 1209.  The D.C. Circuit rejected the same traceability argument that Defendants now advance here: "[Even if] damage to Dr. Foretich's reputation comes in part from the publicity surrounding the custody dispute and [his ex-wife's] allegations, not solely from the [Elizabeth Morgan Act] … this misses the point. The Act itself has caused significant harm to Dr. Foretich." *Id*. at 1216.  The Court also rejected the same redress arguments advanced by Defendants here, explaining: "[B]y vindicating Dr. Foretich's assertion that Congress unfairly and unlawfully rendered a judgment as to his character and fitness as a father, declaratory relief will provide a significant measure of redress sufficient to satisfy the requirements of Article III standing." *Id*.   The D.C. Circuit rejected the notion that Dr. Foretich had to "parse out" the Act's harm from other negative attention—which Defendants argue Kaspersky Lab must do here. *See* Resp. at 27.

*Foretich* also rejected another of Defendants' arguments: that Plaintiffs cannot establish redressability unless they show that their lost (commercial and retail) customers would re-engage with their products, upon rescission of the BOD. *See* Resp. at 25.  Specifically, in *Foretich*, the D.C. Circuit observed that Dr. Foretich was "[o]nce a prominent oral surgeon," that "[his] business suffered a 30% decline following adoption of the Act," that he was "[f]orced to seek employment outside of northern Virginia, denied a position at a North Carolina university in part because of the Act," and that he was "asked to resign his position as Regent of the American

College of Oral and Maxillofacial Surgeons." *Foretich,* 351 F.3d at 1209.  But the D.C. Circuit did not require Dr. Foretich to show that patients who had left his practice would return to him upon invalidation of the Act, or that those other identified injuries would be redressed.  Yet that is what Defendants claim Kaspersky Lab must demonstrate for the Court even to hear this case.

Further, in *Foretich*, the challenged Act was nearly seven years old at the time of the D.C. Circuit's decision, and no longer of legal effect because Dr. Foretich's daughter had reached age 21—yet the D.C. Circuit still held that Dr. Foretich had standing based on reputational injury alone, and invalidated it as an unconstitutional bill of attainder.  *Id.* at 1209.  By contrast, the BOD is just months old, and Plaintiffs have submitted fresh evidence establishing the reputational injury's traceability and redress. Plaintiffs submitted evidence of customers (both retail and commercial) specifically citing the BOD (rather than any other source) as the reason they decided not to make a purchase—or decided to return—Plaintiffs' products.  *See* Application at 34.  Plaintiffs also submitted evidence that "[the] company will be on stronger ground in addressing immediate customer concerns should the BOD be preliminarily rescinded." (Declaration of Angelo Gentile, ¶ 24).

Plaintiffs need show only that rescission likely would redress the discrete harm stemming from the BOD's labelling Plaintiffs' products as "information security risks" to federal government information systems. Indeed, as the Supreme Court has stated, "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will redress his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original).

Finally, it bears mention that Defendants' quotations from *McBryde v. Committee to Rev. Cir. Council Conduct*, 264 F.3d 52 (D.C. Cir. 2001)(see Resp. at 23, 24), to support its redress

argument are equally unhelpful.  In *McBryde*, the court held that a censured district judge had standing, based on injury to his reputation, to challenge his public reprimand, but not to challenge the record of his suspensions, which had expired and become moot.  *See Id.* at 55-58. The standing analysis in *McBryde* turned on mootness. *See Id.* at 57 ("injury to reputation [] alleged as a secondary effect of an *otherwise moot* action." (emphasis added)).  Defendants do not argue that Plaintiffs' BOD claim is legally moot—in fact, they acknowledge it is "not actually moot."  *See* Resp. 27, n.21. The BOD is exactly the type of public reprimand the *McBryde* court found *was* an injury capable of being redressed by the courts.

## II.  Defendants Have Failed to Articulate Sufficient Due Process or Produce an Adequate Administrative Record.

The Response is the latest in a series of unsuccessful attempts by Defendants following the BOD to dress-up the administrative record and the accompanying "process" to give the appearance of adequate legal, administrative, and constitutional protections.

