# Exhibit I



**Baker & McKenzie LLP**

815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
United States

Tel: +1 202 452 7000
Fax: +1 202 452 7074
www.bakermckenzie.com

**Asia Pacific**
Bangkok
Beijing
Brisbane
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur*
Manila*
Melbourne
Seoul
Shanghai
Singapore
Sydney
Taipei
Tokyo
Yangon

**Europe, Middle East & Africa**
Abu Dhabi
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Brussels
Budapest
Cairo
Casablanca
Doha
Dubai
Dusseldorf
Frankfurt/Main
Geneva
Istanbul
Jeddah*
Johannesburg
Kyiv
London
Luxembourg
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh*
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**The Americas**
Bogota
Brasilia**
Buenos Aires
Caracas
Chicago
Dallas
Guadalajara
Houston
Juarez
Lima
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre**
Rio de Janeiro**
San Francisco
Santiago
Sao Paulo**
Tijuana
Toronto
Valencia
Washington, DC

* Associated Firm
** In cooperation with
Trench, Rossi e Watanabe
Advogados

November 10, 2017

Ref:     BOD-17-01

Department of Homeland Security
Washington, D.C. 20528

**Via email**
BOD.Feedback@hq.dhs.gov

*CONFIDENTIAL BUSINESS INFORMATION*
*FOIA TREATMENT REQUESTED*

**Attention:** Elaine C. Duke, Acting Secretary of Homeland Security

**Kaspersky Lab Request for Department of Homeland Security to Initiate Review of Binding Operational Directive - 17-01**

In accordance with the requirements set out in *Federal Register* / Vol. 82, No. 180 / Tuesday, September 19, 2017, and in accordance with our prior correspondence with the Office of General Counsel, please find below Kaspersky Lab's ("Kaspersky Lab" or the "Company") response ("Letter") to the U.S. Department of Homeland Security ("DHS") Binding Operational Directive 17-01 of September 13, 2017 ("BOD"),[1] the Decision Memorandum of the same date ("Decision Memorandum"),[2] and the memorandum for the Acting Secretary of DHS supporting the BOD of September 1, 2017 (the "DHS Memorandum").[3]

## I.     OVERVIEW

Kaspersky Lab is a market-leading defensive cyber technology company consistently recognized by its peers, the industry, and consumer groups for developing best-in-class cyber-protection tools. The Company leads the world in cyberthreat assessment and analysis. Kaspersky Lab is a key part of a global cybersecurity community, collaborating on an apolitical basis to protect all technology users from cyberthreats regardless of their origin or purpose. Kaspersky Lab takes this role and its responsibility very seriously; the Company's integrity and independence together with its stand-out technology are the foundations of its success over the past 20 years of business.

Through the BOD, DHS has sought to summarily extinguish these key contributions as well as Kaspersky Lab's hard-earned reputation, without providing constitutionally mandated due process of law.

---

[1] DHS BOD 17-01 (Sept. 13, 2017) [hereinafter BOD].
[2] DHS Decision Memorandum (Sept. 13, 2017) [hereinafter Decision Memorandum].
[3] DHS Information Memorandum (Sept. 1, 2017) [hereinafter DHS Memorandum].

Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein.

AR0647

In so doing, DHS fails to provide any evidence of wrongdoing on the part of Kaspersky Lab or anyone associated with it, much less any evidence that Kaspersky Lab presents a materially different risk profile than any other similarly situated anti-virus product or system critical software. Yet, based apparently on the nationality of the Company alone, the BOD singles out Kaspersky Lab. Such action is a clear violation of Kaspersky Lab's Equal Protection rights.

The BOD is based on a series of uncorroborated news articles and anonymous sources, none of which have been tested in a fair and public forum. Nor has Kaspersky Lab been granted an opportunity to be heard on these allegations prior to the BOD being put into effect.

Nevertheless, Kaspersky Lab has attempted in this Letter to respond to the arguments and allegations made against the Company by DHS as best it can,[4] including through the engagement of the Berkeley Research Group, LLC ("BRG") to independently review Kaspersky Lab and competitors' products and capabilities. In summary, we will show that: i) Kaspersky Lab software operates in a manner that closely aligns with the offerings of other providers not subject to the DHS action; and ii) Kaspersky Lab and its staff have no inappropriate connections to the Russian Government or its security services and pose no greater risk to the U.S. than any other company, including U.S. companies, that maintains a presence in Russia.

In particular, we wish to highlight that DHS's professed administrative procedure is wholly inadequate to meet even the minimum standards of due process. As early as July 18, 2017, Kaspersky Lab attempted to formally engage in meaningful dialogue with DHS to address its perceived concerns. Despite the clear opportunity to do so, DHS declined to engage with the Company. As a result, from the moment the BOD was issued, Kaspersky Lab began to suffer the significant adverse consequences of DHS's action in its commercial, consumer, and State, local, and education ("SLED") businesses. Furthermore, federal agencies were required to immediately begin identifying subject products on their systems and develop a plan to purge them. Constitutional due process protections of the Fifth Amendment have been consistently interpreted to require the opportunity to be heard at a meaningful time and in a meaningful manner before any action is taken to deprive a company of its protected property or liberty interests. Kaspersky Lab's rights in this regard have therefore been irreparably infringed.

The scope and breadth of the BOD is astonishing, in both effectively debarring Kaspersky Lab from all federal government contracts, and purging it from any existing engagement. But the true impact of the BOD goes far beyond the loss of limited revenue generated from Kaspersky Lab's government business and any future prospect of expanding that portfolio. Through the BOD, and other derogatory statements made by federal Government officials, DHS has taken arbitrary, capricious, and unprecedented action to single-out and seek to exclude Kaspersky Lab from the U.S. market. As a result, Kaspersky Lab has a clear cause of action to challenge the BOD under the Administrative Procedure Act ("APA").

Alongside constitutional failings, Kaspersky Lab has suffered immediate and irreparable harm to its commercial, consumer, and SLED businesses as a direct result of this action

---

[4] Kaspersky Lab reserves the right to produce additional material later deemed to be relevant to DHS's inquiry and concerns.

AR0648

including, but not limited to, a substantial reduction in quarterly results when compared to the same time last year.

DHS has apparently given no consideration to, and certainly has not engaged with, Kaspersky Lab to discuss any reasonable measures that may address its concerns and mitigate the perceived risks inherent in the U.S. Government and others' use of Kaspersky Lab products and services.

## II.    BACKGROUND ON THE BOD

On September 13, 2017, DHS issued the BOD, which compels all federal agencies to: (1) identify the use or presence of Kaspersky Lab-branded products on all federal informational systems within 30 days, (2) develop a detailed plan to remove and discontinue present and future use of all Kaspersky Lab-branded products within 60 days, and (3) begin implementing the plan within 90 days.[5] The 30-day identification deadline fell on October 13, 2017, the 60-day removal plan deadline falls on November 12, 2017, and the 90-day deadline to begin removal falls on December 12, 2017.

In issuing the BOD, DHS relied upon the Federal Information Security Modernization Act of 2014 ("FISMA"), which authorizes the Secretary of Homeland Security to develop and oversee the implementation of binding operational directives to agencies.[6] FISMA provides that a binding operational directive is a "compulsory direction to agencies" for the purpose of "safeguarding Federal information and information systems from a known or reasonably suspected[7] information security threat, vulnerability, or risk."[8]

## III.    BACKGROUND ON KASPERSKY LAB AND ITS U.S. GOVERNMENT BUSINESS

### a.   The Company and its Principles of Fighting Cyberthreats

Kaspersky Lab is a multinational cybersecurity company exclusively focused on protecting against cyberthreats, no matter their origin. From its founding, Kaspersky Lab has set out to be a leader and innovator in this space, and has been recognized as such by cybersecurity experts the world-over.[9]

Kaspersky Lab, which celebrated its 20th anniversary in 2017, is one of the world's largest privately owned cybersecurity companies, operating in 200 countries and territories and maintaining 35 offices in 31 countries, collectively with over 3,800 employees. Among its offices are research and development centers employing anti-malware experts in the U.S., Europe, Japan, Israel, China, Russia, and Latin America. More than 85 percent of Kaspersky Lab's sales are from outside of Russia. Over 400 million users, from commercial enterprise to

---

[5] BOD, *supra* note 1, at 2-3.

[6] 44 U.S.C. § 3553(b).

[7] FISMA provides no definition of the "reasonably suspected" standard, and we are unaware of any judicial or other interpretation of the standard, in this context.

[8] *Id.* § 3552(b)(1)(A). *See also* 44 U.S.C. § 3554(a)(1)(B)(ii) ("The head of each agency shall… be responsible for… complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines, including…operational directives developed by the Secretary under section 3553(b).")

[9] *See* discussion *infra* at Section III(b).

AR0649

critical infrastructure owners and operators and consumers alike, utilize Kaspersky Lab technologies to secure their data and systems.

Kaspersky Lab's Global Research & Analysis Team ("GReAT"), comprised of elite security researchers located in every major region across the world, including the U.S., have been actively involved in the discovery and disclosure of numerous malware attacks. Over the past 10 years, Kaspersky Lab has identified numerous cyberthreats originating in Russia and/or operating in the Russian language,[10] many of which were specifically targeting U.S. (governmental and private) entities, including: Moonlight Maze,[11] RedOctober,[12] CloudAtlas,[13] Miniduke,[14] CosmicDuke,[15] Epic Turla,[16] Penquin Turla,[17] Turla,[18] Black Energy,[19] Agent.BTZ,[20] Teamspy,[21] Sofacy (aka Fancy Bear, APT28),[22] and CozyDuke (aka Cozy Bear, APT29).[23]

Kaspersky Lab's presence in Russia and its deployment in areas of the world in which many sophisticated cyberthreats originate, makes it a unique and essential partner in the fight against such threats which, in its absence, may not otherwise be met. Kaspersky Lab believes that global collaboration is the most effective way of fighting cybercrime and protecting the privacy interests of consumers. Kaspersky Lab openly shares its expertise, knowledge and technical findings with governments, cyber-enforcers, and the information security community.

Eugene Kaspersky has consistently asserted the Company's position that governments and private sector cybersecurity companies need to cooperate to protect citizens, companies, and critical infrastructure against any and all cyberthreats regardless of their geographic origin.

---

[10] The use of Russian language (or any other) does not permit attribution of the threat to any specific country. Language traces cannot be considered reliable evidence because they can be fabricated and deliberately planted in malware code as "red herrings" for investigators.

[11] Costin Raiu, Daniel Moore, Juan Andrés Guerrero-Saade, and Thomas Rid, *Penguin's Moonlit Maze*, SECURELIST (Apr. 3, 2017), https://securelist.com/penguins-moonlit-maze/77883/.

[12] GReAT, *Cloud Atlas: RedOctober APT is back in style*, SECURELIST (Dec. 10, 2014), https://securelist.com/cloud-atlas-redoctober-apt-is-back-in-style/68083/.

[13] *Id.*

[14] GReAT, *Miniduke is back: Nemesis Gemina and the Botgen Studio*, SECURELIST (July 3, 2014), https://securelist.com/miniduke-is-back-nemesis-gemina-and-the-botgen-studio/64107/.

[15] COSMICDUKE, https://apt.securelist.com/#secondPage/attack=01.

[16] GReAT, *The Epic Turla Operation*, SECURELIST (Aug. 7, 2014), https://securelist.com/the-epic-turla-operation/65545/.

[17] Kurt Baumgartner and Costin Raiu, *The 'Penquin' Turla*, SECURELIST (Dec. 8, 2014), https://securelist.com/the-penquin-turla-2/67962/.

[18] *The Epic Turla Operation*, *supra* note 16.

[19] GReAT, *BlackEnergy APT Attacks in Ukraine employ spear phishing with Word documents*, SECURELIST (Jan. 28, 2016), https://securelist.com/blackenergy-apt-attacks-in-ukraine-employ-spearphishing-with-word-documents/73440/. *See generally* https://securelist.com/?s=black+energy.

[20] Alexander Gostev, *Agent.btz: a Source of Inspiration?*, SECURELIST (Mar. 12, 2014), https://securelist.com/agent-btz-a-source-of-inspiration/58551/.

[21] GReAT, *The TeamSpy Crew Attacks – Abusing TeamViewer for Cyberespionage*, SECURELIST (Mar. 20, 2013), https://securelist.com/the-teamspy-crew-attacks-abusing-teamviewer-for-cyberespionage-8/35520/.

[22] GreAT, *Sofacy APT hits high profile targets with updated toolset*, SECURELIST (Dec. 4, 2015), https://securelist.com/sofacy-apt-hits-high-profile-targets-with-updated-toolset/72924/.

[23] Kurt Baumgartner and Costin Raiu, *The CozyDuke APT*, SECURELIST (Apr. 21, 2015), https://securelist.com/the-cozyduke-apt/69731/.

AR0650

Kaspersky has dubbed this philosophy "security without borders,"[24] which is consistent with the broad consensus on the need to develop international standards to govern nation-state conduct in cyberspace.

To this end, Kaspersky Lab works closely with IT security vendors, including those in the U.S., routinely taking part in joint cyberthreat investigations with such companies as Adobe,[25] Novetta,[26] AlienVault Labs,[27] Dell Secureworks,[28] Crowdstrike,[29] Honeynet Project,[30] OpenDNS Security Research Team,[31] GoDaddy Network Abuse Department,[32] Seculert,[33] SurfNET,[34] Microsoft,[35] Kyrus Tech Inc.,[36] and others.

Protecting against cyber criminals is a mission that is shared between Kaspersky Lab and many law enforcement authorities. As such, Kaspersky Lab does, from time to time, have cause to interact with law enforcement.

The Company routinely collaborates with local, regional, and international law enforcement agencies, along with the global IT security community, to fight cybercrime. Key partners include, but are not limited to, INTERPOL,[37] Europol, Microsoft Digital Crimes Unit, the National High Tech Crime Unit ("NHTCU") of the Netherlands' Police Agency, CyberSecurity Malaysia, and the City of London Police, as well as Computer Emergency Response Teams ("CERT"'s) worldwide. Kaspersky Lab works closely with these organizations, providing technical expertise and forensic analysis of malicious programs, during investigations and in compliance with court orders.

---

[24] *See* Eugene Kaspersky, *Security Without Borders*, FORBES, Mar. 18, 2015, https://www.forbes.com/sites/eugenekaspersky/2015/03/18/security-without-borders/#68b70d8010d6, and Eugene Kaspersky, A Digital Geneva Convention? A Great Idea., FORBES, Feb. 15, 2017, https://www.forbes.com/sites/eugenekaspersky/2017/02/15/a-digital-geneva-convention-a-great-idea/#24c682f51e6e.

[25] GReAT, *BlackOasis APT and new targeted attacks leveraging zero-day exploit*, SECURELIST (Oct. 16, 2017), https://securelist.com/blackoasis-apt-and-new-targeted-attacks-leveraging-zero-day-exploit/82732/.

[26] Kaspersky Lab, *Kaspersky Lab helps to disrupt the activity of the Lazarus Group responsible for multiple devastating cyber-attacks* (Feb. 25, 2016), https://www.kaspersky.com/about/press-releases/2016_kaspersky-lab-helps-to-disrupt-the-activity-of-the-lazarus-group-responsible-for-multiple-devastating-cyber-attacks.

[27] *Id.*

[28] Kaspersky Lab, *How Kaspersky Lab and CrowdStrike Dismantled the Second Hlux/Kelihos Botnet: Success Story* (Mar. 28, 2012), http://newsroom.kaspersky.eu/en/texts/detail/article/how-kaspersky-lab-and-crowdstrike-dismantled-the-second-hluxkelihos-botnet-success-story/.

[29] *Id.*

[30] *Id.*

[31] Kaspersky Lab, *Kaspersky Lab Experts Provide In-Depth Analysis of Flame's C&C Infrastructure* (June 3, 2012), https://usa.kaspersky.com/about/press-releases/2012_kaspersky-lab-experts-provide-in-depth-analysis-of-flame-s-c-c-infrastructure.

[32] *Id.*

[33] Kaspersky Lab, *Kaspersky Lab and Seculert Announce 'Madi,' a Newly Discovered Cyber-Espionage Campaign in the Middle East* (July 17, 2012), https://me-en.kaspersky.com/about/press-releases/2012_kaspersky-lab-and-seculert-announce--madi--a-newly-discovered-cyber-espionage-campaign-in-the-middle-east.

[34] Kaspersky Lab, *Kaspersky Lab, Kyrus Tech and Microsoft Disable the Hlux/Kelihos Botnet* (Sept. 30, 2011), http://newsroom.kaspersky.eu/en/texts/detail/article/kaspersky-lab-kyrus-tech-and-microsoft-disable-the-hluxkelihos-botnet/?no_cache=1&cHash=f0887050ffe60599c57cf0073b860dec.

[35] *Id.*

[36] *Id.*

[37] *See*, for example, *infra* note 174.

5

AR0651

Kaspersky Lab has worked with the National Security Agency ("NSA"), DHS U.S. Computer Emergency Readiness Team ("US-CERT") and Industrial Control Systems Cyber Emergency Response Team ("ICS-CERT"), Department of State, and other key elements of the U.S. Government involved in protecting U.S. cyberspace.

In particular Kaspersky Lab and its staff and management have:

- briefed DHS officials on findings related to cyberthreats, often before they were made public, in addition to sharing vulnerability research with US-CERT and ICS-CERT;

- communicated with NSA regarding threats found;

- briefed relevant Congressional and Senate Committees of jurisdiction (including the Committee on Homeland Security, the Committee on Homeland Security and Governmental Affairs, the Permanent Select Committee on Intelligence, the Select Committee on Intelligence, the State Department's Bureau of Diplomatic Security, and others); and

- participated in Congressional staff briefings on ransomware.

In 2016, Kaspersky Lab assisted in Russia's largest cybercriminal investigation and ultimate arrest of hackers known as the "Lurk Gang" who stole $45 million from banks, other financial institutions, and businesses.[38] Kaspersky was also instrumental in identifying and pursuing the "Carbanak cybercrime gang," which targeted dozens of global financial institutions, stealing a total of $1 billion.[39]

### b. Global Recognition by its Peers

Kaspersky Lab has been consistently recognized in the industry and by its peers as a premier organization in the fight against malware and cyber crime. Kaspersky Lab products consistently rank in the top tier of anti-virus products.[40] In 2016, Kaspersky Lab products participated in 78 independent tests & reviews – and was awarded 55 first places and 70 top-three finishes.[41] Kaspersky Lab consistently ranks among the world's top four vendors of security solutions for endpoint users.[42]

The origin of its sales and revenue, both closely tied to its neutrality, alongside these examples of Kaspersky Lab's commitment to protecting its users from cyberthreats and

---

[38] *See* Kaspersky Lab, *Kaspersky Lab Assists in Russia's Largest Cybercriminal Arrest: The Hackers Who Stole $45 Million* (June 1, 2016)*,* https://usa.kaspersky.com/about/press-releases/2016_kaspersky-lab-assists-in-russia-s-largest-cybercriminal-arrest-the-hackers-who-stole--45-million.

[39] *See* New York Times, *Bank Hackers Steal Millions via Malware* (February 14, 2015) https://www.nytimes.com/2015/02/15/world/bank-hackers-steal-millions-via-malware.html and Kaspersky Lab, *The greatest heist of the century: hackers stole $1 bln* (February 16, 2015), https://www.kaspersky.com/blog/billion-dollar-apt-carbanak/7519/.

[40] *See* BRG Assessment, *infra* note 55, at 32.

[41] Kaspersky Lab, *Most Tested. Most Awarded. Kaspersky Lab Protection*, https://usa.kaspersky.com/top3 (last visited Nov. 6, 2017).

[42] Frank Dickson, Robert Westervelt, and Maureen Kelledy, *Worldwide Endpoint Security Market Shares, 2016: Competition Gets Fierce, # US42553717*, INTERNATIONAL DATA CORPORATION, May 2017, https://www.idc.com/getdoc.jsp?containerId=US42553717.

6

preventing cybercrime, run contrary to any suggestion that the Company would engage in the activities alleged and speculated upon in the press articles forming the basis of DHS's conclusions reflected in the BOD.

### c. Corporate Structure

Like many international companies, Kaspersky Lab has a multi-national operating company structure with regional holding companies ultimately deriving up to Kaspersky Labs Limited ("KLL"), a U.K. company. The co-founder and current Chief Executive Officer of Kaspersky Lab, Eugene Kaspersky, personally holds over 80 percent of KLL's stock in the U.K. The remainder of KLL stock is held by individuals, principally those who trace their stock ownership back to the early days of the Company when they were granted a share in its ownership. Currently, there are no outside corporate investors.

Kaspersky Lab has its global headquarters in Moscow, operating through the Russian corporation, AO Kaspersky Lab. AO Kaspersky Lab is 100 percent owned by KLL through the Russian corporation, OOO Kaspersky Group. In addition to its global headquarters, Kaspersky Lab has five regional headquarters managing the company's sales and operations across six continents, including in its North American HQ (Woburn, MA), Latin American HQ (São Paolo, Brazil), European HQ (London, U.K.), Middle East, Turkey & Africa HQ (Dubai, UAE), and Asia-Pacific HQ (Singapore).

Founded in 2004, Kaspersky Lab, Inc. is a Massachusetts corporation and is a directly wholly-owned subsidiary of KLL. There are no Russian companies in the ownership structure of Kaspersky Lab, Inc., which employs nearly 300 people in the U.S. The Company's North American sales and operations are driven through Kaspersky Lab, Inc., which has invested over half a billion dollars in the Company's operations over the last twelve years, and over $65 million in 2016 alone. The U.S. has been and remains one of the most significant geographic markets in Kaspersky Lab's global business, with Kaspersky Lab sales to customers in the United States representing approximately one quarter of total global bookings in 2016.

### d. Kaspersky Lab's Sales to U.S. Government

All Kaspersky Lab U.S. operations and sales are driven through Kaspersky Lab, Inc., with its North American headquarters in Woburn, Massachusetts. Consistent with the practice of most software companies, Kaspersky Lab operates a two-tier channel sales model by which it sells Kaspersky Lab products to customers through distributors and resellers. Kaspersky Lab has no visibility into the terms of any sales that its resellers may make to federal agencies.[43]

Through an analysis of sales data, Kaspersky Lab has identified active licenses held by federal agencies with a total value (to Kaspersky Lab) of less than USD $54,000. More than half of these U.S. Government customer sales (in terms of dollar value) were booked before 2017 and are continuing multi-year licenses. The total value of these licenses held by the U.S.

---

[43] For sales tracking purposes (i.e. to calculate revenue due from its distributors), Kaspersky Lab tracks customer sales volumes and active licenses through its Salesforce Customer Relationship Management system. Although Kaspersky does identify customers by industry (including identifying government customers), it does not specifically identify Federal Government Customers distinct, for example, from state and local government entities.

7

AR0653

Government represents a tiny fraction (0.03 percent) of Kaspersky Lab's annual revenue in the U.S.[44]

In summary, Kaspersky Lab has never specifically sought out federal government agencies as software customers, has always relied on the sales channel to identify and pursue sales leads in both the private and public sector, and works to enable its partners to realize each and every sales opportunity regardless of its target.

As a result, Kaspersky Lab has a very limited customer base within the U.S. Government. It is common that a potential customer, whether governmental or private, will receive several quotes for similar product offerings from a variety of security vendors, and the customer will make its decision to procure one product over another for a variety of reasons, including price terms, reputation, system compatibility, and integration with other solutions the customer may have. From information provided by the partners making the relevant sales, we understand that some U.S. Government customers have actively sought out Kaspersky Lab products because of their renowned anti-malware capabilities,[45] while others have specifically approached resellers for solutions due to Kaspersky Lab's legacy platform support. For instance, Kaspersky Lab protects older operating systems, such as Windows XP, for which other cybersecurity vendors have ceased providing support.

Kaspersky Lab incorporated and launched Kaspersky Government Security Solutions Inc. ("KGSS"), a subsidiary of Kaspersky Lab, Inc., in May 2014. From its inception, KGSS focused on delivering cyberthreat intelligence and data feeds[46] (similar to the Kaspersky Threat Intelligence product expressly excluded from the scope of the BOD). Following its establishment, KGSS undertook a number of marketing initiatives including holding an annual Government Cybersecurity Forum in Washington, D.C. in 2014 and 2015. Despite these efforts, KGSS never made any sales of Kaspersky Lab products or services to the U.S. Government.

By early summer 2017, KGSS' sales and marketing efforts to the U.S. Government were discontinued. Prior to then, business plans had been developed (with no relation to KGSS's business model and product offerings at the time) to monetize Kaspersky Lab's cyberthreat intelligence blog (threatpost.com), and a decision was made to incorporate an additional legal entity in the U.S. in order to manage the business development and operations of the Threatpost blog. In the interest of operational efficiency, rather than incorporating a new U.S. company to take on the Threatpost project, it was decided that the corporation, then known as KGSS, simply be renamed to Threatpost, Inc. such that the already incorporated U.S. legal entity be repurposed in line with the new business plans. In July 2017, KGSS was renamed Threatpost, Inc., which manifests a completely new business model, unrelated to any of KGSS' previous activities.

## IV.   OVERVIEW OF KASPERSKY LAB PRODUCTS SUBJECT TO THE BOD

Kaspersky Lab tracks more than 100 advanced persistent threat actors and operations and has a broad portfolio of products that encompass solutions to suit a wide range of customers.

---

[44] This figure is based on the Company's 2016 net booking data.

[45] *See* discussion *infra* at Section.III.b)

[46] *See* Exhibit A, KGSS Cyber Threat Intelligence Product Catalogue from August 2016.

8

Kaspersky Lab protects home users, enterprises of all sizes, government customers, and others from hugely dynamic cyberthreats through its cost competitive products that allow customers to control and manage their security. For complex corporate, enterprise, and government customers, Kaspersky Lab offers an assortment of solutions and services that secure every node in the network, including mobile and portable devices, data centers, and industrial environments as a whole.

Kaspersky Lab is now, and has always been, ready, willing, and able to provide DHS with any and all further technical data to allow DHS to independently assess the functionality of these products and their integrity. For the reasons explained below, DHS should provide (and should have already provided) Kaspersky Lab with the opportunity to address DHS's concerns and whether they might be mitigated prior to harming Kaspersky Lab's existing property, liberty, and reputational interests.

DHS lists the following Kaspersky Lab products subject to the BOD:[47]

- Kaspersky Anti-Virus;
- Kaspersky Internet Security;
- Kaspersky Total Security;
- Kaspersky Small Office Security;
- Kaspersky Anti Targeted Attack;
- Kaspersky Endpoint Security;
- Kaspersky Cloud Security (Enterprise);
- Kaspersky Cybersecurity Services;
- Kaspersky Private Security Network; and
- Kaspersky Embedded Systems Security.

Kaspersky Lab has not been made aware of how or under what criteria DHS evaluated and compiled this product list, though it appears to have been from a cursory review of the Company's website rather than any substantive review or technical assessment of the individual products.[48] What is clear is that neither this list (nor the inconsistent list contained in the DHS Memorandum),[49] is an accurate rendering of Kaspersky Lab products. For example, neither "Kaspersky Cloud Security (Enterprise)" nor "Kaspersky Cybersecurity Services" represent discrete product offerings the Company makes available. This demonstrates a lack of awareness and understanding of the Kaspersky Lab product portfolio and therefore, we assume also the functionality of many of those products.

Kaspersky Lab does welcome the acknowledgement that Kaspersky Threat Intelligence[50] and Kaspersky Security Training[51] are services of a different category to its anti-virus offerings and therefore have been excluded from the scope of the BOD. However, by including "Kaspersky Cybersecurity Services" on the list of products and services subject to the BOD, which is not a discrete product in its own right, DHS has simultaneously prohibited the

---

[47] BOD, *supra* note 1, at 2.
[48] DHS Memorandum, *supra* note 3, at 5 ("Based on a review of Kaspersky's website, all of the following software products or solutions named in the BOD are or contain anti-virus software.")
[49] DHS Memorandum, *supra* note 3, at 5.
[50] Kaspersky Threat Intelligence is a subscription-based periodic cyberthreat intelligence publication.
[51] Kaspersky Security Training is a cyber security training program.

AR0655

procurement of these services since both (and others) could be considered to fall under the umbrella description of "Cybersecurity Services."

The BOD also applies to any other information security product or solution not explicitly named in the BOD, which is supplied, directly or indirectly, by any Kaspersky Lab entity as well as to all cybersecurity services supplied, directly or indirectly, by Kaspersky Lab, including Threat Hunting, Incident Response, and Security Assessment. As noted above, DHS alleges that "Cybersecurity Services" also supplied by Kaspersky Lab presents various information security risks, even if the services do not involve installation of anti-virus software.

DHS's allegations are conclusory and rely solely on a general statement in the Information Security Risk Assessment, prepared by DHS National Cybersecurity and Communications Integrations Center ("NCCIC"), dated August 29, 2017, (the "NCCIC Assessment")[52] that "any service that involves direct or indirect access to a computer or network, such as through installation of endpoint software to conduct a 'hunt' or incident response, or through other abilities to influence information security practices on a network, presents information security risks."[53] A conclusory allegation that Kaspersky Lab services present the same information security risks as "any service that involves direct or indirect access to a computer or network" is anything but a sufficient basis for a comprehensive ban on all Kaspersky Lab branded products and services.[54]

In order to address the concerns raised in the BOD regarding the capabilities and alleged vulnerabilities of Kaspersky Lab's products, Baker McKenzie retained cybersecurity professionals at BRG to:

- review the methodology employed by DHS in its issuance of the BOD, which concluded that Kaspersky-branded products, in particular, represent an information security risk to federal information systems; and

- provide an independent expert review and assessment of any technical information security risks described in the BOD or its supporting materials related to Kaspersky-branded products or other anti-virus software products in general.

Attached hereto as Exhibit B are the results of BRG's independent review, titled "Information Security Risks of Anti-Virus Software" (the "BRG Assessment")[55] and the findings of BRG's Assessment are further described at Section V. below.

## V.   BRG INDEPENDENT TECHNICAL ASSESSMENT OF KASPERSKY LAB AND COMPETITOR PRODUCTS

The risks that Kaspersky Lab products present to the U.S. Government as alleged in the NCCIC Assessment are broadly categorized as follows:[56]

---

[52] DHS Memorandum, *supra* note 3, at Exhibit 1.

[53] DHS Memorandum, *supra* note 3, at 7.

[54] *Id.*

[55] *See* Exhibit B, Berkeley Research Group, *Information Security Risks of Anti-Virus Software: Independent Review of DHS 17-01* (Nov. 10, 2017) [hereinafter BRG Assessment].

AR0656

- anti-virus software products generally operate with the highest level of system privileges and could theoretically be co-opted by the anti-virus software vendor or other malicious parties (e.g. via exploitation of a software vulnerability) into performing unintended actions of the user's computer (e.g. data exfiltration);

- anti-virus software products often intercept encrypted HTTPS traffic on the user's computer for the purposes of identifying or preventing malicious network traffic, which defeats the intended purpose of HTTPS;

- any software that receives unencrypted updates over the network could be hijacked or otherwise tampered with in order to deliver malicious code to the user's computer; and

- anti-virus software vendors, in particular, could withhold legitimate software or anti-virus signature updates in order to intentionally prevent detection of malicious software.

Each area of concern is considered below.

### a. DHS Fails to Identify any Technical Information Security Vulnerability Specific to Kaspersky-Branded Products

The BRG Assessment notes that DHS presented no evidence to demonstrate (i) that NCCIC performed a technical analysis of Kaspersky Lab products, or (ii) that Kaspersky Lab products (or any other commercial off-the-shelf ("COTS") anti-virus product) have been subjected to (or leveraged for) any of the above-stated risks.[57]

Among other things, BRG analyzed data from USASpending.gov, a website that aggregates federal government contract data and found references to federal government anti-virus software product purchases from approximately 30 different developers over the past 10 years.[58] Based on this data, BRG selected anti-virus products from six other vendors to review: Symantec, McAfee, Trend Micro, Avast, AVG, and ESET.[59]

BRG conducted a search of publicly reported vulnerabilities to determine whether these products may be (or have been) exploitable by malicious actors.[60] In the past five years, security researchers have identified numerous vulnerabilities in software developed by each of the vendors listed above. In addition, BRG's review identified several instances in which hackers have been able to compromise some of the anti-virus companies themselves.

Although most of the publicly-disclosed vulnerabilities were reported by security researchers, it is reasonable to infer that sophisticated state-sponsored actors with substantial resources

---

[56] DHS Memorandum, *supra* note 3, at 5-6.

[57] *See* BRG Assessment, *supra* note 55, at 6.

[58] *See* BRG Assessment, *supra* note 55, at 9-10. Despite the information security concerns identified by DHS in the BOD, BRG concluded that the U.S. Government does not have a consistent approach to the identification, evaluation, procurement, and deployment of anti-virus software across its various departments and agencies.

[59] *See* BRG Assessment, *supra* note 55, at 10.

[60] *See* BRG Assessment, *supra* note 55, at 11.

AR0657

would have the same ability to identify and exploit similar vulnerabilities in any anti-virus software product.

BRG concluded that neither the NCCIC Assessment nor the DHS Memorandum provide any technical evidence to indicate that any Kaspersky Lab product represents "either a greater or lesser technical risk to federal information systems than similar anti-virus software products or vendors."[61] Rather BRG, through its own work, concluded that other anti-virus software products are just as vulnerable to exploitation by malicious cyber actors as DHS alleges is the case for Kaspersky-branded software products.[62]

DHS has not, however, issued a similar ban on the use of any of these other products within government networks or information systems.

### b. Potential Software Vulnerabilities Are Not Limited To Anti-Virus Products

In addition to anti-virus products, there are other applications commonly found on federal information systems that are vulnerable to security risks, which could equally result in the execution of arbitrary code or commands on a victim's computer.[63] Examples of these applications include: web browsers, Microsoft Office products, and the Microsoft Windows operating system. In addition, even "enterprise-level hardware products responsible for enforcing the security of a network have been found to contain vulnerabilities that can be leveraged by a malicious actor to gain unauthorized access to data or systems."[64]

If one were to accept DHS's conclusion that a particular software product or vendor should be banned because of its presumed susceptibility to exploitation by a malicious actor, that same conclusion should reasonably be extended to other software products beyond anti-virus software or other vendors besides Kaspersky Lab.[65]

### c. Kaspersky Lab's Data Collection Practices are Similar to Other Manufacturers of Off the Shelf Anti-Virus Products Used by the U.S. Government

The only alleged information security risk identified in the DHS Memorandum and the NCCIC Assessment that could be unique to Kaspersky Lab (as opposed to broadly describing COTS anti-virus functionality) relates to customer participation in the Kaspersky Security Network ("KSN")."[66]

However, instead of conducting a technical analysis of the operation of KSN, DHS focuses on the terms and conditions set forth in the KSN "Statement for Kaspersky Endpoint Security 10 for Windows" (the "KSN Statement").[67]

---

[61] *See* BRG Assessment, *supra* note 55, at 6.

[62] *See* BRG Assessment, *supra* note 55, at 12.

[63] *See* BRG Assessment, *supra* note 55, at 7.

[64] *See* BRG Assessment, *supra* note 55, at 7.

[65] *See* BRG Assessment, *supra* note 55, at 7.

[66] DHS Memorandum, *supra* note 3, at 6.

[67] DHS Memorandum, *supra* note 3, at 7, fn. 18.

12

AR0658

In particular, if an end-user chooses to participate in KSN, the KSN Statement includes terms that could permit Kaspersky Lab to collect files or other information from a user's device and upload it to the KSN. However, the KSN is not alone in transferring the type of data enumerated above; many other anti-virus software vendors maintain their own networks for providing malware signature updates to users and collecting samples of suspected malware.

BRG reviewed the End User License Agreement ("EULAs") and/or Privacy Policy documents for the six additional anti-virus products listed above that are used by the U.S. Government: Symantec, McAfee, Trend Micro, Avast, AVG, and ESET.[68]

BRG found that nearly every anti-virus product or vendor includes similar or, in some cases (e.g. McAfee), broader allowances for data collection compared to the KSN Statement cited in the DHS Memorandum as an information security risk.[69] Based on this review, BRG concluded that this particular information security risk is not, in fact, unique to Kaspersky Lab and its KSN Statement. Indeed, the number of other anti-virus software providers transferring similar data from its users demonstrates the ubiquity of this practice and shows how Kaspersky Lab, alongside other anti-virus software providers, is following industry practice in user data collection.

For example, similar to how KSN users agree to provide whole files or parts of files that could be exploited by intruders to harm a user's computer, McAfee,[70] Avast CommunityIQ,[71] ESET,[72] TrendMicro,[73] AVG,[74] and Norton Security[75] users also agree to provide files that

---

[68] *See* BRG Assessment, *supra* note 55, at 16-20.

[69] *See* BRG Assessment, *supra* note 55, at 16.

[70] "McAfee Privacy Notice." Privacy & Legal Terms, McAfee, LLC, 4 Apr. 2017, www mcafee.com/consumer/en-us/policy/global/legal html. ("The following are examples of the type of Usage Data that may be collected by McAfee from your web browser or related to your interactions with our products and services:… Data about files and communications, such as potential malware or spam (which may include computer files…).

[71] "Avast Privacy and Information Security Policy." Avast Privacy Policy, AVAST Software S r.o., www.avast.com/en-us/privacy-policy ("Data acquired by Avast CommunityIQ is used to update our databases of viruses and infected websites, and for other statistical purposes, and may include: Information and files (including executable files) on your computer identified by the Avast software as potentially infected, together with the information about the nature of identified threats.")

[72] "Software End User License Agreement." ESET, ESET Spol. s R.o., www.eset.com/us/software-eula/. ("The Software contains a function which collects samples of new viruses and other similar malicious programs and suspicious or problematic files (hereinafter referred to as "Infiltrations") and then sends them to the Provider, along with information about the computer and/or the platform on which the Software is installed (hereinafter referred to as "Information")…The Information may contain data (including randomly or accidentally obtained personal data) about the End User and/or other users of the computer on which the Software is installed, information about the computer, the operating system and programs installed, files from the computer on which the Software is installed and files affected by an Infiltration and details about such files.")

[73] "Privacy Notice for Trend Micro Products and Services (Effective Jan. 2017)." Trend Micro, Trend Micro Incorporated, Jan. 2017, www.trendmicro.com/en us/about/legal/privacy-policy-product html. (Providing these types of information and data enables you to participate, share and leverage Trend Micro's global database of threat related intelligence to rapidly identify and defend against potential threats within your unique network environment, as described in more detail below:… detected malicious file information and detected malicious network connection information.")

[74] "Privacy Policy | We Are Serious about Your Privacy | AVG." AVG.com, AVG Technologies, 23 Mar. 2017, www.avg.com/en-us/privacy. ("We collect non-personal data to improve our products and services, including: data concerning potential malware threats to your device and the target of those threats, including copies of files or emails marked as potential malware…")

13

AR0659

are identified as potential malware and could be exploited by intruders to harm the user's computer.

### d. Use of the KSN Network is Optional

KSN is an automated cloud-enabled system that processes depersonalized cybersecurity-related data streamed from millions of voluntary participants around the world. Kaspersky Lab uses this data to identify emerging threats more quickly and precisely to develop and implement new protection measures as quickly as possible. For example, the data that Kaspersky Lab processes is crucial for identifying new and as yet unknown threats – such as WannaCry and ExPetr. All data transferred via the KSN is aggregated and anonymous; Kaspersky Lab does not attribute data to identified individuals. In addition, all data processed and/or transferred is robustly secured through encryption, digital certificates, segregated storage, and strict data access policies.

As noted by DHS, a customer's participation in the KSN program is entirely voluntary. If a customer does not wish to participate, the terms of the KSN Statement would not apply but nonetheless a small amount of data is shared as it is essential for the product to function properly. This data is used to verify the legitimacy of the products, send database updates, and keep them operational.

As detailed on the Kaspersky Lab website, "users of Kaspersky Lab products can reduce the amount of data processed from their protected devices to the absolute minimum."[76] In addition, the EULA for Kaspersky Anti-virus provides as follows:

> In order to identify new information security threats and their sources, enhance the operational protection of Users of the Software, and improve the quality of the product, You agree to automatically provide Kaspersky Lab with information specified in the Terms of Use of Kaspersky Security Network…You can activate and deactivate the Kaspersky Security Network service at any time in the Software settings window.[77]

Accordingly, the EULA for Kaspersky Anti-virus does not allow for the collection of files without the KSN enabled. In its Assessment, BRG noted that EULA terms are consistent with internal software documentation provided to BRG by Kaspersky Lab for review.[78]

---

[75] "Norton License Agreement." Norton Security / Norton Security with Backup, Symantec Corporation, www.symantec.com/content/en/us/home_homeoffice/media/eula/NS_2.0_EULA_USE.pdf ("From time to time, the Software and Services may collect certain information, including personally identifiable information, from the Device on which it is installed, which may include: Executable files and files that contain executable content that are identified as potential malware, including information on the actions taken by such files at the time of installation. These files are submitted to Symantec using the Software and Service's automatic submission function.")

[76] Kaspersky Lab, *Principles for the processing of user data by Kaspersky Lab security solutions and technologies,* https://www.kaspersky.com/about/data-protection (last visited Nov. 6, 2017).

[77] Kaspersky Lab, *Kaspersky Anti-Virus 2013: End User License Agreement for Kaspersky Anti-Virus* (Mar. 19, 2013), https://support.kaspersky.com/8752.

[78] *See* BRG Assessment, *supra* note 55, at 17.

14

As such, government users (as all users) have the option to disable KSN and would be an option to mitigate some of the concerns raised by the DHS. This does not appear to have been fully considered in the BOD or the DHS Memorandum.

### e. Kaspersky Private Security Network

Business and government users may choose to install a local and Kaspersky Private Security Network, which allows them to obtain the advantages of cloud protection without any data leaving the user's facility.

However, the NCCIC Assessment states that this too presents a security risk by alleging that it "still does not address threats posed by the software itself as an on-premise solution" because users are required to update the on-premise software with updates provided by the software manufacturer.[79] However, DHS's allegations are purely theoretical, speculative, and conclusory.

Further, the concerns raised by DHS are present with any anti-virus solution and fail to give proper consideration to how any reasonable security risks with any anti-virus product could be mitigated. Should an anti-virus software developer intentionally withhold certain malware signatures from the U.S. Government in order to prevent detection of specific malicious software, then such a risk could be mitigated by following the guidelines published by the U.S. National Institute of Standards and Technology ("NIST") in 2013, wherein NIST recommended that this particular vulnerability could be mitigated by multiple layers of anti-virus protection at the host and network level.[80]

## VI. RUSSIA AND KASPERSKY LAB'S GLOBAL FOOTPRINT

As a private company, Kaspersky Lab does not have inappropriate ties to any government, and the Company has never helped, and has repeatedly stated it *will never* help any government in the world with cyberespionage efforts.[81] For 20 years, Kaspersky Lab has focused on protecting consumers and organizations from cyberthreats. The location of its headquarters does not change that core mission.

### a. Kaspersky Lab is Not an Arm of the Russian Government; It is a Successful Multi-National Private Enterprise

The DHS Memorandum has singled out Kaspersky Lab, not because of issues that are specific to Kaspersky Lab products and services, but simply because it is a company headquartered in Russia. In the absence of any evidence of improper coordination between Kaspersky Lab and the Russian Government in furtherance of demonstrable illicit activities, it is improper for DHS to speculate that cybersecurity risks are presented by Kaspersky Lab products merely by virtue of the fact that the Company is headquartered in Moscow.

---

[79] *See* DHS Memorandum, *supra* note 3, at Exhibit 1.

[80] *See* BRG Assessment, *supra* note 55, at 35 (citing http://nvlpubs nist.gov/nistpubs/SpecialPublications/NIST.SP.800-83r1.pdf).

[81] *See* e.g. *Richard Engel Interview with Eugene Kaspersky*, MSNBC, July 28, 2017, http://www msnbc.com/rachel-maddow/watch/russian-kaspersky-labs-faces-new-scrutiny-suspicion-1012640835507 at 15:18.

15

AR0661

As noted previously, all group companies (including Kaspersky Lab, Inc.) roll up to the U.K. holding company KLL, without Russian corporate ownership. DHS's stated concern that the Russian Government engages in cyberespionage is not evidence that any, or all, global companies headquartered, or with operations, in Russia pose the same threat or are necessarily facilitating government sponsored cyber-intrusions.

In excess of 85 percent of Kaspersky Lab's revenue comes from outside of Russia and, therefore, working inappropriately with the Russian Government would clearly be detrimental to the Company's bottom line. Kaspersky Lab has a powerful economic incentive to never take any action that would endanger the trusted relationships and integrity that serve as the foundation of its business by conducting inappropriate or unethical activities with any organization or country.

Rather, Kaspersky Lab's commercial and business rationale dictates that it should do everything in its power to resist and defend against all known cyberthreats and malicious cyber actors regardless of their location origin or allegiance. This is exactly the approach that Kaspersky Lab takes.[82]

Kaspersky Lab's U.S. Government business represents a tiny fraction of its U.S., much less its global, business and software footprint.[83] If DHS is concerned that the Russian Government (or any malicious cyber actor), intended to seek sensitive U.S. Government information, there would be far more direct, targeted, and effective mechanisms for them to do so. It would be much more effective, for example, for a malicious cyber actor to target and compromise a company with a larger footprint across U.S. Government and cyber defense infrastructure. As BRG concluded, other anti-virus software products, including Symantec and McAfee, are likely as vulnerable to exploitation by malicious cyber actors as DHS alleges is the case for Kaspersky-branded software products and have a much larger footprint across federal Government systems.[84]

### b. Kaspersky Lab Management

The DHS Memorandum alleges that Kaspersky Lab Chief Executive Officer Eugene Kaspersky, Chief Legal Officer Igor Chekunov, and Chief Operating Officer Andrey Tikhonov have "ties" with the Russian Government and highlights, among other things, their former service within the Russian Government and/or military and their current profiles and connections.

Each of these individuals grew up in the Soviet Union at a time when the Government relied heavily on conscripted service. As such, allegations of this kind could be made against the majority of Russians of the same generation. These facts do not indicate that their connections or service with the Russian Government were, or are, inappropriate or that they have continued to this day.

Similarly, today, each of these individuals has found great success through Kaspersky Lab and other commercial endeavors. Given their profile, it is hardly surprising that in Russia (as

---

[82] *See* discussion *infra* at Section III.a.

[83] *See* discussion *infra* at Section III (d).

[84] *See* BRG Assessment, *supra* note 55, at 11.

16

AR0662

in the U.S.) such individuals might have acquaintances, friends, and professional relationships within the government. That in itself is not indicative that any such relationship is improper, or would cause Kaspersky Lab employees or management to betray their obligations to the Company, its fundamental philosophy, or its users, to whom each has dedicated a substantial part of their working lives.

Among other things, DHS relies on a newspaper article that states that Kaspersky Lab's then Chief Business Officer, Garry Kondakov, circulated an email saying that the "company's highest positions" would be held only by Russians.[85] Kaspersky Lab has no such policy, but given that its headquarters is in Russia, the majority of the Company's senior management do clearly happen to be located there.

### i. Eugene Kaspersky

Eugene Kaspersky has been the CEO of Kaspersky Lab since 2007. Prior to 2007 Eugene held various titles at the company including, *"Director of Innovation Technologies," "Senior Antivirus Expert,"* and *"Head of Division."*

During the Soviet era, every educational opportunity was endorsed by the government in some manner. After graduating from a prestigious high school with a focus in mathematics, Eugene then studied cryptography at a university overseen by four state institutions, one of which was the KGB, the Soviet intelligence service which was dissolved and reorganized in 1991. After graduating in 1987, Eugene performed his mandatory military service at a Ministry of Defense scientific institute, where he served as a software engineer. Serving as a software engineer was the extent of his military experience, and he never worked for the KGB.

In 1991, the year the Soviet Union dissolved, Eugene left the research institute and formed a small anti-virus division at an emerging commercial company. A few years later, he and a small group of associates founded Kaspersky Lab in 1997.

### ii. Igor Chekunov

Igor Chekunov joined Kaspersky Lab in 2000 as the group Chief Legal Officer. Igor graduated from the Institute of Economics and Law in Moscow and has a Ph.D. in Law from the Moscow University of the Ministry of Internal Affairs of the Russian Federation, where he also currently teaches in the law department on subjects such as criminal law and procedure, criminology and cybercrime forensics.

Prior to joining Kaspersky Lab, Igor held a number of civilian positions in the legal departments of the Russian Ministries of Industry, Oil and Energy, and Transport. Igor's last position in the government was as head of the legal department at the Ministry of Transport of the Russian Federation, which is analogous to the U.S. Department of Transportation.

As a young man, Igor was required to serve in the Border Service in the Soviet Union, fulfilling his obligatory military service for two years between 1984 and 1986. At that time, the Border Service was under the remit of the KGB. In the U.S. this would be equivalent to

---

[85] *See* DHS Memorandum, *supra* note 3, at Exhibit 26.

17

AR0663

working for Customs and Border Protection under DHS. After completing his compulsory service with the Border Service, Igor worked as a police officer.

Again this conscripted service, more than 30 years ago, has no relation to or bearing on Mr. Chekunov's current role as the Chief Legal Officer of a multinational commercial enterprise, Kaspersky Lab.

### iii. Andrey Tikhonov

Andrey Tikhonov was appointed Kaspersky Lab's Chief Operating Officer in January 2012. In his position, Andrey is responsible for the Company's global administrative functions.

Andrey graduated with distinction from a military academy in Kiev. He has been working in the IT industry since 1989, when he began his career in a research institute of Russian Ministry of Defence.

Prior to his current role, Andrey held a number of senior management positions at Kaspersky Lab. In March 2009, he was appointed Chief Information Officer after five years as the Company's Technical Director. Before that, Andrey was head of the Novell development department since 2002.

### c. Kaspersky Lab has a Limited Number of Government Customers in Russia, the U.S., and Around the Globe

As highlighted above,[86] Kaspersky Lab products and services lead the market in cyber security, anti-virus, and threat analysis. In addition to its many millions of private customers, government customers wishing to secure their own data and infrastructure turn to Kaspersky Lab products and services in the same way, and for the same reasons commercial and private customers do: Kaspersky Lab products' superior technical capabilities.

The DHS Memorandum cites news articles[87] discussing an alleged 2009 project in which Kaspersky Lab is said to have developed a defensive product to protect against disruptive denial of service security (DDoS) technology with or for the Russian Security Services. It is unclear how this allegation is relevant to the BOD and DHS's determination since anti-DDoS technology is defensive security software, not malware. Such an engagement if it were to be true, would be anything but inappropriate given Kaspersky Lab's technology and expertise. To be clear however, the Federal Security Service, also known by its Russian acronym FSB, is not currently, and never has been, a Kaspersky Lab DDoS Protection client. In the mid-to-late 2000's, Kaspersky Lab was already working on a commercial anti-DDoS offering and was engaging customers, prospects, and channel partners on this type of solution. In that context, the Russian Government's anti-cybercrime unit told the company that it considered DDoS attacks an emerging and serious threat. Since there was a strong market need, Kaspersky Lab invested in the research and development necessary to finish fully developing the solution and make it available commercially.

---

[86] *See* discussion *infra* at Section III.b.
[87] *See* DHS Memorandum, *supra* note 3, at Exhibit 20.

AR0664

### d. FSB Authority to Compel or Request Assistance from Companies in Russia

All companies represented in Russia have a general obligation to provide the FSB with such information as may be required by the FSB to perform its duties.[88] The FSB has defined duties enumerated by law, including:

- informing state authorities of security threats;
- detecting and preventing foreign intelligence activities;
- obtaining intelligence information in the interests of state security, increasing the state's economic, scientific, technical and defense capability;
- revealing and preventing violations and crimes;
- developing anti-bribery measures;
- providing for various types of security of the Russian Federation;
- developing and implementing measures to protect state secrets; and
- taking measures to protect the Russian state border.[89]

The FSB can request information from companies represented in Russia only in furtherance of the above-listed duties. If a company operating in Russia receives a request from the FSB for information, it must comply with such request. However, the FSB's powers in this regard are not unlimited, and FSB requests are subject to challenge in court.[90]

The authority of the FSB to compel or request assistance from companies in Russia, including any foreign company operating in Russia, applies regardless of the company's ownership structure, legal form, or business (as opposed, for example, to the specific obligations of Russian telecommunications providers and internet communications companies discussed below).

Similar laws exist in the U.S. to compel companies to hand over customer data and any other information. In fact, the U.S. Department of Justice has recently expressed a desire to expand its own powers in this regard to mandate technology companies to hand over encryption keys to law enforcement.[91]

---

[88] Federal Law of the Russian Federation No. 40-FZ "On Federal Security Service" dated April 3, 1995, as amended, Article 13(m).

[89] Federal Law of the Russian Federation No. 40-FZ "On Federal Security Service" dated April 3, 1995, as amended, Article 12.

[90] Article 46(2) of the Constitution of the Russian Federation ("Decisions and actions (or inaction) of bodies of state authority and local self-government, public associations and officials may be appealed against in court."). The FSB Law contains a similar rule with respect to FSB decisions. Federal Law of the Russian Federation No. 40-FZ "On Federal Security Service" dated April 3, 1995, as amended, Article 6.

[91] Del Quentin Wilber, *Justice Department to Be More Aggressive in Seeking Encrypted Data*, WALL ST. JOURNAL, Oct. 10, 2017, https://www.wsj.com/articles/justice-department-to-be-more-aggressive-in-seeking-encrypted-data-1507651438.

AR0665

### e.  FSB Licensing Regime

#### i.  Kaspersky Lab Requires Licenses from the FSB

One assertion relied upon in support of the BOD is that Kaspersky Lab has obtained certificates and licenses from the FSB, and that such receipt "suggest[s] an unusually close" relationship.[92]

To the contrary, there is simply nothing unusual about the licenses or certificates Kaspersky Lab has obtained from the FSB in the normal course of doing business in Russia. In fact, U.S.-based information technology companies involved in cryptography-related activities operating in Russia are required to obtain the same licenses and certificates from the FSB.

In Russia, the agency responsible for the issuance of domestic activity licenses for technology products with encryption functions and features ("encryption-based products") is a subdivision of the FSB called the Center for Licensing, Certification and Protection of State Secret Information (the "FSB Licensing Center"). The FSB Licensing Center issues local encryption licenses authorizing Russian legal entities to locally distribute encryption-based products, perform technical maintenance, service, and support of such products, as well as provide encryption-based services. U.S. companies engaged in the manufacture and distribution of such products and provision of relevant services typically establish Russian subsidiaries in order to promote local sales and provide relevant services and maintenance of their products to local customers. In order to comply with the licensing requirements, Russian subsidiaries of U.S. and other multi-national companies must have relevant internal activity licenses issued by the FSB.

Recognizing the role of the FSB in granting certificates for certain commercial products, the U.S. Department of the Treasury, Office of Foreign Asset Control ("OFAC") issued General License No. 1 under the Cyber Sanctions Executive Orders which expressly authorized: "[r]equesting, receiving, utilizing, paying for, or dealing in licenses, permits, certifications, or notifications issued or registered by the [FSB] for the importation, distribution, or use of information technology products in the Russian Federation."[93] These activities would otherwise have been prohibited due to the FSB's prior designation pursuant to Executive Order 13757.[94]

In fact, Kaspersky Lab obtains licenses and certifications from all the countries it operates in, including one from NIST, certifying the Company's encryption technologies for businesses as being fully compliant with the Federal Information Processing Standards 140-2.

---

[92] DHS Memorandum, *supra* note 3, at 9.

[93] Office of Foreign Assets Control, U.S. Dep't of Treasury, Cyber General License No. 1: Authorizing Certain Transactions with the Federal Security Service (Feb. 2, 2017), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/cyber_gl1.pdf.

[94] On December 29, 2016, President Obama issued Executive Order 13757 (amending Executive Order 13694,), and providing for the imposition of sanctions on individuals and entities responsible for "undermining election processes or institutions." Five entities, including the FSB, were accordingly added to OFAC's list of Specially Designated Nationals, https://www.treasury.gov/resource-center/sanctions/Programs/Documents/cyber2_eo.pdf.

20

ii. Military Unit Noted on Certain Kaspersky Lab Certificates Does Not
Indicate FSB or Military Affiliation

At Section III. D(1) of the DHS Memorandum, the DHS discusses at length two compliance certificates dated 2007 and 2011 issued to Kaspersky Lab. The 2007 certificate states that it is issued to "*military unit 43753 Kaspersky Lab Closed Joint Stock Company*", while the 2011 certificate is issued to "*Kaspersky Lab Closed Joint Stock Company, military unit 43753.*"

Based on a DHS review of translations of the certificates, the DHS Memorandum speculates that "[i]n both cases, this language in the certificates suggests that Kaspersky Lab either *is* military unit 43753 or *is part of* military unit 43753."[95] DHS further extrapolates, without firm basis, that these notations are somehow suggestive of concerning connections between Kaspersky Lab and the FSB.

This is not the case. Kaspersky Lab and military unit 43753 ("MU 43753") are two separate organizations with two separate registration numbers.

- Kaspersky Lab is a joint stock company registered under registration number 1027739867473.[96]

- MU 43753 (full name: Federal State Budget-Supported Institution "Military Unit 43753") is a state enterprise registered under registration number 1037739023024.[97]

The real reason for the indication of MU 43753 in Kaspersky Lab's certificates is as follows: MU 43753 is the FSB department responsible for the protection of information. As explained above, Kaspersky Lab makes available some of its products to government customers and therefore on occasion participates in public tenders for that purpose. Products sold to state authorities in Russia must be accompanied by necessary compliance certificates. Thus, the FSB issued the 2007 and 2011 certificates to Kaspersky Lab and also to MU 43753, presumably so that the latter would be aware that Kaspersky Lab had obtained the certificates and was eligible to participate in public tenders. This is not dissimilar to the certification role played by NIST in the U.S. as referenced above.

### f. SORM Laws

Russia and other countries have implemented national security legislation designed to regulate surveillance aimed at detecting and preventing terrorism and other criminal activities. In Russia, those laws and tools are applicable to telecom companies and Internet Service Providers ("ISPs") only. Kaspersky Lab does not provide communication services, thus the Company is not subject to these laws or other government tools, including Russia's System of Operational-Investigative Measures ("SORM").

Encrypted Kaspersky Lab customer data may theoretically be intercepted by the FSB using SORM only if such data is transmitted through Russian telecom providers' networks or using internet communications and even then only under specific circumstances described below.

---

[95] DHS Memorandum, *supra* note 3, at 9-10.
[96] *See* Exhibit C, an English-language translation of the extract from the Russian Trade Register for Kaspersky Lab.
[97] *See* Exhibit D, an English-language translation of the extract from the Russian Trade Register for MU 43753.

21

AR0667

Such a risk exists with respect to any and all data transferred via telecommunications networks and the internet in Russia.

However, the FSB is only legally permitted to use SORM in a limited number of situations, and each use of SORM technology is subject to court oversight. Law enforcement officers wishing to use this technology must obtain a prior court order in each case when the technology is to be used against a particular person or legal entity.[98] In a limited number of emergency situations, SORM may be used with *post facto* confirmation by a court; but court review is required nonetheless. Such emergency situations include those that may lead to a grave offense or a felony as well as those creating an imminent threat to national security. In such cases, SORM may be used based on the reasonable decision of a head of an investigative authority subject to mandatory notification of a court within 24 hours. Within 48 hours of commencement of SORM use the respective authority must obtain a court order approving SORM use.[99]

### g. Other Anti-Virus Software Vendors Have Ties to Foreign Countries

Finally, it is clear that other anti-virus products used by the U.S. Government are supplied by companies that have foreign affiliations or operations. Specifically, BRG reviewed publicly available information regarding six additional anti-virus products, also referenced above, used by the U.S. Government, including, Symantec, McAfee, Trend Micro, Avast, AVG, and ESET.

BRG found that several of the anti-virus software developers are based outside the U.S., including Trend Micro, Avast, and ESET.[100] Even Symantec, a U.S.-headquartered company, publicly acknowledges that it has three significant office locations in China.[101]

In addition, all of the anti-virus companies included in BRG's review indicate in their respective end-user license agreement that they may transmit data to third parties located in other countries.[102] Additionally, BRG found that some of the products reviewed communicate with servers located outside of the U.S.[103] In particular, Avast and ESET communicated with servers located in the Czech Republic and Slovakia, respectively.[104]

## VII.    OTHER U.S. GOVERNMENT STATEMENTS AND ACTION

At Section III. F of the DHS Memorandum, the DHS cites a series of actions taken, and statements made, by other Government agencies or officials as support for their own action. Contrary to the DHS's assertions, these statements are irrelevant to, and provide no support for, the DHS's own action.

---

[98] U.S. Dep't of State, Country Reports on Human Rights Practices for 2016: Russia (2016), *available at* https://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2016&dlid=265466#wrapper.
[99] Federal Law of the Russian Federation No. 144-FZ "On Operational-Investigative Activities" dated Aug. 12, 1995, as amended, Article 8.
[100] *See* BRG Assessment, *supra* note 55, at 20-21.
[101] See BRG Assessment, *supra* note 55, at 21.
[102] *See* BRG Assessment, *supra* note 55, at 21.
[103] *See* BRG Assessment, *supra* note 55, at 21.
[104] *See* BRG Assessment, *supra* note 55, at 21.

22

In fact, these references are counterproductive and only serve to exacerbate the unwarranted and unsupported actions taken by federal, state, and local agencies including DHS itself against Kaspersky Lab. In the same way that DHS here has referred to the statements and actions of others to support their own actions without considering their underlying basis or context, so others have cited to the BOD, notwithstanding its own lack of basis, to support their own otherwise unsupportable actions. This circular reasoning is self-serving and obscures the reality that no publicly available evidence has been presented to support any of these actions.

### a. House Committee on Science, Space and Technology

The DHS Memorandum cites to recent oversight activity by the Committee on Science, Space, and Technology of the U.S. House of Representatives ("Committee"), noting that Committee Chairman Rep. Lamar Smith ("Chairman Smith") "has expressed serious concerns about the Company's products," as further support for DHS's conclusions about the security of Kaspersky Lab's products.[105] In doing so, however, DHS disregards important distinctions between the Committee's exercise of its oversight responsibilities and the sufficiency of the process and analysis required before DHS can appropriately issue a directive such as the BOD.

A congressional committee's exercise of its oversight authority should not be taken as evidence of a public policy risk. All committees of the U.S. House of Representatives are tasked with conducting oversight on subjects and federal agencies within their jurisdiction. In the current instance, the July 27, 2017, letter from Chairman Smith to several federal agencies reflects the Committee's effort to "understand[] the effectiveness of the NIST Framework, and potential vulnerability that exist on federal information systems."[106] A subsequent statement by Chairman Smith indicates that this letter and the Committee's oversight related to Kaspersky Lab is part of its efforts to assess the need to update the NIST Framework, an area squarely within the Committee's jurisdiction.[107]

Citations to concerns expressed by a Member of Congress in the course of oversight activity directed at gathering information about a specific topic and assessing whether legislation on that topic is necessary is not an adequate basis on which to justify the action taken through the BOD. These communications are part of a normal dialogue between Members of Congress and third parties to inquire about areas of interest relevant to the Committee's areas of jurisdiction and cannot be accepted as factual findings or conclusions upon which to legislate. To take such statements out of the context of this larger process does not meet the

---

[105] DHS Memorandum, *supra* note 3, at 15.

[106] Letter from Rep. Lamar Smith, Chairman, U.S. House of Representatives, Committee on Science, Space, and Technology to the Honorable Sonny Purdue, Secretary, U.S. Department of Agriculture (Jul. 27, 2017) (received from Congress, on file with Kaspersky Lab) [hereinafter Letter from Rep. Lamar Smith to Secretary Purdue].

[107] "Cybersecurity breaches are so prevalent today that it is hard to keep track of them. Every news cycle seems to include a new major incident. To address the federal government's cybersecurity weaknesses, the Committee hopes to bring H.R. 1224, the NIST Cybersecurity Framework, Assessment, and Auditing Act of 2017, to the House floor for a vote." *Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government: Hearing Before the H. Committee on Science, Space, and Technology Subcommittee on Oversight*, 115th Cong. (2017) (statement of Rep. Lamar Smith, Chairman, H. Committee on Science, Space, and Technology), *available at* https://science.house.gov/legislation/hearings/bolstering-government-s-cybersecurity-assessing-risk-kaspersky-lab-products.

23

standards to which DHS should adhere when assessing the need for action analogous to the BOD.

It should be noted that while Chairman Smith states in the July 27, 2017, letter referenced above that he has concerns about Kaspersky Lab's products, he also notes that the allegations giving rise to his concerns have not yet been proven true, recognizing that "*If these widely reported allegations prove true*, then the American public has ample grounds on which to rest their concerns…" (emphasis added).[108]

While Kaspersky Lab takes issue with the assertions made regarding its products and senior executives during the course of the Committee's oversight to date, the process by which the Committee is conducting its oversight, gathering facts to better inform itself through information requests to federal agencies, holding public hearings, and inviting Eugene Kaspersky to testify[109] stands in stark contrast to the absence of any apparent fact-gathering or analysis undertaken by DHS and the lack of any process followed prior to issuing the BOD.

### b. May 2017 Senate Intelligence Committee Hearing

The DHS Memorandum also cites to a May 2017 Senate Intelligence Committee hearing at which leaders of several intelligence community agencies were asked a question about Kaspersky Lab products. The single word responses of various officials when asked a leading question by Senator Rubio in a politically charged Senate Intelligence Committee hearing regarding Russian state sponsored cyberthreats to the U.S. is not evidence, much less an adequate substitute for the constitutional obligation DHS owes to Kaspersky in properly considering all evidence with respect to Kaspersky Lab and its products. The witnesses were not required to put forward the factual or technical reasons basis for their conclusions and the hearing itself did include any analysis of the same. Under such circumstances, reliance upon these statements does not comport with the requirements DHS must meet to issue the BOD.

Other, arguably more informed, and better prepared, witnesses discussing Kaspersky Lab in the same forum have come to quite different conclusions. For example, Thomas Rid, a former Professor of Security Studies at King's College London and current Professor of Strategic Studies at the Johns Hopkins University School of Advanced International Studies, testified as follows in a March 30, 2017, Senate Select Committee on Intelligence Hearing titled *Disinformation: A Primer in Russian Active Measures and Influence Campaigns*:

> "*It's important to say that Kaspersky is not an arm of the Russian government if we look at the publicly available evidence. Kaspersky has published information about Russian cyber attacks, cyber intrusion campaigns, digital espionage, about several different Russian campaigns. Name any American company that publishes information about American cyber espionage?*"[110]

---

[108] Letter from Rep. Lamar Smith to Secretary Purdue, *supra* note 106.

[109] Although Eugene Kaspersky accepted an invitation to testify at a hearing the Committee's Subcommittee on Oversight planned to convene, the Subcommittee cancelled the hearing. Kaspersky Lab understands the cancellation was due to a scheduling conflict.

[110] *Disinformation: A Primer in Russian Active Measures and Influence Campaigns: Hearing Before the S. Select Committee on Intelligence*, 115th Cong. (2017) (statement of Thomas Rid, King's College London), *available at* https://www.intelligence.senate.gov/hearings/open-hearing-intelligence-matters-1.

24

### c. General Services Administration

The DHS Memorandum cites the July 11, 2017, action by the General Services Administration ("GSA") to remove Kaspersky Lab products from Schedules 67 and 70 as an example of where "other government officials have expressed concerns with Kaspersky products."[111]

However, it is important to note that GSA's Chief Information Officer, David Shive, confirmed during his testimony before the Subcommittee on Oversight of the House Committee on Science, Space, and, Technology on October 25, 2017, that GSA did not assess or analyze the capabilities of Kaspersky products or conclude that such products pose information security risks to government networks. Mr. Shive explained instead that GSA removed Kaspersky products from the approved list of vendors because there was a problem with how three resellers entered the products onto their own GSA schedules.[112]

Consistent with its channel sales model[113] Kaspersky Lab did not itself have a GSA schedule contract, and the company did not direct any reseller to add its products to their schedule contracts. Therefore, while DHS and other government officials, particularly at the state level, continue to cite the GSA action as evidence that Kaspersky products pose information security risks to government networks, GSA itself has acknowledged that it took action for reasons unrelated to the Company.

### d. State and Local Action

The federal Government's actions have caused further collateral harm to Kaspersky Lab by inducing a number of States to follow suit in prohibiting their own State and local agencies from using Kaspersky Lab products. The actions of those State and local authorities (taken purely in deference to the federal actions) does not, in turn, validate or add any weight after the fact to the previously initiated actions by the federal government including through the BOD.

Kaspersky Lab has a number of SLED customers that, as a result of these state directives, are required or are otherwise strongly pressured to discontinue their use of Kaspersky Lab software and solutions.

As DHS alludes to,[114] on July 12, 2017, the California Department of General Services, Procurement Division and the California Department of Technology, Statewide Technology Procurement Division, issued Bulletin # P-09-17, which required "all State Departments to immediately discontinue the use of Kaspersky Labs cybersecurity and information

---

[111] DHS Memorandum, *supra* note 3, at 14.
[112] *Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government: Hearing Before the H. Committee on Science, Space, and Technology Subcommittee on Oversight*, 115th Cong. (2017) (statement of David Shive, U.S. General Services Administration), *available at* https://science.house.gov/legislation/hearings/bolstering-government-s-cybersecurity-assessing-risk-kaspersky-lab-products.
[113] *See* discussion *supra* at Section III.d.
[114] DHS Memorandum, *supra* note 3, at 15.

AR0671

technology products and suspend all procurement activities of these products until further notice."[115]

Similarly and immediately following the issuance of the BOD, on September 15, 2017, the New York Office of General Services issued CL # 843, advising state departments to contact their IT departments "to commence a review of purchases and contracts for software and services to determine their exposure to Kaspersky Lab products and service" and, if Kaspersky Lab products are installed or a vendor offers Kaspersky Lab products, that the departments "consider whether the concerns raised by the federal government necessitate further action."[116]

On October 25, 2017, the Chief Information Officer of the University of California issued a memorandum to UC Chief Information Officers, announcing a system-wide moratorium on the purchase or deployment of all Kaspersky Lab technologies, requiring locations to submit six-month plans to stop using Kaspersky-branded technologies and eighteen-month plans to remove technologies with Kaspersky-embedded code from their environments.[117] On October 30, 2017, the Texas Education Agency issued a Cyber Alert titled "DHS Issues Binding Operational Directive on Kaspersky Products" recommending that ESCs and LEAs follow the guidance in the federal directive.[118]

As noted above, these reciprocal actions are not evidence of any underlying support or evidence for any of these agencies actions individually, or for all of them collectively.

## VIII.   BOD RAISES SIGNIFICANT U.S. CONSTITUTIONAL CONCERNS AND FAILS TO PROVIDE ADEQUATE ADMINISTRATIVE PROCESS

Issuing and implementing the BOD with nearly wholesale reliance on public news articles containing self-serving, unverified, and even anonymous statements, without any semblance of a process that allows for the right to be heard, much less the opportunity to confront the evidence used to substantiate such action, results in a clear violation of Kaspersky Lab's rights under both the Due Process and Equal Protection Clauses of the Fifth Amendment. These actions are also clearly arbitrary, capricious, and an abuse of discretion giving rise to challenge under the Administrative Procedure Act.

---

[115] California Department of General Services, Procurement Division and California Department of Technology, Statewide Technology Procurement Division, *Bulletin*, # P-09-17, *Re: Kaspersky Anti-Virus Software*, July 18, 2017, https://www.documents.dgs.ca.gov/pd/delegations/broadcastbulletins/2017/pac071817_P-09-17.pdf.

[116] New York State Office of General Services, *General Information Bulletin*, CL # 84 *Subject: Kaspersky Lab Sofware and Cybersecurity Services,* Sept. 15, 2017, https://www.ogs.ny.gov/purchase/spg/pdfdocs/CL843.pdf.

[117] University of California, Executive Vice President – Chief Operating Officer, *Letter to CRE's & CIO's*, Oct. 25, 2017, http://news.ucmerced.edu/sites/news.ucmerced.edu/files/documents/kaspersky_memo_w_attachments_10-25-17.pdf.

[118] Texas Education Agency, *Cyber Alert: DHS Issues Binding Operational Directive on Kaspersky Products*, Oct. 30, 2017, https://tea.texas.gov/About_TEA/News_and_Multimedia/Correspondence/TAA_Letters/Cyber_Alert__DHS_Issues_Binding_Operational_Directive_on_Kaspersky_Products/.

26

AR0672

### a. DHS's Professed "Administrative Process" Following The Issuance of the BOD Violates Kaspersky Lab's Due Process Rights

As part of the BOD, DHS also announced that it would be making available a yet to be specified administrative process "to inform [DHS] decision making" as to Kaspersky Lab and any other entity which claims that its commercial interests will be directly impacted by the BOD.[119] Under that professed process, which was only articulated in the Federal Register on September 19, 2017,[120] the date set for a response by Kaspersky Lab and any other affected parties is November 3, 2017, which has subsequently been extended to November 10, 2017.[121] Following receipt of this response, "the Secretary's decision will be communicated to the entity in writing by December 13, 2017."[122] This will occur after action has already been required to have been taken by the federal agencies subject to the BOD. In addition, the "[t]he Secretary reserves the right to extend the timelines identified above."[123]

DHS has violated Kaspersky Lab's rights under the Due Process Clause of the Fifth Amendment by offering a deficient "administrative process" that deprives Kaspersky Lab of a constitutionally protected liberty interest without due process of law.

"Due process is flexible and calls for such procedural protections as the particular situation demands,"[124] but fundamentally requires "the opportunity to be heard at a meaningful time and in a meaningful manner."[125] Procedures are not meaningful unless they offer "an opportunity to effectively be heard"[126] and the courts have consistently held that notice of the proposed official action, access to the unclassified evidence supporting that action, and an opportunity to rebut the evidence are essential elements of due process.[127]

In addition, the courts have also made clear that such process must be provided *before* action is taken to deprive entities of their property or liberty interests. For example, in *People's Mojahedin Organization of Iran v. Department of State*, a case concerning the PMOI's designation by the State Department as a foreign terrorist organization, the D.C. Circuit held that "due process requires that the PMOI be notified of the unclassified material on which the

---

[119] DHS Letter to Eugene Kaspersky, 1 (Sept. 13, 2017).

[120] National Protection and Programs Directorate; Notification of Issuance of Binding Operational Directive 17–01 and Establishment of Procedures for Responses, 82 Fed. Reg. 180, 43783, 43784 (Sept. 19, 2017).

[121] *See* Exhibit E, Email Correspondence with Daniel Sutherland.

[122] *Id.*

[123] *Id.*

[124] *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

[125] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U. S. 545, 552 (1965)).

[126] *Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192, 208 (D.C. Cir. 2001).

[127] *See Greene v. McElroy*, 360 U.S. 474, 496 (1956) (Holding that it is an "immutable" principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue"); *NCRI, supra* note 126, at 208 ("[T]hose procedures which have been held to satisfy the Due Process Clause have 'included notice of the action sought,' along with the opportunity to effectively be heard."); *Gray Panthers v. Schweiker*, 652 F.2d 146, 165 (D.C. Cir. 1980) (holding that "adequate notice of why the benefit is being denied and a genuine opportunity to explain why it should not be" is a "core requiremen[t] of due process.")

AR0673

Secretary proposes to rely and an opportunity to respond to that material *before* its [terrorism] redesignation."[128]

Similarly, in *Ralls Corporation vs. Committee on Foreign Investment in the United States*, a case concerning whether the Ralls Corporation had received adequate process during a national security review of a proposed transaction by CFIUS prior to a Presidential order divesting it of a property interest, the D.C. Circuit held that Ralls should have received this same set of procedural protections "*before* the Presidential Order prohibit[ing] the transaction."[129]

The BOD provides no equivalently sufficient due process protection. While access to the DHS Memorandum--an internal 21 page summary drafted in support of the BOD--has been provided, there was no effective opportunity to test or rebut the "evidence" contained therein before action was taken, and therefore there has been no "opportunity to effectively be heard."[130] As referenced above, the "process" purportedly provided by the BOD lays out a timeline in which federal agencies will begin removal of Kaspersky-branded products from their information systems by December 12, 2017, and the Secretary of Homeland Security is only required to finish considering this response a day later, on December 13, 2017. The Secretary also reserves the right to freely extend the period of consideration beyond December 13, 2017. The BOD's "process" therefore violates Kaspersky Lab's due process rights and runs counter to the consistent line of cases establishing that these rights must be provided before any deprivation of a property or liberty interest occurs.

Although the BOD's 30-60-90 day structure gives the impression that the harm is not immediate, in reality, the BOD effectuates an immediate and complete prospective debarment of Kaspersky Lab from government business. No affected federal agency is able to purchase Kaspersky Lab products because, from the moment of issuance, the BOD orders the discontinuation and removal of those products.

Kaspersky has a claim for denial of procedural due process because "(1) the government deprived [it] of a liberty … interest to which [it] had a legitimate claim of entitlement, and (2) … the procedures attendant upon that deprivation were constitutionally insufficient."[131]

### (i)     Deprivation of Liberty Interest

It is long established that "a person's 'right to ... follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' ... concept[] of the Fifth Amendment.'"[132] "[T]his liberty concept protects corporations as well as individuals…."[133] So, for example, "debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause."[134] In

---

[128] *People's Mojahedin Organization of Iran v. Department of State* (*PMOI II*), 613 F.3d 220, 228 (D.C. Cir. 2010) (emphasis added).
[129] *Ralls Corp. v. Comm. on Foreign Inv. in the U.S* ., 758 F.3d 296, 320 (D.C. Cir. 2014) (emphasis added).
[130] *NCRI*, *supra* note 126, at 208.
[131] *Jefferson v. Harris*, 170 F. Supp. 3d 194, 204 (D.D.C. 2016) (internal quotations omitted; alterations omitted).
[132] *Trifax Corp. v. District of Columbia*, 314 F. 3d 641, 643 (D.C. Cir. 2003) (quoting *Greene v. McElroy*, *supra* note 127, at 492).
[133] *Id.*
[134] *Id.*

AR0674

fact, "[a]ll reputation-based [procedural-due-process] claims depend on some deprivation of liberty—in general terms, a constitutionally protected interest in one's good name or in being able to pursue one's chosen profession—without procedures that were constitutionally sufficient."[135] "[S]uch actions are not monolithic"—rather, in the D.C. Circuit, "two independent [albeit not mutually exclusive] theories for how such deprivations occur have crystallized."[136] Both support claims by Kaspersky Lab.

First, Kaspersky Lab has "what is known as a 'stigma-plus'" claim.[137] This claim is based "on a continuing stigma or disability arising from official *action*."[138] Under this theory, a liberty interest is infringed when "'preclusion [from government contracting] is either sufficiently formal *or* sufficiently broad.'"[139] Here, Kaspersky Lab has claims on both formal debarment and alternatively a "broad preclusion" that "seriously affected, if not destroyed, [Kaspersky Lab's] ability to obtain… [contracts] in [its] field."[140]

DHS's statements also support a so-called "reputation-plus" claim.[141] That claim is predicated on "defamation that is '*accompanied* by a discharge from government employment or at least a demotion or rank in pay."[142] While "[t]his theory makes the termination actionable only where the terminating employer has disseminated the reasons for the termination and such dissemination is defamatory"—that is what has happened here as DHS effectively terminated Kaspersky Lab as a government contractor while simultaneously broadcasting to the world insufficient, uncorroborated, and self-serving reasons for that termination.[143]

### (ii)    Constitutionally Insufficient Procedures

This deprivation—on either a stigma-plus or reputation-plus theory—violated Kaspersky Lab's Fifth Amendment rights because the BOD afforded no pre-deprivation process. As explained above, without notice, the BOD effectuated an immediate debarment and preclusion of Kaspersky Lab upon issuance. Pre-deprivation process clearly was required here under the three-factor test set forth in *Mathews v. Eldridge*, which weighs (1) "the private interest . . . affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used;" and (3) "the government's interest, including the function involved and the fiscal and administrative burdens that . . . additional or substitute procedural requirement would entail."[144]

---

[135] *Liff v. Office of the Inspector General for the U.S. Department of Labor*, 2016 U.S. Dist. LEXIS 153979, *20 (D.D.C. 2016)

[136] *Id.*

[137] *Jefferson*, 170 F. Supp. 3d at 205.

[138] *Id.* (internal quotations omitted; emphasis in original).

[139] *Trifax*, 314 F. 3d at 644 (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505 (D.C. Cir. 1995)) (emphasis added).

[140] *Id.* (internal quotations omitted; alterations in original). *See also Liff v. Office of the Inspector General for the U.S. Department of Labor*, 156 F. Supp. 3d 1, 21 (D.D.C. 2016) (citing *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994)) (explaining that government contractor suffers deprivation when broadly precluded).

[141] *Liff*, 2016 U.S. Dist. LEXIS 153979 at *20 (D.D.C. 2016).

[142] *Id.* at *20 (quoting *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998)) (emphasis in original).

[143] *Id.* at *20-21 (internal quotation omitted).

[144] *Mathews*, 424 U.S. 319, 335 (1976). *See, e.g., NCRI*, *supra* note 126, at 205-208; *KindHearts for Charitable Humanitarian Dev., Inc., v. Geithner*, 647 F. Supp. 2d 857, 901 (N.D. Ohio 2009).

AR0675

Under the first *Matthews* factor, it is indisputable that Kaspersky Lab has a substantial private interest in its ability to sell its product to federal agencies, and in its reputation generally. Under the second factor, DHS's failure to provide adequate and timely notice creates a substantial risk of wrongful deprivation. Finally, under the third factor, DHS has failed to demonstrate how prior notice to Kaspersky Lab would have interfered with its goals of eliminating the alleged "information risks" or relatedly why it failed to consider potential mitigation when such a consideration may have helped guard against the BOD being overbroad or more severe than necessary.

Indeed, as the D.C. Circuit explained in *National Council of Resistance of Iran v. Department of State*, with respect to the designation of a foreign terrorist organization by the State Department, "It is simply not the case . . . that the Secretary has shown how affording the organizations whatever due process they are entitled to before their designation as foreign terrorist organizations and the resulting deprivation of right would interfere with the Secretary's duty to carry out foreign policy."[145] In that case, the D.C. Circuit contemplated the following hypothetical pre-deprivation notice—and found it was "not immediately apparent" how providing it would work any harm to the Government:

> We are considering designating you as a foreign terrorist organization, and in addition to classified information, we will be using the following summarized administrative record. You have the right to come forward with any other evidence you may have that you are not a foreign terrorist organization.[146]

The same is true here. This is not a case where a pre-deprivation process would "cripple" the underlying statute—in contrast to, for example, "providing notice before blocking the assets of international narcotic traffickers would create a substantial risk of asset flight."[147] Thus, the D.C. Circuit has observed "[t]hough the Due Process Clause generally requires the Government to afford individuals notice and an opportunity to be heard *before* depriving them of their property, there are 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"[148]

But nowhere does the BOD, or the supporting DHS Memorandum even suggest that the "information security risks" allegedly presented by Kaspersky Lab are imminent, exigent, or urgent—let alone to a degree that justify foreclosing pre-deprivation notice. To the contrary, DHS provides *three months* for affected agencies to "begin to implement their plan of action."[149] In the same vein, the BOD rests heavily on media accounts some of which are nearly two years old—hardly indicating a paramount need for swift action.

---

[145] *NCRI, supra* note 126, at 207-208.

[146] *Id. See also PMOI II, supra* note 128, at 227.

[147] *Zevallos v Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015).

[148] *Id* (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)) (emphasis added; internal quotations omitted). *See also, e.g.*, *Cleanmaster Industries, Inc. v. Shewry*, 491 F. Supp. 2d 937 (C.D. Cal. 2007) ("The Department has not provided evidence of any circumstances that would necessitate the immediate suspension of the plaintiff from the Medi-Cal program, and the concomitant publication of that debarment . . . , prior to providing the plaintiff with a name-clearing hearing.")

[149] BOD, *supra* note 1, at 3.

30

Indeed, DHS had ample opportunity to engage with Kaspersky Lab prior to the issuance of the BOD. Kaspersky Lab wrote to DHS on July 18, 2017,[150] with an offer to provide any information or assistance with regard to any investigation involving the Company, its operations, or its products. At that time, Kaspersky Lab was unaware of what action, if any, DHS was contemplating. In response to Kaspersky Lab, nearly a month later, on August 14, 2017, DHS acknowledged the Company's letter and its offer of assistance, and indicted that DHS "*will be in touch again shortly.*" (emphasis added).[151] No further communication was received prior to the issuance of the BOD. Even following the issuance of the BOD, DHS has repeatedly declined the requests of the Company and its counsel to engage in order to present the Company's position, address DHS's concerns, and discuss any potential options for mitigation.[152]

By way of comparison, an example of an approach in which entities are provided meaningful process can be found in the Federal Acquisition Regulations ("FAR"), which prescribe the policies and procedures governing the debarment and suspension of contractors for cause by federal agencies.[153] The FAR usefully illustrates how this process and the appurtenant procedural protections are typically provided in the debarment context. In that process, debarring officials must afford contractors a formal notice of proposed suspension and/or debarment which must include: (1) the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the alleged conduct upon which the action is based, (2) notice of the opportunity to submit information and arguments in opposition to the proposed debarment within 30 days of receipt of the notice, (3) the procedures that will govern the agency's decision-making process, and (4) the effects of proposed and actual debarment.[154] Crucially, the debarring official's decision may only be made within 30 working days *after* receipt of information and argument from the contractor.[155] This final protection is consistent with the due process requirement that affected parties be given a meaningful opportunity to rebut the evidence before action is taken to deprive it of a property or liberty interest.

Of particular note, the DHS Memorandum explains that DHS considers the BOD to be a more "appropriate" process than a debarment proceeding under the FAR principally because it is more draconian – finding that unlike a FAR debarment, the BOD is prospective as well as retrospective, requires the removal of Kaspersky-branded products "indefinitely," and prevents third parties from selling products produced by Kaspersky.[156] And so, paradoxically, even though it is more thorough in depriving Kaspersky Lab of its property rights, the BOD provides far less adequate process than the FAR, which has a well-established and constitutionally adequate due process that requires agency decisions be made in consideration of a contractor's response before any action is taken to exclude it from government contracts.

---

[150] *See* Exhibit F, Kaspersky Lab Letter to DHS (July 18, 2017).

[151] *See* Exhibit G, DHS Response to Kaspersky Lab (Aug. 14, 2017).

[152] *See* Exhibit E, Email Correspondence with Daniel Sutherland.

[153] 48 C.F.R. Part 9.400(a)(1).

[154] 48 C.F.R. Part 9.406-3(c).

[155] 48 C.F.R. Part 9.406-3(d)(1).

[156] DHS Memorandum, *supra* note 3, at 4.

AR0677

### b.  Through the BOD, DHS Has Violated Kaspersky Lab's Constitutional Right To Equal Protection

DHS also has violated Kaspersky Lab's rights under the Equal Protection Clause of the Fifth Amendment by singularly applying FISMA and the BOD solely to Kaspersky Lab, and not to other similarly-situated companies which also develop and sell anti-virus software to the U.S. Government. This conduct establishes the essential elements of a "class of one" equal protection claim, based on the U.S. Supreme Court's decision in *Village of Willowbrook v. Olech*: intentional, disparate treatment of similarly-situated parties—without a rational basis.[157] Specifically, "[t]o state a claim for 'class of one' equal protection, at the very least, a party must allege that (1) he was treated differently from others similarly situated, (2) it was done so intentionally, and (3) there was no rational basis for the difference in treatment."[158] These elements are satisfied here.

Kaspersky Lab is similarly situated to other anti-virus software manufacturers—*i.e.*, its competitors—including Avast (Czech Republic), AVG Technologies (Czech Republic), ESET (Slovakia), and Trend Micro (Tokyo). Each of these companies, like Kaspersky Lab, develop and sell similar anti-virus software to the federal government.[159] Each of these companies are headquartered in foreign countries, offer products that operate with elevated levels of system privileges, send anti-virus definition updates over international borders, and include broad allowances for data collection via networks similar to KSN. Yet DHS has singled out Kaspersky Lab. DHS's dissimilar treatment is clearly intentional and is designed to exclude the Company from the U.S. market.

DHS has demonstrated no rational basis for applying FISMA and the BOD exclusively to Kaspersky Lab because the use of other foreign anti-virus services present virtually all of same risks DHS has associated with Kaspersky Lab products and services. Nor does Kaspersky Lab having its headquarters in Russia present unique risks. Per the BRG Assessment, one of Kaspersky Lab's competitors, Avast, includes a security product in its anti-virus offering that maintains servers in China and Russia. There is plainly no rational basis for DHS's differential treatment of Kaspersky Lab products and those of its other foreign competitors.

Further, it is clear that the intent of the BOD, and the U.S. Government more generally, is to unfairly interrupt Kaspersky Lab's commercial interests. Recent public statements, often politically or commercially motivated and thin on facts, have, for example, led several big box retailers to remove Kaspersky Lab products from their shelves and suspend their long-standing partnerships with Kaspersky Lab. Several of these retailers, which have provided a steady stream of both new customers and consumer product subscription renewals to

---

[157] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.") *See also 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 ("[T]here are "two essential elements of [a] 'class of one' equal protection claim: (1) disparate treatment of similarly situated parties (2) on no rational basis.")

[158] *Galicki v. New Jersey*, 2016 U.S. Dist. LEXIS 126076, *50 (D.N.J. Sept. 15, 2016) (class-of-one claims adequately pleaded against Governor Chris Christie and others based on George Washington Bridge lane closure (*i.e.*, 'Bridgegate')) (internal quotations omitted).

[159] *See* BRG Assessment, *infra* note 55, at 9-20.

32

Kaspersky Lab over the years, went even further and, upon removing Kaspersky Lab products encouraged and otherwise incentivized existing Kaspersky Lab software customers (current license holders) to "switch" to the software of one of Kaspersky Lab's competitors in the market.

As a result of these actions, Kaspersky Lab's 2017 Q3 retail sales have fallen 37 percent as compared to the same period in 2016. Similarly, the amount of business Kaspersky Lab derived from new online sales customers in the month of October 2017, the month immediately following the issuance of the BOD, declined 30 percent versus the same period in 2016.

At present, Kaspersky Lab is receiving and processing an unprecedented volume of product return and early termination requests, as a result of the U.S. Government's actions (which customers specifically refer to when stating the reason for their return), which will certainly cause the Company's U.S. results to decrease significantly.

Kaspersky Lab's 2017 Q3 U.S. bookings have fallen by over 15 percent since the previous quarter and are 16 percent lower than the results for same quarter in the previous year (2016 Q3), demonstrating the immediate, significant, and detrimental effect of the U.S. Government's actions, including the issuance of the BOD.

Making no effort to disguise the broader intent of this action, Christopher Krebs, the Senior Official Performing the Duties of the Under Secretary for the National Protection and Programs Directorate, who participated in the recommendation that the BOD be issued,[160] in response to a question at a public forum as to how and to what extent consumers should be informed as to the nature of any risk posed by Kaspersky Lab products, while continuing to conceal the specific nature of the risk from the public, stated "…when [DHS] makes a pretty bold statement like issuing the Kaspersky Lab binding operational directive I think that's a fairly strong signal [to consumers]."[161]

The potential implications of this action by DHS go far beyond extinguishing the limited amount of federal government business in which Kaspersky Lab has indirectly profited from as summarized above.[162] The impact will extend to and is already being felt in the Company's commercial business. Recent comments indicate DHS is well aware of and actively supports such adverse impacts of its action. Thus, the BOD not only deliberately deprives Kaspersky Lab of its liberty to engage in its chosen business in violation of the Fifth Amendment's Due Process Clause, but also violates Kaspersky Lab's Fifth Amendment Equal Protection rights.

### c. DHS Action Through The BOD is Arbitrary, Capricious, and an Abuse Of Discretion

The Administrative Procedure Act provides for judicial review of agency action.[163] If review is available, courts may hold unlawful and set aside agency action, findings, and conclusions

---

[160] DHS Memorandum, *supra* note 3, at 1.
[161] *See* Aspen Institute, *Is the US Losing the Cyber Battle?* (Oct. 31, 2017), https://www.aspeninstitute.org/events/us-losing-cyber-battle/.
[162] *See* discussion *infra* at Section III(d).
[163] 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.")

33

that are, among other potential deficiencies, contrary to constitutional right, power, privilege, or immunity[164] or arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.[165]

As discussed in Section VIII(a), the process offered by DHS has the effect of depriving Kaspersky Lab of a constitutionally protected liberty interest without due process of law in violation of the Fifth Amendment's Due Process Clause. As discussed in Section VIII(b), DHS has also violated Kaspersky Lab's Fifth Amendment Equal Protection rights. These constitutional violations can not survive APA scrutiny.

A reviewing court may also hold unlawful and set aside agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.[166] While a court reviewing agency findings under the arbitrary and capricious standard may not "substitute its judgment for that of the agency,"[167] it must ensure that the agency has "articulat[ed] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[168] Under this standard, agency decisions not supported by "substantial evidence" may be reversed.[169]

The BOD is such an agency decision. The DHS Memorandum does not identify any evidence of any malicious cyber conduct on the part of Kaspersky Lab, or even allege that Kaspersky Lab has engaged in any such malicious cyber conduct. Nor does it identify any technical concerns that are unique to Kaspersky Lab products. DHS's arguments and concerns are based entirely on speculation and innuendo, relying on the statements from anonymous sources made to newspapers, self-interested public statements by competitors and security professionals who do not have knowledge of the design of Kaspersky Lab products, and statements by government officials who have been subjected to political pressure to make such statements with no indication or support that they or their staff has closely examined the products they were questioned about.

The BOD is, instead, based on a series of perceived risks derived from (i) DHS's understanding of the functionality of anti-virus software, (ii) the fact that Kaspersky Lab is a Russian company subject to Russian legal provisions that could require Kaspersky Lab to provide certain information technology assistance to the FSB, and (iii) the assertion that, because Kaspersky Lab requires certain licenses and certifications from the FSB to engage in encryption regulated activities in Russia, it may be vulnerable to "leverage" by the Russian Government.[170]

---

[164] *Id.* § 706(2)(B).

[165] *Id.* § 706(2)(A).

[166] 5 U.S.C. § 706(2)(A).

[167] *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[168] *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

[169] *J.A. Jones Mgmt. Servs. v. FAA,* 225 F.3d 761, 764 (D.C. Cir. 2000) (quoting *Kisser v. Cisneros,* 14 F.3d 615, 619 (D.C. Cir. 1994)) ("Under this standard, we 'may reverse only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment.'")

[170] DHS Memorandum, *supra* note 3, at 16. Kaspersky Lab's response to each of these issues is set out at Sections V, and VI above.

AR0680

Courts may appropriately consider the record as a whole and consider "whatever in the record fairly detracts from [the] weight" of the agency's proffered evidence.[171] Other professionals and governmental organizations have already reached different conclusions based on the publicly available evidence. For example, on October 11, 2017, Germany's BSI federal cyber agency indicated that it had "… no plans to warn against the use of Kaspersky Lab products since the BSI has no evidence for misconduct by the Company or weaknesses in its software."[172]

On October 12, 2017, the Department of Prime Minister and Cabinet of Australia confirmed that the Australian Government is not following the U.S. Government's lead in banning Kaspersky Lab products despite being "in constant engagement with our Five Eyes security partners on this matter," referring to the Five Eyes intelligence sharing network which includes its four most trusted Western allies: the U.S., the U.K., Canada and New Zealand.[173]

On the same day, INTERPOL announced that it had signed a new threat intelligence exchange agreement with Kaspersky Lab, stating "Since the first agreement between the two organizations was signed in 2014, Kaspersky Lab experts have regularly cooperated with INTERPOL to share fresh cyberthreat discoveries with police in its member countries." The statement went on to cite Kaspersky Lab's participation in an INTERPOL-led cybercrime operation, which identified nearly 9,000 botnet command and control servers and hundreds of compromised websites, including government portals, across the ASEAN region as well as Kaspersky Lab's previous cooperation in a global operation coordinated by the INTERPOL Global Complex for Innovation ("IGCI") in Singapore to disrupt the Simda criminal botnet – a network of more than 770,000 infected PCs around the world.[174]

Even some of those sources on which DHS seeks to base its own decision, have now openly criticized the actions being taken by DHS against Kaspersky Lab. For example Jeffrey Carr, founder and CEO of Taia Global, who's 2012 report "*Russian Laws and Regulations: Implications for Kaspersky Labs [sic]*"[175] is cited extensively in the DHS Memorandum wrote (in his personal capacity) a blog post titled *U.S. Government Bans Kaspersky Lab Without Cause,* on September 14, 2017, in direct response to news of the BOD, saying:

> "The ban is both malicious and ignorant. It's ignorant because Kaspersky Lab has data on malware coming out of Russia and the CIS that no one else has. By banning their products, the U.S. government has blocked its best source of cyber threat intelligence coming out of a region where it desperately needs it.

---

[171] *Town of Barnstable*, 740 F.3d 681, 687 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).
[172] *See* Reuters, *Germany: 'No evidence' Kaspersky software used by Russians for hacks*, REUTERS, Oct. 11, 2017, https://www.reuters.com/article/us-usa-security-kaspersky-germany/germany-no-evidence-kaspersky-software-used-by-russians-for-hacks-idUSKBN1CG284 ("Germany's BSI federal cyber agency said on Wednesday it had no evidence to back media reports that Russian hackers used Kaspersky Lab antivirus software to spy on U.S. authorities.")
[173] Jackson Gothe-Snape, *No Aussie ban for Russian anti-virus firm Kaspersky Lab, but it does have new lobbyists,* AUSTRALIA BROADCASTING CORPORATION, Oct. 12, 2017, http://www.abc.net.au/news/2017-10-12/no-ban-for-lobbyist-backed-russian-anti-virus-company/9042246.
[174] Interpol, *INTERPOL and Kaspersky Lab sign new threat intelligence exchange agreement* (Oct. 12, 2017), https://www.interpol.int/News-and-media/News/2017/N2017-137.
[175] *See* DHS Memorandum, supra note 3 at Exhibit 17.

35

AR0681

> It's malicious because there's no basis in fact for the charge that Kaspersky products have a backdoor."[176]

Finally, we note that in Section VI of the DHS Memorandum ("Analysis of Available Contrary Evidence"), DHS purports to consider, in a cursory fashion, certain contrary evidence relevant to the recommendation to issue the BOD. But none of these statements were made in the context of, or directly in response to, the BOD. Rather, many of those statements were made under different circumstances and are either irrelevant or taken out of context and have been self-selected and arranged by DHS in an attempt to bolster its own position. These statements (and particularly DHS's representation of them) should not, and must not, be considered Kaspersky Lab's response to the BOD, nor are they necessarily responsive to the issues at hand. They cannot be considered any substitute for Kaspersky Lab's constitutional right to be heard.

Taken together, the forgoing demonstrates that DHS did not properly evaluate the strength of the evidence before it, and therefore failed to satisfactorily support its decision or identify a rational connection between the facts before it and the conclusions it reached. The full record simply does not amount to "substantial evidence"[177] and DHS's BOD should therefore be rescinded, less it be invalidated under the APA as an arbitrary and capricious abuse of agency discretion.[178]

## IX.   FOIA NOTICE

Finally, while we believe that this submission is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(4), we request that your office provide us with written notification of any request under FOIA for release of the information contained herein. To the extent that this submission is reviewed or retained by other agencies of the U.S. Government, we request that it be protected from disclosure by those agencies pursuant to FOIA. If a decision is made to release this material, whether pursuant to a FOIA request or for any other reason, we request that we be provided with a ten-day advance written notice to the undersigned of any proposed release.

Respectfully Yours,

Ryan Fayhee
Partner

+1 202 452 7024
ryan.fayhee@bakermckenzie.com

---

[176] J. Carr *U.S. Government Bans Kaspersky Lab Without Cause* https://medium.com/@jeffreycarr/u-s-government-bans-kaspersky-lab-without-cause-b59cbb50ed56.
[177] *See supra* note 169.
[178] *J.A. Jones Mgmt. Servs. v. FAA*, *supra* note 169, at 255; 44 U.S.C. § 3552(b)(1)(A).

AR0682

Encls.

<u>Exhibit List</u>

Exhibit A – KGSS Cyber Threat Intelligence Product Catalogue
Exhibit B – BRG Assessment
Exhibit C – Russian Trade Register for Kaspersky Lab
Exhibit D – Russian Trade Register for MU 43753
Exhibit E – Email Correspondence with Daniel Sutherland
Exhibit F – Kaspersky Lab Letter to DHS 7.18.17
Exhibit G – DHS Response to Kaspersky Lab 8.14.17

37

AR0683



www.kgss.solutions

# KGSS CYBER THREAT INTELLIGENCE PRODUCTS

1300 17th Street North, Suite 1001, Arlington, VA 22209  (703) 872 7220  info@kgss.solutions

AR0684

# CYBER THREAT INTELLIGENCE PRODUCTS

Tracking, analyzing, interpreting and mitigating constantly evolving IT security threats is a massive undertaking. Enterprises across all sectors are facing a shortage of the up-to-the-minute, relevant data they need to help them manage the risks associated with IT security threats.

Cyber Threat Intelligence Services from KGSS gives you access to the intelligence you need to mitigate these threats provided by our world-leading team of researchers and analysts

Our knowledge, experience and deep intelligence on every aspect of cybersecurity make it the trusted partner for law enforcement and government agencies. You can leverage this intelligence in your organization today

KGSS Cyber Threat Intelligence Products include:

• Threat Data Feeds

• Cyber Threat Intelligence Reports



CYBER
THREAT
INTELLIGENCE
SERVICES

Threat Data Feeds

Intelligence
Reporting



info@kgss.solutions | www.kgss.solutions

AR0685

# THREAT DATA FEEDS

Re nforce your network defense so ut ons nc ud ng SIEMs, firewalls, IPS/IDS, anti-APT and sandbox/ s mu at on techno og es w th cont nuous y updated comprehens ve data wh ch prov de ns ghts nto cyberthreats and targeted attacks

Ma ware fam es and var at ons have grown exponent a y n the ast few years We current y detect about 325 000 un que new ma ware samp es every day To defend the r endpo nts aga nst these threats most organ zat ons dep oy c ass ca protect on measures ke ant -ma ware so ut ons ntrus on prevent on or threat detect on systems n a fast-chang ng env ronment where cybersecur ty s a ways try ng to stay one step ahead of cybercr me these c ass ca so ut ons need to be re nforced w th access to up-to-the-m nute threat nte gence

KGSS Threat Data Feeds are des gned to ntegrate nto ex st ng systems prov d ng an add t ona ayer of protect on Threat Data Feed ntegrat on makes t poss b e to corre ate the ogs com ng to the S EM from different network devices with the URL feeds from KGSS A connect on w th P ArcS ght S EM s nc uded Connectors for Sp unk and QRadar are a so ava ab e

## USE CASES / SERVICE BENEFITS

KGSS Threat Data Feeds:

- Empower your S EM so ut on by everag ng data about harmful URLs. The SIEM is notified about ma ware ph sh ng and Botnet C&C UR s from ogs coming to the SIEM from different network devices (user PCs, network proxies, firewalls, other servers)

- Empower pr mary network defense so ut ons such as firewalls, IPS/IDS, SIEM solutions, anti-APT, sandbox/ s mu at on techno ogy UTM app ances etc w th cont nuous y updated threat nte gence

- mprove your forens c capab t es by prov d ng secur ty teams w th mean ngfu nformat on about threats and ns ghts nto the th nk ng beh nd targeted attacks

- Support your research nformat on about harmfu URLs and MD5 hashes of malicious files provides a va uab e contr but on to threat research projects

KGSS offers three types of Threat Data Feeds:

1  Ma c ous UR s and masks
2  MD5 hashes of ma c ous objects database
3  Mob e Thread Feeds

## FEED DESCRIPTION

**Malicious URLs** – a set of UR s cover ng ma c ous nks and webs tes Masked and non-masked records are ava ab e

**Phishing URLs** – a set of URLs identified by KGSS as phishing sites. Masked and non-masked records are ava ab e

**Botnet C&C URLs** – a set of UR s of botnet command and contro (C&C) servers and re ated ma c ous objects

**Malware Hashes (ITW)** – a set of file hashes and corresponding verdicts covering the most dangerous and preva ent ma ware de vered through the nte gence of G oba Pr vate Network

**Malware Hashes (UDS)** – a set of file hashes detected by KGSS cloud technologies (UDS stands for Urgent Detection System) based on a file's metadata and statistics (without having the object itself). This enables the identification of new and emerging (zero-day) malicious objects that are not detected by other methods.

**Mobile Malware Hashes** – a set of file hashes for detecting malicious objects that infect mobile platforms.

**P-SMS Trojan Feed** — a set of Trojan hashes w th correspond ng context for detect ng SMS Trojans r ng ng up prem um charges for mob e users as we as enab ng an attacker to stea de ete and respond to SMS messages

**Mobile Botnet C&C URLs** — a set of UR s w th context cover ng mob e botnet C&C servers



info@kgss.solutions | www.kgss.solutions

AR0686

# CYBER THREAT INTELLIGENCE REPORTING

Increase your awareness and knowledge of high profile cyber-espionage campaigns with comprehensive, practical reporting from KGSS.

Leveraging the information and tools provided in these reports, you can respond quickly to new threats and vulnerabilities - blocking attacks via known vectors, reducing the damage caused by advanced attacks and enhancing your security strategy.

## APT Intelligence Reporting

Not a  Advanced Pers stent Threat d scover es are reported  mmed ate y  and many are never pub  c y announced. Be the first to know as part of an exclusive group w th our  n-depth  act onab e  nte  gence report ng on APTs

As a subscr ber to KGSS APT  nte  gence Report ng we prov de you w th un que ongo ng access to our  nvest gat ons and d scover es  nc ud ng fu  techn ca data prov ded  n a range of formats on each APT as  t s revea ed  nc ud ng threats that w   never be made pub  c

Our experts  the most sk  ed and successfu  APT hunters  n the  ndustry w   a so a ert you  mmed ate y to any changes they detect  n the tact cs of cyber-cr m na  and cyber-terror st groups  And you w   have access to our comp ete APT reports database – a powerfu  research and ana ys s component for your secur ty armory

### KGSS APT INTELLIGENCE REPORTING PROVIDES:

- **Exclusive access:** Dur ng ongo ng  nvest gat ons and before pub  c re ease  you w   rece ve techn ca descr pt ons of cutt ng edge threats

- **Insight into non-public APTs:** Not all high profile threats are subject to public notification. Some, due to the v ct ms who are  mpacted  the sens t v ty of the data, the nature of the vulnerability fixing process or assoc ated  aw enforcement act v ty  are never made pub  c  But a   are reported to our customers

- **Detailed supporting information:** Techn ca  data samp es and too s  nc ud ng an extended  st of  nd cators of Comprom se ( OCs) ava  ab e  n standard formats such as open OC and ST X Our Yara Ru es are a so access b e

- **Continuous APT campaign monitoring:** Access to act onab e  nte  gence dur ng the  nvest gat on ( nformat on on APT d str but on  OCs C&C  nfrastructure)

- **Retrospective analysis:** Access to a   prev ous y  ssued pr vate reports  s prov ded throughout the per od of your subscr pt on

## NOTE – SUBSCRIBER LIMITATION

Due to the sensitive and specific nature of some of the  nformat on conta ned  n the reports prov ded by th s serv ce  we  m t subscr pt ons to trusted government pub  c and pr vate organ zat ons on y



# INFORMATION SECURITY RISKS OF ANTI-VIRUS SOFTWARE

## Independent Assessment

### November 10, 2017



AR0688



CONFIDENTIAL BUSINESS INFORMATION
FOIA TREATMENT REQUESTED

# Contents

I. Introduction ........................................................................................................ 3

II. Binding Operational Directive 17-01 ................................................................ 4

Scope .................................................................................................................... 4

DHS Methodology ................................................................................................ 5

General Information Security Risks ...................................................................... 5

Kaspersky-Specific Information Security Risks .................................................... 6

Analysis ................................................................................................................ 7

III. Anti-Virus Software Security Risks to the U.S. Government ........................... 8

Background ........................................................................................................... 8

U.S. Government Use of Anti-Virus Software ...................................................... 9

Information Security Risk Analysis ..................................................................... 10

Vulnerabilities in Anti-Virus Software ................................................................ 10

Sensitive Data Collection ................................................................................... 16

Foreign Affiliations ............................................................................................. 20

IV. Preliminary Review of Kaspersky Lab Software ........................................... 23

Scope of Review ................................................................................................ 23

Kaspersky Security Network & Related Services .............................................. 24

Traffic Security ................................................................................................... 24

Kaspersky Private Security Network .................................................................. 28

Malware Record Analysis ................................................................................... 29

Kaspersky Anti-virus Software Rankings ........................................................... 30

V. Conclusions .................................................................................................... 33

Suggested Systematic Framework for U.S. Government Secure Software Procurement .... 33

VI. FOIA Notice .................................................................................................. 35

Overview of Berkeley Research Group ............................................................. 36

About the Authors .............................................................................................. 36

AR0689



**CONFIDENTIAL BUSINESS INFORMATION
FOIA TREATMENT REQUESTED**

# I. Introduction

Berkeley Research Group, LLC ("BRG") was retained on October 20, 2017 by Baker & McKenzie, LLP ("Baker & McKenzie") on behalf of Kaspersky Lab, Inc. ("Kaspersky") in connection with an independent review of Kaspersky-branded products identified by Department of Homeland Security ("DHS") Binding Operational Directive 17-01[1] ("BOD 17-01" or "the Directive") which requires the retroactive removal and prospective debarment of nearly all Kaspersky-branded products on government information systems. The scope of BRG's engagement includes:

- Reviewing the methodology employed by DHS in its issuance of BOD 17-01 which concluded that Kaspersky-branded products, in particular, represent an information security risk to federal information systems; and,

- Providing an independent expert review and assessment of any alleged technical information security risks described in BOD 17-01 or its supporting materials related to Kaspersky-branded products or other anti-virus software products in general.

While we anticipate conducting a broad, independent security assessment of Kaspersky software products, development practices, and operational procedures, given the limited time available to respond to DHS BOD 17-01 we have limited the scope of our initial assessment described in this report to the items above. In connection with this initial assessment, BRG has collected and analyzed information from a variety of sources, including, but not limited to:

- BOD 17-01 and its supporting materials, including an unclassified DHS memorandum[2] proposing the Directive and related exhibits;

- U.S. government procurement databases, including General Services Administration ("GSA") schedules and historical contracts related to federal purchases of anti-virus software;

- Public vulnerability databases and other sources of information regarding the security of anti-virus software products, including those developed and sold by Kaspersky;

---

[1] Federal Register, *National Protection and Programs Directorate; Notification of Issuance of Binding Operational Directive 17-01 and Establishment of Procedures for Responses*, 82 FR 43782, September 19, 2017.

[2] DHS Memorandum, *Proposed Binding Operational Directive 17-01, Removal of Kaspersky-Branded Products*, September 1, 2017.

AR0690



**CONFIDENTIAL BUSINESS INFORMATION
FOIA TREATMENT REQUESTED**

- Interviews with senior Kaspersky personnel involved with anti-virus software research, development, and operations;

- Kaspersky software products and internal technical documentation related to the architecture and operation of their anti-virus software products, supporting tools, and infrastructure; and,

- Videotaped testimony of the October 25, 2017 hearing of the U.S. House of Representatives Committee on Science, Space, and Technology Subcommittee on Oversight regarding *Bolstering the Governments Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government*.

# II. Binding Operational Directive 17-01

DHS issued BOD 17-01 on September 13, 2017 requiring federal executive branch departments and agencies to: (1) within 30 calendar days, identify the use or presence of Kaspersky-branded products on all Federal information systems and provide to DHS a report; (2) within 60 calendar days, develop and provide to DHS a detailed plan of action to remove and discontinue present and future use of all Kaspersky-branded products beginning 90 calendar days after issuance of this directive; and, (3) at 90 calendar days, and unless directed otherwise by DHS based on new information, begin to implement the agency plan of action and provide a status report to DHS on the progress of that implementation every 30 calendar days thereafter until full removal and discontinuance of use is achieved.

## SCOPE

BOD 17-01 broadly applies to all Kaspersky products and services, and names the following products or services, in particular: Kaspersky Anti-Virus; Kaspersky Internet Security; Kaspersky Total Security; Kaspersky Small Office Security; Kaspersky Anti Targeted Attack; Kaspersky Endpoint Security; Kaspersky Cloud Security (Enterprise);[3] Kaspersky Private Security Network; and Kaspersky Embedded Systems Security.

In addition to the security products named above, BOD 17-01 specifically identifies "Kaspersky Cyber Security Services" as a prohibited service. It is not clear exactly to which services the Directive is

---

[3] BRG is not aware of a Kaspersky-branded product identified as "Kaspersky Cloud Security (Enterprise)." Instead, we believe the Directive is referring to Kaspersky Endpoint Security Cloud, which is a cloud-managed version of Kaspersky Endpoint Security.

AR0691



referring, but BRG interprets it to include Kaspersky's Threat Hunting, Incident Response, and Security Assessment services which are generally referred to as "Kaspersky Cybersecurity Services" on Kaspersky's website. BRG notes that the Directive specifically excludes from its scope Kaspersky's Threat Intelligence and Security Training services, which are also generally referred to as Kaspersky Cybersecurity Services on Kaspersky's website.

BRG also notes that the Directive explicitly excludes from its scope Kaspersky code embedded in the products of other companies.

## DHS METHODOLOGY

In connection with our assessment of the methodology employed by DHS in its issuance of BOD 17-01, BRG reviewed an unclassified DHS memorandum titled "Proposed Binding Operational Directive 17-01, Removal of Kaspersky-Branded Products" ("the DHS Memorandum").[4] The DHS Memorandum includes as supporting evidence 47 unclassified exhibits, the majority of which are public news articles and press releases related to Kaspersky or its founder and CEO, Eugene Kaspersky. The DHS Memorandum also references a classified annex purporting to provide additional evidence relevant to the Directive. The classified annex was not available to BRG for review.

### *General Information Security Risks*

The DHS Memorandum is predominately non-technical and focuses instead on public allegations that Eugene Kaspersky has ties to Russian intelligence or other government agencies, rather than on the technical risks or merits of Kaspersky software itself relative to other anti-virus software in use by the U.S. federal government. The memorandum does, however, cite a separate unclassified assessment[5] drafted by DHS's National Cybersecurity and Communications Integration Center ("NCCIC") that principally outlines general theoretical information security risks associated with the use of modern anti-virus software. The risks alleged in the NCCIC Assessment can broadly be summarized as follows:

1. anti-virus software products typically operate with the highest level of system privileges and could theoretically be co-opted by the anti-virus software vendor or other malicious parties (<u>e.g.</u> via exploitation of a software vulnerability) into performing unauthorized actions on the user's computer (<u>e.g.</u> data exfiltration);

---

[4] DHS Memorandum, *Proposed Binding Operational Directive 17-01, Removal of Kaspersky-Branded Products*, September 1, 2017.
[5] DHS NCCIC Assessment, *Information Security Risk Assessment: COTS Antivirus Software and Kaspersky-Branded Products*, August 29, 2017.

AR0692



2. anti-virus software products often intercept encrypted HTTPS traffic on the user's computer for the purposes of identifying or preventing malicious network traffic, which defeats the intended purpose of HTTPS;

3. any software that receives unencrypted updates over the network could be hijacked or otherwise tampered with in order to deliver malicious code to the user's computer; and,

4. anti-virus software vendors, in particular, could withhold legitimate software or anti-virus signature updates in order to intentionally prevent detection of malicious software.

The NCCIC Assessment acknowledges that the above information security risks are present in any commercial off-the-shelf ("COTS") anti-virus product. The authors of the assessment provide no evidence to indicate they performed a technical analysis of Kaspersky products—or any other COTS anti-virus product—in order to evaluate the degree to which they may be susceptible to the above attacks or information security risks. Nor does the assessment provide technical evidence demonstrating that Kaspersky products—or any other COTS anti-virus product—have been subjected to (or leveraged for) any of the above attacks.

## *Kaspersky-Specific Information Security Risks*

The only Kaspersky-specific information security risks identified in the NCCIC Assessment, which were subsequently referenced by the DHS Memorandum, can be summarized as follows:

1. the license agreement associated with the Kaspersky Security Network[6] ("KSN"), which can be used by some Kaspersky-branded software products, includes terms that could permit Kaspersky to collect files or other information from a user's device and upload it to Kaspersky; and,

2. Kaspersky's Cybersecurity Services, including Threat Hunting, Incident Response, and Security Assessment services, present an information security risk because they "involve direct or indirect access to a computer or network" or "through other abilities to influence information security practices on a network."

---

[6] Kaspersky Security Network ("KSN") is Kaspersky's cloud-based object (e.g. files or URLs) reputation service. Kaspersky anti-virus software can also provide to Kaspersky over KSN telemetry about the software, such as threats identified on the user's computer, and, optionally, the malicious files themselves.

AR0693



Again, neither the authors of the NCCIC Assessment nor the DHS Memorandum provide any technical evidence to indicate that KSN or Kaspersky's Cybersecurity Services—or any Kaspersky product or service—represent either a greater or lesser technical risk to federal information systems than similar anti-virus software products, vendors, or services.

## ANALYSIS

The methodology and resulting conclusions described by DHS in the memorandum supporting BOD 17-01 and its associated exhibits, including the NCCIC Assessment, are generally based on the presumption that anti-virus products such as Kaspersky-branded security products *could* be used for malicious purposes rather than on specific technical evidence concerning Kaspersky-branded products. Security experts have publicly argued that if DHS does possess such technical evidence demonstrating Kaspersky-branded software represents a significant information security risk, then that evidence should be disclosed to the public. For example, according to *Wired*, Nicholas Weaver, a University of California at Berkeley computer security researcher, commented, "It is critical to publicize [the evidence] because it will cause people to change behavior, even if it has no effect on the future risk calculation."[7] The article concludes, "If the feds know enough to be sure that Kaspersky's products are tainted, they should share enough to let the rest of us come to the same conclusion."

Further, if one were to accept DHS's conclusion that a particular software product or vendor should be banned based only upon its presumed susceptibility to exploitation by a malicious actor, that same conclusion could reasonably be extended to myriad other software products beyond anti-virus software or vendors besides Kaspersky. For example, several applications commonly found on federal information systems (e.g. web browsers, Microsoft Office products, and the Microsoft Windows operating system) have repeatedly been demonstrated to contain security vulnerabilities which could result in the execution of arbitrary code or commands on the victim's computer. Even enterprise-level hardware products, including network firewalls responsible for enforcing the security of a network, have been found to contain vulnerabilities that could be leveraged by a malicious actor to gain unauthorized access to data or systems.[8,9]

To the best of our knowledge, the U.S. government has not issued a similar ban on the use of these products within government networks or information systems.

---

[7] https://www.wired.com/story/us-kaspersky-ban-evidence/

[8] https://www.wired.com/2015/12/juniper-networks-hidden-backdoors-show-the-risk-of-government-backdoors/

[9] https://arstechnica.com/information-technology/2016/01/et-tu-fortinet-hard-coded-password-raises-new-backdoor-eavesdropping-fears/

AR0694



**CONFIDENTIAL BUSINESS INFORMATION**
**FOIA TREATMENT REQUESTED**

# III. Anti-Virus Software Security Risks to the U.S. Government

## BACKGROUND

Anti-virus software broadly refers to software used to detect, isolate (or "quarantine"), and remove malicious code or software (or "malware") from a computer system. There are many techniques used by modern anti-virus software to detect malware. Traditionally, anti-virus software relied on "signatures"[10] to detect malicious code. When an anti-virus vendor analyzes a piece of malware, they extract a fingerprint (or "signature") that can be used to identify the presence of that malware on a user's computer. The signature may be represented by a particular pattern of bytes, or some other algorithmic derivation of the malware such as a hash (e.g. MD5) or a fuzzy hash.[11] More modern techniques for identifying malicious software have been developed, including heuristic methods and machine learning models that can identify an inexact match to an existing signature, and behavioral methods to examine actions performed by a piece of computer code within a protected sandbox[12] in order to determine if it is safe to execute on the user's computer.

Detecting malicious code on a user's computer, whether in memory or stored in files on the user's hard drive, or malicious traffic on a user's computer network, requires the anti-virus software to operate with broad access to the computer's hardware and operating system. Typically the software includes a user interface ("UI") component that is visible to the user and runs with the same privileges as the user, as well as one or more underlying, highly-privileged software components, such as kernel-mode drivers[13] or SYSTEM-level[14] processes.

Anti-virus software vendors often include additional features in their software with the intent of improving the user's security. For example, most anti-virus software now also intercepts and

---

[10] BRG understands from interviews with Kaspersky personnel that, internally, Kaspersky uses the term "record" instead of "signature," as the former encompasses more modern approaches to malware detection. Other vendors may also use the terms "definition" or "signature" to refer to the same concept.

[11] Fuzzy hashing allows the comparison of fundamentally similar but non-identical pieces of data, such as computer code. Hashing, on the other hand, assumes that two pieces of data which differ by even a single bit will result in different hashes.

[12] This method of malware analysis and detection is sometimes referred to as "emulation."

[13] The "kernel" is a core component of a computer's operating system and is largely responsible for facilitating the interaction between other software running on the computer and the computer's CPU, memory, and other hardware devices (often via additional software called a "device driver").

[14] The SYSTEM account is an internal account on Microsoft Windows operating systems that operates at the highest privilege level.

AR0695



**CONFIDENTIAL BUSINESS INFORMATION
FOIA TREATMENT REQUESTED**

monitors network traffic on a user's computer, including encrypted web browsing traffic, in order to identify malicious code embedded in websites visited by the user. Some anti-virus software also checks the website's address (or "URL") against a list (sometimes called a "reputation list") of known or suspected malicious sites maintained by the anti-virus vendor before the anti-virus software permits the user to access the site.

In order for an anti-virus program to protect a user from a particular variant of malicious code or a malicious website, the vendor must continuously develop signatures or heuristic detection methods for newly-identified threats and provide those updated signatures or detection methods to the client via software updates. Given the rate at which malicious code is developed, most effective anti-virus programs require a means for the software to communicate directly or indirectly with the vendor over the Internet to receive signature updates quickly. The vendor must also obtain and analyze suspected instances of malware detected by their software. As a result, many anti-virus software vendors provide a method by which users of their software can either automatically or manually upload suspected malware to the vendor for analysis.

## U.S. GOVERNMENT USE OF ANTI-VIRUS SOFTWARE

The DHS Memorandum states that "a number of federal agencies use Kaspersky software as part of their anti-virus solution" based on "a DHS analysis of network traffic between federal agencies and known Kaspersky domains, as well as follow-up engagement with specific agencies." The DHS Memorandum does not, however, specify whether there was or has been any analysis or discussion with federal agencies as to which other software products are used as part of their anti-virus solution, nor does it discuss whether any such products have been reviewed for suitability for use on federal information systems based on the same criteria used to evaluate Kaspersky-branded products.

Consequently, we sought to determine, based on publicly available information, what other anti-virus products in addition to Kaspersky-branded products are used by federal government agencies and departments. BRG analyzed data from USASpending.gov,[15] a website that aggregates federal government contract data, for keywords such as "antivirus," "malware," and "spyware." BRG identified references to similar anti-virus software products from approximately 20 different developers which were purchased by the U.S. government for numerous federal departments or agencies over the past 10 years.[16]

---

[15] https://www.usaspending.gov/Pages/Default.aspx

[16] BRG notes that not all contracts provide information about the specific software product or product version purchased by the U.S. government. This estimate is based on contracts that specified this information in the contract description and so the total number of anti-virus software vendors may be higher.

AR0696



Based on our review of this data, BRG concludes that the U.S. government does not have a well-defined, consistent approach to the identification, evaluation, and procurement of anti-virus software across its various departments and agencies despite the information security concerns identified by the DHS Memorandum.

## INFORMATION SECURITY RISK ANALYSIS

BRG selected several of the anti-virus software products identified in the U.S. government procurement data described above to review in order to determine, in the context of the information security concerns used to justify the issuance of BOD 17-01, whether these products purchased by the U.S. government pose similar risks to federal information systems.

Vendors and products were selected based on a numbers of factors, including estimated volume of purchasing contracts in either US dollars or number of licenses, depending on the available information; comparability of available software features to those of the Kaspersky-branded products named in BOD 17-01 and whose functionality the Directive specifically identified as an information security risk (i.e. anti-virus functionality and HTTPS interception); and, companies whose development or operations may have affiliations with foreign countries or governments, which the Directive also identified as an information security risk.

Using the above criteria, BRG selected the following additional companies and products for further review:

| Developer | Product Name | Product Version |
|---|---|---|
| Avast | Business Antivirus Pro Plus | 17.7.2526 |
| AVG | AntiVirus Business Edition | 16.161.8039 |
| ESET | NOD 32 Antivirus | 11.0.144.0 |
| McAfee | Total Protection | 16.0.4 |
| Symantec | Endpoint Protection 14 | 14.0 RU1 |
| Trend Micro | Maximum Security | 12.0.1153 |

**Table 1. Anti-virus software companies and products selected for further review based on U.S. government procurement data.**

### *Vulnerabilities in Anti-Virus Software*

The DHS Memorandum alleges that, "Kaspersky anti-virus products and solutions provide broad access to files and elevated privileges on the computers on which the software is installed, which can be exploited by malicious cyber actors to compromise those information systems." BRG



conducted a limited technical analysis within the time available of the software products and public vulnerability databases to evaluate whether (a) these allegations are accurate in regards to Kaspersky-branded products; and, (b) other anti-virus products purchased by the U.S. government also operate with elevated privileges and may be or have been susceptible to compromise by malicious actors.

As expected, and acknowledged in the NCCIC Assessment, all of the software products reviewed contained components that operated with SYSTEM-level privileges. Each installed multiple kernel drivers within our test systems for various anti-malware purposes, including file system monitoring, process monitoring, and network traffic interception and inspection. A software vulnerability in any one of the kernel drivers or SYSTEM-level processes could reasonably result in a complete compromise of the user's computer.

BRG conducted a search of historical CVE[17] data and other public vulnerability disclosures to evaluate the extent to which these products may be (or have been) exploitable by malicious actors. In the past five years, security researchers have identified numerous vulnerabilities in software developed by each of the vendors listed above. In many cases, the identified software vulnerabilities would have permitted a malicious actor to compromise the system on which the product was installed, while others would enable the malicious actors to evade or bypass the protection purportedly provided by the anti-virus software.

Figure 1 summarizes the total number of CVE entries for vulnerabilities identified in products developed by anti-virus software vendors included in this review, grouped by vendor and severity[18] of the vulnerabilities. Again, given the lack of specific product and version details provided in the government procurement data, we note that some of the vulnerabilities assigned to a particular vendor may refer to products or product versions not in use by the U.S. government. Additionally, the CVE data is not necessarily an exhaustive list of all vulnerabilities identified in all anti-virus products included within the scope of this review. In any event, the data available indicates that security researchers have in the past identified critical security vulnerabilities in anti-virus software from all of the vendors in this review.

---

[17] Common Vulnerabilities and Exposures ("CVE") is an industry-standard list of unique identifiers assigned to publicly-disclosed software or firmware vulnerabilities. Identified vulnerabilities can be assigned a CVE number (or "ID") by a CVE Numbering Authority ("CNA"), which can then be referenced when publicly disclosing or discussing a vulnerability. The MITRE Corporation currently maintains CVE, though some corporations, such as Kaspersky Labs, have been approved to act as CNAs. It is not mandatory for an organization to assign a CVE number to a vulnerability discovered in their software and so CVE should not be considered an exhaustive list.

[18] Vulnerability severity scores are provided by the National Institute of Standards and Technology's ("NIST's") National Vulnerability Database (nvd.nist.gov), which analyzes CVEs and assigns a severity rating based on the Common Vulnerability Scoring System ("CVSS").

AR0698





**Figure 1. Number of CVE entries and corresponding severity disclosed in products developed by the anti-virus software vendors included in this review.[19] (Source: www.cvedetails.com)**

Most of the publicly-disclosed vulnerabilities were reported by independent security researchers, but it is reasonable to infer that sophisticated state-sponsored actors have the ability to identify and exploit similar vulnerabilities in anti-virus software. In addition, our review of public vulnerability disclosures and online media reports identified several instances in which malicious actors have been able to compromise some of the anti-virus companies themselves.

We have included below examples of vulnerabilities identified within the relevant anti-virus software products or vendors. Based on this data, BRG concludes that other anti-virus software products have been and may still be vulnerable to exploitation by malicious cyber actors as DHS alleges is the case for Kaspersky-branded software products.

## Kaspersky

- In October 2017, The New York Times reported that Israel had gained access to Kaspersky networks and identified NSA hacking tools. These reports have not been publicly confirmed.[20]

---

[19] BRG notes that some CVE entries may correspond to multiple vendors. Conversely, not all software vulnerabilities attributable to a particular vendor receive CVE entries.
[20] https://www.nytimes.com/2017/10/10/technology/kaspersky-lab-israel-russia-hacking.html

AR0699



- In June 2017, the Core Security Advisories Team reported that "multiple vulnerabilities were found in the Kaspersky Anti-Virus for Linux File Server Web Management Console. It is possible for a remote attacker to abuse these vulnerabilities and gain command execution as root."[21]

- In September 2015, Google Project Zero team member Tavis Ormandy reported that his team had "sent dozens of reports to Kaspersky to investigate, any of which could result in a complete compromise of any Kaspersky Antivirus user." In the same report, Ormandy also remarked that Kaspersky "set a high bar for other vendors" in terms of their response to the vulnerabilities.[22]

**Avast**

- In September 2017, Cisco's Talos security research division discovered that hackers had inserted a backdoor into CCleaner, an Avast-developed product intended to clean up devices.[23] According to Avast, the attack "used the popular PC cleaning software CCleaner version 5.33.6162 as a distribution vehicle… to deliver the 2nd stage payload" to hundreds of computers.[24]

- In February 2016, Kyriakos Economou of Netitude reported a vulnerability that enabled a "local user…[to] issue a specially crafted IOCTL request to the 'aswSnx.sys' driver to trigger a heap overflow and execute arbitrary code with SYSTEM level privileges on the target system."[25]

**AVG**

- In March 2017, Cybellum reported a vulnerability[26] in multiple AVG products that allowed a local attacker to take full control of any AVG process and turn the software into "a malicious agent, giving an illusion that the anti-virus protects you while actually it is abused in order to attack you." The vulnerability affected numerous other anti-virus products, including those from Kaspersky and all other vendors included in this review.[27]

- In December 2015, EnSilo reported that its researchers had identified a vulnerability in AVG which "effectively enabled a threat actor to exploit any old vulnerability (for instance, as of 2010) in a 3rd party application (such as Acrobat Reader) in order to compromise

---

[21] http://seclists.org/fulldisclosure/2017/Jun/33

[22] https://googleprojectzero.blogspot.com/2015/09/kaspersky-mo-unpackers-mo-problems.html

[23] https://www.wired.com/story/ccleaner-malware-supply-chain-software-security/

[24] https://blog.avast.com/progress-on-ccleaner-investigation

[25] https://www.securitytracker.com/id/1035093

[26] https://cve.mitre.org/cgi-bin/cvename.cgi?name=CVE-2017-5566

[27] http://cybellum.com/doubleagent-taking-full-control-antivirus/

AR0700



the underlying Windows system."[28] This vulnerability was also identified in McAfee Virus Scan Enterprise and Kaspersky Total Security 2015.

- In July 2014, a vulnerability was reported in the AVG Secure Search toolbar that could enable an "unauthenticated attacker to execute arbitrary code with the privileges of the user."[29] In order to do so, the attacker would have to convince "a user to view a specially crafted HTML document (e.g. a web page or an HTML email message or attachment)."

## ESET

- In February 2017, members of the Google Security Team reported that an ESET service was linked to an outdated parser library[30] that had a publicly known vulnerability. This enabled "remote unauthenticated attackers to perform arbitrary code execution as root on vulnerable clients."[31]

- In June 2015, Tavis Ormandy reported a vulnerability in "all currently supported versions and editions of ESET" that would enable a remote attacker to execute arbitrary commands as root.[32] Ormandy indicated that "any network connected computer running ESET can be completely compromised" and that "there would be zero indication of compromise."

- In June 2014, ESET informed its users that its online forum had been hacked, compromising usernames and passwords.[33]

## McAfee

- In January 2017, Trustwave SpiderLabs found two separate "local privilege escalation vulnerabilities" in McAfee Security Scan Plus. In practice, a user with physical access to a computer with McAfee Security Scan Plus installed could exploit these vulnerabilities to grant himself local administrator privileges.[34]

- In December 2016, Andrew Fasano of MIT Lincoln Laboratory reported that McAfee's VirusScan Enterprise for Linux "can be compromised by remote attackers due to a number of security vulnerabilities. Some of these vulnerabilities can be chained together to allow

---

[28] https://blog.ensilo.com/the-av-vulnerability-that-bypasses-mitigations

[29] http://www.kb.cert.org/vuls/id/960193

[30] The "parser library", in this instance, refers to a piece of software used by ESET to read and extract information from Extensible Markup Language ("XML") files.

[31] http://seclists.org/fulldisclosure/2017/Feb/68

[32] https://googleprojectzero.blogspot.com/2015/06/analysis-and-exploitation-of-eset.html

[33] https://www.myce.com/news/antivirus-company-eset-hacked-user-details-compromised-71738/

[34] https://www.trustwave.com/Resources/SpiderLabs-Blog/Two-Privilege-Escalation-Vulnerabilities-in-McAfee-Security-Scan-Plus/

AR0701



remote code execution as root."[35] Fasano also reported that after reporting the bugs, McAfee took six months to patch the vulnerabilities and release a security bulletin.

- In October 2015, McAfee reported a vulnerability in three of its enterprise products that allowed "remote attackers to bypass authentication by logging in with the username 'NGCP|NGCP|NGCP;' and any password."[36]

### Symantec

- In June 2017, security researchers identified vulnerabilities in the Symantec Messaging Gateway that could enable a remote attacker to execute arbitrary code on a target system and to bypass security controls.[37]

- In June 2016, Google's Project Zero found that Symantec's "flagship enterprise security product" contained "multiple critical vulnerabilities."[38] According to Tavis Ormandy, "These vulnerabilities are as bad as it gets. They don't require any user interaction, they affect the default configuration, and the software runs at the highest privilege levels possible." The vulnerabilities were reported on the following products, at least two of which were identified specifically in U.S. Government contracts:

  - Norton Security, Norton 360, and other legacy Norton products (All Platforms)
  - Symantec Endpoint Protection (All Versions, All Platforms)
  - Symantec Email Security (All Platforms)
  - Symantec Protection Engine (All Platforms)
  - Symantec Protection for SharePoint Servers

### Trend Micro

- From 2016-2017, Roberto Suggi Liverani and Steven Seeley "uncovered 223 weaknesses across 11 TrendMicro products. A whopping 194 can be exploited remotely, and all are triggered without user interaction, making them significantly more serious."[39] According to a report published on Forbes, the researchers characterized finding the vulnerabilities as "trivial" and wondered "why the company's own audits hand't [*sic*] picked up on many of them." Seeley also criticized Trend Micro's attempt to patch one of the issues noting, "Their patch completely failed and it was quite bad. I could have easily bypassed it."

---

[35] https://nation.state.actor/mcafee.html

[36] https://kc.mcafee.com/corporate/index?page=content&id=SB10137

[37] https://www.securitytracker.com/id/1038785

[38] https://googleprojectzero.blogspot.com/2016/06/how-to-compromise-enterprise-endpoint.html

[39] https://www.forbes.com/sites/thomasbrewster/2017/01/25/trend-micro-security-exposed-200-flaws-hacked/#62e2610b2678

AR0702

Case 1:17-cv-02697-CKK   Document 19-10   Filed 03/22/18   Page 58 of 200



- In March 2017, Trend Micro patched a vulnerability that "could allow an unauthenticated remote attacker to execute arbitrary code on an affected system."[40]

- In January 2016, Tavis Ormandy identified two vulnerabilities in the "Password Manager" component of Trend Micro's anti-virus product that would enable a remote user to "cause arbitrary code to be executed on the target user's system" and to "obtain passwords on the target system."[41] Ormandy noted one of the vulnerabilities in the report as "the most ridiculous thing I've ever seen."

- In 2008, *CNET* reported that Trend Micro's website was hacked in an "attack that spread to hundreds of other sites."[42]

## *Sensitive Data Collection*

The DHS Memorandum and its supporting documentation identifies specific language within Kaspersky's KSN user agreement (the "KSN Statement") and concludes that Kaspersky users who participate in KSN are exposed to "the traditional risks of anti-virus software, plus additional risks." Specifically, the Directive cites the following: "Kaspersky users agree to the transfer of 'highly sensitive data collected from a user's device, such as information about any files downloaded, web sites visited, running applications, user account names, software installed on the computer, and essentially the full spectrum of forensic data a device produces.'"

As noted previously, several anti-virus software vendors besides Kaspersky maintain their own networks for providing malware signature updates to users and collecting samples of suspected malware (e.g. Symantec's Global Intelligence Network 2.0[43]). We then sought to determine, to the extent possible, whether developers of other anti-virus software used by the U.S. government include within their software agreements language similar to that identified in the DHS Memorandum.

BRG reviewed the End User License Agreement ("EULAs") and/or Privacy Policy documents for the six additional anti-virus products listed above. Nearly every anti-virus product or vendor includes similar or, in some cases (e.g. McAfee), broader allowances for data collection compared to the KSN Statement cited by BOD 17-01 as an information security risk. Based on this review, BRG concludes that this particular information security risk is not unique to Kaspersky and its KSN Statement.

---

[40] https://success.trendmicro.com/solution/1116827

[41] https://securitytracker.com/id/1034662

[42] https://www.cnet.com/news/trend-micros-web-site-hacked-in-massive-attack/

[43] https://www.symantec.com/content/en/us/enterprise/white_papers/b-symantec-gin-WP-21288399.en-us.pdf

AR0703



Below are the vendor-specific findings relevant to this portion of our analysis:

**Kaspersky**

In addition to numerous file attributes and information about a user's system, the KSN Statement says:

> For additional examination the User agrees to provide files or parts of files, including objects detected through malicious links that could be exploited by intruders to harm the User's computer.[44]

According to Kaspersky's website, "users of Kaspersky Lab products can reduce the amount of data processed from their protected devices to the absolute minimum."[45] In particular, the EULA for Kaspersky Antivirus does not appear to permit collection of files without the KSN enabled:

> In order to identify new information security threats and their sources, enhance the operational protection of Users of the Software, and improve the quality of the product, You agree to automatically provide Kaspersky Lab with information specified in the Terms of Use of Kaspersky Security Network…You can activate and deactivate the Kaspersky Security Network service at any time in the Software settings window.[46]

BRG notes that the above text is also consistent with internal software documentation provided by Kaspersky for review.

**Avast**

According to the Avast EULA, the software can collect:

- "Information and files (including executable files) on your computer identified by the Software as potentially infected, together with the information about the nature of identified threats"[47]

- "Copies of the files identified by the Software as potentially infected or parts thereof may be automatically sent to AVAST for further examination and analysis"

The EULA also states:

> The collected information may be transferred to third parties or to other countries that may have less protective data protection laws than the country or region in which you

---

[44] https://support.kaspersky.com/11067#block0
[45] https://www.kaspersky.com/about/data-protection
[46] https://support.kaspersky.com/8752
[47] http://files.avast.com/files/legal/eula-avast-consumer.pdf

AR0704



are situated (including the European Union). AVAST takes measures to ensure that any collected information will receive an adequate level of protection if and when transferred.

## AVG

AVG's privacy policy indicates that its products may collect the following "non-personal data":

- "data concerning potential malware threats to your device and the target of those threats, including copies of files or emails marked as potential malware, file names, cryptographic hash, vendor, size, date stamps, associated registry keys, etc.";

- "information about how you use our products and their features, including information about your particular device, installation and uninstallation rates, language, technical parameters and manufacturer of a device, device security information (password attributes, encryption level), etc."; and,

- "information about where our products and services are used, including approximate location, zip code, area code, time zone, and the URL you came from to reach our products."[48]

The privacy policy also indicates that "AVG may share non-personal data with third parties and may publicly display aggregate or anonymous information."

## ESET

According to the EULA for ESET's NOD32 antivirus product:

> The Software contains functions which collect samples of computer viruses and other malicious computer programs and suspicious, problematic, potentially unwanted or potentially unsafe objects such as files, URLs, IP packets and ethernet frames (hereinafter referred to as "Infiltrations") and then send them to the Provider, including but not limited to information about the installation process, the computer and/or the platform on which the Software is installed, information about the operations and functionality of the Software and information about devices in local network such as type, vendor, model and/or name of device.

## McAfee

According to the McAfee Enterprise End User License Agreement:

> The Software, Support or service subscription may employ applications and tools to collect personally identifiable, sensitive or other information about you and users (e.g.,

---

[48] https://www.avg.com/en-us/privacy#what-do-you-collect-that-can-identify-me

AR0705



**CONFIDENTIAL BUSINESS INFORMATION**
**FOIA TREATMENT REQUESTED**

including, without limitation, your and users' name, address, e-mail address and payment details), their computers, files stored on their computers, or their computers' interactions with other computers (e.g., including, without limitation, information regarding network, licenses used, hardware type, model, hard disk size, CPU type, disk type, RAM size, 32 or 64 bit architecture, operating system types, versions, locale, BIOS version, BIOS model, total scanners deployed, database size, system telemetry, device ID, IP address, location, content," etc....)[49]

The McAfee Privacy Policy identified on their website indicates that the company may collect a variety of "personal information," including "account log-in credentials"; "photographs, images, video, and related hash values"; and, "data about files and communications, such as potential malware or spam (which may include computer files, emails and attachments, email addresses, metadata, and traffic data, or portions or hashes—a hash file is a file that has been converted into a numerical string by a mathematical algorithm—of any of this information)."

McAfee additionally states:

> …we have operations, entities, and service providers in the United States and throughout the world, including in India. As such, we and our service providers may transfer your personal information to, or access it in, jurisdictions that may not provide equivalent levels of data protection as your home jurisdiction. We will take steps to ensure that your personal information receives an adequate level of protection in the jurisdictions in which we process it.[50]

**Symantec**

According to the EULA for Symantec Endpoint Protection, the software can collect "portable executable files and files with executable content that are identified as malware." The EULA claims that what data the software is able to collect is dependent on user settings.[51] Information collected by Symantec may include:

- Executable files identified as potential malware, which could include Personal Information obtained by the malware without your permission; and,

- Email messages sent to Symantec with your permission reported as spam or incorrectly identified as spam;

---

[49] https://www.mcafee.com/us/resources/legal/end-user-license-agreements-en-us.pdf
[50] https://www.mcafee.com/ca/about/legal/privacy.aspx
[51] https://www.symantec.com/content/en/us/enterprise/eulas/b-endpoint-protection-12.1.2-eula-eng.pdf

AR0706



The EULA further states:

> The Transmitted Information and Stored Information may be transferred to Symantec, its affiliates and contractors in the United States or other countries that may have less protective data protection laws than the region in which You are situated (including the European Union) and will be stored and processed manually and electronically through global systems and tools for the purposes above. The Transmitted Information and Stored Information may be accessible by Symantec employees or contractors on a need-to-know basis, exclusively to be used in accordance with the purposes described above…. Symantec has taken steps so that the Transmitted Information and Stored Information, if transferred, receive an adequate level of protection.

**Trend Micro**

According to the Trend Micro Privacy Policy, its products can collect the following types of information "if you enable certain features such as Smart Feedback":[52]

- Product information
- Public IP address
- Mobile/PC environment
- Metadata from suspicious executable files
- URLs, Domains and IP addresses of websites visited
- Metadata of client/device managed by gateway product
- Application behaviors
- Information from suspicious e-mail, including sender and receiver email address, and attachments
- Detected malicious file information
- Detected malicious network connection information

The EULA for the specific anti-virus product evaluated by BRG did not provide any further information on the types of data that Trend Micro can collect.

## *Foreign Affiliations*

The preponderance of the DHS Memorandum focuses on public speculation regarding alleged ties between agencies affiliated with the Russian government and Kaspersky and its founder and CEO, Eugene Kaspersky. BRG is not in a position to verify or evaluate the accuracy of these media reports, but BRG does note that public records indicate that several of the anti-virus software developers whose products have been purchased by the U.S. government and included in BRG's review are, as is the case for Kaspersky, based outside the United States and/or maintain offices in foreign

---

[52] https://www.trendmicro.com/en_us/about/legal/privacy-policy-product.html

AR0707



countries. For example, according to company websites, Symantec,[53] McAfee,[54] and Trend Micro[55] have corporate offices in China, while Symantec, McAfee, Avast,[56] and Kaspersky[57] all maintain offices in Russia.

Additionally, most of the anti-virus companies included in our review indicate in their respective EULAs described previously that they may transmit data to third parties located in other countries. We found that some of the products reviewed also communicate directly with servers located outside of the U.S. In particular, Avast and ESET communicated with servers located in the Czech Republic and Slovakia, respectively. Our review also determined some of the products rely on third-party Content Distribution Networks ("CDNs"), such as Akamai (Trend Micro and Symantec), or hosting providers, such as Amazon Web Services (McAfee), for distribution of software, software updates, and/or malware signature updates or other security-related product functionality (e.g. file or website reputation services).

We also found the following online, media, and public records references indicating foreign affiliations for some of the anti-virus software vendors included in this review:

**Avast**

According to its website, Avast is headquartered in the Czech Republic.[58] Avast's subsidiary AVG was headquartered in The Netherlands until its 2016 acquisition. Marketing materials for Avast's SecureLine VPN product—included by default with the Avast product reviewed by BRG—indicate that it maintains servers in 19 countries, including China and Russia.[59]

**ESET**

According to its company website, ESET is headquartered in Bratislava, Slovakia. ESET's original anti-virus program, NOD, was originally developed in 1987 in Slovakia.[60]

---

[53] https://www.symantec.com/contact-us/

[54] https://www.mcafee.com/us/about/contact-us.aspx

[55] https://www.trendmicro.com/en_us/contact.html

[56] https://www.avast.com/en-us/contacts

[57] https://www.kaspersky.com/about/contact

[58] https://www.avast.com/en-us/contacts

[59] https://www.avast.com/secureline-vpn#pc

[60] https://www.eset.com/me/about/profile/history/
https://www.profesia.sk/en/work/eset/O3045644

AR0708



## Symantec

Symantec lists "Customer Success" profiles for two Chinese companies categorized as state-owned entities by the World Compliance Politically Exposed Person ("PEP") list: Yunnan Power Grid Company [61] and China Mobile Group Henan Company Ltd.[62] A review of available LinkedIn profiles also identified 889 employees who listed Symantec as their employer within China.

## Trend Micro

Trend Micro was originally founded in Los Angeles, California in 1988 and shortly thereafter relocated its headquarters to Taiwan. The company remained headquartered in Taiwan until its relocation to Japan in 1998.[63]

In July 2015, Chinese entity AsiaInfo acquired Trend Micro's Chinese subsidiary, Trend Micro (China) Co., Ltd.[64] An article posted to *Seeking Alpha* characterized the sale as Trend Micro's response to the implementation of a Chinese national security law requiring the disclosure of source code and other sensitive product information.[65] *The New York Times* reported that the Chinese law in question required technology companies that sell equipment to Chinese banks "to turn over secret source code, submit to invasive audits and build so-called 'back doors' into hardware and software…"[66,67]

---

[61] https://www.symantec.com/content/en/us/enterprise/customer_successes/b-yunnan-power-grid-company_CS.en-us.pdf

[62] http://eval.symantec.com/mktginfo/enterprise/customer_successes/b-china_mobile_group_henan_company_CS_20531021.en-us.pdf

[63] https://books.google.com/books?id=BHCmBgAAQBAJ&pg=PA221&lpg=PA221&dq=trend+micro+moved+headquarters+to+taiwan&source=bl&ots=vPaU7vKtOs&sig=xufvQvGf3Z73Md_0JXAJRnZSSfA&hl=en&sa=X&ved=0ahUKEwipgvbd2qDXAhULwrwKHWRMDYkQ6AEIaDAM#v=onepage&q=trend%20micro%20moved%20headquarters%20to%20taiwan&f=false

[64] http://newsroom.trendmicro.com/press-release/financial/asiainfo-acquire-trend-micro-chinese-subsidiary

[65] https://seekingalpha.com/article/3485526-china-national-security-law-bites-trend-micro

[66] https://www.nytimes.com/2015/01/29/technology/in-china-new-cybersecurity-rules-perturb-western-tech-companies.html

[67] BRG notes that other anti-virus software companies included in our review have offices and conduct business in China. It is not clear whether they would have also been subjected to the same requirements avoided by Trend Micro via the sale of their Chinese subsidiary.

AR0709



**CONFIDENTIAL BUSINESS INFORMATION**
**FOIA TREATMENT REQUESTED**

# IV. Preliminary Review of Kaspersky Lab Software

## SCOPE OF REVIEW

Given the significant number of Kaspersky-branded products named in BOD 17-01, the time required to conduct a full technical assessment of a complex product such as anti-virus software, and the limited amount of time available to BRG in which to conduct our initial review, our analysis described in this report is limited to the following high-level objectives:

- Evaluate whether it is feasible, as alleged in the Directive, for an intelligence agency to passively monitor and decrypt traffic between users of Kaspersky-branded products and the Kaspersky Security Network;

- Determine whether turning KSN off—or using KPSN—can reliably prevent potentially sensitive data from inadvertently being transmitted to Kaspersky; and,

- Evaluate whether there exists a mechanism by which a malicious actor leveraging KSN can conduct targeted searches of Kaspersky users for specific information.

In the process of evaluating the above topics, BRG obtained and installed the following Kaspersky-branded software products named in the BOD.

| Product | Version |
|---|---|
| Kaspersky Anti-Virus*[68] | 18.0.0.405 |
| Kaspersky Internet Security* | 18.0.0.405 |
| Kaspersky Total Security* | 18.0.0.405 |
| Kaspersky Small Office Security | 17.0.0.611 |
| Kaspersky Endpoint Security | 10.30.0.6294 AES256 |
| Kaspersky Embedded Systems Security | 2.0.0.385 |
| Kaspersky Private Security Network | 3.0 |
| Kaspersky Security Center | 10.4.343 |

**Table 2. Kaspersky software products included in this review.**

---

[68] For each of the products marked with an asterisk, BRG also independently obtained copies of the software via physical in-store purchases which were registered with accounts not directly linked to BRG or this engagement. We compared their behavior to the licensed versions provided by Kaspersky and noticed no abnormalities within the product functionality tested.

AR0710



Each of the products was installed within a test environment and instrumented to evaluate its file and network activity. BRG also conducted interviews and technical exchanges with Kaspersky research, development, and operations personnel. Additionally, BRG reviewed technical documentation related to Kaspersky's software architecture and its related KSN infrastructure, as well as a subset of Kaspersky source code related to KSN. Due to time constraints, BRG has not yet conducted a full source code review of the Kaspersky products identified in Table 2, though we do anticipate conducting such a review during the course of our engagement. We also detail below additional testing we plan to conduct related to each of objectives above.

## KASPERSKY SECURITY NETWORK & RELATED SERVICES

Kaspersky's KSN infrastructure supports several security-related services provided by Kaspersky software products, including file, website, and wireless network reputation services.[69] It also has the ability to receive information from clients, such as statistics regarding malware detected on users' computers or samples of malicious files, in order to improve Kaspersky's malware detection capabilities. As noted previously, many anti-virus vendors operate their own network infrastructure that serve functions similar to Kaspersky's KSN (e.g. Symantec's Norton Community Watch[70]).

### *Traffic Security*

The DHS Memorandum and NCCIC Assessment refer to KSN as a potential information security risk due to the presumed ability of a malicious third-party to monitor and intercept communications between KSN and users of Kaspersky software. During our product evaluations, we observed that Kaspersky anti-virus software products generally use one of three network protocols for communicating with Kaspersky infrastructure:[71] HTTP, HTTPS, and Kaspersky's proprietary KSN protocol.

### HTTP

The NCCIC Assessment stated that "virus definition updates sent over HTTP and vulnerable to MITM attacks" are a vulnerability "inherent to using any commercial antivirus engine." Kaspersky client

---

[69] A reputation service, in this context, is a service from which anti-virus software clients request information about an object (e.g. a file, file hash, or URL). The reputation service returns information about the object, such as the likelihood that the object is malicious, when that object was first detected by the anti-virus software vendor, etc.

[70] https://www.symantec.com/privacy/product-privacy-statements/norton-community-watch

[71] BRG has not yet independently reviewed any network protocols or other communications systems used within KSN or between KSN and Kaspersky's non-KSN IT infrastructure (e.g. Kaspersky offices or other datacenters).

AR0711



**CONFIDENTIAL BUSINESS INFORMATION**
**FOIA TREATMENT REQUESTED**

software primarily uses HTTP for downloading malware record updates[72] from Kaspersky's servers, as well as for downloading product installation files during initial setup and software updates. While information transmitted over HTTP is, of course, unencrypted and unauthenticated, each of the file types downloaded by Kaspersky software from Kaspersky application servers are authenticated via other standard code- or package-signing mechanisms.

BRG reviewed technical documentation related to Kaspersky's cryptographic signing processes, which rely principally on an internal software service referred to as Kaspersky Lab Signer ("KLS"). KLS is a centralized service intended to cryptographically sign the various file types used by Kaspersky software products prior to distribution to end users. Specifically, for the software included within this review, KLS signs Microsoft Windows installation files (e.g. .cab, .cat, .ctl, .msi, .msp, etc.) and executable files (e.g. .exe, .dll, and .ocx files) using Microsoft's Authenticode[73] code-signing standard. Kaspersky malware record bases are also signed by KLS prior to distribution over HTTP using the GOST 34.10.2001[74] cryptographic standard. Kaspersky client software then verifies the integrity of the bases or index files prior to installation on the user's computer. Consequently, users of Kaspersky software would likely be able to detect attempts by a malicious actor to tamper with application-related files downloaded over HTTP.

Due to time constraints, we have not yet been able to include an assessment of Kaspersky's internal security processes and procedures regarding access to and use of KLS and the keys used to sign bases, packages, or other updates distributed to Kaspersky software clients.

### HTTPS

BRG observed that Kaspersky client software currently uses HTTPS in limited situations. In particular, Kaspersky software will connect to Kaspersky infrastructure using HTTPS for purposes such as product activation, in-product content (e.g. "Kaspersky Lab news" and other consumer-focused content), license purchases and renewals, and uploading application crash dumps[75] to Kaspersky.

In all of the connections BRG observed during our evaluation, Kaspersky client applications followed industry-standard best practices for SSL/TLS encryption. For example, BRG observed that Kaspersky client software used TLSv1.2 by default for connecting to the respective Kaspersky

---

[72] BRG notes that Kaspersky has stated they intend to use HTTPS for all such traffic in the future.

[73] https://msdn.microsoft.com/en-us/library/ms537359(v=vs.85).aspx

[74] https://tools.ietf.org/html/rfc5832

[75] A "crash dump" is a diagnostic record or file created when a software application encounters an unrecoverable error (or "crash"). It often includes the state of the application when the error occurred, possibly including memory contents, logs, or other information about the software on the system at the time of the application crash.

AR0712



application or download servers, properly validated the authenticity of server certificates, and used strong cipher suites by default for session key negotiation and encryption, such as `TLS_ECDHE_RSA_WITH_AES_256_GCM_SHA384`.[76]

As part of our ongoing assessment, we intend to further validate the security of Kaspersky's client-side SSL/TLS implementation (based on the open-source OpenSSL[77] library), as well as the security processes used to manage the application servers themselves.

BRG notes that we identified two non-Kaspersky anti-virus software applications which did not properly validate their respective servers' SSL certificates. As a result, a man-in-the-middle attacker could intercept and potentially tamper with traffic between the vendors' client software and servers. Pursuant to standard vulnerability disclosure practice, BRG will disclose the affected vendors and products after the vendors have had an opportunity remediate the vulnerabilities.

## KSN

Kaspersky software uses its own proprietary, encrypted protocol for communicating with KSN. BRG has reviewed a subset of Kaspersky source code related to the KSN protocol and communicated with a Kaspersky developer with additional knowledge of its implementation. We have also verified, to the extent possible, the information received from Kaspersky regarding its KSN protocol via independent analysis of KSN network traffic generated by applications included in our review.

Based on this review, we understand the KSN protocol encryption to operate at a high-level as follows:

1) *Initial Setup*: Similar to SSL, each KSN server has a long-term 2048-bit RSA key pair consisting of a private key and a public key. Each server also has a randomly-generated short-term 256-bit AES secret key ("$K_S$") which, according to Kaspersky, is re-generated on a weekly basis. The long-term RSA private key and short-term AES secret key are shared across all KSN servers. The servers' RSA public key is distributed with Kaspersky client software.

---

[76] A "cipher suite" describes the set of cryptographic algorithms used to secure an SSL or TLS connection. In this example, the TLS connection is using elliptic curve Diffie-Hellman ("`ECDHE`") for session key negotiation, RSA ("`RSA`") for authentication using public-key cryptography, 256-bit AES in Galois/Counter Mode ("`AES_256_GCM`") for authenticated data encryption, and SHA-384 ("`SHA384`") for message digests (or "hashes").

[77] https://www.openssl.org/

AR0713



2) *Session Initialization*: When a Kaspersky client first connects to KSN, the client software generates and stores a new, random 256-bit AES key ("$K_C$") and encrypts a request (e.g. a file reputation request) with $K_C$. The client also encrypts $K_C$ with the server's RSA public key and appends the encrypted key to the AES-encrypted request. The KSN server then decrypts $K_C$ using its RSA private key and uses $K_C$ to decrypt the client's request. The server generates a response and encrypts it with $K_C$. The server also forms a "session token" by encrypting $K_C$ and the timestamp using the server's AES key $K_S$. The encrypted response and session token are sent back to the client, who can decrypt the server's response using $K_C$.

3) *Session Continuation*: When an existing client re-connects to KSN, the client reuses $K_C$ to encrypt its request and sends the encrypted request along with the session token to a KSN server. The KSN server can decrypt the session token using $K_S$ to recover $K_C$, and then decrypts the client's request using $K_C$. The server encrypts its response using $K_C$ and sends the encrypted response and session token back to the client.

Kaspersky has claimed that the above protocol is intended to (a) reduce load on KSN clients and servers, (b) permit clients to continue an encrypted KSN session across multiple separate TCP connections, and (c) enable any KSN server to handle a client's request since the server's do not maintain any connection state.

Based on our initial review, BRG has determined that the KSN protocol appears to be secure from decryption by a passive adversary who does not possess the server's RSA private key or secret AES key ($K_S$). However, the KSN protocol does not provide forward secrecy.[78] That is, if the server's RSA private key is compromised, a malicious actor could decrypt the client-generated AES key ($K_C$) and passively decrypt all previous or subsequent data sent by or to a Kaspersky client. Similarly, if the server's AES key is compromised, a malicious actor could recover the client-generated AES key from the encrypted session token and use the decrypted AES key to passively decrypt all previous or subsequent data sent by or to a Kaspersky client until the server rotates its AES key. Kaspersky has claimed that it is modifying its current KSN encryption protocol to incorporate a Diffie-Hellman[79] key exchange protocol that would provide for forward secrecy.

As part of our continued engagement, we anticipate including within our review a more comprehensive assessment of Kaspersky's KSN current protocol and planned revisions, as well as the processes and procedures regarding KSN server key generation and management.

---

[78] In cryptography, forward secrecy refers to a desirable property in an encrypted communications protocol in which a malicious actor who compromises a "long-term" key belonging to a client or server (e.g. a web server which uses TLS) is not able to recover previous "short-term" session keys used to encrypt transmitted data.

[79] Diffie-Hellman is a well-known algorithm that allows two parties to negotiate a shared secret key for use in an encryption algorithm such as AES.



## *Kaspersky Private Security Network*

While the DHS Memorandum and NCCIC Assessment posit several theoretical information risks associated with information sent to KSN by Kaspersky software, the NCCIC Assessment, in particular, acknowledges statements from Kaspersky indicating that users of Kaspersky software "have full control over telemetry (data) sharing with their participation being voluntary, and they can disable telemetry reporting completely at any given time." It is not clear from either report that DHS independently tested Kaspersky software to evaluate its interactions with KSN.

In our testing, we observed that, consistent with their respective EULAs, Kaspersky consumer-oriented products (i.e. Kaspersky Anti-Virus, Kaspersky Internet Security, and Kaspersky Total Security) communicated with KSN to a limited degree despite declining to agree to the KSN Statement during product installation and also disabling KSN within the application's user interface. In particular, during our testing we observed our sample malware was detected and, based on the size of the observed network traffic, likely uploaded to Kaspersky when KSN was enabled. When we disabled KSN, we infer from the minimal network traffic volume that only statistics about the infection were uploaded to Kaspersky.

Kaspersky has also previously stated that Kaspersky Private Security Network ("KPSN") is able to act as a self-hosted, on-premises alternative to Kaspersky's cloud-based KSN infrastructure and is available to Kaspersky's business and government customers. Based on Kaspersky documentation reviewed by BRG, KPSN can be installed in one of three configurations: (a) Standard, which allows all on-premises KPSN servers to access Kaspersky servers directly; (b) Unidirectional Gateway, in which access to Kaspersky servers is managed through a gateway installed and configured in an organization's DMZ[80] that allows only inbound traffic to the on-premises KPSN servers, and (c) Proxy, where traffic from the local network to the Internet is routed through a proxy server configured at the network's perimeter.

Given the limited time available, BRG has only configured and tested KPSN services using Kaspersky's "Standard" configuration, though we intend to evaluate the Unidirectional Gateway configuration as part of our assessment as well. During our testing, we monitored traffic between clients running Kaspersky Endpoint Security ("KES") and our KPSN installation, which is enabled using "access codes" generated by management utilities included with KPSN. An additional component, Kaspersky Security Center ("KSC"), is used to configure endpoints to communicate with KPSN instead of the public KSN cloud. It was also used to distribute malware record updates and software updates from Kaspersky to our KES endpoints.

---

[80] A demilitarized zone ("DMZ"), in the context of computer networking, is an isolated network that separates an organization's internal, trusted network from an untrusted network (e.g. the Internet).

AR0715



We observed our test KPSN installation using HTTPS and AMQPS[81] to download and update the reputational databases stored on our KPSN server. We also observed our KES endpoints connecting directly to our on-premises KPSN server rather than the public KSN cloud. When we placed malware samples on our KES endpoints, we observed traffic between KES and our KPSN server. We did not observe any traffic from our KPSN server to KSN or any other Kaspersky servers during our tests. Consequently, at least during our initial testing, we observed that using KPSN in connection with Kaspersky enterprise-oriented products limited what information was provided to Kaspersky in response to a malware infection.

While we noted previously that many anti-virus software vendors maintain networks analogous to KSN, it was not clear during the course of this review whether any of the other anti-virus software vendors we reviewed offer comparable self-hosted options similar to KPSN.

## *Malware Record Analysis*

As part of our analysis, BRG reviewed technical documentation related to the construction and distribution of malware signatures or "records" by Kaspersky malware analysts. We also reviewed files and file activity generated by Kaspersky software on our test systems. Kaspersky Lab Anti-Virus Architecture ("KLAVA") refers to the architecture of Kaspersky's core anti-virus software engine. Fundamentally, the KLAVA anti-virus engine, like most anti-virus engines, operates by ingesting a set of algorithms defined by Kaspersky malware analysts used to detect and, in some cases, remediate a malware infection identified on a user's computer.

Katran is Kaspersky's internal, domain-specific programming language used in the development of malware detection and remediation algorithms used by KLAVA. An implementation of a particular detection algorithm is referred to internally by Kaspersky as a "record." Each program or record contains information about a particular malware threat, such as the name or other identifier assigned to the threat, its signature or other means of detecting the threat, and an action (or "verdict") to take if the program identifies a file or process matching that threat. In addition to malware detection, records can also be used to update or patch the Kaspersky software itself.

Once completed, individual records are compiled and aggregated by Kaspersky's build process into multiple database files (called simply "bases"), which are stored in Kaspersky's proprietary KDC file format. The KLAVA engine ingests multiple bases, which are then used to detect and, if possible, remediate suspected malware infections. In addition to binary signatures or other more advanced detection methods defined in Katran, records can also include references (called "links") to executable procedures implemented in C/C++ code. Links have nearly unrestricted access to the

---

[81] AMQPS is an encrypted version of the Advanced Message Queuing Protocol ("AMQP"), which facilitates the efficient transfer of messages between many clients and servers over a network.

AR0716



user's system, including the ability to call operating system APIs or other low-level system functions.[82]

The KLAVA engine provides several library functions that can be called from a Katran program. Relevant to our analysis, KLAVA provides a function called "sendCurrObjectP2P" which allows the analyst to upload a file processed by KLAVA to Kaspersky for further analysis. KLAVA also exposes to Katran programs a number of additional functions that can be used to retrieve and upload information besides files, such as Microsoft Windows registry keys[83] or a log of a malicious object's behavior on the user's computer. Whether or not the user is notified about the detection is specified in the record's "verdict" section.

We anticipate including within our review a more comprehensive assessment of the circumstances in which a file will be uploaded to Kaspersky from a user's computer, as well as any mitigating techniques (e.g. KPSN) that may be available to users of Kaspersky software in order to limit what files may be uploaded to Kaspersky. Additionally, BRG will include a review of Kaspersky's operational processes related to any controls surrounding the development, testing, deployment, and auditability of records given their capabilities and breadth of system access.

## KASPERSKY ANTI-VIRUS SOFTWARE RANKINGS

While it is unclear from the public documentation available to BRG what criteria, if any, the government has used when purchasing anti-virus software from approximately 20 various vendors identified in our review of U.S. government procurement data, there does appear to be agreement that the U.S. government may be selecting anti-virus products on the basis of cost rather than other factors. At the October 25 Subcommittee on Oversight hearing regarding the U.S. government's use of anti-virus software, in response to a question from U.S. Congressman Jerry McNerney, Founder and President of a Washington, D.C.-based strategic consulting firm James Norton testified, "What we're seeing are the impacts of sequestration where we've essentially conditioned government executives, CIOs, other managers to really look for that LPTA[84] product and they might not necessarily look for the best type of software that's available."

---

[82] BRG understands that Kaspersky has plans to implement an isolated environment (or "sandbox") for a subset of links responsible for parsing potentially complex file formats. The sandbox environment will not, however, restrict links which call low-level operating system functions.

[83] The "registry" in Microsoft Windows is a database that stores settings or other information for or about the operating system and other applications on the system.

[84] The "Lowest Price Technically Acceptable" ("LPTA") refers to the contracting principle of identifying the lowest cost product that meets a defined set of minimum technical requirements.

AR0717



**CONFIDENTIAL BUSINESS INFORMATION**
**FOIA TREATMENT REQUESTED**

BRG has not independently conducted a comparison of the products included within this review for factors such as system performance and reliability of malware detection. Additionally, we note that there are no industry-recognized standards for testing anti-virus products, and that comparative anti-virus testing in general has been controversial. For example, in 2013, Eugene Kaspersky complained that independent anti-virus testing firm AV-TEST[85] had relaxed its certification criteria for home anti-virus software in order to encourage more vendors to participate and thus increase exposure and revenue for AV-TEST.[86] More recently, Cylance's VP of Industry Relations & Product Testing accused security testing companies of accepting payment in exchange for "test results [which] show 100% efficacy."[87]

The Anti-Malware Testing Standards Organization ("AMTSO"),[88] of which all of the anti-virus software vendors included in our review are members, is in the process of drafting standardized testing protocols that are intended to help ensure fairness and consistency in the testing process.

Given that there is currently no industry-standard anti-virus testing protocol and ranking system to use as a basis for comparison, we aggregated results from four different independent testing organizations: AV-Comparatives,[89] AV-TEST, SE Labs,[90] and Virus Bulletin.[91] These organizations are all members of the AMTSO and typically review multiple anti-virus products on the basis of (a) malware protection, (b) product usability, and (c) performance impact on the system. We identified from each testing organization the two most recent publicly-available individual test results for enterprise-related anti-virus software on Microsoft Windows and counted the number of "top"[92] ratings each software developer received. The results from our analysis are shown in Table 3.

---

[85] https://www.av-test.org/en/

[86] https://eugene.kaspersky.com/2013/05/09/av-test-certification-devalued/

[87] https://www.cylance.com/en_us/blog/security-testing-houses-know-the-truth.html

[88] http://www.amtso.org/

[89] https://www.av-comparatives.org/

[90] https://selabs.uk/

[91] https://www.virusbulletin.com/

[92] Testing organizations frequently use different scales when assigning a rating to an anti-virus product. For example, AV-TEST assigns a rating of 0 through 6 in each of the three categories listed above, while Virus Bulletin only assigns a binary rating of "VB100 Certified" or not. Several products or vendors can simultaneously receive a testing organization's highest rating within a given test. For the purposes of this comparison, we counted the number of times a vendor's product received the highest rating or certification in each respective testing organization's rating system.

AR0718



| Vendor | # Tests | # "Top" Ratings | % "Top" Ratings |
|---|---|---|---|
| Kaspersky | 8 | 8 | 100% |
| ESET | 6 | 5 | 83% |
| Avast | 4 | 3 | 75% |
| Symantec | 6 | 4 | 66% |
| AVG | 6 | 3 | 50% |
| Trend Micro | 6 | 3 | 50% |
| McAfee | 4 | 1 | 25% |

**Table 3. Aggregated test results from four independent testing organizations for anti-virus software from vendors identified within the scope of this review.**[93]

In any event, we observed that testing organizations and multiple online publications[94,95,96] consistently rank Kaspersky products in the top tier of anti-virus software available. Reviewers of Kaspersky-branded products typically cite positive lab test results and low impact on system performance,[97] and suggest that Kaspersky has historically been among the best anti-virus platforms.[98]

BRG also identified numerous negative online reviews from users of Kaspersky software which typically referenced poor customer service rather than flaws with the product itself. On the Consumer Affairs website, in particular, Kaspersky is seventh of sixteen listed among anti-virus products with a

---

[93] For the individual test results, please see the following references:
June 2017, https://www.av-test.org/en/antivirus/business-windows-client/windows-10/
August 2017, https://www.av-test.org/en/antivirus/business-windows-client/
https://selabs.uk/en/reports/enterprise April-June 2017
https://selabs.uk/en/reports/enterprise July-September 2017
https://www.virusbulletin.com/testing/results/test_from/2017-08/vb100-antimalware
https://www.virusbulletin.com/testing/results/test_from/2017-06/vb100-antimalware
September 2017, https://chart.av-comparatives.org/chart1.php
https://www.av-comparatives.org/wp-content/uploads/2017/10/avc_per_201710_en.pdf

[94] https://www.tomsguide.com/us/best-antivirus,review-2588.html
[95] http://www.expertreviews.co.uk/software/1405413/kaspersky-internet-security-2017-review-the-one-to-beat
[96] http://www.techradar.com/news/the-best-antivirus-software-of-2017
[97] https://www.av-test.org/en/antivirus/business-windows-client/
[98] https://www.pcmag.com/article2/0,2817,2372364,00.asp

AR0719



2/5 star rating.[99] A majority of the 26 one-star reviews refer to product installation and operation difficulties, followed by poor customer service support from Kaspersky.

# V. Conclusions

Based on our analysis of all materials reviewed in connection with this assessment, including testimony before the U.S. House of Representatives Committee on Science, Space, and Technology Subcommittee on Oversight, BRG concludes that the U.S. federal government lacks a consistent framework and process for evaluating information security risks of critical software, such as anti-virus software, for use on federal information systems.

The majority of the arguments cited by the DHS Memorandum in support of the issuance of BOD 17-01 are non-technical and based largely on speculation or allegations in public media regarding Kaspersky and its founder and CEO, Eugene Kaspersky. The NCCIC Assessment, in particular, does not appear to include any actual testing or evaluation of Kaspersky-branded software products or services, and instead relies only on information from Kaspersky's website. It also refers to presumptive information security risks that are not just present in anti-virus software from multiple vendors beyond Kaspersky, but also in many other types of software and hardware in general.

Consequently, the Directive fails to make a reasoned case based on technical evidence that Kaspersky-branded software products present a greater risk to the security of federal information systems than other comparable software purchased by the U.S. government.

## SUGGESTED SYSTEMATIC FRAMEWORK FOR U.S. GOVERNMENT SECURE SOFTWARE PROCUREMENT

In general, we believe it is incumbent on the federal government to enforce a set of standards which agencies can use to guide procurement processes related to information security. At the October 25 Subcommittee on Oversight hearing, Sean Kanuck, International Institute for Strategic Studies Director of the Future Conflict and Cyber Security program, similarly testified, "I would encourage the U.S. government to assess all IT products from all vendors regardless of national origin, because if we're trying to protect sensitive information, we should be fully cognizant that foreign intelligence actors will be willing to exploit any IT vendor that we're using, even if it's not of their own national origin." We outline below several key factors we believe should be considered when reviewing a security-critical software product, such as anti-virus software, or vendor for use on federal information systems.

---

[99] https://www.consumeraffairs.com/computers/kaspersky-anti-virus.html

AR0720



First, federal government agencies should agree upon a set of standards for secure software development practices and, critically, hold software vendors accountable to these standards. Congressman Ed Perlmutter commented at the same hearing that while NIST publishes "guidelines," the GSA "could demand something like that as part of the purchase." At the same Congressional hearing, Kanuck testified that a similar model has proven successful in the defense industrial base.

Many large software companies already publicize information about their secure software development lifecycles to demonstrate that they conform to industry standards, including McAfee[100] and Symantec.[101] Kaspersky has also recently launched its Global Transparency Initiative to provide similar public insight into their software development processes and procedures.[102] There are currently several widely accepted sets of secure software development practices, including those recommended by the U.S. National Institute of Standards and Technology.[103]

Second, the federal government should have a consistent framework for assessing information security risk in a given software product based, in part, on the developer's adherence to secure software development principles. Again, many industry-accepted software security assessment frameworks are publicly available, such as SAFECode's Principles for Software Assurance Assessment.[104] We believe that deciding on a subset of these for use in the federal government procurement process and enforcing their implementation would drastically improve the government's information security posture and reduce the overall threat of compromise. Using such a framework would also help to ensure an objective assessment of software products, such as those addressed in BOD 17-01.

Finally, after selecting approved software, it is equally important to ensure that the software is deployed, configured, and updated appropriately. Notably, several of the critical risks outlined in the Directive were entirely contingent on user configuration of anti-virus software. For example, according to Kaspersky documentation, use of the Kaspersky Security Network is optional in Kaspersky's business and government-oriented software products (e.g. Kaspersky Endpoint Security). Other risks could be mitigated by additional controls. For example, the NCCIC Assessment highlighted the risk that an anti-virus software developer such as Kaspersky could intentionally

---

[100] https://www.mcafee.com/us/resources/misc/ms-product-software-security-practices.pdf
[101] https://www.symantec.com/content/dam/symantec/docs/about/symantec-software-security-process-en.pdf
[102] https://usa.kaspersky.com/about/press-releases/2017_trust-first-kaspersky-lab-launches-its-global-transparency-initiative
[103] http://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-64r2.pdf
[104]
https://www.safecode.org/publication/SAFECode_Principles_for_Software_Assurance_Assessment.pdf



**CONFIDENTIAL BUSINESS INFORMATION
FOIA TREATMENT REQUESTED**

withhold certain malware signatures from the U.S. government in order to prevent detection of specific malicious software. This particular vulnerability could be mitigated by multiple layers anti-virus protection at the host and network level, a practice that NIST endorsed in a 2013 publication.[105]

We believe the above framework is a model for the basis of an objective assessment that can be applied by the U.S. government or an independent auditor to not just Kaspersky software, but also to other anti-virus software products anticipated for use on U.S. federal information systems.

# VI. FOIA Notice

Kaspersky Lab believes that this submission is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. Section 552(b)(4). Kaspersky Lab requests that your office provide Kaspersky Lab and BRG with written notification of any request under FOIA for release of the information contained herein. To the extent that this submission is reviewed or retained by other agencies of the U.S. Government, we request that it be protected from disclosure by those agencies pursuant to FOIA. If a decision is made to release this material, whether pursuant to a FOIA request or for any other reason, we request that we be provided with a ten-day advance written notice to the undersigned of any proposed release.

---

[105] http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-83r1.pdf

AR0722



**CONFIDENTIAL BUSINESS INFORMATION
FOIA TREATMENT REQUESTED**

# Overview of Berkeley Research Group

Berkeley Research Group, LLC is a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation and regulatory support, authoritative studies, strategic advice, and document and data analytics to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world.

From testifying in high-stakes litigation to consulting on large-scale projects, BRG experts and consultants combine intellectual rigor with practical, real-world experience and an in-depth understanding of industries and markets. Their expertise spans economics and finance, data analytics and statistics, and public policy in many of the major sectors of our economy, including healthcare, banking, information technology, energy, construction, and real estate.

Berkeley Research Group is headquartered in Emeryville, California, with offices across the United States and in Australia, Canada, Latin America, and the United Kingdom.

## ABOUT THE AUTHORS

### *Matthew Edman, Ph.D.*

Matthew Edman is a Director in BRG's Cyber Security and Investigations Group and is based in New York. Dr. Edman previously worked as a Lead Cyber Security Engineer for The MITRE Corporation, a federally funded research and development center, where he provided specialized computer network security research and development to federal law enforcement on a number of high-profile cases. Dr. Edman was recognized within law enforcement and the United States Intelligence Community as a subject matter expert on cyber investigations related to anonymous communication systems, such as Tor, and virtual currencies like Bitcoin.

Prior to joining BRG, Dr. Edman also worked as a Senior Vulnerability Engineer for a global financial services, software, and media company based in New York. As a member of the firm's Vulnerability Analysis Team, his work focused on the protection of sensitive client data from both internal and external threats through continuous vulnerability research, architecture design reviews, risk assessments, and penetration testing of the firm's network infrastructure, websites, software, and mobile applications.

Dr. Edman is a graduate of Baylor University with a B.S. in Computer Science and has an M.S. and Ph.D. in Computer Science from Rensselaer Polytechnic Institute, where his research areas included

AR0723



novel techniques for cryptographic security and authentication in wireless networks, and the design, implementation and analysis of anonymous communication systems on the Internet.

## *Thomas Kiernan*

Thomas Kiernan is an Associate Director in BRG's Cyber Security and Investigations Group and is based in New York. As a computer scientist with the FBI for more than 23 years, Mr. Kiernan investigated and provided technical support to a number of high-profile, ground-breaking cases, including the investigations of the Silk Road and Silk Road 2.0 online drug marketplaces, the dismantling of the Anonymous/LulzSec "hacktivist" groups, the Operation Citi-skim and Operation CardShop investigations into large-scale credit card fraud organizations, and the Operation Ghost Click/Rove Digital investigations which resulted in one of the largest malware takedowns on the Internet.

Mr. Kiernan is a graduate of St. John's University with a B.S. in Computer Science. He is also a Certified Forensic Computer Examiner (CFCE), a member of the International Association of Computer Investigative Specialists (IACIS), and an FBI-certified Digital Extraction Technician.

## *David Franzel*

David Franzel is a Senior Managing Consultant in BRG's Global Investigations and Strategic Intelligence Practice and is based in New York. Mr. Franzel has diverse experience that includes complex investigations, software project management, and network security. He has worked on matters related to forensic litigation support, competitive intelligence, transactional intelligence, risk-mitigation and compliance for both public and private sector clients. Mr. Franzel is also involved in domestic and international due diligence and business intelligence investigations involving research and analysis across a broad range of public records and information sources for investment banks, private equity firms and other businesses.

Prior to BRG, Mr. Franzel worked for a U.S.-based hedge fund where he was project manager of a large software development team responsible for a key technology security initiative. In that role, Mr. Franzel participated in implementing (and in some cases redesigning) security processes that protected the firm's highly sensitive intellectual property.

Prior to his work at the hedge fund, Mr. Franzel spent three years living and working in Egypt and subsequently joined a global consulting firm where he specialized in investigations. Mr. Franzel is a graduate of Claremont McKenna College with a B.A. in Middle Eastern Studies and is fluent in Arabic.



## *Jonathan Taber*

Jonathan Taber is a Senior Managing Consultant in BRG's Global Investigations and Strategic Intelligence Practice and is based in New York. Mr. Taber has more than nine years of investigative experience including asset tracing, enhanced due diligence, social media investigations, developing discreet source inquiries, anti-money laundering investigations, financial account audits, FCPA investigations and hostile takeover defenses. He is well versed in a variety of investigative databases, domestic and international public records resources, and software applications necessary to engineer creative solutions for complex investigative needs.

Prior to BRG, Mr. Taber spent three years at the Manhattan District Attorney's Office where he managed the evidentiary research of several high profile prosecutions involving terrorism, murder, and drug trafficking. As part of these prosecutions, Mr. Taber regularly testified in Grand Jury and New York State Supreme Court proceedings.

Mr. Taber is a graduate of the University of Delaware with a B.A. in Psychology and has an M.A. in Criminal Justice from the John Jay College of Criminal Justice.

AR0725

## UNIFIED STATE REGISTER OF LEGAL ENTITIES

Information about the legal entity

### JOINT STOCK COMPANY KASPERSKY LAB

Main State Registration Number (OGRN) 1027739867473

Taxpayer Identification Number (INN)/Reason-for-Registration Code (KPP) 7713140469/774301001 as of 19 October 2017

| No. | Title | Description |
|---|---|---|
| 1 | 2 | 3 |
| **Name** | | |
| 1 | Full name | KASPERSKY LAB JOINT STOCK COMPANY |
| 2 | Abbreviated name | KASPERSKY LAB JSC |
| 3 | State registration number and date when the entry containing the above information was made in the USRLE | 2157747178565 25 June 2015 |
| **Address (location)** | | |
| 4 | Postal code | 125212 |
| 5 | Constituent territory of the Russian Federation | THE CITY OF MOSCOW |
| 6 | Street (avenue, lane, etc.) | LENINGRADSKOE SHOSSE |
| 7 | House (estate, etc.) | HOUSE 39A |
| 8 | Block (building, etc.) | BUILDING 2 |
| 9 | State registration number and date when the entry containing the above information was made in the USRLE | 6147747131450 02 July 2014 |
| **Registration details** | | |
| 10 | Form of establishment | Establishment of a legal entity before 1 July 2002 |
| 11 | Main State Registration Number | 1027739867473 |
| 12 | Date when the Main State Registration Number was assigned | 24 December 2002 |
| 13 | Registration number assigned before 1 July 2002 | 867596 |
| 14 | Date of registration before 1 July 2002 | 26 June 1997 |
| 15 | Name of authority that registered the legal entity before 1 July 2002 | State Institution Moscow Registration Chamber |
| 16 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473 24 December 2002 |
| **Information about the registration authority at the legal entity's location** | | |
| 17 | Name of the registration authority | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| 18 | Address of the registration authority | 3, Pokhodny Proezd, building 2, Moscow, 125373 |
| 19 | State registration number and date when the entry containing the above information was made in the USRLE | 1 January 2008 |
| **Information about registration with the tax authority** | | |

| 20 | Taxpayer Identification Number | 7713140469 |
|---|---|---|
| 21 | Reason-for-Registration Code | 774301001 |
| 22 | Date of registration | 2 July 2014 |
| 23 | Name of the tax authority | Inspectorate of the Federal Tax Service No. 43 for Moscow |
| 24 | State registration number and date when the entry containing the above information was made in the USRLE | 6147747131471 2 July 2014 |
| **Information about registration as an insurant in the local department of the Pension Fund of the Russian Federation** | | |
| 25 | Registration number | 087206007431 |
| 26 | Date of registration | 9 July 2014 |
| 27 | Name of the local department of the Pension Fund | Government Institution - Main Department of the Pension Fund of the Russian Federation No. 5 for Moscow and Moscow Region, Voikovsky Municipal District of Moscow |
| 28 | State registration number and date when the entry containing the above information was made in the USRLE | 6147747338799 10 July 2014 |
| **Information about registration as an insurant in the executive body of the Social Insurance Fund of the Russian Federation** | | |
| 29 | Registration number | 770100494777011 |
| 30 | Date of registration | 11 September 1997 |
| 31 | Name of the executive body of the Social Insurance Fund | Branch No. 1 of Government Institution - Moscow Regional Division of the Social Insurance Fund of the Russian Federation |
| 32 | State registration number and date when the entry containing the above information was made in the USRLE | 8167748628370 12 September 2016 |
| **Information regarding charter capital (share capital, authorized fund, equity contributions)** | | |
| 33 | Type | CHARTER CAPITAL |
| 34 | Amount (in rubles) | 8,400 |
| 35 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473 24 December 2002 |
| **Information about the person having the right to act on behalf of the legal entity without a power of attorney** | | |
| 36 | State registration number and date when information of this person was entered in the USRLE | 2147747316924 4 June 2014 |
| | | |
| 37 | Surname | KASPERSKY |
| 38 | Name | EUGENE |
| 39 | Patronymic | VALENTINOVICH |
| 40 | Taxpayer Identification Number | 773304640227 |
| 41 | State registration number and date when the entry containing the above information was made in the USRLE | 2147747316924 4 June 2014 |
| 42 | Position | GENERAL DIRECTOR |
| 43 | State registration number and date when the entry containing the above information was made in the USRLE | 2147747316924 4 June 2014 |

| | Information regarding founders (participants) of the legal entity | |
|---|---|---|
| | *The Unified State Register of Legal Entities contains data of founders of the joint stock company and not about its shareholders in accordance with laws of the Russian Federation regarding state registration of legal entities. Data regarding company shareholders are reflected in the register of shareholders, whose holder is the company itself or the registrar* | |
| | **1** | |
| 44 | State registration number and date when information of this person was entered in the USRLE | 1027739867473 24 December 2002 |
| | | |
| 45 | Surname | KASPERSKY |
| 46 | Name | EUGENE |
| 47 | Patronymic | VALENTINOVICH |
| 48 | Taxpayer Identification Number | 773304640227 |
| 49 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473 24 December 2002 |
| | | |
| 50 | Nominal value of participation interest (in rubles) | 3,360 |
| 51 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473 24 December 2002 |
| | **2** | |
| 52 | State registration number and date when information of this person was entered in the USRLE | 1027739867473 24 December 2002 |
| | | |
| 53 | Surname | DE-MONDERIK |
| 54 | Name | ALEXEY |
| 55 | Patronymic | NIKOLAYEVICH |
| 56 | Taxpayer Identification Number | 771206313972 |
| 57 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473 24 December 2002 |
| | | |
| 58 | Nominal value of participation interest (in rubles) | 1,680 |
| 59 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473 24 December 2002 |
| | **3** | |
| 60 | State registration number and date when information of this person was entered in the USRLE | 1027739867473 24 December 2002 |
| | | |
| 61 | Surname | BOGDANOV |
| 62 | Name | VADIM |
| 63 | Patronymic | VIKTOROVICH |
| 64 | Taxpayer Identification Number | 772436855548 |

| 65 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473<br><br>24 December 2002 |
|---|---|---|
| 66 | Nominal value of participation interest (in rubles) | 1,680 |
| 67 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473<br>24 December 2002 |
| **4** | | |
| 68 | State registration number and date when information of this person was entered in the USRLE | 1027739867473<br>24 December 2002 |
| | | |
| 69 | Surname | KASPERSKAYA |
| 70 | Name | NATALIA |
| 71 | Patronymic | IVANOVNA |
| 72 | Taxpayer Identification Number | 771120669134 |
| 73 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473<br>24 December 2002 |
| | | |
| 74 | Nominal value of participation interest (in rubles) | 1,680 |
| 75 | State registration number and date when the entry containing the above information was made in the USRLE | 1027739867473<br>24 December 2002 |
| **Information regarding holder of register of shareholders of joint stock company** | | |
| 76 | State registration number and date when information of this person was entered in the USRLE | 7147747245397<br>7 August 2014 |
| 77 | Main State Registration Number | 1027739063087 |
| 78 | Taxpayer Identification Number | 7705038503 |
| 79 | Full name | COMPUTERSHARE REGISTRAR CLOSED JOINT STOCK COMPANY |
| 80 | State registration number and date when the entry containing the above information was made in the USRLE | 7147747245397<br>7 August 2014 |
| **Information about types of business activities according to the All-Russian Classification of Business Activities** | | |
| *(OKVED OK 029-2014 NACE, Rev. 2)* | | |
| ***Information about the main activity*** | | |
| 81 | Code and name of activity | 62.01 Development of computer software |
| 82 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| ***Information regarding additional activity*** | | |
| **1** | | |
| 83 | Code and name of activity | 46.49 Wholesale trade in other household goods |
| 84 | State registration number and date when the | 6177746724853 |

| | entry containing the above information was made in the USRLE | 21 February 2017 |
|---|---|---|
| | 2 | |
| 85 | Code and name of activity | 46.90 Wholesale non-specialized trade |
| 86 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 3 | |
| 87 | Code and name of activity | 47.99 Other retail trade outside stores, kiosks and markets |
| 88 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 4 | |
| 89 | Code and name of activity | 47.99.2 Trading through automated vending machines |
| 90 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 5 | |
| 91 | Code and name of activity | 62.02 Consulting activity and work in computer technologies area |
| 92 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 6 | |
| 93 | Code and name of activity | 62.02.1 Business of planning and design of computer systems |
| 94 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 7 | |
| 95 | Code and name of activity | 62.02.2 Business of survey and expert examination of computer systems |
| 96 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 8 | |
| 97 | Code and name of activity | 62.02.3 - Users training business |
| 98 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 9 | |
| 99 | Code and name of activity | 62.02.4 Business of computer systems preparation for operation |
| 100 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| | 10 | |
| 101 | Code and name of activity | 62.02.9 Other consulting activity in computer technologies area |

| 102 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
|---|---|---|
| | 11 | |
| 103 | Code and name of activity | 62.03 Computer equipment management business |
| 104 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 12 | |
| 105 | Code and name of activity | 62.03.1 Computer systems management business |
| 106 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 13 | |
| 107 | Code and name of activity | 62.03.11 Computer systems direct management business |
| 108 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 14 | |
| 109 | Code and name of activity | 62.03.12 Computer systems remote management business |
| 110 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 15 | |
| 111 | Code and name of activity | 62.03.13 Computer systems support business |
| 112 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 16 | |
| 113 | Code and name of activity | 62.03.19 Other computer equipment management business not included into other groups |
| 114 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 17 | |
| 115 | Code and name of activity | 63.11.1 Business of creation and use of databases and information resources |
| 116 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853<br>21 February 2017 |
| | 18 | |
| 117 | Code and name of activity | 63.11.9 Other business of providing information posting services |
| 118 | State registration number and date when the | 6177746724853 |

| | | |
|---|---|---|
| | entry containing the above information was made in the USRLE | 21 February 2017 |
| 19 | | |
| 119 | Code and name of activity | 69.10 Business in the area of law |
| 120 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| 20 | | |
| 121 | Code and name of activity | 70.21 Business in sphere of public relations |
| 122 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| 21 | | |
| 123 | Code and name of activity | 70.22 Consulting on commercial operations and management matters |
| 124 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| 22 | | |
| 125 | Code and name of activity | 72.19 Other scientific research and developments in the field of natural and technical sciences |
| 126 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| 23 | | |
| 127 | Code and name of activity | 72.19.1 Conducting fundamental studies, scientific and research and development work in the field of nuclear energy use and in the field of nuclear weapon products |
| 128 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| 24 | | |
| 129 | Code and name of activity | 73.20 Market survey and public opinion studies |
| 130 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| 25 | | |
| 131 | Code and name of activity | 73.20.1 Market survey |
| 132 | State registration number and date when the entry containing the above information was made in the USRLE | 6177746724853 21 February 2017 |
| Details of licenses | | |
| 133 | License number | 13175N ON LETTERHEAD LSZ No. 0009529 |
| 134 | License date | 27 September 2013 |
| 135 | License effective date | 27 September 2013 |
| 136 | Type of licensed activity, for which license was issued | Development, manufacture, distribution of encryption (cryptographic) devices, |

| | | information systems and telecommunications systems protected with the use of encryption (cryptographic) devices, performance of work, provision of services in the sphere of encryption of information, technical maintenance of encryption (cryptographic) devices, information systems and telecommunications systems protected with the use of encryption (cryptographic) devices (except for the cases when the technical maintenance of encryption (cryptographic) devices, information systems and telecommunications systems protected with the use of encryption (cryptographic) devices is performed for the own needs of a legal entity or an individual entrepreneur) |
|---|---|---|
| 137 | Name of licensing authority that issued or reissued the license | Center of Licensing, Certification and Protection of State Secret, 2nd Service |
| 138 | State registration number and date when the entry containing the above information was made in the USRLE | 9137747216390 25 October 2013 |

### Information about entries made in the Unified State Register of Legal Entities

**1**

| | | |
|---|---|---|
| 139 | State registration number and date when the entry was made in the USRLE | 1027739867473 24 December 2002 |
| 140 | Reason for making an entry in the USRLE | (R17001) Entry of information about the legal entity established before 1 July 2002 in the USRLE |
| 141 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 39 of the RF Ministry for Taxes and Levies for the City of Moscow |
| | | |
| | Information about the certificate confirming that the entry was made in the USRLE | |
| 142 | Series, number and date of issuance of the certificate | 77 6187423 24 December 2002 |

**2**

| | | |
|---|---|---|
| 143 | State registration number and date when the entry was made in the USRLE | 14 January 2003 |
| 144 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 145 | Name of the registration authority which made the entry in the USRLE | Inter-District Inspectorate of the Russian Federation Ministry of Taxes and Levies No. 13 for Northern Administrative District of Moscow |

**3**

| | | |
|---|---|---|
| 146 | State registration number and date when the entry was made in the USRLE | 2037733012744 25 February 2003 |
| 147 | Reason for making an entry in the USRLE | (R13001) Amendments to the constitutional documents |
| 148 | Name of the registration authority which made the entry in the USRLE | Inspectorate of the Russian Federation Ministry of Taxes and Levies No. 33 for |

AR0733

|  |  | Northwestern Administrative District of Moscow |
|---|---|---|
|  |  |  |
|  | Information about the certificate confirming that the entry was made in the USRLE |  |
| 149 | Series, number and date of issuance of the certificate | 77 001737512<br>25 February 2003 |
| **4** | | |
| 150 | State registration number and date when the entry was made in the USRLE | 2077758575915<br>02 August 2007 |
| 151 | Reason for making an entry in the USRLE | (R14001) Making amendments not related to the constitutional documents |
| 152 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
|  |  |  |
|  | Information about the documents submitted when the entry was made in the USRLE |  |
| 153 | Name of the document | APPLICATION (WITH ATTACHMENTS) |
| 154 | Date of the document | 27 July 2007 |
|  |  |  |
| 155 | Name of the document | OTHER |
| 156 | Date of the document | 27 July 2007 |
|  |  |  |
|  | Information about the certificate confirming that the entry was made in the USRLE |  |
| 157 | Series, number and date of issuance of the certificate | 77 008339618<br>02 August 2007 |
| **5** | | |
| 158 | State registration number and date when the entry was made in the USRLE | 2077759140303<br>16 August 2007 |
| 159 | Reason for making an entry in the USRLE | Entry of information on registration with the RF Pension Fund |
| 160 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **6** | | |
| 161 | State registration number and date when the entry was made in the USRLE | 7097746018781<br>05 March 2009 |
| 162 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 163 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **7** | | |
| 164 | State registration number and date when the entry was made in the USRLE | 7117747030658<br>04 October 2011 |
| 165 | Reason for making an entry in the USRLE | Entry of data on license issuance |
| 166 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **8** | | |

| 167 | State registration number and date when the entry was made in the USRLE | 7117747030746<br>04 October 2011 |
|---|---|---|
| 168 | Reason for making an entry in the USRLE | Entry of data on license issuance |
| 169 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |

<table>
<tr><td colspan="3" align="center"><strong>9</strong></td></tr>
<tr><td>170</td><td>State registration number and date when the entry was made in the USRLE</td><td>7117747030779<br>04 October 2011</td></tr>
<tr><td>171</td><td>Reason for making an entry in the USRLE</td><td>Entry of data on license issuance</td></tr>
<tr><td>172</td><td>Name of the registration authority which made the entry in the USRLE</td><td>Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow</td></tr>
<tr><td colspan="3" align="center"><strong>10</strong></td></tr>
<tr><td>173</td><td>State registration number and date when the entry was made in the USRLE</td><td>9137747216390<br>25 October 2013</td></tr>
<tr><td>174</td><td>Reason for making an entry in the USRLE</td><td>Entry of data on license issuance</td></tr>
<tr><td>175</td><td>Name of the registration authority which made the entry in the USRLE</td><td>Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow</td></tr>
<tr><td colspan="3" align="center"><strong>11</strong></td></tr>
<tr><td>176</td><td>State registration number and date when the entry was made in the USRLE</td><td>2147747316924<br>04 June 2014</td></tr>
<tr><td>177</td><td>Reason for making an entry in the USRLE</td><td>(R14001) Making amendments not related to the constitutional documents</td></tr>
<tr><td>178</td><td>Name of the registration authority which made the entry in the USRLE</td><td>Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow</td></tr>
<tr><td></td><td></td><td></td></tr>
<tr><td></td><td>Information about the documents submitted when the entry was made in the USRLE</td><td></td></tr>
<tr><td>179</td><td>Name of the document</td><td>R14001 APPLICATION FOR MAKING CHANGES TO INFORMATION NOT RELATED TO AMENDMENT OF THE CONSTITUTIONAL DOCUMENTS (PARAGRAPH 2.1)</td></tr>
<tr><td></td><td></td><td></td></tr>
<tr><td>180</td><td>Name of the document</td><td>RESOLUTION 1, LIST 1, ENVELOPE 1</td></tr>
<tr><td colspan="3" align="center"><strong>12</strong></td></tr>
<tr><td>181</td><td>State registration number and date when the entry was made in the USRLE</td><td>6147747131450<br>02 July 2014</td></tr>
<tr><td>182</td><td>Reason for making an entry in the USRLE</td><td>(R13001) Amendments to the constitutional documents</td></tr>
<tr><td>183</td><td>Name of the registration authority which made the entry in the USRLE</td><td>Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow</td></tr>
<tr><td></td><td></td><td></td></tr>
<tr><td></td><td>Information about the documents submitted when the entry was made in the USRLE</td><td></td></tr>
<tr><td>184</td><td>Name of the document</td><td>R13001 APPLICATION ON AMENDMENTS TO THE CONSTITUTIONAL DOCUMENTS</td></tr>
</table>

| | | |
|---|---|---|
| 185 | Name of the document | CHARTER OF LEGAL ENTITY |
| | | |
| 186 | Name of the document | DOCUMENT OF STATE DUTY PAYMENT |
| 187 | Number of the document | 4570127359 |
| 188 | Date of the document | 25 June 2014 |
| | | |
| 189 | Name of the document | RESOLUTION ON INTRODUCTION OF AMENDMENTS INTO CONSTITUTIONAL DOCUMENTS |
| | | |
| 190 | Name of the document | POWER OF ATTORNEY |
| | | |
| 191 | Name of the document | GUARANTEE LETTER 1, CERTIFICATE, COPY 1 |
| **13** | | |
| 192 | State registration number and date when the entry was made in the USRLE | 6147747131460 02 July 2014 |
| 193 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 194 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **14** | | |
| 195 | State registration number and date when the entry was made in the USRLE | 6147747131471 02 July 2014 |
| 196 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 197 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **15** | | |
| 198 | State registration number and date when the entry was made in the USRLE | 6147747210627 04 July 2014 |
| 199 | Reason for making an entry in the USRLE | Entry of information on registration with the RF Pension Fund |
| 200 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **16** | | |
| 201 | State registration number and date when the entry was made in the USRLE | 6147747338799 10 July 2014 |
| 202 | Reason for making an entry in the USRLE | Entry of information on registration with the RF Pension Fund |
| 203 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **17** | | |
| 204 | State registration number and date when the entry was made in the USRLE | 7147747245397 07 August 2014 |
| 205 | Reason for making an entry in the USRLE | (R14001) Making amendments not related to |

| | | |
|---|---|---|
| | | the constitutional documents |
| 206 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| | | |
| | Information about the documents submitted when the entry was made in the USRLE | |
| 207 | Name of the document | R14001 APPLICATION FOR MAKING CHANGES TO INFORMATION NOT RELATED TO AMENDMENT OF THE CONSTITUTIONAL DOCUMENTS (PARAGRAPH 2.1) |
| | | |
| 208 | Name of the document | Power of Attorney, NOTARIZED COPY |
| **18** | | |
| 209 | State registration number and date when the entry was made in the USRLE | 2157747178565 25 June 2015 |
| 210 | Reason for making an entry in the USRLE | (R13001) Amendments to the constitutional documents |
| 211 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| | | |
| | Information about the documents submitted when the entry was made in the USRLE | |
| 212 | Name of the document | R13001 APPLICATION ON AMENDMENTS TO THE CONSTITUTIONAL DOCUMENTS |
| 213 | Name of the document | CHARTER OF LEGAL ENTITY, NEW VERSION |
| | | |
| 214 | Name of the document | RESOLUTION ON INTRODUCTION OF AMENDMENTS INTO CONSTITUTIONAL DOCUMENTS |
| 215 | Name of the document | POWER OF ATTORNEY |
| **19** | | |
| 216 | State registration number and date when the entry was made in the USRLE | 8167748628370 12 September 2016 |
| 217 | Reason for making an entry in the USRLE | Entry of information on registration with the RF Social Insurance Fund |
| 218 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| **20** | | |
| 219 | State registration number and date when the entry was made in the USRLE | 6177746724853 21 February 2017 |
| 220 | Reason for making an entry in the USRLE | (R14001) Making amendments not related to the constitutional documents |
| 221 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of |

|  |  | Moscow |
|---|---|---|
| | Information about the documents submitted when the entry was made in the USRLE | |
| 222 | Name of the document | APPLICATION PER FORM R14001 |
| | | |
| 223 | Name of the document | MINUTES OF GENERAL PARTICIPANTS MEETING OF LEGAL ENTITY |
| 224 | Name of the document | ANOTHER DOCUMENT IN ACCORDANCE WITH RUSSIAN LAWS |

Information is sourced from the web site of the Federal Tax Service of Russia using the service "Information about the State Registration of Legal Entities, Individual Entrepreneurs and Peasant Farms".

## UNIFIED STATE REGISTER OF LEGAL ENTITIES

Information about the legal entity

### FEDERAL STATE BUDGET-SUPPORTED INSTITUTION "MILITARY UNIT 43753"

Main State Registration Number (OGRN): 1037739023024

Taxpayer Identification Number (INN)/Reason-for-Registration Code (KPP): 7731150251/773101001

as of 19 October 2017

| No. | Title | Description |
|---|---|---|
| 1 | 2 | 3 |
| **Name** | | |
| 1 | Full name | FEDERAL STATE BUDGET-SUPPORTED INSTITUTION "MILITARY UNIT 43753" |
| 2 | Abbreviated name | FSBSI "MILITARY UNIT 43753" |
| 3 | State registration number and date when the entry containing the above information was made in the USRLE | 2117747493708 2 August 2011 |
| **Address (location)** | | |
| 4 | Postal code | 121351 |
| 5 | Constituent territory of the Russian Federation | CITY OF MOSCOW |
| 6 | Street (avenue, lane, etc.) | MILITARY UNIT 43753 STREET |
| 7 | State registration number and date when the entry containing the above information was made in the USRLE | 2107747081649 22 April 2010 |
| **Registration details** | | |
| 8 | Form of establishment | Establishment of a legal entity before 1 July 2002 |
| 9 | Main State Registration Number | 1037739023024 |
| 10 | Date when the Main State Registration Number was assigned | 5 January 2003 |
| 11 | Registration number assigned before 1 July 2002 | 313 |
| 12 | Date of registration before 1 July 2002 | 24 December 1991 |
| 13 | State registration number and date when the entry containing the above information was made in the USRLE | 1037739023024 5 January 2003 |
| **Information about the registration authority at the legal entity's location** | | |
| 14 | Name of the registration authority | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| 15 | Address of the registration authority | 3, Pokhodny Proezd, building 2, Moscow, 125373 |
| 16 | State registration number and date when the entry containing the above information was made in the USRLE | 1 January 2008 |
| **Information about registration with the tax authority** | | |

AR0739

| 17 | Taxpayer Identification Number | 7731150251 |
|---|---|---|
| 18 | Reason-for-Registration Code | 773101001 |
| 19 | Date of registration | 30 October 1994 |
| 20 | Name of the tax authority | Inspectorate No. 31 of the Federal Tax Service for the City of Moscow |
| 21 | State registration number and date when the entry containing the above information was made in the USRLE | 2117747493719<br>2 August 2011 |

| **Information about registration as an insurant in the local department of the Pension Fund of the Russian Federation** | | |
|---|---|---|
| 22 | Registration number | 087415043588 |
| 23 | Date of registration | 18 April 2005 |
| 24 | Name of the local department of the Pension Fund | State Institution – Main Department of the RF Pension Fund No. 7 for the City of Moscow and the Moscow Region –<br>Municipal District Sokolinaya Gora of the City of Moscow |
| 25 | State registration number and date when the entry containing the above information was made in the USRLE | 9167749192844<br><br>28 October 2016 |

| **Information about registration as an insurant in the executive body of the Social Insurance Fund of the Russian Federation** | | |
|---|---|---|
| 26 | Registration number | 772515090677251 |
| 27 | Date of registration | 12 December 2013 |
| 28 | Name of the executive body of the Social Insurance Fund | Branch No. 25 of the State Institution – Moscow Regional Division of the Social Insurance Fund of the Russian Federation |
| 29 | State registration number and date when the entry containing the above information was made in the USRLE | 2137748948401<br>13 December 2013 |

| **Information about the person having the right to act on behalf of the legal entity without a power of attorney** | | |
|---|---|---|
| 30 | State registration number and date when information of this person was entered in the USRLE | 6157748774573<br>25 December 2015 |
| 31 | Surname | IVASHKO |
| 32 | Name | ANDREY |
| 33 | Patronymic | MIKHAYLOVICH |
| 34 | Taxpayer Identification Number | 504807939760 |
| 35 | State registration number and date when the entry containing the above information was made in the USRLE | 6157748774573<br><br>25 December 2015 |
| 36 | Position | UNIT COMMANDER |
| 37 | State registration number and date when the entry containing the above information was made in the USRLE | 6157748774573<br><br>25 December 2015 |

**Information about types of business activities according to the All-Russian Classification of**

AR0740

| Business Activities (OKVED OK 029-2014 NACE, Rev. 2) | | |
|---|---|---|
| **Information about the main activity** | | |
| 38 | Code and name of activity | 84.24 Activities to ensure public order and security |
| 39 | State registration number and date when the entry containing the above information was made in the USRLE | 6157748774573<br><br>25 December 2015 |
| **Information about entries made in the Unified State Register of Legal Entities** | | |
| **1** | | |
| 40 | State registration number and date when the entry was made in the USRLE | 1037739023024<br>5 January 2003 |
| 41 | Reason for making an entry in the USRLE | (R17001) Entry of information about the legal entity established before 1 July 2002 in the USRLE |
| 42 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 39 of the RF Ministry for Taxes and Levies for the City of Moscow |
| | Information about the certificate confirming that the entry was made in the USRLE | |
| 43 | Series, number and date of issuance of the certificate | 77 007294220<br>5 January 2003 |
| **2** | | |
| 44 | State registration number and date when the entry was made in the USRLE | 2057731030905<br>12 April 2005 |
| 45 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 46 | Name of the registration authority which made the entry in the USRLE | Inspectorate No. 31 of the Federal Tax Service for the City of Moscow |
| **3** | | |
| 47 | State registration number and date when the entry was made in the USRLE | 7107746055553<br>12 February 2010 |
| 48 | Reason for making an entry in the USRLE | (R14001) Making amendments not related to the constitutional documents |
| 49 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| | Information about the documents submitted when the entry was made in the USRLE | |
| 50 | Name of the document | R14001 Application for making changes to information not related to amendment of the constitutional documents (paragraph 2.1) |
| 51 | Name of the document | ENVELOPE |
| | Information about the certificate confirming that the entry was made in the USRLE | |
| 52 | Series, number and date of issuance of the | 77 013575250 |

AR0741

| | certificate | 12 February 2010 |
|---|---|---|
| | | |
| | Information about the status of the entry | |
| 53 | Status of the entry | The entry was corrected in connection with the technical error made by the registration authority |
| 54 | State registration number and date of the correcting entry made in connection with the technical error | 9107746270018 5 April 2010 |
| **4** | | |
| 55 | State registration number and date of the entry in the USRLE | 9107746270018 5 April 2010 |
| 56 | Reason for making an entry in the USRLE | Correction of mistakes made by the registration authority |
| 57 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| 58 | State registration number and date of the entry which was corrected | 7107746055553 12 February 2010 |
| **5** | | |
| 59 | State registration number and date of the entry in the USRLE | 2107747081649 22 April 2010 |
| 60 | Reason for making an entry in the USRLE | (R13001) Amendments to the constitutional documents |
| 61 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| | | |
| | Information about the documents submitted when the entry was made in the USRLE | |
| 62 | Name of the document | R13001 Application for making amendments to the constitutional documents |
| | | |
| 63 | Name of the document | Charter of the legal entity |
| 64 | Date of the document | 20 March 2010 |
| | | |
| 65 | Name of the document | Decision to make amendments to the constitutional documents |
| 66 | Number of the document | No.130 |
| 67 | Date of the document | 20 March 2010 |
| | | |
| 68 | Name of the document | CHARTER |
| | | |
| 69 | Name of the document | ORDER + LIST |
| | | |
| 70 | Name of the document | REQUEST + RECEIPT |
| | | |
| 71 | Name of the document | ENVELOPE |
| | | |
| 72 | Name of the document | Document confirming payment of the stamp duty |

| 73 | Number of the document | 235 |
|---|---|---|
| 74 | Date of the document | 19 April 2010 |
| | | |
| | Information about the certificate confirming that the entry was made in the USRLE | |
| 75 | Series, number and date of issuance of the certificate | 77 013349576<br>22 April 2010 |

**6**

| 76 | State registration number and date when the entry was made in the USRLE | 2107747081650<br>22 April 2010 |
|---|---|---|
| 77 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 78 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |

**7**

| 79 | State registration number and date when the entry was made in the USRLE | 2117747493708<br>2 August 2011 |
|---|---|---|
| 80 | Reason for making an entry in the USRLE | (R13001) Amendments to the constitutional documents |
| 81 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| | | |
| | Information about the documents submitted when the entry was made in the USRLE | |
| 82 | Name of the document | R13001 Application on amendments to the constitutional documents |
| | | |
| 83 | Name of the document | Document confirming payment of the stamp duty |
| 84 | Number of the document | 4 |
| 85 | Date of the document | 28 July 2011 |
| | | |
| 86 | Name of the document | Charter of the legal entity |
| 87 | Date of the document | 30 June 2011 |
| | | |
| 88 | Name of the document | Decision to make amendments to the constitutional documents |
| 89 | Number of the document | No. 287 |
| 90 | Date of the document | 30 June 2011 |
| | | |
| 91 | Name of the document | COPY OF THE CHARTER |
| | | |
| 92 | Name of the document | ORDER, POWER OF ATTORNEY, LIST, REQUEST, ENVELOPE |
| | | |
| 93 | Name of the document | Payment document for the provision of information contained in the State Register |
| 94 | Number of the document | 3 |

AR0743

| 95 | Date of the document | 28 July 2011 |
|---|---|---|
| | | |
| | Information about the certificate confirming that the entry was made in the USRLE | |
| 96 | Series, number and date of issuance of the certificate | 77 011902142<br>2 August 2011 |

| **8** | | |
|---|---|---|
| 97 | State registration number and date when the entry was made in the USRLE | 2117747493719<br>2 August 2011 |
| 98 | Reason for making an entry in the USRLE | Entry of information about registration with the tax authority |
| 99 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |

| **9** | | |
|---|---|---|
| 100 | State registration number and date when the entry was made in the USRLE | 2127746621704<br>3 February 2012 |
| 101 | Reason for making an entry in the USRLE | (R14001) Making amendments not related to the constitutional documents |
| 102 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |
| | | |
| | Information about the documents submitted when the entry was made in the USRLE | |
| 103 | Name of the document | R14001 Application for making changes to information not related to amendment of the constitutional documents (paragraph 2.1) |
| | | |
| 104 | Name of the document | ENVELOPE, POWER OF ATTORNEY, LIST, REQUEST |
| | | |
| | Information about the certificate confirming that the entry was made in the USRLE | |
| 105 | Series, number and date of issuance of the certificate | 77 014455788<br>3 February 2012 |

| **10** | | |
|---|---|---|
| 106 | State registration number and date when the entry was made in the USRLE | 2137748948401<br>13 December 2013 |
| 107 | Reason for making an entry in the USRLE | Entry of information on registration with the RF Social Insurance Fund |
| 108 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |

| **11** | | |
|---|---|---|
| 109 | State registration number and date when the entry was made in the USRLE | 6157748774573<br>25 December 2015 |
| 110 | Reason for making an entry in the USRLE | (R14001) Making amendments not related to the constitutional documents |
| 111 | Name of the registration authority which | Inter-district Inspectorate No. 46 of the |

|  |  |  |
|---|---|---|
|  | made the entry in the USRLE | Federal Tax Service for the City of Moscow |
|  |  |  |
|  | Information about the documents submitted when the entry was made in the USRLE |  |
| 112 | Name of the document | R14001 APPLICATION FOR MAKING CHANGES TO INFORMATION NOT RELATED TO AMENDMENT OF THE CONSTITUTIONAL DOCUMENTS (PARAGRAPH 2.1) |
|  |  |  |
| 113 | Name of the document | POWER OF ATTORNEY E.V. KARPUSHIN |
| **12** |  |  |
| 114 | State registration number and date when the entry was made in the USRLE | 9167749192844 28 October 2016 |
| 115 | Reason for making an entry in the USRLE | Entry of information on registration with the RF Pension Fund |
| 116 | Name of the registration authority which made the entry in the USRLE | Inter-district Inspectorate No. 46 of the Federal Tax Service for the City of Moscow |

Information is sourced from the web site of the Federal Tax Service of Russia using the service "Information about the State Registration of Legal Entities, Individual Entrepreneurs and Peasant Farms".

Information from the web site of the Federal Tax Service of Russia
19.10.2017 16:51

MSRN 1037739023024

Page 1 of 7

AR0745

# Exhibit J

U.S. Department of Homeland Security
Washington, DC 20528



December 6, 2017

**FINAL DECISION**

MEMORANDUM FROM THE ACTING SECRETARY

SUBJECT:          **Binding Operational Directive 17-01**

The Federal Information Security Modernization Act authorizes the Department of Homeland
Security ("DHS") to issue binding operational directives ("BODs") to federal executive branch
agencies "for the purposes of safeguarding federal information and information systems from a
known or reasonably suspected information security threat, vulnerability, or risk."[1]  On
September 13, 2017, I issued BOD 17-01, which required federal agencies to take certain steps to
address the known and reasonably suspected threat, vulnerability, and risk presented by
Kaspersky-branded products.

BOD 17-01 requires agencies to identify the use or presence of Kaspersky-branded products and
begin to implement agency plans to remove and discontinue present and future use of Kaspersky-
branded products starting at 90 calendar days after issuance of the BOD, unless directed
otherwise by DHS based on new information.  The Decision Memorandum that I issued
concurrently with the issuance of the BOD stated that I may modify or terminate the BOD based
on new information provided during the administrative process that was described in the *Federal
Register*.  As explained further below, however, the information obtained by DHS since issuance
of the BOD does not meaningfully impact, and indeed further supports, the information security
and national security determination that I made in issuing the BOD.  I therefore issue this Final
Decision maintaining BOD 17-01 without modification.

**BACKGROUND**

On September 13, 2017, I issued a Decision Memorandum that included:  the background and
legal authority for issuing a BOD; a summary of the unclassified evidence and analysis in
support of the BOD and contrary evidence from Kaspersky provided in an Information
Memorandum from the Assistant Secretary for Cybersecurity and Communications (the
"September 1 Information Memorandum"), including an Information Security Risk Assessment
prepared by the National Cybersecurity and Communications Integration Center (the "NCCIC
Assessment"); an explanation of the administrative process that the Department was making
available to Kaspersky and any other entity that claims its commercial interests are directly

---

[1] 44 U.S.C. §§ 3552(b)(1), 3553(b)(2).

AR0934

impacted by the BOD;[2] an explanation of my determination that a BOD was a more appropriate process than a debarment proceeding for addressing the information security risks posed by Kaspersky-branded products; and my decision to issue BOD 17-01 because I determined that Kaspersky-branded products present a known or reasonably suspected information security threat, vulnerability, or risk to federal information and information systems. In addition, I stated in the Decision Memorandum that I made that determination based on the unclassified record alone, although I also reviewed classified information, included in a Classified Annex to the September 1 Information Memorandum, which provides further support for exercising my authority to issue BOD 17-01.

Since issuing BOD 17-01 and that Decision Memorandum, the Department has received a submission from Kaspersky pursuant to the administrative process (the "Kaspersky Submission"). As it committed to in the Decision Memorandum, the Department closely reviewed the Kaspersky Submission. It also met with Kaspersky and its counsel on November 29, 2017. In addition, the Department identified additional statements by Kaspersky from public sources, obtained information from agencies pursuant to the BOD 17-01 reporting requirements, and received a report on relevant provisions of Russian law prepared by Professor Peter Maggs of the University of Illinois College of Law (the "Maggs Report"), as well as a Supplemental Assessment from the National Cybersecurity and Communications Integration Center. The Department also is aware of the passage of the National Defense Authorization Act for Fiscal Year 2018, including the Kaspersky prohibition contained at Section 1634, which is effective on October 1, 2018. Each of these sources of information is addressed in an Information Memorandum, dated December 4, 2017, from the Assistant Secretary for Cybersecurity and Communications (the "December 4 Information Memorandum"). That Information Memorandum contains a detailed analysis of the Kaspersky Submission.

## DECISION

Based on the totality of the administrative record, my determination that Kaspersky-branded products present a known or reasonably suspected information security threat, vulnerability, or risk to federal information and information systems remains unchanged. I therefore have determined to maintain BOD 17-01 without modification. As with the determination to issue BOD 17-01, this determination is based on the unclassified record alone, although the classified information contained in the Classified Annex to the September 1 Information Memorandum further supports this action.

---

[2] DHS published BOD 17-01 and the administrative process in the *Federal Register* on September 19, 2017. DHS National Protection and Programs Directorate, *Notification of Issuance of Binding Operational Directive 17-01 and Establishment of Procedures for Responses*, 82 Fed. Reg. 43782 (Sept. 19, 2017). The description of the administrative process in the *Federal Register* advised Kaspersky and other entities "to provide the Department with a written response and any additional information or evidence supporting the response, to explain the adverse consequences, address the Department's concerns, or mitigate those concerns." *Id.* at 43784. As required, the Assistant Secretary for Cybersecurity and Communications reviewed the materials and issued a recommendation to me, and I am required to communicate my decision to the submitting entity in writing by December 13, 2017. I have issued this Final Decision in advance of December 13 to conclude the administrative process before agencies are required to start to implement their plans for removing Kaspersky-branded products.

2

As explained in detail in the September 1 Information Memorandum, including the NCCIC Assessment, and as summarized in the Decision Memorandum, the Department's concerns include the following: federal agencies are using Kaspersky-branded products on federal information systems; anti-virus products and solutions, including Kaspersky-branded products, have broad access to files and elevated privileges on the computers on which the software is installed; customers who participate in the Kaspersky Security Network permit a wide range of sensitive data to be automatically transferred from user computers to Kaspersky servers; Russia has engaged and likely will continue to engage in malicious cyber activities against federal information and information systems; Kaspersky and certain Kaspersky officials have ties with Russian intelligence and other government agencies; and the Federal Security Service (the "FSB") and other Russian government agencies are authorized under Russian law to request or compel assistance by Russian companies, including Kaspersky, and to intercept communications transiting Russian telecommunications and Internet Service Provider networks. It is the interrelationship between these issues that presents the known or reasonably suspected information security risk of Kaspersky-branded products.

The Kaspersky Submission does not sufficiently address these concerns. As detailed in the December 4 Information Memorandum and the attached Supplemental Information Security Risk Assessment prepared by the NCCIC, the Kaspersky Submission, including its attached Independent Assessment prepared by the Berkeley Research Group (the "BRG Assessment"), concedes and actually further confirms many of the concerns underlying issuance of the BOD. In addition, the mitigation options proposed by Kaspersky, including federal agency non-participation in the Kaspersky Security Network, deployment of the Kaspersky Private Security Network, and/or agency use of Kaspersky-branded products along with anti-virus products from other suppliers, do not meaningfully address the full scope of information security risks presented by Kaspersky-branded products, among other issues with these options.

Furthermore, the Maggs Report provides additional support for the Department's concerns related to the authorities of the Russian Government, including the FSB, to compel or request assistance from Kaspersky, or otherwise exploit the access provided by Kaspersky-branded products, in furtherance of intelligence and other activities contrary to U.S. national security and the security of federal information and information systems. This includes the general obligation for private entities like Kaspersky to assist the FSB in its intelligence, counterintelligence, and other broadly-defined duties. It also includes more specific risks that the FSB can monitor, intercept, and/or modify transmissions between Kaspersky and its customers, including U.S. government customers, with or without Kaspersky's collaboration. If Eugene Kaspersky consents, the FSB also is permitted to second FSB military personnel to Kaspersky offices while remaining on military service, where such personnel could engage in a wide range of actions that present significant risks to federal information and information systems.

For the above reasons, the presence of Kaspersky-branded products on federal information systems creates known and reasonably suspected risks that Kaspersky or the Russian Government will exploit the access provided by these products for purposes contrary to U.S. national security. These risks exist regardless of whether Kaspersky-branded products already have been used by Kaspersky or the Russian Government for malicious purposes. In addition, the legal arguments Kaspersky makes regarding the BOD and the administrative process

3

AR0936

provided to the company are unfounded; the process provided to Kaspersky in connection with this BOD has been reasonable and appropriately tailored to the interests and issues involved. The BOD shall be maintained.

Elaine C. Duke
Acting Secretary

4

AR0937

# Exhibit K

UNCLASSIFIED//FOR OFFICIAL USE ONLY



*Office of Cybersecurity and Communications*
*National Protection and Programs Directorate*
**U.S. Department of Homeland Security**
Washington, DC 20528

December 4, 2017

**INFORMATION**

MEMORANDUM FOR THE ACTING SECRETARY

THROUGH:        Christopher C. Krebs
                Senior Official Performing the Duties of the Under Secretary

FROM:           Jeanette Manfra
                Assistant Secretary

SUBJECT:        **Final Decision on Binding Operational Directive 17-01, Removal of
                Kaspersky-Branded Products**

---

## I.    PURPOSE

This memorandum summarizes information obtained by the Department since you issued
Binding Operational Directive ("BOD") 17-01 on September 13, 2017. This includes
information and arguments submitted by Kaspersky Lab pursuant to the administrative process
made available by the Department (the "Kaspersky Submission");[1] information submitted by
agencies as required by the BOD; an analysis of relevant portions of Russian law prepared by
Professor Peter Maggs of the University of Illinois College of Law (the "Maggs Report");[2] a
supplemental information security risk assessment prepared by the NCCIC (the "NCCIC
Supplemental Assessment");[3] and a section of the National Defense Authorization Act for FY
2018 ("NDAA") that imposes a government-wide ban on the use of Kaspersky products.[4]

Based on the totality of the evidence, including evidence in the September 1, 2017 Information
Memorandum and its exhibits (the "Information Memorandum"),[5] your September 13, 2017
Decision Memorandum (the "Decision Memorandum"), the Kaspersky Submission, and other
information and developments since issuance of the BOD, I recommend that you issue a Final

---

[1] The Kaspersky Submission consists of a *Kaspersky Lab Request for Department of Homeland Security to Initiate
Review of Binding Operational Directive – 17-01*, submitted by counsel for Kaspersky at Baker & McKenzie LLP,
and seven exhibits (Exhibits A-G). The full Kaspersky Submission is provided as Attachment D to the Action
memorandum to which this Information memorandum is attached. References below to the "Kaspersky
Submission" with page numbers refer to pages in the *Kaspersky Lab Request* submitted by Baker & McKenzie.
References to the BRG Assessment refer to Exhibit B to the *Kaspersky Lab Request*.
[2] The Maggs Report is provided as Exhibit 1.
[3] The NCCIC Supplemental Assessment is provided as Exhibit 2.
[4] This section of the NDAA is provided as Exhibit 3.
[5] The Information Memorandum and its first exhibit, the NCCIC Assessment discussed below, are attached as
Exhibit 4 and Exhibit 4.A, respectively.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0752

UNCLASSIFIED//FOR OFFICIAL USE ONLY

information and developments since issuance of the BOD, I recommend that you issue a Final Decision memorandum (the "Final Decision") that maintains BOD 17-01 without modification. I also recommend that you transmit a letter to Kaspersky enclosing the Final Decision, this memorandum, and its exhibits, including the NCCIC Supplemental Assessment and the Maggs Report.

This memorandum proceeds as follows.  Section II provides context for these recommendations, including the standard for issuing BODs and the rationale for issuing BOD 17-01.  Section II.A explains four mechanisms by which DHS obtained information since issuance of BOD 17-01: the Kaspersky Submission; other public statements by Kaspersky; reports and other communications from federal agencies; and the Maggs Report.  Section III addresses the Kaspersky Submission in detail, starting with Kaspersky responses to specific concerns in the Information Memorandum and Decision Memorandum (Section III.A) followed by additional information and arguments presented by Kaspersky (Section III.B).  Section IV analyzes the record and recommends issuance of the Final Decision and transmission to Kaspersky.

## II.    CONTEXT AND TIMELINESS

BOD 17-01 requires all federal executive branch departments and agencies to (1) identify the use or presence of "Kaspersky-branded products"[6] on all federal information systems  within 30 days of BOD issuance (*i.e.*, by October 13); (2) develop and provide to DHS a detailed plan of action to remove and discontinue present and future use of all Kaspersky-branded products within 60 days of BOD issuance (*i.e.*, by November 12);[7] and (3) begin to implement the plan of action at 90 days after BOD issuance (*i.e.*, December 12),[8] unless directed otherwise by DHS in light of new information obtained by DHS, including but not limited to new information submitted by Kaspersky.

The Secretary of Homeland Security is authorized to issue BODs, in consultation with the Director of the Office of Management and Budget, for the purpose of safeguarding federal information and information systems from a known or reasonably suspected information security threat, vulnerability, or risk.[9]  I recommended issuing the BOD in the Information Memorandum, and the rationale for issuance of the BOD was summarized in your Decision Memorandum.  As described further below, your decision to issue BOD 17-01 was based on three interrelated concerns that rested on expert judgments concerning national security:  the broad access to files and elevated privileges of anti-virus software, including Kaspersky software; ties between Kaspersky officials and Russian government agencies; and requirements under Russian law that

---

[6] The BOD defines "Kaspersky-branded products" as all "information security products, solutions, and services supplied, directly or indirectly, by AO Kaspersky Lab or any of its predecessors, successors, parents, subsidiaries, or affiliates."  The BOD explicitly does not apply, however, to two specific Kaspersky services:  Kaspersky Threat Intelligence and Kaspersky Security Training.

[7] As November 12 was a Sunday, the deadline for submission was pushed to the next business day:  Monday, November 13.

[8] Day 90 is December 12.  However, DHS previously communicated to agencies that Day 90 is December 13.  This arose because, as described above, Day 60 was November 12 (a Sunday), the agency submission due date was pushed to Monday, November 13, and 30 days from November 13 is December 13.  As such, in practice, agencies may start removal, pursuant to the BOD, on December 13.

[9] 44 U.S.C. §§ 3552(b)(1), 3553(b).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0753

UNCLASSIFIED//FOR OFFICIAL USE ONLY

allow Russian intelligence agencies to request or compel assistance from Kaspersky and to intercept communications transiting between Kaspersky operations in Russia and Kaspersky customers, including U.S. government customers.  Because of these interrelated concerns, you determined that Kaspersky-branded products present a "known or reasonably suspected information security threat, vulnerability, or risk."  In addition, you found that these risks exist regardless of whether Kaspersky-branded products have ever been exploited for malicious purposes.  The BOD is a tool for protecting federal information and information systems from any "known or reasonably suspected information security threat, vulnerability, or risk," and the Department's authority to issue it does not depend on whether Kaspersky-branded products have been exploited by the Russian Government or Kaspersky to date.

DHS published the BOD in the *Federal Register* on September 19, 2017.

## A.  Administrative Process and Other Information Gathering

### 1.  Kaspersky Submission

On the day the BOD was issued, you sent Kaspersky a letter enclosing the Decision Memorandum.  The letter also explained an administrative process that DHS made available to Kaspersky and to any other entity that claimed its commercial interests were directly impacted by the BOD.  This administrative process also was published in the *Federal Register*.  The administrative process permitted Kaspersky and other entities to initiate a review of the BOD by submitting to DHS "a written response and any additional information or evidence supporting the response, to explain the adverse consequences, address the Department's concerns or mitigate those concerns."

At the request of counsel for Kaspersky, DHS also sent to Kaspersky's counsel on September 29, 2017 the full Information Memorandum and exhibits to ensure that Kaspersky had the complete unclassified rationale for issuance of the BOD.  Kaspersky also stated publicly that it was "grateful for the opportunity to provide additional information" to DHS as part of the administrative process.[10]

The administrative process requires that I, or another official designated by you, "review the materials relevant to the issues raised by the [submitting] entity" and issue a recommendation to you regarding the matter.  Your decision then needs to be communicated to the submitting entity by December 13, 2017.  However, to complete the administrative process before agencies are required to start removal of Kaspersky software, I recommend that you respond to Kaspersky and issue your Final Decision on or before Monday, December 11.

DHS received a lengthy submission from Kaspersky on November 10, 2017, after granting Kaspersky a one week extension, at the request of Kaspersky's counsel, beyond the original November 3 deadline published in the *Federal Register*.  As stated in footnote 1 above, the full Kaspersky Submission, including seven exhibits, is provided as Attachment D to the Action

---

[10] Exhibit 5 (Kaspersky Lab Response to Issuance of DHS Binding Operational Directive 17-01, Sept. 13, 2017, https://usa.kaspersky.com/about/press-releases/2017_kaspersky-lab-response-to-issuance-of-dhs-binding-operational-directive-17-01).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

3

AR0754

UNCLASSIFIED//FOR OFFICIAL USE ONLY

memorandum to which this memorandum is attached. DHS has not received a submission from any other entity.

On November 29, DHS met with two Kaspersky U.S. officials and their counsel, attorneys from Baker and McKenzie LLP. The meeting included a discussion of the Kaspersky Submission and related topics, including: Kaspersky's corporate structure; the alleged effects to the company's business that it attributes to U.S. government actions generally (not specific to the BOD); the NDAA provision discussed in Section II.B below; Kaspersky's intention not to target federal business and instead focus on enterprise and consumer customers; Kaspersky's view that any BOD should address software and other IT procurement risks generally, and not apply only to Kaspersky; and Kaspersky's mitigation proposals, discussed in Section III.A.2 below. Kaspersky did not present any new mitigation proposals beyond the limited proposals presented in the Kaspersky Submission.

### 2. Other Kaspersky Statements

Kaspersky, including Eugene Kaspersky, has made numerous statements publicly since the issuance of the BOD, including the following admissions and comments:

- Kaspersky's back-end servers, as well as a portion of its Kaspersky Security Network ("KSN") front-end servers, are located in Russia.[11]
- Kaspersky anti-virus software operates like other anti-virus software and thus has broad access to files and operates with the highest levels of system privileges.[12]
- In one instance, Kaspersky's software automatically pulled back classified Word files, contained in an archive file with other files that Kaspersky identified as malicious, from the alleged home computer of an NSA contractor.[13]

### 3. Information from Agencies

Since issuance of the BOD, all federal civilian executive branch agencies have reported to DHS on whether they identified Kaspersky-branded products on their federal information systems. Based on agency reports in response to the BOD and other communications between DHS and the agencies, DHS gained information about, among other matters, the types of Kaspersky products deployed on federal networks (enterprise vs. consumer, local vs. cloud-based); the types of Kaspersky services provided to federal customers; the types of devices that Kaspersky

---

[11] Exhibit 6 (Kaspersky Lab, *Principles for the processing of user data by Kaspersky Lab security solutions and technologies*, https://usa.kaspersky.com/about/data-protection).

[12] Exhibit 7 (Kaspersky Lab, *Investigation Report for the September 2014 Equation malware detection incident in the US*, Secure List, 16 November 2017, https://securelist.com/investigation-report-for-the-september-2014-equation-malware-detection-incident-in-the-us/83210/) ("Kaspersky Lab security software, like all other similar solutions from our competitors, has privileged access to computer systems to be able to resist serious malware infections and return control of the infected system back to the user. This level of access allows our software to see any file on the systems that we protect.")

[13] *See* Exhibit 7 (Kaspersky Lab, *Investigation Report for the September 2014 Equation malware detection incident in the US*, 16 November 2017, https://securelist.com/investigation-report-for-the-september-2014-equation-malware-detection-incident-in-the-us/83210/).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0755

UNCLASSIFIED//FOR OFFICIAL USE ONLY

products protect (endpoint vs. server); and the use of Kaspersky products by government contractors.

In total, fourteen agencies identified Kaspersky-branded products on their federal information systems. Some of those agencies removed the software in advance of the BOD's requirement to start removal on Day 90, unless directed otherwise by DHS based on new information. These agencies acted on their own initiative pursuant to standard agency risk management responsibilities under the Federal Information Security Modernization Act of 2014. DHS did not advise these agencies to start removal in advance of Day 90. As required by the Day 60 reporting requirement, the remaining agencies have submitted detailed plans of action for removal of Kaspersky-branded products starting on Day 90, unless directed otherwise by DHS.

### 4. *Report on Relevant Provisions in Russian Law*

As indicated above, DHS engaged a leading academic and consultant in Russian law, Professor Peter Maggs of the University of Illinois College of Law. Professor Maggs prepared a Report, attached as Exhibit 1, which confirms the key aspects of Russian law discussed in my Information Memorandum and provides additional support for DHS's Russian law-related concerns. In particular, Professor Maggs explains that, under Russian law, private entities, including Kaspersky, are obligated to assist the Russian Federal Security Service ("FSB") in executing the FSB's intelligence and other activities; that the FSB can second military personnel to Kaspersky with Eugene Kaspersky's consent; that Kaspersky is obligated to install equipment and software that permits the FSB to monitor transmissions between Kaspersky in Russia and its customers, including U.S. government customers, and Kaspersky has other obligations to provide information to the FSB; that Kaspersky is required to provide the keys or other information needed for the FSB to decrypt encrypted transmissions between Kaspersky and its customers; and that no court order is required for any of the above activities. Further details from the Maggs Report are provided in Section III.A.4 below.

## B. NDAA Prohibition on Kaspersky Products and Services

In November 2017, Congress passed the National Defense Authorization Act for Fiscal Year 2018 (the "NDAA"). Section 1634(a) of the NDAA provides that "[n]o department, agency, organization, or other element of the Federal Government may use, whether directly or through work with or on behalf of another department, agency, organization, or element of the Federal Government, any hardware, software, or services developed or provided, in whole or in part," by Kaspersky or related entities.[14] Section 1634(b) provides that this prohibition takes effect on October 1, 2018.[15]

Unlike the statutory provision, BOD 17-01's direction to remove Kaspersky-branded products from federal information systems is effective on December 12, 2017, unless DHS directs otherwise. As stated above, the NDAA prohibition is not effective until October 2018. Thus,

---

[14] Exhibit 3 (Excerpt from National Defense Authorization Act for Fiscal Year 2018, § 1634(a), https://www.congress.gov/115/bills/hr2810/BILLS-115hr2810enr.pdf).

[15] Exhibit 3 (Excerpt from National Defense Authorization Act for Fiscal Year 2018, § 1634(b), https://www.congress.gov/115/bills/hr2810/BILLS-115hr2810enr.pdf).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0756

UNCLASSIFIED//FOR OFFICIAL USE ONLY

until October 1, 2018, the BOD's requirement to start removal on Day 90, unless modified or rescinded by you, is the operative prohibition on agency use of Kaspersky products. At the same time, the NDAA provision is likely to cause agencies and other elements of the Federal Government, to the extent that they currently use Kaspersky hardware, software, or services, to take removal steps in advance of October 2018 to comply with the provision as of October 1, 2018.

## III.   ANALYSIS OF KASPERSKY SUBMISSION

Your decision to issue BOD 17-01 was based on three interrelated concerns: the broad access to files and elevated privileges of anti-virus software, including Kaspersky-branded products; ties between Kaspersky officials and Russian government agencies; and requirements under Russian law that allow Russian intelligence agencies to request or compel assistance from Kaspersky and to intercept communications transiting between Kaspersky operations in Russian and Kaspersky customers, including U.S. government customers. The combination of these factors creates various risks that the access and privileges provided by Kaspersky software installed on federal networks could be exploited by the Russian Government, alone or in collaboration with Kaspersky.

As detailed below, the Kaspersky Submission does not meaningfully address these concerns. Indeed, in certain statements, it confirms DHS's concerns, as do the Maggs Report and the NCCIC Supplemental Assessment. The Kaspersky Submission also does not present any new or comprehensive mitigation proposal to address these risks.

The analysis below is divided into two parts. First, I address aspects of the Kaspersky Submission that respond to the DHS concerns communicated to the company. I then address additional information and arguments presented by Kaspersky.[16]

---

[16] The Kaspersky Submission also provides information on certain topics that I have not addressed below because the information does not directly relate to the information security risks presented by Kaspersky-branded products. For example, Kaspersky includes a description of its corporate structure that was not previously available to DHS. DHS now understands that AO Kaspersky Lab is wholly owned by Kaspersky Labs Limited ("KLL"), a United Kingdom company, through OOO Kaspersky Group, a Russian corporation, and Eugene Kaspersky personally owns over 80 percent of KLL's stock. *See* Kaspersky Submission at 7. The fact that the ultimate parent entity is a UK company does not affect the applicability of the Russian law provisions discussed below, which apply to legal entities, operations, and individuals in Russia, including Kaspersky headquarter operations in Moscow. Kaspersky also provides information on its sales to U.S. government customers and negative financial effects that Kaspersky attributes to the BOD. *See* Kaspersky Submission at 2, 7-8, 33. Furthermore, Kaspersky notes that the list of Kaspersky products in the Information Memorandum is "inconsistent" with the final list of Kaspersky products in the BOD. *See* Kaspersky Submission at 9-10. That is true, but also intentional. Between the issuance of the Information Memorandum on September 1 and your issuance of the BOD on September 13, DHS decided to group products with similar names using a general term, rather than listing numerous specific products individually. For example, DHS grouped distinct products under the general term "Kaspersky Endpoint Security" and distinct cybersecurity services under the general term "Kaspersky Cybersecurity Services." This did not affect the scope of the BOD, since the BOD applies to *all* products, solutions, and services supplied, directly or indirectly, by Kaspersky, with the exception of two specific services. Kaspersky also states that DHS's inclusion of "Kaspersky Cloud Security (Enterprise)" indicates a lack of understanding about Kaspersky's product portfolio and the functionality of Kaspersky products. Kaspersky Submission at 9. On the contrary, DHS understands that Kaspersky Cloud Security is not a discrete product offering, and instead refers to a set of cloud security capabilities marketed to Enterprise customers, as described on this Kaspersky webpage: https://www.kaspersky.co.in/enterprise-

UNCLASSIFIED//FOR OFFICIAL USE ONLY

6

AR0757

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## A. Kaspersky Responses to Specific Concerns in the Information Memorandum

### 1. NCCIC and BRG Assessments

#### i. Overview

Exhibit 1 to the Information Memorandum was an Information Security Risk Assessment prepared by the NCCIC (the "NCCIC Assessment"). The NCCIC Assessment analyzed the information security risks of anti-virus software generally and Kaspersky-branded products specifically. Among other information security risks, the NCCIC Assessment explained that anti-virus software, including Kaspersky-branded products, needs to operate with broad access to files and high-level system privileges in order to identify and remediate system threats. This functionality could be exploited by a malicious cyber actor to conduct a wide range of cyber attacks against systems and networks running Kaspersky anti-virus software. Like nearly all software, Kaspersky anti-virus also receives software updates that could include malware, or the software's signature updates could withheld to allow a specific attack.

Kaspersky discounts the NCCIC Assessment, asserting that it consists of "general" and "conclusory" allegations and is not based on independent testing and evaluation of Kaspersky products. To address this alleged deficiency, Kaspersky's outside counsel at Baker & McKenzie LLP retained Berkeley Research Group, LLC ("BRG"), a self-described "leading global strategic advisory and expert services firm."[17] BRG's assessment, titled "Information Security Risks of Anti-Virus Software" (the "BRG Assessment"), is provided as Exhibit B in the Kaspersky Submission.

The majority of the BRG Assessment argues that the risks that DHS has identified with respect to Kaspersky anti-virus software also exist with respect to other anti-virus software supplied by other vendors to federal agencies. These arguments are addressed in Section III.B.2 below.

The remainder of the BRG Assessment, sub-titled "Preliminary Review of Kaspersky Lab Software," explains BRG's initial testing of various Kaspersky products across three objectives (described below).[18] The Kaspersky Submission does not discuss BRG's preliminary review. NCCIC reviewed this portion of the BRG Assessment and prepared a supplementary analysis (the "NCCIC Supplemental Assessment"), which is attached as Exhibit 2.

#### ii. High-Level Comments

Kaspersky and BRG fault DHS for not conducting a technical assessment of Kaspersky's products.[19] But DHS's determination that Kaspersky-branded products present an information

---

security/cloud-security. Finally, Kaspersky correctly notes that Kaspersky Threat Intelligence and Kaspersky Security Training services are explicitly excluded from the scope of the BOD. Thus, while the BOD applies to most Kaspersky Cybersecurity Services, the BOD does not apply to these two services, and DHS has not "simultaneously prohibited procurement" of these services. *See* Kaspersky Submission at 10.

[17] Kaspersky Submission at 11; BRG Assessment at 36.

[18] *See* BRG Assessment at 23-30.

[19] *See* BRG Assessment at 6; Kaspersky Submission at 9.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0758

UNCLASSIFIED//FOR OFFICIAL USE ONLY

security risk to federal information and information systems was not based on unique technical aspects of Kaspersky-branded products, but rather the broad access and privileges that anti-virus products have by their nature, combined with the location of Kaspersky's servers and other operations in Russia, ties between Kaspersky officials and Russian officials, and the authorities provided to Russian government agencies under Russian law.

In addition, far from refuting the NCCIC Assessment, the BRG Assessment confirms some of its key conclusions. As described further in the NCCIC Supplemental Assessment, BRG explains, consistent with the NCCIC Assessment, that anti-virus software operates with "broad access to the computer's hardware and operating system" and that the software "runs with the same privileges as the user, as well as one or more underlying, highly-privileged software components, such as kernel-mode drivers or SYSTEM-level processes."[20]

### iii.   BRG's Technical Analysis and the NCCIC Supplemental Assessment

BRG evaluated specific Kaspersky products according to the following objectives:

(1) To evaluate whether it is feasible for an intelligence agency to passively monitor and decrypt traffic between users of Kaspersky-branded products and the Kaspersky Security Network ("KSN"), a cloud-based network that receives and analyzes information about possible threats from installed Kaspersky software;

(2) To determine whether turning KSN off — or using the Kaspersky Private Security Network ("KPSN") — can reliably prevent potentially sensitive data from being transmitted inadvertently to Kaspersky; and

(3) To evaluate whether a malicious actor leveraging KSN can conduct targeted searches of Kaspersky users for specific information.

As explained in the NCCIC Supplemental Assessment, the BRG analysis not only is largely unresponsive to DHS's security concerns, but also supports DHS's concerns in certain areas. For example, on objective (1), BRG analyzed only to the security of the connection between the anti-virus software and the KSN; BRG did not address the security of communications within the KSN or between KSN and Kaspersky's non-KSN IT infrastructure, such as Kaspersky offices and datacenters.[21] BRG also evaluated the potential for "passive" interception of communications by intelligence agencies, but DHS is concerned about "active" operations involving access by Russian intelligence to Kaspersky offices and servers in Russia, as discussed in Section III.A.4 below and Part III.E of the Information Memorandum.

On objective (2), BRG determined that user data was transmitted to Kaspersky even when a user turned KSN off, and did not address the risks of using the KPSN, which is the on-premise version of the KSN.. I address objective (2) further in Section III.A.2 below.

On objective (3), BRG determined that Kaspersky's anti-virus software can be used to retrieve and upload files and other data from user's computers without the user necessarily being

---

[20] BRG Assessment at 11.
[21] *See* BRG Assessment at 24 n.71.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0759

UNCLASSIFIED//FOR OFFICIAL USE ONLY

notified.[22]  Moreover, BRG concedes that it has not reviewed "Kaspersky's operational processes related to any controls surrounding the development, testing, deployment, and auditability of records [the basis for Kaspersky pulling back malware and other files] given their capabilities and breadth of system access."[23]  Thus, BRG presented no evidence undermining DHS's concerns about Kaspersky software being used to pull non-malicious files from users computers.

### iv.    Kaspersky Services

As you know, the BOD applies not only to software but also to Kaspersky services, with two specific exceptions.  The NCCIC Assessment states that the Kaspersky services subject to the BOD, including threat hunting, incident response, and security assessment services, present various information security risks, with the specific risks dependent on the specifics of the service provided.  In general, however, NCCIC determined that "any service that involves direct or indirect access to a computer or network, such as through installation of endpoint software to conduct a hunt or incident response, or through other abilities to influence information security practices on a network, presents information security risks."[24]

Kaspersky states that this portion of the NCCIC Assessment is conclusory,[25] but neither Kaspersky nor the BRG Assessment provide any evidence or explanation why the Kaspersky services covered by the BOD, including threat hunting, incident response, and security assessment services, do not present the information security risks identified by the NCCIC.

### v.    No Need for Evidence of Wrongdoing

Without disputing that its software operates with elevated access and privileges, Kaspersky argues that DHS has not presented "any evidence of wrongdoing" by Kaspersky or any evidence that Kaspersky products have been "subject to (or leveraged for) any of the information security risks identified by DHS.[26]

This argument misunderstands the purpose of the BOD and the standard for issuing it.  Congress granted you the authority to issue BODs based on any known or reasonably suspected information security threat, vulnerability, or risk.  For the reasons stated in the Information Memorandum and its attached NCCIC Assessment, Kaspersky-branded products meet that standard.  And, as you stated in your Decision Memorandum, "[t]hese risks exist regardless of whether Kaspersky-branded products already have been used by Kaspersky or the Russian Government for malicious purposes."

### 2. *Proposed Mitigations:  Kaspersky Security Network, Kaspersky Private Security Network, and Use of Multiple Anti-Virus Products*

---

[22] *See* BRG Assessment at 29-30; NCCIC Supplemental Assessment at 10.
[23] BRG Assessment at 30.
[24] Exhibit 4.A (NCCIC Assessment at 6-7).
[25] *See* Kaspersky Submission at 10.
[26] Kaspersky Submission at 2.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0760

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Kaspersky argues that DHS has not accounted for reasonable measures that may mitigate the risks presented by Kaspersky products and services.[27] The Kaspersky Submission, however, contains no clear or comprehensive mitigation proposal. Rather, in two limited sections of the Kaspersky Submission and objective (2) in the BRG "Preliminary Review," Kaspersky appears to suggest that federal agencies: (1) either choose not to participate in the Kaspersky Security Network ("KSN") or deploy the local Kaspersky Private Security Network ("KPSN"); and (2) install one or more additional anti-virus solutions, in addition to Kaspersky anti-virus software, to address the risk that Kaspersky's software may not include necessary signature updates. Kaspersky did not offer any other mitigation proposal in its in-person meeting with DHS on November 29, 2017.

First, these options address, at best, only a limited set of the information security risks identified by DHS. For example, none of these options address the risk that the Russian government, without the company's knowledge or cooperation, or Kaspersky, in collaboration with Russia, can exploit the high-level privileges of the software to install malware on government computers.[28] As discussed in Section III.B of the Information Memorandum and the NCCIC Assessment, such malware could jeopardize the integrity or availability of federal information or information systems, and potentially be used to exfiltrate files outside of any customer connection with the KSN.

To the extent that these options address risks identified by DHS, they also are insufficient or impractical. For example, DHS understands that the KSN allows Kaspersky users to offload certain detection processing to external servers that receive data on new threats from other Kaspersky KSN participants around the world.[29] Government customers that decline this participation may reduce the risk of sensitive files and other data being uploaded to the KSN, but these customers also would lose at least some of the threat detection benefits of participating in the KSN.

Further, according to the End User License Agreements ("EULAs") for Kaspersky products, including for Kaspersky Anti-Virus 2013 and Kaspersky Anti-Virus 2018, Kaspersky customers do transmit data to Kaspersky's network even if they decline participation in the KSN. Based on the EULA for Kaspersky Anti-Virus 2013, which Kaspersky references in this section of its submission, the end-user agrees to provide to Kaspersky various information such as the following:

- To increase operational protection: Certain data ("checksums") representing files processed, information to determine the reputation of URLs, information about the types of identified threats, digital certificates used and "information necessary to verify their authenticity."

---

[27] *See* Kaspersky Submission at 3.
[28] *See* Section III.A.4 below.
[29] *See, e.g.,* Exhibit 6 (Kaspersky Lab, *Principles for the processing of user data by Kaspersky Lab security solutions and technologies*, https://usa.kaspersky.com/about/data-protection).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

10

AR0761

UNCLASSIFIED//FOR OFFICIAL USE ONLY

- If the computer is equipped with Trusted Platform Module ("TPM"):  The TPM report about the computer operating system boot process and "the information necessary to verify the authenticity of the report."[30]

The EULA for the more recent Kaspersky Anti-Virus 2018 requires users, including non-KSN-participants, to automatically provide a broader set of information, including the following:

- Information about installed programs;
- Information on detected threats and infections;
- Checksums of processed objects;
- Technical information about the computer and devices connected to it; and
- Information about online activity of the device.[31]

BRG similarly determined that Kaspersky "consumer-oriented products," which may be used by federal agencies, "communicated with KSN to a limited degree *despite declining to agree to the KSN Statement during product installation and also disabling KSN within the application's user interface*" (emphasis added).[32]  BRG does not provide a full description of the data uploaded to KSN, but BRG states that it "infers" that "statistics" about detection of a malware file were uploaded to Kaspersky, and the file itself was "likely uploaded to Kaspersky when KSN was enabled."[33]

Kaspersky also states that "[a]ll data transferred via the KSN is aggregated and anonymous; Kaspersky Lab does not attribute data to identified individuals" (emphasis added).[34]  This statement appears to be imprecise and overbroad based on prior Kaspersky statements.  First, by contrast with the EULA for Kaspersky Anti-Virus 2013, which provides that "[t]he Software does not process any personally identifiable data and does not combine the processed data with any personal information[,]"[35] the EULA for Kaspersky Anti-Virus 2018 includes no such representation.[36] This omission appears to be a telling one. Indeed, in the Information Memorandum, I quoted the following from the KSN Statement:  "Kaspersky Lab uses the information received only in an anonymized form as part of aggregated statistics.  These aggregated statistics are generated automatically from the original information received and do not contain personal information or any other confidential information.  Initial information received is destroyed upon accumulation (once a year).  General statistics are kept indefinitely."[37]  I noted that, if a customer participates in the KSN, "it appears that Kaspersky

---

[30] *See* Exhibit 8 (End-User License Agreement for Kaspersky Anti-Virus 2013, 19 March 2013, § 5, https://support.kaspersky.com/8752).

[31] *See* Exhibit 9 (End-User License Agreement for Kaspersky Anti-Virus 2018, 21 August 2017, § 6, https://support.kaspersky.com/13596).

[32] BRG Assessment at 28.

[33] BRG Assessment at 28.

[34] Kaspersky Submission at 14.

[35] Exhibit 8 (End-User License Agreement for Kaspersky Anti-Virus 2013, 19 March 2013, § 5.4, https://support.kaspersky.com/8752)

[36] *See generally* Exhibit 9 (End-User License Agreement for Kaspersky Anti-Virus 2018, 21 August 2017, https://support.kaspersky.com/13596).

[37] Exhibit 4 (Information Memorandum at 19) (quoting the KSN Statement for Kaspersky Endpoint Security 10 for Windows, Section B).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0762

UNCLASSIFIED//FOR OFFICIAL USE ONLY

obtains 'original information' and retains that information for one year, apart from any anonymized, aggregated 'use' of that data."[38]  I also referred to the NCCIC Assessment, which explained that this information could contain a range of data that identifies customers, such as user account names, computer names, and file paths, even if not combined with Kaspersky subscription information or contact lists.[39]  Neither Kaspersky nor BRG provides any information or arguments to rebut these concerns.

DHS, including the NCCIC, also examined the information that Kaspersky and BRG provided about the KPSN.  Specifically, as described in the BRG Assessment and the NCCIC Supplemental Assessment, the KPSN can be deployed in three possible configurations.  BRG tested KPSN in its "Standard" configuration — which allows outbound connections between on-premise KPSN servers and Kaspersky servers directly and, in response to a malware detection test, BRG observed traffic between its enterprise Kaspersky software and the KPSN servers, but not any traffic between the KPSN server and the KSN or any other Kaspersky server.

As stated above, however, the KPSN deployment option still receives software updates from Kaspersky, which could include malware or not include all updates needed to identify known cybersecurity threats.  Such malware, for example, could compromise the integrity or availability of data or services on a local agency network, even if no data is transmitted back to Kaspersky. Such risks exist even if agencies deployed KPSN in its "Unidirectional Gateway" configuration, in which a gateway in the organization's "demilitarized zone" allows only inbound traffic to on-premise KPSN servers.[40]  Kaspersky's characterization of these risks as "purely theoretical, speculative, and conclusory"[41] is not evidence rebutting the risks, particularly in light of the discussion in the BRG Assessment about malware and vulnerabilities in anti-virus products, which presumably existed in the software in its original installation or were introduced into the software, and thus on to the user's computer, through a software update or upgrade.[42]

Finally, Kaspersky and the BRG Assessment argue, citing NIST Special Publication 800-83, Revision 1, that the risk of Kaspersky intentionally withholding signatures to allow specific attacks can be mitigated by using "multiple layers of anti-virus protection at the host and network level."[43]  The determination to issue BOD 17-01 was based on a combination of concerns, not on the withholding of signatures in isolation.  However, for the sake of argument, the NIST publication that Kaspersky cites also states that "running multiple antivirus products on a single host simultaneously is likely to cause conflicts between the products" and thus, "if multiple products are used concurrently, they should be installed on separate hosts" (*e.g.*, one anti-virus product on perimeter email servers and a different product on internal email servers).[44] NIST also notes that this "would necessitate increased administration and training, as well as

---

[38] Exhibit 4 (Information Memorandum at 19).
[39] Exhibit 4 (Information Memorandum at 19).
[40] BRG Assessment at 28-29.
[41] Kaspersky Submission at 15.
[42] *See* BRG Assessment at 12-16.
[43] Kaspersky Submission at 15; BRG Assessment at 35.
[44] Exhibit 10 (Excerpt from NIST Special Publication 800-83, Rev. 1, *Guide to Malware Incident Prevention and Handling for Desktops and Laptops*, July 2013, at 11,
http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-83r1.pdf).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

12

AR0763

UNCLASSIFIED//FOR OFFICIAL USE ONLY

additional hardware and software costs."[45]  DHS cannot reasonably expect that federal agencies buy and deploy additional anti-virus software, and bear the attendant costs and technical challenges, in connection with a mitigation measure that does nothing to address the various access and privilege risks raised by Kaspersky software.

### 3.  *Kaspersky Ties to the Russian Government*

In the Information Memorandum, I described certain ties, past and present, between Kaspersky officials and Russian government agencies.[46]  Kaspersky concedes key aspects of this account, such as Eugene Kaspersky's former studies at an institute overseen by the KGB and other state institutions and his service as a software engineer at a Ministry of Defense institute.[47]  It also admits that its officials might have "acquaintances, friends, and professional relationships within the [Russian] government," although Kaspersky states that, "in itself," does not mean that these connections were or are "inappropriate" or "improper."[48]  Furthermore, Kaspersky does not deny various connections to Russian intelligence described in the Information Memorandum, including that Eugene Kaspersky has saunas with a group that usually includes Russian intelligence officials; that Kaspersky's Chief Legal Officer Igor Chekunov manages a team of specialists who provide technical support to the FSB and other Russian agencies; that the team can gather identifying information from individual computers; and that this technology has been used to aid the FSB in investigations.[49]

In the Information Memorandum, I also briefly addressed a *Bloomberg* article from July 2017 that reported, based on internal Kaspersky emails, that "Eugene Kaspersky was overseeing the development of a secret anti-hacking software project for the FSB," and "[t]hat project became the basis of Kaspersky's anti-denial-of-service security technology."[50]  The Kaspersky Submission states that it is "unclear how this allegation is relevant to the BOD and DHS's determination since anti-DDoS technology is defensive security software, not malware."[51]  Moreover, Kaspersky states that "[s]uch an engagement if it were to be true, would be anything but inappropriate given Kaspersky Lab's technology and expertise."  Kaspersky raises a valid point that the alleged relationship with respect to anti-DDoS technology, if true, relates to a defensive use of software, and thus is not the type of relationship between the FSB and Kaspersky that is of most concern to DHS.  Nonetheless, this project, if true, is evidence that Kaspersky has developed software for or in collaboration with the FSB.  Such an established relationship and connections between Kaspersky and the FSB could facilitate future cooperation for other purposes and therefore is an area of serious concern to DHS.  Kaspersky further states that "the Russian Government's anti-cybercrime unit told the company that it considered DDoS attacks an emerging and serious threat" and that the FSB "has never been[] a Kaspersky Lab

---

[45] Exhibit 10 (Excerpt from NIST Special Publication 800-83, Rev. 1, *Guide to Malware Incident Prevention and Handling for Desktops and Laptops*, July 2013, at 11, http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-83r1.pdf).

[46] *See* Exhibit 4 (Information Memorandum at 10-11).

[47] Kaspersky Submission at 17.

[48] Kaspersky Submission at 16-17.

[49] *See* Exhibit 4 (Information Memorandum at 10-11).

[50] Exhibit 4 (Information Memorandum at 10).

[51] Kaspersky Submission at 18.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0764

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DDoS Protection client."[52] It is unclear whether these statements are intended to suggest, contrary to the *Bloomberg* report, that Kaspersky has *never* developed software for or in collaboration with the FSB. In any event, as further described below, Kaspersky is required to collaborate with Russian government entities under Russian law.

### 4. *Risks Arising under Russian Law*

DHS has retained Professor Peter Maggs, a leading Russian law scholar, to advise the Department and to prepare a report (the "Maggs Report") on various aspects of Russian law, including on the ability of Russian government agencies, including the FSB, to compel or request assistance from Kaspersky. Professor Maggs is a Professor of Law Emeritus at the University of Illinois College of Law; he speaks, reads, and writes Russian fluently; and he is the author, co-author, co-editor, translator, or co-translator of a dozen books and numerous articles on Soviet and Russian law, including a translation of the Russian Civil Code.[53] The Maggs Report is provided as Exhibit 1.

The Maggs Report was prepared based on extensive research and analysis by Professor Maggs, including reviewing, in Russian, Russian laws, amendments to those laws, and other legal authorities, among other sources. He then translated key provisions into English for inclusion in the Maggs Report.

Professor Maggs makes a number of significant conclusions. Specifically, Professor Maggs concludes that:

(a) Russian law requires FSB bodies to carry out their activities in collaboration with various entities in Russia, including private enterprises, and thus including Kaspersky.

(b) Private enterprises, including Kaspersky, are under a legal obligation to assist FSB bodies in the execution of the duties assigned to FSB bodies, including counterintelligence and intelligence activity.

(c) Russian law permits FSB service personnel to be seconded to private enterprises, including Kaspersky, with the consent of the head of the enterprise and with the FSB personnel remaining in FSB military service status during the secondment.

(d) Kaspersky qualifies as an "organizer of the dissemination of information on the Internet" and, as such, is required (1) to store in Russia and provide to authorized state bodies, including the FSB, metadata currently and content as of July 1, 2018; and, based on this or other laws, (2) to install equipment and software that enables the FSB and potentially other state authorities to monitor all data transmissions between Kaspersky's computers in Russia and Kaspersky customers, including U.S. government customers.

---

[52] Kaspersky Submission at 18.
[53] Exhibit 1 (Maggs Report at ¶ 9).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0765

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(e)     No court order is required for FSB operational-investigative activities undertaken in the performance of FSB duties, including operational-investigative activities involving the obtaining of information stored on and communications with United States government computers, and Kaspersky is obligated to assist the FSB with such operational-investigative activities.

(f)     Kaspersky is required to provide the FSB and other Federal executive bodies in the field of security with the keys or other information needed to decrypt Kaspersky's encrypted data transmissions.

Each of these conclusions, independently and collectively, present significant risks of action by the Russian Government, alone or in collaboration with Kaspersky, that create a risk to federal information and information systems.  These conclusions also are consistent with DHS's analysis of Russian law before retaining Maggs and during the engagement.

Key aspects of the above analysis were presented in the Information Memorandum, such as the FSB's authority to compel or request assistance from companies in Russia.[54]  I also described the FSB's ability to intercept data transmissions made over Russian telecom and Internet Service Provider networks.[55]

The Kaspersky Submission concedes various aspects of these conclusions.  For example, Kaspersky concedes that "[a]ll companies represented in Russia have a general obligation to provide the FSB with such information as may be required by the FSB to perform its duties, including very broadly defined duties such as "informing state authorities of security threats"; "detecting and preventing foreign intelligence activities"; "obtaining intelligence information in the interests of state security" and "increasing the state's economic, scientific, technical and defense capabilities"; and "providing for various types of security of the Russian Federation."[56]  Kaspersky states starkly: "If a company operating in Russia receives a request from the FSB for information, it must comply with such request."[57]

Kaspersky cautions that "the FSB's powers in this regard are not unlimited, and FSB requests are subject to challenge in court."[58]  However, the FSB does not need a court order to obtain information stored on and communications with United States government computers.  Instead, court approval is only needed for the interception of Russian Constitutionally-protected personal communications, and such protections generally would not apply to transmissions sent to or received from anti-virus software on U.S. government computers.  Furthermore, on the ability to challenge FSB requests in court, Maggs' research did not reveal a single case brought against the FSB by a party seeking to avoid cooperation with the FSB.[59]

Kaspersky attempts to justify these authorities by equating them with United States laws.  Specifically, Kaspersky states that "[s]imilar laws exist in the U.S. to compel companies to hand

---

[54] *See* Exhibit 4 (Information Memorandum at 12-13).
[55] *See* Exhibit 4 (Information Memorandum at 13).
[56] Kaspersky Submission at 19.
[57] Kaspersky Submission at 19.
[58] Kaspersky Submission at 19.
[59] Exhibit 1 (Maggs Report at ¶ 38).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

15

AR0766

UNCLASSIFIED//FOR OFFICIAL USE ONLY

over customer data and any other information," and that the U.S. Department of Justice has recently expressed a desire to mandate that technology companies provide encryption keys to law enforcement.[60]  These general comparisons to the U.S. are irrelevant; DHS is only concerned, with respect to BOD 17-01, about information security risks arising from Kaspersky-branded products.

Kaspersky also argues that it is not subject to Russian requirements that telecommunications companies and Internet Service Providers install equipment that permits FSB surveillance of communications and other data transmissions over their networks because the company does not "provide communication services."[61]  But Kaspersky arguably is required to install hardware and/or software in its network that permits FSB monitoring of data transmissions between Kaspersky in Russia and Kaspersky customers, including U.S. government customers, under one or more laws.[62]  In addition, Kaspersky does not deny that its data transmissions with customers, including U.S. government customers, occur over Russian telecom and ISP networks that are subject to interception by the FSB.  And, as explained above, Professor Maggs identified a legal provision requiring Kaspersky to provide the decryption keys or other information needed to decrypt its encrypted communications over these networks.[63]

Further, Kaspersky incorrectly states that any such interception by the FSB either requires prior court approval or, in certain emergency situations, notification to a court within 24 hours and court approval within 48 hours.  However, as indicated above, court approval is only needed for interception of Russian Constitutionally-protected personal communications, and such protections would not apply to transmissions sent to or received from anti-virus software on U.S. government computers.[64]

Finally, in a separate section of the Kaspersky Submission, Kaspersky states that all U.S. operations and sales are "driven through" Kaspersky Lab, Inc., a Massachusetts corporation that is headquartered in Woburn, Massachusetts and is a direct wholly-owned subsidiary of Kaspersky Labs Limited, a UK company described in footnote 11 above.  Kaspersky admits, however, that its headquarters, back-end servers, and a portion of its front-end KSN servers are located in Russia, and therefore Kaspersky customer data is stored in Russia or accessible from Russia.[65]  As such, Kaspersky's statement that there are "no Russian companies in the ownership structure of Kaspersky Lab, Inc."[66] is not responsive to the Russia-related risks identified by DHS.

### 5. *Kaspersky Licenses and Certificates*

On page 20 of its Submission, Kaspersky describes the role of a subdivision of the FSB in issuing licenses to companies involved in encryption-related activities.  DHS does not dispute

---

[60] Kaspersky Submission at 19.

[61] *See* Kaspersky Submission at 21.

[62] *See* Exhibit 1 (Maggs Report at ¶¶ 42-52).

[63] *See* Exhibit 1 (Maggs Report at ¶¶ 31, 55 ).

[64] *See* Exhibit 1 (Maggs Report at ¶¶ 29-30, 55).

[65] Exhibit 6 (Kaspersky Lab, *Principles for the processing of user data by Kaspersky Lab security solutions and technologies*, https://usa.kaspersky.com/about/data-protection).

[66] Kaspersky Submission at 7.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0767

UNCLASSIFIED//FOR OFFICIAL USE ONLY

that one or more components of the FSB are involved in such licensing, or that the U.S. Department of the Treasury, Office of Foreign Assets Control issued a general license authorizing certain otherwise prohibited transactions with the FSB to obtain such licenses.[67] Rather, in my Information Memorandum, I expressed concern that the Russian government could impose conditions as part of the issuance of such licenses or certificates, such as a condition requiring that Kaspersky or Russian telecommunications providers provide keys to decrypt encrypted data transmissions or otherwise provide access to customer data.[68] The Kaspersky Submission does not deny or otherwise address these concerns.

Nor does Kaspersky offer a meaningful response to the specific concerns raised in the Information Memorandum about certificates issued in 2007 and 2011 to Kaspersky Lab and Military Unit ("MU") 43753. Kaspersky states, without explanation, that MU 43753 "is the FSB department responsible for the protection of information." Kaspersky then states that the FSB issued the certificates "to Kaspersky Lab and also to MU 43753, *presumably* so that the latter would be aware that Kaspersky Lab had obtained the certificates and was eligible to participate in public tenders."[69] Kaspersky's use of "presumably" indicates that Kaspersky does not know why the certificates were also issued to MU 43753, and thus does not have confidence in its explanation. Professor Maggs also states that Kaspersky likely has documentation in its files that would explain the relationship, but such materials are not discussed in Kaspersky's submission.[70]

### 6. *Statements and Actions by Other Federal and State Officials*

The Information Memorandum describes statements and actions by U.S. Intelligence Community agency heads; the Chairman of the House Science Committee; the General Services Administration ("GSA"); and the California Department of General Services, all of whom expressed concern with the information security risks presented by Kaspersky products.[71]

Kaspersky argues that this portion of the Information Memorandum is "irrelevant" and the reasoning "circular," and it criticizes each reference individually.[72] I do not agree with Kaspersky's characterizations and critiques. Contrary to Kaspersky's assertions, DHS has extensive evidence to support the BOD independent of these statements, which were offered simply to show that other officials reached the same conclusion as DHS, before issuance of the BOD, that Kaspersky products present information security risks.

By way of example regarding Kaspersky's specific critiques, Kaspersky argues that Chairman Lamar Smith issued letters to agency heads about Kaspersky because the Committee was conducting oversight related to the NIST Framework.[73] While I agree that Chairman Smith focuses on NIST pursuant to the House Science Committee's jurisdiction over NIST, these comments ignore the substance of Chairman Smith's letter, which clearly express concern that

---

[67] *See* Kaspersky Submission at 20.
[68] *See* Exhibit 4 (Information Memorandum at 13).
[69] Kaspersky Submission at 21.
[70] *See* Exhibit 1 (Maggs Report at ¶ 41).
[71] *See* Exhibit 4 (Information Memorandum at 14-15).
[72] Kaspersky Submission at 22-26.
[73] *See* Kaspersky Submission at 23-24.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

17

AR0768

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Kaspersky products can be used as a tool for nefarious actions against the United States.[74] For example, the letter states: "The Committee is concerned that Kaspersky Lab is susceptible to manipulation by the Russian government, and that its products could be used as a tool for espionage, sabotage, or other nefarious activities against the United States."[75]

Kaspersky also discusses testimony by the GSA Chief Information Officer, who stated that GSA directed three resellers to remove Kaspersky products from GSA schedule contracts because the resellers "did not gain approval to do so via the required contract modification process,"[76] rather than because of any reasons related to Kaspersky.[77] However, GSA has stated publicly that its basis for removing Kaspersky products from two GSA schedules was the information security risks presented by the products, not because of a technical, contractual failure by the these suppliers. Specifically, GSA stated in response to press inquiries about GSA's reasons for the removals: "GSA's priorities are to ensure the integrity and security of U.S. government systems and networks and evaluate products and services available on our contracts using supply chain risk management processes."[78]

## B. **Additional Information and Arguments in Kaspersky Submission**

### 1. *Kaspersky's Positive Reputation and Activities*

Kaspersky argues that it is a "market-leading" company; that it is "consistently recognized by its peers, the industry, and consumer groups for developing best-in-class cyber-protection tools," including receiving top product rankings; that it "leads the world in cyberthreat assessment and analysis"; that its researchers and analysts in its Global Research & Analysis Team ("GReAT") have identified numerous cyberthreats originating in Russia and/or in the Russian language; that it collaborates with well-known IT security vendors in conducting joint cyberthreat investigations; and that it collaborates with law enforcement agencies and elements of the U.S. government in fighting cybercrime and sharing threat information.[79] Kaspersky states that "working inappropriately with the Russian Government would clearly be detrimental to the Company's bottom line," and therefore, "Kaspersky has a powerful economic incentive to never take any action that would endanger the trusted relationship and integrity that serve as the foundation of its business."[80]

---

[74] *See* Exhibit 4 (Information Memorandum at 15).

[75] Exhibit 11 (Letter from Chairman Smith to The Honorable Sonny Perdue, 27 July 2017, https://science house.gov/sites/republicans.science house.gov/files/documents/072717%20Smith-Agencies%20-%20Kaspersky.pdf).

[76] Exhibit 12 (Statement of David Shive, Hearing Before the House Committee on Science, Space, and Technology Subcommittee on Oversight, *Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government*, 25 October 2017, https://science house.gov/sites/republicans.science house.gov/files/documents/HHRG-115-SY21-WState-DShive-20171025.pdf).

[77] *See* Kaspersky Submission at 25 and n. 112.

[78] Exhibit 13 (Eric Geller, *Trump Administration Restricts Popular Russian Security Software*, Politico, 11 July 2017, https://www.politico.com/story/2017/07/11/trump-russian-security-software-240423).

[79] *See* Kaspersky Submission at 1, 3-7; BRG Assessment at 30-33.

[80] *See* Kaspersky Submission at 7, 16.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0769

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DHS is aware that Kaspersky products have received top ratings for malware detection (among other performance factors) and that the company has received positive comments for its' research and analysis. However, these product ratings, by third-party testing organizations, test suitability for enterprise or consumer users generally; they were not conducted by government testing organizations or conducted for purpose of rating suitability for federal networks. More importantly, high malware detection ratings do not mean that Kaspersky products could not also be leveraged for malicious activities by Russian cyber actors. Indeed, on the company's reputation, Eugene Kaspersky admits in a blog post: "[W]e know awards and accolades don't address these recent allegations."[81] Finally, I am not persuaded that DHS should ignore the information security risks presented by Kaspersky-branded products based on the company's statement that it would not be rational to allow its products to be exploited for malicious purposes. As explained in Section III.A.4 above, under Russian law, Kaspersky does not have a choice on whether to assist the FSB and the FSB could exploit the access provided by Kaspersky products without Kaspersky's knowledge.

### 2. *Comparison to Other Anti-Virus Products Sold to the U.S. Government*

Kaspersky and BRG devote a substantial portion of their submissions to the argument that the federal government purchases anti-virus software from a range of suppliers, and there is no basis for the BOD to apply only to Kaspersky anti-virus software.

To support this argument, BRG identified other anti-virus software suppliers to the federal government using procurement information in a USASpending.gov database. Of approximately 20 different suppliers over the past 10 years, BRG selected six suppliers — Avast , AVG, ESET, McAfee, Symantec, and Trend Micro — in addition to Kaspersky, based on a number of factors, including estimated volume of purchasing contracts in either US dollars or number of licenses; comparability of software features to those of Kaspersky-branded products; and supplier affiliations with foreign countries or governments.[82] BRG then selected specific products developed by each of these companies, although BRG acknowledges that it does not know if these are the specific product versions in use at U.S. government agencies because of limitations in the public procurement data.[83]

Kaspersky argues that these software developers are "similarly situated" to Kaspersky — based on foreign affiliations of the companies, publicly-reported vulnerabilities in the software, and sensitive data collection by the software — but not subject to the BOD.[84]

For the reasons discussed below, none of these anti-virus developers or their products present the same information security risks that DHS has identified with respect to Kaspersky-branded products. In addition, this BOD is focused on the information security risks presented by Kaspersky-branded products, and DHS has no obligation to apply the BOD to all anti-virus products that might present some information security risk. Nonetheless, DHS will continue to

---

[81] Exhibit 14 (Eugene Kaspersky, *Proud to keep on protecting – no matter of false allegations in U.S. media*, Kaspersky Lab Blog, 19 October 2017, https://www.kaspersky.com/blog/whats-going-on/19860/).

[82] *See* BRG Assessment at 9-10.

[83] *See* BRG Assessment at 11.

[84] *See, e.g.*, Kaspersky Submission at 2.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0770

UNCLASSIFIED//FOR OFFICIAL USE ONLY

assess the risks presented to federal information and information systems, including by information technology products, and will take action where appropriate.

        i.    <u>Foreign Affiliations of the Other Anti-Virus Suppliers</u>

BRG highlights the following "foreign affiliations" of these software developers:[85]

- <u>Headquarters Outside the U.S.</u>: Avast (headquartered in the Czech Republic); ESET (headquartered in Slovakia); Trend Micro (headquartered in Taiwan until its relocation to Japan in 1998).
- <u>Offices in Russia</u>: Symantec, McAfee, Avast, and Kaspersky.
- <u>Offices in China</u>: Symantec,[86] McAfee, and Trend Micro.
- <u>Servers Outside the U.S.</u>: Avast (19 countries, including China and Russia).
- <u>Product Communicates Directly with Servers Outside the U.S.</u>: Avast (product communicates with server in the Czech Republic); ESET (product communicates with server in Slovakia).
- <u>Product Relies on Third-Party Content Distribution Networks or Hosting Providers to Distribute the Software, Updates, Malware Signature Updates, or other Functionality</u>: Trend Micro and Symantec (use Akamai); McAfee (uses Amazon Web Services).

These other anti-virus suppliers are not "similarly situated" to Kaspersky. Kaspersky is headquartered in Moscow, Russia and its back-end servers are located in Russia.[87] This presents a substantially greater risk of exploitation than other anti-virus software developed by companies headquartered in the Czech Republic, Slovakia, or Japan (none of which has been identified as presenting the same cyber threat as Russia[88]). This also presents a substantially greater risk than companies with "offices" in Russia or China, since no detail is provided on whether sensitive activities occur at these offices, or whether they are limited to or focused on sales and marketing. Furthermore, companies with unspecified servers in Russia, China, or other countries are distinguishable from a company like Kaspersky that controls its servers from Russia and whose top leadership includes individuals with admitted ties to Russian government agencies).

        ii.    <u>Vulnerabilities of Other Anti-Virus Software</u>

BRG states that it "conducted a search of historical CVE [*i.e.*, Common Vulnerabilities and Exposures] data and other public vulnerability disclosures to evaluate the extent to which these products may have been (or have been) exploitable by malicious actors."[89] BRG's research identified what it characterizes as critical security vulnerabilities, publicly disclosed in the past five years, in anti-virus software from all seven companies (although, again, not necessarily in

---

[85] *See* BRG Assessment at 20-22.
[86] BRG identified 889 individuals in China who list Symantec as their employer on their LinkedIn profiles. *See* BRG Assessment at 22.
[87] Exhibit 6 (Kaspersky Lab, *Principles for the processing of user data by Kaspersky Lab security solutions and technologies*, https://usa.kaspersky.com/about/data-protection).
[88] *See, e.g.,* Exhibit 4 (Information Memorandum at 7).
[89] BRG Assessment at 11.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0771

UNCLASSIFIED//FOR OFFICIAL USE ONLY

the specific software product(s) used by federal agencies).[90] Kaspersky also notes that "BRG's review identified several instances in which hackers have been able to compromise some of the anti-virus companies themselves."[91]

DHS is aware of vulnerabilities identified in anti-virus products from Kaspersky and other developers. However, DHS's concern about Kaspersky products does not depend on any specific technical vulnerability(ies) that have been disclosed previously or that may be disclosed in the future. Rather, as explained above, it is the normal functioning of Kaspersky products, which is susceptible to exploitation by Russian actors, that creates the information security risks on which the BOD was issued.

### iii. Data Collection by Other Anti-Virus Software

The Information Memorandum explained that Kaspersky customers who choose to participate in the Kaspersky Security Network ("KSN") must agree to a KSN Statement that authorizes the automated transfer of a lengthy list of sensitive data from the user's computer to the KSN.[92] As stated in Section II.A.2 above, Kaspersky's front-end KSN servers are located in various countries around the world, including Russia, and the data stored in the KSN is accessible by Kaspersky personnel located in Russia.

Kaspersky concedes that "if an end-user chooses to participate in the KSN, the KSN Statement includes terms that could permit Kaspersky Lab to collect files or other information from a user's device and upload it to the KSN."[93] Kaspersky and BRG argue, however, that the End User License Agreement ("EULA") and/or Privacy Policy documents from the six other anti-virus software vendors to the U.S. government permit similar or broader data collection than Kaspersky.[94]

This discussion of other vendor data collection does not address DHS's concerns with the KSN Statement. DHS's concern with the KSN statement is not the collection of data for further analysis by anti-virus companies generally, or the fact that such companies may be permitted to transfer such data to third parties in other countries;[95] rather, DHS's specific concern with respect to the KSN statement relates to data collected or collectible by Russian actors, through these cloud-based systems, for malicious purposes, and neither BRG nor Kaspersky has presented evidence that any of these other vendor networks present a comparable risk to Kaspersky.

---

[90] *See* BRG Assessment at 10-16 (providing examples of the specific vulnerabilities).
[91] Kaspersky Submission at 11. Kaspersky appears to be referring to three items identified by BRG: (1) An unconfirmed New York Times report in October 2017 that "Israel had gained access to Kaspersky networks and identified NSA hacking tools"; (2) a September 2017 report by Cisco Talos security research division that "hackers had inserted a backdoor into CCleaner, an Avast-developed product intended to clean up devices"; and (3) a 2008 CNET report that Trend Micro's website (which is distinguishable from a compromise of internal IT resources) was hacked. *See* BRG Assessment at 12-13, 16.
[92] *See* Exhibit 4 (Information Memorandum at 6-7).
[93] Kaspersky Submission at 13.
[94] *See* Kaspersky Submission at 13-14; BRG Submission at 16-20.
[95] *See* Kaspersky Submission at 22; BRG Assessment at 21.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

21

UNCLASSIFIED//FOR OFFICIAL USE ONLY

     iv.    <u>Breadth of Presence on Federal Networks</u>

Kaspersky explains that it has a relatively small presence on federal networks,[96] and it argues that the Russian Government would more effectively obtain sensitive U.S. government information by targeting a company with a larger presence on federal networks, such as Symantec and McAfee.[97]

First, as stated in the Information Memorandum, Russia is a full-scope cyber actor that DHS anticipates would use any available access to U.S. government information systems, including through Kaspersky anti-virus, and not hold back on exploiting Kaspersky's access because other anti-virus providers may have a larger installed base on federal networks.[98]  This is particularly true because access to one device or network often can be used by sophisticated attackers to gain access to other devices and networks.  In addition, the other anti-virus products that BRG reviewed are not subject to the full scope of risks arising under Russian law that arise with Kaspersky.

### 3. Information Security Risks of Other IT Products

The BRG Assessment briefly states that software products other than anti-virus software are potentially susceptible to exploitation by a malicious actor.  For example, several applications commonly found on federal information systems, such as web browsers, Microsoft Office products, and the Microsoft Windows operating system, have "repeatedly been demonstrated to contain security vulnerabilities which could result in the execution of arbitrary code or commands on the victim's computer."  Enterprise-level hardware products, including network firewalls, also "have been found to contain vulnerabilities that could be leveraged by a malicious actor to gain unauthorized access to data or systems."[99]

DHS agrees that software and hardware, other than Kaspersky anti-virus products, can present information security risks to federal networks.  However, the interrelationship of factors upon which DHS's decision was based are not present — or present to a much lesser degree if at all — in other information security products.  Moreover, as stated above with respect to anti-virus software written by other companies, DHS is under no requirement to address the information security risks presented by all information technology products when issuing a BOD.  Instead, BOD 17-01 addresses a particularly acute set of risks presented by products of a specific company.  DHS has authority to issue later BODs, or to exercise other authorities, to address other information security risks that other products present to federal networks as appropriate.

### 4. Suggested Framework for U.S. Government Software Procurement

The BRG Assessment concludes with a "Suggested Systematic Framework for U.S. Government Security Software Procurement."[100]  As with BRG's "Preliminary Review" of Kaspersky

---

[96] *See* Kaspersky Submission at 7-8.
[97] *See* Kaspersky Submission at 16.
[98] Exhibit 4 (Information Memorandum at 7-8).
[99] BRG Assessment at 7.
[100] BRG Assessment at 33-35.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0773

UNCLASSIFIED//FOR OFFICIAL USE ONLY

software, it is not clear whether Kaspersky supports this Suggested Systematic Framework because Kaspersky does not address it anywhere else in the Kaspersky Submission.

The Framework offered by BRG is an "outline" of "several key factors" that BRG believes should be considered "when reviewing a security-critical software product, such as anti-virus software, or vendor for use on federal information systems."[101]  BRG suggests, for example, that federal agencies should (i) agree on a set of secure software development practices and require compliance with those practices and standards to qualify for government procurements; (ii) implement a consistent framework for assessing information security risk in a given software product; and (iii) ensure that software is deployed, configured, and updated appropriately.[102]

For purposes of this Information memorandum and BOD 17-01, DHS does not need to take a position on this Suggested Systematic Framework because the Suggested Systemic Framework is irrelevant to the question of whether Kaspersky-branded products present a known or reasonably suspected information security threat, vulnerability, or risk.  Nevertheless, as you know, DHS and other federal agencies are constantly evaluating software procurement risks based on a range of factors.  Furthermore, the NDAA discussed in Section II.B above requires a review and report by the Secretary of Defense, in consultation with the Secretary of Homeland Security and other agency heads, that addresses, among other topics, "Federal Government-wide authorities that may be used to prohibit, exclude, or prevent the use of suspect products or services on the information technology networks of the Federal Government."[103]

## C.  Kaspersky Legal Arguments

Kaspersky raises several legal challenges to the BOD and the accompanying administrative process.  The company argues that DHS (i) deprived Kaspersky of Constitutional due process by ordering agencies to remove its products without giving the company prior notice and an opportunity to be heard, (ii) violated its Constitutional right to equal protection by failing to offer a rational basis for targeting Kaspersky alone, and (iii) acted in an arbitrary and capricious manner, abused its discretion, and issued the BOD without substantial evidence in violation of the Administrative Procedures Act ("APA").

I am confident that the BOD procedures are constitutional and lawful. DHS exercised its statutory authority to issue a BOD for purposes of safeguarding federal information and information systems from known or reasonably suspected threats, vulnerabilities, or risks.  This was a sensitive and inherently discretionary judgment call, based on a substantial body of evidence and based on national security concerns.  That evidence, to the extent it could be released, was disclosed to Kaspersky, and the process thus provided Kaspersky with meaningful notice and opportunity to confront the evidence against it, and the process used by DHS is analogous to other agency actions involving similar issues.  In addition, the administrative record provides adequate support for your conclusion that Kaspersky-branded products present a known or reasonably suspected national security threat to federal information systems. Finally, DHS has

---

[101] BRG Assessment at 33.
[102] BRG Assessment at 34.
[103] Exhibit 3 (Excerpt from National Defense Authorization Act for Fiscal Year 2018, § 1634(c), https://www.congress.gov/115/bills/hr2810/BILLS-115hr2810enr.pdf).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0774

UNCLASSIFIED//FOR OFFICIAL USE ONLY

acted appropriately to address information security risks presented specifically and uniquely by this company's products and services. Ultimately, I am convinced that the company's legal arguments are unfounded and the determination to issue the BOD was proper and consistent with the parameters in the U.S. Constitution, FISMA, and the APA.

## IV.    **RECOMMENDATION**

I have considered the totality of the administrative record. This includes the information security risks presented in the Information Memorandum, including the original NCCIC Assessment; the information and arguments presented by Kaspersky in the Kaspersky Submission, including the BRG Assessment; the NCCIC Supplemental Assessment prepared in response to the BRG Assessment; the analysis of relevant provisions in Russian law presented in the Maggs Report; the relationship between BOD 17-01 and the NDAA; and the information in this memorandum.

The record presents a compelling picture of the various ways that the Russian Government, and particularly the FSB intelligence agency, can compel, request, and otherwise exploit the access provided by Kaspersky-branded products to the information and information systems of Kaspersky customers, including U.S. government customers. This includes the general obligation for private entities like Kaspersky to assist the FSB in its intelligence, counterintelligence, and other broadly-defined duties, as well as more specific risks that Kaspersky will install equipment and software that permits monitoring of its network, provide decryption keys or other information to the FSB to enable clear-text access to encrypted transmissions, and provide other information to the FSB with or without the company's collaboration. Further, if Eugene Kaspersky consents, the FSB also is permitted to second FSB military personnel to Kaspersky offices, where such FSB personnel may have broad ability to view and collect customer data, send malware to customer computers, or other take other actions that present significant risks to federal information and information systems.

The NCCIC Supplemental Assessment also usefully examines the limitations of the assessment of Kaspersky software prepared by BRG. As NCCIC highlights, BRG confirms key aspects of the NCCIC Assessment, including the broad access to files and high-level privileges with which Kaspersky software operates. The specific testing that BRG has done to date also does not meaningfully address the information risks that NCCIC has identified. Specifically, BRG has not proven or even provided evidence that the FSB would be unable to monitor and decrypt traffic between Kaspersky's offices and Moscow and Kaspersky users (directly or through the KSN); that not participating in the KSN or deploying the Kaspersky Private Security Network prevents transmission of customer data to Kaspersky; or that a malicious cyber actor such as the FSB could not write signatures (*e.g.*, when on secondment to Kaspersky) or otherwise exploit the Kaspersky software to conduct targeted searches of customer computers and networks for specific information.

Based on all of this information, I maintain my recommendation that you determine that Kaspersky-branded products present known or reasonably suspected information security risks to federal information and information systems. These risks arise because of the broad access to files and high-level privileges of anti-virus software, including Kaspersky–branded products; the publicly-reported and Kaspersky-acknowledged ties between Kaspersky officials and the

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0775

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Russian Government; and the significant authorities under Russian law, detailed in the Maggs Report, that permit the FSB to request or compel assistance from Kaspersky and to intercept transmissions between Kaspersky and its federal government customers without a court order. This recommendation is based upon expert judgments relating to national security. Classified information, provided in the Classified Annex to the Information Memorandum, further supports this recommendation.

In response to these concerns, Kaspersky has not submitted a clear and comprehensive proposal to mitigate these risks. Instead, Kaspersky suggests that agencies could use both Kaspersky software and anti-virus software from another vendor (to address the risk that Kaspersky or the Russian Government would intentionally withhold needed signature updates), and that agencies either could decline participation in the KSN or deploy the local KPSN. However, as described in the NCCIC Supplemental Assessment and Section III.A.2 above, use of multiple anti-virus products creates technical and budgetary issues while not addressing the key risks, declining participation in KSN does not eliminate transmission of data to Kaspersky, and neither declining participation in KSN nor deploying a local KPSN addresses the risks of malicious signature or software updates, which could impair the integrity or availability of federal information and information systems, among other information security risks. In sum, none of these options individually or collectively address the information security risks that necessitated issuance of BOD 17-01.

For the above reasons, I recommend that you issue a Final Decision that maintains BOD 17-01 without modification. As required by the administrative process that DHS made available to Kaspersky and other entities, I also recommend that you transmit a letter to Kaspersky enclosing the Final Decision, this Information memorandum, and its exhibits, including the NCCIC Supplemental Assessment and the Maggs Report.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0776

# Exhibit L



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

December 6, 2017

Mr. Eugene Kaspersky
Founder and Chief Executive Officer
Kaspersky Lab
Americas Headquarters
500 Unicorn Park, 3rd Floor
Woburn, Massachusetts  01801
Via electronic transmission:  Tara.Hairston@kaspersky.com

Dear Mr. Kaspersky:

I am writing to advise you of my final decision that concludes the administrative process relating to Binding Operational Directive ("BOD") 17-01.  I issued BOD 17-01 on September 13, 2017, pursuant to the authority under 44 U.S.C. § 3553(b)(2).

I advised you of that decision on September 13th, and informed you of an administrative process by which your company could request review of BOD 17-01 by providing to the Department a written response and any additional information or evidence supporting the response, to explain the adverse consequences, address the Department's concerns, or mitigate those concerns.  The Department received a response and supporting exhibits from your company on November 10, 2017, pursuant to a one week extension granted by the Department, and subsequently met with Kaspersky officials and the company's outside counsel on November 29, 2017.

As provided in my letter to you on September 13, 2017 and in the notification published in the *Federal Register* on September 19, 2017, the Assistant Secretary for Cybersecurity and Communications reviewed the materials relevant to the issues raised by the company and issued a recommendation to me.  That recommendation and the underlying analysis are provided in the enclosed Information Memorandum.

I have carefully considered your company's submission, your representative's input, and the recommendation from the Assistant Secretary.  For the reasons set forth in my Final Decision Memorandum, which is enclosed, I have maintained BOD 17-01, without modification.

Sincerely,

Elaine C. Duke
Acting Secretary

Enclosures:
Final Decision Memorandum regarding Binding Operational Directive 17-01
Information Memorandum from the Assistant Secretary for Cybersecurity and Communications

www.dhs.gov

# Exhibit M

# REPORT OF PETER B. MAGGS

## INTRODUCTION

1.      I have been retained by the Department of Homeland Security to advise on Russian law.

2.      In this capacity, I have reviewed the Information Memorandum from the Assistant Secretary for Cybersecurity and Communications to the Acting Secretary, dated September 1, 2017, and the Kaspersky Lab Request for Department of Homeland Security to Initiate Review of Binding Operational Directive 17-01.

3.      I am providing this Report to be attached to a memorandum from the Assistant Secretary for Cybersecurity and Communications to the Secretary of Homeland Security. This Report is based on my review and analysis of Russian laws related to the authorities of Russian intelligence and other government agencies, to the requirements for private enterprises to develop, use, and sell products that use encryption, and to other matters relevant to Binding Operational Directive 17-01.   This Report is not intended to be an exhaustive analysis.  If needed for a future purpose, I may supplement this Report.

4.      All translations in this report have been made or verified by me.

## MY QUALIFICATIONS AND EXPERIENCE

5.      I teach at the University of Illinois, where I am Professor of Law Emeritus and holder of the Clifford M. & Bette A. Carney Chair Emeritus.  My specialty is law of the Russian Federation, law of the other former Soviet republics, and law of the former Soviet Union.

6.      I have consulted on Soviet and Russian law for government agencies and for lawyers with clients investing in and trading with the USSR and, more recently, Russia and other former Soviet republics. I speak, read, and write Russian fluently, and I have visited Russia frequently.

7.      I have studied law both in the United States and in Russia.  In 1957, I received an A.B. Degree from Harvard College in Classics and Slavic and, in 1961, I received a J.D. Degree from Harvard Law School.  During 1961-1962, I was an exchange post-graduate student at the Faculty of Law of Leningrad (now St. Petersburg) State University. There, I studied with Professor O.S. Ioffe, a leading expert on Russian civil law.  In 1963-1964, I was an associate of the Harvard Russian Research Center and a Research Associate at Harvard Law School.  In 1977, I taught as a Fulbright Lecturer at Moscow State University.

1

AR0777

8.    After the dissolution of the Soviet Union, I worked extensively under United States government auspices on foreign aid projects designed to help with the creation of the legal basis for a market economy in the Russian Federation and the other former Soviet republics.  One important part of this effort was the creation of model Civil Code legislation, which eventually became a basis for the civil codes of a number of former republics.  In connection with this project, I met frequently with civil code drafters from Russia and other former republics during the 1990s.

9.    I am author, co-author, co-editor, translator, or co-translator of a dozen books and numerous articles on Soviet and Russian law, including a translation of the Russian Civil Code and a book, Law and Legal System of the Russian Federation, which I co-authored with Professor William Burnham, Olga Schwartz, and the late Professor Gennady M. Danilenko.  In addition to my writings on Russian law, I am also the co-author of several casebooks and the author of various articles on United States law.

10.   An up-to-date copy of my curriculum vitae is attached as Appendix 1 to this Report.

## THE RUSSIAN LEGAL SYSTEM

### Introduction

11.   The Russian legal system belongs to the European civil law family (or continental system). Russian law makes a strict division between different branches of law, such as criminal law, civil law, and labor law. Each branch has its own principles and sources of legislation. Usually the key principles of each branch are codified, for instance in the Civil Code and the Civil Procedure Code. The system of Russian law and of Russian civil law, in particular, is much more closely related to German law than to French law. However, it would be a great mistake to assume that any rule or the interpretation of any legal provision in Russia would necessarily follow the law in other civil law countries.

### Sources of Law

12.   The principal sources of the law of the Russian Federation, in hierarchical order, are: the Constitution of the Russian Federation, laws adopted by the Russian Parliament, decrees of the President, and regulations issued by the Government and governmental agencies. There is also legislation adopted at regional and city levels, but this legislation is not relevant to the legal issues discussed in this Report. When ordinary laws in a particular branch are changed, generally the codes are changed at the same time to avoid conflicts.

AR0778

Statutes often contain cross-references clarifying their relationship to various branches of law.

## SUMMARY OF LEGAL ANALYSIS

13. Below I provide a summary of my legal analysis. My conclusions are as follows:

(a) Russian law requires FSB bodies to carry out their activities in collaboration with various entities in Russia, including private enterprises, and thus including Kaspersky Lab.

(b) Private enterprises, including Kaspersky Lab, are under a legal obligation to assist FSB bodies in the execution of the duties assigned to FSB bodies, including counterintelligence and intelligence activity.

(c) Russian law permits FSB service personnel to be seconded to private enterprises, including Kaspersky Lab, with the consent of the head of the enterprise and with the FSB personnel remaining in FSB military service status during the secondment.

(d) Kaspersky Lab qualifies as an "organizer of the dissemination of information on the Internet" and, as such, is required (1) to store in Russia and provide to authorized state bodies, including the FSB, metadata currently and content as of July 1, 2018; and, based on this or other laws, (2) to install equipment and implement other means that enable the FSB and potentially other state authorities to monitor data transmissions between Kaspersky's computers in Russia and Kaspersky Lab customers.

(e) No court order is required for FSB operational-investigative activities undertaken in the performance of FSB duties, including operational-investigative activities involving the obtaining of information stored on and communications with United States government computers, and Kaspersky Lab is obliged to assist the FSB with such operational-investigative activities.

(f) Kaspersky Lab is required to provide the FSB and other Federal executive bodies in the field of security with the keys or other information needed to decrypt Kaspersky Lab's encrypted data transmissions.

## DETAILED LEGAL ANALYSIS

**(a) Russian law requires FSB bodies to carry out their activities in collaboration with various entities in Russia, including private enterprises, and thus including Kaspersky Lab.**

3

AR0779

14.     The Federal Law of April 3, 1995, No. 40-FZ, "On the Federal Security Service" requires FSB bodies to carry out their activities in collaboration with various entities in Russia, including private enterprises such as Kaspersky. This obligation is stated in the first paragraph of Article 15 of this law:

> Federal security service bodies shall carry out their activity in collaboration with federal bodies of state authority, bodies of state authority of constituent entities of the Russian Federation, enterprises, institutions, and organizations, regardless of their form of ownership.

15.     The "bodies" of the FSB are defined in Article 2 of the same law as the "federal body of executive authority in the area of ensuring security" and the regional and specialized security bodies subordinate to it.

**(b) Private enterprises, including Kaspersky Lab, are under a legal obligation to assist FSB bodies in the execution of the duties assigned to FSB bodies, including counterintelligence and intelligence activity.**

16.     The Federal Law of April 3, 1995, No. 40-FZ, "On the Federal Security Service" places private enterprises under a legal obligation to assist FSB bodies in the execution of the duties assigned to the FSB bodies. This obligation is stated in the third paragraph of Article 15 of this law:

> State bodies and also enterprises, institutions and organizations have the obligation to assist federal security service bodies in the execution of the duties assigned to these bodies.

17.     The duties assigned to these bodies may be in any of the "basic directions" listed in Article 8 of the Law 40-FZ of April 3, 1995, as amended, which provides:

> **Article 8. Directions of Activity of the Federal Security Service Bodies**
>
> The activity of federal security service bodies shall be conducted in the following basic directions:
>
> counterintelligence activity;
>
> the fight with terrorism;
>
> the fight with crime;

AR0780

intelligence activity;

border activity;

ensuring information security.

Other directions of activity of federal security service bodies shall be defined by federal legislation.

18.    In particular, Kaspersky Lab must assist FSB bodies in their counterintelligence and intelligence activity, since these are duties assigned to FSB bodies. These activities are defined in the first paragraph of Article 9 and the first paragraph of Article 11 of the Federal Law of April 3, 1995, No. 40-FZ, "On the Federal Security Service":

### Article 9. Counterintelligence Activity

Counterintelligence activity – activity conducted by bodies of the federal security service and/or their subdivisions (hereinafter in this Article – "counterintelligence bodies"), and also by official persons of these bodies and subdivision by the conduct of counterintelligence measures for the purpose of revealing, preventing, and stopping intelligence and other activity of special services and organizations of foreign states and also of individual persons, which is directed at causing harm to the security of the Russian Federation.

### Article 11. Intelligence Activity

Intelligence activity is conducted by the body of foreign intelligence of the federal body of executive activity in accordance with the Federal law "On Foreign Intelligence."

The manner of interaction of the body of foreign intelligence of executive authority in the area of ensuring security with other bodies of foreign intelligence of the Russian Federation is defined by federal legislation and by agreements concluded among them, and/or by  joint normative legal acts.

The manner of conducting intelligence measures and the manner of use of special methods and means in the conduct of intelligence activities shall be established by normative legal acts of the federal body of executive authority in the area of ensuring security.

**(c) Russian law permits FSB service personnel to be seconded to private enterprises, including Kaspersky Lab, with the consent of the head of the enterprise and with the FSB personnel remaining in FSB military service status during the secondment.**

5

AR0781

19.    As appears from Article 7 of the Federal Law of April 3, 1995, No. 40-FZ, "On the Federal Security Service," the Federal Security Service has its own military service personnel, in addition to civil service personnel, and ordinary employees.

20.    The Federal Law of April 3, 1995, No. 40-FZ, "On the Federal Security Service" permits FSB military service personnel to be seconded to private enterprises, including Kaspersky, with the consent of the head of the enterprise and with the FSB military service personnel remaining on military service during the secondment.  This authority is stated in the sixth paragraph of Article 15 of this law:

> For the purposes of resolving the tasks of safeguarding the security of the Russian Federation, military service personnel of federal security service bodies may be seconded to state authorities, enterprises, institutions and organizations, regardless of their form of ownership, with the consent of their heads and in the manner established by the President of the Russian Federation, while remaining on military service.

**(d) Kaspersky Lab qualifies as an "organizer of the dissemination of information on the Internet" and as such, is required (1) to store in Russia and provide to authorized state bodies, including the FSB, metadata currently and content as of July 1, 2018; and, based on this or other laws, (2) to install equipment and implement other means that enable the FSB and potentially other state authorities to monitor data transmissions between Kaspersky's computers in Russia and Kaspersky Lab customers.**

21.    Article 10.1 (introduced by the Federal Law of May 5, 2014, No. 97-FZ) of the Federal Law of July 27, 2006, No. 149-FZ, "On Information, Information Technologies, and Protection of Information," places a number of important obligations on any entity that qualifies as "an organizer of the dissemination of information on the Internet" as defined in the Law.  The term "organizer of the dissemination of information on the Internet" is defined in Article 10.1.1 as follows:

> An organizer of the dissemination of information on the Internet is a person who carries out activities to ensure the operation of information systems and/or programs for electronic computers that are designed and/or used to receive, transmit, deliver and/or process electronic messages of users of the Internet.

22.    Kaspersky Lab qualifies as "an organizer of the dissemination of information on the Internet" because its anti-virus software carries out activities to ensure the operation of information systems and are designed and used to receive, transmit, deliver, and process

AR0782

electronic messages, including data transmissions and emails, between Internet users (i.e., Kaspersky Lab and its customers).

23. The duties of organizers of the dissemination of information on the Internet are stated in Paragraphs 2 through 4.1 of Article 10.1, which are currently in effect except as noted, and which provide:

**Article 10.1. The Duties of the Organizer of the Dissemination of Information on the Internet**

2. An organizer of the dissemination of information on the Internet network is obliged to notify the federal executive body that performs functions of control and supervision in the sphere of mass media, mass communications, information technologies and communications in accordance with the procedure established by the Government of the Russian Federation, of the initiation of activities specified in part 1 of this Article.

3. An organizer of the dissemination of information on the Internet network is obliged to keep on the territory of the Russian Federation:

1) information about the receipt, transmission, delivery and/or processing of voice information, written text, images, sounds, video or other electronic messages of users of the Internet and information about these users within one year from the end of the implementation of such actions;

*Subparagraph 2 immediately below takes effect July 1, 2018*

*2) text messages of Internet users, voice information, images, sounds, video, other electronic messages of Internet users up to six months from the end of their reception, transmission, delivery and/or processing. The procedure, terms and volume of storage of information specified in this subparagraph shall be established by the Government of the Russian Federation.*

3.1. The organizer of the dissemination of information on the Internet network is obligated to provide information specified in Point (3) of this Article to

7

AR0783

authorized state bodies carrying out operational-investigative activity or ensuring the security of the Russian Federation in cases stipulated by federal laws.

*[An amendment effective January 1, 2018, changed the words "Point 3" above to "Part 3".]*

4. An organizer of the dissemination of information on the Internet shall have the duty to ensure the implementation of the requirements for the equipment and for the technical and program means used by the organizer in the operation by it of information systems, i.e., the requirements that have been established by the federal body of executive power in the area of communications by agreement with the authorized state bodies conducting operative search activity or ensuring security of the Russian Federation for use by the conduct by these bodies (in cases provided by federal laws) of measures for the purposes of carrying out the tasks assigned to these bodies. The organizer also shall have the duty to take measures to prevent the discovery of the organizational and tactical methods of the conduct of such measures. The Government of the Russian Federation shall establish the manner in which the organizers of the distribution of information on the Internet interact with the authorized state bodies conducting operative-search activity or ensuring the security of the Russian Federation.

(e) **No court order is required for FSB operational-investigative activities undertaken in the performance of FSB duties, including operational-investigative activities involving obtaining information stored on and communications with United States government computers, and Kaspersky Lab is obliged to assist the FSB with such operational-investigative activities.**

24. An important way in which the FSB carries out its duties is by "operational-investigative activities." Such activities are governed by Federal Law No. 144-FZ of August 12, 1995 (as amended), "On Operational-Investigative Activity."

25. Article 6 of the Federal Law of August 12, 1995, No. 144-FZ, as amended through July 6, 2016, "On Operational-Search Activity" requires private businesses, including Kaspersky Lab, to install any equipment supplied by the FSB for use in obtaining computer information.

### Article 6. Operational-Search Measures

The following operational-search measures are conducted in the conduct of operational search activity:

. . .

8

15. Obtaining computer information.

. . .

Operational-search measures connected with the monitoring of things sent by post, telegraph and other communications, eavesdropping on telephone conversations with connection to fixed apparatus of enterprises, institutions and organizations regardless of the form of ownership, and of physical and legal persons providing services and means of communication with the taking of information from technical channels of communications and with the receipt of computer information shall be conducted with the use of the operational-technical abilities and means of bodies of the federal security service and bodies of internal affairs in the manner determined by interdepartmental normative acts or by agreements among bodies conducting operational search activity.

. . .

26. The second paragraph of Article 8 of this Law makes it clear that, as a general rule, operational-investigative activities may be carried out against anyone anywhere:

Citizenship, nationality, sex, place of residence, property, official or social status, membership in public associations, attitude toward religions and political views of individual persons are not a hindrance to the conduct of operational-investigative activities with respect to them unless otherwise provided by a federal law.

27. The third paragraph of Article 8 of this Law makes it clear that operational-search activities include obtaining computer information. This third paragraph also indicates that a court order is required if the activities affect constitutional rights, and that such court order may be issued only if one of the three listed grounds is present:

Carrying out operational-search activities (including obtaining computer information) which restrict the constitutional rights of man and the citizen to the secrecy of correspondence, telephone conversations, postal, telegraphic and other messages transmitted over electric and postal communication networks, as well as the right to inviolability of the home, is allowed on the basis of a court decision and in the presence of information:

1. On the signs of a prepared, committed or committed unlawful act, according to which the production of the preliminary investigation is

AR0785

mandatory.

2. On persons who prepare, commit or have committed a wrongful act, according to which the production of the preliminary investigation is mandatory.

3. On events or actions (inaction) creating a threat to the state, military, economic, information or environmental security of the Russian Federation.

28. The fourth paragraph of Article 8 allows a 48-hour period of operational-search activities without a court order, even if the activities affect citizen's constitutional rights:

In cases that do not tolerate delay and can lead to the commission of a grave or especially grave crime, and also in the presence of data on events and actions (or inaction) creating a threat to the state, military, economic, information or ecological security of the Russian Federation, on the basis of a reasoned decision one of the heads of the body that carries out operational-search activity it is allowed to conduct the operational-search activities, provided by part two of this Article, with the obligation of informing a court (or judge) within 24 hours. Within 48 hours from the moment of the beginning of the operational-search activity, the body that implements it is obliged to obtain a court decision on carrying out such an operative-investigative measure or to stop it.

. . .

29. It is important to note that the restrictions in the third paragraph of Article 8, which require a court order for monitoring or intercepting private communications, are limited to communications involving rights of privacy of communication guaranteed to private individuals by the Constitution of the Russian Federation. Nothing in these restrictions indicates that they protect the secrecy of (1) the content of computers owned or used by the United States government for government-related purposes; (2) communications between individuals not subject to Russian constitutional guarantees, such as private communications outside Russia between individuals who are not Russian citizens; or (3) personal information about people outside Russia who are not Russian citizens. Therefore, operational-investigative activity by the FSB to collect any of these three types of information does not require a court order.

30. In sum, Kaspersky Lab's legal obligation to assist the FSB in its counterintelligence and intelligence functions includes a duty to assist the FSB in operational-investigative activity,

10

AR0786

in support of FSB counterintelligence and intelligence functions in the situations listed above (e.g., collecting information from U.S. computers), with no need for the FSB to have obtained a court order.

**(f) Kaspersky Lab is required to provide the FSB and other Federal executive bodies in the field of security with the keys or other information needed to decrypt Kaspersky Lab's encrypted data transmissions.**

31.     Paragraph 4.1 of Article 10.1 of the Federal Law of July 27, 2006, No. 149-FZ, "On Information, Information Technologies, and Protection of Information," requires Kaspersky to provide the FSB and other Federal executive bodies in the field of security with the keys or other information needed to decrypt Kaspersky's encrypted data communications.  Article 10.1 was added to this law by the Federal Law of May 5, 2014, No. 97-FZ.  Paragraph 4.1 was added to Article 10.1 by the Federal Law of July 6, 2016, No. 374-FZ.  Paragraph 4.1 reads as follows:

> **Article 10.1. The duties of the organizer of the dissemination of information on the Internet**
>
> . . .
>
> 4.1. The organizer of the dissemination of information on the Internet network is obliged when using additional electronic message coding for receiving, transmitting, delivering and/or processing electronic messages of Internet users and/or when providing Internet users with the possibility of additional coding of electronic messages, to present to the federal executive body in the field of security the information necessary to decode the received, transmitted, delivered and/or processed electronic communications.

**COMMENTS ON THE KASPERSKY LAB REQUEST FOR REVIEW**

32.     I have been supplied with a copy of the "Kaspersky Lab Request for Department of Homeland Security to Initiate Review of Binding 5. Directive - 17-01" and have been asked to comment on some of the assertions concerning Russian law and Russian legal obligations on pages 19-22 of the Request.

33.     The short summary of the duties of the FSB on page 19 is correct.

34.     Later on page 19, Kaspersky also accurately states that the FSB can request information from companies in Russia in furtherance of the FSB's duties and that such companies are obligated to comply with the request.  However, Kaspersky states on page 19 that "the

11

AR0787

FSB's powers in this regard are not unlimited, and FSB requests are subject to challenge in court." I have searched the leading Russian legal database, "Consultant Plus", for cases involving the power given to the FSB to require state agencies and private businesses "to assist federal security service bodies in the execution of the duties assigned to these bodies". I found only two such cases. Neither case was brought against the FSB. Rather both cases were brought against parties sanctioned by public authorities. These parties complained that various entities had improperly voluntarily cooperated with the FSB. The complaints of both parties were rejected.

35.    In one case, a private company complained that other organizations had improperly cooperated with the FSB in helping to find information on the basis of which the private company was fined.[1]

36.    In another, a regional public entity was sanctioned by the Federal agency that enforced public contract bidding legislation. The Federal agency had acted on the basis of information of violation of the legislation provided to it by the FSB. The regional public entity argued that the Federal agency should not have acted on this basis. The court upheld the actions of the Federal agency in acting on the basis of the FSB information. The court noted that "the list of matters on which state bodies, enterprises, and institutions regardless of form of ownership were obligated to render aid to security bodies was rather broad."[2]

37.    This statement confirms my opinion that, while the FSB's powers are not "unlimited," the FSB's duties are very broadly written and interpreted.

38.    Thus my research revealed not a single case brought against the FSB by a party seeking to avoid cooperation with the FSB.

39.    I have not conducted detailed research and analysis on the specific requirements and processes for obtaining licenses and certificates related to encryption products in the Russian Federation. However, based on the materials that I have reviewed, I generally agree that one or more components of the FSB are involved in granting encryption-related licenses to companies and that the U.S. Department of the Treasury, Office of Foreign Assets Control has issued a general license to authorize certain otherwise-prohibited transactions with the FSB.

40.    On page 21, Kaspersky Lab states that Kaspersky Lab and Military Unit 43753 are separate organizations, and Kaspersky Lab attaches as exhibits English-language translations of the

---

[1] Decision of the Twenty-first Arbitrazh Appellate Court of July 21, 2017, No. AP-1382/2017 in Case No. A83-3691/2017.

[2] Decision of the Twelfth Arbitrazh Appellate Court of March 18, 2015, No. 12AP-581/2015 in Case No. A06-7963/2014,

12

AR0788

Case 1:17-cv-02697-CKK Document 19-10 Filed 02/02/18 Page 147 of 200

Russian Trade Register for each organization. I found the same registration records by searching the Russian tax service's public online corporate registry. However, the discussion on page 21 fails to explain the nature of the relationship between Kaspersky Lab and Military Unit 43753 that led to the joint issuance of the certificates in 2007 and 2011. I note that the Kaspersky Request states [emphasis added]:

> Thus, the FSB issued the 2007 and 2011 certificates to Kaspersky Lab and also to MU 43753, *presumably* so that the latter would be aware that Kaspersky Lab had obtained the certificates and was eligible to participate in public tenders.

41.  I would expect that Kaspersky Lab's files would contain documentation that provides actual evidence of the relationship between Kaspersky Lab and Military Unit 43753 connected with the joint issuance of the certificates. Apparently the authors of the Request either were not given access to this documentation or chose not to address further in the Request. Rather, Kaspersky Lab only states what "presumably" might have occurred.

42.  The most problematic portion of the discussion of Russian law in the Request is in its discussion (pages 21-22) of Russian legislation on operative-investigative measures.

43.  The Request states:

> Russia and other countries have implemented national security legislation designed to regulate surveillance aimed at detecting and preventing terrorism and other criminal activities. In Russia, those laws and tools are applicable to telecom companies and Internet Service Providers ("ISPs"). Kaspersky Lab does not provide communication services, thus the Company is not subject to these laws or other government tools, including Russia's System of Operational-Investigative Measures ("SORM").

44.  The above statement is incorrect. First, as explained in subsection (e) above, the FSB has long had the power to engage in operational-investigative measures and Kaspersky Lab has long had the duty to cooperate with such measures. As explained above in paragraph 25, this duty would include the installation of any special equipment provided by the FSB.

45.  Second, as also explained in subsection (d) above , Kaspersky Lab has the duty as an "organizer of the disseminator of information on the Internet" to install hardware or software that permits FSB monitoring and interception of data transmissions between

13

AR0789

Kaspersky and its customers.   These laws and tools apply to Kaspersky Lab whether or not it is considered to be a provider of communications services.

46.   Further, the Request's statement, "Kaspersky Lab does not provide communication services, thus the Company is not subject to these laws or other government tools[,]" is quite dubious.

47.   Article 15 of Law 40-FZ of April 3, 1995, "On the Federal Security Services," has provided ever since its enactment in 1995, in what is now its fifth paragraph (emphasis added):

> Physical persons and legal entities in the Russian Federation providing postal communications services and *electronic communications services of all types*, including data, confidential, and satellite communications systems, *shall be under obligation, at the request of federal security service bodies, to include in the apparatus additional hardware and software and create other conditions required to implement operational/technical measures by bodies of the federal security service*.

48.   To interpret the meaning of "legal entities . . . providing . . . electronic communications services of all types," it is common practice in interpreting Russian legislation to use the definition of terms in the main law in a particular area to interpret the meaning of terms in other laws that use these terms. Terms concerning communications were defined in Law No. 15-FZ of February 16, 1995, "On Communications."  These definitions would have been, and still are, used to interpret the meaning of identical or almost identical terms used in Law No. 40-FZ of April 3, 1995, "On the Federal Security Service."  Thus, to interpret the scope of "legal entities . . . providing . . . electronic communications services of all types," I researched and identified the following relevant definitions in Law No. 15-FZ of February 16, 1995, "On Communications" [emphasis added]:

> **Article 2. Basic Terms Used in the Present Federal Law**
> For the purposes of the present Federal Law, the following basic terms are used:
>
> Electrical communications (electronic communications) – every transmission or receipt of signs, signals, written text, images, or sounds over cable, radio, optical or other electromagnetic systems;
>
> . . .
>
> Electronic communications networks – technological systems providing one or several types of transmissions: telephone, telegraph, fax, transfer of data and other types of documentary communications, *including exchange of information among computers,* television, sound and other types of radio and cable broadcasting;

14

AR0790

49.    The 1995 Law on Communications was repealed and replaced by Federal Law No. 126-FZ of July 7, 2003, "On Communications."  This law had a somewhat different list of definitions.  As stated in paragraph 48 above, Russian practice has been to interpret terms in one law using definitions for the same or similar terms at the time the borrowing legislation was passed.  Thus, the definitions in the 1995 Law On Communications are the relevant definitions when interpreting paragraph 5 of Article 15 of Law 40-FZ of April 3, 1995, "On the Federal Security Services."  Although, in my opinion, the definitions in the 2003 Law are not relevant, I nevertheless provide them immediately below:

**Article 2. Basic Terms Used in the Present Federal Law**

For the purposes of the present Federal Law the following basic terms are used:

. . .

24) communications network – a technological system including means and lines of communications and meant for electronic communications or postal communications;

. . .

35) electronic communications – any emission, transfer, or receipt of symbols, signals, voice information, written text, images, sounds or communications of any type by a radio system, cable, optical or other electromagnetic systems;

50.    Using the definitions in the 1995 Law, Kaspersky Lab certainly is engaged in the "transmission or receipt" of signals and certainly has set up a world-wide system that provides for the "transfer of data" and the "exchange of information among computers".  Kaspersky Lab similarly provides electronic communications services under the definitions in the 2003 Law.

51.    Thus, the FSB would have strong grounds to assert that under Article 15 of the Law on the FSB, Kaspersky Lab has the obligation, if requested, to "include in the apparatus additional hardware and software and create other conditions required to implement operational/technical measures by bodies of the federal security service."

52.    In sum, apart from whether Kaspersky is subject to the requirement that telecom companies and ISPs install SORM equipment that permits surveillance of communications and data transmissions over telecom and ISP networks in Russia, Kaspersky Lab clearly is subject to "other government tools" that raise significant risks that Kaspersky Lab will be required

15

AR0791

Case 1:17-cv-02603-CKK Document 19-10 Filed 02/02/18 Page 150 of 200

or requested to cooperate with FSB intelligence and other activities. For instance, the FSB could require that Kaspersky Lab install monitoring equipment provided by the FSB.

53.    Whether or not the FSB has requested that Kaspersky Lab cooperate by installing monitoring equipment, Kaspersky Lab concedes that "[e]ncrypted Kaspersky Lab customer data may theoretically be intercepted by the FSB using SORM only if such data is transmitted through Russian telecom providers' networks or using internet communications." Kaspersky then does not deny that its data transmissions with customers occur using the networks of Russian telecom providers or Russian ISPs.

54.    The Request goes on to state:

> However, the FSB is only legally permitted to use SORM in a limited number of situations and each use of SORM technology is subject to court oversight. Law enforcement officers wishing to use this technology must obtain a prior court order in each case when the technology is to be used against a particular person or legal entity.

55.    As pointed out in paragraphs 29-30 above, this statement is incorrect. The legal safeguards cited in the Request only apply to situations involving the privacy of personal communications protected by the Constitution of the Russian Federation. Communications sent from or received by United States government computers concerning United States government functions are not protected by the Russian Constitution. Therefore, I do not believe that the FSB would need to obtain any court order to use SORM technologies to intercept data transmissions between Kaspersky Lab and its U.S. government customers. In addition, as stated in paragraph 31 above, Kaspersky Lab is required to provide the FSB and other Federal executive bodies in the field of security with the keys or other information needed to decrypt Kaspersky's encrypted data communications.

56.    As explained above in paragraphs 21-23, starting July 1, 2018, internet service providers and other "organizers of the dissemination of information on the Internet" will be required to store all communications for six months. The FSB would have access to this data in carrying out its operational-search activity. And as explained in paragraphs 29-30 and 55

16

AR0792

above, it would need no court order to access data other than private communications of Russian citizens.

Respectfully submitted,

Peter B. Maggs                    Date: December 2, 2017

AR0793

APPENDIX 1 – CURRICULUM VITAE OF PETER B. MAGGS

Peter B. Maggs -- Biographical Information

Office Address:

University of Illinois College of Law, 504 East Pennsylvania Avenue, Champaign, Illinois 61820, USA

Telephones: office: (217) 333-6711, mobile: (202) 413-3213

Fax: (217) 244-1478

Email: p-maggs @ illinois.edu.

Homepage: http://www.illinois.edu/ph/www/p-maggs

Employment:

Professor of Law and Clifford M. and Bette A. Carney Chair Emeritus, University of Illinois at Urbana-Champaign, 2014-

Professor of Law, Clifford M. and Bette A. Carney Chair in Law, University of Illinois at Urbana-Champaign, 2002-2014.

Peer & Sarah Pedersen Professor of Law, University of Illinois at Urbana-Champaign, 1998-2002.

Richard W. & Marie L. Corman Professor of Law, University of Illinois at Urbana-Champaign, 1988-1998.

Acting Dean, College of Law, University of Illinois at Urbana-Champaign, fall 1990.

Professor of Law, University of Illinois at Urbana-Champaign, 1969-1988.

Associate Professor of Law, University of Illinois at Urbana-Champaign, 1967-69.

Assistant Professor of Law, University of Illinois at Urbana-Champaign, 1964-67.

Associate, Harvard Russian Research Center and Research Associate, Harvard Law School, 1963-64.

Fellowships, Visiting Appointments, etc.:

Summer 2004.  Worked in Serbia for National Center for State Courts evaluating legal education and designing a program for assistance to law schools.  Visited law schools, wrote extensive report

18

AR0794

Winter 2002-2003.  Worked in Russia for USAID evaluating legal education and designing programs for assistance to legal education.  Visited law schools, participated in writing extensive report.

Spring Semester 2002. Fulbright Distinguished Chair, University of Trento, Italy.

Summer 2001. Fulbright Senior Scholar, University of Malaya, Petaling Jaya, Malaysia

Spring 1998 - Visiting Professor, George Washington University Law School

January 1995 - present.  Consultant for USAID contractors and the World Bank on numerous law reform projects in the former USSR, including legislative drafting and legal education projects in Armenia, Belarus, Moldova, Kazakstan, Kyrgyzstan, Russia, Tajikistan, and Ukraine.

1995-2000; 2005-2015. - Member, Panel of Recommended Arbitrators, International Commercial Arbitration Court of the Russian Chamber of Commerce and Industry

2015-2018 – Panelist of the Kuala Lumpur Regional Centre for Arbitration

January 1994 - January 1995. On leave from the University of Illinois to serve as Director/Legal Reform Specialist for the Rule of Law Consortium, Washington, D.C., administering a contract from the United States Agency for International Development to support the "rule of law" in the newly independent states of the former Soviet Union.

Fulbright, Lecturer, Universidade Federal de Santa Catarina, Florianopolis, Brazil, May-August 1982.

Guggenheim Fellow, January-December 1979.

Fulbright Lecturer, Moscow State University, Spring Semester, 1977.

ACLS - Soviet Academy of Sciences Exchange Scholar, Novosibirsk, USSR, August 1972.

Senior Fellow, East-West Population Institute, Honolulu, Hawaii, Spring Semester 1972.

ACLS Summer Language Fellowship, Rumania, June-August 1969.

IUCTG Exchange Scholar, Bulgarian Academy of Sciences, Sofia, Bulgaria, June-August 1967.

Fulbright Scholar, Belgrade University, Belgrade, Yugoslavia, January-June 1967.

IUCTG Exchange Student, Leningrad State University [now St. Petersburg State University], Leningrad, USSR, September 1961 - June 1962.

Education:

AR0795

A.B., Harvard College, 1957; J.D., Harvard Law School, 1961.

Subjects Taught:

Contracts; Sales, Copyright, Trademark & Unfair Competition, Statutory Interpretation, Russian Law.

Foreign Languages:

Fluent in Russian; good in Portuguese, competent in French; reading knowledge of German, Serbian, Bosnian & Croatian; Bulgarian; Macedonian; Ukrainian; Italian; Spanish; Romanian & "Moldovan".

Major Funded Research Projects Completed:

The Process of Making and Implementing Laws in the Soviet Union in the Gorbachev and Brezhnev Periods, under a contract with the U.S. Department of State, 1988-1989.

Soviet Law Under Gorbachev, under a contract with the U.S. Department of State, 1987-1988.

The Soviet Economy: A Legal Analysis, supported by the National Council for Soviet and East European Research, 1985-1986.

Soviet and East European Law and the Scientific and Technical Revolution, supported by the National council for Soviet and East European Research, 1979-1981.

Talking Computer Terminals for the Blind, supported by the U.S. Department of Health, Education, and Welfare, 1978- 1979, 1980-1981.

Soviet Law Under Khrushchev and Brezhnev, supported by the Ford Foundation, 1975-1978.

Computer-Based Legal Education, supported by the Council of Legal Education for Professional Responsibility, 1973-1975.

Miscellaneous:

Member, Board of Directors, Open Voting Consortium, <http://www.openvotingconsortium.org>, 2004-2006.

Member, Practicing Law Institute Advisory Committee on Intellectual Property Law, 1996-present.
Member, American Law Institute, Members Consultative Group on Uniform Commercial Code, Articles 2 (Sales), 2A (Leases), and 2B (Licenses), 1996-2003.

Member,  American Law Institute Members Consultative Group on Intellectual Property: Principles Governing Jurisdiction, Choice of Law, and Judgments in Transnational Disputes,

20

AR0796

2004-present.

Member, Board of Editors, The Uppsala Yearbook of East European Law, 2004-present.

Member, Board of Advisors, Central and East European Legal Materials, 1990-present.

Corresponding Member, International Academy of Comparative Law, 1988-present.

Member, American Law Institute, Members Consultative Group on Restatement of the Law, Third, Unfair Competition, 1987-1995.

Member, American Law Institute, 1986-present.

Member, Subcommission on Law, American Council of Learned Societies--USSR Academy of Sciences Commission on the Humanities and Social Sciences, 1986-1989.

Member, Board of Directors, Center for Computer-Assisted Legal Instruction, 1982-1985.

Parliamentarian, American Association for the Advancement of Slavic Studies, 1978-1983.

Editor, Soviet Statutes and Decisions, 1976-1984.

Consultant on Computer Systems, U.S. Department of Justice, 1979-1981.

Chairman, Committee on Soviet Law, American Bar Association Section of International Law, 1975-1981.

Co-Editor-in-Chief, Bulletin on Current Research in Soviet and East European Law, 1974-1981.

Chairperson, Section of Comparative Law, Association of American Law Schools, 1976-1977.

Member, Advisory Committee on Research on Law and Computer Technology, American Bar Foundation, 1975-1977.

Reporter, Uniform Land Transaction and Uniform Simplification of Land Transfers Act, National Council of Commissioners on Uniform State Laws, January 1974 - August 1976.

Guide, American National Exhibition, Moscow, summer 1959; awarded Medal of Merit of United States Information Agency.

Admitted to practice in the District of Columbia.

Peter B. Maggs -- List of Publications

Books

AR0797

Translator and editor (with cotranslator and coeditor Alexei Zhilstov), *Civil Code of the Russian Federation as Amended through  February 7, 2017*  (with introduction by Olga Kozyr, Peter Maggs, and Alexei Zhiltsov).  Book version: Createspace, 2017. Electronic Version: Kindle, 2017.

Translator and editor (with cotranslator and coeditor Alexei Zhilstov), *Civil Code of the Russian Federation, First Part, as of May 23, 2016* (with introduction by Olga Kozyr, Peter Maggs, and Alexei Zhiltsov).  Book version: Createspace, 2016. Electronic Version: Kindle, 2016.

Translator and editor (with cotranslator and coeditor Alexei Zhilstov), *Civil Code of the Russian Federation, First Part, as of January 31, 2016* (with introduction by Olga Kozyr, Peter Maggs, and Alexei Zhiltsov).  Book version: Createspace, 2016. Electronic Version: Kindle, 2016.

(with coauthors Olga Schwartz, William Burnham and the late Gennady Danilenko), *Law and Legal System of the Russian Federation*, 6th Ed. (Huntington, N.Y.: Juris Publishing, 2015).

(with coauthors John Soma and the late James Sprowl, *Computer and Internet Law*, 4th ed. (St. Paul, Minn.: West 2013).

(with coauthor Roger Schechter), *Trademark and Unfair Competition, Cases and Comments*, 7th ed. (St. Paul, Minn.: West, 2012).

(with coauthors William Burnham and the late Gennady Danilenko), *Law and Legal System of the Russian Federation*, 5th Ed. (Huntington, N.Y.: Juris Publishing, 2012).

Author of the introduction and translator, *Kazakhstan Law on Joint-Stock Company* (2012).  This book is published in three forms: electronic for the Amazon Kindle, electronic for Barnes & Noble Nook, and paperback by Createspace. The paperback version has the English translation and Russian text of the law on parallel pages.

Translator and editor (with cotranslator and coeditor Alexei Zhilstov), *Civil Code of the Russian Federation, First Part* (in parallel official Russian text and English translation by Peter B. Maggs and Alexei Zhiltsov, with introduction by Olga Kozyr, Peter Maggs, and Alexei Zhiltsov). (Moscow & Berlin: Infotropic, 2010).

Translator and editor (with cotranslator and coeditor Alexei Zhilstov), *Civil Code of the Russian Federation, Second Part* (in parallel official Russian text and English translation by Peter B. Maggs and Alexei Zhiltsov) (Moscow & Berlin: Infotropic, 2010).

Translator and editor (with cotranslator and coeditor Alexei Zhilstov), *Civil Code of the Russian Federation, Third Part* (in parallel official Russian text and English translation by Peter B. Maggs and Alexei Zhiltsov) (Moscow & Berlin: Infotropic, 2010).

Translator and editor (with cotranslator and coeditor Alexei Zhilstov),  *Civil Code of the Russian Federation, Fourth Part* (in parallel official Russian text and English translation by Peter B. Maggs and Alexei Zhiltsov) (Moscow & Berlin: Infotropic, 2010).

22

(with coauthors James Sprowl and John Soma) *Internet and Computer Law: Cases – Comments – Questions*, 3rd ed. (St. Paul: West, 2010.

(with coauthors James Sprowl and John Soma) *Teacher's Manual to Internet and Computer Law: Cases – Comments – Questions, 3rd ed.* (St. Paul: West, 2010.

(with coauthors William Burnham and Gennady Danilenko), Law and Legal System of the Russian Federation, 4th Ed. (Huntington, N.Y.: Juris Publishing, 2009).

Translator and editor (with cotranslator and coeditor Alexei Zhilstov) *Civil Code of the Russian Federation, Fourth Part* (in parallel official Russian text and English translation by Peter B. Maggs and Alexei Zhiltsov, with introductions by Alexander Makovsky and Peter Maggs), (Moscow: Wolters-Kluwer, 2008).

(with coauthors John Soma and James Sprowl) *Internet and Computer Law: Cases--Comments--Questions*, 2nd ed. (St. Paul: West Group, 2005).

(with coauthors William Burnham and Gennady Danilenko), Law and Legal System of the Russian Federation,  3rd Ed. (Huntington, N.Y.: Juris Publishing, 2004).

Translator and editor (with cotranslator and coeditor Alexei Zhiltsov), *Civil Code of the Russian Federation: Parallel Russian and English Texts* (Moscow: Norma, 2003).

(with coauthor Roger Schechter), *Teacher's Manual for Use With Trademark and Unfair Competition, Cases and Comments*, 6th ed. (St. Paul, Minn.: West Group, 2003).

(with coauthors John Soma and James Sprowl) *2002 Supplement to Internet and Computer Law: Cases--Comments--Questions* (St. Paul: West Group, 2002).

Translator and editor, *The Civil Code of the Russian Federation, Third Part* (Armonk, N.Y.: M.E. Sharpe, (2002).

(with coauthor Roger Schechter), *Trademark and Unfair Competition, Cases and Comments*, 6th ed. (St. Paul, Minn.: West Group, 2002).

(with John Soma and James Sprowl) *Teacher's Manual to Accompany Internet and Computer Law: Cases--Comments--Questions* (St. Paul: West Group, 2001).

(with John Soma and James Sprowl) *Internet and Computer Law: Cases--Comments--Questions* (St. Paul: West Group, 2001).

(with A.P. Sergeev) *Intelektual'naia sobstvennost'* ("Intellectual Property") (Moscow: Iurist, 2000). Also published on the Internet by the Open Society Institute (Moscow) (supported by the Soros Foundation)  at: <http://www.auditorium.ru/books/343/.

23

AR0799

*Copyright / Statutory Interpretation* (Teaching Materials) (Champaign: University of Illinois College of Law, 1998, 1999, 2001)

Translator (with Anna Tarassova and Alexei Zhiltsov) and editor (with Vladimir Nazaryan and Anna Tarassova), *Civil Code of the Republic of Armenia* (Yerevan: Iris, 1999). Published on the Internet by the "Law Reform in Transition States" project at the University of Bremen with the support of "Deutsche Gesellschaft für Technische Zusammenarbeit GmbH" (GTZ) at: <http://www.cis-legal-reform.org/civil-code/armenia/civ-arm-eng.htm>

Translator (with Alexei Zhiltsov) and editor, *The Civil Code of the Russian Federation*, with a Preface by A. Makovsky and an Introduction by A. Makovsky and S. Khokhlov (Armonk, N.Y.: M.E. Sharpe, 1997) (prepublished, without the Preface and Introduction in *Soviet Statutes and Decisions*, 1996-1997.

Translator (with Alexei Zhiltsov) and editor, *The Civil Code of the Russian Federation*, with a Preface by A. Makovsky and an Introduction by A. Makovsky and S. Khokhlov (Moscow: International Centre for Financial and Economic Development, 1997).

(With John Soma and James Sprowl), *1996 Supplement to Computer Law, Cases-Comments-Questions*, (St. Paul, Minn.: West Publishing Co., 1996).

*The Mandelstam File, the Der Nister File: An Introduction to Stalin-Era Prison and Labor Camp Records* (Armonk, N.Y.: M.E. Sharpe, 1996)

(With John Soma and James Sprowl), *Teacher's Manual for Use With Computer Law, Cases, Comments, and Questions*, (St. Paul, Minn.: West Publishing Co., 1992).

(With Glen E. Weston, and Roger Schechter), *Teacher's Manual for Use With Unfair Trade Practices and Consumer Protection, Cases and Comments, 5th ed.* (St. Paul, Minn.: West Publishing Co., 1992).

(With Glen E. Watson, and Roger Schechter), *Unfair Trade Practices and Consumer Protection, Cases and Comments*, 5th ed. (St. Paul, Minn.: West Publishing Co., 1992).

(With John Soma and James Sprowl), *Computer Law, Cases, Comments, and Questions*, (St. Paul, Minn.: West Publishing Co., 1992).

(Translator and co-editor with Robert Sharlet and Piers Beirne), *Stuchka: Selected Writings on Soviet Law and Marxism* (Armonk: M.E. Sharpe, 1988).

(With William E. Butler and John B. Quigley, Jr., co-editors), *Law After Revolution (New York: Oceana Publications*, 1988).

(With O.S. Ioffe), *The Soviet Economic System: A Legal Analysis* (Boulder: Westview, 1987).

(With James Sprowl), *Computer Applications in the Law* (St. Paul, Minn.: West Publishing Co.,

24

AR0800

1987).

(With D.A. Loeber, editor-in-chief, Donald Barry, F.J.M. Feldbrugge, and George Ginsburgs, co-editors) *Ruling Communist Parties and Their Status Under Law* (Dordrecht: Martinus Nijhoff, 1986).

(With S. Chesterfield Oppenheim, Glen E. Weston, and Roger Schechter), *1986 Supplement to Unfair Trade Practices and Consumer Protection* (St. Paul, Minn.: West Publishing Co., 1986).

(With John N. Hazard and William E. Butler) *The Soviet Legal System: The Law in the 1980's (New York: Oceana Publications*, 1984).

(With S. Chesterfield Oppenheim, Glen E. Weston, and Roger Schechter) *Teacher's Manual for Use With Unfair Trade Practices and Consumer Protection, Cases and Comments, 4th ed.* (St. Paul, Minn.: West Publishing Co., 1983).

(With O.S. Ioffe) *Soviet Law in Theory and Practice* (New York: Oceana Publications, 1983).

(With S. Chesterfield Oppenheim, Glen E. Watson, and Roger Schechter) *Unfair Trade Practices and Consumer Protection, Cases and Comments*, 4th ed. (St. Paul, Minn.: West Publishing Co., 1983).

(With Gordon Smith and George Ginsburgs, co-editors) *Law and Economic Development in the Soviet Union* (Boulder, Colorado: Westview Press, 1982).

(With Gordon Smith and George Ginsburgs, co-editors) *Soviet and East European Law and the Scientific-Technical Revolution* (New York: Pergamon, 1981).

(With S. Chesterfield Oppenheim and Glen E. Weston) *1981 Supplement to Oppenheim and Weston's Unfair Trade Practices and Consumer Protection* (St. Paul, Minn.: West Publishing Co., 1981).

(Translator) *Pashukanis: Selected Writings on Marxism and Law*, edited by Piers Beirne and Robert Sharlet (London: Academic Press, 1979).  Full text with original pagination available on the Internet at: <http://www.uiuc.edu/ph/www/p-maggs/pashukanis.htm>.

(With Donald Barry, F.J.M. Feldbrugge, and George Ginsburgs, co-editors) *Soviet Law After Stalin, III: Soviet Institutions and the Administration of Law* (Alphen aan den Rijn: Sijthoff & Noordhof, 1979).

(With Donald Barry and George Ginsburgs, co-editors) *Soviet Law After Stalin, II: Social Engineering through Law in the USSR* (Alphen aan den Rijn: Sijthoff & Noordhof, 1978).

(With Donald Barry and George Ginsburgs, co-editors) *Soviet Law After Stalin, I: The Citizen and the State in Contemporary Soviet Law* (Leiden: A.W. Sijthoff, 1977).

AR0801

(With John N. Hazard & William E. Butler) *The Soviet Legal System*, 3d ed. (Dobbs Ferry, N.Y.: Oceana Publications, 1977).

(With John N. Hazard & Isaac Shapiro) *The Soviet Legal System*, 2nd ed. (Dobbs Ferry, N.Y.: Oceana Publications, 1969).

(With Harold J. Berman) *Disarmament Verification Under Soviet Law* (Dobbs Ferry, N.Y.: Oceana Publications, 1967).

Laws, Monographs, Translations, and Technical Reports

"Soviet Health Law" (400 pages of selected and translated legislative materials constituting Volume XX of Soviet Statutes and Decisions).

"Soviet Economic Law Reform" (400 pages of selected and translated legislative materials constituting Volume XIX of Soviet Statutes and Decisions).

"Soviet Higher Education Law" (400 pages of selected and translated legislative materials constituting Volume XVIII os Soviet Statutes and Decisions).

"Soviet Social Welfare Law" (400 pages of selected and translated legislative materials constituting Volume XVII of Soviet Statutes and Decisions).

"Soviet Labor Law" (800 pages of selected and translated legislative materials constituting Volumes XV and XVI of Soviet Statutes and Decisions).

"Soviet Copyright Law" (400 pages of selected and translated legislative materials and judicial decisions constituting Volume XIV of Soviet Statutes and Decisions).

"Soviet Patent Law" (400 pages of selected and translated legislative materials constituting Volume XIII of Soviet Statutes and Decisions).
Law and Population in Eastern Europe. Medford, Mass.: Fletcher School of Law and Diplomacy, Law and Population Monograph Series, No. 3 (1977).

Reporter (with Marion Benfield), Uniform Simplification of Land Transfers Act, Uniform Laws Annotated, Vol. 14, 209-349.

Reporter (with Marion Benfield, chief reporter), Uniform Land Transactions Act, 1975 Official Text with Comments, (St. Paul, Minn., West Publishing Co., 1976).

"Report of Research on Computer Model of the Legal Regulation of the Communist Economic Enterprise," American Philosophical Society Yearbook 1972 (Philadelphia, 1973), p. 496.

Representation of National and Regional Political Units in a Computerized World Future Model. Honolulu: East-West Population Institute, East-West Center, Worker Paper No. 27, October 1972.

26

AR0802

Legal regulation of Population Movement to, from and within the United States--A Survey of Current Law and Constitutional Limitations. Honolulu: East-West Population Institute, East-West Center, Working Paper No. 25, June 1972.

Law and Population Growth in Eastern Europe. Medford, Mass.: Fletcher School of Law and Diplomacy, Law and Population Monograph Series, No. 3 [1972].

"A Proposal for Cooperation . . .," Second Symposium on the coordination of Research Concerning the Legal Systems of Central and Eastern Europe, Strasbourg, 1971. Document AS/Coll. RSJ (71) 17.

(With R.T. Chien and F.A. Stahl) New Directions in Legal Information Processing. Urbana, Ill.: University of Illinois Coordinated Science Laboratory, Report R-538, December 1971.

Nonmilitary Secrecy Under Soviet Law. RAND Corp. P-2856-1, 1964.

Articles

"The Uncertain Legal Status of Free and Open Source Software in the United States." In Axel Metzger ed., Free and Open Source Software (FOSS) and other Alternative License Models: A Comparative Analysis. *Ius Comparatum* – Global Studies in Comparative Law, Vol. 12, Springer International Publishing Switzerland, 2016, pp. 477-493.

"К вопросу о правовой охране ноу-хоу по российскому законодательству." [Regarding Legal Protection of Knowhow in Russian Legislation]. Труды по интеллектуальной собственности [Works on intellectual property]. Vol. XVII, No. 2, pp. 102-117. (2014).

"К вопросу о технических средствах защиты авторских и смежных прав."  [Regarding Technical Measures of Protecting Copyright and Neighboring Rights] Труды по интеллектуальной собственности [Works on intellectual property] Vol. XVI, No. 1, pp. 102-115. (2014).

"License Contracts, Free Software and Creative Commons in the United States." American Journal of Comparative Law, Supplement, Volume 62 (Supplement) 2014, pp. 407-423.

"Lost in Translation (Interpretation)?" in *Liber Amicorum* in Honour of 50th Anniversary of Alexey Zhiltsov: Transational Trade and Law, compiled and edited by A. Muranov and V. Plekhanov, Moscow-Berlin, Infotropic Media, 2013, pp. 139-145.

"Islamic Banking in Kazakhstan Law," Review of Central and East European Law, Volume 36 (2011), pp. 1-32.  http://www.law.illinois.edu/pmaggs/arts.htm.

"The Balance of Copyright in the United States of America," American Journal of Comparative Law, Supplement, Volume 58 (Supplement) 2010, pp. 369-376.

27

AR0803

"Conflict of Laws in the Area of Intellectual Property" (in Russian) in a forthcoming Festschrift honoring M.M. Boguslavsky. (Corrected final proofs have been returned to publisher; awaiting publication).

"Unconscionability of the Arbitral Clause under United States Law," *Vestnik mezhdunarodnogo kommercheskogo arbitrazha*, Vol. I, No. 1 (2010), pp. 167-181.

"Reflections of Anglo-American Legal Concepts and Language in the New Russian Civil Code, " in William Simons, ed., *Private and Civil Law in the Russian Federation. Law in Eastern Europe: Essays in Honor of FJ.M. Feldbrugge,* 60 (Martinus Nijhoff: Leiden-Boston, 2009) 197-203.

"O prave na sekret proizvodstva (nou-khau). Kriticheskii analiz polozhenii IV chasti Grazhdanskogo kodeksa Rossiiskoi Federatsii" [The Right to Secrets of Production (Know-How). A Critical Analysis of Provisions of the Fourth Part of the Civil Code of the Russian Federation], *Voprosy pravovedeniia* (Questions of Legal Thought), 2009, No. 3-4, pp. 76-91.

"Zhong Ou ya guo jia min fa dian yi ge bi jiao xing de gai guan [On Eurasian civil codes], 74 *Graduate Law Review of CUPL* (2007), pp. 143-154.

"From Goldilocks to Micky Mouse - the Limits of Intellectual Property Protection," in Grazhdanskoe zakonodatel'stvo [Civil Legislation], Issue 27, edited by A.G. Didenko and E.A. Belianevich (Almaty, Kazakhstan, 2007), pp. 306-314. Also in Russian in the same volume as "Ot Zlatovlaski k Mikki Mausu - predely zashchity intellektual'noi sobstvennosti," pp. 294-305.

"Constitution of 1977," *Encyclopedia of Russian History.*

"High Arbitration Court," *Encyclopedia of Russian History*.

*"Supreme Court," Encyclopedia of Russian History*.

*"*Free Legal Advice on the Internet," *International Journal of Legal Information*, Vol. 34, No. 3 (Winter 2006), pp. 483-513.

"United States Courts Judge Transition Country Legal Systems," in Rechtslage von Auslandsinvestitionen in Transformationsstaaten (Berlin: Berliner Wissenschafts Verlag, 2006), pp. 529-539.

"Abusive Advertising on the Internet (SPAM) Under United States Law", 2006 *American Journal of Comparative Law, Supplement* 385-394, reprinted in John Kozyris, ed., *Regulating Internet Abuses: Invasion of Privacy* (Alphen aan den Rijn: Kluwer Law International, 2007), 203-211.

"Dietrich André Loeber," *Sudebnik,* Vol. 9 (2004), No. 2, p. 265.

28

AR0804

Case 1:17-cv-02697-CKK Document 19-10 Filed 02/22/18 Page 163 of 200

"Public Land Ownership in the Russian Federation," in *Public Policy and Law in Russia: In Search of a Unified Legal and Political Space, Essays in Honor of Donald D. Barry, Law in Eastern Europe* 55, edited by Robert Sharlet and Ferdinand Feldbrugge (Leiden: Brill, 2005), pp. 199-211.

"Russia's Writing Requirement under the Convention on Contracts for International Sale of Goods," in *Balancing of Interests Liber Amicorum Professor Peter Hay zum 70. Geburtstag* (Frankfurt am Main: Verlag Recht und Wirtschaft GmbH, 2005), pp. 279-283.

"Commercial Law, 1917-1990s," in *Supplement to the Modern Encyclopedia of Russian, Soviet & Eurasian History*, Vol. 6, pp. 179-182.

"Civil Law in Russia, Soviet Union, Russian Federation," in *Supplement to the Modern Encyclopedia of Russia, Soviet & Eurasian History*, Vol. 6, pp. 117-123 (2005).

"Struggling towards Law?  Human Rights and Legislative Reform in Moldova," in Ann Lewis, ed., *The EU and Moldova: On a Fault-line of Europe* (London: Federal Trust, 2004), pp. 149-154.

"Conflict of Laws and Russian-U.S. Intellectual Property Relations," in Alexander Trunck, Rolf Knieper, and Andrej G. Svetlanov, editors, Russland im Kontext der internationalen Entwicklung: Internationales Privatrecht, Kulturgüterschutz, geistiges Eigentum, Rechtsverinheitlichung; Russia in the International Context: Private International Law, Cultural Heritage, Intellectual Property, Harmonization of Laws; Rossiia v kontekste mezhdunarodnogo razvitiia: mezhdunarodnoe chastnoe pravo, zashchita kul'turnyskh tennostei, intellektual'naia sobststvennost', unifikatsiia prava: Festschrift für Mark Moiseevič Boguslavskij (Berlin: BMV Berliner Wissenschafts-Verlag, 2004).

"Judicial Precedent Emerges at the Supreme Court of the Russian Federation," 9 *The Journal of East European Law* 479-500 (2002). (actually published in 2004).

"Ronald Rotunda, Friend and Colleague," 2003 *University of Illinois Law Review* 1169-1170.

"The Effect of Proposed Amendments to Uniform Commercial Code Article 2," *University of Illinois Journal of Law, Technology and Policy*, 2002 U. Ill. J.L. Tech. & Pol'y 311.

"Soviet Law." *Encyclopaedia Britannica* 2003 http://www.britannica.com/eb/article?eu=70730 Also to appear in bound and CD-ROM editions.

"The '.us' Internet Domain," *American Journal of Comparative Law*, Vol. 50 Supplement (2002), pp. 297-318.

"*The Process of Codification in Russia:* Lessons Learned from the Uniform Commercial Code." *McGill Law Review*, Vol. 44, No. 2 (August 1999), 281-300.

"The Impact of the Internet on Legal Bibliography," *American Journal of Comparative Law*,

AR0805

Vol. 46, Supplement 1998, pp. 665-675.

"Civil Law Reform and Privatization in the Newly Independent States," *Rule of Law Consortium Newsletter*, Spring 1998, pp. 3-4.

"Consumer Protection on the Internet," *Ajuris*, March 1998, pp. 105-112. (This is a paper presented at the First Interamerican Congress of Consumer Law.)

"The Russian Courts and the Russian Constitution," *Indiana International and Comparative Law Review*, Vol. 8, No. 1, pp. 99-117 (1997) (This is an expanded version of the Third John N. Hazard Lecture at the Association of the Bar of the City of New York.).

"The Mutual Restoration of Russian and United States Copyright," 3 *Parker School Journal of East European Law* 305-324 (1996).

"The Right Arbitration Forum Can Make the Difference Between Wining and Losing Disputes," *Russian Petroleum Investor*, June/July 1996, pp. 71-73.

"Russia's New Production Sharing Law Provides for Arbitration, But is Hampered by Politics," *Mealey's International Arbitration Report*, May 1996; reprinted in *Mealy's International Arbitration Review* 1996.

(With Robert Sharlet) "Reforming Legal Education in the Newly Independent States," *Rule of Law Consortium Newsletter*, Winter/Spring 1996, pp. 1-3.

"The Uniform Simplification of Land Transfers Act and the Politics and Economics of Law Reform," 20 *Nova Law Review* 1091- 1093 (1996).

"Industrial Property in the Russian Federation," in G. Ginsburgs et al., eds., *The Revival of Private Law in Central and Eastern Europe* (Leiden: Kluwer, 1996), pp. 377-90.

"The Russian Constitutional Court's Decisions on Residence Permits and Housing," 2 *Parker School Journal of East European Law* 561-582 (1995).

"Russian Commercial Courts Expand Jurisdiction Over International Business Disputes," *International Practitioner's Notebook*, August 1995, pp. 20-21.

"Legal Databanks in the United States and their Use in Comparative Law," 22 *International Journal of Legal Information*, 214-227 (1994).

"The Non-Role of Financial Intermediaries in Voucher Privatization in Russia, October 1992-February 1993," in Hans Smit & Vratislav Pechota, eds., *Privatization in Eastern Europe: Legal, Economic, and Social Aspects* (Irvington-on-Hudson: Transnational Juris Publications, 1994), 104-107.

"Overcoming Legal Obstacles to Doing Business in Russia," in *Law in Russia* (Donald W.

AR0806

Treadgold Papers, No. 101, 1994), 18-27.

"Importing Russian Intellectual Property; the Interaction of Russian and United States Law," 1 *Parker School Journal of East European Law* (1994).

"The Use of Expert Systems in Comparative Law," United States national report prepared for the XIVth International Congress of Comparative Law, *American Journal of Comparative Law, Supplement 1994*, 801-812.

"International Trade and Commerce" in the proceedings of a conference on the work of Harold J. Berman, 42 *Emory Law Journal*, 449-473 (1993); reprinted in Harold O. Hunter, ed., *The Integrative Jurisprudence of Harold J. Berman* (Boulder: Westview Press, 1996), pp. 51-74.

"Russian International Arbitration Legislation, *International Arbitration Report*, Nov. 11, 1993, (Vol. 8, #11), pp. 16-18.

"The Role of Publishing Houses in Developing Legal Research and Publication," Académie intenationale de droit comparé- International Academy of Comparative Law, *Rapports Généraux XIIIe Congrè international Montreal 1990 XIIIth International Congress General Reports* (Cowansville, Québec: Yvon Blais, 1992), 961-967.

"Legal forms of doing business in Russia," *North Carolina Journal of International Law and Commercial Regulation*, Vol. 18, No. 1, pp 173-192 (1992).

With Leonid P. Malkov, "Protecting Intellectual Property in Russia," *Research-Technology Management*, Jan.-Feb. 1993 (Vol. 36, No. 1), pp. 15-16.

"New Russian Intellectual Property Legislation," *Mealey's Litigation Reports: Intellectual Property*, Dec. 28, 1992 (Vol. 1, #6), pp. 43-47.

"Substantive and Procedural Protection of Enterprise Rights," in Donald D. Barry, ed., *Toward the "Rule of Law" in Russia; Political and Legal Reform in the Transition Period* (Armonk, M.E. Sharpe, 1992), pp. 277-290.

Translator, "Soviet Enterprises on the Difficult Path to a Market Economy," by V.P. Mozolin, in Donald D. Barry, ed., *In Search of the Law Governed State: Political and Societal Reform Under Gorbachev* (1992).

"The Ministry of Finance," in Eugene Huskey, ed., *Executive Power and Soviet Politics; The Rise and Decline of the Soviet State*, (Armonk, M.E. Sharpe, 1992), pp. 129-142.

"Legal Rights of the Handicapped in the USSR," in *The Emancipation of Soviet Law* [*Law in Eastern Europe* No. 44], 1992, pp. 249-255.

"Developments in Arbitration Law in Russia, Ukraine, and Kazakhstan," *International Arbitration Report*, Nov. 1992, pp. 16- 18.

31

AR0807

With Leonid P. Malkov, "Telfonye brokery." *Delovoi mir*, Sept. 18,1992, p. 15.

"Taking the 'Poison Pill': A Commentary on a Case Study," *Soviet Economy*, April-June 1992 (Vol. 8, No. 2), 158-163.

"Enforcing the Bill of Rights in the Twilight of the Soviet Union,"1991 *University of Illinois Law Review* 1049-1063.

"Legal Forms of Doing Business in Russia," 18 *North Carolina Journal of International Law and Com. Reg*. 173-192 (1992).

"Ownership Rights." In Michael P. Claudon and Tamar L. Gutner, *Investing in Reform: Doing Business in a Changing Soviet Union* (New York: New York University Press, 1991), pp. 155-169.

"Judicial Activism in the USSR." In Kenneth M. Holland, ed., *Judicial Activism in Comparative Perspective* (Houndmills: MacMillan, 1991), pp. 202-214.

"Post-Soviet Law: The Case of Intellectual Property Law." *Harriman Institute Forum*, Vol. 5, No. 3 (Nov. 1991), pp. 3-9.

"Special Section on the Fundamentals of Civil Law: Intellectual Property," *Soviet & East European Law*, 2 (1991), No. 6.

"Special Section on the Fundamentals of Civil Law: Choice of Law," *Soviet & East European Law*, 2(1991), No. 6.

"Law on Inventions," *Soviet & East European Law*, 2 (1991), No. 5.

"Systems for the Automated Storage and Retrieval of Legal Information: Their Use in Research on Foreign, Comparative, and International Law," *Proceedings of the XIIth International Congress of Comparative Law*.

"Recent Developments in Products Liability Law in the USA," *Journal of Consumer Policy* 14 (1991), 29-33.

"Product Liability Law in the US," *Australian Product Liability Reporter*, April 1991, pp. 7-9.

"Secret Soviet Economic Legislation," in *The Soviet Sobranie of Laws* (Berkeley: University of California, 1991), pp. 55-67.

"Edward Cleary as Colleague and Mentor," *University of Illinois Law Review*, 1990, 901-902.

"Marion Benfield as Colleague, Friend, Neighbor, Co-Reporter, and Fellow North Carolinian," *University of Illinois Law Review* (1990), 761-762.

AR0808

(With co-authors Robert Sharlet et al., "P.I. Stuchka and Soviet Law," in *Revolution in Law, Contributions to the Development of Soviet Legal Theory*, 1917-1938 (Armonk: M.E. Sharpe, 1990), pp. 45-60.

"The 1987 Decree on The State Committee on Science and Technology," in Albert J. Schmidt, ed., *The Impact of Perestroika on Soviet Law* (Dordrecht: Martinus Nijhoff, 1990), pp. 289-298.

"Second Soviet Draft Law on Inventions Published," *Soviet & East European Law*, 1 (1990), 7, 10.

"Property and Rights of the Individual: Definition and Enforcement," *Moscow Conference on Law and Bilateral Relations* (1990), 169-171.

"U.S. and Soviet Barriers to Bilateral Trade: Using Trade as an Instrument of Foreign Policy, Currency Controls, Intellectual Property Protection, and the Authority to Contract," *Moscow Conference on Law and Bilateral Relations* (1990), 77-79.

"Facilitating U.S.-Soviet Joint Ventures Through Legislative Reform," *in Financial Markets, Joint Ventures, and Business Opportunities in the Soviet Union* (Middlebury: Geonomics Institute, 1990).

"Constitutional Implications of Changes in Property Rights in the USSR," *Cornell International Law Journal* 23 (1990) 363-375.

Participant in roundtable discussion, "Crises in the USSR: are the constitutional and legislative changes enough?" (Symposium: Perspectives on the Legal Perestroika; Soviet Constitutional and Legislative Changes), *Cornell International Law Journal* 23 (1990) 377-398.

"Access to Justice for the Consumer in the USA," *Journal of Consumer Policy*, 13 (1990), 45-58.

"The Restructuring of the Soviet Law of Inventions," *Columbia Journal of Transnational Law* 28 (1990) 277-289; reprinted in *Legal Reform in the USSR* (Transnational Juris Publications: Ardsley-on-Hudson, 1991).

(With co-author Ronald Rotunda), "Meanwhile, back in Mother Russia," *Legal Times*, Oct. 2, 1989, p. 35, col. 2.

"Systems for the Automated Storage and Retrieval of Legal Information: Their Use in Research on Foreign, Comparative, and International Law," *Proceedings of the XIIth International Congress of Comparative Law*.

"Administrative Law and Finance Law," in G. Ginsburgs, ed., *Soviet Administrative Law: Theory and Property* [*Law in Eastern Europe* No. 40] (Dordrecht: Martinus Nijhoff, 1989), 387-397.

"Reglament Arbitrazhnogo Instituta Stokgol'mskoi Torgovoi Palaty," *Arbitration International* 4

33

AR0809

(1988) 331-333.

"The Role of Soviet Banking and Finance Law in Joint Enterprises," *Columbia Journal of International Business*, 23:2 (Summer 1988), 13-24.

"Introduction," in *Advertising Law Anthology*, Vol. XI (1988), ix- xii.

"Introduction," in *Model Jury Instructions for Business Tort Litigation*, 2nd ed. (Chicago: American Bar Association, 1988), xv-xxviii.

"Choice and Compulsion in Soviet Labor Law: Labor Conscription 1917-21," *Law After Revolution*, edited by William E. Butler, Peter B. Maggs, and John Quigley, Jr., (New York: Oceana Publications, 1988), 35-45.

"Law," a chapter of James Cracraft, ed., *The Soviet Union Today: an Interpretative Guide*, 2d ed. (Chicago: University of Chicago Press, 1987), pp. 339-348.

"Direct Contacts of Soviet Organizations in International Economic Relations," in *The Distinctiveness of Soviet Law* (Dordrecht: Martinus Nijhoff, 1987), pp. 183-195.

"Legal Regulation of the Dissemination of Scientific and Technical Information in the USSR," in Olimpiad S. Ioffe and Mark W. Janis, ed., *Soviet Law and Economy* (Dordrecht: Martinus Nijhoff, 1987), pp. 103-126.

"The League of Communists of Yugoslavia and the Law," in *Communist Parties and the Law*, (pp. 347-356).

"The Party of Labor of Albania and the Law," in Communist Parties and the Law, (pp. 211-221).

"Marxism and Soviet Environmental Law," *Columbia Journal of Transnational Law* 23 (1985) 510-522.

"Accounting," *Encyclopedia of Soviet Law*, 2nd ed. (Leiden, 1985), pp. 3-4.

"Budgets of Enterprises" *Encyclopedia of Soviet Law*, 2nd ed. (Leiden, 1985), pp. 92-93.

"Cooperatives," *Encyclopedia of Soviet Law*, 2nd ed. (Leiden, 1985), p. 184.

"Computers and the Law," *Encyclopedia of Soviet Law*, 2nd ed. (Leiden, 1985), p. 153.

"The Legal Impact of Modernization in the USSR," in *Law and Economic Development in the Soviet Union* (Boulder, Colorado: Westview Press, 1982), 1-10.

"Legal Aspects of the Computerization of Management Systems in the USSR and Eastern Europe," in *Law and Economic Development in the Soviet Union* (Boulder, Colorado: Westview Press, 1982), 133- 157.

AR0810

"Computer Programs as the Object of Intellectual Property in the United States of America," *American Journal of Comparative Law*, 30 (1982), Supplement, 251-273.

"The Soviet Constitution . . ." *Human Rights*, 10 (1982), No. 2, pp. 34-39, 55-56.
"Land Records of the Uniform Simplification of Land Transfers Act," *Southern Illinois University Law Journal* (1981), 491-510.

"The Soviet Union's Approach to Coping with the Economic Aspects of National Security and Foreign Policy: The Soviet Legal Structure and the Development of Computer Technology," 1 *St. Louis University Public Law Forum*, 111-114 (1981).

"The Legal Structure of Technology Transfer in Eastern Europe," *Soviet and East European Law and the Scientific Technical Revolution*, edited by Gordon Smith, George Ginsburgs, and Peter B. Maggs (New York: Pergamon, 1981), 272-294.

"Socialist Law," *Academic American Encyclopedia*, Vol. 18, p. 25 (1981).

"New Life for Patents: Chakrabarty and Rohm and Haas Co.," *Supreme Court Review* (1980), 57-75.

"Characteristics of Soviet Tax and Budgetary Law," in Barry, Feldbrugge, Ginsburgs, and Maggs, eds., *Soviet Law After Stalin, III: Soviet Institutions and the Administration of Law*, (Alphen aan den Rijn: Sijthoff & Noordhoof, 1979), 93-106.

"Some Problems of Legal Protection of Programs for Microcomputer Control Systems," *University of Illinois Law Forum*, 1979, 453- 468.

"Automated Processing of Legal Information," *American Journal of Comparative Law*, Vol. 26 (Supplement) 1978: Law in the U.S.A. in the Bicentennial Era, 517-529.

"Improving the Legal Mechanisms for Economic Change," in Barry, Ginsburgs, and Maggs, eds., *Soviet Law After Stalin, II: Social Engineering Through Law* (Alphen aan den rijn: Sijthoff & Noordhoof, 1978), 117-138.

"Strict Law in Soviet Contract Law," in *The Unity of Strict Law: A Comparative Study*, ed. Ralph A. Newman. Brussels: Establissements Emile Bruylant, 1978, pp. 311-318.

"The Legal Status of Collective Farm Members," in *Soviet Law After Stalin, I: The Citizen and the State in Contemporary Soviet Law*. (Leiden: A.W. Sijthoff, 1977), 159-178.

"Remedies for Breach of Contract Under Article Two of the Uniform Land Transaction Act," *Georgia Law Review*, 11 (1977), 275-296.

"Teaching Law by Computer," *LeCourt*, 1 (1976), No. 2, pp. 10-13.

AR0811

"Tube-watching in Law School," *Trial* 12 (1976), No. 12, pp. 32- 38.

(With Luke T. Lee), "North African Migrants Under Western European Law," *Texas International Law Journal*, 11 (1976), 225- 250; reprinted as *Law and Population Mongraph Series* No. 37 (1976) by the Law and Population Programme of the Fletcher School of Law and Diplomacy.

"Amnesty and Prisoner Population," *Soviet Union*, 3 (1976), 51-62.

"Legal Problems of Patents, Industrial Designs, Technical Data, Trademarks, and Copyrights in Soviet-American Trade," *Denver Journal of International Law and Policy*, 5 (1975), 311-322.

"Law and Sociology in Bulgaria: The Experiments with Pronatalist Legislation, *Review of Socialist Law*, 1 (1975), 253-260.

(With T.D. Mbody) "Computer-Based Legal Education at the University of Illinois: A Report of Two Years' Experience," *Journal of Legal Education*, 27 (1975), 138-156.

"Legal Controls on American Publication of Heterodox Soviet Writings," *Dissent in the USSR: Politics, Ideology, and People*, Ed. R.L. Tökés. Baltimore: John Hopkins, 1975, pp. 310-325.

"The Language of Codification: A Computer Analysis of the Family Code of the R.S.F.S.R.," *Codification in the Communist World*, Leiden: A.W. Sijthoff, 1975, pp. 239-290.

"Unification of Methods of Legal Automation," *Law in the United States in Social and Technical Revolution; Reports from the United States of America on Topics of Major Concern as Established for the IX Congress of the International Academy of Comparative Law*, Ed. J. Hazard & W.J. Wagner. Brussels: Establissements Emile Bruylant, 1974, pp. 677-694.

"A Computer Model of the System of Legal Regulation of the Soviet State Industrial Enterprise," *Contemporary Soviet Law: Essays in Honor of John N. Hazard*, ed. D.D. Barry, W.E. Butler & G. Ginsburgs. The Hague: Martinus Nijhoff, 1974, pp. 175-194.

"Compression of Legal Texts for More Economical Computer Storage, *Jurimetrics Journal*, 14 (1974). 254-261.

"New Directions in U.S.-U.S.S.R. Copyright Relations," *American Journal of International Law*, 68 (July 1974), 391-409.

"The Construction of a Concordance to the Uniform Commercial Code," *University of Illinois Law Forum*, 1974, 7-10.

(With W.D. Hawkland) "UCC Concordance,: *University of Illinois Law Forum*, 1974, 11-136; reprinted in William Hawkland, *Uniform Commercial Code Series*, Vol. 1, "Concordance Introduction," pp. 1-9, "Concordance," pp. 1-252.
"Accounting," *Encyclopedia of Soviet Law*, Ed. F. Feldbrugge. Leiden: A.W. Sijthoff, 1974, pp.

AR0812

5-6.

"Budgets of Enterprises," *Encyclopedia of Soviet Law*, Ed. F. Feldbrugge. Leiden: A.W. Sijthoff, 1974, p. 90.

"Cooperatives," *Encyclopedia of Soviet Law*, Ed. F. Feldbrugge. Sijthoff, 1974, pp. 168-169.

"Englischsprachige Veröffentlichungen zum sowjetischen Zivil-und Wirtschaftsrecht," *Osteuropa-Recht*, 19 (1973), 283-299.

"Population Laws of Eastern Europe," Law and Population: *Lectures and Reading Materials Computer from the Seminar on Law and Population*, E.L. Lee. Medford, Mass.: Fletcher School of Law and Diplomacy, 1973, pp. 1-27.

"An Evolutionary Approach to Compatible Identifiers for Computerized Land Records," *Land Parcel Identifiers for Information Systems*, Ed. D. Moyer and K. Fisher. Chicago: American Bar Foundation, 1973, pp. 183-197.

"Automation of the Land Title System," *American University Law Review*, 22 (Winter 1973), 369-391, reprinted in R.N. Freed, *Computers and the Law—A Reference Work*. Boston: Freed, 4th ed. 1974, 467-478.

"A Computer Service Utility for the Legal Profession," *ACM Urban Symposium 1972*, Computers and Urban Society, pp. 133-146.

(With R.T. Chien and F.A. Stahl) "New Directions in Legal Information Processing," *1972 Spring Joint Computer Conference*, pp. 531-540.

(With Cary B. deBessonet) "Automated Logical Analysis of Systems of Legal Rules," *Jurimetrics Journal*, 12 (1972), 158-169.

*"The Law of Farm-Farmer Relations," The* Soviet Rural Community, ed. J.R. Millar. Urbana: University of Illinois, 1971, pp. 139- 156.

"Investment in Yugoslavia and Eastern Europe" (with co-author, Milan Smiljanic), *Journal of Law and Economic Development*, 4 (1969), 1-15.

"Negative Votes in Soviet Elections," Res Baltica, ed. A. Sprudz and A. Rusis. Leiden: Sijthoff, 1968, pp. 146-151.

"Unification of Law in Eastern Europe," *American Journal of Comparative Law*, 16 (1968), 107-126.
(With K. Winkler) "Libel in the Soviet Press: The New Civil Remedy in Theory and Practice," *Tulane Law Review*, 41 (December 1966), 55-74.

(With J.W. Jerz) "The Significance of Soviet Accession to the Paris Convention for the

37

AR0813

Protection of Industrial Property," *Journal of the Patent Office Society*, 48 (April 1966), 242-263.

"Soviet Corporation Law: The New Statute on the Socialist State Production Enterprise," *American Journal of Comparative Law*, 14 (Summer 1965), 478-489.

"Les aspects juridiques de la planification economique en U.R.S.S.," *Annuaire de L'U.R.S.S.*, 3 (1965). 231-257.

"Der nichtmilitärische Geheimschutz nach Sowjetrecht," *Osteruropa Recht*, 11 (September 1965), 161-181.

"The Soviet Viewpoint on Nuclear Weapons in International Law," *Law and Contemporary Problems*, 29 (Autumn 1964), 956-970. Reprinted in *The Soviet Impact on International Law*, Ed. H.W. Baade. Dobbs Ferry, N.Y.: Oceana Publications, 1965.

"Commentary on 'Liberty, Law and the Legal Order,' " *Northwestern University Law Review*, 58 (November-December 1963), 657-662.

"The Security of Individually-Owned Property Under Soviet Law," *Duke Law Journal*, (Autumn 1961), pp. 525-537. Reprinted in Durham, N.C.: Duke University, World Rule of Law Center, *World Rule of Law Center Booklet Series*, No. 11.

Radio Talk

"Doing Business in Russia," *Common Ground Radio Series on World Affairs*, January 1994.

Educational Computer Programs

(Published on the PLATO/NOVANET Systems)

Contracts -- Offer and Acceptance

Contracts -- Statute of Frauds

(With Robert Platt) Regulated Industries -- Basic Legal Accounting

(With Thomas Mbody and Robert Platt) Regulated Industries -- Simulation Exercise

Legal Writing -- Citation Abbreviations
Legal Writing -- Latin Words and Phrases

Book Reviews

Review of Aleksei Gennad'evich Nazarov, *Predely osushchestvleniia iskliuchitelnogo prava na rezul'taty intellektual'noi deiatel'nosti* [Limits on the Exercise of the Exclusive Right to the

AR0814

Results of Intellectual Activity], Review of Central and East European Law, 2015, No. 3-4, 375-376.

Review of William R. Spiegelberger, *The Enforcement of Arbitral Awards in Russia: Eleven Years of Commercial Court Practice Applying the New York Convention*, *Review of Central and East European Law*, Vol. 40, No. 2 (2015), pp. 203-204.

Review of *The Legal Dimension in Cold War Interactions: Some Notes from the Field*, ed. by Tatiana Borisova and William Simons, *Journal of Cold War Studies*, Vol. 16, No. 1, Winter 2014, pp. 244-245.

Review of Trygve Ben Holland, *Legal Commentary: Russian Competition Law* Trygve Ben Holland, Saarbrücker Verlag für Rechtswissenschaften, Saarbrücken, 2011, *Review of Central and East European Law*, 38 (2013) 195-196.

Review of *"The Judiciary in Central and Eastern Europe: Mechanical Jurisprudence in Transformation."* (*Law in Eastern Europe*, no. 61). By Zdenek Kühn. *Slavic Review*, 2012, p. 936.

Review of "*International Law: A Russian Introduction*. By V. I. Kuznetsov and B. R. Tuzmukamedov. Edited and translated by William E. Butler," to be published in *American Journal of International Law*, April 2010, p. 342.

Review of Patricia Kennedy Grimstead, F. J. Hoogewoud, and Eric Ketelaar, eds., *Returned from Russia: Nazi Archival Plunder in Western Europe and Recent Restitution.* Journal of Cold War Studies, Winter 2010, Vol. 12, No. 1, pp. 200-202.

Review of Noel Calhoun, *Dilemmas of Justice in Eastern Europe's Democratic Transitions*, Canadian American Slavic Studies, Vol. 41, No. 4, pp. 451-452 (2007).

Review of *Ruling Russia: Law, Crime, and Justice in a Changing Society*, ed. William Alex Pridemore, Slavic Review, Vol. 65, No. 3, pp. 614-615 (2006).

Review of W.E. Butler, *The Law of Treaties in Russia and the Commonwealth of Independent States: Text and Commentary.* Canadian American Slavic Studies, Vol. 38, No. 4, pp. 473-474 (2004).

Review of Soli Nysten-Haarala. *Russian Law in Transation: Law and Institutional Change,* Canadian American Slavic Studies, Vol. 37, No. 4, pp. 444-445 (2003).

Review of Hildegard Kochanek. *Die russisch--nationale Rechte von 1968 bis zum Ende der Sowjetunion: eine Diskursanalyse,* Canadian American Slavic Studies, Vol. 37, No. 4, pp. 443-444 (2003).

Abstract of Virginia Martin, *Law and Custom in the Steppe: The Kazakhs of the Middle Horde and Russian Colonialism in the Ninteenth Century*, Journal of the Central Eurasian Studies

39

AR0815

Society, Vol. 2, No. 1 (Winter 2003), p. 26.

Review of Hiroshi Oda, *Russian Commercial Law*, American Journal of Comparative Law, Vol. 50, No. 4, pp. 875-877 (2002).

Review of Gordon Smith, *Reforming the Russian Legal System*, 61 Law and History Review 607-608 (1998).

Review of F.J.M. Feldbrugge, *Russian Law, the End of the Soviet System and the Role of Law*, 41 *American Journal of Comparative Law* 513-514 (1993).

Review of Antonio Boggiano, *International Standard Contracts: The Price of Fairness* (1991), *International Journal of Legal Information*, 20 (1992) 179-180.

Review of C. Prins, *Computer Program Protection in the USSR: A New Era for Socialist Copyright*, 1991. *Review of Central and East European Law*, 18 (1992) 293-296.

Review of Dencho Georgiev, *Suverenitetut v suvremennoto mezhdunarodno pravo I sutrudnichestvoto mezhdu durzhavite*, American Journal of International Law, 86 (1992), 438.

Review of Esa Paasivirta, *Participation of States in International Contracts and Arbitral Settlement of Disputes*, 1990. *International Journal of Legal Information*, 19 (1991) 260- 261.

Review of Heinz Schäffer and Attila Rácz, eds. (in collaboration with Barbara Rhode), *Quantitative Analyses of Law: A Comparative Empirical Study: Sources of Law in Eastern and Western Europe*, International Journal of Legal Information, 19 (1991) 136-137.

Review of Raymond Hutchings, *Soviet Secrecy and Non-Secrecy*, 1987. *The Russian Review*, 50 (1991) 379-380.

Review of Miodrag Sukijasovic, *Pravno regulisanje medunarodne trgovine kafom*, American Journal of International Law, 85 (1991) 249-50.

Review of William E. Butler, *Arbitration in the Soviet Union*, International Journal of Legal Information, 18 (1990), 169-170.

Review of Marc Maresceau, ed., *The Political and Legal Framework of Trade Relations Between the European Community and Eastern Europe*, International Journal of Legal Information, 18 (1990), 90-91.

Review of *Medunarodno pravo mora i izvori medunarodnog prava*, American Journal of International Law, 84 (1990), 614-615.

Review of A.W. Koers, D. Kracht, M. Smith, J.M. Smits and M.C.M. Weusten, *Knowledge-Based Systems in Law: In Search of Methodologies and Tools* (1989). *International Journal of Legal Information* 17 (1989) 286-287.

AR0816

Review of G.P.V. Vandenberghe, ed., *Advanced Topics of Law and Information Technology*, *International Journal of Legal Information* 17 (1989) 204.

Review of Arie Bloed, *The External Relations of the Council for Mutual Economic Assistance* and of George Ginsburgs, *The Soviet Union and International Cooperation in Legal Matters (Part 1): Recognition of Arbitral Agreements and Execution of Foreign Commercial Arbitral Awards*, *American Journal of International Law* 83 (1989) 701-702.

Review of O.N. Sadikov, *Soviet Civil Law* and of Olimpiad S. Ioffe, *Soviet Civil Law*. *Russian Review* 48 (1989) 227-228.

Review of Ernst-Joachim Mestm„ker (ed.), *The Law and Economics of Transborder Telecommunications*. *International Journal of Legal Information* 17 (1989) 104.

Review of P.D. Finn, *Essays on Contract*. *International Journal of Legal Information* 17 (1989) 55.

Review of H.W.K. Kaspersen, et al., *Telebanking, Teleshopping and the Law*. *International Journal of Legal Information* 68-69 (1989).

Review of Melville B. Nimmer and Paul Edward Geller (eds.*) International Copyright Law and Practice*. *International Journal of Legal Information* 17 (1989) 88.

Review of J.A. Keustermans and I.M. Arckens, *International Computer Law; A Practical Guide to the International Distribution and Protection of Software and Integrated Circuits*. *International Journal of Legal Information* 17 (1989) 82-84.

Review of Robert P. Bigelow, *Computer Contracts: Negotiating and Drafting Guide*. *International Journal of Legal Information*, 17 (1989) 189-190.

Review of Kazimierz Grzybowski, *Soviet International Law and the World Economic Order*. *Canadian-American Slavic Studies* (1989).

Review of E. Allan Farnsworth and Viktor P. Mozolin, *Contract Law in USSR and the United States: History and General Concept*. *Connecticut Journal of International Law*, 3 (1988) 519-523.

Review of Wolfgang Gößmann, *Die Kombinate in der DDR: Eine wirtschaftsrechtliche Untersuchung*. *Review of Socialist Law*, 14 (1988), 298-299.

Review of John N. Hazard, *Reflections of a Pioneering Sovietologist*. *International Journal of Legal Information* 16 (1988), 141.

Review of Daniel J. Meador, *Impressions of Law in East Germany; Legal Education and Legal Systems in the German Democratic Republic*. *University of Illinois Law Review* (1987), 543-545.

AR0817

Review of Marie Helen Pichler, *Copyright Problems of Satellite and Cable Television in Europe*. *International Journal of Legal Information*, 16 (1988), 217-218.

Review of Stanley S. Arkin et al., *Prevention and Prosecution of Computer and High Technology Crime*. *International Journal of Legal Information*, 16 (1988), 237-238.

Review of M.M. Boguslavskii, *Mezhdunarodnoe ekonomicheskoe pravo*. *American Journal of International Law*, 81 (1987) 1007.

Review of John Livermore, *Exemption Clauses and Implied Obligations in Contracts*. *International* Journal of Legal Information, 15 (1987), 157-158.

Review of Henry Carr, *Computer Software: Legal Protection in the United Kingdom*. *International Journal of Legal Information*, 15 (1987) 181-182.

Review of Kojo Yelpaala, Maro Rubino-Sammartano, and Dennis Campbell, eds., *Drafting and Enforcing Contracts in Civil and Common Law Jurisdictions*. *International Journal of Legal Information*, 15 (1987), 76-77.

Review of *Yearbook on Socialist Legal Systems, 1986*. *American Journal of International Law*, 81 (1987), 821-822.

Review of Vojin Dmitrijevic, Strahovlada: *Ogled o ljudskim pravima I drzavnom teroru*. *American Journal of International Law*, 81 (1987), 799-800.

Review of Eugene Huskey, *Russian Lawyers and the Soviet State*. *American Historical Review*, 1987.
Review of Ger P. van den Berg, *The Soviet System of Justice: Figures and Policy*. *The Russian Review*, 1986.

Review of J. Fraser Mann; *Computer Technology and The Law in Canada*. *International Journal of Legal Information*, 15 (1987) 280-281.

Review of Bernard D. Reams, *University-Industry Research Partnerships*. International Journal of Legal Information, 14 (1986) 185-186.

Review of W.E. Butler and V.N. Kudriavtsev, eds., *Comparative Law and Legal System: Historical and Socio-Legal Perspectives*. *American Journal of International Law*, 80 (1986), 771-772.

Review of Danilo Türk, *Nacelo neintervencije v mednarodnih odnosih in v mednarodnem pravu*. *American Journal of International Law* 80 (1986), 403-404.

Review of James M. Swanson, *Scientific Discoveries and Soviet Law: A Sociohistorical analysis*. *American Historical Review*, (1986), 158-159.

AR0818

Review of W.E. Butler, *Basic Documents on the Soviet Legal System*, 23 *American Journal of International Law*, 23 (1985), 521- 522.

Review of Hazard, *Managing Change in the USSR: The Politico- Legal Role of the Soviet Jurist* (1983). *International Journal of Legal Information*, 12 (1984), 162-163.

Review of Pretnar, *Inventor's Certificates, Rationalization Proposals and Discoveries* (1982). *American Journal of Comparative Law*, 32 (1984), 775-776.

Review of *The Soviet Union Through its Laws*, edited and translated by Leo Hecht. *Slavic Review*, 42 (1984), 320-3231.

Review of Ciampi, Femeli, and Trivisonno, *THES-BID: A Computer- Based Thesaurus of Terminology in Computers and the Law*. *International Journal of Legal Information*, 11 (1983), 90-91.

Review of Kourilsky, Racz and Schaffer, *The Sources of Law: A Comparative Empirical Study -- National Systems of Sources of Law*. *International Journal of Legal Information*, 11 (1983), 190-191.

Review of Rudolph and Strohbach: *Die rechtlich Regelung der internationalen Wirtschaftsbeziehungen der DDR zu Partnern im nichtsozialistischen Wirtschaftsgebiet*. *International Journal of Legal Information*, 11 (1983), 201-202.

Review of F.J.M. Feldbrugge, and William B. Simons, editors, *Perspectives on Soviet Law for the 1980s* (1982). *Soviet Union/Union Sovietique*, 10 (1983), 104.

Review of Konstantin Simis, *USSR: The Corrupt Society* and Logan Robinson, *An American in Leningrad*. *Slavic Review*, 42 (1983), 501-503.

Review of Milan Bulajic, *Medunarodno pravo ekonomskog razvoja: Pravni aspekti novog medunarodnog ekonomskog poretka*. *American Journal of International Law*, 77 (1983), 193.

Review of *The Soviet Codes of Law*, edited by William B. Simons. *Slavic Review*, 41 (1982), 729.

Review of Manfred Balz, *Eigentumsordmung und Technologiepolitik. Eine system-vergliechende Studie zum sowjetischen Patent-und Technologierecht*. *Review of Socialist Law*, 4 (1982), 392.

Review of *Deutsches und sowjetisches Wirtschaftsrecht; Rechtliche Aspekte der internen und bilateralen Wirtschaftsbeziehungen: Sowjetunion und BRD*. *Review of Socialist Law*, 4 (1982), 396.

Review of Mark Boguslavsky, *The USSR and International Copyright Protection*, translated by Yuri Shirokov. *Slavic Review*, 40 (1981), 122-123.

AR0819

Review of Beith Krevitt Eres, *Legal and Legislative Information Processing. International Journal of Law Libraries*, 9 (1981), 119.

Review of Davorin Rudolf, *Neutralnost I paksaktivnost: Medunarodnopravni aspekti. American Journal of International Law*, 74 (1980), 490.

Review of Budislav Vukas, *Relativno djelovanje medunarodnih ugovora. American Journal of International Law*, 74 (1980), 248.

Review of George Dana Cameron III, *The Soviet Lawyer and His System: A Historical and Bibliographic Study. The Russian Review*, 39 (1980), 256.

Review of Serge L. Levitsky, *Copyright, Defamation, and Privacy in Soviet Civil Law. The Russian Review*, 39 (1980), 381-382.

Review of Gyula Eörsi, Comparative Civil (Private) Law; Law Types, Law Groups, the Roads of Legal Development. International Journal of Law Libraries, 8 (1980), 178-179.

Review of Benninger, *Die sowjetische Gesetzgebung zur rechtlichen Stellung des nichtehelichen Kindes unter besonderer Berücksichtigung ihres Einflusses auf die Geburtenzhal. Review of Socialist Law*, Vol 4 (1978), 399-491.

Review of Michael A. Newcity, *Copyright Law in the Soviet Union. Russian Review*, 37 (1978), 472.

Review of Stanislaw J. Sawicki, *Soviet Land and Housing Law. Russian Review*, 37 (1978), 354-355.

Review of D.A. Loeber, *East-West Trade: A Sourcebook on the International Economic Regulations of Socialist Countries and Their Legal Aspects. American Journal of Comparative Law*, 25 (1977), 571-573.

Review of Manfred Balz, *Innovation and Invention Under Soviet Law. Technology and Culture*, 17 (1976), 561-562.

Review of Ronald A. May, ed. *Sense and Systems in Automated Law Research. American Bar Association Journal*, 62 (1976), 570-572.

Review of R.J. Erickson, *International Law and the Revolutionary State: A Case Study of the Soviet Union and International Law. American Political Science Review*, 70 (1976), 675-676.

Review of W. Kilian, *Juristiche Entscheidung und elektronische Datenverarbeitung. American Journal of Comparative Law*, 23 (1975) 772-773.

Review of J. Quigley, *The Soviet Foreign Trade Monopoly. American Journal of Comparative*

AR0820

*Law*, 23 (1975), 154-156.

Review of E.W. Kitch and H.S. Perlman, *Legal Regulation of the Competitive Process, Cases, Materials and Notes on Unfair Business Practices, Trademarks, Copyright and Patents*. *Nebraska Law Review*, 52 (1973), 308-312.

Review of Gy. Eörsi and A. Harmathy, *Law and Economic Reform in Socialist Countries*. *American Journal of Comparative Law*, 21 (1973), 187-188.

Review of K. Grzybowski, *Soviet International Law, Doctrines and Diplomatic Practice*. *The Russian Review*, 31 (April 1972), 184- 185.

Review of J.N. Hazard, *Communists and Their Law*, and S. Kucherov, *The Bodies of Soviet Administration of Justice*. *Harvard Law Review*, 85 (December 1971), 530.

Review of S. Schwarz, *Sot'sial'noe strakhovanie v Rossii v 1917- 1919 godakh. American Historical Review*, 74 (June 1969), 1670.

Review of Conquest, *The Soviet Police System & Justice and the Legal System in the U.S.S.R. American Bar Association Journal*, 55 (January 1969), 168-169.
Review of M. Jaworskij, *Soviet Political Thought. American Journal of Comparative Law*, 16 (1968), 643.

Review of translations of Soviet Civil Legislation. *American Journal of Comparative Law*, 14 (1966), 729.

Review of Seara Vazquez, *Cosmic International Law*. *Journal of Legal Education*, 18 (1966), 490.

Review of J.F. Triska and R.M. Slusser, *The Theory, Law and Policy of Soviet Treaties. Slavic Review*, 22 (December 1963), 767.

AR0821

# Exhibit N

Case 1:17-cv-02697-CKK   Document 19-10   Filed 02/02/18   Page 181 of 200

UNCLASSIFIED//FOR OFFICIAL USE ONLY

U.S. Department of Homeland Security
National Cybersecurity and Communications Integrations Center

# Information Security Risk Assessment:

## COTS Antivirus Software and Kaspersky-Branded Products

August 29, 2017

**WARNING:** *This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with the DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS office.*


**NCCIC**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0025

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## PURPOSE

This assessment presents the inherent information security concerns and security ramifications associated with the use of any commercial-off-the-shelf (COTS) antivirus solution in devices with access to a federal network. It also addresses specific risks presented by Kaspersky-branded products, solutions, and services (collectively, "Kaspersky-branded products").

## BACKGROUND

Many organizations deploy antivirus software solutions to user workstations as a base layer of security to detect and remove the most common threats, including Trojans, malware, worms, and adware. Antivirus solutions have become a default part of cyber hygiene at the workstation level, though security experts recommend antivirus software be deployed alongside a full security stack to more robustly protect the network, a practice referred to as layered security or "defense-in-depth."[1]

Antivirus solutions usually employ one or more of three signature detection methods: file scanning, heuristics, and emulation.[2] File scanning leverages full content inspection in order to detect malicious code in files downloaded, emailed, or transferred to the computer. Heuristic scanning monitors all processes and establishes baselines for a workstation's patterns of behavior in order to detect deviations from those baselines. Emulators use sandboxed virtual machines to test run suspicious or encrypted executables. Monitoring changes in the sandbox allows the antivirus software to make a determination of whether the suspicious process is safe to execute on the host system or if the process is deemed unsafe and should be deleted or quarantined.

In order to perform these functions and protect the workstation, antivirus software requires the highest level of system privileges, particularly to combat any malicious software that might try to remove the antivirus or interrupt kernel-level system calls as part of its attack kill-chain. Each antivirus product operates off an antivirus engine—the main kernel programmed to search for malicious activity using the methods described above. Multiple antivirus products from different antivirus companies may share the same antivirus engine if an antivirus company does not have the resources to build its own engine.[3]

---

[1]  Shenk, 2013.

[2]  Sanok Jr, 2005.

[3]  Koret, 2014.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0026

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## GENERAL ANTIVIRUS SECURITY CONCERNS

Deploying an antivirus product increases that workstation's attack surface. Mitigating this risk requires:

- trust in the antivirus company not to abuse its privileges on the host; and
- trust in the product to capably resist hijacking by the attackers against which it defends.

Assessing the vendor's reputation for trustworthiness is a crucial part of any security product acquisition process.

In order to perform their basic functions, antivirus products operate with the highest level of system privileges, which is higher than any standard computer process. This gives the antivirus vendor system-level privileges on the customer endpoints it defends. An antivirus product also has full content inspection capabilities, and could remove or transmit anything—from a downloaded Trojan and routine detection metrics to Personally Identifiable Information (PII) and proprietary data—back to its home servers. Because antivirus processes are often white-listed by the other products in an organization's security stack, an immense level of trust is granted to the antivirus vendor not to abuse that level of access for economic, espionage, or destructive purposes.

Many antivirus vendors now provide a virtual machine known as a "cloud sandbox" to further analyze suspicious executables. When the antivirus software detects and quarantines a suspicious file, it uploads the suspicious file to the antivirus vendor's virtual machine sandbox, which is located on a remote server (requiring an upload over the Internet). Some sandboxes are self-contained to prevent malware samples from contacting their command-and-control servers, but others remain connected to the Internet to record and analyze the malware's unhindered execution and communications. Researchers from SafeBreach Labs found it possible to hijack these Internet-connected sandboxes for data exfiltration. They accomplished this by having the malware embed the desired data payload into a second malware sample before purposely triggering the antivirus quarantine function. The antivirus then uploads the data-infused malware to the cloud sandbox, where it can contact and exfiltrate the data to attacker-controlled servers with no interference from the passive sandbox.[4]

Another feature many antivirus products advertise is the capability to "break-and-inspect" Hyper Text Transfer Protocol Secure (HTTPS) traffic for malicious code by intercepting the traffic with a man-in-the-middle (MITM) connection.[5] The antivirus software uses its own certificate to sign outgoing traffic from the user and incoming traffic from the server in order to decrypt the content and determine whether malicious commands or software are part of the communication. However, this technique expands the attack surface further, because it leaves no way for the

---

[4] Klein and Kotler, 2017.
[5] Bachaalany and Koret, 2015.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Case 1:17-cv-02697-CKK Document 19-10   Filed 02/22/18   Page 184 of 200
Case 1:17-cv-02697-CKK   Document 12-3   Filed 02/05/18   Page 11 of 152

UNCLASSIFIED//FOR OFFICIAL USE ONLY

client to independently validate its connection to the server and leaves it wholly dependent on the security product's validation.[6]

Additional concerns lie in flaws with the antivirus products themselves, as some "do not properly verify the certificate chain of the server,"[7] do not always forward certificate-chain verification errors to the client, and occasionally connect to servers using weaker encryption protocols than the client itself would allow.[8] Even with the antivirus product working securely, simply employing this function defeats the purpose of end-to-end encrypted HTTPS connections with an external server because a third party is allowed to read, manipulate, and forward any information in the connection. In the best case, an antivirus product would detect an encrypted malware callback and remove it from the outgoing traffic so the malware cannot contact the attacker's server. In the worst case, a product could store and exfiltrate sensitive information, including login credentials being transmitted from the client to the server, or otherwise compromise the integrity of the network communication.

Furthermore, any software that receives vendor-provided updates could disguise known malicious software via the antivirus update process. Just as antivirus companies like Webroot have accidentally released signature updates that mistakenly identify legitimate programs as malicious,[9] an antivirus company could just as easily provide signatures marking known malicious software as legitimate and safe. More subtly, the antivirus software could withhold signatures that would identify known malware. Additionally, even a correctly functioning antivirus update process can still fall victim to third-party attack, as Windows Update did in 2012 when the Flame virus spoofed a legitimate Microsoft certificate to trick the workstation into loading the malware launcher, which was disguised as a normal update.[10] While antivirus definitions are usually specially formatted and encrypted lists of pattern-match signatures, updates to the antivirus software itself modify the code the program runs on, and the updates themselves could potentially include malicious code.

Deployment of personal antivirus on employee bring-your-own-devices (BYOD) introduces additional security considerations because, while these devices are not subject to the same supplementary security restrictions and access controls as an enterprise workstation, they are often allowed to operate on the same enterprise data.

Like any software, antivirus products themselves are subject to exploitation, and any attacker with the ability to compromise the product has the ability to assume the security privileges of that running process. COSEINC security researcher and author of *The Antivirus Hacker's Handbook*, Joxean Koret presented multiple vulnerabilities, identified across a wide array of

---

[6] US-CERT, 2017.

[7] US-CERT, 2017.

[8] US-CERT, 2017.

[9] Sulleyman, 2017.

[10] Whitney, 2012.

different antivirus products, during his presentation to the information security conference 44CON in 2014.

While many of these security flaws were quickly patched by the antivirus companies in question, Koret also identified vulnerabilities inherent to using any commercial antivirus engine, such as:

- buffer overflows due to the properties of the programming languages used to code most engines;
- virus definition updates sent over HTTP and vulnerable to MITM attacks;
- libraries compiled without using address space layout randomization (ASLR); and
- other vulnerabilities.[11]

A security stack is only as strong as its weakest component, and antivirus solutions present a large vulnerability in the event that an attacker can compromise the software.

## KASPERSKY-SPECIFIC CONSIDERATIONS

Based on publicly available information, Kaspersky-branded antivirus software and other Kaspersky-branded products and solutions that contain antivirus functionality appear to present the general antivirus software risks identified above. For example, the default installation of Kaspersky Internet Security scans all encrypted HTTPS connections using the interception technique described above in order to detect malicious activity.[12]

Additionally, Kaspersky customers may participate in the Kaspersky Security Network (KSN). KSN is a cloud-based network to which a wide range of data from customer devices may be transferred for the purpose of additional analysis. A list of such data is available in the KSN Statement, which users must agree to in order to participate.[13] Under the terms of the agreement, the information subject to transfer includes highly sensitive data collected from a user's device, such as information about the computer's hardware and software, files downloaded, certain websites visited, running applications, and user account names—essentially the full spectrum of forensic data a device produces. Furthermore, Kaspersky notes in the KSN Statement that it reserves the right to disclose any of the information processed "under confidentiality and licensing agreements with certain third parties which assist [Kaspersky] in developing, operating, and maintaining the Kaspersky Security Network."[14] These third parties may be trusted partners of Kaspersky, but that does not mean they are subject to the same vetting and rigorous suitability scrutiny as other companies with which the U.S. Government has entrusted its data.

---

[11] Koret, 2014.

[12] Kaspersky Labs 2017.

[13] Kaspersky Labs 2017.

[14] Kaspersky Labs 2017.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Kaspersky also notes that "no data transmission can be guaranteed secure"[15] and "[Kaspersky] cannot guarantee the security of any data [participants] transmit to [Kaspersky] or from [Kaspersky] products or services,"[16] with a final warning that participants "use all these services at [their] own risk."[17] Such data, whether provided to Kaspersky through normal course of operation, to third parties by Kaspersky as part of their sharing agreement, or to adversaries by in-transit interception techniques, could assist an attacker in obtaining sensitive files from government computers, targeting employees with precisely crafted spear-phishing attacks, and other information security risks.

Kaspersky has made statements that the risks of KSN can be mitigated by the customer or user. A May 9, 2017, Kaspersky press release states: "Unlike in many other products, Kaspersky Lab users have full control over telemetry (data) sharing with their participation being voluntary, and they can disable telemetry reporting completely at any given time. In addition, business and government users may choose to install a local and private Kaspersky Security Network (KSN) center on their premises to make sure the data never leaves their facility."[18]

The National Cybersecurity and Communications Integration Center (NCCIC) recognizes that Kaspersky may offer customers the ability to deploy a KSN center on the customer's local network and choose configuration settings that limit or eliminate the transfer of data to the KSN (among other potential options). However, assuming that the statements made by Kaspersky are fully accurate and it is possible to prevent any files from leaving a host or network, that assumption still does not address threats posed by the software itself as an on-premise solution. The level of system access granted to antivirus software would allow malicious activity to be conducted through the antivirus software itself, and even if the threat is not present in a current build of the software, it could be added through a future update or a third-party exploitation of the software. In order to stay up-to-date with the most advanced threats, even on-premise solutions require vendor updates to the antivirus signatures and less frequent updates to the software itself; and these updates are usually downloaded via temporary or indirect Internet connection or physical media like USB flash drives. Any software update has the potential to add functionality or expand the attack surface of the host machine. If a vendor withheld a signature update, the endpoints would remain vulnerable to a known threat. Furthermore, while the customer has the option of making configuration changes in the antivirus software, a configuration page is only a user interface, meaning it could display options as disabled while they remain enabled in the antivirus code.

Kaspersky also offers various cybersecurity services, including threat hunting, incident response, and security assessment. The information security risk presented by any service depends on the

---

[15] Kaspersky Labs 2017.

[16] Kaspersky Labs 2017.

[17] Kaspersky Labs 2017.

[18] Kaspersky 2017.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0030

UNCLASSIFIED//FOR OFFICIAL USE ONLY

specifics of the service provided. In general, these services present various significant information security risks. For example, any service that involves direct or indirect access to a computer or network, such as through installation of endpoint software to conduct a hunt or incident response, or through other abilities to influence information security practices on a network, presents information security risks.

## RECOMMENDATIONS

While new software acquisitions are primarily assessed for technical capability, effectiveness, and ease of use, vendors should undergo vetting separate from that of their products. Security vendors with access to sensitive federal data and networks must be confirmed as trustworthy partners who keep customer business independent of—and unaffected by—any obligations to the vendors' home government or commercial partners.

In response to concerns about the security of an antivirus product, some vendors may offer a government the opportunity to review the product's source code. The value of such a review should be viewed with caution. First, by its inherent nature, antivirus software has broad access rights and privileges (as described above), and it is this inherent functionality that presents information security risks. Thus, even if a source code review found no backdoors or other unusual code, these risks would remain. Apart from the inherent risks in the code (when exploited by a malicious actor), if a reviewer did review the code, the reviewer may not know or be able to confirm whether the provided source code is complete and unaltered. The code could also be updated at any time, and the reviewing party may not have the resources or ability to continually re-review the code. The review also may be incomplete or ineffective unless done by someone with deep familiarity with the software (such as one of its original developers).

*WARNING: This document is UNCLASSIFIED//For Official Use Only (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with the DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS office.*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0031

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## WORKS CITED

Bachaalany, Elias, and Joxean Koret. "The Antivirus Hacker's Handbook". Indianapolis: John Wiley & Sons, Inc., 2015.

Kaspersky Labs. "Kaspersky Internet Security 2018 release notes: commercial release of version 18.0.0.405." Kaspersky. August 14, 2017. http://support.kaspersky.com/13617#block1 (accessed August 18, 2017).

Kaspersky Labs. "Kaspersky Security Network Statement." Kaspersky. March 3, 2017. http://support.kaspersky.com/9365#block0 (accessed August 8, 2017).

Kaspersky. May 9, 2017 Statement Regarding Recent False Allegations about Kaspersky Lab. May 9, 2017. https://usa.kaspersky.com/blog/statement-regarding-false-allegations/11109/ (accessed August 23, 2017).

Klein, Amit, and Itzik Kotler. "The Adventures of AV and the Leaky Sandbox." SafeBreach. July 28, 2017. https://go.safebreach.com/rs/535-IXZ-934/images/Adventures_AV_Leaky_Sandbox.pdf (accessed August 23, 2017).

Koret, Joxean. "Breaking Antivirus Software." 44CON. 2014. 146. http://joxeankoret.com/download/breaking_av_software_44con.pdf (accessed August 18, 2017).

Sanok Jr., Daniel J. "An Analysis of How Antivirus Methodologies Are Utilized in Protecting Computers from Malicious Code." InfoSecCD '05 Proceedings of the second annual conference on Information security curriculum development. Kennesaw, GA: ACM New York, NY, USA, 2005. 142-144.

Shenk, Jerry. Layered Security: Why It Works. White Paper, SANS Institute, 2013. https://www.sans.org/reading-room/whitepapers/analyst/layered-security-works-34805 (accessed August 27, 2017).

Sulleyman, Aatif. "Windows Users Mystified As Antivirus Accidentally Cripples Computers." The Independent. April 25, 2017. http://www.independent.co.uk/life-style/gadgets-and-tech/news/windows-antivirus-software-malware-webroot-trojan-facebook-microsoft-a7701896.html (accessed August 18, 2017).

US-CERT. "HTTPS Interception Weakens TLS Security." National Cyber Awareness System (NCAS) Alert (TA17-075A). March 16, 2017. https://www.us-cert.gov/ncas/alerts/TA17-075A (accessed August 24, 2017).

Whitney, Lance. Flame virus can hijack PCs by spoofing Windows Update. June 5, 2012. https://www.cnet.com/news/flame-virus-can-hijack-pcs-by-spoofing-windows-update/ (accessed August 24, 2017).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

AR0032

# Exhibit O

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**TLP:AMBER**

**REPORT:**
**Supplemental Information**
**Security Risk Assessment**

NUMBER

DATE

*Kaspersky-Branded Products and Berkeley Research Group Independent Assessment*



UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR0822

Case 1:17-cv-02697-CKK   Document 19-10   Filed 02/02/18   Page 191 of 200

UNCLASSIFIED // FOR OFFICIAL USE ONLY



## Background

The Department of Homeland Security (DHS) National Cybersecurity and Communications Integration Center (NCCIC) reviewed the Independent Assessment, titled *Information Security Risks of Anti-Virus Software* (hereafter "BRG Assessment")*,* prepared by Berkeley Research Group, LLC (BRG), and dated November 10, 2017. Kaspersky Lab (hereafter "Kaspersky") submitted the BRG Assessment to DHS as an exhibit to Kaspersky's request for DHS to initiate a review of Binding Operational Directive (BOD) 17-01. The BRG Assessment, in part, responds to the *NCCIC Information Security Risk Assessment* (hereafter "NCCIC Assessment") on commercial off-the-shelf (COTS) anti-virus software and Kaspersky-branded products, dated August 29, 2017. The NCCIC Assessment was attached as Exhibit 1 to an Information Memorandum from the Assistant Secretary for DHS Cybersecurity and Communications (CS&C) to the Acting Secretary of DHS, dated September 1, 2017 (hereafter "Information Memorandum"). This document is a *Supplemental Information Security Risk Assessment* and will similarly be attached to an Information Memorandum from the Assistant Secretary for CS&C to the Acting Secretary of DHS.

## 1. File Access and High-Level Privileges

The BRG Assessment confirms the key conclusions of the NCCIC Assessment. Specifically, BRG explains, consistent with the NCCIC Assessment, that anti-virus software operates with "broad access to the computer's hardware and operating system" and that the software "runs with the same privileges as the user, as well as one or more underlying, highly-privileged software components, such as kernel-mode drivers or SYSTEM-level processes." BRG describes the "kernel" as a "core component of a computer's operating system and largely responsible for facilitating the interaction between other software running on the computer and the computer's central processing unit (CPU), memory, and other hardware devices (often via additional software called a "device driver")."[1] The "SYSTEM account" is "an internal account on Microsoft Windows operating systems that operates at the highest privilege level."[2] Most anti-virus software now also "intercepts and monitors network traffic on a user's computer, including encrypted web browsing traffic, in order to identify malicious code embedded in websites visited by the user."[3]

Based on its "limited technical analysis within the time available" of Kaspersky and other anti-virus products, BRG determined that all of the software that it analyzed, including Kaspersky-branded products, "contained components that operated with SYSTEM-level privileges." Additionally, BRG determined that "[e]ach installed multiple kernel drivers within our test systems for various anti-malware purposes, including file system monitoring, process monitoring, and network traffic interception and

---

[1] BRG Assessment, p. 8, n. 13.

[2] BRG Assessment, p. 8, n. 14.

[3] BRG Assessment, pp. 8-9.

UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR0823

Case 1:17-cv-02697-CKK   Document 19-10   Filed 02/22/18   Page 192 of 200

UNCLASSIFIED // FOR OFFICIAL USE ONLY

inspection."[4] BRG states that, "[A] software vulnerability in any one of the kernel drivers or SYSTEM-level processes could reasonably result in a complete compromise of the user's computer."[5]

While BRG refers (above) to a "software vulnerability" in a kernel driver or SYSTEM-level process, as detailed in the NCCIC Assessment, DHS is concerned about the information security risks presented by the normal functionality of anti-virus software, apart from any specific "vulnerability" in the software. The Russian Government or Kaspersky—in collaboration with the Russian Government—can exploit this functionality, including broad access to files, high-level system privileges, and interception and inspection of encrypted web traffic.

## 2. BRG Preliminary Review of Kaspersky-Lab Software

### Overview

The BRG Assessment states that BRG conducted a "preliminary review" of specific Kaspersky anti-virus products and solutions. BRG states that the BRG Assessment intended the review to address the following three high-level objectives:

1. Evaluate whether it is feasible for an intelligence agency to passively monitor and decrypt traffic between users of Kaspersky-branded products and the Kaspersky Security Network (KSN);

2. Determine whether turning KSN off—or using the Kaspersky Private Security Network (KPSN)—can reliability prevent potentially sensitive data from inadvertently being transmitted to Kaspersky; and

3. Evaluate whether there exists a mechanism by which a malicious actor leveraging KSN can conduct targeted searches of Kaspersky users for specific information.

NCCIC assesses each of these objectives in turn below.

### Objective 1:  Passive Interception and Decryption of Traffic between Kaspersky-Branded Products and KSN

Kaspersky's KSN infrastructure "supports several security-related services provided by Kaspersky software products, including file, website, and wireless network reputation services."[6] KSN also "has the ability to receive information from clients, such as statistics regarding malware detected on users' computers or samples of malicious files, to improve Kaspersky's malware detection capabilities."[7] These are all consistent with NCCIC's understanding of KSN functionality.

---

[4] BRG Assessment, p. 11.

[5] BRG Assessment, p. 11.

[6] BRG Assessment, p. 24.

[7] BRG Assessment, p. 24; see also p. 6, n. 6.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR0824



BRG indicates that it identified this objective because the NCCIC Assessment and the Information Memorandum "refer to KSN as a potential information security risk due to the presumed ability of a malicious third party to monitor and intercept communications between KSN and users of Kaspersky software."[8]

DHS notes two significant limitations in this portion of the BRG Assessment. First, as BRG states, "BRG has not yet independently reviewed any network protocols or other communications systems used *within* KSN or *between KSN and Kaspersky's non-KSN IT infrastructure* (e.g., Kaspersky offices or other datacenters)" (emphasis added by author).[9] It is this access to Kaspersky offices and datacenters in Russia—and communications between such offices and datacenters and KSN—that is a principal concern of DHS. In addition, BRG states that its objective is to evaluate the potential for "passive" monitoring and decryption by an intelligence agency or other third party. As explained in detail in the Information Memorandum, DHS is concerned—not only about such passive activities—but also about active operations involving Russian intelligence access to Kaspersky offices and datacenters, requests for decryption keys, and other abilities of Russian government agencies to compel or request assistance from Kaspersky.

On the specifics of what BRG did test, BRG states that it observed Kaspersky anti-virus software products "generally" using one of three network protocols for communicating with KSN infrastructure:

- Hypertext Transport Protocol (HTTP),
- HTTP Secure (HTTPS), and
- Kaspersky's proprietary KSN protocol.

### *Use of HTTP in Kaspersky Products*

BRG states that Kaspersky client-side software uses HTTP to download product installation files during initial setup, to download software updates, and to download malware "record" updates. While other anti-virus vendors use the term "definition" or "signature," according to BRG, Kaspersky personnel internally use the term "record" to refer both to traditional signatures (used to identify malware on a user's computer) as well as more modern approaches to malware detection, such as heuristic methods, machine learning models, and behavioral methods.[10]

As BRG states, HTTP transmissions are unencrypted and unauthenticated. Nevertheless, BRG explains that all file types downloaded by Kaspersky software from Kaspersky servers are authenticated using "standard code- or package-signing mechanisms", including Microsoft's Authenticode and GOST 34.10.2001. Kaspersky software then "verifies the integrity of the bases or

---

[8] BRG Assessment, p. 24.

[9] BRG Assessment, p. 24, n. 71.

[10] BRG Assessment p. 8, n. 10.

              TLP:AMBER

AR0825

UNCLASSIFIED // FOR OFFICIAL USE ONLY



index files prior to installation on the user's computer" and, consequently, users "would likely be able to detect attempts by a malicious actor to tamper with application-related files downloaded over HTTP."[11]

BRG does not explain exactly what error message would be presented to a user or any other mechanism by which a user would be alerted to a maliciously modified update. Moreover, BRG states that, "[d]ue to time constraints, we have not yet been able to include an assessment of Kaspersky's internal security processes and procedures regarding access to and use of [Kaspersky Lab Signer] and the keys used to sign bases, packages, or other updates distributed to Kaspersky software clients."[12] These are significant gaps in BRG's analysis. BRG's analysis of this use of HTTP therefore does not mollify DHS's concern that Kaspersky or Russian government actors could incorporate malicious functionality into Kaspersky software through the software or record update process.

### *Use of HTTPS in Kaspersky Products*

BRG states that it observed Kaspersky software using HTTPS "in limited situations." Specifically, BRG explains that Kaspersky software will connect to KSN infrastructure:

- to activate the product;
- to obtain "in-product content" (such as Kaspersky Lab news);
- for communications about product license purchases and renewals; and
- for uploading "application crash dumps," which often include "the state of the application when the error occurred, possibly including memory contents, logs, or other information about the software on the system at the time of the application crash."[13]

BRG states that Kaspersky software "followed industry-standard best practices for SSL/TLS encryption," including using TLSv1.2 by default, properly validating the authenticity of server certificates, and using strong cipher suites for session key negotiation and encryption.[14]

DHS understands these uses of HTTPS and generally agrees with the use of HTTPS, if properly implemented, to protect web traffic. However, DHS notes that BRG states that it needs to "further validate the security of Kaspersky's client side SSL/TLS implementation (based on the open-source OpenSSL library), as well as the security processes used to manage the application servers."[15] Thus, if BRG identifies client-side implementation issues or issues with the security processes for management of Kaspersky application servers, these would present additional risks of concern to DHS.

---

[11] BRG Assessment, p. 25.

[12] BRG states that Kaspersky Lab Signer ("KLS") is Kaspersky's internal, centralized service "intended" to cryptographically sign the various file types used by Kaspersky software prior to distribution to users. BRG Assessment, p. 25.

[13] BRG Assessment, p. 25.

[14] BRG Assessment, p. 25.

[15] BRG Assessment, p. 26.

UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR0826

Case 1:17-cv-02697-CKK Document 19-10 Filed 02/02/18 Page 195 of 200

UNCLASSIFIED // FOR OFFICIAL USE ONLY

### *Breaking and Inspecting of HTTPS by Kaspersky Products*

While BRG focuses on Kaspersky's use of HTTPS to encrypt communications between users and KSN, BRG does not address the risks created by the Kaspersky software's ability to break and inspect other HTTPS communications by the user's non-anti-virus applications.

As explained in the NCCIC Assessment, Kaspersky-branded products have the ability to decrypt encrypted HTTPS transmissions, inspect and analyze the contents, and then re-encrypt and forward on the traffic. Specifically, the NCCIC Assessment states, with respect to anti-virus products—including Kaspersky products that have this functionality—that the "antivirus software uses its own certificate to sign outgoing traffic from the user and incoming traffic from the server in order to decrypt the content and determine whether malicious commands or software are part of the communication. However, this technique expands the attack surface further, because it leaves no way for the client to independently validate its connection to the server."[16] Furthermore, "employing this function defeats the purpose of end-to-end encrypted HTTPS connections with an external server because a third party is allowed to read, manipulate, and forward any information in the connection."[17] And, "[i]n the worst case, a product could store and exfiltrate sensitive information, including login credentials being transmitted from the client to the server, or otherwise compromise the integrity of the network connection."[18]

Kaspersky's ability to break and inspect encrypted traffic is clearly described in publically-available Kaspersky documentation.[19] However, BRG's analysis does not address the above risks.

### *Use of Proprietary Encryption Protocol for Communications with the KSN*

In addition to using HTTP and HTTPS, the BRG Assessment states that Kaspersky software uses "its own proprietary, encrypted protocol for communicating with KSN."[20] DHS understands that this custom protocol is the primary encryption method leveraged by Kaspersky products to protect sensitive customer information in-transit between the customer's Kaspersky software and KSN.

To analyze use of this protocol, BRG states that it reviewed a subset of the Kaspersky source code related to this protocol, communicated with a Kaspersky developer with knowledge of its implementation, and analyzed KSN network traffic generated by the Kaspersky products it was reviewing.[21] BRG then explains, at a high level, the various encryptions and decryptions—using certain public, private, and secret keys—that occur when Kaspersky client software first connects to KSN (e.g.,

---

[16] NCCIC Assessment, pp. 3-4.

[17] NCCIC Assessment, p. 4.

[18] NCCIC Assessment, p. 4.

[19] Kaspersky Lab, *How to scan encrypted connections in Kaspersky Internet Security 2012*, August 15, 2012, ID: 6271, https://support.kaspersky.com/us/6271.

[20] BRG Assessment, p. 26.

[21] *See* BRG Assessment, p. 26.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR0827



with a file reputation request), when the KSN server responds to the client software, and during future connections between the client and the KSN server.

BRG concludes that the KSN protocol "appears to be secure from decryption by a passive adversary who does not possess the server's RSA private key or secret [Advanced Encryption Standard] AES key ($K_s$)." Significantly, the KSN protocol "does not provide forward secrecy"—i.e., "if the server's RSA private key [which is a long-term key shared across all KSN servers] is compromised, a malicious actor could decrypt the client-generated AES key ($K_c$) and passively decrypt *all previous or subsequent data sent by or to a Kaspersky client*" (emphasis added by author).[22] Similarly, BRG states that "if the server's AES key [which is a secret key also shared across KSN servers and re-generated weekly] is compromised, a malicious actor could recover the client-generated AES key from the encrypted session token and use the decrypted AES key to passively decrypt *all previous or subsequent data sent by or to a Kaspersky client until the server rotates its AES key*" (emphasis added by author).[23]

BRG states that, according to Kaspersky, this proprietary, encrypted protocol is intended to "(a) reduce load on KSN clients and servers, (b) permit clients to continue an encrypted KSN session across multiple separate TCP connections, and (c) enable any KSN server to handle a client's request since the servers do not maintain any connection state."[24] However, as BRG explains, the encryption implementation creates significant risks to the confidentiality of the data transmitted between Kaspersky software and KSN servers, if a KSN RSA private key or an AES secret key is compromised or otherwise obtained. As DHS explains in the Information Memorandum to which this Supplemental NCCIC Assessment is attached, based on a report prepared by Professor Peter Maggs, Russian law requires Kaspersky—and all other companies that use encrypted communications—to provide to the Russian Federal Security Service (FSB) the keys or other information needed to decrypt the company's encrypted communications in Russia. Thus, DHS has significant concerns about the ability of FSB to obtain access to unencrypted transmissions between KSN and U.S. government customers that use Kaspersky-branded products and participate in KSN.

According to BRG, Kaspersky "has claimed that it is modifying its current KSN encryption protocol to incorporate a Diffie-Hellman key exchange protocol that would provide for forward secrecy."[25] The above issues nevertheless currently remain.

## Objective 2:  Turning KSN Off or Using the Kaspersky Private Security Network

As described in the NCCIC Assessment, DHS is aware of Kaspersky statements that user participation in KSN is voluntary and users can "disable telemetry [data] reporting completely at any given time."[26] However, BRG testing determined that this statement is inaccurate, at least with respect to Kaspersky

---

[22] BRG Assessment, pp. 26-27.

[23] BRG Assessment, pp. 26-27.

[24] BRG Assessment, p. 27.

[25] BRG Assessment, p. 27.

[26] NCCIC Assessment, p. 6.

UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR0828

UNCLASSIFIED // FOR OFFICIAL USE ONLY

consumer-oriented products; products which could be used by federal departments and agencies. Specifically, BRG observed that "Kaspersky consumer-oriented products (i.e., Kaspersky Anti-Virus, Kaspersky Internet Security, and Kaspersky Total Security), communicated with KSN to a limited degree *despite declining to agree to the KSN Statement during product installation and also disabling KSN within the application's user interface*" (emphasis added by author).[27] In particular, when the software detected sample malware, BRG inferred that "statistics" about the infection were uploaded to Kaspersky— although BRG does not appear to know what exact data was uploaded—and that the sample file was "likely uploaded" to Kaspersky when KSN was enabled.[28] Thus, even if a customer declines to participate in KSN and disables KSN in the user interface, some data is transferred to Kaspersky, and even a sophisticated user is unable to determine exactly what that data is.

The NCCIC Assessment also acknowledged the ability of government customers to deploy a local version of KSN on the customer's network, referred to as the Kaspersky Private Security Network (KPSN). Kaspersky markets KPSN as a way for customers' files and other objects to be analyzed locally, in an IT environment controlled by the customer, rather than sending the files back to KSN over the public Internet (using the proprietary, custom protocol described above).

BRG explains that KPSN can be installed in one of three configurations: "(a) Standard, which allows all on-premise KPSN servers to access Kaspersky servers directly; (b) Unidirectional Gateway, in which access to Kaspersky servers is managed through a gateway, installed and configured in an organization's [demilitarized zone] DMZ, that allows only inbound traffic to the on-premise KPSN servers, and (c) Proxy, where traffic from the local network to the Internet is routed through a proxy server configured at the network's perimeter."[29]

In its testing, BRG observed its test KPSN server downloading and updating its reputational databases using HTTPS and AMQPS, an encrypted version of the Advanced Message Queuing Protocol. In response to a sample malware infection, a Kaspersky enterprise-oriented product (Kaspersky Endpoint Security) communicated (presumably about the detection) to the KPSN server, and BRG did not observe any traffic from the KPSN server to KSN or any other Kaspersky servers.[30]

However, BRG did not address a main concern expressed in the NCCIC Assessment about the KPSN option. Specifically, the NCCIC Assessment explains that

- "even on-premise solutions require vendor updates to the anti-virus signatures and less frequent updates to the software itself,"
- "these updates are usually downloaded via temporary or indirect Internet connection or physical media like USB flash drives," and

---

[27] BRG Assessment, p. 28.

[28] BRG Assessment, p. 28.

[29] BRG Assessment, p. 28.

[30] BRG Assessment, p. 29.

 UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR0829

Case 1:17-cv-02697-CKK   Document 19-10   Filed 02/02/18   Page 198 of 200

UNCLASSIFIED // FOR OFFICIAL USE ONLY



- "[a]ny software update has the potential to add functionality or expand the attack surface of the host machine."[31]

The Kaspersky client software still receives record and software updates from Kaspersky through KPSN, and such software updates can contain malware or take another action that presents risks to federal information and information systems (e.g., by compromising the integrity of data or the availability of IT resources; in addition to other mechanisms for data exfiltration outside of the connection between the customer and KSN).

The NCCIC Assessment also notes that a vendor-withheld signature would make the endpoint remain vulnerable to a known threat.[32] DHS recognizes that Kaspersky has pointed to NIST Special Publication 800-83, Revision 1 to argue that the risk of Kaspersky intentionally withholding signatures to allow specific attacks can be mitigated by using anti-virus products from multiple vendors. However, the NIST publication that Kaspersky cites also states that "running multiple antivirus products on a single host simultaneously is likely to cause conflicts between the products" and that "if multiple products are used concurrently, they should be installed on separate hosts" (e.g., one anti-virus product on perimeter email servers and a different product on internal email servers).[33] NIST also notes that this "would necessitate increased administration and training, as well as additional hardware and software costs."[34] Finally, this suggestion does not address the risks of software updates including malware, the risks of the increased attack surface and risk of vulnerabilities that come with deploying multiple anti-virus products, or other risks.

## Objective 3: Risk of Leveraging KSN to Conduct Targeted Searches of Kaspersky Users for Specific Information

BRG explains that Kaspersky Lab Anti-Virus Architecture (KLAVA) is the architecture for the core component of the Kaspersky anti-virus products, the anti-virus "engine." According to BRG, the KLAVA anti-virus engine, like most anti-virus engines, operates by ingesting a set of algorithms defined by Kaspersky malware analysts to detect and, in some cases, remediate, a malware infection.[35] Kaspersky refers internally to the implementation of a particular detection algorithm as a record, which may contain the name or other identifier assigned to the threat, its signature, or other means of detecting the threat, and an action (the "verdict") to take if the software identifies a file or process matching the threat.[36] BRG explains that, in addition to signatures and more advanced detection methods, records may also

---

[31] NCCIC Assessment, p. 6.

[32] NCCIC Assessment, p. 6.

[33] NIST Special Publication 800-83, Rev. 1, *Guide to Malware Incident Prevention and Handling for Desktops and Laptops*, July 2013, p. 11, http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-83r1.pdf.

[34] NIST Special Publication 800-83, Rev. 1, *Guide to Malware Incident Prevention and Handling for Desktops and Laptops*, July 2013, p. 11, http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-83r1.pdf.

[35] BRG Assessment, p. 29.

[36] BRG Assessment, p. 29.

   UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR0830

Case 1:17-cv-02697-CKK Document 19-10 Filed 02/02/18 Page 199 of 200

UNCLASSIFIED // FOR OFFICIAL USE ONLY

include references (called "links") to executable procedures implemented in C/C++ code, and these links "have nearly unrestricted access to the user's system, including the ability to call operating system [Application Programming Interfaces] or other low-level system functions."[37] Additionally, records can be used to update and patch Kaspersky software.[38] Individual records are compiled and aggregated into multiple database files (called "bases"), which are stored in Kaspersky's proprietary KDC file format and distributed for ingestion into the KLAVA engines.

Significantly, BRG explains that KLAVA provides a function "which allows the analyst to upload a file processed by KLAVA to Kaspersky for further analysis," as well as additional functions that can be used to retrieve and upload other information, such as Microsoft Windows registry keys.[39] Depending on the record's "verdict" section, Kaspersky may—or may not—notify the user about the detection.[40] Furthermore, because Kaspersky uses a proprietary file format and encryption, a customer is unable to access the records to analyze whether any might be malicious.

BRG concedes that it anticipates doing, but has not yet completed,

1. "a more comprehensive assessment of the circumstances in which a file will be uploaded to Kaspersky from a user's computer"; and
2. "a review of Kaspersky's operational processes related to any controls surrounding the development, testing, deployment, and auditability of records given their capabilities and breadth of system access."[41]

BRG has not yet addresses either of these areas, both of which are of significant areas of concern for DHS.

## 3. Conclusion

The NCCIC Assessment explained various risks to federal information and information systems presented by Kaspersky-branded products. As detailed in this Supplement, the BRG Assessment confirms NCCIC's concerns about the broad file access and high-level system privileges of Kaspersky anti-virus products and BRG's "Preliminary Review" of Kaspersky anti-virus software, across three objectives, does not meaningfully address the information security risks identified by DHS.

---

[37] BRG Assessment, pp. 29-30.

[38] BRG Assessment, p. 29.

[39] BRG Assessment, p. 30.

[40] BRG Assessment, p. 30.

[41] BRG Assessment, p. 30.

 

AR0831

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**TLP:AMBER**

*WARNING: This document is UNCLASSIFIED//For Official Use Only (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with the DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS office.*

   UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR0832