### A.  DHS's decision was final upon issuance of the BOD in September 2017; the "Final Decision" issued in December is an illusion which Defendants continue through their Response.

As explained at length in our Application Memorandum, the BOD was fully final and injurious at the time that it was issued. *See* Application at 10. No notice or opportunity to be heard was afforded by Defendants prior to that time, as was required. *See Id.* at 19.

Defendants now seek to retroactively argue that the BOD *itself* was a pre-deprivation notice and that no decision was made or injury caused to the Plaintiffs prior to the Final Decision in December. Resp. at 28.  This argument is wholly unsupported by the administrative record and mis-characterizes the approach taken by the Defendants throughout this post-BOD process.

In describing the BOD in their Response, Defendants betray their true intent: "DHS, on September 13, 2017, Issued BOD 17-01[…] Acting Secretary Elaine Duke issued the directive

*after determining* that the presence of Kaspersky [Lab] products on federal information systems presents a "known or reasonably suspected threat, vulnerability or risk" to federal information and information systems." Resp. at 10. (emphasis added). Accordingly, it is clear that all relevant legal determinations and the relevant administrative decision had been made prior to, or immediately upon, the issuance of the BOD in September, without any notice to Plaintiffs or a meaningful opportunity to be heard.

In its continued series of contradictions, only two pages later in their Response, Defendants argue the same decision was in fact made in December and then only "[a]fter closely reviewing the company's submission of opposition to the BOD." Resp. at 12. In so doing, Defendants again conflate the BOD as pre-deprivation "notice" and the 30-60-90 day structure as a pre-deprivation consultation period. It was neither. Rather, the BOD set in motion a process for the identification and removal of Plaintiffs' products from federal information systems that had no prospect of being reversed. The 30-60-90 day structure was always an implementation phase and never an administrative review period.

Relatedly, Defendants are simultaneously critical of the filing for preliminary injunction "more than four months after DHS issued the BOD" while also arguing that no final decision was made until December 2017. Resp. at 2. Had Plaintiffs brought their Complaint in September, Defendants would surely have argued that they had not exhausted their administrative remedies and so redress of the court under the APA would not have been available.

Notwithstanding the obvious deficiencies in the advertised process at the time and Plaintiffs' immediate and ongoing injury occasioned by the BOD, Plaintiffs in good faith sought to engage with Defendants during these months in the hope that Defendants would rectify their errors or give proper consideration to the Kaspersky Lab Submission. Defendants did not do so,

thereby warranting the Plaintiffs' prompt filing of the Complaint and Application for Preliminary Injunction in this matter.

### B.  Plaintiffs suffered injury long before the Final Decision.

In issuing the BOD, Defendants indicated their clear intent to all federal agencies and to the world that they had determined Kaspersky Lab products to be a "known or reasonably suspected threat, vulnerability or risk" to federal information systems. The damage was immediate. This is clearly evidenced by the actions taken by a number of agencies to remove Plaintiffs' software prior to the 90-day mark. *See* Application at 10. It makes no difference that Defendants did not expressly direct any agency to do so, the damage caused prior to the 90-day mark is self evident, and would not have occurred but for the manner in which the BOD was issued.

Indeed, Defendants make precisely this argument with respect to the effective date of the NDAA and its implementation, arguing that prior to its effective date, the impending ban would "make the prospect of doing business with Kaspersky during the implementation period a practical (if not legal) impossibility […] Congress has spoken on the use of Kaspersky products, and its intent was clear." Resp. at 19. Defendants cannot simultaneously argue that the BOD caused Plaintiffs no injury prior to the "Final Decision" as DHS' intent was equally clear at the time the BOD was issued.

Ample opportunity was available for Defendants to grant Plaintiffs notice and an opportunity to be heard prior to the BOD being issued.  Defendants claim that "[i]n the weeks and months before the BOD, the Department engaged in extensive consultations with its cybersecurity experts and interagency partners and reviewed information from a variety of

sources […]" Resp. at 10. However, Defendants failed to consult or engage with the one source with which they were constitutionally obliged to: the Plaintiffs.

If, as they now argue, the period between the BOD and the Final Decision represented a "fact finding" or "information-gathering" stage, and a pre-deprivation opportunity for the Plaintiffs to be heard (Resp. at 30), it would have been entirely possible for Defendants to have designed a process which fulfilled that objective, comported with Plaintiffs' due process rights, and delayed injury to the Plaintiffs until a final decision was made.

For example, via either a BOD or a simple letter, agencies could have been asked to identify whether they were using Plaintiffs' software.  At the same time, Defendants could have given Plaintiffs proper pre-deprivation notice, the administrative record, and a right to respond, before publicizing the allegations. Such a notice would have come closer to the type of pre-deprivation notice considered appropriate before imposing, for example, the designating of a party as a foreign terrorist organization in *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001). In that case, the D.C. Circuit found it was "not immediately apparent" how providing notice would work any harm to the government's interest in "national security." *Id.* at 207, 208.  Here, nothing in the record suggests an "extraordinary situation," or an indication that the "State must act quickly," or that "it would be impractical to provide pre-deprivation process," or that this is one of those "limited cases demanding prompt action."  Pre-deprivation process would have in no way inhibited the government's interest in security.

In this hypothetical process, now armed with the results of their fact-finding and the input of the Plaintiffs, DHS could have made an informed decision about the information security risks (if any) presented by Plaintiffs' (and others') software and notified agencies of how those risks could be properly and consistently mitigated.

The record is clear: Defendants proceeded otherwise.

At best, affording Plaintiffs an opportunity to make a submission after the BOD was issued is a post-deprivation appeal process, and is nevertheless inadequate. In actual fact, no opportunity existed for Plaintiffs to challenge the BOD. The decision had already been made, was being implemented, and had no genuine prospect of being reversed.  No meaningful "decision" was made in December 2017. The status quo from the date of the BOD's issuance was simply maintained "without modification." *See* Information Memo for Acting Secretary, Dec. 4, 2017 at AR0753.

### C.  Defendants seek to retroactively demonstrate due process where none exists.

Upon issuance, it was immediately clear to all concerned, including Defendants, that the BOD gave insufficient consideration to the due process rights of the Plaintiffs.

The BOD Decision and the letter by which it was conveyed to Plaintiffs contained only passing reference to the fact that an administrative process was to be provided to Plaintiffs and other affected parties, without providing any meaningful detail. It was clear that a "process" was an afterthought and not considered by Defendants to have been a central part of the review and decision making process. The repeated announcement of a forthcoming "administrative process" absent any meaningful standards actually being provided should not be confused as constitutional due process. This was administrative process in name only.

Ever since, Defendants have highlighted their attempts to retroactively demonstrate (or appear to demonstrate) due process where none existed. On September 19, 2017, an enumerated "process" did appear in the Federal Register, which, as described elsewhere, effectively amounted only to the ability for the Plaintiffs to write a letter of objection to the Department,

hoping beyond hope that the BOD decision would be reversed. 82 Fed. Reg. 43,782 (Sept. 19, 2017)

The Federal Register further provided that, following DHS's receipt of a response to the BOD, "[T]he Secretary's decision will be communicated to the entity in writing by December 13, 2017." *See id.* at 43,784.  December 13, 2017 was one day *after* the 90-day deadline by which agencies were to have begun removing Kaspersky Lab products. In apparent acknowledgement of this procedural deficiency, and in an attempt to conceal the fact that the process was inadequate and illusionary, the Final Information "recommend[ed] that [the Acting Secretary] respond to Kaspersky and issue [her] Final Decision on or before Monday, December 11"— notwithstanding the December 13, 2017, deadline set forth in the Federal Register.  *See* Information Memo for Acting Secretary, Dec. 4, 2017 at AR0754.

Defendants did not provide the BOD Information to Plaintiffs until September 29, 2017 (two weeks after the BOD had been issued, and Plaintiffs were notified), and then only following request of Plaintiffs' counsel.  *See* Decl. of Ryan Fayhee at Document 10-3 ¶ 8. It is clear that, absent this request, the administrative record would not otherwise have been provided as part of the stated process.  Defendants now incorrectly claim that the BOD Information was provided "at the beginning of the administrative process" (Resp. at 35.), retroactively implying a level of forethought and planning on behalf of Defendants, where none actually existed at the time.

Despite repeated requests by Plaintiffs' counsel for immediate engagement (*See* Email Correspondence between Ryan Fayhee and Daniel Sutherland, Fayhee Decl. at Ex I) plaintiffs were only afforded a meeting with DHS following its formal submission. The meeting occurred on November 29, 2017, over two months after the BOD was issued. Such a meeting was clearly not planned or anticipated to be part of any due process at the time of the BOD and was only

allowed to give the appearance of an adequate process. In an attempt to meet their due process obligations, Defendants now incredibly argue that this limited and reluctant engagement amounts to "a fully interactive process." Resp. at 12. The record shows otherwise.

The meeting itself was perfunctory and not indicative of meaningful consideration or due process, as indicated by the issuance of the Final Decision only a week later, on December 6, 2017.

Right up to, and including in the Final Decision and its Information, Defendants continued to introduce new materials and arguments into the administrative record (including but not limited to the "Maggs Report"). Defendants now list the Maggs Report and the supplemental NCCIC report included with the Final Decision in its list of documents forming part of the administrative record, to which they argue Plaintiffs had opportunity to respond, as if those documents had been available to the Plaintiffs during the review period from the beginning. Resp. at 11. and 41.

### D. Defendants' administrative process falls well short of what would have been required to debar Plaintiffs under the Federal Acquisition Regulations.

The actions taken by Plaintiffs clearly amount to a debarment of Plaintiffs' products. In fact, the Decision is explicit that DHS considered the BOD to be a more "appropriate" process than a debarment proceeding under the FAR principally because it is more draconian (Decision at 4). The BOD had immediate effect since, in the Defendants' own words (used in relation to their claimed immediate debarring effect of the NDAA) "no agency would make an investment in Kaspersky software and go to the trouble of testing, installing, and integrating the software, only to have to remove it and start the process anew within a matter of months." Resp. at 20, *citing* Schneider Declaration at ¶¶ 9-11.  Plaintiffs concede that had debarment proceeded through the FAR, the attendant "well-established" and "constitutionally adequate" debarment procedures would have had to have been followed. Resp. at 32.

15

Defendants go on to argue, however, that "the process afforded to Kaspersky not only meets [the FAR requirements], but even exceeds it in important ways" (Resp. at 29.) and that "any differences between the two procedures are not of constitutional dimension." Resp. at 32. However, Defendants make only one comparison to the FAR process, namely that Plaintiffs were afforded "52 days – more than three weeks longer than the 30 days required under the FAR" to respond to the BOD. Resp. at 30.

Under the FAR, debarring officials must provide formal notice of proposed suspension and/or debarment, including: (1) the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the alleged conduct upon which the action is based, (2) notice of the opportunity to submit information and arguments in opposition to the proposed debarment within 30 days of receipt of the notice, (3) procedures that will govern the agency's decision-making process, and (4) the effects of proposed and actual debarment.  *See* 48 C.F.R. Part 9.406-3(c).  Critically, the debarring official's decision may be made only within 30 working days after receipt of information and argument from the contractor. *See* 48 C.F.R. Part 9.406-3(d)(1).  This final protection under the FAR is consistent with the due process requirement that an affected party be given a meaningful opportunity to rebut the evidence before action is taken to deprive it of a property or liberty interest.

The additional 22 days afforded to Plaintiffs to respond to the BOD is immaterial when compared to the fundamental difference between the FAR process and that afforded by Defendants: namely that the FAR process has to conclude *before* any debarment can take effect. Under the FAR process there is a 60-day period between the notice and the first day upon which the debarment can take effect. Contrary to Defendants' contention, this difference is absolutely of a "constitutional dimension." It goes to the heart of constitutionally sound due process.

16

### III. Defendants Overstate the Degree of Discretion Granted to DHS Under FISMA and the Degree of Deference Afforded under the APA.

In the alternative, and assuming a deficient due process, Defendants argue either that the relevant provision of the FISMA is not reviewable under the APA (since it affords absolute discretion to DHS in issuing binding operational directives) and/or that enhanced deference ought to be granted to the Defendants in light of the national security context, urgency, and highly technical nature of the BOD's subject matter. Resp. at 35 and 40.

#### A. Binding Operational Directives issued under FISMA are subject to APA review.

Defendants argue that "numerous plaintiffs have brought APA challenges seeking to enjoin agency decisions under [FISMA]," yet "[n]ot one of these suits has prevailed, and every court to consider the issue has agreed that decisions under FISMA are committed to agency discretion and thus outside the scope of APA review."  Resp. at 13.  Defendants cite only three FISMA cases in support, each involving a class action seeking monetary damages, but none instructive here.  *See* Resp. at 37-8.[5] Defendants have not referenced a single case in which a FISMA binding operational directive has been challenged under the APA, and for good reason: this is the first such challenge.

This is not a case where Plaintiffs "attempt to use the APA to police a federal agency's actions" under FISMA. Resp. at 3. Defendants rather have used FISMA to effectuate a

---

[5] *See* Resp. at 37-8 (*citing Welborn v. IRS*, 218 F. Supp. 3d 64 (D.D.C. 2016)(victims of cyber breaches at federal agency suing agency, alleging its failure to comply with FISMA); *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig*., 266 F. Supp. 3d 1, 43-44 (D.D.C. 2017)(same); and *Cobell v. Kempthorne,* 455 F.3d 301, 303 (D.C. Cir. 2006)(class action, brought prior to 2014 amendment of FISMA, by beneficiaries of American Indian Money trust accounts, based on "Interior's problems maintaining adequate computer security").  As Defendants' lead case makes clear, these "stand[] in stark contrast and are wholly inapplicable" to the reviewability issue at hand.  *See Watervale Marine Co. v. DHS*., 55 F. Supp. 3d 124, 135, 140 (D.D.C. 2014)(internal quotation omitted)("All other courts that have addressed this statutory provision have done so under markedly different circumstances").

debarment and one that is immediate and enhanced. They cannot escape the availability of the APA to challenge debarment decisions, particularly where debarment is effected in a more draconian fashion through a statute which was never intended to be used to debar individual companies, rather than via the well-established and constitutionally sound FAR processes. FISMA was established, and amended, so that DHS could establish uniform security standards through binding operational directives and to otherwise protect federal information systems, not so that it could be used to debar companies from federal contracting without due process.

The starting point for Defendants' "committed to agency discretion" argument must be the presumption of reviewability. "The APA embodies the basic presumption of judicial review to one suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Delta Air Lines v. Export-Import Bank of the US*, 718 F. 3d 974, 976 (D.C. Cir. 2013) (internal quotations omitted). As a threshold matter, "[t]he exception for agency action 'committed to agency discretion by law' is a very narrow one, reserved for those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Hi-Tech Furnace Systs., Inc. v. FCC*, 224 F.3d 781, 788, 343 (D.C. Cir. 2000)(internal quotation and citation omitted). Rather, "there is a strong presumption that agency action is reviewable and Congress rarely draws statutes in terms so broad that there is no meaningful standard." *Kirwa v. DOD*, 2017 U.S. Dist. LEXIS 176826, at *28 (D.D.C. Oct. 25, 2017) (*quoting Sec'y of Labor v. Twentymile Coal Co*., 456 F.3d 151, 156 (D.C. Cir. 2006)).

In an attempt to establish this "very narrow exception," Defendants apply a three-part test (Resp. at 36), inviting the court to evaluate: "(1) the nature of the administrative action at issue; (2) the language and structure of the statute that supplies the applicable legal standards for

reviewing that action, and (3) Congress's intent to commit the matter fully to agency discretion as evidenced by, among other things, the statutory scheme." *See* Resp. at 36, citing *Waterville* 55 F. Supp. 3d at 137-38 (internal quotations omitted).

Under the first factor, the BOD clearly is not one of the "categories of administrative decisions that the Supreme Court and the D.C. Circuit consider presumptively unreviewable"— as in "[f]or example, an agency's refusal to take enforcement action." *Id.* at 138 (internal quotation omitted). Rather, as DHS makes clear in both its Information and Decision Memos, the BOD has effectuated a debarment. *See* Information Memo for Acting Secretary, Sept. 1, 2017, at AR0005-AR0006 and Acting Secretary Decision Memo, Sept. 13, 2017 at AR0631, sections entitled "**DEBARMENT.**" DHS acknowledges it based the BOD solely on unclassified information. *See* Acting Secretary Decision Memo at AR0631 ("I therefore hereby exercise my authority…to issue BOD 17-01. I make this determination based on the unclassified record alone.").

Under the second factor, Congress need only "provide[] a meaningful—not a rigorous, but neither a meaningless—standard against which to judge the exercise of agency discretion." *Arent v. Shalala*, 70 F.3d 610-614 (D.C. Cir. 1995). The limitation of the BOD to "safeguard" federal IT systems from "a known or reasonably suspected information, security threat, vulnerability, or risk" certainty provides "meaningful standards" against which to measure DHS's action. 44 U.S.C. §§ 3552(b)(1), 3553(b)(2). *See, e.g., Nicopure Labs, LLC v. FDA,* 266 F. Supp. 3d 360 (D.D.C. 2017) (rejecting FDA's committed-to-agency-discretion argument where the statute gave the agency the authority to apply the Tobacco Control Act's provisions "to any other tobacco products that the Secretary by regulation deems to be subject to [that Act]." (*quoting* 21 U.S.C.§ 387a(b)).  Indeed, a "statute can confer on an agency a high degree of

discretion, and yet a court might still have an obligation to review the agency's exercise of its discretion to avoid abuse, especially on procedural grounds." *Delta*, 718 F.3d at 977 (quoting 3 Richard J. Pierce, Jr., Administrative Law Treatise § 17.6 (4th ed. 2002)).  Clearly, FISMA provides meaningful standards that qualify DHS' discretion in issuing BODs, and has not "vested [DHS with] complete discretion," as Defendants claim.  *See* Reply at 37.  Nor is it determinative, as Defendants suggest, that there is no statutory definition of what constitutes a "'known or reasonably suspected information security threat, vulnerability, or risk.'" It is within the court's power to interpret these qualifications based on their plain meaning or comparative legal concepts.

Finally, applying the third factor—Congress' intent as evidenced by the statutory scheme—as discussed *supra*, Defendants simply quote from inapplicable FISMA-related class actions.  Defendants fail to point to anything in FISMA that would indicate Congress intended to allow DHS to effectuate a debarment beyond the reach of  judicial review.

**B.   There is no suggestion in the record of any operational urgency for the BOD.**

Defendants next argue that the U.S. government's networks and computers security "depends on the government's ability to act swiftly and effectively in the face of rapidly evolving cyber threats." Resp. at 1. However, nothing in the administrative record or in the Defendants' Response indicates any operational urgency to this BOD. To the contrary, Defendants (at Resp. FN1) cite to a 2012 *Wired* magazine article which contains many of the same arguments that Defendants seek to rely on in support of the BOD over five years later.

The only significant development in 2017 was intense political scrutiny following Russia's apparent interference in the 2016 presidential election, in which there is no allegation that Plaintiffs had any involvement. *See* Resp. at 7-10. This political pressure culminated in the

issuance of the BOD and the enactment of the NDAA, both of which bowed, unconstitutionally, to that pressure in singling out and punishing Plaintiffs and depriving them of their due process rights.

### C. The BOD is based on news reports and not on any highly technical or classified information.

Defendants also argue that this is a circumstance in which enhanced deference is due to their administrative decision-making process due to the "expert-driven and highly technical" nature of the BOD and its subject matter. Resp. at 38.

In reality, the BOD is neither highly technical nor expert-driven, the underlying administrative record consists almost entirely of unsubstantiated news reports and allegations against the company, which the court is well within its capability to review for their evidential value.

Defendants also claim that the "BOD was issued only after extensive investigation and consultation with cyber security experts inside and outside of the [DHS]." Resp. at 1. But nowhere in the administrative record is there any indication of these consultations. The only support cited are two reports authored by the National Cybersecurity and Communications Integration Center ("NCCIC"). NCCIC falls under DHS' jurisdiction and so can hardly be considered an independent assessment or interagency review. If other consultations occurred, Plaintiffs request, and the court requires, that evidence of the same be added to the administrative record filed by Defendants should they wish to rely upon them in this case.

Defendants also claim their reliance on news reports is appropriate by citing cases where news articles from "part of the unclassified record" (as in *Zevallos v. Obama*) or as part of "a broad range of evidence" (as in *Holy Land*). However, in neither of these cases did the record reflect such a heavy focus on news articles.

The D.C. Circuit's express rationale for permitting reliance on news articles is simply inapplicable here: (i) there is no need to protect confidential information, because the BOD is not "based in part on classified information;" (ii) there are no "logistical or political difficulties obtaining judicial or law enforcement records from other countries;" (iii) there are no "diplomatic concerns … limiting what [the agency] can say publicly"—to the contrary, DHS has been frank about its views; and (iv) there is no suggestion in this case that "the safety of investigators or informants might be put at hazard." *See Zevallos v. Obama*, 793 F. 3d 106, 113 (D.C. Cir. 2015).

Moreover, in the cases allowing such a reliance, the media articles were used to establish discrete facts—not ultimate legal conclusions, as here. *See, e.g., Id.* at 112 (reliance on newspaper articles that a designated drug kingpin controlled overseas assets). *See also, People's Mojahedin Organization v. State*, 182 F. 3d 17, 24-25 (D.C. Cir. 1999)("[T]he Secretary had before her information that each of the organizations engaged in bombing and killing in order to further their political agendas. Any one of the incidents…would have sufficed under the statute."). And, in *Holy Land Foundation v. Ashcroft*, 333 F. 3d 156, 162 (D.C. Cir. 2003), the D.C. Circuit made clear that, while the terrorist designation could be based on "a broad range of evidence, including intelligence data and hearsay declarations"—Treasury's decision "was based on ample evidence in a *massive* administrative record"—including "testimony of numerous FBI sources and findings by both Israeli and Palestinian governmental authorities." (emphasis added).

In contrast, as stated in the Plaintiffs' Application, many sections of the BOD Information and key DHS findings in support of the BOD's three elements[6] (and particularly the

---

[6] (1) The broad access to files and elevated privileges provided by antivirus products and services, including Kaspersky products, that can be exploited by malicious cyber actors to compromise information systems; (2) Ties between certain Kaspersky officials and Russian intelligence and other government agencies; and (3) Russian legal provisions that allow Russian

second and most critical of those three elements) allege "ties between certain Kaspersky officials and Russian intelligence and other government agencies" and are supported exclusively by uncorroborated news reports.

Defendants also contend that to escape the BOD, it was for Plaintiffs to prove their own innocence by "rebutting or disproving" these news articles. Resp. at 41. But it is the Defendants who have failed to meet the evidentiary standards required of them in establishing a sufficient risk to the government information systems that are supported by "substantial evidence."

Defendants continue to cite news articles in purported support for their Response (Resp. FN 11), as if they were determinative of fact, and as a substitute for genuine or meaningful agency fact-finding. Since the substance of those allegations are not determinative of this Motion, and since Plaintiffs have already responded to these substantive issues in detail in the Kaspersky Submission, Plaintiffs do not intend to address or refute them here, save to note their continued objection both to their substance and their continued perpetuation without corroboration.

In an apparent attempt to distract from the deficiencies in the administrative record, Defendants have again alluded to the classified materials considered by the Acting Secretary, Resp. at 10., as if the existence of such a record, regardless of its content, lends weight to their arguments on national security grounds. At the same time, Defendants also reiterate their claim, as they have done throughout this process, that "DHS believes that the BOD can be sustained on the basis of the unclassified portions of the administrative record." Resp. at FN 12. An APA challenge examines only what the agency actually considered and relied upon in making its decision. If Defendants in fact did not rely on the classified record, they should strike their

intelligence agencies to request or compel assistance from Kaspersky and to intercept communications transiting Russian networks.

repeated references throughout the unclassified record and their tacit insinuation that if we were to pull back the curtain, all potential questions and concerns would be satisfied.

Plaintiffs do not seek this Court's assessment or ruling on those allegations, nor (as Defendants allege at Resp. 45.) do Plaintiffs ask the Court to "second guess" any determination of DHS in that regard. Rather, Plaintiffs simply request the court to uphold the requirements of the APA and Plaintiffs' constitutional rights to due process, and that Defendants properly consider this matter in line with their legal and constitutional obligations.

### IV.   Plaintiffs have Established Remaining Elements for Preliminary Injunction.

Finally, Defendants' remaining arguments on the preliminary injunction standard are not availing.   *See* Resp. at 42-43.   First, they claim that the heightened requirement applies to a "mandatory injunction," where the plaintiff seeks to compel a "positive act."   *See Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 286 (D.D.C. 2005) ("the court would order the Army to discharge Qualls"); *Nat'l Conference on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 42 (D.D.C. 2003) (seeking mandamus requiring defendant to include plaintiff in fundraising program).   But Plaintiffs are not seeking to compel Defendants to accept their products or to install products on their systems.   They are seeking a preventative injunction, one that would *stem* a continuing injury.

Second, there is no merit to Defendants' claim that Plaintiffs' grave financial and reputational harm does not amount to *irreparable* harm.   Defendants rely on *Wisconsin Gas Co. v FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985)—but that was not an APA case, nor is it instructive here.   *See also, Open Cmtys. All. v. Carson*, 2017 U.S. Dist. LEXIS 211319, *67 (D.D.C. Dec. 23, 2017)(explaining that defendants "misread" *Wisconsin Gas,* and holding that in an APA case monetary losses can establish irreparable harm because "APA provides no damages remedy.").

24

Plaintiffs' financial harm is anything but speculative, nor is there any question that Plaintiffs are directly harmed by the BOD.  (*Cf, Wisconsin Gas,* 758 F.2d at 675 (denying preliminary injunction based on a "purely hypothetical chain of events.")) Moreover, that *other sources* of reputational harm may have contributed does not preclude relief.  See *Supra.*

Finally, on balance of equities, it bears repeating: "[T]he power of debarment is tantamount to one of life or death over a business."  *Gonzalez* 334 F.2d at 575, n.5 (quotation omitted).  To effect this debarment, Defendants violate well-established standards of due process and the APA.  As this Court has held, "There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA…" *Open Cmtys.* 2017 U.S. Dist. LEXIS 211319 at *68-69 (internal quotations omitted).

## CONCLUSION

For the reasons set out above and those set out in its Memorandum of Law in Support of Preliminary Injunction, Plaintiffs respectfully repeat their request that the Court grant their Application, and preliminarily invalidate and rescind the BOD and the December 6, 2017, Final Decision maintaining the BOD, and preliminarily enjoin DHS from enforcing the BOD and the Final Decision.

Dated: February 12, 2018

Respectfully submitted,

*/s/ Ryan P. Fayhee*
Ryan P. Fayhee (Bar No. 1033852)
Steven Chasin (Bar No. 495853)
**Baker & McKenzie LLP**
815 Connecticut Avenue NW
Washington D.C. 20006
Tel: (202) 452 7024
Ryan.Fayhee@bakermckenzie.com
Steven.Chasin@bakermckenzie.com

*Attorneys for Kaspersky Lab, Inc. and Kaspersky Labs Limited*