**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| ) | | |
| KASPERSKY LAB, INC.; and ) | | |
| KASPERSKY LABS LIMITED, ) | | |
| ) | | |
| *Plaintiffs*, ) | | |
| ) | | |
| *v.* ) | Civ. No. 17-2697 (CKK) | |
| ) | | |
| U.S. DEPARTMENT OF ) | | |
| HOMELAND SECURITY; and ) | | |
| KIRSTJEN NIELSEN ) | | |
| *Secretary of Homeland Security* ) | | |
| ) | | |
| *Defendants*. ) | | |

---

**EXHIBIT 3-A**

# Russia's Top Cyber Sleuth Foils US Spies, Helps Kremlin Pals

**wired.com**/2012/07/ff_kaspersky/all/

Noah Shachtman                                                    July 23, 2012



Eugene Kaspersky, Soviet officer turned software tycoon. Photo: Stephen Voss

**It's early February in Cancun, Mexico**. A group of 60 or so financial analysts, reporters, diplomats, and cybersecurity specialists shake off the previous night's tequila and file into a ballroom at the Ritz-Carlton hotel. At the front of the room, a giant screen shows a globe targeted by crosshairs. Cancun is in the center of the bull's-eye.


Also in this issue

A ruddy-faced, unshaven man bounds onstage. Wearing a wrinkled white polo shirt with a pair of red sunglasses perched on his head, he looks more like a beach bum who's lost his way than a business executive. In fact, he's one of Russia's richest men—the CEO of what is arguably the most important Internet security company in the world. His name is Eugene Kaspersky, and he paid for almost everyone in the audience to come here. "*Buenos dias*," he says in a throaty Russian accent, as he apologizes for missing the previous night's boozy activities. Over the past 72 hours, Kaspersky explains, he flew from Mexico to Germany and back to take part in another conference. "Kissinger, McCain, presidents, government ministers" were all there, he says. "I have panel. Left of me, minister of defense of Italy. Right of me, former head of CIA. I'm like, 'Whoa, colleagues.'"

He's bragging to be sure, but Kaspersky may be selling himself short. The Italian defense minister isn't going to determine whether criminals or governments get their hands on your data. Kaspersky and his company, Kaspersky Lab, very well might. Between 2009 and 2010, according to *Forbes*, retail sales of Kaspersky antivirus software increased 177 percent, reaching almost 4.5 million a year—nearly as much as its rivals Symantec and McAfee combined. Worldwide, 50 million people are now members of the Kaspersky Security Network, sending data to the company's Moscow headquarters every time they download an application to their desktop. Microsoft, Cisco, and Juniper Networks all embed Kaspersky code in their products—effectively giving the company 300 million users. When it comes to keeping computers free from infection, Kaspersky Lab is on its way to becoming an industry leader.

But this still doesn't fully capture Kaspersky's influence. Back in 2010, a researcher now working for Kaspersky discovered Stuxnet, the US-Israeli worm that wrecked nearly a thousand Iranian centrifuges and became the world's first openly acknowledged cyberweapon. In May of this year, Kaspersky's elite antihackers exposed a second weaponized computer program, which they

dubbed Flame. It was subsequently revealed to be another US-Israeli operation aimed at Iran. In other words, Kaspersky Lab isn't just an antivirus company; it's also a leader in uncovering cyber-espionage.

Kaspersky has 300 million customers. His geek squad uncovers US cyberweapons. And he has deep ties to the KGB's successors in Moscow.

Serving at the pinnacle of such an organization would be a remarkably powerful position for any man. But Kaspersky's rise is particularly notable—and to some, downright troubling—given his KGB-sponsored training, his tenure as a Soviet intelligence officer, his alliance with Vladimir Putin's regime, and his deep and ongoing relationship with Russia's Federal Security Service, or FSB. Of course, none of this history is ever mentioned in Cancun.

What is mentioned is Kaspersky's vision for the future of Internet security—which by Western standards can seem extreme. It includes requiring strictly monitored digital passports for some online activities and enabling government regulation of social networks to thwart protest movements. "It's too much freedom there," Kaspersky says, referring to sites like Facebook. "Freedom is good. But the bad guys—they can abuse this freedom to manipulate public opinion."

These are not exactly comforting words from a man who is responsible for the security of so many of our PCs, tablets, and smartphones. But that is the paradox of Eugene Kaspersky: a close associate of the autocratic Putin regime who is charged with safeguarding the data of millions of Americans; a supposedly-retired intelligence officer who is busy today revealing the covert activities of other nations; a vital presence in the open and free Internet who doesn't want us to be too free. It's an enigmatic profile that's on the rise as Kaspersky's influence grows.

**Eugene Kaspersky was a bright kid.** At 16 he was accepted to a five-year program at the KGB-backed Institute of Cryptography, Telecommunications, and Computer Science. After graduating in 1987, he was commissioned as an intelligence officer in the Soviet army. A quarter century after the fact, he still won't disclose what he did in the military or what exactly he studied at the institute. "That was top-secret, so I don't remember," he says.

Kaspersky is more open about the day in October 1989 when a virus first infected his computer. It was a playful little thing called Cascade that made the characters on a PC screen tumble to the bottom like *Tetris* blocks. Curious, Kaspersky saved a copy of the virus on a floppy disk to study how the code worked. A couple of weeks later he encountered a second virus, and then a third. His interest grew with each discovery. "For Eugene, it was an addiction," his friend Alexey De Mont De Rique says. Each time a new virus appeared, Kaspersky would "sit in front of the computer for 20 hours straight," trying to pick it apart, De Mont De Rique recalls. In the small world of antivirus researchers, the Soviet officer quickly made a name for himself.

By the early '90s, Kaspersky wanted out of the army so he could study viruses full-time. There was one small problem: "It was almost not possible," he explains. The only way to get out was to go to jail, get sick, or prove yourself to be extremely incompetent. Kaspersky's old instructor at the Institute of Cryptography had a company that sold everything from athletic shoes to PCs.

Somehow—Kaspersky won't answer questions about this either—the former professor was able to get Kaspersky a discharge and hire him. Kaspersky's wife, Natalya, and De Mont De Rique soon joined him at the company.

In 1997 the three of them went into the antivirus business for themselves. Their software was advanced for the time. They were the first to allow users of Internet security software to watch malware operate in an isolated "sandbox," quarantined from the rest of the computer; they were among the first to store entire programs in a virus database. The young company flourished even as Kaspersky's marriage to Natalya fizzled. The couple divorced in 1998, but she continued to handle sales and finance while he worked in the "virus lab," classifying new threats himself. "The typical analyst would process maybe 100 pieces of new malware a day," says Aleks Gostev, one of Kaspersky's top researchers. "Eugene would do 300."

Today Kaspersky Lab employs about 200 virus researchers—some in the US and China, but the bulk of them in a converted electronics factory 6 miles northwest of the Kremlin. On a sunny April morning when I visit, the old factory feels more like a grad school, with tattooed twentysomethings from across the former Soviet Union roaming the curved halls. The school mascot seems to be Kaspersky himself. Some employees wear Che Guevara T-shirts—with the boss's face replacing the revolutionary's. On the walls are black-and-white photos of long-



serving employees dressed in war paint and moccasins like Native Americans. "Eugene the Great Virus Hunter," reads the caption under the CEO's image—in which he's drawing a bow and arrow. Some 12,543 emails about suspicious programs came into the company just this morning, bringing the grand total to nearly 7.8 million.

'Rule number one of successful companies here is good relations with the secret police.'

The accumulation happens automatically. When a user installs Kaspersky software, it scans every application, file, and email on the computer for signs of malicious activity. If it finds a piece of known malware, it deletes it. If it encounters a suspicious program or a message it doesn't recognize— and the user has opted to be part of the Kaspersky Security Network—it

Eugene Kaspersky as a young Soviet military cadet.
Photo: courtesy Eugene Kaspersky

sends an encrypted sample of the virus to the company's servers. The cloud-based system automatically checks the code against a "whitelist" of 300 million software objects it knows to be trustworthy, as well as a "blacklist" of 94 million known malicious objects. If the code can't be found on either of these lists, the system analyzes the program's behavior—looking at whether it's designed to make unauthorized changes to the computer's configuration options, for example, or whether it constantly pings a remote server. Only in the rare instance that the system is stumped will one of Kaspersky's T-shirt-clad virus researchers step in. They'll characterize the code by function: password stealer, bogus web page server, downloader of more malicious programs. Then they'll suggest a "signature" that can be used to spot and filter out the malware in the future. In just minutes, a software update that incorporates these new signatures can be pushed out to Kaspersky's tens of millions of users.

This is the core of the $600-million-a-year business that grew out of Kaspersky's virus hobby. It's really not all that different from the way US security companies like Symantec or McAfee operate globally. Except for the fact that in Russia, high tech firms like Kaspersky Lab have to cooperate with the *siloviki*, the network of military, security, law enforcement, and KGB veterans at the core of the Putin regime.

The FSB, a successor to the KGB, is now in charge of Russia's information security, among many other things. It is the country's top fighter of cybercrime and also operates the government's massive electronic surveillance network. According to federal law number 40-FZ (.pdf), the FSB can not only compel any telecommunications business to install "extra hardware and software" to assist it in its operations, the agency can assign its own officers to work at a business. "Rule number one of successful companies here is good relations with the *siloviki*," says one prominent member of Russia's technology sector.

Kaspersky says the FSB has never made a request to tamper with his software, nor has it tried to install its agents in his company. But that doesn't mean Kaspersky and the security agency operate at arm's length. Quite the opposite: "A substantial part of his company is intimately involved with the FSB," the tech insider says. While the Russian government has used currency restrictions to cripple a firm's international business in the past, Kaspersky faces no such interference. "They give him carte blanche for his overseas operations, because he's among the so-called good companies."

**Next door to the Moscow virus lab** is the home base for another arm of the operation—a team of elite hackers from around the world that Kaspersky hand-selected to investigate new or unusual cybersecurity threats. Kaspersky calls this his Global Research and Expert Analysis Team—GREAT, for short. Two of them are waiting for me in their office. Sergei Golovanov sports rectangular glasses and a beard out of a '90s nu-metal video. Aleks Gostev is skinny as a rope and has dark circles under his eyes.

With Kaspersky's encouragement, GREAT has become increasingly active in helping big companies and law enforcement agencies track down cybercriminals. Gostev assisted Microsoft in its takedown of the Kelihos botnet, which churned out 3.8 billion pieces of spam every day at its peak.
Golovanov

spent months chasing the <u>Koobface</u> gang, which suckered social media users out of an estimated $7 million.

One of GREAT's frequent partners in fighting cybercrime, however, is the FSB. Kaspersky staffers serve as an outsourced, unofficial geek squad to Russia's security service. They've trained FSB agents in digital forensic techniques, and they're



Eugene Kaspersky's lab isn't just an antivirus company; it's also a leader in uncovering cyber-espionage.
Photo: Stephen Voss

sometimes asked to assist on important cases. That's what happened in 2007, when agents showed up at Kaspersky HQ with computers, DVDs, and hard drives they had seized from suspected crooks. "We had no sleep for a month," Golovanov says. Eventually two Russian virus writers were <u>arrested</u>, and Nikolai Patrushev, then head of the FSB, emailed the team his thanks.

Kaspersky's public-sector work, however, goes well beyond Russia. In May, Gostev and Kaspersky were summoned to the Geneva headquarters of the International

Telecommunication Union, the UN body charged with encouraging development of the Internet. The Russians were ushered into the office of ITU secretary-general Hamadoun Touré, where the Soviet-educated satellite engineer told them that a virus was erasing information on the computers of Iran's oil and gas ministry. This was coming just two years after the discovery of the Stuxnet worm, which had damaged Iran's centrifuges. Touré asked Kaspersky to look into it.

Back at the lab, analysts from GREAT began combing through archived reports from customers' machines. One file name stood out: ~DEB93D.tmp. The virus was eventually found on 417 customers' computers—398 of which were in the Middle East, including 185 in Iran. Some machines had been infected since 2010, but the file had never been deeply analyzed. The researchers were able to isolate one piece of the malicious code—and then another and another.

One module of the software surreptitiously turned on a machine's microphone and recorded any audio it captured. A second collected files, especially design and architectural drawings. A third uploaded captured data to anonymous command-and-control servers. A fourth module, with the file name Flame, infected other computers. The analysts discovered about 20 modules in all—an entire toolkit for online espionage. It was one of the biggest, most sophisticated pieces of spyware ever discovered. In honor of the transmission program, the researchers called it Flame. On May 28, a Kaspersky analyst announced what the team had found.

Flame was another part of America's shadow war against Iran — and Kaspersky killed it.

The spyware was too complex for simple crooks or hacktivists, the researchers said. Flame had been coded by professionals, almost certainly at a government's behest. The company called it a cyberweapon and speculated that it was related to Stuxnet.

On June 1, *The New York Times* revealed for the first time that the White House had, in fact, ordered the deployment of Stuxnet as part of a sophisticated campaign of cyberespionage and sabotage against Tehran. Then, on June 19, *The Washington Post* was able to confirm that Flame was yet another part of this shadow war against Iran. Kaspersky had outed—and in effect killed—it.

For Kaspersky, exposing Flame reflects his company's broader ambition: to serve as a global crime-stopper and peacekeeper. Malware has evolved from a nuisance to a criminal tool to an instrument of the state, he says, so naturally he and his malware fighters have grown in stature and influence too. "My goal is not to earn money. Money is like oxygen: Good idea to have enough, but it's not the target," he says. "The target is to save the world."

In a locked room down the hall from his office, Kaspersky is working on a secret project to fulfill that lofty ambition. Not even his assistant has been allowed inside. But after we've spent a day together—and knocked back a few shots of Chivas 12—he unlocks the door and offers me a peek. It's an industrial control system, a computer for operating heavy machinery, just like the ones that Stuxnet attacked (and, Kaspersky researchers believe, Flame may also have targeted). Kaspersky's team is quietly working on new ways to harden these systems against cyberattack—to protect the power grids and prisons and sewage plants that rely on these

controllers. The idea is to make future Stuxnets harder to pull off. The controllers haven't been engineered with security in mind, so the project is difficult. But if it succeeds, Kaspersky's seemingly outsize vision of his company's role in the world might become a little less outlandish.

In the meantime, there's always politics.



Kaspersky at the 2011 Brazilian Grand Prix, flanked by drivers from the Ferrari F1 team that he sponsors.
Photo: courtesy of Kaspersky Lab

**Kaspersky has cultivated the image** of a wild man with cash to burn—the flamboyant say-anything, do-anything, drink-anything gazillionaire. In Asia, he's clowned around in TV commercials with Jackie Chan. In Europe, Kaspersky sponsors the Ferrari Formula One team and goes on Dublin pub crawls with Bono. Back in Russia, he throws New Year's parties for 1,500. The most recent one had a rock-and-roll theme; Kaspersky took the stage in a Harley jacket. Last summer he took some 30 people to Russia's Kamchatka Peninsula for a volcano-hiking excursion. Then there are the Kaspersky Lab conferences disguised as boozy getaways (or perhaps vice versa): the "analysts' summit" on Spain's Costa del Sol, the "VIP executive forum" in Monte Carlo, the "press tour" in Cyprus, the whatever-it-was thing in Cancun.

All of this might lead some to dismiss Kaspersky as a dilettante plutocrat who drinks single-malt and gets made up for TV while his employees do the real technical work. But the critics would be missing the point: One of the systems Kaspersky is now trying to hack is politics, and his antics are part of the act. Every trip to Shanghai's Formula One race or the London Conference on Cyberspace is another chance to court diplomats and politicians, another chance to extend

his company's influence. And one of his goals is to persuade policymakers to refashion the Internet into something more to his liking—and, as it happens, something more to the liking of the Putin government as well.

Kaspersky says it's time to give up privacy online: 'By protecting our right to freedom we actually sacrifice it!'

In one hotel ballroom after another, Kaspersky insists that malware like Stuxnet and Flame should be banned by international treaty, like sarin gas or weaponized anthrax. He argues that the Internet should be partitioned and certain regions of it made accessible only to users who present an "Internet passport." That way, anonymous hackers wouldn't be able to get at sensitive sites—like, say, nuclear plants. Sure, it might seem like we'd be sacrificing some privacy online. But with all the advertisers, search engines, and governments tracking us today, Kaspersky argues, we don't really have any privacy left anyway. "You can have privacy if you live somewhere in the jungle or the middle of Siberia," he recently told a confab in the Bahamas.

The Internet grew from a network of researchers to the global nervous system in large part because practically anyone was able to access any part of it from anywhere—no ID needed. And the values of openness, freedom, and anonymity became deeply embedded in net culture and in the very architecture of the network itself. But to Kaspersky, these notions no longer work: By "protecting our right to freedom we actually sacrifice it! We sacrifice the right to safe Internet surfing and to not get infected by some nasty piece of malware at every step."

The idea of stripping some amount of privacy from the Internet is gaining traction in many sectors, thanks at least in small part to Kaspersky's lobbying. In Cancun, he was joined onstage by Alexander Ntoko, a top official at the International Telecommunication Union. "Why don't we have digital IDs as a de facto for everybody?" he asks. "When I'm going to my bank, I'm not going to cover my face." In other words, why should things be any different online?

The ITU was once a bureaucratic backwater. In recent years, however, the Russian and Chinese governments have been pushing to give the agency a central role in governing the Internet. Instead of the US-dominated nonprofits that currently coordinate domain names and promote technical standards, they want to turn authority over to a gathering of national governments represented by the ITU. It's a move that one of the Internet's creators, Vint Cerf, told Congress risks "losing the open and free Internet," because it would transfer power from geeks to government bureaucrats. The ITU is set to revisit the 24-year-old treaty governing international telecommunications in December.

Whether or not it secures this power, the ITU has found a willing ally in Kaspersky. When he traveled to ITU headquarters in Geneva, a few months after Cancun, Kaspersky not only agreed to look into the attacks on the Iranian oil ministry, he also told ITU chief Touré that he would assign some of his top researchers to be on call to help the organization with any future investigations. It's a good deal for both men. Kaspersky gets to extend his influence—and maybe catch the next big cyberweapon. Touré and the ITU get a personal cybersecurity team.

But Kaspersky's closest political ties remain in Russia. As one of his country's most successful

technology entrepreneurs—and, in many ways, Russia's spokesman for all things Internet—
Kaspersky has hosted former president and current prime minister Dmitry Medvedev in his
offices (see video below); Medvedev, in turn, appointed Kaspersky to serve in Russia's Public
Chamber, which is charged with monitoring the parliament.

Kaspersky and the Moscow government have espoused strikingly similar views on
cybersecurity. This goes beyond the security industry's basic mission of keeping data safe.
When Kaspersky or Kremlin officials talk about responses to online threats, they're not just
talking about restricting malicious data—they also want to restrict what they consider malicious
*information*, including words and ideas that can spur unrest.

Kaspersky can't stand social networks like Facebook or its Russian competitor, VK (formerly
known as VKontakte). "People can manipulate others with the fake information," he says, "and
it's not possible to find who they are. It's a place for very dangerous action." Especially
dangerous, he says, is the role of social networks in fueling protest movements from Tripoli to
Moscow, where blogger Alexei Navalny has emerged as perhaps the most important dissident
leader and sites like VK and LiveJournal have helped bring tens of thousands of people into the
streets. Kaspersky sees these developments as part of a disinformation campaign by
antigovernment forces to "manipulate crowds and change public opinion."

Nikolai Patrushev—the former FSB chief who now serves as Putin's top security adviser—
makes a nearly identical case. In June he told a reporter that outside forces on the Internet are
constantly creating tensions within Russian society. "Foreign sites are spreading political
speculation, calls to unauthorized protests," he says.

Russia's government and its most famous technology entrepreneur have long had each other's
backs, cooperating on cybercrime investigations and supporting each other's political agendas.
But the two became utterly intertwined at 6:30 in the morning on April 19, 2011, when
Kaspersky's cell phone rang in his London hotel room. According to the caller ID, it was Ivan,
Kaspersky's 20-year-old son. But the voice on the other end was not Ivan. It was an older man
who politely told Kaspersky: "We've got your son."

**Outwardly, Kaspersky didn't react** to the news of Ivan's kidnapping. He said he was tired and
asked the caller to ring him back later in the morning—which the caller did, from another
number. This time, Kaspersky said he was in an interview and told the guy to make a third call.

It was a ploy, a stall for time while Kaspersky hurriedly reached out to his corporate security
manager, who reached out to the FSB. Ordinarily the Russian intelligence service isn't in the
business of freeing kidnap victims. But Ivan Kaspersky wasn't your average abductee. "My first
thought was that this is serious. Second, immediately call the FSB. And third, they are stupid to
attack me," Kaspersky says. "I was 100 percent sure—well, 99 percent sure—that FSB and
police would find them. We have very good relations with both the FSB cybersecurity
department and the Moscow police department. They know us. They know us as people who
support them when they need it. They started to work like crazy."

That night Kaspersky took the red-eye back to Moscow. He plodded his way through the morning rush hour, his phone ringing every few minutes. As the kidnappers made their demands —3 million euros in denominations of 500—they tried to cover their tracks, switching cell phones and SIM cards constantly. But with every call, the kidnappers were giving the FSB more data to track them down.

According to the caller ID, it was Kaspersky's kid. But the voice on the other end was an older man's, saying: 'We've got your son.'

Kaspersky arrived at a police station in central Moscow and promptly passed out from anxiety and exhaustion. He and his ex-wife stayed there for the next four days, pacing the halls while the FSB pored through call records and the Moscow cops staked out a suburban cabin where they believed Ivan was being held. After a few days, the officers lured the kidnappers out of the house with the promise of a ransom payment. They were captured without a shot. Ivan was



Eugene Kaspersky now travels in Russia with bodyguards, after the kidnapping of his son.
Photo: Stephen Voss

freed, a little grimy—there was no running water in the cabin—but otherwise fine. "It was

At first, Kaspersky publicly blamed himself for not adequately protecting his family. But later he started blaming something else: VK. Kaspersky said that the Russian social network had tempted Ivan into posting his address, phone number, even details of his internship at InfoWatch, Natalya's security company. "Social networks shouldn't encourage users to post that

sort of information. <u>If a site asks for private information, then criminal charges should be brought against it</u> in the event of a leak," Kaspersky told Russia's RT television channel in October. Widely viewed as a <u>Kremlin propaganda outlet</u>, RT aired the remarks as part of a documentary on the death of online privacy and the dangers of social networks, with Ivan's kidnapping as a primary example. The program encouraged people to protect themselves by dropping offline completely. As it happened, the documentary ran just as online opposition to the ruling party was starting to bubble up. In the months that followed, top bloggers and activists were detained by the government, and the FSB tried (unsuccessfully) to force VK to purge the pages of some groups from its network.

The Kaspersky kidnapping ended up being a tool for the ruling party. But according to Natalya, the whole kidnapped-because-of-VK story is nonsense. "They found him on social networks? It's not true. They followed him for a month or more. They knew all his ways, where he is going, whom he contacts," she says. Yes, Ivan posted an address online—"a false address from an old house." There's no way, she says, that this helped the kidnappers.

So why did Eugene Kaspersky publicly blame VK? Perhaps Kaspersky simply let his emotions get the better of him—his son had been kidnapped, after all. Perhaps he mistook the fake address Ivan posted for a real one. Whatever the reason, in the end, the son's kidnapping became a way to attack the father's political foes.

**Eugene Kaspersky now travels** in Moscow with a team of bodyguards. He moved to a duplex in a gated community bordering a park—better for keeping his girlfriend and their infant son safe, he explains. A wraparound balcony overlooks the still-frozen Moskva River and the site of Kaspersky Lab's new five-story headquarters. To the left you can almost see Kaspersky's childhood home: a one-room shack originally built for prison laborers in the Stalin era.

It's an early Sunday afternoon in late April. Kaspersky, smoking a Chinese cigarette, is wearing the same bargain-rack striped shirt he was wearing Friday. His mother, who also lives in the complex, heats up blintzes and opens some canned caviar. Up close it becomes clear that Kaspersky's image as a mega-rich, hyperconnected playboy is mostly an act. In truth, he stays away from Russia's oligarchs, whom he sees as little different from the cybercrooks he chases. He views his move into politics as a necessary evil, an offer he's in no position to refuse. Kaspersky doesn't bother with political rallies or Moscow's famously immoderate nightlife; he'd rather be in an airplane seat on his way to some conference to share ideas with other technophiles. When he goes to places like Kamchatka, he says, he takes employees or clients. "I don't have any friends outside of work."

Sure, Kaspersky touts a Kremlin-friendly line. In Putin's Russia, executives who don't have a habit of disappearing.

While critics assume that Kaspersky's company is a virtual arm of Russian intelligence, he and his staff insist, not unconvincingly, that their work with the FSB has its limits. They argue that using its software to spy on users would undermine the company's credibility worldwide; it would

be like the local locksmith moonlighting as a cat burglar. That credibility is at the heart of Kaspersky Lab's business. Without lots of customers, there would be no Kaspersky Security Network, no database of known threats or tally of infected machines.

Yes, Kaspersky publicly touts a Kremlin-friendly line. But in Putin's Russia, executives who neglect to do so have a disturbing habit of winding up in jail or being forced into exile. Besides, you don't need to be a Moscow crony to push against free speech and privacy online. Plenty of Western officials are doing that too. Until 2011, Italians had to present their ID cards before using Wi-Fi at an Internet café. The European Commission is now mulling a continent-wide system of "electronic authentication." British prime minister David Cameron contemplated cracking down on social media after the 2011 London riots. And retired US vice admiral Mike McConnell wrote in *The Washington Post* about the "need to reengineer the Internet to make attribution … more manageable." He previously served as US director of national intelligence— America's top spy.

In many ways, the relationship between the Kremlin and Kaspersky Lab is the same as the one between Washington and the big US security companies. Moscow gives millions to Kaspersky to help secure government networks—much as the Pentagon pours millions into contracts with McAfee and Symantec. Kaspersky helps the FSB track down cybercrooks; McAfee and Symantec work with the FBI. Kaspersky employees brief the Duma, Russia's parliament; American researchers brief Congress and the White House. These security firms have all become key players in their home countries' network defenses and in cybersecurity investigations worldwide.

But while the American and Russian companies are similar, there are important differences. Stuxnet was a highly classified US operation serving one of the government's top geopolitical goals. Symantec, a US company, went after it anyway. It's hard to find a similar case of Kaspersky and the Kremlin working at cross-purposes.

In December 2011, Kaspersky came under criticism for appearing to do the opposite—ignoring an act of online criminality when it was politically convenient. On the eve of Russia's parliamentary elections, massive denial-of-service attacks brought down social networks like LiveJournal, media outlets like Kommersant.ru, and the independent election watchdog Golos. It seemed to be a politically motivated hit on potential opponents and critics of the ruling regime. Yet Kaspersky Lab—which boasts that its software can spot and fight DDoS attacks—denied the existence of any such activity. "We detected none. Very strange," Kaspersky tweeted. The next day he wrote on his blog that the attacks actually had been detected, but he speculated that many of the sites were victims of technical problems or perhaps their own popularity.

Kaspersky denies that he blew off the DDoS attacks in an attempt to curry favor with the ruling powers. (Then he claims that pro-Putin sites got hit by the online strikes as well.) But Andrei Soldatov, a muckraking investigative journalist whose Agentura.ru site was hammered in the attacks, has a very different view: "I cannot explain Kaspersky's ignorance by anything but conscious intention to take the Kremlin's side, a position very weird for the independent expert he claims to be."

**Kaspersky's office has just the** trappings you'd expect for someone who rose from a kid in a shack to become a continent-hopping mogul: a Ferrari racing jacket, boxes of his software in Chinese and German, a model of *SpaceShipTwo*, the aircraft that's going to fly well-heeled tourists to the edge of the atmosphere (Kaspersky already has a $200,000 ticket). Late one afternoon, he reaches into a small closet and pulls out a lab coat with his company's logo to show me. Behind that is a basketball jersey from the New Jersey Nets, the NBA team owned by Russian billionaire Mikhail Prokhorov. At the very back of the closet I glimpse the dark green dress jacket from Kaspersky's Soviet Army uniform. The garment is in pristine condition; it looks like it could still be worn in a military parade.

There are plenty of Russian magnates content to use their Kremlin connections and corruption-fueled profits to bully and buy their way into the global arena. Kaspersky has long tried to play a different game: He's an international entrepreneur and thinker who is from Putin's Russia, but not of it. Kaspersky's financial success and influence is a testament to how skillfully he has walked this fine line. Yet the questions endure: Can a company so valuable to Moscow's government ever be truly independent of it? And what else is hidden in the back of the closet, that the rest of the world can't see?

I go in for a closer look at the jacket. Kaspersky shuts the door. "It's nothing," he says, walking out of the room. "Let's find a drink."

Go Back to Top. Skip To: Start of Article.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| KASPERSKY LAB, INC.; and | ) | |
| KASPERSKY LABS LIMITED, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | Civ. No. 17-2697 (CKK) |
| | ) | |
| U.S. DEPARTMENT OF | ) | |
| HOMELAND SECURITY; and | ) | |
| KIRSTJEN NIELSEN | ) | |
| *Secretary of Homeland Security* | ) | |
| | ) | |
| *Defendants.* | ) | |

**EXHIBIT 3-B**

# A PRIMER IN RUSSIAN ACTIVE MEASURES AND INFLUENCE CAMPAIGNS PANEL II

gpo.gov/fdsys/pkg/CHRG-115shrg25998/html/CHRG-115shrg25998.htm

[Senate Hearing 115-40, Part 2]
[From the U.S. Government Publishing Office]


                                            S. Hrg. 115-40, Pt. 2

              DISINFORMATION: A PRIMER IN RUSSIAN ACTIVE
                   MEASURES AND INFLUENCE CAMPAIGNS
                              PANEL II

=======================================================================


                              HEARING

                            BEFORE THE

                SELECT COMMITTEE ON INTELLIGENCE

                             OF THE

                    UNITED STATES SENATE

                 ONE HUNDRED FIFTEENTH CONGRESS

                         FIRST SESSION

                            _____


                    THURSDAY, MARCH 30, 2017

                            _____


        Printed for the use of the Select Committee on Intelligence




[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Available via the World Wide Web: http://www.fdsys.gov

———

U.S. GOVERNMENT PUBLISHING OFFICE

25-998 PDF                  WASHINGTON : 2017
--------------------------------------------------------------------
  For sale by the Superintendent of Documents, U.S. Government Publishing
 Office Internet: bookstore.gpo.gov Phone: toll free (866) 512-1800;
         DC area (202) 512-1800 Fax: (202) 512-2104 Mail: Stop IDCC,
                     Washington, DC 20402-0001

SELECT COMMITTEE ON INTELLIGENCE

[Established by S. Res. 400, 94th Cong., 2d Sess.]

RICHARD BURR, North Carolina, Chairman
MARK R. WARNER, Virginia, Vice Chairman

| | |
|---|---|
| JAMES E. RISCH, Idaho | DIANNE FEINSTEIN, California |
| MARCO RUBIO, Florida | RON WYDEN, Oregon |
| SUSAN COLLINS, Maine | MARTIN HEINRICH, New Mexico |
| ROY BLUNT, Missouri | ANGUS KING, Maine |
| JAMES LANKFORD, Oklahoma | JOE MANCHIN, West Virginia |
| TOM COTTON, Arkansas | KAMALA HARRIS, California |

JOHN CORNYN, Texas

MITCH McCONNELL, Kentucky, Ex Officio
CHUCK SCHUMER, New York, Ex Officio
JOHN McCAIN, Arizona, Ex Officio
JACK REED, Rhode Island, Ex Officio

----------

Chris Joyner, Staff Director
Michael Casey, Minority Staff Director
Kelsey Stroud Bailey, Chief Clerk

CONTENTS

----------

MARCH 30, 2017

OPENING STATEMENTS

Burr, Hon. Richard, Chairman, a U.S. Senator from North Carolina.   1
Warner, Hon. Mark R., Vice Chairman, a U.S. Senator from Virginia   2

WITNESSES

Mandia, Kevin, Chief Executive Officer, FireEye, Inc.............   2
    Prepared statement..........................................   6
Alexander, General (Ret.) Keith B., President and Chief Executive
  Officer, Ironnet Cyberspace...................................  13
    Prepared statement..........................................  15
Rid, Thomas, Ph.D., Professor of Security Studies, King's
  College, London...............................................  19
    Prepared statement..........................................  22

SUPPLEMENTAL MATERIAL

Prepared statement of Senator Burr..............................  68

DISINFORMATION: A PRIMER IN RUSSIAN
ACTIVE MEASURES AND INFLUENCE CAMPAIGNS
PANEL II

----------

THURSDAY, MARCH 30, 2017

U.S. Senate,
Select Committee on Intelligence,
Washington, DC.

The Committee met, pursuant to notice, at 2:05 p.m. in Room SD-106, Dirksen Senate Office Building, Hon. Richard Burr (Chairman of the Committee) presiding.

Committee Members Present: Senators Burr, Warner, Risch, Rubio, Blunt, Lankford, Cotton, Cornyn, Feinstein, Wyden, Heinrich, King, Manchin, Harris, and Reed.

OPENING STATEMENT OF HON. RICHARD BURR, CHAIRMAN, A U.S. SENATOR FROM NORTH CAROLINA

Chairman Burr. I'd like to call this hearing to order. This morning the committee examined the history and characteristics of the Russian active measures campaign as it led up to this, our second panel, which will examine the role cyber operations play in support of these activities.

I'd like to welcome our witnesses: Mr. Kevin Mandia, Chief Executive Officer of FireEye, a global cyber security company. Prior to founding the cyber security company Mandiant, which was acquired by FireEye in 2013, Mr. Mandia served in the United States Air Force as a computer security officer and later as a special agent in the Air Force Office of Special Investigations, where he worked as a cyber crime investigator.

Mr. Mandia, I thank you for being here today and, more importantly, thank you for your service.

General Keith Alexander is the CEO and President of IronNet Cybersecurity, another global cyber security firm on the forefront of our Nation's commercial efforts to mitigate cyber security threats. Prior to founding IronNet, General Alexander served for 40 years in our armed forces, culminating with his tenure as the Director of the National Security Agency from 2005 to 2014 and concurrent service as Director of U.S. Cyber Command from 2010 to 2014.

General, thank you for being here today and, more importantly, for your service to the country.

Also, Dr. Thomas Rid is a Professor of Security Studies at Kings College, London. He has studied and written extensively on cyber security issues. He has worked at Hebrew University in Jerusalem, John Hopkins School for Advanced International Studies, and the Rand Corporation.

Dr. Rid, thank you as well for your expertise and we look forward to your testimony, as well as we do the other two witnesses.

I'd like to note for the public and for my fellow members that the level of cyber expertise in front of us is truly remarkable. These witnesses will be able to provide at an unclassified level some extremely useful texture and detail to

the discussion that we began this morning, and I feel certain--
and I say this to all three of you--that the committee in a
closed setting might want to reach out to you as we begin to
dig a little deeper, so that we can get your thoughts and tap
into your expertise in a setting that might be able to explore
a little further than the open setting of this hearing.

So once again I'll say to members that for this hearing we
will be recognized by order of seniority for five-minute
rounds. I would note for members that we are targeted to have a
vote somewhere between 4:00 and 4:30. It would be my hope that
we could wrap up prior to that vote and not hold our witnesses
open, and that way we would conclude Senate business for the
week with that vote.

Vice Chairman.

OPENING STATEMENT OF HON. MARK R. WARNER, VICE CHAIRMAN, A U.S.
SENATOR FROM VIRGINIA

Vice Chairman Warner. Thank you, Mr. Chairman. I don't have
any statement other than one to welcome all the witnesses and
to point out that before Mr. Mandia's company was acquired by a
California company he was based in Alexandria, Virginia, where
he did great, great work. And we'd be happy to have you bring
your company back, with all due deference to Senator Harris,
back to Virginia.

Senator Harris. Stay in the sunshine.

Chairman Burr. With that, Kevin, I'm going to recognize you
to start, and recognize there's a big difference between the
tech company you ran and the tech company he claims that he
ran.

[Laughter.]

STATEMENT OF KEVIN MANDIA, CHIEF EXECUTIVE OFFICER, FIREEYE,
INC.

Mr. Mandia. Thank you. I'd like to start by thanking the
Chairman, thanking the Vice Chairman, and the whole Senate
Intelligence Committee for this opportunity to share some of
the experiences and observables I've had in cyberspace over the
last 22 years. What I'm going to speak about today is the cyber
capabilities and techniques attributed to Russian hackers,
specifically the threat group that we refer to as APT28. I want
to talk also about recommendations to prevent or mitigate the
impact of these efforts to compromise.

Before I answer your questions, I want to give you a little
bit of my background or the background of our company so you
understand the context of my narrative. As I sit here right
now, we have hundreds of employees responding to computer
security breaches. We think it's critical to own that moment of
responding to a breach, collecting the trace evidence, and
analyzing that evidence.

So as I give you my narrative today, it's based on really
three things. It's based on: one, what we are learning as we

respond to hundreds of breaches a year. We're cataloguing that
trace evidence and we're putting it into a linked database.
Then we have over 150 threat analysts worldwide who speak 32
languages. They're in 32 countries, and they're trying to marry
up what we're seeing in cyberspace to what we're seeing in the
geopolitical world out there today.

Then the third source of my dialogue, the third source of
evidence, is in fact we have 5,000-plus customers who are
relying on our technology to protect them on a daily basis.

Let me first speak to the methodologies being used by APT
Group 28. We attribute many intrusions to these folks. You
might have heard about the Worldwide Antidoping Agency, the DNC
breach, the DCC breach, the Ukrainian Central Election
Commission, TV5Monde, and I can keep going on. I believe the
Doctor will mention some more of these victims.

But all the breaches that we attribute to APT28 in the last
two years involved the theft of internal data as well as the
leaking of this data by some other party, potentially APT28,
potentially some other arm of the organization, into the
public.

During the course of our APT28 investigations, we've had a
significant amount of evidence. We've looked at 550 or more
pieces of custom malware. A lot of people will think, well,
what's that mean? We don't see this malware publicly available.
It's not available to any of you to download and use tomorrow.
It's being crafted by somebody in a building somewhere. It's
being shared by people in a closed loop and it's not widespread
or available to anybody.

We've identified over 500 domains or IP addresses used by
this group when they attack. To put that in perspective, almost
every modern nation that develops an operational capability in
cyberspace, the first thing they need to do is get an
infrastructure they use to then attack the real site of their
attacks, the real intent, the real target. So there's a huge
infrastructure of compromised machines or false fronts or
organizations that are used for these attacks, and we found
over 500 of those.

We've analyzed over 70 lure documents written in many
different languages. These are the documents that you receive
during a spear phishing and they're armed documents if you open
up and peruse them. What's interesting is when you assess the
lure documents they're related to the subjects and interests of
the people who are receiving these documents. So a lot of work
is going into the backdrop or the background of the people that
are being spear phished.

I can go on and on. I've got 40, 50 more pages of what they
do. But I'll focus on a couple things that also help us
attribute APT28's activities to the Russian government. In 2015
alone, we saw APT28 leverage five zero-days, at least based on
our observables. A zero-day is an attack that does not have a
patch available for it. It will work if received and you
execute the file.

The best way to liken the value of a zero-day is, the

minute it's used and it's been weaponized, its value goes down incredibly fast. So when you see these things, they're mostly in the--they're mostly in the toolbox of a nation-state at this point. Over the last ten years, the security industry has done a great job making the cost of zero-days go up and to the right, and we're seeing APT28 deploy zero-days as needed.

They're also extremely hard to detect once they're in your network, because they rely on the tools your system administrators rely on. So they're pretty--I always say they turn to ghosts almost. The minute they're in, you're likelihood of detecting them if you don't detect the initial breach goes down exponentially. So they have zero-day capability. They operate using your tools and they operate very hard to detect.

I want to share with you three observations that I saw emerge in 2014 that I did not see prior to responding to these state actors. I had the privilege of responding to them when I was in the Air Force, probably a different group, but a group that we attributed to the Russian government. Every time I responded to them on the front lines, if they knew we were watching them they would evaporate. We never got to observe the tools, tactics, and procedures of Russian state-sponsored intrusions in the late 1990s and early 2000s. They didn't let us do it.

For some reason, in August of 2014 we were responding to a breach at a government organization and during our response our front-line responder said: They know we're there, they know we're observing them, and they're still doing their activities. So I actually flew in, sat on the front lines. It's the first I have seen it.

To me that was big news because I had a 20-year run from 1993 to about 2014 where they never changed the rules of engagement. I'd say they changed in August or September 2014.

The second thing they did, they started operating at a scale and scope where you could easily detect them. We were observing and orienting on them. They were letting us do it, but their scale and scope became widely known to many security organizations, and we all started working together to get better visibility and fidelity into their tools, tactics, and procedures.

Lastly, something that I wouldn't have predicted, but we also witnessed for the first time in 2014, is a group that we'd attribute to the Russian government compromising organizations and then suddenly the documents were being leaked out in a public forum through hacktivist personas, which we have not seen.

In conclusion, today and into the foreseeable future it is our view that the United States is going to continue to see these things happen. While many organizations are actively trying to counter these attacks, there is such an asymmetry between offense and defense in cyberspace that it's really hard for any organization to modernize and prevent these intrusions from occurring when you have a state-sponsored attacker.

Therefore, we need to explore ways both within and outside

of the cyber domain to help deter these attacks.

    Lastly, I always say if I had five minutes to talk to the
Senate, what would I say? Well, here it is. I think we have to
first start with we've got to get attribution right. We've got
to know who's hacking us so we can establish a deterrent, and
this gives us a great opportunity to make sure we have the
tools necessary and the international cooperation necessary to
have attribution. When you have attribution right, then you can
consider the proportional response and the other tools at your
disposal as diplomats to make sure we have the deterrence we
need.

    Thank you very much for this opportunity.
    [The prepared statement of Mr. Mandia follows:]


    [GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


    Chairman Burr. Thank you.
    General, welcome.

    STATEMENT OF GENERAL (Ret.) KEITH B. ALEXANDER, PRESIDENT AND
           CHIEF EXECUTIVE OFFICER, IRONNET CYBERSPACE

    General Alexander. Chairman, Ranking Member, distinguished
members of the committee: It's an honor to be here, I think. I
want to pick up from where Kevin left off. I want to raise it
up a strategic level.

    I had the opportunity this morning to see on the news you
and the Ranking Member talk about approaching this in a
bipartisan way, approaching the solution in a bipartisan way.
When you look at the problem and what we're facing, it's not a
Republican problem, it's not a Democratic problem. This is an
American problem and we all have to come together to solve it.
I think that's very important.

    If we step back and look at this, I want to cover several
key areas to give my perspective on what's going on. First with
respect to technology, communications is doubling every year.
We're getting more devices attached to the network. This
network is growing like crazy, and so are the vulnerabilities.
Our wealth, our future, our country is stored in these devices.
We've got to figure out how to secure them.

    With those vulnerabilities, we've seen since 2007 attacks
on countries like Estonia, Georgia, Ukraine, Saudi Arabia--a
whole series of attacks, and then Crimea and others, and then
the attacks on the power grid in the Ukraine. What's clear is
this network and these tools have gone from interesting
exploitation for governments and crime to elements of national
power.

    I think from my perspective, when we consider that this is
now an element of national power, we have to step back and say:
What's their objective? Sun-Tzu said: ``Know yourself and know
your enemy and you'll be successful in a thousand campaigns.''

What's Russia trying to do and why are they trying to do it?

From my perspective as I look at it from my background, it's clear it's not just trying to go after the Democratic National Convention or others. This is widespread and a campaign that they're looking at doing that will drive wedges between our own political parties and between our country and NATO and within NATO and within the European Union.

Why? I believe when you look at Russia and if you were to play out on a map what's happened over the last 25 or 30 years, they see the fall of the Soviet Union and the impacts on their near border and all these as impacts on them.

I bring all this up because one of the questions that's out in the press is: Do we engage the Russians or do we not? Every administration that I'm familiar with, including the Obama administration, started out with: We're going to engage them. In fact it was called ``the reset button.'' While that didn't go far, I believe this Administration should do the same.

When I look at what's going on here, there's another opportunity that we have. When you look at the characteristics of leaders in this Administration, we have people with great business experience--the President and the Secretary of State-- and great national security experience. In addressing the problem that we're now dealing with, this is a new area. We're seeing cyber as an element of national power. How do we now engage Russia and other countries and set the right framework?

I believe we have to engage and confront: engage them in those areas that we can, set up the right path, reach out, and cool this down, I really do. We've got to fix that.

At the same time, we've got to let them know what things they can't do and why they cannot do those--set those standards. I think what this group can do and what you are doing, Chairman and Vice Chairman, is make this a bipartisan approach: solve this for the good of the Nation.

We look at cyber security and what Kevin gave you in terms of what industry sees and what government sees. Over the last decade, we have jointly worked on coming up with cyber legislation, how industry and government works together. If we're going to address attribution and other issues, we also have to set up the way for our industry and sectors to work with the government so that that attribution of things that the government knows and those things that industry knows can be used for the common good.

It's interesting that sitting in the presidential commission, one of the things that came out when we looked at what's going on was, what's our strategy? At times people looked at this as it's a government issue and it's an industry issue. It's not. This is something that we need to look at as a common issue. ``For the common defense,'' it's in the preamble to the Constitution and it's something that we should all look at. Then we should see, how do we extend that to our allies?

So I would step back and encourage, encourage you to step back and look at the strategy: What's Russia trying to do and why are they trying to do it, and how do we engage them? At the

same time, we need to address our cyber security issues and go
fix those and get on with that.

Thank you very much, Mr. Chairman.

[The prepared statement of General Alexander follows:]


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


Chairman Burr. Thank you, General.

Mr. Rid.

STATEMENT OF THOMAS RID, Ph.D., PROFESSOR OF SECURITY STUDIES,
KING'S COLLEGE, LONDON

Dr. Rid. Chairman Burr, Vice Chairman Warner, members of
the committee: Thank you for giving me the opportunity to speak
today about active measures.

Understanding cyber operations in the 21st century is
impossible without first understanding intelligence operations
in the 20th century. Attributing and countering disinformation
today is therefore also impossible without first understanding
how the United States and its allies attributed and countered
hundreds of active measures throughout the Cold War.

Nobody summarized this dark art of disinformation better
than Colonel Rolf Wagenbreth from the Stasi, who headed the
Department X there. He said, and I quote: ``A powerful
adversary can only be defeated through a sophisticated,
methodical, careful, and shrewd effort to exploit even the
smallest cracks within our enemies and within their elites.''

The tried and tested way of active measures is to use an
adversary's existing weaknesses against himself, to drive
wedges into preexisting cracks. The more polarized a society,
the more vulnerable it is; and America in 2016, of course, was
highly polarized, with lots of cracks to drive wedges into. But
not all wedges; improved high-tech wedges that allowed the
Kremlin's operatives to attack their target faster, more
reactively, and at a far larger scale than ever before.

But the Russian operatives also left behind more clues and
more traces than ever before, and assessing these clues and
operations requires context. First, in the past 60 years--and
we talked about this already this morning--active measures
became the norm. The Cold War likely saw more than 10,000
active measures across the world. This is a remarkable figure.
The lull in the 1990s and the 2000s I think was an exception.

Second, in the past 20 years aggressive Russian digital
espionage campaigns--Kevin Mandia mentioned one of them--became
the norm as well. The first major state-on-state campaign was
called Moonlight Maze, and it started in 1996. In 2000 a shift
in tactics became apparent, especially in Moscow's military
intelligence agency, GRU. A once careful, risk-averse, and
shrewd and stealthy espionage actor became more careless, risk-
taking, and error-prone. One particularly revealing slip-up

resulted in a highly granular view of just one slice of GRU
targeting between March 2015 and May 2016 in the lead-up to the
election. That slice contained more than 19,000 malicious links
targeting nearly 7,000 individuals across the world, really.

Third, in the past two years now, coming closer to the
present, Russian intelligence operations began to combine those
two things, hacking and leaking. By early 2015, military
intelligence was targeting defense and diplomatic entities at
high tempo. Among the targets were the private accounts, for
example, of the current Chairman of the Joint Chiefs of Staff,
General Dunford, or current Assistant Secretary of the Air
Force Daniel Ginsberg, or the current U.S. Ambassador to Russia
John Tefft, and his predecessor Michael McFaul; a large number
of diplomatic and military officials in Ukraine, Georgia,
Turkey, Saudi Arabia, Afghanistan, and many countries bordering
Russia, especially their defense attaches.

All, I add, are legitimate and predictable targets for a
military intelligence agency. Russia intelligence, curiously,
also targeted inside Russia, critics inside Russia, for
example, the hacker group Shaltay Boltai. In early 2015, GRU
breached successfully not just the German Parliament, but also
the Italian military and the Saudi foreign ministry.

Between June 15 and November 16, at least six different
front organizations appeared, very much Cold War style, to
spread some of the stolen information to the public in a
targeted way.

Finally, in the past year the timeline here in the U.S.
election campaign began to align. Between March 10th and April
7, GRU targeted at least 109 full-time Clinton campaign
staffers. These are only full-time core staffers, not their
volunteers. These are not even counted here. Russian
intelligence targeted Clinton's senior advisor Jake Sullivan in
at least 14 different attempts beginning on 19 March. GRU
targeted even Secretary Clinton's personal email account, but
the data show that she did not fall for the trick and didn't
actually reveal her password.

Military intelligence agency GRU also targeted DNC staffers
between March 15 and April 11, the timing lines up nearly
perfectly. About one week later, after the events that I just
mentioned, the DCLeaks website was registered, getting ready to
spread these data publicly. The overlap between individuals
hacked by GRU and leaked on DCLeaks is nearly perfect. Out of
13 named leak victims, the available forensic evidence
identifies 12 as targeted by GRU, with the exception of George
Soros, by the way.

But a narrow technical analysis would miss the main
political and ethical challenge. Soviet bloc disinformation
specialists preferred the art of exploiting what was then
called ``unwitting agents.'' There is no contradiction in their
reading between being an honest American patriot and at the
same time furthering the cause of Russia. In the peace movement
in the 1980s we saw that people were genuinely protesting, say,
the NATO double track decision, but at the same time advancing

Russian goals. There is no contradiction.

Three types of unwitting agents--and I would like to close with that--stand out: WikiLeaks; Twitter, the company itself, and I'm happy to expand later; and over-eager journalists aggressively covering the political leaks while neglecting or ignoring their provenance.

In 1965 the KGB's grandmaster of dezinformatsiya, General Ivan Agayants, inspected his active measures outpost in Prague, a particularly effective and aggressive one, and he said, quote: ``Sometimes I am amazed how easy it is to play these games. If they did not have press freedom, we would have to invent it for them.''

Later the Czech operative that he was speaking with in that very moment defected to the United States and testified in Congress, and I quote him to close. He said: ``The press should be more cautious with anonymous leaks. Anonymity is a signal indicating that the Big Russian Bear might be involved.''

Thank you.

[The prepared statement of Dr. Rid follows:]


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]




Chairman Burr. I want to thank all three of you for your testimony. I think it's safe to say that this is probably a foundational hearing for our investigation, to have three people with the knowledge that you do. I hope when you do get that second call or third call that you'll sit down with us as we have peeled back the onion and a little bit and we have technical questions. But we've got some technical expertise on the committee. You can look at a lot of gray hair and realize that my technology capabilities are very shallow and that many of us struggle to understand not just what they can do, but even the lingo that's used, the dark side of the web, the open side of the web. These things are amazing and would be shocking to most people.

I'm going to turn to the Vice Chairman for his questions.

Vice Chairman Warner. Thank you, Mr. Chairman. Let me echo what you said. I think we've got an incredible panel of experts, and you're here because of that expertise.

I've got three questions that I'd like to try to get through, the first one hopefully fairly quickly. Based upon your expertise and knowledge, do you have, any of you, have any doubt that it was Russia and Russian agents that perpetrated during the 2016 presidential campaign the hacks of the DNC and the Podesta emails and the misinformation and disinformation campaign that took place during the election? A short answer will do. Do any of you have any doubt that it was Russia?

Mr. Mandia. I think basically, from the observables we get at the victim sites you can't always connect the dots. We can't

show you a picture of a building. We can't give you a list of names of people who did it. We have to look at a lot of other factors, some of which is incredible amounts of detail.

But we've got ten years of observation here. We've seen similar behaviors in the past. My best answer is it absolutely stretches credulity to think they were not involved.

Vice Chairman Warner. General Alexander.

General Alexander. I believe they were involved.

Vice Chairman Warner. Dr. Rid.

Dr. Rid. I believe they were involved as well.

Vice Chairman Warner. Thank you.

It has been reported that some of the techniques--and I say to my good friend Richard Burr, I used to be technologically savvy up until about year 2000, 2001, which still puts me a decade ahead of some of my colleagues.

But it's been reported in the press and elsewhere that by using internet trolls and then the botnets and that exponential ability then to kind of flood the zone that in the misinformation and disinformation campaign they were, the Russians, were able to flood the zone, actually not in a broad-based, across the whole country, but literally target it down to precinct levels in certain states.

Is that capable to do, if you could have the botnet network that would in effect put out misinformation or disinformation and then all of the other accessory sites that would then gang up on that and target that down to a geographic location?

General Alexander. I think it's technically possible. I don't know that you have--that I have enough information to say that was done at each one of those locations. But I think it's technically possible. If you put enough people on it, yes, you could do that.

Vice Chairman Warner. Dr. Rid or Mr. Mandia.

Dr. Rid. It's very technically possible. May I just make an important distinction here between a ``botnet,'' which is usually remotely controlling somebody's computing resources and machine, and ``bots,'' that is fake Twitter accounts that are automated.

Vice Chairman Warner. But they both have the effect. Somebody's campaign--somebody's computer that is accessed or fake Twitter accounts, bots, they still have the same effect of pushing a news story higher on a news feed, for example, a Twitter news feed or a Facebook news feed?

Dr. Rid. That is mostly done by bots within social media networks, that can be any social media network. Botnets are usually used for different purposes.

Vice Chairman Warner. Kevin, do you want to?

Mr. Mandia. Yes. Peeling back the question, there's a couple things. I think you can always try to get public perception to go certain ways based on the results of Google searches and things like that, and you can automate ways to up-level people's attention to things, with all the social media.

The good news is during the election a lot of states had the foresight to, let's do shields up and let's be very

diligent, let's watch all the cyber traffic we can. And we
didn't see any evidence, at least in the DDOS side or
distributed denial of service attacks or attacks--we didn't see
anything that harmed the actual election process.

Vice Chairman Warner. That was not the--but the question of
targeting in.

So here's the last question. I've heard and it's been
reported that part of the misinformation-disinformation
campaign that was launched was launched in three key states--
Wisconsin, Michigan, and Pennsylvania--and it was launched,
interestingly enough, not to reinforce Trump voters to go out,
but actually targeted at potential Clinton voters with
misinformation in the last week where they were not suddenly
reading, if they got their news from Facebook or Twitter,
Clinton and Trump back and forth, but stories about Clinton
being sick and other things.

I guess my final point here is--and this may be beyond
anybody's expertise, but my understanding is the Russians,
although very good at some of this technology piece, they might
not have been so good at being able to target to a precinct
level American political turnout; that that would mean they
might be actually receiving some information or alliance from
some American political expertise to be able to figure out
where to focus these efforts.

Dr. Rid. I haven't seen a detailed analysis of the
precinct-level targeting that would be good enough to
substantiate this assumption. But this relates to a more
fundamental problem. One different, separate entire group of
actors and some completely legitimate within the campaign were
taking advantage of social media. So it's really difficult to
distinguish for researchers after the fact what actually is a
fake account and what is a real account.

Ultimately, we need the cooperation of some of the social
media companies to give us heuristics and visibility into the
data that only they have.

General Alexander. I would take it a step higher, that,
Senator, I think what they were trying to do is to drive a
wedge within the Democratic Party between the Clinton group and
the Sanders group, and then within our Nation between
Republicans and Democrats. I think what that does is it drives
us further apart, that's in their best interest. And we see
that elsewhere.

I'm not sure I could zone it down to a specific precinct,
but I think what we would expect is for them to create
divisions within the whole framework and destroy our unity. And
you can see, actually, if you look back over the last year, we
didn't need a lot of help in some of those areas.

So now the question is, and where I think you have the
opportunity, is how do we build that back?

Chairman Burr. Let me say before I recognize Senator Rubio, I
want to clarify what I said about Senator Warner's business.
My reference meant that it was about 14 years ago, 15 years
ago. And I think it was you, General Alexander, that came in

front of the committee and said: In the future, people won't
file technological patents because technology will change so
quickly that you won't have a year and a half's time to go
through the patent approval process before your technology is
obsolete.

I think we have reached that point of technological
explosion, that what we're talking about today we could have a
hearing six months from now and probably talk about something
different.

Vice Chairman Warner. But I would say that the cell phones
that I was involved with in the early 1980s have become a bit
ubiquitous.

Chairman Burr. Well, we all wish we had flip phones again,
I can tell you that.

[Laughter.]

Senator Rubio.

Senator Rubio. Thank you, Mr. Chairman, and to the Ranking
Member.

Before I get to my question, Mr. Chairman, in the first
panel one of the individuals that appeared before us mentioned
me in connection with efforts in the 2016 presidential primary.
I am not prepared to comment on that and any information on
that issue hopefully will be reflected in our report, if any.

I do think it is appropriate, however, to divulge to the
committee, since a lot of this has taken a partisan tone, not
in the committee but in the broader perspective, the following
facts. In July of 2016, shortly after I announced that I would
seek reelection to the United States Senate, former members of
my presidential campaign team who had access to the internal
information of my presidential campaign were targeted by IP
addresses with an unknown location within Russia. That effort
was unsuccessful.

I'd also inform the committee that within the last 24
hours, at 10:45 a.m. yesterday, a second attempt was made,
again against former members of my presidential campaign team
who had access to our internal information, again targeted from
an IP address from an unknown location in Russia. That effort
was also unsuccessful.

My question to all the panelists: I have heard a lot on the
radio and on television an advertisement for a firm in the
United States actively marketed in Best Buy and other places by
the name of Kaspersky Labs. There have been open source reports
which I can cite that basically say that Kaspersky Labs has a
long history connecting them with the KGB's successor, the
Russian security services. I have a Bloomberg article here and
others.

I would ask the panelists: In your capacity as experts in
information technology, would any of you ever put Kaspersky
Labs on any device that you use, and do you think any of us
here in this room should ever put Kaspersky Labs products on
any of our devices or computers or IT material?

Mr. Mandia. I think the way I'd address that is, generally
people's products are better based on where they're most

located and what attacks they defend against. For example, you think about Symantec or McAfee or my company and other companies. We are prominently used in the U.S., so we get to see the best attacks from China and cyber espionage campaigns in Russia. In the Middle East, it's already in massive escalation mode and we're all prominent there.

I think what we're starting to see is an alignment where Japan will let a U.S. company secure Japan, South Korea will let a U.S. company defend South Korea, the Middle East will let a U.S. company defend it, but you almost see lines being drawn.

There's no doubt the efficacy of Kaspersky's products. They probably get to see different things than we see, being this relevant here.

Senator Rubio. My question was not about whether it's an effective tool. My question about it is whether you would ever put it on your computer.

Mr. Mandia. My answer indirectly would be there would be better software probably available to you than Kaspersky to defend you here.

General Alexander. I'll answer by, no, I wouldn't, and I wouldn't recommend that you do it either. There's better capabilities here that you can use, FireEye, for example, and I'm being credited now with that--no. There are other U.S. firms that answer and solve problems that will face you for the issues that you described earlier, Senator, that I think would be better at blocking them.

Dr. Rid. I would, yes. I would also use a competing product at the same time. Always a bit of redundancy never harms.

But it's important to say that Kaspersky is not an arm of the Russian government if we look at the publicly available evidence. Kaspersky has published information about Russian cyber attack, cyber intrusion campaigns, digital espionage, about several different Russian campaigns. Name any American company that publishes information about American digital espionage?

Senator Rubio. My second question to the panel in the time that I have remaining is: My concern in our debate here is that we're so focused on the hacking and the emails that we've lost--and I think others have used this terminology--we've focused on the trees and have lost sight of the forest.

The hacking is a tactic to gather information, for the broader goal of introducing information into the political environment, into the public discourse, to achieve an aim and a goal. It is the combination of information leaked to the media, which of course is always very interested in salacious things, as is their right in a free society. The public wants to read about that, too, sometimes.

But it's also part of this other effort of misinformation, fake news, and the like. Would you not advise this panel to look simply beyond the emails--that's an important part--to the broader effort in which the emails in the strategic placement of information in the press is one aspect of a much broader campaign?

General Alexander. Senator, that was part of my point about bringing this up to a strategic level and saying that what's Russia trying to accomplish with respect to NATO, the European Union, and the U.S., and driving a wedge between those and creating tensions between those countries and ours.

If you were to go back and look at what's happened to Russia over the last 30 years and then play that forward and see what they're now doing, you can see a logic to their strategy. I think that's something that we now need to address. I do think we ought to address this with the Russians and get the Administration to do that. It's not something that we want to go to war on. It's something that we want to resolve by engagement and confrontation.

Dr. Rid. How are active measures today different from in the Cold War? This is in answer to your question. In the Cold War, active measures were really artisanal--very quiet, craftsmanship, a lot of hard work, forging letters, doing research. It was a real undertaking. Today they're not artisanal; they're outsourced, outsourced in part to the victim, and especially to journalists, American journalists. They add the value to these active measures.

This is important because if we look at the operations in hindsight they appear a lot more sophisticated than they actually were. So we run the risk of overestimating Russian capabilities here.

Chairman Burr. Senator Feinstein.

Senator Feinstein. Thank you very much, Mr. Chairman.

Kevin Mandia, it's good to see you again. I want to know how much your nation report was appreciated. You spoke before this committee and I think everybody very much appreciated it and I think it had some good results. So thank you very much.

General Alexander, this is the first time I've seen you out of uniform. Civilian clothing is becoming. I'd like to personally welcome you.

I don't know our third gentleman, but I want to address this to General Alexander. You were Cyber Command for a number of years. You spoke about the fact that the time has come for us to get tough. We have talked about that before. We have WikiLeaks and stream after stream after stream of release of classified information, which has done substantial harm to this Nation.

Yet we do nothing. And everybody says, well, we'd like to do something, but we don't quite know what it is. I never thought we would be in a situation where a country like Russia would use this kind of active measure in a presidential campaign. The size of this, the enormity of it, is just eclipsing everything else in my mind.

Yet there is no response. As you have left now and you've put the Cyber Command on your desk, what would you do? What would you recommend to this government?

General Alexander. I think there are two broad objectives we ought to do. We ought to fix the defense between the public

and private sector, between government and industry.

Senator Feinstein. You've said that.

General Alexander. We have to fix that, because much of what we're seeing is impacting the commercial--or the private sector. Yet the government can't really see that. So the government's not going to be able to help out and the ability to take actions to actively mitigate it therefore are nonexistent or after the fact.

If you think about Sony as an example and imagine that as the attack coming in, the government couldn't see that at network speed and so the government came in and did incident response. Everything could happen to Sony. What you really want the government to do is just stop a nation-state like North Korea or Russia from attacking us. But the government can't do that if it can't see it.

So we have to put this together. We have to come up with a way of sharing threat intelligence information at network speed and practicing what our government and industry do together and work that with our allies. I believe we can do this and protect civil liberties and privacy. I think we often combine those two, but we can actually separate and show that you can do both.

Senator Feinstein. How?

General Alexander. Well, for first, the information that we're talking about here doesn't involve our personally identifiable information. Think of this as looking at airplane traffic over the country. When you see radars looking at those airplanes that are going by--think of those as pieces of information--they aren't reading everybody in the airplane. They're seeing an airplane and they're passing it on to another controller, who sees a comprehensive picture.

What we see is what radar sees today. So we don't actually--we're not talking about reading threat information. We want to know what's that packet of information doing, why is it coming here, and can I or should I share the fact that a threat is coming to us.

Senator Feinstein. I understand what you're saying. But what I'm asking you for is different. It is your expertise based on this, based on the fact that the Russian government, including two intelligence services, made a major cyber attack on a presidential election in this country, with a view of influencing the outcome.

What would you recommend?

General Alexander. The first step was fix the defense, because if you take offense and you don't have a defense then the second step of going after the power or other sectors puts us at greater risk. So from a National Security Council perspective, what I would expect any administration to do is to look at the consequences of the actions that they take.

So when I said engage and confront, in this regard what I would do, what I would recommend, is first and foremost a quiet engagement with the Russian government about what we know and why we know it, without giving away our secrets, and say,

that's got to stop. We need an engagement here.

If we're going to confront them, it would be: We know you're doing this right now; stop that. We had a channel in the Cold War for doing it. We need a channel to get that and build back the ability to stop things, from my perspective.

I would be against using cyber only as a tool against Russia when we have these vulnerabilities we haven't addressed here in our own country. I think it would be a mistake until we fix that. So that's why I say we have to do both.

I actually--and it was interesting. We were talking beforehand, and Thomas can add to this. One of the things that as you look at this--I don't believe Russia understood the impact their decisions would have in this area. It's far exceeded it. With all the discussion going on in our country today, I am sure that people in Russia are saying: Oops, we overdid this.

Now is the time for us to say: not only did you overdo it, we need to set a framework for how we're going to work in the future, and we need to set that now. That can only be done by engaging them face to face, and I think that's what has to be done.

Senator Feinstein. Thank you. Very helpful.

Thank you, Mr. Chairman.

Chairman Burr. Senator Blunt.

Senator Blunt. Let's start with General Alexander. I asked a question this morning, which was, after all the discussion of the long history of Russian involvement in European elections, of things that have happened for a long time and really in a significant way in the last 15 years, why do you think that we were not better prepared for this?

General Alexander, you just said that we needed to have a defense. Why wouldn't we have had a defense? What was this about this particular thing that had been so anticipated that the intelligence community, the U.S. Government, even the media, appears not to have had the defense you just mentioned we should have now?

General Alexander. Senator, this has been a great discussion that you and the other House of Congress have talked about, and that's how do we put together our country's cyber legislation? Right now we do not have a way for industry and government to work together. So if you think about the DNC or the RNC or the electricity sector and others, when they're being attacked the ability for the government to see and do something on that doesn't exist.

Everybody recognizes that we need to do it. We talk about it. In fact, we had at the Armed Services Committee a discussion on it. But we haven't taken the steps to bind that together. We allow it, but we haven't created it.

I believe that's the most important thing that we could do on that one vector that Senator Feinstein brought up: fix the defense. The reason is the government's not tracking the RNC and the DNC. Now, industry sees it, and Kevin brought out some key points of what was going on and what they were seeing from

an industry perspective. But the reality is we haven't brought
these two great capabilities together.

The other part, it's my personal experience the government
can help on attribution several times greater than what we see
in industry. If you put those two together, we could act a lot
better.

Senator Blunt. Let's go to Mr. Rid. Mr. Rid, should we
have--was there nothing we could have done here? Were we not
paying the level of attention that we should have paid? Or is
it just we just aren't ready because our structure doesn't
allow us to anticipate what we know was happening in elections
all over the world before 2015 and 2016 here? Particularly in
Europe. Maybe ``all over the world'' might be a stretch, but
all over Europe, not a stretch.

Dr. Rid. There's a lot we can do in order to increase
defenses here, as well as to minimize the effect of active
measures that are already taking place. Let me name an example.
Let's make this concrete. You as members of the legislative
body are--and the same is true in Europe--the soft underbelly
of the government of the wider administration and government,
because--this is true for all parliaments--the IT security is
notoriously bad.

The chip card that many of your staff members carry around
their neck, the CAC card, as it's called, here in Congress, if
my information is correct, doesn't actually have the proper
chip. It has a picture of a chip. Try feeling. Try to feel the
chip with your fingernail. There is no chip. It's only to
prevent chip environment if you meet with other parts of the
Executive Branch. That tells you that there's a very serious IT
security problem. It should be mandatory--and potentially this
is something you would think about as we move forward--it
should be mandatory for all campaigns, just like you have to
disclose financial records, it should be mandatory by default
to have two-factor authentication. So not just a password, but
actually a second thing, like a number that is generated by an
app or a specific key.

Senator Blunt. Thank you.

We had somebody this morning say it should be mandatory for
the State Department to have a program to every day say what
was true and what wasn't true. There are certain levels beyond
what you can require people to do that really don't make that
kind of sense.

Mr. Mandia--and I don't mean your comment didn't, but there
are practical levels now. I also say the ``soft underbelly'' is
one of the nicer things the Legislative Branch would be called
these days. But your thoughts on why we didn't see this coming?
The earlier panel had a more robust sense of where we should
have been understanding what was going on than this one.

Mr. Mandia. There's probably a lot of ways to answer that.
I'll answer it this way. When it comes to cyber security, first
off, I don't want to destroy anybody's hopes. When we say fix
the problem, we've known about cancer for 4,000 years; we
haven't cured it yet. The reality is this: when we fix the

problem here, we're still going to have incidents, we're still
going to have something of impact and consequence.

     My experience is this: People get serious about cyber
security when they have two things: either, A, a compliance
driver and they take it seriously; or, B, they have the ``oh,
crap'' moment, quite frankly, and they've been breached.

     We published reports, my company did, in 2014 that had a
lot of the allusions to what just happened. But sometimes you
have to have it happen before you recognize that, wow, that was
really on the table. I doubt it'll happen again, but now we're
having the dialogue to make sure that it doesn't.

     Senator Blunt. Thank you, Chairman.

     Chairman Burr. Senator Wyden.

     Senator Wyden. Thank you, Mr. Chairman. I think it's been a
very good panel.

     I want to talk about one of our most significant
vulnerabilities as it relates to cyber security. I have been
working for some time now with Congressman Ted Lieu of
California, who is a real expert in this field. One of the
things that I'm particularly troubled by is our vulnerabilities
in what's called ``SS7,'' Signaling System 7. This essentially
allows cellular networks to be able to talk to one another. We
seem to have some very significant vulnerabilities that could
allow a foreign actor, Russians and a variety of other
interests hostile to our country, to hack, tap, or track an
American's mobile phone. The hackers could be just about
anybody, but certainly a foreign government, and the victim
could be just about any American.

     I think, Dr. Rid--and I welcome anyone who'd like to talk.
But I think, Dr. Rid, you've done some serious analysis of
these vulnerabilities in SS7 and I would be interested in
hearing, A, how serious you think this is, and, B, what do you
think our government ought to do about it, particularly in
connection to the topic at hand, which is dealing with these
Russian hacks?

     Dr. Rid. Thank you for this very specific question,
although I have to say that I'm not an SS7 expert and I don't
want to pretend to be one here. But the technology that you're
referring to is certainly a weak point and can easily be
exploited, ultimately because it is a trust-based system, a
trust-based protocol. And if you have a landscape of a lot of
mobile phone providers, it's relatively easy to undermine, that
some one entity essentially undermines, can essentially exploit
the trust here.

     There are ways to remedy the problem, but I will just add
one observation, that if--and I think many people in Congress
will be doing this already--if you use an encrypted app for
your communications, then you will most likely defeat some of
that vulnerability there.

     Senator Wyden. I hope that's the case. I think the
Congressman and I have been concerned that that may not be
enough, because largely what has happened thus far is there
have been self-regulatory approaches and that and other

approaches weren't pursued. So we're going to continue this
discussion. As I understood it, you had talked to some of our
folks. You may not think yourself--you may not consider
yourself an expert, but our folks thought you were very
knowledgeable.

Dr. Rid. Well, may I respond?

Senator Wyden. Sure.

Dr. Rid. I think we're looking in multiple ways at market
failures here. So two-factor authentication, which I mentioned,
we're looking at a market failure there because it's still an
opt-in situation. If you have an opt-in situation, most people
will not opt in and hence remain vulnerable.

The market, when we look at active measures--and this is
one of the most fundamental ethical dilemmas here. The market
favors disinformation today, and I can go into specifics on how
we can remedy this if you like.

Senator Wyden. Well, the Congressman and I feel that we
ought to get the FCC, the Federal Communications Commission,
off the dime, too, because it is clear that they have been
slow-walking the various kinds of approaches that could provide
an added measure of security.

Let me ask one other question and any of you three can get
into it. In January the IC assessment, the intelligence
community assessment, said that Russian intelligence accessed
elements of multiple State or local electoral boards. So I
asked the FBI Director then what exactly had been compromised
and what was the nature and the extent of the compromise.

Director Comey responded that the Russians had attacked
State voter registration databases and taken data from those
databases. Can you add anything else to that? Any of you three
are welcome to do it, because that sounds to me like pretty
alarming stuff. The FBI Director in January--and I wish I'd had
more time to get into it with him--essentially said that this
was a problem, and I would be curious whether you knew anything
more about this topic.

We can just go right down.

General Alexander. I don't. I have talked to some of the--
one of the Secretaries of State on just this and the issue that
you brought up, the polling data, the registration data, is
something that's at risk and something that the states are
looking at. So I do think that's important.

Senator Wyden. Great.

Thank you, Mr. Chairman.

Chairman Burr. Senator Cornyn.

Senator Cornyn. Thank you for being here and testifying.

I think maybe we assume that people know more about what
we're talking about than maybe they actually do. So I'd like to
kind of get basic maybe for my benefit and maybe some other
people will learn some things as well. But I think we've
referred to something that's called spear phishing. So I'd like
to have one of you explain what that is.

Let me just tell you, by the way, that occasionally my junk
email box on my personal email, I'll get emails that purport to

be from the FBI Director or the Army Chief of Staff, Mark Milley, my friend from Fort Hood who's now the Army Chief of Staff, or maybe from Apple, telling me that I need to reset my password, or from Google saying I need to execute some sort of maneuver.

Then there's a link for me to click on. Is that what is commonly known as spear phishing, and once you click on that link then they basically could take over your machine?

Mr. Mandia. Yes, you've basically got that right. Looking back at 2015 and 2016, we did nearly 1,000 investigations into computer intrusions, and we have a skewed vantage point because no one hires us to respond to an intrusion when they're five minutes behind the hack. They hire us when the hack and the breach is already at a scale and scope where they need help.

In 91 percent of those breaches, victim zero was in fact spear phishing, meaning that's how the Russian groups, the Chinese cyber espionage campaigns, and every capable hacking threat actor is breaking in. It is in fact a link that purports--it's a link or an attacked document that comes to you. It looks like it's coming from someone that knows you and it's got something relevant attached or the link is to something you consider relevant to what you do for a living.

That's what we were talking about earlier, is that's how we kind of know what the Russians were targeting, is they're doing very specific spear phishes to very specific people. But that is the number one way human trust is being exploited and that's how folks are breaking in.

Senator Cornyn. Would you be surprised if a member of Congress was being targeted by a Russian or a foreign government spear phishing?

Mr. Mandia. I would not be, and I would expect every one of you is targeted on a near-daily basis.

Senator Cornyn. General Alexander, you were going to say something?

General Alexander. Yes, I was going to add to what Kevin said. They're going to do research on you, know who your friends are, so they know you with Mark Milley from Texas, they know key things about you. Perhaps you golf and you have a friend that golfs, and they're going to send you something: Hey, how about this golfing thing? Click here or do this. And that's how they do it.

Spear phishing is targeted on an individual. They do research and understand more about you to go after you as a person.

Senator Cornyn. Well, Dr. Rid, you talked about the poor IT and cyber hygiene in the government space. I think some of this could be as simple as updating your antivirus software, scanning your machine periodically, and the like. But let me just mention the specific hack of the OPM, the Office of Personnel Management. I mentioned it at an earlier panel. 21 million Americans had their personal information stolen in government custody.

So even though they may have considered it private

information, they were forced to give it to the government for security clearance or some other purpose, and now some foreign state actor through a cyber hack has access to 21 million private records, including more than 5 million sets of fingerprints.

Is that the kind of information that cyber actors, either criminals or espionage agents, foreign governments, would use to further collect espionage or to steal or to implant ransomware or something in a machine or in a business and then shake them down for money?

Dr. Rid. Yes, absolutely. The more information, the more confidential information also, you have, the easier it is to craft a spear phishing, a targeted email, a deceptive email, a forged email so to speak. In my written testimony I included a number of samples, a number of exhibits----

Senator Cornyn. I saw that.

Dr. Rid [continuing]. Including John Podesta's.

Senator Cornyn. Thank you. Thank you for doing that.

Well, we don't have control over everybody's private computer or what kind of software they use. But we do have something to say, I think, about what the United States Government does. And I think one of the things we need to be attentive to is to make sure that the United States Government networks are adequately protected.

I know, General Alexander, you had something to do about that at the NSA. But you didn't have the ability to protect all of this other information.

Let me just ask--I just have a couple of seconds and since you're here, General Alexander, we're going to have to take up the reauthorization of the Foreign Intelligence Surveillance Act, particularly Section 702. I just would like to ask you, since we have you here, a little bit about its importance to detecting and countering foreign cyber activity. And if you would also include in your answer the privacy protections that are a very, very important part of that and oversight that you got to see first-hand in your capacity as head of NSA and Cyber Command.

General Alexander. I think that's the most important program that's out there, especially in counterterrorism. I can give you a real quick example. Najibullah Zazi in Denver was detected by that specific authorization. NSA saw that, provided it to the FBI, and Nazibullah Zazi was the individual in 2009 who was driving across the country to New York City when they arrested the individual in New York City based off of the other program and they found several backpacks in various states of readiness to attack the New York City subway--done by that program.

I think that's the most effective counterterrorism program we have, and I think it will be also effective in some areas for cyber security, although I don't have any examples off the top of my head here.

Senator Cornyn. Could you conclude your answer and talk a little about minimization and other privacy protections,

because I think that's important to the American people, to
know that we're very vigilant and diligent in that area as
well?

General Alexander. Yes. It's interesting because we did a
series of presidential review groups on NSA after the Snowden
leaks about these programs. At the time one of the board
members of the ACLU, Geoffrey Stone, was on that panel. I was
kind of skeptical about this individual being on there, and I'm
sure he looked at me somewhat askance.

After five weeks of sitting down with our people and going
through every one of those, he came up to me and he said: Your
people have the greatest integrity of any agencies I've seen.
And I said: Don't tell me; tell the American people; tell
Congress; tell the people of NSA and tell the White House. And
he did.

So there are some key statements by Geoffrey Stone that
show that we can protect civil liberties and privacy. I think
it's important to see some of his statements there, because
what it did is--he also asked me to write an op-ed. So imagine
an Army officer and a board member of the ACLU writing an op-ed
on reauthorizing the metadata program, with some changes. And
we did.

The reason--I asked him: Why are you doing that? And he
said: The reason that I'm doing this is that if we don't have
programs like this and we're attacked, we won't have civil
liberties and privacy, and the mechanisms and the capabilities
you have here to protect it are overseen by Congress, overseen
by the courts, and overseen by the Administration. Everything
has 100 percent review on it. And I think that's the best way
to do it.

You know, he is right. If we do get another attack, they're
going to ask Congress, they're going to ask the Administration,
why we didn't stop those. I think this is exactly why we have
to move down. I do think we have to be more transparent. I
think as we bring cyber security in here, having a discussion
like this open hearing about how we can protect these is
absolutely critical for our country.

I have some statements, but I think your folks can pull
those off the web, from Geoffrey Stone, with a ``G''. Thank
you.

Chairman Burr. Senator Heinrich.

Senator Heinrich. Let me start by saying that I guess I can
take some comfort now knowing that Senator Rubio and Senator
Cornyn and quite a few of us have had these sort of
sophisticated targeting examples where you end up having to
make sure that everything's in place, that your devices were
not penetrated. I've certainly had staff targeted. I've had
family members who have received these very sophisticated spear
phishing and other kinds of approaches. Sometimes you know
where the IP address is coming from because your provider
literally tells you: Oh, by the way, if you didn't try to reset
your account from Russia yesterday at 3:22 p.m., let us know.

And having been through that a few times, one of the things

that I've certainly shared with my colleagues--and you
mentioned this, Dr. Rid, is the importance of two-step
authentication. I think it just can't be oversold to the
public. Do you want to say just a couple more words about that
and why that's so important?

Dr. Rid. Had John Podesta had two-factor authentication the
last month of the campaign, the last month of the campaign
would have looked very different. I think that says it all.

Senator Heinrich. That says it all. Yes, I could not agree
more.

Given what we saw in 2016 and how easy it is to sometimes
drive these wedges within our own society, what should we be
expecting in 2018 and how should we be preparing for that?
That's open-ended for any of the three of you if you want to
share your thoughts.

Mr. Mandia. It took about 18 years for me even to figure
out as I responded to breaches they reflected geopolitical
conditions, but they actually do. What I think we're going to
observe in 2017 and 2018, the attacks will always exploit human
trust. There will be clever ways to do it. There are ways to
get around two-factor authentication, which we've seen Russians
use as well as the Chinese government use.

I think it's going to be more what's fair game to
espionage. I think that governments are going to start working
on defining what are the industries that are fair game, what
are the activities that are fair game and what aren't, because,
quite frankly, every nation can get sucker-punched in cyber
space, because we're exploiting human trust.

Senator Heinrich. How do you send those signals about what
is over the line and what the consequences of crossing that
line might be?

Mr. Mandia. Well, that's why we have diplomats. I think
we're going to have doctrine. We're going to have things that
we publish. We're going to have to let people know what we
think are the right activities and are the wrong activities.
The private sector will participate. Governments will
participate. We'll get alignment with some nations and
misalignment with others, and we'll adapt to that.

General Alexander. Could I add to that?

Senator Heinrich. Go ahead, General.

General Alexander. I believe that one of the things that
you could do and encourage is with the states setting up an
exercise program between the State governments and the Federal
Government about how you're actually going to improve the
security of that and what they need to do, set the standards.

So I'd go beyond the National Institute of Standards and
Technology. How do we know we're protecting voter registration
databases, and what are the standards that we're holding them
to and who's watching that, and setting the controls in place.
I think that the states would greatly appreciate, so what are
you going to do when we're being pummeled by a persistent? Now
the government, the Federal Government, needs to step in.
That's part of Senator Feinstein's question: How do you? Well,

we haven't practiced that. We should practice that.

Senator Heinrich. Dr. Rid.

Dr. Rid. A very concrete suggestion that I think would actually make a difference. How many of the social media interactions, especially Twitter interactions, during the campaign of the most important Twitter accounts were created by bots?

Senator Heinrich. Yes.

Dr. Rid. Were created by automated scripts and not humans? The answer to that question--we don't know the answer to that question because Twitter and other social media networks have not provided the data. You could write a letter to these companies and ask them to provide the heuristics, to provide the data: How much of a problem is our bots?

Senator Heinrich. That actually, that's very much in line with my next question that I was going to direct to you, which is: In addition to looking at the data, are there things that we should be doing working in concert with those social media companies to dampen the effectiveness of this feedback loop in the media cycle that is being exploited?

Dr. Rid. Absolutely. You could, for instance, ask social media companies to provide detailed data, including a methodology of how they arrived at those data. It's very difficult for outsiders to get to the answer to these questions: How much of a problem are bots? I think it is a very significant problem.

When you sign up for a new Twitter account today, you can say--you know, the new accounts all have an egg face. You can say: I don't want any eggs, people who never change their account picture. No eggs is a good thing. You can say, I don't want eggs, but you can't say, I don't want bots. Bots are more of a problem than eggs, I believe.

So we should be in a position to, by default, move into an environment where we switch out abuse and bots out of our vision, if you like, as users.

Senator Heinrich. Very helpful. Thank you all very much.

Chairman Burr. Senator Collins.

Senator Collins. Thank you, Mr. Chairman.

General Alexander, first of all, it's nice to see you once again. Section 501 of the fiscal year 2017 intelligence authorization bill, which, regrettably, has not yet become law, requires the President to establish an interagency committee to counter active measures by Russia, including efforts to influence people and governments through covert and overt broadcasting.

The purpose of this committee would be to expose falsehoods, agents of influence, corruption, human rights abuses carried out by the Russian Federation or its proxies. Like the U.S. Information Agency, there once was an Active Measures Working Group that worked to counter covert disinformation from the Soviet Union, and that was disbanded.

Is this a recommendation, as we search for ways to counter the Russian attempts to spread propaganda, outright lies,

influence our people--is this a recommendation that you believe should be implemented?

General Alexander. I do. I think I would look at giving the Administration a suite of capabilities from diplomatic through cyber to what you just said, active measures, what we can do to expose that. I think we also need to give them the freedom to determine what's shared and what's not shared in terms of protecting the Nation in that regard, sharing it all with Congress of course, but how you publicize that if you know something is going on and you've got it through other means.

I think those things you'd want the Administration to at least be reasonable about, but I do think these are the kinds of things that should be put on the table. I would have to go back and look at all the tools that you're going to give them and say, does that meet the objectives of engaging Russia and confronting them when they cross the line on something? I think in this case this is something that would give them a tool, if they've crossed that line, to say, stop, here's what we know and here's the consequences.

Senator Collins. Because one of the aspects of this investigation that I found troubling that we've already learned is how weak our response is when we have a disinformation campaign. It seems to me that this working group could be useful. I realize it's a delicate issue in some ways because you don't want to sweep up legitimate--you don't want to be trying to set the rules for journalists, for example.

But that brings me to another issue for Professor Rid. That is, in your testimony you talked about how Russian disinformation specialized the act--the specialists, I'm sorry, perfected the act of exploiting the unwitting agent. I assume by that you mean that individuals or entities who don't know or realize that they are being used by the Russians, but nevertheless are.

In your testimony you use examples of Twitter and journalists who cover political leaks without describing the origins of those leaks as examples of unwitting agents that were involved in the Russian influence campaign in 2016. You also list WikiLeaks. I would put WikiLeaks in a different category personally.

But what can we do about the unwitting agent? I mean the truly unwitting agent.

Dr. Rid. Yes, I agree, in the case of WikiLeaks it's unclear whether they are unwitting indeed or just witting, so to speak.

Senator Collins. Right.

Dr. Rid. But I think we are trained, the Western mind, if you like, is trained to think in contradictions. It's either this or that. But here I think we're looking at a situation-- and this has been a pattern throughout the Cold War--where active measures operators recognize that unwitting agents--this could be journalists, politicians even; members of Parliament in the past have been the case--just because they're genuinely so passionate and engaged and activist in their outlook further

the Russian cause.

So we have to recognize that this will continue to be a problem. We cannot simply get rid of that problem. It is something--for instance, we have documents from the Cold War time where disinformation active measures operators say they actually want conflict between the unwitting agent and the actual adversary, say WikiLeaks and the U.S. Government, conflict is good. So that's how far you can take. If the goal is driving wedges, then the unwitting agent is a trump card in your sleeve.

Senator Collins. Thank you, Mr. Chairman.

Chairman Burr. Senator King.

Senator King. Following up on that, it seems to me that the unwitting agent is a key part of this entire process, particularly where you're talking about disinformation. I think you make the point in your prepared statement that anonymity, anonymous leaks, there should be more work on where did it come from. Is that correct?

Dr. Rid. Yes, absolutely. WikiLeaks was purpose-built to hide the source. That is the goal of the entire platform. Of course, I think--and I do take Julian Assange seriously when initially at least, historically, he was just an activist.

Senator King. He was a clearinghouse, but now he's a selective leaker.

Dr. Rid. That seems to be the case, yes.

Senator King. General Alexander, we've been talking about this for at least four years. One of the problems--and you talked about this with Senator Collins--this country has no strategy or doctrine around cyber attacks; isn't that correct? And isn't that part of the problem? We need to have a doctrine and our adversaries need to know what it is.

General Alexander. Absolutely, Senator, and I would add rules of engagement. We don't have--the consequence is if there were a massive attack we'd have to go back and get authority to act, where if it were missiles coming in we already have rules of engagement. So I think we need to step that up as well.

Senator King. Ironically, part of that is transparency, because if we have a capability that would act as a deterrent but our adversaries don't know we have it, it doesn't act as a deterrent. Is that correct?

General Alexander. That's correct. In fact, if I could, just to add something, because Thomas brought out another issue. I think it would be good also for the American people to release perhaps collectively the number of vulnerabilities our government has pushed out to industry, that has been identified by government, because often that's opaque. So what you wouldn't see is how much of that is actually being pushed to industry and how that's cleared. But you could get a collective summary from the departments and agencies that have pushed those out and see what's being shared. I think that's a good thing and it's a good way to start that dialogue.

Senator King. That's a positive development, but I still believe that we need to develop a deterrence 2.0 to deal with

the nature of the threats. And it doesn't have to be cyber for cyber. It could be sanctions or other. But there needs to be a certain response, a defined response and a timely response. Otherwise it's not going to have the deterrent effect.

General Alexander. That's right, and we have to get the roles and responsibilities of the different agencies. Who's actually going to conduct that response? I think that has to be set straight and clear. We discussed that in the other hearing, but I think that's something that also means that if we had to react we wouldn't have the right people set up to react.

Senator King. Mr. Mandia, one of the things--and I think this has been touched upon in the hearing--is the question of the vulnerability of our State election systems. We know that the Russians were poking around, if you will, in our State election systems. I learned recently that more than 30 states now allow internet voting and 5 have gone completely paperless. Doesn't this create a significant vulnerability?

Mr. Mandia. It also creates an opportunity to do things even better. At the end of the day, when we look at--I go right to Estonia and what they do in their election process. I'm not totally intimate with it, but they have an identity management that's far better than our State, for our Nation.

When you have anonymity, it's really, really hard to secure the internet. Obviously, we're going to always have attacks on these areas. But what we're seeing is every election year--and I've responded to breaches every election year since 2004--both sides get targeted, things happen. We are still going up and to the right. I'm confident a modern nation--and probably others could speak better to this--would reserve the tool of tweaking electoral votes or ballots to the last resort. I've never seen evidence of that and I think we'll always have a natural risk profile to show great diligence in how we secure the election process and go forward.

Senator King. My understanding of the intelligence is that it doesn't appear that they changed votes or vote tallies in this election.

Mr. Mandia. No.

Senator King. But they weren't going into those State election systems just for recreation. There was some purpose. I think one question, which I think any of you could answer, but you can answer: 2016 wasn't a one-off. This is a continuing ongoing and certainly future threat, is it not?

Mr. Mandia. I think so. I think right now when you look at intelligence, it's been totally redefined by the internet. People are searching YouTube every day to see what operations are going on by ISIS. So the intelligence collection that we have today has never existed in the past. It's just that during this election we saw Russia break rules of engagement they had traditionally followed in that they added collections with computer intrusion, stealing documents and leaking them. But yes, I think this is a tool everybody's going to use.

Senator King. Dr. Rid, do you want to respond?

Dr. Rid. The great active measures campaign of 2016 will be

studied in intelligence schools for decades to come, not just in Russia, of course, but in other countries as well.

Senator King. So not only will it be studied; it will be attempts made to replicate it.

Dr. Rid. That we can only assume, but it will certainly be studied.

Senator King. Thank you.

Thank you, Mr. Chairman.

Chairman Burr. Senator Lankford.

Senator Lankford. Thank you, Mr. Chairman.

Let me ask you a question, Mr. Mandia. Your company has gone through an extensive amount of background to be able to look at the DNC hack and the exfiltration of their data. I want to repeat again what you have said orally and what is in your statement. Any other details that you can give us. You felt that this was Russian intelligence. You have answered that yes. But much of what you have put in your written statement seems to be a circumstantial look at it, that you were basically eliminating other things.

So let me ask you a question. Is this a process of elimination much like a doctor doing a diagnosis, saying it's not this, this, this, and it must be this? Or do you think there's something that zeroes in and says, no, that's really it and here's the evidence that links it?

Mr. Mandia. I think that the intelligence available to the private sector is different for attribution than it is in the government. We can only take it so far. We're not going to fly people into Moscow and troll the streets trying to find a building. We have to do it by process of elimination. We have to do it by just deduction. But at the same timeframe, we hope the level of exactitude needed will come from the intelligence communities.

But we've done this with China. China, we just got lucky. Their operational security broke down so we could get an exact building and some people. Russia's operational security on the internet is better than that.

Senator Lankford. So let me ask: There has been conversation about Guccifer 2 being linked to the Russian government. Do you have any evidence of that or anything that would lead you to conclude that is true or lead you to at least disagree with the intelligence community on that?

Mr. Mandia. I think it would be hard to think of any other--here's what we do know. I would attribute the Russian government to the breaches. We cannot connect all the dots from the breach, at least with the observables available to my company and our investigators. We can't go from breach and leaked data to suddenly Guccifer 2.0. We just don't have the means to do that.

Senator Lankford. But you think they're consistent?

Mr. Mandia. I think it's remarkably consistent. APT28 intrusions are occurring and it's APT28 stolen data that's being leaked by DCLeaks, Guccifer, Anonymous Poland, and a bunch of other what we call fake personas or false personas.

Senator Lankford. Great, fair enough. So how confident are you that there's not any false flag operations that are involved in this?

Mr. Mandia. We've observed this since 2007. I'm confident that APT28, the hacking group, is in fact sponsored by the government, the Russian government.

Senator Lankford. Fair enough. So let me ask you a question and it's the ongoing dialogue that we have here all the time. How do you define any difference in what's thrown around commonly as ``We've had a cyber attack'' or, as has been used in this conversation, ``They've crossed the line''? We continue to talk about things like cyber doctrine, giving clear boundaries. We don't have any of those things. This has been an ongoing conversation for a while about who would set them, how they would be set. But at some point we have to have a clearer, a clear statement of what is crossing the line.

Earlier you made a statement it would depend on the State, it would depend on the situation and such. Can you give me an example--obviously, this is an example.

Mr. Mandia. Right.

Senator Lankford. So other than this one, but give me an example of what it means to have a cyber attack that we can communicate to the American people, this is not just a nuisance hacker stealing information, this is an attack from a foreign government on our sovereignty?

Mr. Mandia. First off, I go back to somebody made a comment once: It's hard to define pornography, but we know it when we see it. The reality is it's hard to delineate the cyber attack. I'll give you an example, though. I received a phone call once from one of our intrusion responders saying: We think North Korea hacked Sony Pictures. We went on site, we did the work, and we were as shocked as everyone that we even attributed it at, via our means, to most likely North Korea.

Then you start wondering, what levers do we have on North Korea to change their behaviors? That's why I think, A, attribution's critical. Got to know who did it. But I think the response will probably depend on our relations with those nations and their cooperation.

Senator Lankford. Talking to the difficulty of identifying who did it, as far as linking places when you get a chance to bounce and to be able to hide it different ways, is that becoming more difficult or easier based on the tools that we have or based on the tools that they have to be able to hide their location?

Mr. Mandia. In the private sector, it's becoming more difficult for us to do attribution categorically. We used to have--we respond to hundreds of intrusions a year. By the end of 2010, six years of doing this, we only had 40 buckets of evidence. Every time we responded to a breach to figure out what happened and what to do about it, the trace evidence of what happened, cleanly into 40 buckets. Now we're into the thousands.

The TTPs and the malware's change, the infrastructure's

changing. I would say actors are getting smarter about remaining anonymous in their attacks.

Senator Lankford. Mr. Rid, quickly I want to be able to ask you a question because you were alluding to this earlier. A matter of an attack is not just a matter of going and deleting files or creating chaos. It could be manipulating an existing file where you lose trust for it or adding a file that was never there, and suddenly there's something appearing on your computer that you never put there, someone else added to you.

So the threats of the attack that is out there, what could that look like?

Dr. Rid. We have concrete examples. A recent one is a critic of President Putin in London was hacked and allegedly-- and I think the evidence is quite good--illegal child abuse imagery was uploaded to his computer as an active measure to undermine his--to make him into a criminal in the U.K.

Senator Lankford. So they added child pornography onto his computer?

Dr. Rid. You can just download something, as in the case of the DNC hack, where they uploaded something.

Senator Lankford. Thank you.

Chairman Burr. Senator Manchin.

Senator Manchin. Thank you, Mr. Chairman.

Thank you all for your testimony today and helping us as much as you possibly can. We appreciate that. Let me ask this question. Could Russia have made a difference in the outcome if they wanted to? Did they get to the level that they could have gone further, but stopped and we fell into the trap?

Mr. Mandia.

Mr. Mandia. In regards to the computers----

Senator Manchin. Basically, I'm understanding they were more aggressive than they've ever been and they got more involved than they ever got. Could they have done more and just stopped and we fell into the trap?

Mr. Mandia. I don't know if we fell into the trap. I don't know what you mean by that.

Senator Manchin. The trap is basically what we're doing right now.

Mr. Mandia. Could be. I can tell you this: I believe we probably know 90 percent of their cyber capability, maybe even only 80. They probably reserve their upper echelon for maybe----

Senator Manchin. Could they have basically changed the outcome of the election?

Mr. Mandia. I have no idea. I don't know.

Chairman Burr. You don't know if they're capable of doing that?

Mr. Mandia. I think--when I think of changing the outcome of an election, I'm an engineer; I think ones and zeroes kind of. I would say, could they have altered the votes? I think we would have seen that. I think we'll see the shot across the bow on some of the most severe attacks, things where we have lots of observation. I think we'd catch the shot across the bow.

Senator Manchin. Let me ask this question for anybody who wants to answer. How intense has their involvement been in other countries that we know in the past? Is it to the level they've gotten to with the United States in this past 2016 election? Are they that involved in France, Belgium, Germany?

Dr. Rid.

Dr. Rid. It depends on how far you want to go back in history. The Stasi, we know that for a fact, affected the outcome of one vote of no confidence in the Bundestag, which kept Chancellor Brandt in power. So we have many, many historical precedents of elections.

Senator Manchin. How about in France going right now?

Dr. Rid. Right now. We currently do not have a single example in Europe to my knowledge where a hack and a leak were combined in the way it would happen in the United States.

Senator Manchin. But their involvement in the election has shown a desire to get people that are more friendly toward the Russians?

Dr. Rid. Yes. I mean, I'm not saying there's nothing going on. In fact, there are active measures under way. But they are of a different kind, it seems at this stage at least, than what we saw in 2016 here. They're more old-school, more forgeries, like the Lisa case that Senator Rubio mentioned earlier.

Senator Manchin. From the technology end of it, from the cyber end of it, do we have the ability to stop? And you're saying, what can we use? Is there going to be cyber warfare back to them? Is there something that we can do to a Russia that would stop this behavior or they would be concerned about we could intervene or interfere with their system?

Mr. Mandia. I think General Alexander should comment on that, but I can tell you, at least on defense in the private sector, probably the best analogy I can give you is a hockey analogy. It's like going up against Gretzky on a penalty shot when the Russian government targets your organization. They have a good chance of putting the puck in the net.

General Alexander. There's a couple of things, Senator, that I think we need to do. We talked about fix the defense. I think what we're doing right now with this committee and others is we have highlighted that we know they did this. They know that we know, and now the issue is they've been put on notice and now it's over to our government on the path forward.

We have an opportunity to engage and confront them on different issues. I think that in and of itself was something that perhaps they miscalculated. Now what we need to do is fix the defense and see what other actions we should take to defend our infrastructure, including the electoral infrastructure.

Senator Manchin. General, when Putin puts his statement out that he put out today claiming no responsibility, no knowledge whatsoever, and we know and the whole world should know--we've made it official. He seems to have a very high rating in Russia, so I don't think they're going to believe us. Do we have the ability to show from a technical aspect what was done?

General Alexander. I think one of the benefits of his

actual active campaign is it's had a great impact on his
popularity in Russia. He's taken us on in these areas. I think
saying ``It wasn't us'' is something that he would say ad
infinitum. We saw this across the board, Thomas brought out,
all the way back from Moonlight Maze and before Russian
involvement, and they said it wasn't them. We knew it was.

    Senator Manchin. Do any one of you three have what you
would recommend as the greatest retaliation for Russia for this
type of activity? Let's start right down the line if you will,
Dr. Rid. What would you recommend? How would we retaliate,
basically, to make sure that we harm them or hurt them to the
point they will not continue this type of behavior?

    Dr. Rid. That's a tough question.

    Senator Manchin. Militarily? Electronically?

    Dr. Rid. Certainly not militarily as there would be an
escalation that is entirely inappropriate.

    Senator Manchin. Economically?

    Dr. Rid. In I believe it was the DHS publication at the end
of December, 29th, the then-Obama government pointed out, the
Administration pointed out, RT as a major outlet of Russian
active measures. At this stage RT has a license in the United
States.

    General Alexander. I think we should step back, Senator,
and say what is our objective with Russia? This was a single
event. I think we should have--this is where the Administration
from Secretary of State, Secretary of Defense, and others
should get together--and we should give them the opportunity
and time to do this--and say, what's our strategy going to be
with Russia, which includes what you're asking? Because I don't
think we want to do it tit for tat on these things and just
retaliate.

    What we really want to do is, how do we get an engagement
with Russia that puts us and the world in a better place? I
think it's part engagement and saying, here's what we want to
do, we know this, and we've got to figure out how to stop, and
here's what's going to happen if we don't, and put those on the
table. But I think that needs to be done more in private than
in public if we're going to have a chance of success.

    You know, it's in our interests to address these problems
now, when you look at what's going on in the Middle East,
what's going on in Eastern Europe, and all the other problems
we have. We've got to solve some of these by allowing the
Administration to engage in that area. So I would push it over
to the Administration. They have good people in this area.

    Senator Manchin. My time--go ahead.

    Mr. Mandia. Yes, sir. A lot of comments here. I've got a
very simple--there's a carrot or a stick. There's either money
or the 82nd Airborne. I'd agree with everything the General
said--not time for that.

    I would caution the response if it's just in cyber space,
the asymmetry. If all our tools work against them and all their
tools worked against us in cyber space, Russia wins. So I don't
think--there's too much asymmetry in cyber, based on our

economy relying on it, our communications relying on it, our
free press even. They can do an invasion on the privacy of
everybody in this room. We can't really reciprocate that, hack
Putin's email and post it and get the same results.

So I would just advise cyber-on-cyber just feels like we're
in the glass house throwing rocks at a mud hut. We're not going
to pan out very well there.

Senator Manchin. Thank you.

Chairman Burr. Senator Harris.

Senator Harris. Mr. Mandia, one main reason that we're
doing this public hearing is so that the American public can
actually understand what happened. So if we can just take a
step back, because this is a fairly complex issue, and
particularly when we start talking about bots and all these
other things. Some people wonder, is it just a short form for a
robot?

Let me ask you--Americans, I think many whom I've spoken
with can't help but feel that they have been played if they
made their decision in this election based on fake news. How
can they know that they are receiving fake news? How can they
detect it so that they can ultimately make decisions like who
will be their President based on accurate information?

Mr. Mandia. That goes beyond my expertise as a cyber
security individual. I can just say as a lay person everybody's
got to take everything they hear and vet it against multiple
sources. But I simply don't have the right tools to be an
expert on how do you determine fake from non-fake news.

Senator Harris. Do any of you feel experienced enough to
answer that question?

Dr. Rid. It's a simple answer. If it's in The New York
Times or the Washington Post, it's not fake news. I mean, we
have to believe in the center, so to speak. If we don't, if we
can't trust the mainstream media any more, then we've lost.

General Alexander. Could I add to that?

Senator Harris. Yes, please.

General Alexander. I think part of it is we at times
sensationalize and inflame, not inform. How do we get a more
informed set of reports out to the American people on some of
these issues? That's something I don't have an answer to, but
that's part of the problem. We've got to figure out how to
address that as we go into this next age of having all the
information available at an instant.

We saw the attack on the White House, the theoretical
attack about a year ago. It turned out to be fake news. I think
we've got to take another few steps on that. That's where the
news agencies, social media, and governments have to work
together to help get the facts out there. Just the facts,
ma'am.

Senator Harris. So tell me--I'm going to direct it--I'll
start with Mr. Mandia, but whoever can answer this question if
you feel you have an answer. How can we tell if Fox manipulated
a Google search to elevate the placement of fake news in the
2016 elections, and what partnerships might we take with Google

or any other search engine to avoid that happening in the future?

Mr. Mandia. I think that's a great question. I think Google probably has the answer. Here's the reality even that's going to be difficult for them. There's a lot of ways. What you're describing is what we used to call astroturfing. It's the way to manipulate public opinion just based on the number of hits and influences behind that. It depends on the platform. It's actually a complex challenge for us to pierce anonymity behind, is that a bot or a human, because bots keep getting smarter, replicating us.

General Alexander. I would just add, I think Google has some great folks in this area, and that may be something that you get the folks at Google, Facebook, Twitter together along with some of the other social media and ask them that question: How can we jointly solve some of these issues? I think it's a great question and one that they would take on.

Dr. Rid. Social media companies are--the market assesses social media companies on the basis of active users, the active user base. Now, if a certain amount of the active users are simply bots. There's a commercial interest in not revealing the fact that a tenth, a third of your user base actually is machines.

Senator Harris. Thank you.

General Alexander, as a former General--I asked this question of the earlier panel. We invest in our military and our soldiers as part of our defense system and rightly. But Russia seems to be investing a great amount in its cyber security as a tool of warfare. What would you recommend we do in terms of the United States Government to meet those challenges in terms of how we're investing in infrastructure to be able to combat, both on the point of deterrence, but also resilience; after we do detect, when and if we do detect that we've been hacked, how we can step back up and pick back up as quickly as possible; and then obviously what we need to do in terms of any sort of retaliation?

General Alexander. I think there are several key points that we have to do. One is we have to fix the relationship between industry and the government for sharing information so that they can be protected. We have to set up the rules of engagement and the rules of what each of the departments are going to do and they have to understand and agree to those. We have to rehearse that within the government and between government and industry.

Senator Harris. I only have a few seconds left, so I'd like you to direct your response--and I appreciate the points you made earlier on this, on this point. But we have a budget coming up. What would you advocate in terms of the budget that is going to be before us to vote on? It's called a skinny budget. There's a whole lot of discussion about where the limited resources and dollars are going to go. On this point, what would you advise us in terms of how we distribute those limited resources to meet these challenges, the challenges in

terms of the Russian government and the finding by the FBI, NSA, and CIA that they hacked our systems?

General Alexander. I think we definitely need to continue and increase the investment in what we have in our cyber capabilities, the forces and the infrastructure and the tools that we create. That's needed. I think we also have to look at--and one of the members over here brought out--government. Our IT in government is broke. We need to fix it, and we need to look at how we secure it. OPM was a great example that they used. I think that's something this Administration is already looking at, but we need to help them get there and figure out the best way to do that.

When you think about it, they don't have the IT resources or the cyber security professionals to actually defend them. The solution has got to look at what we do with the commercial sector and how we add that to government. I think those are the key things.

Senator Harris. I appreciate that. Thank you.

Chairman Burr. Do any other members seek additional questions?

Vice Chair.

Vice Chairman Warner. I would just like to ask one quick one. I think this line of questioning we've heard about how we can react, very briefly because the Chairman hasn't asked his questions yet. But I do wonder. We saw the example that somebody did hack into former Prime Minister Medvedev's files, which showed lots and lots of luxury properties all over the world. In many ways that seemed to result in a series of protests across Russia, where unfortunately protesters were arrested.

But comment on that? Very briefly, since the Chairman hasn't had his questions.

Dr. Rid. I'm not sure I understand the question properly. Are you implying that----

Vice Chairman Warner. I'm inquiring whether the--I agree with Kevin on the notion of simply tit-for-tat actions in cyber because we're more technologically dependent. But there are activities kind of around active measures where Prime Minister, former President and now Prime Minister, Medvedev in Russia-- maybe I'm mispronouncing the name--suddenly all his extensive property holdings became public, which caused great consternation in Russia and a series of protests.

Dr. Rid. We know from publicly available information that President Putin, Vladimir Putin, believes the Panama Papers leak, which broke on the 3rd of April in 2016, so right in the middle of the ramped-up targeting--targeting on their side ramped up before Panama Papers broke as a story, but we have to assume they knew about Panama Papers, that it was coming.

Putin seems to believe Panama Papers was an American active measure against him. I don't think this was the case, but that puts the entire operation into a slightly different light and it's important to consider that.

Chairman Burr. Thank you, Vice Chairman.

Listen, we really are grateful to all three of you for making yourselves available. Keith, you're a guy that the committee has looked up to, not just because of the stars on your shoulder, but it's the knowledge in your head and how you have had a way for years to convey to the committee in a way that we could understand what the threat was, what our capabilities needed to be, the actions that we needed to take, why we needed to take them, and the objective of the effort.

I think what concerns me is that this thing's speeding so fast now, it's like you pulled the string on the top when we were kids, and over time the top slowed down, and it looks like now the top starts spinning faster and faster and faster once you've pulled the string.

So I want you to understand that we're probably going to invite you back in an informal setting, probably not a public setting, where some of the things we got into today we couldn't dig much deeper. And thank you for showing the constraint of doing that. For that reason, I'm not going to include you in my other two questions, because it might put you on the spot.

I'm going to turn first to Dr. Rid. Do we have any idea how Russia transmitted emails to WikiLeaks? And if that's the process that everybody assumes happened, then how could WikiLeaks be, as you referred to, unwitting?

Dr. Rid. That's a good question. Guccifer 2.0, the front that was created, tweeted that they gave emails to WikiLeaks. WikiLeaks tweeted that they received something from Guccifer 2.0 before this was attributed to Russia. So that's the only evidence that we have publicly and I think it's quite strong, or it's certainly notable.

Is WikiLeaks an unwitting agent? In truth, we can't answer the question because they haven't spoken on it. But we also can't just assume that they're not an unwitting agent. But ultimately it doesn't matter, because they are a very effective unwitting agent.

Chairman Burr. Kevin, do the forensics that you're able to have done suggest that WikiLeaks continues to hold additional emails that have not been released?

Mr. Mandia. I can't answer that. I can tell you from all my experience what we've seen publicly released is probably under one percent of what we've attributed to the Russian government stealing.

Chairman Burr. We're trying as a committee to come up to speed on not just terminology, but what that terminology means. So I'd like to give you an opportunity to walk us through how you identify an actor like APT28?

Mr. Mandia. Yes, and here comes the details. First, for the first time ever we started getting better software in place beforehand so we'd see keystroke by keystroke what they're doing. I think most Senators do not do command line execution, but there's different commands you can type, there's different letters that you type in different orders. You start getting to know the attackers when you get that command-level access to them.

Then it's the malware they've created, the IP addresses they use, the infrastructure they use to attack, the people that they actually target, the encryption algorithms they use, the pass phrases they use when they encrypt things, and the list goes on and on.

We tracked at one point--we created a scheme in about 2006 on how do you categorize the intelligence or the evidence, the forensics, from an intrusion investigation, and we had over 650 categories. I can't go into all of them today, but trust me, you observe a group for ten years or more; after a while, we got the bucket right. APT28 to us is a bucket. Every time we respond to them, there's enough criteria together that APT28 is our APT28, APT29 is our APT29, APT1 was PLA Unit 61398.

The link is we couldn't take 28 and 29 and say GRU or FSB. It just isn't available to us in the trace evidence when we respond to intrusions. But it's time-stamps, compilations.

I'll give you one last example because this is understandable. When you look at the malware that's been used in these attacks and their compile times, 98 percent or higher of it is compiled during business hours in Moscow or St. Petersburg. That's a pretty good clue. And whoever's doing it speaks Russian.

Chairman Burr. If you'd rather not answer this or don't know the answer, punt it and I'll forget it. Had the DNC decided to provide their system for FBI to do forensics on, would we have gotten more information?

Mr. Mandia. I don't know. I can tell you--I can't speak specifically to that one, but over the last five to six years we respond to a lot of breaches now where the FBI is there, and they are there. And they're not the ones traditionally doing forensics. They are relying on a lot of the private sector forensicators. That's a made-up word. But we're doing our forensics. We're producing it. And the customers are choosing, our clients are choosing, to share that with the FBI.

I think the group that responded to the DNC is highly technical, highly capable. They got it right.

Chairman Burr. It was a diplomatic way of asking, do we have different capabilities than the private sector. And you said----

Mr. Mandia. Yes. We've had tremendous help. When we respond and the FBI is in the room, it's fantastic help. Maybe they're cleansing intel from another agency or not. But there's been numerous cases where we're showing up and we know maybe three things to look for, and the FBI says: here's another 80; go look for those as well. So we are--and I've been doing this 20 years. It's more likely than not when we respond to intrusion the FBI is actually there and responding with us.

Chairman Burr. I sort of leave this hearing not having heard a word that I think we're going to use frequently based upon what's going on, and that's ``dox.'' My understanding of the term ``dox'' is it's the 21st century term for ``steal and leak.'' Am I going to hear ``dox'' a lot in the future?

Mr. Mandia. It's an irritating word to hear, isn't it? But

at the end of the day, yes, you'll probably hear it. That's the technique that, it looks like a state actor is using it. I can tell you the first time we saw North Korea delete things in the United States, that felt like it crossed a red line. Doxing appears to be the thing that crossed the line with the Russian activities.

Chairman Burr. Thomas.

Dr. Rid. One sentence on what Kevin just said about the FBI there. Usually in an investigation of the kind he was describing, you would make a so-called image of the computer hard disk, and if the FBI has these images, which I understand they may have, then you don't actually have to physically be there. It's as good as being there physically.

But on the doxing observation, yes. Just to make another observation that may be personal for many of you here in this room, but the ethics rules in Congress may actually make members of Congress and in the Senate more vulnerable, because it forces you to use different devices, sometimes as many as three devices, I understand, to make different calls and different communications.

So even if the main work device is actually secured properly, then it would push you down into a more vulnerable area. That is a problem that possibly can also be fixed.

Chairman Burr. One last general statement, and I heed the advice you gave, General, and you backed up, Thomas, and I think, Kevin, you supported as well. Our response has to be well thought through, and it's not just what we do in reaction to, it's what we do as we set the course for some better defensive mechanism in the future.

But you can't neglect the fact that Russia over a period of time has done things outside of cyber--invasion of Ukraine, Moldova, presence in Syria, presence in Egypt. It continues on. We might look at this today in the rear view mirror and say: Boy, they miscalculated. The only way they miscalculated is to have taken our neglect of reaction to what they did as an opportunity to push a little harder on the accelerator.

Not being critical, but we've done nothing to Russia when they've made aggressive moves. And now all of a sudden this happened at home. It happened with elections. When you look at it from a standpoint of impact, I think the Ukrainian people would tell me what happened to them is much worse, and if it happened in the United States we would think that's much worse.

But the fact is that this is going to require a global response, because the globe is just as exposed as the United States. It was our election system in 2016. It is the French, the Germans--I won't get into the long list of them. But we're within 30 days of what is a primary election in France. It could be that the Russians have now done enough to make sure that a candidate that went to Russia recently and a socialist make the runoff and they end up with a pro-Russian government in France. They've won. That was their intent, I feel certain.

We're not sure what the effects are going to be in Germany, but we've actually seen them build up a party in Germany, not

tear down but build up a party, and exploit things that were, when you look back on them, fake news, not that we created, but that was created within Germany, that never was news, but they used it, they exploited it. And look at what it's turned into.

So we may have been the first victim, but we may not have been victimized as much as others are going to be in the short term, and we certainly should heed the warning and not be an additional victim in 2018 or 2020.

Let me move to Senator King real quick.

Senator King. Just a follow-up question to Dr. Rid. Tell me more about Guccifer 2.0. Is that a flesh-and-blood human being? Is it an office? Second question: is there any doubt that Guccifer 2.0 is an agent or somehow working for the Russian government?

Dr. Rid. Guccifer 2.0 is--we know this from the evidence that's available, not all of it public, but only private sector sources and academic sources, I may say. Guccifer 2.0 is certainly not just one individual, because in private interactions with journalists we can literally see different types of humans at play. Some use it consistently at a specific time, lots of smileys and very informal. Others are more formal. All communicating through the same channel.

On the links, Guccifer 2.0 to others, APT28, as I mentioned and as I also lay out in my evidence in the written testimony, hacked 12 of the targets that were leaked, doxed, on DCLeaks. Guccifer 2.0 provided a password that was not publicly known, provided a password to DCLeaks to the smoking gun, the outlet. So that's a very strong forensic link there. The link I think-- the docs can be connected.

Senator King. But how about my second part of my question? Is Guccifer 2.0 an agent of the Russian government in some way, shape, or form?

Dr. Rid. If you mean by ``agent,'' an agency or sort of organization, it could be a subcontractor, it could be a team within an intelligence agency.

Senator King. Affiliated or associated with the Russian government?

Dr. Rid. I am confident that the answer is yes.

Senator King. Thank you.

Thank you, Mr. Chairman.

Chairman Burr. I thank all the members, and I thank our panel today. You have provided us some incredible insight and knowledge. We're grateful to you.

This hearing is adjourned.

[Whereupon, at 4:02 p.m., the hearing was adjourned.]


                    Supplemental Material


    [GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


                          [all]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| KASPERSKY LAB, INC.; and | ) | |
| KASPERSKY LABS LIMITED, | ) | |
|  | ) | |
| *Plaintiffs*, | ) | |
|  | ) | |
| *v.* | ) | Civ. No. 17-2697 (CKK) |
|  | ) | |
| U.S. DEPARTMENT OF | ) | |
| HOMELAND SECURITY; and | ) | |
| KIRSTJEN NIELSEN | ) | |
| *Secretary of Homeland Security* | ) | |
|  | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**EXHIBIT 3-C**

# BOLSTERING THE GOVERNMENT'S CYBERSECURITY: ASSESSING THE RISK OF KASPERSKY LAB PRODUCTS TO THE FEDERAL GOVERNMENT

## HEARING

BEFORE THE

### SUBCOMMITTEE ON OVERSIGHT &

### COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

### HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

———

October 25, 2017

———

**Serial No. 115–33**

———

Printed for the use of the Committee on Science, Space, and Technology



Available via the World Wide Web: http://science.house.gov

———

U.S. GOVERNMENT PUBLISHING OFFICE

27–672PDF                    WASHINGTON : 2018

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

HON. LAMAR S. SMITH, Texas, *Chair*

FRANK D. LUCAS, Oklahoma
DANA ROHRABACHER, California
MO BROOKS, Alabama
RANDY HULTGREN, Illinois
BILL POSEY, Florida
THOMAS MASSIE, Kentucky
JIM BRIDENSTINE, Oklahoma
RANDY K. WEBER, Texas
STEPHEN KNIGHT, California
BRIAN BABIN, Texas
BARBARA COMSTOCK, Virginia
GARY PALMER, Alabama
BARRY LOUDERMILK, Georgia
RALPH LEE ABRAHAM, Louisiana
DRAIN LaHOOD, Illinois
DANIEL WEBSTER, Florida
JIM BANKS, Indiana
ANDY BIGGS, Arizona
ROGER W. MARSHALL, Kansas
NEAL P. DUNN, Florida
CLAY HIGGINS, Louisiana

EDDIE BERNICE JOHNSON, Texas
ZOE LOFGREN, California
DANIEL LIPINSKI, Illinois
SUZANNE BONAMICI, Oregon
ALAN GRAYSON, Florida
AMI BERA, California
ELIZABETH H. ESTY, Connecticut
MARC A. VEASEY, Texas
DONALD S. BEYER, JR., Virginia
JACKY ROSEN, Nevada
JERRY MCNERNEY, California
ED PERLMUTTER, Colorado
PAUL TONKO, New York
BILL FOSTER, Illinois
MARK TAKANO, California
COLLEEN HANABUSA, Hawaii
CHARLIE CRIST, Florida

————

### SUBCOMMITTEE ON OVERSIGHT

HON. DRAIN LAHOOD, Illinois, *Chair*

BILL POSEY, Florida
THOMAS MASSIE, Kentucky
GARY PALMER, Alabama
ROGER W. MARSHALL, Kansas
CLAY HIGGINS, Louisiana
LAMAR S. SMITH, Texas

DONALD S. BEYER, Jr., Virginia, *Ranking Member*
JERRY MCNERNEY, California
ED PERLMUTTER, Colorado
EDDIE BERNICE JOHNSON, Texas

# C O N T E N T S

**October 25, 2017**

Page

Witness List ........................................................................................................... 2
Hearing Charter ...................................................................................................... 3

**Opening Statements**

Statement by Representative Lamar S. Smith, Chairman, Committee on
  Science, Space, and Technology, U.S. House of Representatives ..................... 4
    Written Statement ............................................................................................ 6
Statement by Representative Darin LaHood, Chairman, Subcommittee on
  Oversight, Committee on Science, Space, and Technology, U.S. House of
  Representatives ................................................................................................ 8
    Written Statement ............................................................................................ 10
Statement by Representative Donald S. Beyer, Jr., Ranking Member, Sub-
  committee on Oversight, Committee on Science, Space, and Technology,
  U.S. House of Representatives ......................................................................... 12
    Written Statement ............................................................................................ 14
Statement by Representative Eddie Bernice Johnson, Ranking Member, Com-
  mittee on Science, Space, and Technology, U.S. House of Representatives .... 16
    Written Statement ............................................................................................ 17

**Witnesses:**

Ms. Donna Dodson, Associate Director and Chief Cybersecurity Advisor, Infor-
  mation Technology Laboratory; and Chief Cybersecurity Advisor, National
  Institute of Standards and Technology
    Oral Statement ................................................................................................ 18
    Written Statement (Joint statement with Dr. Kent Rochford) ...................... 21
Mr. David Shive, Chief Information Officer, U.S. General Services Adminis-
  tration
    Oral Statement ................................................................................................ 27
    Written Statement (Joint statement with Ms. Lisa Casias) ......................... 29
Mr. James Norton, President, Play-Action Strategies LLC; and Adjunct Pro-
  fessor, Johns Hopkins University
    Oral Statement ................................................................................................ 34
    Written Statement ........................................................................................... 35
Mr. Sean Kanuck, Director of Future Conflict and Cyber Security, Inter-
  national Institute for Strategic Studies
    Oral Statement ................................................................................................ 44
    Written Statement ........................................................................................... 46
Discussion .............................................................................................................. 54

**Appendix I: Answers to Post-Hearing Questions**

Mr. Sean Kanuck, Director of Future Conflict and Cyber Security, Inter-
  national Institute for Strategic Studies ........................................................... 70

**Appendix II: Answers to Post-Hearing Questions**

Document submitted by Representative Clay Higgins, Committee on Science,
  Space, and Technology, U.S. House of Representatives .................................... 78

(III)

IV

Page

Document submitted by Representative Barry Loudermilk, Committee on
    Science, Space, and Technology, U.S. House of Representatives  ......................    81

# BOLSTERING THE GOVERNMENT'S CYBERSECURITY: ASSESSING THE RISK OF KASPERSKY LAB PRODUCTS TO THE FEDERAL GOVERNMENT

————

**Wednesday, October 25, 2017**

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON OVERSIGHT AND
COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY,
*Washington, D.C.*

The Subcommittee met, pursuant to call, at 10:06 a.m., in Room 2318 of the Rayburn House Office Building, Hon. Darin LaHood [Chairman of the Subcommittee] presiding.

2

LAMAR S. SMITH, Texas
CHAIRMAN

EDDIE BERNICE JOHNSON, Texas
RANKING MEMBER

## Congress of the United States
### House of Representatives
COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

2321 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6301

(202) 225–6371
www.science.house.gov

### Subcommittee on Oversight

### *Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government*

Wednesday, October 25
10:00 a.m.
2318 Rayburn House Office Building

### Witnesses

**Ms. Donna Dodson,** Associate Director and Chief Cybersecurity Advisor, Information Technology Laboratory; and Chief Cybersecurity Advisor, National Institute of Standards and Technology

**Mr. David Shive,** Chief Information Officer, U.S. General Services Administration

**Mr. James Norton,** President, Play-Action Strategies LLC; and Adjunct Professor, Johns Hopkins University

**Mr. Sean Kanuck,** Director of Future Conflict and Cyber Security, International Institute for Strategic Studies

3

**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY**

**HEARING CHARTER**

October 19, 2017

TO:        Members, Subcommittee on Oversight

FROM:   Majority Staff, Committee on Science, Space, and Technology

SUBJECT:  Oversight Subcommittee hearing: *Bolstering the Government's Cybersecurity:*
*Assessing the Risk of Kaspersky Lab Products to the Federal Government*

_____

The Subcommittee on Oversight will hold a hearing titled *Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government* on Wednesday, October 25, 2017, at 10:00 a.m. in Room 2318 of the Rayburn House Office Building.

**Hearing Purpose:**

The purpose of this hearing is to examine the concerns raised regarding the risks associated with utilizing Kaspersky Lab products on federal government information technology systems ("IT systems") and the federal government's response to the concerns. Witnesses will discuss the government's cybersecurity posture, potential cybersecurity risks Kaspersky Lab's products pose to agency IT systems, and ways to improve agency practices related to design, acquisition, development, modernization, use and performance of federal IT resources.

**Witness List:**

- **Ms. Donna Dodson**, Associate Director and Chief Cybersecurity Advisor, Information Technology Laboratory; and Chief Cybersecurity Advisor, National Institute of Standards and Technology
- **Mr. David Shive**, Chief Information Officer, U.S. General Services Administration
- **Mr. James Norton**, President, Play-Action Strategies LLC; and Adjunct Professor, Johns Hopkins University
- **Mr. Sean Kanuck**, Director of Future Conflict and Cyber Security, International Institute for Strategic Studies

**Staff Contact:**

For questions related to the hearing, please contact Drew Colliatie or Tom Connally of the Majority Staff at 202-225-6371.

4

Chairman LAHOOD. The Subcommittee on Oversight will come to order.

Without objection, the Chair is authorized to declare recesses of the Subcommittee at any time.

I want to welcome you to today's hearing titled "Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government."

The subject of today's hearing involves some information that is classified. I remind Members that their questions may call for a response that the witnesses know to be classified. Please be mindful of this fact. I would like to instruct the witnesses to answer to the best of their ability, but should an answer call for sensitive information, it may be addressed if we vote to move into executive session at the end of the hearing.

At this time, I'm going to yield to the Chairman of the Full Committee, Chairman Lamar Smith, for his opening statement at this time.

Chairman SMITH. Thank you, Mr. Chairman. I appreciate your deferring to me and yielding me time, and let me apologize to the panelists. I have to leave immediately for a Judiciary Committee markup where they are considering a piece of legislation that I've introduced, so that's why I have to leave early, but perhaps I'll be able to get back.

Cybersecurity breaches are so prevalent today that it is hard to keep track of them. Every news cycle seems to include a new major incident. To address the federal government's cybersecurity weaknesses, the Committee hopes to bring H.R. 1224, the NIST Cybersecurity Framework, Assessment, and Auditing Act of 2017, to the House Floor for a vote.

Specific to Kaspersky Lab, new revelations regarding cyber-espionage continue to surface. This Committee has engaged in robust oversight of Kaspersky Lab, thanks to questions raised by Congressman Higgins during a hearing in June.

On July 27, 2017, this Committee requested all federal departments and agencies to disclose their use of Kaspersky Lab products. This was less than a month after the U.S. General Services Administration banned Kaspersky Lab products from its government-wide schedule contracts. However, we still have questions: Why was the software approved for government use? And was removing it from the approved GSA schedule sufficient to protect U.S. interests?

I support this Administration's subsequent actions. The interagency working group on cybersecurity has begun to address the problem.

On September 13, 2017, the Department of Homeland Security issued a government-wide order directing federal departments and agencies to identify and remove the company's products from use. In subsequent hearings, we will need to assess whether the federal government's response has been sufficient.

While once considered reputable, Kaspersky Lab, its founder and their Russian ties have created a significant risk to U.S. security. According to several media investigations, these connections have allowed Kaspersky Lab to be exploited not only by the Russian government but also by criminal hackers around the world. Mr.

5

Kaspersky's history and recent remarks have done little to alleviate these concerns.

As we move forward with this hearing and future hearings, we expect to uncover all aspects of Kaspersky Lab. We are particularly interested in what led the previous Administration to include Kaspersky Lab products on two GSA schedules. I look forward to the testimony of Mr. Shive, the GSA Chief Administration and Information Officer. I am also interested in proactive steps GSA has taken to assist other departments and agencies in rooting out the presence of Kaspersky products on their systems.

Also, we need to better understand the recent news related to the breach of an NSA contractor's personal computer.

The threat Kaspersky Lab products present to the government has now been publicly identified and confirmed by the Israeli government. I urge anyone with knowledge of potential risks to contact the Committee and share that information with us. We must be vigilant in addressing this wolf in sheep's clothing.

Thank you, Mr. Chairman. I'll yield back.

[The prepared statement of Chairman Smith follows:]

6



COMMITTEE ON
# SCIENCE, SPACE, & TECHNOLOGY
Lamar Smith, Chairman

For Immediate Release                    Media Contacts: Thea McDonald, Brandon VerVelde
October 25, 2017                                              (202) 225-6371

## Statement from Chairman Lamar Smith (R-Texas)
*Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government*

**Chairman Smith:** Cybersecurity breaches are so prevalent today that it is hard to keep track of them. Every news cycle seems to include a new major incident.

To address the federal government's cybersecurity weaknesses, the Committee hopes to bring H.R. 1224, the NIST Cybersecurity Framework, Assessment, and Auditing Act of 2017, to the House floor for a vote.

Specific to Kaspersky Lab, new revelations regarding cyber-espionage continue to surface. This Committee has engaged in robust oversight of Kaspersky Lab, thanks to questions raised by Congressman Higgins during a hearing in June.

On July 27, 2017, this Committee requested all federal departments and agencies to disclose their use of Kaspersky Lab products.

This was less than a month after the U.S. General Services Administration (GSA) banned Kaspersky Lab products from its government-wide schedule contracts. However, we still have questions: Why was the software approved for government use? And was removing it from the approved GSA schedule sufficient to protect US interests?

I support this administration's subsequent actions. The interagency working group on cybersecurity has begun to address the problem.

On September 13, 2017, the Department of Homeland Security issued a government-wide order directing federal departments and agencies to identify and remove the company's products from use. In subsequent hearings, we will need to assess whether the federal government's response has been sufficient.

While once considered reputable, Kaspersky Lab, its founder and their Russian ties have created a significant risk to U.S. security. According to several media investigations, these connections have allowed Kaspersky Lab to be exploited not only by the Russian government but also by criminal hackers around the world.

Mr. Kaspersky's history and recent remarks have done little to alleviate these concerns.

7

As we move forward with this hearing and future hearings, we expect to uncover all aspects of Kaspersky Lab.

We are particularly interested in what led the previous administration to include Kaspersky Lab products on two GSA schedules. I look forward to the testimony of Mr. Shive, the GSA Chief Information Officer.

I am also interested in proactive steps GSA has taken to assist other departments and agencies in rooting out the presence of Kaspersky products on their systems.

Also, we need to better understand the recent news related to the breach of an NSA contractor's personal computer.

The threat Kaspersky Lab products present to the government has now been publicly identified and confirmed by the Israeli government.

I urge anyone with knowledge of potential risks to contact the Committee and share that information with us. We must be vigilant in addressing this wolf in sheep's clothing.

###

Chairman LAHOOD. Thank you, Mr. Chairman.

At this time I recognize myself for five minutes for an opening statement, and again I want to welcome our witnesses here today.

Today we intend to discuss and evaluate the cybersecurity posture of the federal government. Specifically, we will examine the concerns that this Committee has raised about the risks associated with using Kaspersky Lab's products on federal information technology systems, as well as actions that the Trump Administration has taken in response to these concerns.

As part of today's hearing, we will hear from government and private sector cybersecurity experts about the potential risks that Kaspersky Lab products and services pose to agency IT systems. In doing so, we hope to find effective and efficient ways to improve agency practices related to the design, acquisition, development, modernization, use and performance of federal IT resources.

Kaspersky Lab is based in Moscow, Russia, and was founded in 1997 by Eugene Kaspersky. The company is one of the world's largest providers of cybersecurity software and services, including both consumer and enterprise solutions. As early as 2015, reports began to surface alleging that Mr. Kaspersky maintained close ties to Russian spies. Not only for Mr. Kaspersky—not only was Mr. Kaspersky educated at a KGB-sponsored university, he also wrote code for the Soviet military.

In May of this year, the concerns surrounding Kaspersky Lab were brought to public light during a Senate Intelligence Committee hearing, where several intelligence community officials unanimously affirmed they would be uncomfortable using Kaspersky Lab's software and services. In June of this year, during this Committee's hearing on the WannaCry ransomware outbreak, our witnesses expressed similar concerns.

The matter reached a tipping point in July, when the General Services Administration, the GSA, announced the removal of Kaspersky Lab products from its preapproved government contracts schedules.

On July 27, the Committee commenced its investigation of the matter, with Chairman Smith probing 22 federal departments and agencies on their use of Kaspersky Lab products and services. Last month, the Trump Administration took another step toward addressing the concerns surrounding Kaspersky when the Department of Homeland Security issued Binding Operational Directive 17–01, ordering all federal departments and agencies to remove Kaspersky Lab software from their systems within 90 days.

Mr. Kaspersky has been highly critical of the U.S. throughout this entire process, frequently arguing that no public evidence existed to support the concerns raised about his company. Earlier this month, however, several prominent American news organizations published startling revelations that confirmed this Committee's gravest concerns: the Russian government has wielded Kaspersky's software as a tool for cyber-espionage. This Administration has been proactively remedying the Kaspersky situation, and we must continue to take steps to ensure that we do not repeat past mistakes.

To that end, I look forward to hearing from our expert witnesses about how Kaspersky became approved for use on federal systems,

9

the policies and procedures that can be implemented to bolster the federal government's cybersecurity risk-management processes, and the actions that must be taken to ensure that federal systems remain secure against nefarious cyber actors.

Thank you.

[The prepared statement of Chairman LaHood follows:]

10



For Immediate Release
October 25, 2017

Media Contacts: Thea McDonald, Brandon VerVelde
(202) 225-6371

## Statement from Chairman Darin LaHood (R-Ill.)

*Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government*

**Chairman LaHood:** Good morning and welcome to today's Oversight Subcommittee hearing, "Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government."

Today we intend to discuss and evaluate the cybersecurity posture of the federal government. Specifically, we will examine the concerns that this Committee has raised about the risks associated with using Kaspersky Lab's products on federal information technology (IT) systems, as well as actions that the Trump administration has taken in response to these concerns.

As part of today's hearing, we will hear from government and private sector cybersecurity experts about the potential risks that Kaspersky Lab products and services pose to agency IT systems. In doing so, we hope to find effective and efficient ways to improve agency practices related to the design, acquisition, development, modernization, use and performance of federal IT resources.

Kaspersky Lab is based in Moscow, Russia, and was founded in 1997 by Eugene Kaspersky. The company is one of the world's largest providers of cybersecurity software and services, including both consumer and enterprise solutions.

As early as 2015, reports began to surface alleging that Mr. Kaspersky maintained close ties to Russian spies. Not only was Mr. Kaspersky educated at a KGB-sponsored university, he also wrote code for the Soviet military.

In May of this year, the concerns surrounding Kaspersky Lab were brought to public light during a Senate Intelligence Committee hearing, where several intelligence community officials unanimously affirmed they would be uncomfortable using Kaspersky Lab's software and services. In June of this year, during this Committee's hearing on the WannaCry ransomware outbreak, our witnesses expressed similar concerns. The matter reached a tipping point in July, when the General Services Administration (GSA) announced the removal of Kaspersky Lab products from its pre-approved government contracts schedules.

11

On July 27, the Committee commenced its investigation of the matter, with Chairman Smith probing 22 federal departments and agencies on their use of Kaspersky Lab products and services.

Last month, the Trump administration took another step toward addressing the concerns surrounding Kaspersky when the Department of Homeland Security (DHS) issued Binding Operational Directive (BOD) 17-01, ordering all federal departments and agencies to remove Kaspersky Lab software from their systems within 90 days.

Mr. Kaspersky has been highly critical of the U.S. throughout this entire process, frequently arguing that no public evidence existed to support the concerns raised about his company.

Earlier this month, however, several prominent American news organizations published startling revelations that confirmed this Committee's gravest concerns: the Russian government has wielded Kaspersky's software as a tool for cyber-espionage.

This administration has been proactively remedying the Kaspersky situation. And we must continue to take steps to ensure that we do not repeat past mistakes.

To that end, I look forward to hearing from our expert witnesses about how Kaspersky became approved for use on federal systems, the policies and procedures that can be implemented to bolster the federal government's cybersecurity risk-management processes, and the actions that must be taken to ensure that federal systems remain secure against nefarious cyber actors.

###

12

Chairman LaHood. At this time I now recognize the Ranking Member, the gentleman from Virginia, for his opening statement.

Mr. Beyer. Thank you, Chairman LaHood, and thank all of you for being with us.

Security concerns related to the Kaspersky Lab products and reported ties between Eugene Kaspersky, his company, and Russian intelligence services have been brewing within the U.S. intelligence community for years. This is deeply troubling given that Kaspersky Lab, whose main product is antivirus software, has offices in 32 countries, approximately 270,000 corporate clients, and its software is used by approximately 400 million people worldwide. And, until just recently, the U.S. Government also used KL software.

The founder of Kaspersky Lab, Eugene Kaspersky, is a software engineer educated at a KGB cryptography institute who also worked for the Russian intelligence services before starting his software company in 1997. He's been described as the Bill Gates of Russia. Despite his background and the concerns of the U.S. intelligence community, the company has vigorously argued that it has no ties to any government.

Concerns about connections between Kaspersky Lab and Russian intelligence services have become more pronounced over the last year. In April, the Senate Intelligence Committee asked the Director of National Intelligence and the U.S. Attorney General to look into Kaspersky employees' potential ties with Russian intelligence. In May, six U.S. intelligence agency directors, including the Directors of the CIA and NSA, told the Intelligence Committee that they would not be comfortable using Kaspersky products on their networks. In June, it was reported that FBI agents had interviewed U.S.-based employees of Kaspersky Lab, and in July, Bloomberg Businessweek published a story referencing internal company emails that showed a close working relationship between Kaspersky Lab and Russian intelligence.

Finally, earlier this month, the New York Times reported that Israeli intelligence were able to determine that Russian government hackers have been using the company's software to search for the code names of U.S. intelligence programs. Specifically, the Israelis discovered that a contractor to the National Security Agency had his data compromised over two years ago by these Russian hackers after he improperly took classified documents home and stored them on his home computer. Kaspersky's antivirus software had been installed on the contractor's home computer, and KL Lab has repeatedly denied any affiliation with the Russian hacking, but just today, the company admitted in a blog post that it had collected the NSA files through routine malware data collection.

All of this has led to legitimate security concerns about the use of Kaspersky Lab software. I am glad that the U.S. Government has realized this. In July, as our Chairman has said, the General Services Administration removed Kaspersky Lab from its list of approved federal vendors, and, last month, the Department of Homeland Security issued a Binding Operational Directive banning federal agencies from using any product or service offered by KL, giving federal agencies until mid-December to implement that directive.

13

But cybersecurity is no longer simply about defending our data from theft. It's also about defending our democracy from disinformation campaigns that combine cyber assaults with influence operations. Since the 2016 election, it has been well-established that Russia has spread falsehoods and disinformation, seeking to sow divisions between us and confusion among us. This is not, and should not be, a partisan issue. Together we should be striving to defend our democracy against those who seek to damage it.

Mr. Chairman, I hope we can have a future hearing where we hear from social scientists, researchers, and technical experts about the tools and technologies we can employ to help identify these evolving threats beyond traditional cybersecurity and defend against them.

I look forward to hearing from all our witnesses today and especially Sean Kanuck, who happens to be one of my constituents, an expert on these topics. He was appointed the first National Intelligence Officer for Cyber Issues in 2011 and served in that position at the National Security Council until 2016. Prior to that he spent ten years at the CIA in their Information Operations Center. Today he joins us as the Director of Future Conflict and Cyber Security at the International Institute for Strategic Studies. So Sean, welcome, and I look forward to all of your testimony.

Mr. Chairman, I yield back.

[The prepared statement of Mr. Beyer follows:]

14

OPENING STATEMENT
**Ranking Member Don Beyer (D-VA)**
**of the Subcommittee on Oversight**

House Committee on Science, Space and Technology
*"Bolstering the Government's Cybersecurity:*
*Assessing the Risk of Kaspersky Lab Products to the Federal Government"*
October 25, 2017

Thank you, Chairman LaHood.

Security concerns related to Kaspersky Lab products and reported ties between Eugene
Kaspersky, his company, and Russian intelligence services have been brewing within the U.S.
intelligence community for years. This is deeply troubling given that Kaspersky Lab – whose
main product is anti-virus software – has offices in 32 countries, an estimated 270,000 corporate
clients, and its software is used by approximately 400 million people worldwide. And, until just
recently, the U.S. Government also used Kaspersky Lab's software.

The founder of Kaspersky Lab, Eugene Kaspersky, is a software engineer educated at a KGB
cryptography institute who also worked for the Russian intelligence service before starting his
software company in 1997. Eugene Kaspersky has been described as the "Bill Gates of Russia".
Despite his background and the concerns of the U.S. intelligence community, the company has
vigorously argued that it has no ties to any government.

Concerns about connections between Kaspersky Lab and Russian intelligence services have
become more pronounced over the past year:
•       In April, the Senate Intelligence Committee asked the Director of National Intelligence
and U.S. Attorney General to look into Kaspersky employees' potential ties with Russian
intelligence.
•       In May, six U.S. intelligence agency directors, including the Directors of the CIA and
NSA, told the Intelligence Committee that they would not be comfortable using Kaspersky
products on their networks.
•       In June, it was reported that FBI agents had interviewed U.S.-based employees of
Kaspersky Lab.
•       In July, Bloomberg Businessweek published a story referencing internal company emails
that showed a close working relationship between Kaspersky Lab and Russian intelligence.

Finally, earlier this month, the New York Times reported that Israeli intelligence were able to
determine that Russian government hackers have been using the company's software to search
for the code names of U.S. intelligence programs. Specifically, the Israelis discovered that a
contractor to the National Security Agency (NSA) had his data compromised over two years ago
by these Russian hackers after he improperly took classified documents home and stored them on
his home computer. Kaspersky's antivirus software had been installed on this contractor's home
computer. Kaspersky Lab has repeatedly denied any affiliation with the Russian hacking, but just
today, the company admitted in a blog post that it had collected the NSA files through routine
malware data collection.

15

All of this has led to legitimate security concerns about the use of Kaspersky Lab software. I am glad that the U.S. Government has realized this: in July, the General Services Administration (GSA) removed Kaspersky Lab from its list of approved federal vendors. And, last month, the Department of Homeland Security (DHS) issued a Binding Operational Directive (BOD) banning federal agencies from using any product or service offered by Kaspersky Lab, giving federal agencies until mid-December to implement that directive.

But, cybersecurity is no longer simply about defending our data from theft. It is also about defending our democracy from disinformation campaigns that combine cyber assaults with influence operations. Since the 2016 election, it has been well-established that Russia has spread falsehoods and disinformation, seeking to sow divisions between us and confusion among us.

This is not, and should not be, a partisan issue – together we should be striving to defend our democracy against those who seek to damage it.

Mr. Chairman, I hope we can also have a future hearing where we hear from social scientists, researchers, and technical experts about the tools and technologies we can employ to help identify these evolving threats – beyond traditional cybersecurity – and defend against them. I hope that you will commit to that.

I look forward to hearing from all of our witnesses today and especially Sean Kanuck, who happens to be one of my constituents, and who is an expert on these topics. Mr. Kanuck was appointed the first National Intelligence Officer (NIO) for Cyber Issues in 2011 and served in that position at the National Security Council (NSC) until 2016. Prior to that he spent ten years at the Central Intelligence Agency's (CIA's) Information Operations Center. Today he joins us as the Director of Future Conflict and Cyber Security at the International Institute for Strategic Studies (IISS). Welcome Sean, and welcome to all of our witnesses.

16

Chairman LAHOOD. Thank you, Mr. Beyer.

At this time I now recognize the Ranking Member of the Full Committee, Ms. Johnson, for her opening statement.

Ms. JOHNSON. Thank you very much, Mr. Chairman.

Kaspersky Lab is one of the world's largest cybersecurity companies, and makes a popular antivirus program used by 400 million users worldwide. But recent concerns by the U.S. intelligence community about close connections between Kaspersky Lab, its founder Eugene Kaspersky, and the Russian intelligence services have led to much greater scrutiny of its activities.

This hearing is premised on examining what threat that Kaspersky software poses to the federal government. However, the federal government has already preemptively addressed that threat.

Last month, the Department of Homeland Security issued a directive that required all federal agencies to identify any of their networks using Kaspersky Lab software, and gave those agencies a 90-day deadline to initiate a plan to remove the Kaspersky Lab software from those computer systems. DHS decided that the security risk of having a Russian company embedded on federal computer networks was simply not worth it. I have confidence in the ability of the federal government agencies to eliminate the Kaspersky Lab products from their respective computer systems.

I am less confident, though, in our collective ability to identify and guard against cyber warfare actions from Russian state actors. Russian hackers have infiltrated some of our nation's nuclear power plants, private email accounts, and state election databases. Russia, according to a publicly available Intelligence Community assessment, conducted an influence campaign in 2016 to undermine public faith in the U.S. democratic process and to harm the campaign chances of Hillary Clinton winning the Presidency.

The intelligence assessment should be a wake-up call for all of us. We should expect attempts by foreign actors to affect future elections using computer hacking, social media, and other means, as was done in 2016.

Mr. Chairman, prior to the 2016 election, this Committee held a hearing to review guidelines for protecting voting and election systems including voter registration databases and voter machines. I believe a follow-up hearing would be appropriate to discuss protecting these same systems, in light of last year's events, as well as examining the sophisticated influence operations conducted by Russian intelligence services to disrupt our democratic processes and damage our democracy. With the knowledge of Russian cyber warfare actions in 2016, we can have a more robust discussion on the measures hostile actors have been using against America's voting infrastructure, and we can discuss measures that need to be taken to bolster the security of our elections.

Mr. Chairman, I hope that you seriously consider holding a 2016 election security postmortem with a focus on what the Science Committee can do to help protect the vote going forward.

I thank you, and yield back the balance of my time.

[The prepared statement of Ms. Johnson follows:]

17

OPENING STATEMENT
**Ranking Member Eddie Bernice Johnson (D-TX)**

House Committee on Science, Space, and Technology
Subcommittee on Oversight
*"Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the
Federal Government"*
October 25, 2017

Thank you Chairman LaHood.  Kaspersky Lab is one of the world's largest cybersecurity companies, and makes a popular anti-virus program used by 400 million users worldwide.  But recent concerns by the U.S. intelligence community about close connections between Kaspersky Lab, its founder Eugene Kaspersky, and the Russian Intelligence Services have led to much greater scrutiny of its activities.  This hearing is premised on examining what threat Kaspersky software poses to the federal government.  However, the federal government has already pre-emptively addressed that threat.  Last month, the Department of Homeland Security (DHS) issued a directive that required all federal agencies to identify any of their networks using Kaspersky Lab software, and gave those agencies a 90-day deadline to initiate a plan to remove Kaspersky Lab software from those computer systems.  DHS decided that the security risk of having a Russian company embedded on federal computer networks was simply not worth it.

I have confidence in the ability of federal government agencies to eliminate Kaspersky Lab products from their respective computer systems.  I am less confident, though, in our collective ability to identify and guard against cyber warfare actions from Russian state actors.  Russian hackers have infiltrated some of our nation's nuclear power plants, private e-mail accounts, and state election databases.  Russia, according to a publicly available Intelligence Community assessment, conducted an influence campaign in 2016 to undermine public faith in the US democratic process and to harm Hillary Clinton's chances of winning the Presidency.  That intelligence assessment should be a wake-up call for all of us. We should expect attempts by foreign actors to affect future elections, using computer hacking, social media, and other means, as was done in 2016.

Mr. Chairman, prior to the 2016 Election, this Committee held a hearing to review the guidelines for protecting voting and election systems—including voter registration databases and voting machines.  I believe a follow-up hearing would be appropriate to discuss protecting these same systems, in the light of last year's events, as well as examining the sophisticated influence operations conducted by Russian intelligence services to disrupt our democratic processes and damage our democracy.  With the knowledge of Russian cyber warfare actions in 2016, we can have a more robust discussion on the measures hostile actors have been using against America's voting infrastructure, and we can discuss measures that need to be taken to bolster the security of our elections.

Mr. Chairman, I hope that you seriously consider holding a 2016 election security postmortem, with a focus on what the Science Committee can do to help protect the vote going forward.  Thank you and I yield back the balance of my remaining time.

18

Chairman LaHood. Thank you, Ms. Johnson.

At this time let me introduce our witnesses here today. Our first witness today is Ms. Donna Dodson, Associate Director and Chief Cybersecurity Advisor of the Information Technology Laboratory, and Chief Cybersecurity Advisor at the National Institute of Standards and Technology (NIST). Ms. Dodson began her career at NIST in 1987 as a Computer Science Researcher. In 2010, she was promoted to Computer Security Division Chief for NIST. She holds a master's degree in computer science from Virginia Tech. Welcome.

Our second witness is Mr. David Shive, Chief Information Officer at the U.S. General Services Administration. Prior to being named CIO, Mr. Shive was the Director of the Office of Enterprise Infrastructure at the GSA. He received his bachelor's degree in physics from California State University in Fresno, his master's degree in research meteorology from the University of Maryland in College Park, and his postgraduate management certificate from the Carnegie Mellon Graduate School of Industrial Management.

Our third witness is Mr. James Norton. He is the founder and President of Play-Action Strategies LLC, and an Adjunct Professor at Johns Hopkins University. Mr. Norton previously served as Vice President of Strategy and Communications for the Mission Systems Division at General Dynamics. He holds a Bachelor of Science and a master's in business administration from Salve Regina University.

Our last witness today is Mr. Sean Kanuck, Director of Future Conflict and Cyber Security at the International Institute for Strategic Studies. He previously served as the National Intelligence Officer for Cyber Issues from 2011 to 2016. Mr. Kanuck holds a Bachelor of Arts and law degree from Harvard University, a master's of science from the London School of Economics, and an LLM from the University of Oslo.

Thank you all for being here. I will now recognize Ms. Dodson for five minutes to present her testimony.

## TESTIMONY OF DONNA DODSON

Ms. Dodson. Chairman LaHood, Ranking Member Beyer, and members of the Subcommittee, I am Donna Dodson, Chief Cybersecurity Advisor for the National Institute of Standards and Technology, known as NIST. Thank you for the opportunity to appear before you today to discuss NIST's role in cybersecurity highlighting the Cybersecurity Framework, referred to as the Framework, and the NIST cybersecurity portfolio.

As a non-regulatory agency, NIST leverages its deep technical expertise as well as its power of convener of stakeholders to develop and improve solutions to a wide range of technical and policy cybersecurity challenges. NIST's role in cybersecurity as codified in law is to research, develop, and deploy information security standards and technology to protect the federal government's non-national security information systems against threats to confidentiality, integrity, and availability, and to facilitate and support the development of voluntary industry-led cybersecurity standards and best practices for critical infrastructure.

In addition to providing resources that organizations of all sizes can use to manage cybersecurity risk, NIST also provides resources

19

to help organizations recover quickly from cybersecurity attacks with confidence that the recovered data is accurate, complete, and free of malware and that the recovered system is trustworthy and capable.

I will highlight five of NIST's critical cybersecurity programs which are the Cybersecurity Framework, supply-chain risk management, cryptography, the National Vulnerability Database, and the National Software Reference Library.

The first resource, the NIST Cybersecurity Framework, or Framework, was created in collaboration with industry, academia and other government agencies. The Framework consists of voluntary standards, guidelines and practices to promote the protection of critical infrastructure and to manage cybersecurity risks. While originally designed to help protect critical infrastructure, numerous businesses use the Framework to manage their cybersecurity risk. Since publishing the Framework, NIST has released additional guidelines to help small businesses manage their cybersecurity risk. Under Executive Order 13800, every federal agency or department will need to manage their cybersecurity risk by using the Framework and then provide a risk management report to OMB and DHS. In response to the EO, NIST released the Cybersecurity Framework Implementation Guidance for Federal Agencies to help federal agencies use the Framework in conjunction with an extensive set of NIST cybersecurity risk management standards, guidelines, and controls to manage their cybersecurity risk.

The Cybersecurity Framework also provides guidance for the second critical area, which is the security of the supply chain. Because of outsourcing, organizations must ensure the integrity, security, and resilience of their supply chain. To assist in this, NIST established the Supply Chain Risk Management program to identify and evaluate effective technologies, tools, techniques, practices, and standards that help secure an organization's supply chain.

Another critical area is cryptography. NIST began its work in cryptography in 1972. Today, NIST cryptographers research, analyze and standardize cryptographic technology. Although these standards apply to federal information systems, many private-sector organizations voluntarily rely on them to protect sensitive personal and business information. NIST also runs a program that validates the test results of vendor's cryptographic modules to the NIST standard. In this program, NIST confirms that a company's underlying cryptography works but is not validating the vendor or the company.

Two final critical components are the National Vulnerability Database and the National Software Reference Library. NIST maintains the repository for all known and publicly reported IT vulnerabilities called the National Vulnerability Database, or NVD. The vulnerabilities in the NVD are weaknesses in coding found in software and hardware that if exploited can impact the integrity of information systems. The National Software Reference Library, or NSRL, is another tool that along with DHS and other, federal, state and local enforcement agencies is supported by the NIST. The NSRL is like a fingerprint database for computer files that promotes efficient and effective use of computer technology.

20

The programs that I have mentioned here are only a portion of NIST portfolio and cybersecurity NIST worked to provide and improve technical and policy solutions to an ever-growing set of cybersecurity challenges continues to grow.

Thank you for the opportunity to testify today. I am happy to answer any questions you may have.

[The prepared statement of Ms. Dodson follows:]

21

Testimony of

Donna Dodson
Chief Cybersecurity Advisor
Director, National Cybersecurity Center of Excellence
National Institute of Standards and Technology
United States Department of Commerce

Before the
United States House of Representatives
Committee on Science, Space, and Technology
Subcommittee on Oversight

*"Bolstering the Government's Cybersecurity:  Assessing the Risk of Kaspersky Lab Products to the Federal Government"*

October 25, 2017

22

**Introduction**

Chairman LaHood, Ranking Member Beyer, and members of the Subcommittee, I am Donna Dodson, Director of the National Cybersecurity Center of Excellence and Chief Cybersecurity Advisor at the Department of Commerce's National Institute of Standards and Technology (NIST). Thank you for the opportunity to appear before you today to discuss NIST's key roles in cybersecurity. Specifically, I will discuss NIST's activities in support of the cybersecurity Framework and NIST's cybersecurity portfolio.

**NIST's Role in Cybersecurity**

NIST is a non-regulatory agency with the mission to promote U.S. innovation and industrial competitiveness in ways that enhance economic security and improve our quality of life. As a non-regulatory agency, NIST leverages its deep technical expertise, as well as its power as a convener of stakeholders from government, academia, and the private sector to develop and improve solutions to a wide range of technical and policy cybersecurity challenges.

One of NIST's key roles is to research, develop, and deploy information security standards and technology to protect the Federal Government's information systems against threats to confidentiality, integrity, and availability. Such efforts were strengthened through the Computer Security Act of 1987 (*Public Law 100-235*), broadened through the Federal Information Security Management Act of 2002 (FISMA) *(Public Law 107-347*), and reaffirmed in the Federal Information Security Modernization Act of 2014 (*Public Law 113-283*). The Cybersecurity Enhancement Act of 2014 (*Public Law 113-274*) further authorized NIST to facilitate and support the development of voluntary, industry-led cybersecurity standards and best practices for critical infrastructure.

To address cybersecurity issues, NIST has long worked effectively with industry and federal agencies to help protect the confidentiality, integrity, and availability of information systems. NIST's Information Technology Laboratory (ITL) develops and deploys standards, tests, and metrics to make the nation's information systems more secure, usable, interoperable, and reliable. Our work in the cybersecurity area covers program areas including configuration and vulnerability management, cryptography, cybersecurity education and workforce development, identity and access management and risk management.

In addition to providing resources that organizations of all sizes can use to manage cybersecurity risk, NIST also provides resources to help organizations recover quickly from cybersecurity attacks with confidence that the recovered data is accurate, complete, and free of malware and that the recovered system trustworthy and fully capable to again function as originally designed. Some of NIST's critical cybersecurity resources are described below.

**NIST's Cybersecurity Framework**

In 2014, NIST issued the *Framework for Improving Critical Infrastructure Cybersecurity*[1] (Framework), which NIST created in collaboration with industry, academia, and other

---

[1] https://www.nist.gov/cyberframework

2

23

government agencies. The Framework consists of voluntary standards, guidelines, and practices to promote the protection of critical infrastructure, such as the information technology, transportation, energy, healthcare, and financial services sectors. The voluntary, risk-based, flexible, repeatable, and cost-effective approach of the Framework helps those who use the Framework to manage cybersecurity risk. The Framework was originally designed to help protect critical infrastructure, but numerous business of all sizes and from many economic sectors now use the Framework to manage their cybersecurity risks, such as for supply chain risk management as described below.

Since publishing the Framework, NIST has released the NIST Interagency Report (NISTIR) *Small Business Information Security: The Fundamentals* (NISTIR 7621) to help small businesses understand and manage their cybersecurity risks.

Under Executive Order 13800, *Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure*, signed by President Trump on May 11, 2017, every Federal agency or department has to manage their cybersecurity risk by using the Framework and provide a risk management report to the Director of the Office of Management and Budget and to the Secretary of Homeland Security.

NIST also released a draft NISTIR, *The Cybersecurity Framework: Implementation Guidance for Federal Agencies* (NISTIR 8170). This report helps federal agencies use the Framework, in conjunction with an extensive set of NIST cybersecurity risk management standards, guidelines, and controls, to manage their cybersecurity risks. Currently, NIST is in the process of updating the Framework, a process NIST plans to finalize in 2018.

NIST collaborates with the Department of Homeland Security's (DHS) Critical Infrastructure Cyber Community Voluntary Program to promote Framework implementation within the critical infrastructure sectors. NIST and DHS coordinate on a range of events promoting Framework implementation and understanding, such as webinars and workshops.

**Supply Chain Risk Management**

The Cybersecurity Framework also provides guidance for the security of the supply chain and to reduce supply chain threats to businesses and the manufacturing sector. The number of information and communication technologies is rapidly increasing and becoming more capable and complex every day. These technologies rely on a supply-chain ecosystem that is long, complex, variable, interconnected, globally distributed, and geographically diverse. Many organizations outsource the development, maintenance, and management of this ecosystem.

Because of this outsourcing, organizations—including federal agencies—are increasingly at risk of supply chain compromise. The same factors that decrease cost, enable interoperability, foster rapid innovation, and provide other benefits, also increase cyber supply chain risks. Managing supply chain risk requires an organization to ensure the integrity, security, and resilience of its supply chain.

24

NIST developed the Supply Chain Risk Management Program to work with industry, academia, and government to identify and evaluate effective technologies, tools, techniques, practices, and standards that help secure an organization's supply chain. This program examines the supply-chain risk throughout the entire lifecycle of systems, products, and services.

NIST is currently working to describe a structured method of prioritizing systems and components based on their relationship to an organization's mission, thereby enabling organizations to most efficiently deploy their resources.

## Cryptography

NIST began its work on cryptography in 1972 and its importance is reflected in the growth of this work today. Under FISMA, NIST is responsible for developing standards and guidelines to protect non-national security federal information systems and the information they process. Our Cryptographic Technology Group (CTG) researches, analyzes, and standardizes cryptographic techniques and technologies, while encouraging innovation and helping technology users manage risks.

Although Federal Information Processing Standards (FIPS) apply to federal information systems, many private sector organizations voluntarily rely on them to protect sensitive personal and business information.

The Cryptographic Technology Group is developing its standards using an open and transparent process. The CTG conducts workshops and requests input and comments from government agencies, private industry, academia, and the global cryptographic community. We make such comments available publicly in the interest of transparency, trust, and to promote future research. The CTG examines each of its standards on a regular basis to determine if they need to be revised, withdrawn, or re-opened for public comment and, when appropriate, possible revision.

In addition to developing these standards, NIST runs the Cryptographic Module Validation Program, which validates the test results of a vendor's cryptographic modules to NIST FIPS 140-2. Laboratories accredited under the program test any company's cryptography to determine whether it meets NIST's cryptographic standards. NIST does not "pick winners and losers" among potential vendors. Rather, private-sector accredited testing laboratories conduct testing under this program that simply confirms whether a company's underlying cryptography works and technically meets the standard—nothing more and nothing less. As with the FIPS standards themselves, many private sector organizations worldwide rely upon this testing program for assurance that the cryptographic products they purchase meet NIST standards. To date, under this voluntary testing program, over 3000 cryptographic modules have been successfully validated under this program.

## The National Vulnerability Database

Protecting information technology is critical and NIST plays a key role in this area by maintaining the repository of all known and publicly reported information technology

25

vulnerabilities, called the National Vulnerability Database (NVD). The NVD is an authoritative source for standardized information on security vulnerabilities that NIST updates regularly.

These vulnerabilities catalogued in the NVD are weaknesses in coding found in software and hardware that, if exploited, can impact the confidentiality, integrity, or availability of information or information systems. The NVD tracks vulnerabilities over time and allows users to assess changes in vulnerability discovery rates within specific products or specific types of vulnerabilities.

As part of maintaining the NVD, NIST works with organizations that apply to become a Common Vulnerabilities and Exposures (CVE) Numbering Authority, which allows an organization to publicly disclose a vulnerability with a preassigned CVE ID number, rather than be required to request a new number every time it discovers a new vulnerability. NIST also analyzes and provides a severity metric to assist practitioners in responding to each vulnerability.

**National Software Reference Library**

NIST, along with the Department of Homeland Security, and other federal, state, and local law enforcement agencies, supports the National Software Reference Library (NSRL). The NSRL collects digital signatures of software so that an organization can efficiently search its networks for that software and determine if and where the software is deployed. In a sense, the NSRL is like a fingerprint database for computer files; however, rather than helping a detective identify a person, it helps an organization quickly find a piece of software. In effect, the NSRL promotes efficient and effective use of computer technology in the investigation of crimes involving computers.

The NSRL collects software from various sources and incorporates profiles computed from this software into a Reference Data Set (RDS) of information. The RDS can be used by law enforcement, government, and private industry to review files on a computer by matching profiles in the RDS. This process helps alleviate much of the effort involved in determining which files on a computer are important evidence or which files are already part of a criminal investigation. This ability reduces the number of files which must be manually examined, reducing the time and other resources law enforcement officials need to commit to a single incident.

Other stakeholders, such as businesses and other government agencies, use the NSRL RDS as part of their routine IT operations to ensure there are no malicious or unverified files on their systems.

**Conclusion**

The programs that I have mentioned here are only a portion of NIST's portfolio in cybersecurity, which is only a portion of what NIST does more broadly. NIST's work to provide and improve technical and policy solutions to an ever-growing set of cybersecurity challenges continues to grow. Thank you for the opportunity to testify today on NIST's work in cybersecurity. I am happy to answer any questions you may have.

26



**Donna F. Dodson, NIST Associate Director and Chief Cyber Security Advisor**

Donna F. Dodson is a Fellow at the National Institute of Standards and Technology (NIST).  She holds the position of the Chief Cybersecurity Advisor for NIST and is the Associate Director for the Information Technology Lab (ITL).  Donna also serves as the Director of NIST's National Cybersecurity Center of Excellence (NCCoE).

Donna oversees ITL's cyber security program to conduct research, development and outreach necessary to provide standards, guidelines, tools, metrics and practices to protect the information and communication infrastructure.  Under her leadership, ITL collaborations with industry, academia and other government agencies in research areas such as security management and assurance, cryptography and systems security, identity management, security automation, secure system and component configuration, test validation and measurement of security properties of products and systems, security awareness and outreach and emerging security technologies.  In addition, Donna guides ITL programs to support both national and international security standards activities.  She recently led the establishment of the NIST NCCoE.  Through partnerships with state, local and industry, the NCCoE collaborates with industry sectors to accelerate the widespread adoption of standards-based cyber security tools and technologies.

Donna's research interests include applied cryptography, key management, authentication and security testing.  She has led technical teams to produce standards, guidelines and tools in each of these areas.

Donna received two Department of Commerce Gold Medals and three NIST Bronze Medals.  She was a Fed 100 Award winner for her innovations in cybersecurity and in 2011 was included in the top 10 influential people in government information security.  Recently, FedScoop recognized Donna as one of DC's Top 50 Women in Tech.

27

Chairman LaHood. Thank you, Ms. Dodson.

I now recognize Mr. Shive for five minutes to present his testimony.

## TESTIMONY OF DAVID SHIVE

Mr. Shive. Thank you, and good morning, Chairman LaHood, Ranking Member Beyer, and members of the Subcommittee. My name is David Shive, and I'm the Chief Information Officer at the U.S. General Services Administration. I welcome the opportunity to share my organization's experiences related to the cybersecurity posture of GSA and the federal government.

The mission of GSA is to deliver the best value in real estate, acquisition, and technology services to government and the American people. In support of that, one of my organization's key goals in supporting GSA's mission is to deliver technology that provides both a secure environment for doing business while also ensuring that both IT and business continue to run efficiently.

The Federal Information Security Management Act provides a comprehensive framework which helps federal CIOs and federal Chief Information Security Officers manage overall information technology security risks across federal data and assets. The FISMA framework supports the rigorous IT security program implemented at GSA by the CISO under the auspices of the CIO's authority. Our security program assures the risks to GSA's IT systems are assessed and proper security controls implemented to mitigate those risks down to an acceptable level. It also ensures periodic evaluation and testing of the effectiveness of IT security controls, including management, operational, and technical controls.

Furthermore, GSA has a robust incident handling and response program that strongly aligns with the NIST Cybersecurity Framework. Due to the effectiveness of that program, GSA received a rating level of 4, which is managed and measurable under "response" on the latest FISMA report from our Office of the Inspector General (OIG).

In accordance with FISMA, GSA adheres to all of NIST's Federal Information Processing Standards and Special Publications in implementing GSA's IT security program. In addition, GSA completes a risk-based security assessment in accordance with NIST guidance and issues a signed Authority to Operate by the authorizing official with concurrence by the CISO before any new system goes into production. This is accomplished by prioritizing the implementation of security controls and focusing on those that have the biggest impact on securing the system and data such as securing—ensuring secure configurations and patching of vulnerabilities, access controls, and auditing and monitoring. GSA is in the process of implementing Executive Order 13800. GSA has adopted the framework for Improving Critical Infrastructure Cybersecurity developed by NIST and has required—as required by the Executive Order. GSA has provided a risk management report, as well as an action plan to implement the Framework, to the Secretary of Homeland Security and the Director of the Office of Management and Budget. GSA continues to explore leading edge technologies in order to stop the latest and most sophisticated attacks from our adversaries.

28

This includes next generation antivirus solutions that use machine learning and artificial intelligence, as well as advanced detection of malware that is embedded in email attachments and links. Both of these technologies will greatly protect the end user, which is one of the primary vectors for exploiting federal government systems.

One of GSA's core missions is to assist in procuring goods and services that can be made available to federal agencies. GSA's Federal Acquisition Service (FAS) offers a continuum of voluntary government-wide innovative solutions and services in a number of areas. Federal agencies spend approximately $23 billion annually to acquire IT products and services through FAS. This represents only 42 percent of the federal government's $55 billion in total IT spend. Significantly, a product's placement on a GSA schedule or contract vehicle only certifies that the vendor meets the necessary regulatory requirements for the product to be sold to the federal government. It does not make any value or technical judgment about the nature of the product.

With respect to Kaspersky Lab products, they were available from three resale vendors on GSA schedules contracts. On July 11 of this year, GSA directed the three resellers to remove all Kaspersky Lab manufactured products from their catalogs within 30 days. All three resellers complied. As of today, GSA does not offer any Kaspersky Lab manufactured products through its our GSA scheduled contracts.

GSA took a proactive stance and completed comprehensive scanning of all IT assets for the presence of Kaspersky products in June of 2017. GSA confirmed that there was no installation of such products in our on-premise and cloud-based systems, and reported this to DHS in accordance with Binding Operational Directive) 17–01 on October 4. In addition, GSA's FedRAMP PMO is coordinating this activity for the government-wide cloud service providers that are covered by its ATOs.

Again, I thank the Subcommittee for its oversight and for allowing me the opportunity to contribute to this important topic. At this time, I'm happy to take any questions that you might have.

[The prepared statement of Mr. Shive follows:]

29

**10/25/2017 Hearing: Cybersecurity Posture**

**The Oversight Subcommittee of the**

**Committee on Science, Space, and Technology of the**

**U.S. House of Representatives**

### Introduction

Good morning Chairman LaHood, Ranking Member Beyer, and members of the Subcommittee. My name is David Shive, and I am the Chief Information Officer (CIO) of the U.S. General Services Administration (GSA). I welcome the opportunity to share my organization's experiences related to the cybersecurity posture of the Federal Government, specifically pertaining to the utilization of Kaspersky Lab products at Federal agencies, as well as the implementation of Executive Order 13800 and the NIST Cybersecurity Framework.

### GSA Mission

The mission of GSA is to deliver the best value in real estate, acquisition, and technology services to Government and the American people. GSA's priorities are to deliver better value and savings, serve our partners, expand opportunities for small business, make Government more sustainable, and be a leader in innovation.

In support of that, and as it relates to the Subcommittee's objectives today, one of my organization's key goals in supporting GSA's mission is to deliver technology that provides a secure environment for doing business, while ensuring that both IT and business continue to run efficiently.

### FISMA

The Federal Information Security Modernization Act of 2014 (FISMA) provides a comprehensive framework which helps Federal CIOs and Federal Chief Information Security Officers (CISOs) manage overall Information Technology (IT) security risks across Federal data and assets.

The FISMA framework supports the rigorous IT security program implemented at GSA by the CISO under the auspices of the CIO's authority. Our security program assures risks to GSA's IT systems are assessed and proper security controls implemented to mitigate those risks down to an acceptable level. It also provides a comprehensive policy, procedure, and governance structure, and ensures periodic evaluation and testing of the effectiveness of IT security controls, including management, operational, and technical controls. Further, all GSA employees take IT security awareness training; role-based training may also be required dependent on position and function.

30

Furthermore, GSA has a robust incident handling and response program that strongly aligns with the NIST Cybersecurity Framework. Due to the effectiveness of that program, GSA received a rating of Level 4 (Managed and Measurable) under "Response" on the latest FISMA report from the Office of Inspector General (OIG).

**NIST Standards, FISMA and ATOs**

In accordance with FISMA, GSA adheres to all of NIST's Federal Information Processing Standards (FIPS) and Special Publications (SP) in implementing GSA's IT security program. These include standards and guidance on encryption, security categorization of confidentiality, integrity, and availability (i.e., low, moderate, high), security control selection and implementation, risk management, authentication, identity management, system authorization, and contingency planning.

In addition, GSA completes a risk-based security assessment in accordance with NIST guidance and issues a signed Authority to Operate (ATO) by the authorizing official with concurrence by the CISO before any new system goes into production. The ATO is the official declaration that the IT systems can go live and be operated within an acceptable level of risk.

**Cybersecurity Risk Management**

Using the FISMA framework, along with NIST's Cybersecurity Framework, standards, and publications, GSA implements a risk-based strategy to manage IT security across the enterprise. Risk can never be completely eliminated, but the goal of GSA's IT security program is to allow GSA to provide services to its customers using information technology operated within an acceptable level of risk. This is accomplished by prioritizing the implementation of the security controls and focusing on those that have the biggest impact on securing the system and data. These include, but are not limited to: encryption, 2-factor authentication, ensuring secure configurations and patching of vulnerabilities, access controls, and auditing and monitoring.

**Implementation of EO 13800 and the NIST Cybersecurity Framework**

GSA is in the process of implementing Executive Order 13800, *Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure* (May 11, 2017). GSA has adopted the framework for Improving Critical Infrastructure Cybersecurity (the Framework) developed by the National Institute of Standards and Technology, as required by the Executive Order. Specifically, GSA uses the Identify, Protect, Detect, Respond, and Recover areas of the NIST cybersecurity framework to better manage the overall risk to the agency.

In addition, GSA has provided a risk management report, as well as an action plan to implement the Framework, to the Secretary of Homeland Security and the Director of the Office of Management and Budget (OMB) per the Executive Order. The report identified GSA's highest risk areas along with risk mitigation and acceptance choices. GSA's program received

31

an overall evaluation of "Managing Risk" by the U.S. Department of Homeland Security (DHS) in their Cybersecurity Risk Management Assessment as part of the Executive Order.

GSA continues to explore leading edge technologies in order to stop the latest and most sophisticated attacks from our adversaries. These include next generation anti-virus solutions that use machine learning and artificial intelligence, as well as advanced detection of malware that is embedded in email attachments and links. This is done by doing in-depth analysis of the email before it reaches the end user. Both of these technologies will greatly protect the end user which is one of the primary vectors for exploiting Federal Government systems (otherwise known as phishing attacks).

**GSA Role in Governmentwide IT Procurement**

One of GSA's core missions is to assist in procuring goods and services that can be made available to Federal agencies. GSA's Federal Acquisition Service (FAS) offers a continuum of Governmentwide innovative solutions and services in a number of areas. Federal agencies spend approximately $23 billion annually to acquire IT products and services through FAS. This amount represents only 42 percent of the $54.8 billion in total contracted Federal IT spending across the entire Federal Government. As this figure indicates, Federal agencies are not required to use GSA contracts and, in fact, the majority of Federal IT spending does not occur through GSA.

Regardless of the acquisition vehicle used to acquire IT, as CIO it is my responsibility, as is the responsibility of any agency CIO, to ensure that we conduct a thorough examination of the IT solution and understand the risk of the product before we interface it with the existing agency IT infrastructure.

Significantly, a product's placement on a GSA Multiple Award Schedule (Schedule) or other contract vehicle only certifies that the vendor meets the necessary contract and legal authority requirements for the product to be sold to the Federal Government; it does not make any value or technical judgment about the nature of the product. In the IT space, FISMA requires agency CIOs, such as myself, to make the determination for which products and solutions are appropriate for an agency's environment.

With respect to Kaspersky Lab (KL) products, three resellers offered KL products through GSA Schedules contracts, but did not gain approval to do so via the required contract modification process. On July 11, 2017, GSA directed the three resellers to remove all KL manufactured products from their catalogs within 30 days. All three resellers complied. In addition, it is GSA's understanding that on the same day, NASA and NIH, the other two Federal agencies with Governmentwide IT procurement contracts, removed Kaspersky manufactured products from their resellers' catalogs. GSA does not offer any Kaspersky Lab manufactured products through its Schedules contracts.

**Discovery and Removal of Kaspersky Products**

3

32

GSA took a proactive stance and completed comprehensive scanning of all IT assets for the presence of KL products in June 2017. GSA confirmed that there was no installation of KL products in GSA's on-premise and cloud-based systems, and reported this to DHS in accordance with its Binding Operational Directive (BOD) 17-01 on October 4, 2017. GSA currently uses McAfee as its anti-virus provider.

In addition, GSA's Federal Risk and Authorization Management Program's (FedRAMP) Program Management Office is coordinating this activity for the Governmentwide Cloud Service Providers (CSPs) that are covered by FedRAMP ATOs.

**Conclusion**

Again, I thank you for allowing me the opportunity to contribute to this important topic. GSA appreciates this Committee's oversight of the Federal Government's cybersecurity posture on behalf of the American people.

At this time, I'm happy to take any questions that you might have.

4

33

**David A. Shive,** *Chief Information Officer for the U.S. General Services Administration*

David A. Shive is the Chief Information Officer for the U.S. General Services Administration. Mr. Shive oversees the GSA IT organization, and is responsible information technology operations and ensuring alignment with agency and administration strategic objectives and priorities. He joined the U.S. General Services Administration's Office of the Chief Information Officer in November 2012.  Prior to being named CIO, he was the Associate CIO of the Office of Enterprise Infrastructure, responsible for the enterprise information technology infrastructure platforms and capability that support the GSA business enterprise.  He was also the ACIO for Corporate Systems for the GSA business support offices. Prior to joining GSA, he served in the District of Columbia government as a Chief Information Officer.  In this role, Mr. Shive had executive responsibility for agency IT operations including financial systems, security and privacy programs, internal controls and compliance, strategic planning, enterprise architecture and performance management and measurement programs and directed the transformation of enterprise systems and processes. to public/private cloud hybrid. He holds an undergraduate degree in physics from California State University, Fresno; a master's degree in research meteorology from the University of Maryland College Park; and a post-graduate management certificate from the Carnegie Mellon Graduate School of Industrial Management.

34

Chairman LaHood. Thank you, Mr. Shive.

At this time I recognize Mr. Norton for five minutes to present his testimony.

### TESTIMONY OF JAMES NORTON

Mr. Norton. Thank you. Chairman LaHood, Ranking Member Beyer, and members of the Subcommittee, thank you very much for inviting me to testify before you today. My name is James Norton, and I am the founder and President of Play-Action Strategies, a homeland security and cybersecurity consulting firm here in Washington, DC. I'm also a member of the faculty at Johns Hopkins University.

Previously, I served in multiple positions at the Department of Homeland Security under President George W. Bush including as Deputy Assistant Secretary of Legislation Affairs. I was a member of the Department's first team tasked with confronting the nascent cybersecurity threat.

Cyber threats pose a real and immediate danger to our federal government and the American people it represents. In 2016, the federal government experienced 30,899 cyber incidents that led to the compromise of information or system functionality according to the Office of Management and Budget.

DHS's role in protecting government networks is foundational. Because the Department cannot be well positioned to assist the private sector and serve as a model of best practices for state and local governments until it has its own federal networks or federal systems secure. In order to meet today's challenges, DHS must update its systems and technology and strengthen the organization in support of its cybersecurity functions. Together these issues have led to the use of potentially problematic software that is the subject of today's hearing.

To help DHS meaningfully address these challenges, I offer the following recommendations: provide CIOs and other officials across federal agencies with the resources necessary to invest in high-quality, reliable cybersecurity tools; require the development of a trusted vendor list that provides guidance on approved cybersecurity vendors with a secure supply chain that agencies can have confidence in; work with OMB and the White House to prevent redundancy across the federal government so that competing cyber organizations do not arise in other federal agencies.

I thank the Committee for holding this important hearing, and I look forward to your questions.

[The prepared statement of Mr. Norton follows:]

35

**Subcommittee on Oversight Hearing - Bolstering the Government's
Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal
Government**

**U.S. House of Representatives Committee on Science, Space, and
Technology
Subcommittee on Oversight**

**Testimony of James Norton
Founder and President, Play-Action Strategies LLC**

**October 25, 2017**

**Introduction**

Chairman LaHood, Ranking Member Beyer, and members of the

Subcommittee, thank you very much for inviting me to testify before you today.

My name is James Norton, and I am the founder and president of Play-Action

Strategies LLC, a homeland security and cybersecurity consulting firm here in

Washington, D.C. Previously, I served in multiple positions at the Department of

Homeland Security ("DHS") under President George W. Bush, including as Deputy

Assistant Secretary of Legislative Affairs. During the stand up of DHS, I was

involved in policy formation and execution related to border security, aviation, and

infrastructure protection. I was also deeply engaged in the creation of the

Department's first team dedicated to confronting the then-nascent cybersecurity

threat. After my service at DHS, I continued to work extensively on cybersecurity

issues in my consultancy and as an adjunct faculty member at Johns Hopkins

University's Zanvyl Krieger School of Arts and Sciences Advanced Academic

Programs, teaching courses on homeland security, cybersecurity policy, and

congressional affairs.[1]  To be clear however, today I am expressing my personal

---

[1] The views expressed today are solely my own and are not representative of Johns Hopkins or any other organization.

1

36

views.  I am appearing in my individual capacity and not as a representative of any company or organization.

The Department's mission is stated simply—"With honor and integrity, we will safeguard the American people, our homeland, and our values"—but in practice it is anything but. To be successful, DHS must be dynamic and possess the ability to evolve ahead of the ever-changing threats we face. It is important to note that DHS was created in response to the devastating terror attacks of September 11, 2001, and, as such, it initially focused on physical threats to the homeland. Emergency management was also a core function of the Department from its inception. But securing the homeland took on additional meaning as cyber attacks emerged as one of the most serious threats to our national security. Over time, the Department has taken on the dual functions of protecting federal civilian networks and of building cybersecurity partnerships with private sector stakeholders. The Department has done an admirable job, and its recent efforts, working with the private sector to blunt the impact of the WannaCry ransomware attack is just one example of its fine work in the cyber arena.

As the Committee is well aware, however, more work remains. The focus of my testimony will be on the internal side of DHS's cyber mission, which is to protect government networks. This portion of DHS's mission is foundational, because the Department cannot be well-positioned to assist the private sector and serve as a model of best practices for state and local governments until it has its own federal systems secure. Additional resources and legislative fixes will be critical in equipping the Department to carry out its mission.

**Current Cyber Threat Landscape**

37

Cyber threats pose a real and immediate danger to our federal government and the American people it represents.  The increasing volume and sophistication of cyber attacks puts the sensitive information, taxpayer money, and critical systems controlled by the federal government at serious risk.  We have seen dramatic and far-reaching consequences from cyber attacks on the federal government in recent years.  In 2015, a data breach at the federal Office of Personnel Management exposed the personal information of more than 20 million current, former, and prospective federal employees and contractors.[2]  But, only a tiny fraction of cybersecurity incidents garner media attention.  The unfortunate reality is that breaches within and attacks on federal government systems are pervasive.  In 2016, the federal government experienced 30,899 cyber incidents that led to the compromise of information or system functionality, according to a report from the Office of Management and Budget.[3]  Moreover, federal agencies faced thousands of other attempted intrusions that were ultimately unsuccessful.

**Importance of Hearing**

This hearing comes at a critical moment. Those of us who follow cybersecurity issues have long wondered when the tipping point will be reached. That is, when does the cyber threat become real and tangible enough for us to stop being reactionary and finally dedicate sufficient resources and talent to get ahead of it?  I believe that moment is now, and I thank the Committee for its important and continuing work in providing coherence and funding to federal cybersecurity efforts. The Department is resilient and, with the help of Congress, it has dramatically improved its capacities in other areas: Aviation security and emergency

---

[2] "OPM Hack: Government Finally Starts Notifying 21.5 Million Victims," NBC News, 10/1/2015
[3] Federal Information Security Modernization Act of 2014 Annual Report to Congress – FY2016, Office of Management and Budget, November 2016

38

management, for example.  The same can happen with cybersecurity.  With

guidance, support, and funding from Congress, DHS could provide the federal

civilian network protection that the American people need and deserve.

**Challenges at the Federal Level**

The first hurdle DHS must clear is the update of its systems and technology.

The scope of the cybersecurity challenge has grown exponentially over the past

decade.  The Government Accountability Office (GAO) found that the number of

annual information security incidents affecting the federal government has grown

by more than 1,300 percent since fiscal year 2006.[4]  But the cybersecurity

infrastructure at the federal level has not kept pace. While I served at DHS, one of

my responsibilities was to work as a DHS representative with the initial group of

individuals at the national cyber security division to establish relationships with the

other agencies, the private sector, and leaders on Capitol Hill to create the early

cybersecurity framework to guide departmental operations.  Programs that are still

in operation today – like Einstein, which detects and blocks cyber attacks and

allows DHS to use threat information detected in one agency to protect the rest of

the government – were born during those early days and, unfortunately, the

Department is still using technology and strategy from 15 years ago. The GAO

recently concluded, "Einstein was largely ineffective at thwarting hackers" because

it "could only detect known cyber threats and lacked the ability to suss out

sophisticated hackers."[5]

Another challenge to be addressed is the organization of DHS's cybersecurity

function.  The cyber organization was initially buried in the now-defunct Information

[4] Testimony Before the Subcommittee on Research and Technology, Committee on Science,
Space, and Technology, House of Representatives – Cybersecurity: Actions Needed to Strengthen US Capabilities, United States Government
Accountability Office, 2/14/2017
[5] "DHS cyber chief defends expansion of criticized software," The Hill, 2/11/2016

4

39

Analysis and Infrastructure Protection bureaucracy. When DHS was reorganized in the wake of Hurricane Katrina, several agencies, including the Office of Biometric Identity Management, the Federal Protective Service and the cyber functions, were left without a home and were all grouped together into a new sub-organization at DHS called the National Protection and Programs Directorate (NPPD).  As a result, it is not apparent from the cybersecurity operation's organizational status that cybersecurity is a top priority for DHS.  Cybersecurity operations lack the organizational muscle, credibility and political support they need in order to lead on cyber. For example, the procurement of the more than one billion dollar "Domino" program was delayed for almost three years, undermining DHS' ability to increase its cybersecurity capacity. DHS should be reorganized to create a standalone cybersecurity component agency; a critical first step is the appointment of an Undersecretary of NPPD who can serve as a point person for the Department's cyber functions.

This important hearing is focused on the removal of potentially problematic software – this issue is partly the result of massive confusion about who, specifically, is in charge at DHS. Without a dedicated cyber organization to set policy, different Chief Information Officers (CIOs) are independently responsible for purchasing software and other cybersecurity tools – leading to a system that relies on many different products with differing levels of quality and security. Reorganization would allow cybersecurity authority to be both concentrated within the Department—in the leadership of a standalone agency—and exerted across DHS and the federal civilian operations—through cybersecurity leadership that possesses the requisite authority and clout.

40

Returning to software acquisitions, a compounding factor to the current challenge is the fact that – as a result of sequestration – many CIOs are forced to abide by the lowest price technically acceptable (LPTA) standard, which often means they don't end up with the best products. In order to have a first-class civilian cyber organization, the Federal government needs to spend money and provide consistent guidance on high-quality, secure products.  Funding is a key issue when it comes to cybersecurity infrastructure across the federal government. When President Trump signed an Executive Order ("EO") 13800 - "Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure" – he indicated a commendable focus on the security of federal networks. Two key provisions of the EO are the requirement that all Federal agencies use the National Institute of Standards and Technology Cybersecurity Framework and the direction to all federal agencies to identify ways to improve cybersecurity in critical infrastructure.  But without funding, these well-intended orders become unenforceable mandates.  The protection of federal civilian networks therefore hinges on support and funding that must be initiated in this Chamber.

**Recommendations**

In the face of rapidly increasing and evolving threats to cyber infrastructure, there are certain concrete steps Congress and the federal government can take to protect critical systems:

1. There is currently legislation pending – H.R.3359, the Cybersecurity and
   Infrastructure Security Agency Act of 2017 – that would reorganize DHS and
   create a dedicated cyber agency. Centralizing civilian cyber operations within

41

DHS will create a more coherent chain of command for addressing cybersecurity issues and will help leverage limited resources more effectively. Establishing a trusted organization that has research and development capabilities, and the ability to share information in real time will only be possible with a new, fully-funded organization. Congress should act quickly to implement such a reorganization.

2. Budget cuts across the Federal government – specifically as a result of sequestration – have forced CIOs and other officials to rely on the lowest price technically acceptable (LPTA) standard when acquiring cybersecurity software and other tools. When it comes to critical cybersecurity infrastructure, sacrificing quality for short-term savings has the potential to leave open vulnerabilities and cost more money in the long-term as a result of intrusions. CIOs and other officials across federal agencies should be empowered with the resources necessary to invest in high-quality, reliable cybersecurity tools.

3. The quality of cybersecurity software and other tools is tremendously important, but there are many different options available to federal, state, and local officials. As the current situation demonstrates, implementing problematic software and later removing it creates significant disruption. The federal government should take the lead on developing a "trusted vendor" list that provides guidance on approved cybersecurity vendors with a secure supply chain that agencies can have confidence in. While this list should

42

certainly consider the risks associated with sourcing foreign cybersecurity tools, it should recognize that many trusted allies produce high-quality products that would benefit the United States.

4. Prevent Redundancy – The White House, Office of Management and Budget and the Congress should work together to prevent redundancy across the federal government so that competing cyber organizations do not arise in other federal agencies and, instead, centralize federal resources in DHS.

**Conclusion**

Thank you very much for the opportunity to testify, and I welcome your questions.

43



**James Norton**
Founder and President, Play-Action Strategies LLC

James Norton is the Founder and President of Play-Action Strategies LLC, a comprehensive strategic consulting firm located in Washington, D.C.

Previously, James served in multiple positions at the U.S. Department of Homeland Security (DHS), including as Deputy Assistant Secretary of Legislative Affairs, where he was responsible for helping to develop and implement critical policies related to border security, aviation, and infrastructure protection, including the creation of DHS' first cybersecurity team.

James has also previously served as a senior defense-industry executive and as a Special Assistant to U.S. Environmental Protection Agency Administrator Christine Todd Whitman. Since 2008, he has taught graduate level courses on homeland security, cybersecurity policy, and congressional affairs as an Adjunct Professor in the Johns Hopkins University Zanvyl Krieger School of Arts and Sciences.

James has received distinguished awards from both the Environmental Protection Agency and DHS for his government service.

Originally from Massachusetts, James holds Bachelor of Science and Master of Business Administration degrees from Salve Regina University.

James can be reached at James.Norton@playaction.com.

44

Chairman LAHOOD. Thank you, Mr. Norton.

At this time I recognize Mr. Kanuck for five minutes to present his testimony.

**TESTIMONY OF SEAN KANUCK**

Mr. KANUCK. Good morning. Thank you, Chairman LaHood, Ranking Member Beyer, and Distinguished Members of Congress. It's my pleasure to be here today, and being a strategic threat analyst, I'm going to speak directly to the risks theoretically posed by Kaspersky Lab and Russian cyber operations.

First, I think we need to understand the very nature of the technologies that Kaspersky products offer. They are complete network monitoring solutions that can see all activity on their clients' networks, and they have remote administration capabilities. In these ways, they are not dissimilar from many other IT security vendors' products, but what is important to note here is that discussions about surreptitious backdoors in these kind of products is actually a fairly moot point because the very nature of these products and services is to have a wide-open front door. Clients pay for that 24/7 monitoring of their entire network.

Now, what is interesting, that ends up an aggregate providing Kaspersky Lab and other similar vendors incredible optic and visibility into global internet activity including malicious software, espionage activities, and other things. In essence, it becomes a private global cyber intelligence network, and as we've seen from the recent media reports this month, that kind of capability is incredibly desired by government intelligence actors. If we believe the media reports in the public sector, then at least two foreign government agencies have exploited Kaspersky's network, and in my mind, that makes the question of "is there a risk through Kaspersky products" to become nearly tautological because allegedly it's already happened twice.

Furthermore, I do not personally feel it is necessary to prove a willful complicity or collaboration by Kaspersky employees or the company with the Russian government or any other to show that there is a potential risk. That added factor, if it were true, would of course be a counterintelligence concern and a further cause for prohibiting such software or products. But the mere fact alone that foreign intelligence agencies have sought access through this implies there is a risk.

So what I think we need to do is actually focus on that foreign intelligence threat and let's take a moment to discuss Russian cyber posture. I can't do it any justice better than Director of National Intelligence Dan Coats did in his worldwide threat assessment presentation in May where he identified Russia as a primary cyber threat actor of the United States with a continued interest in exploiting our networks not only for espionage but for influence operations, and that testimony further noted that even disruptive actions have been undertaken by Russia against targets outside the United States. So when we combine that willful interest in adversarial context with the telecommunications surveillance and monitoring laws of Russia and the access potentially posed by Kaspersky Lab products, you have a potent combination.

45

Even without complicity, it is theoretically possible that all Kaspersky Lab corporate communications transiting nodes in Russia could possibly be monitored by the domestic security service under their telecom surveillance laws. Therefore, if you are trying to examine the full scope of this threat, a simple review of Kaspersky's products themselves or the source code would not be enough. You have to understand the commands that remote administrators or unauthorized third parties may be issuing to those client networks through that access point, and you must understand traffic routing of the global internet and how Kaspersky communications move between its regional offices and different counterparts.

Moving to a strategic risk management perspective, I offer that resilience is the key to better security, and my witnesses—my fellow witnesses have already spoken to that to some degree, and I believe that internal review of one's own enterprise assets and who might be trying to compromise them is essential.

I'll conclude by offering a couple thoughts on the prohibition of Kaspersky Lab software in U.S. government networks. I do believe there's a risk posed, and my assessment is primarily based on historical arguments of what has already happened as well as the access that I've described and the foreign threat actors. I am also aware that U.S. government actions against specific named foreign companies may likely result in similar backlashes against U.S. corporate entities. That's not a security risk assessment, it's a political realism.

My last comment will be that I would encourage the U.S. government to assess all IT products from all vendors regardless of national origin because if we're trying to protect sensitive information, we should be fully cognizant that foreign intelligence actors will be willing to exploit any IT vendor that we're using, even if it's not of their own national origin.

Thank you very much.

[The prepared statement of Mr. Kanuck follows:]

46

**STATEMENT FOR THE RECORD**

of

**Sean Kanuck**
**Director for Future Conflict and Cyber Security**
**IISS-Americas**

for

**United States House of Representatives**
**Committee on Science, Space, and Technology**
**Subcommittee on Oversight**

**Hearing entitled**
**"Bolstering the Government's Cybersecurity: Assessing the Risk of**
**Kaspersky Lab Products to the Federal Government"**

**25 October 2017**
**10:00 am**

**Rayburn House Office Building**
**Room 2318**

47

Chairman LaHood, Ranking Member Beyer, and distinguished Members of Congress:

It is my honor and privilege to participate in the hearing entitled "Bolstering the Government's Cybersecurity: Assessing the Risk of Kaspersky Lab Products to the Federal Government" before the Subcommittee on Oversight of the Committee on Science, Space, and Technology of the House of Representatives. I thank you for your invitation and sincerely hope that my contribution will assist you in your work on this critical topic.

This Statement for the Record draws upon my twenty years of experience in the field of information and communication technologies (ICT), including: as a strategic analyst with the International Institute for Strategic Studies (IISS), as a professional attorney who specializes in cyber law, and formerly, as a senior intelligence officer for the United States Government. Although my testimony today is completely unclassified and provided in my current capacity as a think tank researcher, the perspective offered herein also benefits from my background as the National Intelligence Officer for Cyber Issues from May 2011 to May 2016. Having led cyber threat analysis for the US Intelligence Community for five years, I am quite familiar with assessing the cyber risk to both federal government and critical infrastructure systems.

My testimony will focus on assessing the risk of employing foreign ICT products and services in government networks and attempt to provide a better understanding of how they can be exploited. In my view, the present issue regarding Kaspersky Lab represents only one instance of a much larger and very complicated cyber security challenge that the US government, many other governments, and private industry all face today. While I am indeed knowledgeable of Executive Order 13800 and the National Institute of Standards and Technology (NIST) Cybersecurity Framework, I will largely defer to my fellow witnesses who are in active government service to comment on the current implementation of those policy initiatives.

1.  Kaspersky Lab

In order to properly assess any risk posed by Kaspersky Lab products to the federal government, one must first understand the technical nature of those products themselves. As with many other ICT vendors and service providers, Kaspersky Lab remotely administers its services on client networks. Moreover, the very nature of Kaspersky Lab's security product offering is to provide constant and complete network monitoring to prevent and/or detect cyber intrusions and the harmful effects of malicious software. Discussions regarding the potential to introduce surreptitious "back doors" into Kaspersky Lab software are largely a moot point, because a well-known – and explicitly marketed feature – of the product offering is a wide open "front door" for Kaspersky algorithms and technicians to not only view corporate network activity (including files and traffic flows) but also to issue remedial instructions to computers on the networks they protect.

An October 2014 marketing publication by Kaspersky Lab detailed the level of system monitoring that occurs:

48

> "Kaspersky System Watcher scans the most relevant system event data.  The monitor tracks information about the creation and modification of files, the work of system services, any changes made to the system registry, system calls and data transfers over the network.  System Watcher also processes information about operations with symbolic links containing references to files or directories, modifications of the master boot record where the loader for the installed operating system is stored and interception of OS boots.  Moreover, it analyses the contents of the packets transmitted via TCP, the main Internet transport layer protocol, in search of any evidence of criminal activity.  The data collection process is automated and does not require user interaction."[1]

There can be no doubt that Kaspersky Lab products are thorough in their network monitoring.  That is exactly what its customers are knowingly and willingly paying for, and that directly contributes to the commercial success of its business.

Another important consideration is Kaspersky Lab's ability to aggregate network information from a large and geographically diverse client base.  Like other cyber security firms, cloud service providers, and telecommunications companies, Kaspersky Lab has broad visibility of activity on the Internet.  As a result, it is able to detect trends and anomalies that could indicate malicious software tools, cyber intrusion efforts, and even espionage operations.[2]  That capability becomes equivalent to a global cyber intelligence analysis capacity and would therefore be of high interest to many nation states.  In fact, numerous press articles from October 2017 state that Israeli intelligence officers penetrated Kaspersky Lab and thereby detected Russian spying efforts that also exploited the company's access and databases.[3]

The next issue that must be considered in assessing any risk of Kaspersky Lab products to federal government systems is whether willful complicity with foreign intelligence or security services is required for such threats to manifest themselves.  The answer there is a resounding "no."  If the media reports mentioned above are accurate, then at least two foreign governments have already penetrated and leveraged Kaspersky Lab's cyber security products and/or international ICT network access.  While the company may remain adamant that such exploitation has occurred unwittingly, the question of knowing complicity may actually be a secondary counter-intelligence concern that distracts somewhat from the underlying cyber risk concern.  I respect that the United States, Israel, and other governments may be highly interested in determining if Kaspersky Lab, or any of its employees, are operating in league with the Russian intelligence and security services, but that is immaterial from a basic analytic viewpoint.  If Russian operatives – or Israeli operatives for that matter – have been able to exploit Kaspersky Lab, then the answer to the question about risk to federal government systems becomes tautological.  Then only remaining question then is whether Kaspersky Lab is more prone or susceptible to such activity than other cyber security vendors, for it is clear that foreign intelligence services are not limited to exploiting the products of companies originating from their own countries.  National laws and regulations may, however, make it much easier for them to do so.

49

In the case of the Russian Federation, world-class intelligence capabilities combined with legally mandated telecommunications monitoring for law enforcement and national security purposes makes the threat very real. "Russian law gives Russia's security service, the FSB, the authority to use SORM ("System for Operative Investigative Activities") to collect, analyze, and store all data that [sic] transmitted or received on Russian networks, including calls, emails, website visits and credit card transactions. SORM has been in use since 1990 and collects both metadata and content."⁴ Accordingly, any Kaspersky Lab data that electronically transits ICT networks within Russian jurisdiction could, at least theoretically, be subject to Russian government surveillance.

So once again, willful complicity may not be a required element of any foreign intelligence threat related to Kaspersky Lab. If Kaspersky Lab were required by law to render its source code to Russian authorities, or if Kaspersky Lab communications from its global operations were subject to SORM monitoring at transit points in the Russian Federation, then its mere compliance would provide Russian authorities a clear intelligence advantage. In many respects, the subject matter of this Hearing is similar to previous investigations of Chinese ICT vendors conducted by the House Permanent Select Committee on Intelligence.⁵ That report concluded that, although it could not prove wrongdoing, "The investigation concludes that the risks associated with Huawei's and ZTE's provision of equipment to U.S. critical infrastructure could undermine core U.S. national-security interests." The analysis centered mainly on the <u>potential</u> for intelligence access to be derived through corporate products of foreign origin, and shifted the focus to the known espionage activities and likely intent of the foreign government. Accordingly, any discussion of Kaspersky Lab must appropriately acknowledge the Russian cyber threat.

2.  Russian Cyber Operations

The Director of National Intelligence's (DNI) Worldwide Threat Assessment from May 2017, leaves no doubt that Russia remains one of the most capable cyber adversaries of the United States. His testimony before the Senate Select Committee on Intelligence stated:

> "Russia is a full-scope cyber actor that will remain a major threat to US Government, military, diplomatic, commercial, and critical infrastructure. Moscow has a highly advanced offensive cyber program, and in recent years, the Kremlin has assumed a more aggressive cyber posture. ... In some cases, Russian intelligence actors have masqueraded as third parties, hiding behind false online personas designed to cause the victim to misattribute the source of the attack. ... We assess that Russian cyber operations will continue to target the United States and its allies to gather intelligence, support Russian decision-making, conduct influence operations to support Russian military and political objectives, and prepare the cyber environment for future contingencies."⁶

Russian efforts to influence the 2016 presidential election in the United States are just the latest in a long history of Russian cyber operations. The DNI 's testimony also noted that "Outside the United

50

States, Russian actors have conducted damaging and disruptive cyber attacks, including on critical infrastructure networks."

If one considers Russia's intentions in cyberspace and conjoins it with the kind of information and access that could be derived from exploitation of Kaspersky Lab products and services, then the risk must be considered to be substantial. Finally, in order to determine the magnitude of that risk, one would need to look well beyond the source code of those Kaspersky products themselves. A thorough review of Russian intelligence operations, telecommunications surveillance laws, and decryption capabilities would be required, as well as a proper understanding of the Internet traffic routing patterns of Kaspersky corporate communications.

The risk associated with the Russian Federation's cyber activities must be imputed to any ICT systems or vendors over which that country's authorities are able to exercise control – wittingly or unwittingly. In this case, Kaspersky Lab's assertions that it does not collaborate with any intelligence or security services are not necessarily inconsistent with the fact that its networks could be nonetheless exploited by such services. In fact, the open source reporting previously mentioned in this Statement for the Record would seem to suggest that is a very real concern. Russian cyber operations targeting United States interests would likely leverage any avenue that could provide the desired access or information.

3.   Strategic Risk Management

The final topic that I would like to concentrate on is strategic risk management of cyber threats. The greatest factor in deterring or preventing foreign cyber espionage and cyber attacks is improving the resilience of the United States' own ICT networks. That holds true for both public and private sector infrastructures. As I envision it, such resilience includes both (i) better cyber defenses to prevent intrusions, as well as (ii) alternative back-up systems to provide critical services when the primary ICT networks that we rely upon are degraded. Cost-saving measures and the convergence of ICT platforms in general (at the network, protocol, and device level) have dramatically reduced the redundancy that can provide continuity of service under adverse circumstances. Many single "points" of failure (to include persons, processes, software applications, hardware platforms, logical protocols, infrastructure nodes, etc.) are being created which threaten the robustness of the information resources that underpin the governments, industry, and the global economy.

Executive Order 13800 and the NIST Cybersecurity Framework are important steps to help safeguard critical information infrastructures. Furthermore, I believe that information security practitioners must repeatedly assess their own enterprise networks and determine not only what information assets they possess, but also, what entities might seek to compromise (e.g. steal, expose, disrupt, destroy) those assets. For entities like the United States government whose networks are obvious targets of interest for foreign cyber actors, it may be appropriate to institute profound measures that reduce potential foreign access. Banning Kaspersky Lab products from

51

federal systems may be one such measure, just as banning Huawei from the United States' telecommunications backbone was also deemed a necessary national security precaution.

It must be noted, however, that any such decisions may produce a reciprocal backlash from foreign governments that would adversely impact the commercial opportunities of US companies. I consider that economic policy consideration to be analytically distinct from questions of systemic cyber risk, but I am well aware that it will necessarily be part of related policy discussions. ICT vendors from the United States have already been disadvantaged as a result of previous geo-political strife, and one can presume more instances in the future. Therefore, from a policy perspective, it might be preferable to regulate or legislate against the factors and/or features that give rise to any cyber risks that are deemed unacceptable. For example, instead of outlawing Kaspersky Lab products per se, one could imagine restrictions that proscribe products of any origin that transmit US government data overseas or which maintain unfettered remote access throughout entire networks. In this regard, limitations could be imposed analogous to those that have been applied to cases brought before the Committee on Foreign Investment in the United States (CFIUS).

In conclusion, I assess that the threat of foreign cyber exploitation of Kaspersky Lab products remains a sincere concern for US federal networks. That assessment, however, rests largely on the public record of third-party exploitation, Russia's known cyber practices vis-à-vis the United States, and the inherent nature of Kaspersky's technological offerings. Willful collaboration would be a further concern, but one that is not necessarily required to assess a substantial risk. Finally, I would strongly recommend an equally rigorous analysis of the security of all ICT products used in federal networks – regardless of the national origin of the vendor – for we know that intelligence operatives are criminals alike are highly opportunistic actors.

Once again, thank you for the opportunity to provide this public service.

Respectfully submitted by Sean Kanuck, Director for Future Conflict and Cyber Security, IISS-Americas.

52

[1] Kasperksy Lab, "Preventing emerging threats with Kaspersky System Watcher", October 2014.

[2] Kaspersky Lab, Press Release entitled "Kaspersky Lab Identifies Operation 'Red October,' and Advanced Cyber-Espionage Campaign Targeting Diplomatic and Government Institutions Worldwide", 14 January 2013; Kaspersky Lab, Press Release entitled "Equation Group: The Crown Creator of Cyber-Espionage", 16 February 2015.

[3] The New York Times, "How Israel Caught Russian Hackers Scouring the World for U.S. Secrets", 10 October 2017; The Washington Post, "Israel hacked Kaspersky, then tipped the NSA that its tools had been breached", 10 October 2017; The Guardian, "Israel hack uncovered Russian spies' use of Kaspersky in 2015, report says", 11 October 2017.

[4] Center for Strategic and International Studies, Reference Note on Russian Communications Surveillance, 18 April 2014.

[5] Chairman Mike Rogers and Ranking Member C.A. Dutch Ruppersberger of the Permanent Select Committee on Intelligence, "Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE", 8 October 2012.

[6] Daniel R. Coats, Director of National Intelligence, Statement for the Record, Worldwide Threat Assessment of the US Intelligence Community, 11 May 2017.

53

## SEAN KANUCK

Sean Kanuck is the Director of the Future Conflict and Cyber Security program at the International Institute for Strategic Studies.  He has also received several international appointments, including: Chair of the Research Advisory Group for the Global Commission on the Stability of Cyberspace (Hague, Netherlands), Distinguished Visiting Fellow at Nanyang Technological University (Singapore), and Distinguished Fellow with the Observer Research Foundation (New Delhi, India).

From 2011-2016, Sean led cyber analysis for the US Intelligence Community as its first National Intelligence Officer for Cyber Issues.  He came to the National Intelligence Council after a decade of experience with the Central Intelligence Agency's Information Operations Center, the White House National Security Council, and the United States delegation to the United Nations Group of Governmental Experts on international information security.

Prior to government service, Sean practiced law with Skadden Arps in New York City, where he specialized in mergers and acquisitions, corporate finance, and banking matters.  Sean holds degrees from Harvard University (A.B., J.D.), the London School of Economics (M.Sc.), and the University of Oslo (LL.M.).

54

Chairman LaHood. Thank you, Mr. Kanuck, for your opening statement, and thank all the witnesses for your opening statement. We will begin the questioning part of the hearing today, and with that, the Chair recognizes himself for five minutes.

I'd like to start. After months of denying any improper activity, and Kaspersky has claimed that any allegation they're involved with cyber espionage or involved with the Russian government, they claim that's false allegations, and today there's an article by Reuters that came out this morning on the cusp of this hearing titled, "Kaspersky says it obtained suspected NSA hacking code from U.S. computer," and that article goes on to say, and Kaspersky Lab admits "that its security software had taken source code for a secret American hacking tool from a personal computer in the United States." And in fact, in this article, the company admits that it exfiltrated the code earlier than previously reported and that Kaspersky gained access in 2014, and I think that's troubling on a lot of levels.

Let me just start off with you, Mr. Norton. Should the federal government have known about this incident?

Mr. Norton. Thank you for the question. You know, I think that we need to take into effect that there's kind of the military side of federal networks, the military networks, and then there's the civilian side of networks, and I think, you know, what we're seeing today is that it's been years of really underfunded networks where we haven't really had the capability or the staffing or the opportunity to really take a look, an internal look at, you know, what is on the network outside of kind of these kind of clean-up that's going on right now in terms of removing what's on there. So I think that, you know, we need to take into effect that we haven't really taken this issue seriously. The Executive Branch is just now looking at this in the last couple of years and so I think that it's obviously a big miss and there's been a lot of success in terms of foreign adversaries being able to infiltrate not only the DOD, DHS and other networks as well as civilian networks, and so I think that it's definitely an issue that it's important that it's being covered in this hearing and that it is something that we need to know going forward. However, you know, I think we just haven't had the capability in place over the last couple of years to even know what's there, and I think that's part of the trouble.

Chairman LaHood. And Mr. Norton, what are the consequences of this revelation?

Mr. Norton. Well, I think what you're seeing today is the government essentially scrambling to fix this. I think the fact that Homeland Security Secretary had this public announcement of removing the software is really alarming in the sense that, you know, for it to raise to that level, for the Secretary to put out an immediate edict across the federal government, I think that is certainly troubling and that's something that it says that we're not where we need to be and we have a long way to go to get there in terms of securing out networks.

Chairman LaHood. And does it surprise you that Kaspersky has denied this all the way through until today?

Mr. Norton. You know, I don't have access to all the intelligence. You know, I think that the issue is not only, you know,

55

Kaspersky but I think other, you know, possible intruders that are, you know, on the network that are there. So I think this is absolutely a global issue. I think that, you know, for DHS and other intelligence communities to probably share more would be a good thing so the general public has a sense of what this means and how it is impacting our networks, so I think it's important for them to tell us a little bit more so we know what's going on.

Chairman LaHood. Ms. Dodson, same question for you in terms of should the federal government have known about this incident and what are the consequences of this revelation?

Ms. Dodson. So from the NIST perspective, security controls that we provide through our guidelines and special publications provide guidance on how to set up security for networks and be able to take a look at those. But a second critical issue relates to supply chain, and that is the ability to understand your suppliers, the kinds of products and services that you have and that you're using in your systems. NIST has been working with the federal government and with industry to develop supply chain guidelines as part of the Framework for Improving Critical Infrastructure that can be used to give organizations a much better understanding of those suppliers so that they can have the trust and confidence that they need when they put these products and services on their networks.

Chairman LaHood. As a follow-up on that, can you—what confidence can you give us that the NSA, their ability to stay ahead of our adversaries on this issue?

Ms. Dodson. I can't speak for another organization such as——

Chairman LaHood. Do you have an opinion on that?

Ms. Dodson. The federal government as a whole is taking the threat issues very seriously across government and working with industry to set up information-sharing systems so that as threat issues come up we can act and respond quickly. We are all taking this kind of issue very, very seriously.

Chairman LaHood. Thank you.

I now yield to Mr. Beyer for his questions.

Mr. Beyer. Thank you, Mr. Chairman, very much.

Mr. Norton, thank you for bringing up the LPTA issue. I will just quote you quickly: "Many CIOs are forced to abide by the lowest price technically acceptable, LPTA standard, which often means they don't up with the best products." I couldn't agree more, and we have a bipartisan bill, Mark Meadows and I, which has been reported out of the Oversight and Government Reform Committee unanimously. So if you can help us get it on the House Floor, we can get it passed unanimously and send it over to the Senate and not tie the hands of our purchasing agents on lowest price rather than encouraging them to get the best value.

Mr. Kanuck, Ms. Dodson talked about the voluntary risk-based, flexible, repeatable and cost-effective approach of the NIST Framework. So that's for the federal government. At what point do we ever consider making it mandatory across the U.S. business community or mandatory for subcontractors of the federal government? When do we elevate it to just beyond where we are?

Mr. Kanuck. Currently, that is not the approach under law and regulation. Private-sector entities are left to their own corporate

56

policies and hiring cybersecurity elements to assist them. As far as taking legislative or regulatory actions to mandate certain activities, that may be forthcoming in the future but I cannot speculate on that. What the NIST Framework does is, it provides a baseline for a lot of the private sector to emulate what the government is doing and is required as Ms. Dodson said. I think that is universally viewed as a positive. And the challenge remains, is the U.S. government going to force actions on the private sector, and there are pros and cons to that.

Mr. BEYER. One of the things we may think about is, do we begin with government contractors?

Mr. KANUCK. That is actually a very interesting point to start, and clearly in the defense industrial base that is done through the procurement power of requiring certain aspects of cybersecurity to be utilized or followed by entities that are contracting with the U.S. government, and there's been success with that model. So that may be a model to be extended beyond just the defense contracting community. I think that would be a wise option.

Mr. BEYER. Mr. Kanuck, you probably know what's been called the Gerasimov Doctrine, so I'll take a moment to explain to others who may not have read it.

In 2013, General Valery Gerasimov, Russia's Chief of the General Staff, or head of its military, published an article titled "The Value of Science is in the Foresight" in a weekly Russian trade paper in which he let out—laid out his theory of modern warfare. He blends tactics developed by the Soviets with strategic military thinking about total war, which looks much more like the hacking of an enemy's society than attacking it head on. He wrote, "The very rules of war have changed. The role of non-military means of achieving political and strategic goals have grown. In many cases, they have exceeded the power of the force of weapons and their effectiveness. All of this is supplemented by military means of a concealed character."

So Mr. Kanuck, do you believe that we're seeing the Gerasimov Doctrine in practice during this last election cycle, and what are they trying to achieve by engaging these aggressive assaults on our democracy?

Mr. KANUCK. Well, I think you're not only seeing it in the form of influence operations in recent democratic elections in the United States and/or France, I think you've also seen it conjoined with military operations in Crimea or Ukraine as well. The Russian Federation, as I alluded to in my written comments and my opening statement, is very active in the area of information operations beyond the simple layer of cyber or critical infrastructure issues that we tend to think about. They actually used the word "information confrontation" when discussing this issue, and that is a wholesale part of their strategic paradigm. You can read it in the open translations of their strategic doctrine from 2000 onwards, and as you articulated it, I would wholeheartedly concur that you are seeing that assault on the intellectual and media space of societies through cyber means. What they have found is the perfect tool set, whether it's social media, remote hacking, et cetera, to achieve their philosophical objective through that stated doctrine.

57

Mr. BEYER. Thank you. Quick question. You wrote that all similar companies, the antivirus, could be unwittingly exploited by third parties. How at risk are Norton and MacAfee of this, you know——

Mr. KANUCK. I am not——

Mr. BEYER. —especially when you talk about they create the open front door.

Mr. KANUCK. So I'm not prepared to talk critically about other companies besides Kaspersky today. I will say, though, that a proper review of the features of a lot of these security softwares would allow you to do a proper assessment, and quite frankly, in my experience, foreign intelligence actors and criminals alike, once they find out who has access to the network they seek access will attempt to derive ways to exploit that path in, and it's a matter of intent and resources. I do not believe there is any network or any product that is perfectly secure. It's all a risk management issue.

Chairman LAHOOD. Thank you, Mr. Beyer.

I now yield to Mr. Higgins for his questions.

Mr. HIGGINS. Thank you, Mr. Chairman. I ask unanimous consent to enter a letter from Mr. Troy Newman, a cybersecurity professional with whom I consulted, to the record.

Chairman LAHOOD. Without objection.

[The information appears in Appendix II]

Mr. HIGGINS. Thank you, Mr. Chairman.

Ms. Dodson, how long have you been a cybersecurity advisor for the United States government?

Ms. DODSON. I have worked at NIST since 1987, and I've been the Chief Cybersecurity Advisor for about four years.

Mr. HIGGINS. So you were in place in 2012?

Ms. DODSON. Yes.

Mr. HIGGINS. You mentioned in one of your responses that the U.S. government is taking cybersecurity and the realm of cyberattack very seriously. Were we taking it very seriously in 2012 when the State Department contracted with Kaspersky?

Ms. DODSON. The federal government has been working on issues related to supply chain for about seven years, and we continue to work on our guidelines there as the complexity of our systems continue to grow. There are challenges in understanding all that we have in our networks but it's necessary to do that, and our work with the Framework to improve critical infrastructure cybersecurity provided some opportunities to think about supply chain, to think about resiliency in our networks so that we can understand cyber threat and respond quickly to those.

Mr. HIGGINS. So in your opinion, the United States government was taking cybersecurity very seriously in 2012?

Ms. DODSON. I think NIST has been taking cybersecurity seriously——

Mr. HIGGINS. Very well.

Ms. DODSON. —for a very long time.

Mr. HIGGINS. Mr. Chairman, Kaspersky product has over 400 million users nationwide. It's widely known Kaspersky's ties to the FSB. That's the Federal Security Service, the Russian Federation. FSB is the main successor to the Soviet Union's former KGB. Kaspersky headquarters is headquartered in Moscow in the former

58

KGB headquarter buildings in Lubyanka Square, and yet in 2012, the United States State Department contracted with Kaspersky. I read from Mr. Newman's letter that I entered into the official record earlier. Many security software users believe that security software is akin to a shield, that this shield wards off would-be attackers. The reality is that security software is more similar to an inoculation, as Mr. Kanuck pointed out earlier. Security software resides deep inside the computers and infrastructure within the very most sensitive and secure areas. In order to install any effective security software, we must first expose the system, making all information vulnerable. The security software has full access to all input and output operations. Security software is fully imbedded in such a way that it has complete access to total—to the entire system.

Mr. Shive, you're familiar with the end-user license agreement for security?

Mr. SHIVE. Yes, I am.

Mr. HIGGINS. That's the part that most Americans when we purchase a cybersecurity product, it appears on the screen and it's a lot of language that we don't read, we just click "I agree." Is that correct?

Mr. SHIVE. Yes.

Mr. HIGGINS. The end-user license agreement for Kaspersky systems is governed by the laws of the United States or by the laws of the Russian Federation?

Mr. SHIVE. If they're doing business in the United States, it would be governed by the United States.

Mr. HIGGINS. The end-user license agreement for Kaspersky products, Mr. Chairman, according to my research, are governed by the laws of the Russian Federation. We have certainly begun recently taking cybersecurity very seriously, but I find it alarming that although it was rather well known within the cybersecurity realm that Kaspersky was—you know, posed a particular risk—we continued to do business with them until very recently.

Let me just ask quickly, Mr. Shive. Are U.S. government employees restricted from using Kaspersky products, devices, on their own at this time?

Mr. SHIVE. I can't speak for the entire government. TSA employees are not restricted.

Mr. HIGGINS. Are Kaspersky products still allowed to be purchased by U.S. government agencies outside or separate from the GSA contract process?

Mr. SHIVE. Not if they're going to comply with the Binding Operational Directive that DHS published.

Mr. HIGGINS. And my colleague asked earlier, are U.S. government contractors restricted from using Kaspersky products?

Mr. SHIVE. Yes, they are as a result of the Binding Operational Directive.

Mr. HIGGINS. Mr. Chairman, my time has expired. I thank you for your cooperation.

Chairman LAHOOD. Thank you, Mr. Higgins.

I now yield to Ms. Johnson for her questions.

Ms. JOHNSON. Thank you very much.

59

Mr. Kanuck, the Russians appear to have a very good understanding of ways that they can attempt to influence America's views on certain issues or disrupt democratic institutions. Social scientists are now working with journalists and technologists and others to help understand these techniques and to identify them in order to forewarn the public about the covert efforts that intentionally generate disinformation and fake news for political purpose. Do you believe a robust understanding of social science and investment in the area of research can be applied to helping to thwart these sort of disinformation influence campaigns in the future?

Mr. KANUCK. Absolutely. I think we would want a triumvirate of government initiative efforts to protect systems. I think we would want the corporations whose social media or other platforms are being exploited to join the effort to preserve the integrity of their own corporate interests and networks. And then finally, broader public awareness and education to appreciate the risk and to take measures to secure their own systems would all be beneficial.

Ms. JOHNSON. Are there technologies we might be able to invest in to get a better grasp on this?

Mr. KANUCK. Certainly. There are a number of different innovative proposals, some being offered in the social-media community, others in the block chain technology. I believe this Committee even had discussions of quantum computing and quantum cryptography recently. So there are a number of different innovative technologies which may offer some additional security solutions in the future, and I do hope that both government and private-sector initiatives pursue them because as of right now, it is incredibly difficult to detect and/or prevent the kind of influence operations which you were referring to.

Ms. JOHNSON. Thank you very much.

I yield back Mr. Chairman.

Chairman LAHOOD. Thank you, Ms. Johnson.

At this time I'll yield to Mr. Posey—no, he's not there. We'll go to Mr. Marshall, Dr. Marshall of Kansas.

Mr. MARSHALL. Thank you, Mr. Chairman.

I think I'll start with Ms. Shive. Mr. Shive, is there a problem with the Kaspersky software now? Is there really a problem with it?

Mr. SHIVE. So the GSA position for Kaspersky is, there was a problem with them being entered onto GSA schedules the way that they were entered onto GSA schedules, hence them being removed. GSA doesn't run Kaspersky products so we haven't done deep and rich analysis into the capabilities or technologies associated with that.

Mr. MARSHALL. Was or is the Kaspersky Lab a threat to national security?

Mr. SHIVE. I'm not in a position to answer that. Our partners at DHS felt there was something significant enough to bar use of Kaspersky in the——

Mr. MARSHALL. When do you think they first would have thought or been concerned, approximately?

Mr. SHIVE. Who is "they"?

Mr. MARSHALL. DHS is who you mentioned.

60

Mr. SHIVE. Right.

Mr. MARSHALL. Or GSA, either one.

Mr. SHIVE. So GSA became aware that there was some discussion about the risk associated with Kaspersky at the end of last year, and then as news came out, we did a couple of evaluations on the GSA internal enterprise. When we found that we weren't running Kaspersky internally, we did no further deep and rich analysis of the technology embedded within Kaspersky. DHS can speak to when they became aware of——

Mr. MARSHALL. Mr. Kanuck, our friends in Israel obviously go back to 2014, it looks like, with a concern about that. Is that accurate that the Israel government maybe alerted us in 2014 that there was a problem?

Mr. KANUCK. Given the unclassified nature of this hearing, I'm going to have to simply refer to the recent media discussions that I saw in the New York Times, Washington Post, and Guardian and others that took it back to 2015.

Mr. MARSHALL. Okay. Mr. Norton, when the government identifies a problem in this aspect, whose responsibility is it to fix something like this? Is it particular to the people that are running the software or this is a bigger problem, maybe more of a national-security problem? Whose responsibility is it to fix the problem?

Mr. NORTON. That's absolutely a national-security issue. I think that, you know, on paper it's the Department of Homeland Security's challenge for the civilian side of the networks to fix this problem and to alert their other federal partners. I think that DHS has been challenged essentially since day one to kind of work their way around the bureaucracy that we have.

Mr. MARSHALL. It looks like to me this probably has been going on for two or three years. Frankly, I'm embarrassed. I've helped run a hospital and as well as part of a bank. I've seen us take on all these IT problems over the past decade. Absolutely convinced that if Thursday morning this is presented to me and we weren't solving the problem by Friday that people would have been fired and lost their job over it, and this looks like to me it took three years when we knew there was a problem, a potential problem. Even if it was just a potential problem, if it's a national-security issue, we should have been fixing it yesterday, not tomorrow. Am I—what's wrong with my expectations, Mr. Norton?

Mr. NORTON. I think your expectations are absolutely fair and they're right on, and I think that the government has——

Mr. MARSHALL. Mr. Kanuck, are my expectations unrealistic?

Mr. KANUCK. I think the desire to remediate things as soon as possible is very well placed. I'm also aware that the speed of changes in government can occasionally be slow.

Mr. MARSHALL. Okay. You know, I think of this concept of the fox and the henhouse. Again, I go back to my experience working with a hospital and bank. If we would have vendors applying to do our IT and to protect our stuff, and if I would have brought to the board people with connections to the Russian government, A, they would have probably fired me, and B, they would have fired the IT person who even let them in the door. I mean, did this pass the sniff test, Mr. Kanuck? Would they pass the sniff test today to get this type of contract?

61

Mr. KANUCK. If it's meant to protect the information of a sensitive national security type, I would think that it would not pass the sniff test because of the foreign penetrations and foreign influence that we have previously discussed here.

Mr. MARSHALL. Mr. Shive, in today's environment, would they pass—the smell test is a better term. I've been corrected by my colleagues across the aisle. We called it sniff in Kansas. Maybe it's smell other——

Mr. SHIVE. Again, because we don't run that particular software, I can't say specifically, and we don't base those evaluations on press reports. What I can say is that every agency CIO has a responsibility and obligation to vet any software or technology or process that runs in that organization, and that if Kaspersky or any similar tool was going to be entered into service in that agency, it would be put through a battery of tests to evaluate whether or not it was suitable for that environment.

Mr. MARSHALL. Mr. Chairman, may I have 30 more seconds?

Chairman LAHOOD. I'll yield you 30 more seconds.

Mr. MARSHALL. You know, it feels like with all these IT issues that we have, people are trying to rob the bank, and as long as they don't get—as long as they don't rob the bank, we don't prosecute them. What do we do when people are just trying to rob the bank? So all these attacks on us, people are trying to rob the bank. They're trying to rob us of information? What's the solution to trying to—I mean, my gosh, I can't believe this goes on this much. They're robbing—they're trying to rob the bank, they don't accomplish it, so it seems like nothing happens to them. Does anybody have a solution, a short solution? Mr. Kanuck, you raised your hand.

Mr. KANUCK. Where we lack the ability to have cooperative international law enforcement or forensic capabilities to identify and prosecute those individuals, we are left with recourse to improving our own networks' resiliency.

Mr. MARSHALL. Thank you. I yield back.

Chairman LAHOOD. Thank you, Dr. Marshall.

I now yield to Mr. McNerney.

Mr. MCNERNEY. I thank the Chairman. I thank the witnesses. It's certainly an important subject and I want to pursue a little bit.

Mr. Norton, in your written testimony, you mentioned that budget cuts across the federal government are affecting—are forcing federal officials to use the lowest price technically available standards. What aspects of security might be compromised as a result of that lowering of standards?

Mr. NORTON. Well, I think that, you know, sequestration, which was put in place 7 or eight years ago, right now what we're seeing is the impacts of sequestration where we've essentially conditioned government executives, CIOs, other managers to really look for that LPTA product and they might not necessarily look for the best type of software that's available, maybe something that's customized, something that might fit the particular need of an agency, and also we're seeing where they're not turning on the software to fully capability and that they maybe use part of an acquisition and maybe not all of it and so I think all that goes to not having

62

enough resources and being kind of constrained to the sequestration that's essentially still in place and kind of hovering——

Mr. MCNERNEY. Are there specific examples you could submit to the Committee of this phenomenon you're describing?

Mr. NORTON. I think that broadly I would say, you know, program to program from, you know, federal agencies, you know, like at DHS where they have, you know, component agencies like Customs and Border Protection or other places where, you know, you've got components that are purchased that might not necessarily have a cyber component, you know, put inside of it.

I think if you think about the commercial attack back in October of last year where essentially the internet was slowed down because they were attacking a piece of the internet from a small company in, you know, New Hampshire. You find these little parts that can be exploited and slow down the internet overall, and you think of that broadly in terms of other products that maybe are purchased day to day at, you know, Best Buy, for example, that don't necessarily have cyber built into it goes to that lowest price technically acceptable.

Mr. MCNERNEY. Thank you.

Mr. Shive, are commercial antivirus computer security software products made by other companies also potentially vulnerable to the same sorts of exploitation as in the case of Kaspersky?

Mr. SHIVE. Because of the persistent nature of the threat, all softwares are vulnerable, and that's why CIOs have the obligation to assess those softwares before they enter them into service in each of their agencies.

Mr. MCNERNEY. Do you have any recommendations for federal—to protect federal systems?

Mr. SHIVE. Increased investment in cybersecurity is a very good idea.

Mr. MCNERNEY. Ms. Dodson, has NIST made available any guidelines or best practices concerning security of voting infrastructure?

Ms. DODSON. NIST has developed guidelines for voting infrastructures that relate to cybersecurity and in particular looking at risk-management processes that can be put in place for the different phases of voting systems and voting use.

Mr. MCNERNEY. Should NIST be doing more in this arena?

Ms. DODSON. NIST is continuing to work with the voting community as well as the Department of Homeland Security as they are also looking at security and voting systems, so we are continuing our efforts there.

Mr. MCNERNEY. Okay. What limitation's do you face?

Ms. DODSON. I'm sorry. What kind of limitation do we face in——

Mr. MCNERNEY. Right.

Ms. DODSON. So NIST continues to look at a number of different aspects of voting and work with that community. We are looking at security. We are looking at the interoperability and the usability, so many different aspects of voting systems to support the United States and to support the different states as they're developing and implementing their solutions.

63

Mr. McNerney. Thank you. Mr. Shive, what would you recommend small businesses do to strengthen their cybersecurity networks and practices?

Mr. Shive. For small businesses, employ the best practices that exist for large business and government in their cybersecurity practices, make an emphasis and focus on cybersecurity from the ground up at the beginning of creation of their product, tools, process or service rather than as a bolt on at the end.

Mr. McNerney. But a lot of these small businesses don't have the resources to have an IT person to take care of those issues.

Mr. Shive. And then they'll suffer the same fate that every other corporation that makes that fundamental mistake does and they'll go out of business.

Mr. McNerney. Thank you. Mr. Chairman, I yield back.

Chairman LaHood. Thank you, Mr. McNerney.

I now yield to the gentleman from South Carolina, Mr. Norman.

Mr. Norman. Thank you, Mr. Chairman.

Mr. Shive, when we talk about getting on the GSA's preapproved contract list, who's got the final approval? Is it a person, is it a group? Who would make the final call on that?

Mr. Shive. The Federal Acquisition Service in GSA, which is made up of contracting officers, lawyers, and business professionals who interact with the vendor community and create a framework for their entrance into the schedules.

Mr. Norman. How many people is that?

Mr. Shive. I can get back to you with the number. I think it's around 6,000 people.

Mr. Norman. Okay. Now, was Congressman Higgins right when he mentioned the fine print of being under the—and I forget which agency he mentioned but being under the, I guess the legal guidelines of Soviet Union rather than the United States? Is that right?

Mr. Shive. So thank you for asking that clarifying question. So every company has a EULA as a part of their business practice. The federal government, the U.S. federal government is not obligated under that EULA to enter service. There's a negotiation that takes place that includes on the government side lawyers and contracting officers that assess the EULA relative to the regulation and policy of the federal government. If there's a disconnect there, then the vendor can't do business with government.

Mr. Norman. Okay. So going forward, would that be—would any changes be made on that?

Mr. Shive. No. I think it's a good process to have government lawyers and contracting officers scanning that test for corporations and making sure that it complies with federal regulation and law.

Mr. Norman. Okay. And Mr. Shive, in your testimony you note that three resellers included Kaspersky's products without taking appropriate steps to modify the contracts. Is that right?

Mr. Shive. That's right.

Mr. Norman. Did these three resellers comply with the GSA's request to remove Kaspersky products from the list?

Mr. Shive. Yes, they did so immediately.

Mr. Norman. After the fact?

Mr. Shive. Yes.

64

Mr. NORMAN. Okay. Did the GSA evaluate whether these three resellers needed to be sanctioned for including the products?

Mr. SHIVE. I'm not aware of the sanctioning process, of any sanctioning process.

Mr. NORMAN. Do you think there need to be sanctions, at least go down—to go down that path to have consequences? Because it looks like just from what I'm hearing has really been the—there's no consequences on this.

Mr. SHIVE. Right. So I'm actually not saying that there were or were not consequences. I just don't know if there was. We can circle back to you and get you that information.

Mr. NORMAN. Like Congressman Marshall mentioned, you know, the consequences in the private sector, the consequences in just about everything in the political arena, and it looks like there ought to be consequences with this. It's pretty serious from what I'm hearing today.

Mr. SHIVE. Understood. We're happy to circle back with you and let you know what the consequences were, if there were in fact any.

Mr. NORMAN. Thanks so much.

I yield back, Mr. Chairman.

Chairman LAHOOD. Thank you, Mr. Norman.

I now will yield to Mr. Perlmutter from Colorado.

Mr. PERLMUTTER. I thank the Chair, and just an inquiry of the Chair. Was Mr. Kaspersky invited to testify or somebody from his organization?

Chairman LAHOOD. Not to today's hearing. I know that we plan to have a few more hearings on this, and we'll entertain that as we move along.

Mr. PERLMUTTER. All right. Thank you.

And Mr. Norton, it's good to see you. We've had two records today. You have had the shortest opening statement, and the Ranking Member had the shortest questioning along with Mr. Norman today that we've had I think on this Committee of all time, so thank you all.

You know, over time the computers I've had, I've had MacAfee, I've had Kaspersky, and I've had—and Mr. Norton, I don't think it's your company but I've had Norton antivirus too.

Mr. NORTON. It is not my company.

Mr. PERLMUTTER. I think this is a very important hearing we're having today. Mr. Higgins talked about the KGB potentially having access into governmental records, talked about—I think Dr. Marshall talked about the fox in the henhouse and robbing the bank or attempting to rob the bank, and words like "trusted" and "complicit" and "willful" and "adversarial" and "espionage" and "intelligence risk" and "national security" have been bandied about today. What—I'll start with you, Mr. Kanuck. What is it that we're worried about here?

Mr. KANUCK. I believe we're particularly worried about the ability for unauthorized users to access systems and either steal confidential information or disrupt the availability of——

Mr. PERLMUTTER. But a particular unauthorized user, who is that? What is that?

Mr. KANUCK. Well, from my role as a Strategic Threat Analyst, I would say there are numerous of them in the international space.

65

The one we seem to be focusing on today is the Russian threat actor and that has theoretically, according to open-source reporting, exploited Kaspersky products to that end.

Mr. PERLMUTTER. Mr. Norton, are you familiar with Guccifer 2.0?

Mr. NORTON. Yes.

Mr. PERLMUTTER. What is that?

Mr. NORTON. Well, essentially it's hacktivism, if you will, in terms of, you know, hacking into, finding information, you know, getting into a system and then pulling information out. I think your assessment in terms of what exactly we're talking about here is a great point. I think there are multiple threats. Whether they're here domestically or they're international, I think the government is woefully behind in terms of preparation in terms of what we've done now and what we need to do, you know, going forward. I think that we seem to be having, you know, these type of discussions every 6 to 12 months with these massive hacks that are occurring, and I think that, you know, it's time to really kind of move on and figure out what is the next step, whether it's massive research and development funding for the government to hire these, you know, more experts, bring people in to government. I think that we've, you know, kind of assigned this opportunity to CIOs and other people within the government that have had traditional roles and now they seem to be the cybersecurity experts, and I think they obviously do a great job for us but I also think they need more help and more services and more, you know, support.

Mr. PERLMUTTER. And the Congress has got to be in the lead hopefully of providing those resources, which I think you now mentioned and Mr. Kanuck mentioned.

So let me move to NIST and to the GSA for just a second and then I've got a political statement I want to make. I think one of the places where we can harden systems especially for small business is through small business taking advantage of the NIST Framework and that the GSA in its protocols demand that small business have access, you know, taking advantage of those NIST protocols or Framework, just if the two of you would comment real quickly.

Ms. DODSON. NIST has developed some guidance specifically for small businesses around the Framework to make that publicly available, and we've worked with the Small Business Administration, with our manufacturing Extension Partnership and others to make sure these guidelines are available and that small businesses can find out about them.

Mr. PERLMUTTER. But for you, they're guidelines. For GSA, they could demand something like that as part of the purchase.

Mr. SHIVE. And that's exactly right. Increasingly we find that business both big and small is increasingly availing themselves of NIST policy, guide work and frameworks because it's good IT and cybersecurity practice. As a CIO who purchases softwares and technologies increasingly I'm asking my vendor partners to conform to those standards as well.

Mr. PERLMUTTER. If I could have just a few more seconds, Mr. Chairman——

Chairman LAHOOD. Absolutely.

Mr. PERLMUTTER. —for my political statement?

66

Chairman LAHOOD. It depends on what it is but——

Mr. PERLMUTTER. Well, you're not going to like it but I mean, I think this is a very important subject but obviously, you know, when we have at the White House an investigation between connections between the White House and many of its people with the guy who was the former head of the KGB, Vladimir Putin, then we've got a lot of ground to cover, whether it's within the cybersecurity or as to, you know, just basic oldpersonal relationships and not have too many front doors to Russia because I think that is jeopardizing our national security, and with that, I yield back.

Chairman LAHOOD. Thank you, Mr. Perlmutter.

At this time I'll yield to Mr. Loudermilk of Georgia.

Mr. LOUDERMILK. Thank you, Mr. Chairman, and thank all of you for being here today.

Spending 20 years in the IT industry, actually 30 if you include my time in the intelligence community when I was in the military, there are so many aspects of this issue that are so disturbing that I can't even get my hands around all of it, and some of it outside of this hearing such as an intelligence analyst taking classified material home. I mean, that was a felony when I was in the intelligence community. And then somebody who is in that arena having pirated software, I mean, anybody who works in this arena at all, you know that if it's pirated software, it's dirty. It's likely dirty in some way. So anyhow, that's outside the scope of this. This happened in a previous Administration and hopefully we're cleaning up some of the looseness that we've had in the intelligence community, but I'm reading an article from Associated Press which, Mr. Chairman, I'd like to introduce into the record.

Chairman LAHOOD. Without objection.

[The information appears in Appendix II]

Mr. LOUDERMILK. This thing reads like a Clancy novel, the Israelis spying on the Russians who are spying on us, and they alert us to the fact that the Russians are gaining information that are being captured through this software.

Mr. Norton, in your experience, if a cybersecurity company comes across, whether intentional or unintentional, comes across classified information, I would think, through my experience, that it not only legally but professionally you should alert the agency of which it came from that—or at least the proper officials that you have come across this information. Am I wrong in that? Is that something that you would assess if somebody just happened to come across this information they would alert?

Mr. NORTON. I think in the last couple of years that there has been an effort in terms of sharing information amongst DHS and other, you know, companies across the cyber realm, if you will, in terms of moving information back and forth certainly could be better but I think the process has started and I think as you're seeing professionals kind of cross into the private sector and back into government and back and forth, it's getting a little bit better, but absolutely, it's something that we need to continue to get our arms around and do a better job.

Mr. LOUDERMILK. I mean, if in your business you come across a piece of classified information that was not within your realm of need to know, you would report to someone?

67

Mr. NORTON. Of course.

Mr. LOUDERMILK. Okay. In this article from Associated Press, you know, they reported that Israel notified us that Russia was gaining classified information using the software. Eugene Kaspersky spoke—in this article, he stated that they did collect NSA materials clearly marked classified in 2014, which were spirited to Moscow for analysis, and then deleted at his direction. When asked if Kaspersky alerted the NSA that his software discovered classified materials, he claimed that he didn't want to see it in the news. If he is asked why he didn't report it, he didn't want to see in the news that I tried to contact the NSA to report the case, definitely I didn't want to see it in the news. Is that plausible that he would not report that they, you know, came across by unintentional means that they came across classified information? Is it plausible that he would have not reported it just because he didn't want to see it in the news? Yes, Mr. Norton. I'm sorry.

Mr. NORTON. I guess the answer is, sir, I don't know what's going inside his head or what his thought process was. It's hard for me to assess why he made that decision or didn't make that decision.

Mr. LOUDERMILK. To me, from a legal aspect, maybe laws have changed since I was in the intelligence community but I would have a legal responsibility at that point to notify the authorities look, our software came across this information, you may need to go look at this employee. I also have issue with them just reading the documents they come across as well.

Mr. Kanuck, do you think this is a plausible response by Mr. Kaspersky?

Mr. KANUCK. My first observation would be that Mr. Kaspersky may not be subject to a secrecy agreement of any kind that would have the legal contractual binding nature that yourself previously and myself have had before that would have obligated us to report that information had we stumbled across it. Secondly, I guess I am personally a little surprised that knowing the scrutiny that his firm is under that he might not have taken an opportunity to return it to the U.S. government and try to get in our good favor.

Mr. LOUDERMILK. Maybe redeem himself, you know, to show goodwill.

Let me ask you, why would he not inform the NSA? I mean——

Mr. KANUCK. Possibly because he felt there was no legal obligation for him to, and in his personal decision thought it was not in the best interest of his company, which again is a Russian company.

Mr. LOUDERMILK. Mr. Norton, is it plausible that maybe the suspicions that the Israelis have, that we have is that they're purposely mining for information? Is that plausible?

Mr. NORTON. I think that, you know, with the digital age having really grown in the last 15 years that online intelligence gathering is the normal. I think that we as, you know, society need to continue to come to grips with the fact that mining online data and the fact that you can target individuals is the new normal and that we all need to be aware of this, and I think that whether it's the Russians or other adversaries, nation-states, individuals, absolutely our networks are a target every day, every second, and we need to be really aware of that.

68

Mr. LOUDERMILK. Why would be send it to Moscow? Is that not suspect that he sent the documents to Moscow, then asked for them to be deleted, Mr. Norton?

Mr. NORTON. I think—again, I don't know what really occurred or didn't occur. It seems like that would be something that we would need to really kind of take a look at, and hopefully our intelligence services is on that and they can give us——

Mr. LOUDERMILK. Mr. Kanuck, would you—would you find it suspect that he sends them to Moscow after seeing that they're classified NSA documents determines to not notify the NSA but then sends them to Moscow and then says I'm going to have them deleted? I mean, that's pretty suspect to me.

Mr. KANUCK. So again, I'm not personally knowledgeable of whether he himself was the one who did the discovering and the forwarding. I would, as I said in my opening statement, encourage the analysis of traffic flows within the Kaspersky global communications network. That may have been standard operating procedure or it may have been an ad hoc decision. I can't speak to that because I don't work for that company.

Mr. LOUDERMILK. All right. Well, thank you, Mr. Chairman. I yield back the time I have exceeded.

Chairman LAHOOD. Well, thank you, Mr. Loudermilk, for your insightful questions there.

That concludes our questions here today. I want to thank the witnesses for your valuable testimony here today. I think this Committee as part of our oversight mission will continue to investigate leads and evidence as it relates to this matter. Secondly, I think we've just touched the surface as it relates to Kaspersky and their alleged complicity and involvement with cyber espionage, and this Committee will continue to work on that. We anticipate more hearings and more testimony to come.

So with that, this hearing is concluded, and we thank you.

[Whereupon, at 11:31 a.m., the Subcommittee was adjourned.]

# Appendix I

———————

ANSWERS TO POST-HEARING QUESTIONS

70

ANSWERS TO POST-HEARING QUESTIONS

*Responses by Mr. Sean Kanuck*

**RESPONSES TO QUESTIONS FOR THE RECORD**
As Submitted by Rep. Eddie Bernice Johnson

by

Sean Kanuck
Director for Future Conflict and Cyber Security
IISS-Americas

for

United States House of Representatives
Committee on Science, Space, and Technology
Subcommittee on Oversight

Hearing entitled
"Bolstering the Government's Cybersecurity: Assessing the Risk of
Kaspersky Lab Products to the Federal Government"

held on

25 October 2017

71

Chairman LaHood, Ranking Member Beyer, and distinguished Members of Congress:

Thank you again for the invitation to testify before the Subcommittee on Oversight during its hearing on 25 October 2017. I am also pleased to take this opportunity to respond to the questions for the record submitted by Ranking Member Eddie Bernice Johnson of the Committee on Science, Space, and Technology. Several of her questions referred to statements I made in my op-ed entitled "Get ready for Democracy 3.0" that was published in The Hill on the same day as the hearing, so I respectfully request to incorporate that piece by reference rather than reiterating the full content in its entirety here.

**Question 1.a In what ways have Russia's influence operations become more effective?**

In the last two years, Russian influence operations have become both more brazen and more effective from a Western political perspective. Allegations of Russian (dis)information campaigns related to the "Brexit" vote, the US presidential election, the French presidential election, and the Catalan independence referendum, suggest an increasing level of intervention in countries beyond Russia's historical sphere of influence (i.e. the former Soviet Union and Eastern Europe).[1] Russian activities have leveraged existing political strife in the United States and Europe to foment discord and raise questions regarding the fundamental institutions of liberal democracy, namely the legitimacy of elections and the rule of law. Creating such uncertainties has a destabilizing effect on Russia's competitors – which must now focus more political energy on domestic concerns in lieu of checking Moscow's foreign policy moves on the global stage – and provides a public relations advantage among the Kremlin's own domestic audience. Russian influence operations have become more effective because they have now challenged the basic assumptions about democratic government and liberal values in an open society. The ongoing congressional hearings, media coverage, and popular discourse are all a testament to the success of Moscow's recent influence campaigns.

Moreover, that approach is consistent with Russia's views on information conflict as well as its stated military doctrine. According to paragraph 23 of the 2016 Doctrine of Information Security of the Russian Federation, the main thrusts of information security include *inter alia* "suppressing the activity detrimental to the national security of the Russian Federation", "improving information support activities to implement the State policy of the Russian Federation", and "neutralizing the information impact intended to erode Russia's traditional moral and spiritual values."[2] In 2012, Russia's Chief of General Staff, Nikolai Marakov, even commented on the military's role in "working on domestic and foreign public opinion using the media, Internet and more."[3]

**Question 1.b What about the "scale and scope" has changed?**

Several quantitative and qualitative factors have contributed to the higher effectiveness of influence operations conducted via cyberspace. First, automated technologies permit fewer operators to both monitor and/or produce data flows on a greater scale.  That means fewer working hours are required to generate impact, because "botnets" and "astroturfing" (i.e. the fabrication of seemingly "grass-roots" support on social media) can multiply the perceived popularity of ideas (e.g. "trending"). In essence, a number of strategically placed advertisements and social media postings that are then (inadvertently) promulgated by other Internet platforms and large search engines can have a

72

disproportionate impact. Second, the geographic reach – or scope – of influence operations has almost no limit. Individuals from Moscow, St. Petersburg, or anywhere else can induce their desired effects in nearly any country around the world over the Internet. That is especially true in liberal democracies which pride themselves on freedom of expression, an open press, and little or no online censorship. Operatives no longer need to be physically resident in – or within radio communication distance of – the jurisdiction they wish to influence.

Those quantitative changes dramatically alter the qualitative calculus for conducting such influence operations. Cyber-enabled influence operations are fairly costless and potentially quite effective compared to other foreign policy options. There is little or no physical risk to the operators themselves, and precedents to date show only minimal repercussions for their state sponsors if the activities are ever attributed to them.

**Question 1.c Finally, what specific new tools have Russian Intelligence leveraged in their more effective campaigns in the U.S. and elsewhere, and how have they used these tools?**

The 2017 US Intelligence Community Assessment entitled "Assessing Russian Activities and Intentions in Recent US Elections" concluded that Russia's messaging strategy blended "covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or 'trolls.'"[4] That report also indicated that Russian military intelligence publicized material online, directly or indirectly, through Guccifer 2.0., DCLeaks.com, media outlets, and WikiLeaks.[5] Moscow used both new tools (e.g. computer hacking, social media, Internet websites) and traditional methods (e.g. espionage, broadcast television). It is noteworthy that these various tools were used in concert in order to create a combined, strategic effect. Perhaps the most important lesson learned is that a series of coordinated propaganda activities can produce a much greater impact today than in previous eras. That is the political analogue of "cross-channel" or "multi-channel" marketing in the business environment.

Social media played a significant role in recent Russian influence campaigns. Facebook has acknowledged that Russia was linked to thousands of political advertisements on its platform.[6] Twitter also had numerous Russian-linked accounts; furthermore, its platform enabled large-scale, automated messaging that could be conducted by a relatively small number of individuals.[7] These tools, and others, were used to create the impression that Americans were responsible for the views being represented and that certain ideas had much broader support than they did in reality – thereby skewing the discourse towards foreign-generated, extreme, and/or minority viewpoints. It also fueled partisanship and distrust in the electoral system.

**Question 2.a How did Russian intelligence use social media in its efforts to influence the 2016 Presidential Election?**

This response builds on my answer to Question 1.c above. Russia used "trolls" (i.e. paid social media participants) to post and "tweet" about particular issues. These agents were instructed to propagate certain memes and spread discontent regarding controversial topics such as racism, police violence, gun control, and gender/sexual orientation.[8] For example, Facebook (unwittingly) sold $100,000 in

73

advertisements to a pro-Kremlin "troll farm."[9] Using automated botnets, Russian actors could then "re-tweet" or "like" those original (or other selected) social media posts and advertisements to increase their perceived popularity. Those memes that "trended" in social media were then picked up by search engines and other news outlets. As a result, postings from relatively obscure origins – some completely false – captured the attention of "mainstream" political discussions.

In addition, Russian influence operations were explicitly designed to exacerbate existing political rifts, in some cases promulgating views on both sides of highly divisive issues.[10] The strategic objective of Russian intelligence was to destabilize and/or discredit the US electoral process, not just to favor any specific candidate. Russia's intervention was not simply about Trump or Clinton; it was about trust in government institutions, international reputation, global politics, and "soft power" projection.

**Question 2.b How would you attempt to identify and limit foreign interventions in our democracy while upholding our basic democratic principles and institutions, including a free press?**

Finding an operative solution to the problems identified above is no easy task. To a certain extent, the national interest in the security and fidelity of elections is somewhat at odds with the national interest in freedom of expression. In reality, neither value can be enjoyed in its fullest extreme if both are to be enjoyed. A second critical factor is that the social media platforms in question are private companies not government agencies. Accordingly, efforts to limit such foreign interventions will either need to be done consensually by those firms or else be imposed through regulation.

Restricting the almost unlimited freedom of expression over social media (whether done by government or the private sector) in order to safeguard democratic principles may seem paradoxical, but that is essentially what would be required to identify and limit foreign interventions. If I understand the concerns over Russia's influence operations correctly, they are twofold: (A) the actors were foreign, and (B) they achieved a disproportionate impact. There are three possible parameters for limiting intervention – content, origin, and propagation – and each merits closer consideration.

First, content-based restrictions for social media would be antithetical to the First Amendment to the US Constitution and the desired objective of open political discourse surrounding elections. Therefore, I would personally limit any such restrictions to the general legal prohibitions against the incitement to violence or threats to public safety.

Second, freedom of expression does not necessarily imply complete freedom of anonymous expression. A free press need not be an anonymous press; however, anonymity has historically been a safeguard against persecution. Requiring social media companies to disclose the source of political advertisements or the provenance of memes could be difficult and costly. But, that would be the only way to address concern (A) regarding foreign voices manipulating the US political discourse surrounding elections. While I would personally favor such disclosure for online political campaigns, I must acknowledge that the majority of politically-infused speech on social media would not meet the criteria of an explicit campaign advertisement. Regulatory efforts to demarcate between election-related speech whose speaker must be identified and general social media content which could

74

remain anonymous would be onerous if not downright infeasible. Simple disclosure of paid advertising sponsors and/or foreign-registered user accounts might be practical, intermediate steps.

Third, US campaign finance laws currently try to limit the disproportionate impact of individual entities by placing limits on donations (and disclosing the identity of donors). A similar effort to mitigate concern (B) above could conceivably be applied to social media activity concerning elections. Although I am aware that some countries limit expenditures on and/or provide egalitarian access to broadcast media for election campaigns,[11] I believe it would be impracticable to apply such approaches in the context of social media and the propagation of memes. The number of online fora, the number of user accounts, and the sheer volume of posts (and re-posts or links) would make such regulation unduly burdensome. Precluding disproportionate impact would also presuppose the ability to identify the origin of the activity, which reverts to concern (A) above.

In summary, I offer that disclosure of foreign paid advertisements and foreign-registered social media accounts would be the least intrusive, and probably the only feasible, way to identify and limit foreign interventions. That would, however, require social media companies to "know their customer" in a way that would remove anonymity from the social media environment.

**Question 3.a Do you have any recommendations regarding what the federal, state or local governments can do to ensure our election/voting infrastructure is well protected from potential cyber attacks?**

As with any other critical infrastructure, the resiliency of the election/voting infrastructure consists of strong defenses to prevent compromises as well as intentional redundancy to overcome any compromises or occasional degradations. Recent studies have shown the vulnerabilities of electronic voting machines,[12] and nearly all – if not all – Internet-accessible computer systems are currently susceptible to remote hacking. Therefore, I offer the following ten recommendations:

(1) Subject all electronic voting machine hardware and software to rigorous "red teaming" (i.e. penetration testing) by offensive experts from the government and private sector.
(2) Harden voting machines against all electromagnetic transmissions.
(3) Conduct tests of electronic voting machines with sample sizes equal to election-day turnouts and on the same calendar date (i.e. internal clock setting) as the election itself.
(4) Properly vet all polling station personnel who will have physical access to voting machines. (This also applies to access to any storage facilities between elections.)
(5) Predicate any future online or wireless voting capabilities upon biometric verification.
(6) Fund research and development of advanced technologies (e.g. blockchain, quantum cryptography, etc.) for establishing secure, online elections in the future.
(7) Maintain all original paper ballots indefinitely for audit purposes.
(8) Conduct random audits of paper ballots to verify electronic vote tallies as well as mandatory audits of paper ballots for precinct results within a specified margin of error.
(9) Provide an opt-in capability for voters to verify if their own votes were recorded accurately. (Many voters may prefer this option to an uncertain secret ballot.)
(10)   Apply machine learning algorithms to detect statistical anomalies for further investigation (cf. insider trading and credit card or telecommunications billing fraud.)

75

Voting is the essential "transaction" of democracy and the integrity of that process needs to be protected as much if not more than any other financial or economic transaction. My recommendations (1) through (4) above involve improving the defenses of existing voting systems. Recommendations (5) and (6) speak to developing better systems for the future. Finally, recommendations (7) through (10) are intended to provide an *ex post* "check sum" on the system to guarantee its results are valid.

**Question 3.b Do you have any recommendations regarding efforts the U.S. government, state or local governments or others, should take to help identify foreign influence operations against the United States?**

This response builds on my answer to Question 2.b above. It may be appropriate for the federal or state governments to require disclosure of paid advertising sponsors or foreign-registered social media accounts in certain contexts that affect domestic elections, but I would strive to keep such regulation to a minimum. Social media has proven to be a powerful tool for popular discourse that has empowered individuals from all backgrounds and socio-economic strata to voice their opinions. I firmly believe that the United States is unique – and better off – for maintaining its open political dialogue about all issues, including with foreign contributions that are intended to inform or engage Americans (vice misinform, purely promote controversy, or falsely distort elections). It is undeniable that French political philosophy contributed to the drafting of the US Constitution and that Britain's abolition of slavery further encouraged the same in the United States.

It is most apposite to conclude with a discussion of the private companies that operate the social media platforms and search engines. Facebook, Twitter, Instagram, Google, etc. are best placed to detect and interdict foreign efforts to manipulate their own networks; moreover, the events of 2016 and 2017 have not only raised their awareness of foreign interventions but also shown the deleterious effects that influence operations can have on their business reputation. Those companies already employ advanced machine learning algorithms for search optimization, facial recognition, and other business purposes, so it would not be unreasonable for them apply similar techniques to detect illegal, fraudulent, and/or foreign activity on their networks. In fact, companies like Facebook and Twitter have increasingly been removing terrorist and hate speech accounts.[13]

In many respects, the private business interests of those companies will actually be aligned with the objectives of the governmental authorities seeking to protect the integrity of electoral processes. Social media firms do not want to be unwittingly manipulated by foreign interest groups (or domestic ones for that matter), and the nominal advertising revenue to be gained from a foreign intelligence service's covert influence campaign would not justify jeopardizing a corporate brand worth billions of dollars. Therefore, I would recommend minimalist regulatory approaches that leverage those common interests and make the implementation of any "know your customer" and/or disclosure requirements the responsibility of the social media platforms themselves. They should not only have an incentive to do so, but could perform the role most efficiently. Most importantly, the government would then not be in a position of directly monitoring or censoring American social media activity.

Respectfully submitted by Sean Kanuck, Director for Future Conflict and Cyber Security, IISS-Americas.

76

---

[1] *See e.g.,* https://www.theguardian.com/technology/2017/nov/19/trump-russia-fake-news-libertarians-autocrats-democracy

[2] http://www.mid.ru/en/foreign_policy/official_documents/-/asset_publisher/CptICkB6BZ29/content/id/2563163

[3] *See* THE TRANSFORMATION OF RUSSIA'S ARMED FORCES: TWENTY LOST YEARS, edited by Roger N. McDermott (2016), page 205.

[4] https://www.dni.gov/files/documents/ICA_2017_01.pdf

[5] See https://www.dni.gov/files/documents/ICA_2017_01.pdf

[6] *See e.g.,* https://www.nytimes.com/2017/10/01/technology/facebook-russia-ads.html

[7] *See e.g.,* https://www.nytimes.com/2017/09/27/technology/twitter-russia-election.html

[8] *See* https://www.npr.org/2017/10/20/559113223/russian-magazine-says-trolls-used-social-media-to-disrupt-u-s-election

[9] *See* https://www.washingtonpost.com/politics/facebook-says-it-sold-political-ads-to-russian-company-during-2016-election/2017/09/06/32f01fd2-931e-11e7-89fa-bb822a46da5b_story.html?utm_term=.164469bf21d8

[10] *See e.g.,* http://www.chicagotribune.com/news/opinion/commentary/ct-russia-facebook-ads-20171102-story.html

[11] *See e.g.,* https://www.loc.gov/law/help/campaign-finance-regulation/unitedkingdom.php

[12] *See e.g.,* https://www.defcon.org/images/defcon-25/DEF%20CON%2025%20voting%20village%20report.pdf

[13] *See e.g.,* https://www.wired.com/2016/08/twitter-says-suspended-360000-suspected-terrorist-accounts-year/

# Appendix II

———————

ADDITIONAL MATERIAL FOR THE RECORD

78

LETTER SUBMITTED BY REPRESENTATIVE CLAY HIGGINS

 CYBER5

Cybersecurity for the Real World™

October 24, 2017

Congressman Clay Higgins
Louisiana 3rd District Representative
Member, SST Oversight Subcommittee

Congressman Higgins,

I am writing to express my appreciation for the action being consider to protect our national security interests by limiting or eliminating the use of foreign information technology security software. I am offering my professional insight and expert opinion to impress upon you the necessity of the immediacy of that action. There is a common misconception of how security software functions and the ultimate level of vulnerability that must be allowed for security software to function. I believe, if this vulnerability is revealed, our country will take immediate action to bolster our defenses and secure our assets.

Historically, in my experience, The United States has an established defensive posture regarding foreign super powers and espionage. The purpose of that posture has been to protect national interests from potential espionage efforts. The technology has dramatically shifted from remote listening telemetry to modern Cyberwar – espionage no longer requires physical presence, the worldwide network of connected infrastructure and data and systems provides a remote platform for gathering and transferring stolen information. Cyber technology has enabled an entirely new form of threats and not just from government agencies, now unscrupulous actors engage in data theft and ransomware. Some for political stature and others for financial gains.

Many security software users believe that security software is akin to a shield or a knight's armor. That this shield wards off would be attackers. The reality is that security software is more similar to an inoculation. Security software resides deep inside the computers and infrastructure within the very most sensitive and secure areas. In order to install any effective security software, we must first expose the system making all information vulnerable. The security software has full access to all input/output operations. Security software is fully embedded in such a way that it has complete and total system access.  Therefore, it is of the utmost importance that we fully trust in these security applications and understand the laws they are governed by. So why would we expose and make our systems so vulnerable to any foreign super power?  Kaspersky is security software, when installed all information accessed by or residing on the system is available to the software. Kaspersky is governed by the laws of the Russian Federation.  Reflecting on my career in my military and post-active duty, we sure would have loved to walk right into Moscow and insert our surveillance systems right in the Kremlin!

Make no mistake, the potential security risks of allowing any foreign governed security software onto any system poses a significant risk! I do not wish to cast any negative remarks towards Kaspersky Lab's security software.  In fact, their team contributed to catching the famed Karbanak gang, which was responsible for billions of dollars of bank fraud.  However, I simply cannot understand why anyone would even consider taking

Cyber5, LLC
18 Augusta Pines Drive, Suite 150
Spring, Texas 77389
713.982.8004

79



Cybersecurity for the Real World™

the risk of inviting foreign governed security software into the very core of our own federal government infrastructure. Assuming that Kaspersky has been cast out of the federal technology systems, we must now identify the best process to not only uninstall, but to completely remediate any risk of compromise and ensure the security and integrity of the systems. We must be able to ensure the CIA (Confidentiality, Integrity, and Availability) triad is intact.

I recommend these actions. Address the complete removal of all foreign security software from all federal systems. Recommend to the business world that foreign security software be avoided for the preservation of proprietary data. Leverage the NIST Cybersecurity Framework and Managed Cybersecurity Service Providers. Engage with MSP's proficient in the space and with certifications and clearances to meet the highest security requirements. Hardware and software must meet WISP and functional requirements while offering elasticity and complete audit controls. Develop and select products in line with NIST Cybersecurity framework. Leverage Secure cloud services, such as Microsoft Azure and Amazon Web. Train all staff with WISP (Written Information Security Program and Policies). Assess and Audit systems and staff to ensure adherence to WISP.

Let's get this tight sir.

I will make myself available to the committee as needed to explore these ideas further.

Best regards.

*Troy A. Newman*, CISSP

Cyber5

18 Augusta Pines Drive, Suite 150, Spring TX 77389

Troy@cyber5.com| http://www.cyber5.com

Tel:+1713.982.8004 - Office | Tel:+1281.236.4598 - Mobile

Top Reasons to raise concern regarding Kaspersky Security Software -

Cyber5, LLC
18 Augusta Pines Drive, Suite 150
Spring, Texas 77389
713.982.8004



Cybersecurity for the Real World™

- EULA (End User License Agreement) - Governed by the laws of the Russian Federation.
- EULA (End User License Agreement) - Software components that use geolocation, the camera or GPS functions…
- Close association with high ranking officials in FSB, KGB, Russian Govt. - socializing regularly in "Banyagate"
- Close ties to Russian Govt - educated at KGB-sponsored cryptography institute, and worked with Russian military intelligence. " A Specialist in Cryptography from KGB".
- Quick command of FSB and Russian Police to recover kidnapped son (in a country that seems unphased by regular kidnappings)
- Supported FSB raids on suspected cybergangs - then employee suddenly imprisoned on accusations of treason
- Certification issues to Kaspersky by Russian Secret Service with military intelligence unit number matching that of FSB program
- Nato Cyber expert quoted " A worldwide deployment of sensors may be too great a temptation for any country's intelligence services to ignore".
- Senate hearing - six high ranking American officials (CIA, FBI, NSA) said under no circumstances would they use Kaspersky software.
- Is it coincidence that the DNC acquired Kaspersky security software in August of 2016; and then had a multitude of information leaks? (Federal Election Commission records show the purchase).
- New VPN product that requires access to all phone data in order to use it? Where are the servers? Are they logging and mining all traffic?
- Timing of New Free Products just becoming available.
- Why should we take the risk knowing the affiliations and understanding the deep access security software has to our systems? There are several US based security products that many consider superior!

Cyber5, LLC
18 Augusta Pines Drive, Suite 150
Spring, Texas 77389
713.982.8004

81

DOCUMENT SUBMITTED BY REPRESENTATIVE BARRY LOUDERMILK

10/25/2017                                     Kaspersky: We uploaded US documents but quickly deleted them

**AP**

AP NEWS    Log in | Sign up

# Kaspersky: We uploaded US documents but quickly deleted them

AP Top News   Politics   Entertainment   Explore ∨



By RAPHAEL SATTER
Today


https://ww

RELATED TOPICS
Anti-virus software
Technology
Business
United States
Europe
Russia
Software

More from
International News

PARIS (AP) — Sometime in 2014, a group of analysts walked into the office of Eugene Kaspersky, the ebullient founder of Russian cybersecurity firm Kaspersky Lab, to deliver some sobering news.

Kaspersky's anti-virus software had automatically scraped powerful digital surveillance tools off a computer in the United States and the analysts were worried: The data's headers clearly identified the files as classified.

"They immediately came to my office," Kaspersky recalled, "and they told me that they have a problem."

He said there was no hesitation about what to do with the cache.

https://www.apnews.com/c360a29de62245o4abdc65d83c6467d7                                    1/8

82



"It must be deleted," Kaspersky says he told them.

The incident, recounted by Kaspersky during a brief telephone interview on Tuesday and supplemented by a timeline and other information provided by company officials, could not immediately be corroborated. But it's the first public acknowledgement of a story that has been building for the past three weeks — that Kaspersky's popular anti-virus program uploaded powerful digital espionage tools belonging to the National Security Agency from a computer in the United States and sent them to servers in Moscow.

The account provides new perspective on the U.S. government's recent move to blacklist Kaspersky from federal computer networks, even if it still leaves important questions unanswered.

To hear Kaspersky tell it, the incident was an accident borne of carelessness.

Analysts at his company were already on the trail of the Equation Group — a powerful group of hackers later exposed as an arm of the NSA — when a computer in the United States was flagged for further investigation. The machine's owner, identified in media reports as an NSA worker, had run anti-virus scans on their home computer after it was infected by a pirated copy of Microsoft Office, according to a Kaspersky timeline released Wednesday.

83



The scan didn't just treat the infection. It also triggered an alert for Equation Group files the worker had left in a compressed archive which was then spirited to Moscow for analysis.

Kaspersky's story at least partially matches accounts published in The New York Times, The Washington Post and The Wall Street Journal. All three publications recently reported that someone at the NSA's elite hacking unit lost control of some of the agency's powerful surveillance tools after they brought their work home with them, leaving what should have been closely guarded code on a personal computer running Kaspersky's anti-virus software.

But information security experts puzzling over the hints dropped by anonymous government officials are still wondering at whether Kaspersky is suspected of deliberately hunting for confidential data or was merely doing its job by sniffing out suspicious files.

Much of the ambiguity is down to the nature of modern anti-virus software, which routinely submits rogue files back to company servers for analysis. The software can easily be quietly tweaked to scoop up other files, too: perhaps classified documents belonging to a foreign rival's government, for example.

Concerns have been fanned by increasingly explicit warnings from U.S. government officials after tensions with Russia escalated in the wake of the 2016 presidential election.

84

Kaspersky denies any inappropriate link to the Russian
government, and said in his interview that any classified
documents inadvertently swept up by his software would be
destroyed on discovery.

"If we see confidential or classified information, it will be
immediately deleted and that was exactly (what happened in)
this case," he said, adding that the order had since been written
into company policy.

An AP request for a copy of that policy wasn't immediately
granted.

Kaspersky's account still has some gaps. For example, why not
alert American authorities to what happened? The newspaper
reports alleged that the U.S. learned that Kaspersky had
acquired the NSA's tools via an Israeli spying operation.

Kaspersky declined to say whether he had ever alerted U.S.
authorities to the incident.

"Do you really think that I want to see in the news that I tried to
contact the NSA to report this case?" he said at one point.
"Definitely I don't want to see that in the news."

So did he alert the NSA to the incident or not?

"I'm afraid I can't answer the question," he said.

Even if some questions linger, Kaspersky's explanation sounds
plausible, said Jake Williams, a former NSA analyst and the
founder of Augusta, Georgia-based Rendition InfoSec. He noted
that Kaspersky was pitching itself at the time to government
clients in the United States and may not have wanted the risk of
having classified documents on its network.

"It makes sense that they pulled those up and looked at the
classification marking and then deleted them," said Williams. "I
can see where it's so toxic you may not want it on your
systems."

As for the insinuation that someone at the NSA not only walked
highly classified software out of the building but put it on a

85

computer running a bootleg version of Office, Williams called it "absolutely wild."

"It's hard to imagine a worse PR nightmare for the NSA," he said.

___

Online:

Kaspersky's timeline:

https://www.kaspersky.com/blog/internal-investigation-preliminary-results/19894/

## More From AP
by Taboola

Authorities: Bodies in California desert locked in embrace

US astronaut's memoir provides blunt take on year in space

Mike Ditka apologizes for comment on racial oppression

Man admits fatally shooting daughter over lack of 'respect'

## Ad Content
Sponsored Links by Taboola

Reclusive Millionaire Warns Retirees: "Get Out Of Cash Now"
DailyWealth

New Device Leaves Auto Mechanics Angry
FIXD

Pierce Brosnan's Wife Lost 105lb - Try Not To Gasp!

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| KASPERSKY LAB, INC.; and ) | |
| KASPERSKY LABS LIMITED, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| *v.* ) | Civ. No. 17-2697 (CKK) |
| ) | |
| U.S. DEPARTMENT OF ) | |
| HOMELAND SECURITY; and ) | |
| KIRSTJEN NIELSEN ) | |
| *Secretary of Homeland Security* ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**EXHIBIT 3-D**

IV

115TH CONGRESS
1ST SESSION

# H. CON. RES. 47

Expressing the sense of Congress that until the conclusion of the FBI's criminal and counterintelligence investigations into the nature of the Russian connection to the Trump campaign, the Trump Administration is acting under a "gray cloud" of the appearance of a conflict of interest, and, as such, should refrain from taking any actions or making any changes to United States policy that could be seen as benefitting President Putin or his inner circle.

---

## IN THE HOUSE OF REPRESENTATIVES

APRIL 5, 2017

Mr. SWALWELL of California (for himself and Mr. ENGEL) submitted the following concurrent resolution; which was referred to the Committee on Foreign Affairs, and in addition to the Committees on the Judiciary, and Intelligence (Permanent Select), for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

---

# CONCURRENT RESOLUTION

Expressing the sense of Congress that until the conclusion of the FBI's criminal and counterintelligence investigations into the nature of the Russian connection to the Trump campaign, the Trump Administration is acting under a "gray cloud" of the appearance of a conflict of interest, and, as such, should refrain from taking any actions or making any changes to United States policy that could be seen as benefitting President Putin or his inner circle.

2

Whereas the Russian Federation has been a longstanding ad-
versary of the United States;

Whereas the Director of the Federal Bureau of Investigation
(FBI), James Comey, and the Director of the National
Security Agency, Michael Rogers, testified at a March
20, 2017, hearing of the House Permanent Select Com-
mittee on Intelligence (in this resolution referred to as
the ''HPSCI Hearing'') that the Russian Federation is a
foreign adversary of the United States and should be
treated as such in all interactions with United States offi-
cials;

Whereas the Russian Federation has an institutionalized op-
position to human rights, democracy, and the sovereignty
of its neighbors, exhibited most recently in its 2014 inva-
sion of Crimea, its support for troops that shot down a
Malaysian Airlines passenger jet, its state-sponsored sup-
pression of an independent media, and its support for
Syrian dictator Bashar al-Assad;

Whereas 17 United States intelligence agencies jointly con-
cluded in a January 2017 public report (''IC report'')
that Russian President Vladimir Putin personally ordered
a campaign to interfere in the 2016 United States elec-
tions in order to harm former Secretary of State Hillary
Clinton's chances of winning with a preference toward
candidate Donald Trump;

Whereas the Russian Federation's attack on the 2016 United
States elections was multi-faceted, and included the hack-
ing and dissemination of the contents of electronic sys-
tems of the Democratic National Committee and the
Democratic Congressional Campaign Committee and its
emails, the hacking and dissemination of the e-mails of
Secretary Clinton's campaign chairman, the probing of

3

voter databases in Florida, Illinois, and, Arizona, the dis-
semination of fake news through paid social media trolls,
and using its state broadcasting station—directly tied to
Russia's intelligence services—RT, to attack Secretary
Clinton and support Donald Trump;

Whereas the IC report concluded that the Russian Federation
will undoubtedly attempt to meddle in and influence fu-
ture United States elections and elections of United
States allies;

Whereas despite the Russian Federation's status as an adver-
sary and its attack on our democracy, Trump campaign
officials and members of the Trump Administration have
established or maintained well known and publicly docu-
mented ties with people close to President Putin;

Whereas such ties include—

(1) Attorney General Jeff Sessions, who provided
misleading testimony for his Senate confirmation hear-
ings with respect to at least twice meeting with Russia's
Ambassador to the United States, Sergey Kislyak, in
2016;

(2) former Assistant to the President for National
Security, Michael Flynn, who was compelled to resign
just weeks into his tenure because he misled Vice Presi-
dent Mike Pence about his conversations with Ambas-
sador Kislyak, and who also failed to disclose a $33,750
payment from RT, for a speech in Moscow in 2015, and
a $11,250 payment from Kaspersky Lab, a company sus-
pected of having ties with the Russian intelligence serv-
ices and later caught up in a Russian espionage inves-
tigation, for a speech in 2015;

(3) Trump campaign chairman Paul Manafort, who
received over $12,000,000 from former pro-Russian

4

Ukrainian President Viktor Yanukovych in his work as a political consultant in Kiev, and who reportedly signed a $10,000,000 annual contract with Russian business magnate and Putin ally, Oleg Depripaska, saying he would influence American politics, business, and news, in a pro-Russia manner;

(4) Trump campaign national security advisor J.D. Gordon, who directly advocated for a change in the 2016 Republican Party platform to include more pro-Russia and less pro-Ukraine policies, and who met with Ambassador Kislyak, telling him he would like to improve United States-Russia relations;

(5) Trump campaign senior foreign policy advisor Carter Page, who has ties to Gazprom, the Russian Federation's state-owned gas company, made a speech in Moscow critical of United States foreign policy while a Trump campaign advisor, and met with Ambassador Kislyak at the 2016 Republican National Convention while serving as campaign advisor;

(6) Trump campaign advisor Roger Stone, who had back-channel discussions with Julian Assange, the WikiLeaks founder, and had exchanges with hacker Guccifer 2.0, a known front for Russian intelligence, both of whom released documents damaging to Secretary Clinton and her presidential campaign; and

(7) Secretary of State Rex Tillerson, who has met a number of times with President Putin and was awarded Russia's Order of Friendship in 2013, the highest state honor for a foreigner;

Whereas, despite being presented with clear and convincing evidence of atrocities committed by the Government of the Russian Federation and its President, President Trump has not only refused to criticize them, but has

5

gone so far as to praise President Putin and his govern-
ment, and furthermore, President Trump has been ex-
ceedingly willing to criticize or offend some of our closest
allies, including the United Kingdom, Australia, Canada,
Germany, and Mexico;

Whereas President Trump, his campaign officials, and some
of his cabinet members have openly criticized the North
Atlantic Treaty Organization (NATO), its usefulness,
and its future, and this open criticism of NATO only
helps Russia by seeming to call into question NATO's
power, influence, and ability to counter the Russian Fed-
eration strategically and militarily;

Whereas NATO is one of our oldest and strongest military
alliances that was created to counter the former Soviet
Union's aggression, and, more recently, provides a needed
deterrent capability against an increasingly belligerent
Russia;

Whereas the Russian Federation has increased militarization
in the region in the last few years, and the prime target
of this aggression is our European allies, and NATO is
a critical defense against this type of military aggression;

Whereas the Russian Federation has increasingly used
cyberwarfare as a weapon against democracies and demo-
cratic institutions, including in Estonia in 2007, Lith-
uania in 2008, Ukraine in 2014, Germany in 2015, and
the United States in 2016;

Whereas in response to the Russian Federation's invasion of
Ukraine, the United States, in close coordination with its
European partners, imposed a series of escalating rounds
of sanctions on business transactions in the United

6

States with respect to both Russian individuals and Russian companies, and in addition through travel bans;

Whereas in response to the Russian Federation's interference in the 2016 United States elections, the United States issued sanctions against Russian intelligence agents and entities, expelled 35 Russian personnel registered with the Russian diplomatic mission in the United States and listed them as ''persona non grata'', and shut down two Russian compounds in Maryland and New York alleged to have been used for intelligence activities;

Whereas the FBI generally does not publicize ongoing investigations, except in extraordinary circumstances in which it believes it is in the public interest, and FBI Director Comey testified at the HPSCI Hearing, ''This is one of those circumstances'';

Whereas Director Comey further testified that the FBI ''is investigating the Russian government's efforts to interfere in the 2016 presidential election'';

Whereas Director Comey further testified that the FBI's criminal and counterintelligence investigations include ''investigating the nature of any links between individuals associated with the Trump campaign and the Russian government, and whether there was any coordination between the campaign and Russia's efforts'';

Whereas coordination between a foreign adversary and members of a United States presidential campaign during the adversary's attack on our democracy would be an unprecedented assault on the government and democratic process of the United States; and

Whereas the extensive ties between President Trump's campaign and Administration with President Putin's govern-

7

ment and associated individuals, President Trump's statements and those of his Administration toward President Putin and his government about defense policy as it relates to the Russian Federation, and the ongoing criminal and counterintelligence investigations by the FBI, raise enough serious questions about the intent and influence behind any policy decisions the President or his Administration may make with respect to President Putin and the Government of the Russian Federation or otherwise affecting them: Now, therefore, be it

1   *Resolved by the House of Representatives (the Senate*
2   *concurring)*, That it is the sense of Congress that—

3        (1) President Trump, his family, his business
4     associates, his campaign associates, and members of
5     his Administration should cooperate fully with all in-
6     vestigations undertaken which examine the Russian
7     Federation's attack on our democracy during the
8     2016 United States elections, ties between officials
9     with President Trump's campaign and the Russian
10    Federation, and possible coordination between these
11    officials and the Russian Federation as part of its
12    attack;

13       (2) until the conclusion of the FBI's criminal
14    and counterintelligence investigations into the nature
15    of the Russian connection to the Trump campaign,
16    the Trump Administration is acting under a ''gray
17    cloud'' of the appearance of a conflict of interest,
18    and, as such, should refrain from taking any actions

8

1    or making any changes to United States policy that

2    could be seen as benefitting President Putin or his

3    inner circle; and

4    (3) the appearance of any conflict of interest

5    concerning a well-resourced, committed, and dan-

6    gerous foreign adversary and the institutions of

7    United States Government primarily responsible for

8    national defense and the conduct of foreign policy

9    weakens our national security and erodes confidence

10    between the United States and our allies.

○

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

KASPERSKY LAB, INC.; and
KASPERSKY LABS LIMITED,

_Plaintiffs_,

_v._

U.S. DEPARTMENT OF
HOMELAND SECURITY; and
KIRSTJEN NIELSEN
_Secretary of Homeland Security_

_Defendants._

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 17-2697 (CKK)

**EXHIBIT 3-E**

# BOLSTERING THE GOVERNMENT'S CYBERSECURITY: LESSONS LEARNED FROM WANNACRY

## JOINT HEARING

BEFORE THE

### SUBCOMMITTEE ON OVERSIGHT &
### SUBCOMMITTEE ON RESEARCH AND TECHNOLOGY

## COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

## HOUSE OF REPRESENTATIVES

### ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

———

June 15, 2017

———

### Serial No. 115–17

———

Printed for the use of the Committee on Science, Space, and Technology



Available via the World Wide Web: http://science.house.gov

———

U.S. GOVERNMENT PUBLISHING OFFICE

26–234PDF                    WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

HON. LAMAR S. SMITH, Texas, *Chair*

FRANK D. LUCAS, Oklahoma
DANA ROHRABACHER, California
MO BROOKS, Alabama
RANDY HULTGREN, Illinois
BILL POSEY, Florida
THOMAS MASSIE, Kentucky
JIM BRIDENSTINE, Oklahoma
RANDY K. WEBER, Texas
STEPHEN KNIGHT, California
BRIAN BABIN, Texas
BARBARA COMSTOCK, Virginia
GARY PALMER, Alabama
BARRY LOUDERMILK, Georgia
RALPH LEE ABRAHAM, Louisiana
DRAIN LaHOOD, Illinois
DANIEL WEBSTER, Florida
JIM BANKS, Indiana
ANDY BIGGS, Arizona
ROGER W. MARSHALL, Kansas
NEAL P. DUNN, Florida
CLAY HIGGINS, Louisiana

EDDIE BERNICE JOHNSON, Texas
ZOE LOFGREN, California
DANIEL LIPINSKI, Illinois
SUZANNE BONAMICI, Oregon
ALAN GRAYSON, Florida
AMI BERA, California
ELIZABETH H. ESTY, Connecticut
MARC A. VEASEY, Texas
DONALD S. BEYER, JR., Virginia
JACKY ROSEN, Nevada
JERRY MCNERNEY, California
ED PERLMUTTER, Colorado
PAUL TONKO, New York
BILL FOSTER, Illinois
MARK TAKANO, California
COLLEEN HANABUSA, Hawaii
CHARLIE CRIST, Florida

———

SUBCOMMITTEE ON OVERSIGHT

HON. DRAIN LaHOOD, Illinois, *Chair*

BILL POSEY, Florida
THOMAS MASSIE, Kentucky
GARY PALMER, Alabama
ROGER W. MARSHALL, Kansas
CLAY HIGGINS, Louisiana
LAMAR S. SMITH, Texas

DONALD S. BEYER, Jr., Virginia, *Ranking Member*
JERRY MCNERNEY, California
ED PERLMUTTER, Colorado
EDDIE BERNICE JOHNSON, Texas

———

SUBCOMMITTEE ON RESEARCH AND TECHNOLOGY

HON. BARBARA COMSTOCK, Virginia, *Chair*

FRANK D. LUCAS, Oklahoma
RANDY HULTGREN, Illinois
STEPHEN KNIGHT, California
DARIN LaHOOD, Illinois
RALPH LEE ABRAHAM, Louisiana
DANIEL WEBSTER, Florida
JIM BANKS, Indiana
ROGER W. MARSHALL, Kansas
LAMAR S. SMITH, Texas

DANIEL LIPINSKI, Illinois
ELIZABETH H. ESTY, Connecticut
JACKY ROSEN, Nevada
SUZANNE BONAMICI, Oregon
AMI BERA, California
DONALD S. BEYER, JR., Virginia
EDDIE BERNICE JOHNSON, Texas

# C O N T E N T S

## June 15, 2017

| | Page |
|---|---|
| Witness List ........................................................................................................... | 2 |
| Hearing Charter ...................................................................................................... | 3 |

### Opening Statements

Statement by Representative Darin LaHood, Chairman, Subcommittee on
Oversight, Committee on Science, Space, and Technology, U.S. House of
Representatives ................................................................................................. 4
    Written Statement ........................................................................................... 6
Statement by Representative Donald S. Beyer, Jr., Ranking Member, Sub-
committee on Oversight, Committee on Science, Space, and Technology,
U.S. House of Representatives ......................................................................... 9
    Written Statement ........................................................................................... 10
Statement by Representative Ralph Abraham, Vice Chairman, Subcommittee
on Research and Technology, Committee on Science, Space, and Technology,
U.S. House of Representatives ......................................................................... 12
    Written Statement ........................................................................................... 14
Statement by Representative Daniel Lipinski, Ranking Member, Sub-
committee on Research and Technology, Committee on Science, Space, and
Technology, U.S. House of Representatives ................................................... 16
    Written Statement ........................................................................................... 18
Statement by Representative Lamar S. Smith, Chairman, Committee on
Science, Space, and Technology, U.S. House of Representatives .................... 20
    Written Statement ........................................................................................... 22

### Witnesses:

Mr. Salim Neino, Chief Executive Officer, Kryptos Logic
    Oral Statement ................................................................................................ 24
    Written Statement ........................................................................................... 28
Dr. Charles H. Romine, Director, Information Technology Laboratory, Na-
tional Institute of Standards and Technology
    Oral Statement ................................................................................................ 33
    Written Statement ........................................................................................... 35
Mr. Gregory J. Touhill, CISSP, CISM; Brigadier General, USAF (ret); Adjunct
Professor, Cybersecurity & Risk Management, Carnegie Mellon University,
Heinz College
    Oral Statement ................................................................................................ 44
    Written Statement ........................................................................................... 46
Dr. Hugh Thompson, Chief Technology Officer, Symantec
    Oral Statement ................................................................................................ 54
    Written Statement ........................................................................................... 56

Discussion ................................................................................................................ 64

### Appendix I: Answers to Post-Hearing Questions

Dr. Charles H. Romine, Director, Information Technology Laboratory, Na-
tional Institute of Standards and Technology ................................................. 82

IV

Page

Mr. Gregory J. Touhill, CISSP, CISM; Brigadier General, USAF (ret); Adjunct Professor, Cybersecurity & Risk Management, Carnegie Mellon University, Heinz College ..................................................................................................... 84

Dr. Hugh Thompson, Chief Technology Officer, Symantec .................................. 87

**Appendix II: Additional Material for the Record**

Statement submitted by Representative Eddie Bernice Johnson, Ranking Member, Committee on Science, Space, and Technology, U.S. House of Representatives ..................................................................................................... 90

# BOLSTERING THE GOVERNMENT'S CYBERSECURITY: LESSONS LEARNED FROM WANNACRY

————————

**Thursday, June 15, 2017**

House of Representatives,
Subcommittee on Oversight and
Subcommittee on Research and Technology
Committee on Science, Space, and Technology,
*Washington, D.C.*

The Subcommittees met, pursuant to call, at 10:05 a.m., in Room 2318 of the Rayburn House Office Building, Hon. Darin LaHood [Chairman of the Subcommittee on Oversight] presiding.

2

LAMAR S. SMITH, Texas
CHAIRMAN

EDDIE BERNICE JOHNSON, Texas
RANKING MEMBER

## Congress of the United States
### House of Representatives
COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

2321 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6301

(202) 225–6371
www.science.house.gov

Subcommittees on Oversight and Research and Technology

## *Bolstering the Government's Cybersecurity: Lessons Learned from WannaCry*

Thursday, June 15, 2017
10:00 a.m. – 12:00 p.m.
2318 Rayburn House Office Building

### Witnesses

**Mr. Salim Neino,** Chief Executive Officer, Kryptos Logic

**Dr. Charles H. Romine,** Director, Information Technology Laboratory, National Institute of Standards and Technology

**Mr. Gregory J. Touhill,** CISSP, CISM; Brigadier General, USAF (ret); Adjunct Professor, Cybersecurity & Risk Management, Carnegie Mellon University, Heinz College

**Dr. Hugh Thompson,** Chief Technology Officer, Symantec

3

**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY**

**HEARING CHARTER**

Thursday, June 8, 2017

TO:        Members, Committee on Science, Space, and Technology

FROM:   Majority Staff, Committee on Science, Space, and Technology

SUBJECT:  Oversight Subcommittee and Research and Technology Subcommittee hearing:
            "Bolstering the Government's Cybersecurity: Lessons Learned from WannaCry"

---

The Subcommittee on Oversight and the Subcommittee on Research and Technology of the Committee on Science, Space, and Technology will hold a joint hearing titled *Bolstering the Government's Cybersecurity: Lessons Learned from WannaCry* on Thursday, June 15, 2017, at 10:00 a.m. in Room 2318 of the Rayburn House Office Building.

**Hearing Purpose**

The purpose of the hearing is to examine the recent WannaCry ransomware attack that compromised computer systems globally last month.  Because the ransomware attack was the first of its kind, the hearing will allow Members to hear recommendations for what the government can do to ensure its systems are protected against similar and possibly more sophisticated attacks.  The hearing will also examine the benefits of public-private partnerships for cybersecurity, as well as the President's recent Executive Order, which makes NIST's Cybersecurity Framework mandatory for Executive Branch departments and agencies.

**Witness List**

- **Mr. Salim Neino**, Chief Executive Officer, Kryptos Logic
- **Dr. Charles H. Romine**, Director, Information Technology Laboratory, National Institute of Standards and Technology
- **Mr. Gregory J. Touhill**, CISSP, CISM; Brigadier General, USAF (ret); Adjunct Professor, Cybersecurity & Risk Management, Carnegie Mellon University, Heinz College
- **Dr. Hugh Thompson**, Chief Technology Officer, Symantec

**Staff Contact**

For questions related to the hearing, please contact Caroline Ingram of the Majority Staff at 202-225-6371.

72

is cumulative behind cyber. Cyber is very difficult to attribute. You need other areas to attribute a——

Mr. HIGGINS. What's your opinion? Was North Korea behind WannaCry?

Mr. NEINO. I don't really want to comment. I've seen other people make very good conjectures about it being China. I've seen other conjectures as of just being random people. But I don't think it's worth commenting because I'm just not a subject domain expert in intelligence.

Mr. HIGGINS. Intelligence is a safe answer, sir.

When security software is designed, how easy is it for the designer to build a backdoor access that would be virtually undetectable within that cybersecurity software?

Mr. NEINO. We've seen that a multitude of times, and there's very good studies from a variety of areas. The level of entry to do that is very low.

Mr. HIGGINS. Thank you for concluding that.

Brigadier General, my question is to you, sir. Thank you for your service. Are you familiar with Kaspersky Labs out of Moscow?

General TOUHILL. I am familiar with Kaspersky.

Mr. HIGGINS. Manufacturer of cybersecurity products, a long list of cybersecurity products, that top intelligence officials at the FBI, the CIA, the NSA and others advise this body that they don't trust Kaspersky, that they would not use their product on their personal devices. However, it's still used widely across the United States Government in various departments. Can you explain that to this Committee?

General TOUHILL. Well, sir, I don't know what kind of conversation, you know, my colleagues from those agencies had with this Committee. However, as I go and I take a look at the different products that are in the market today, I believe that the American products are the best ones out there, and just on a value proposition, I buy American.

Mr. HIGGINS. I concur. That's a brigadier general speaking right there.

General TOUHILL. That's an American speaking, sir.

Mr. HIGGINS. Let me say that although there's no public evidence of collusion between Kaspersky Labs and the Russian government, it's not a large leap, and Eugene Kaspersky has suggested that his products have no ties to the Russian government. However, as part of the national conversation, Mr. Chairman, and it's widely known that the Russians have been involved in efforts to influence governments across the world with cyber-attack, and Mr. Kaspersky has suggested that he would testify before this body. I strongly suggest that we take him up on his offer. I'd sure like to talk to him regarding the kill switch in North Korea, that having been a rather glaring error on the part of the designer of that worm cyber-attack.

Mr. Neino, what do you think that happened to that guy in North Korea? It was a kill switch, wasn't it? So this message, should it get to any of the cyber-attack cyber experts in North Korea, if you can get out of the country, you're welcome in the West. We'd love to have you before this Committee. We'll give you some real good food.

Mr. Chairman, I yield back.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| ) | |
| KASPERSKY LAB, INC.; and ) | |
| KASPERSKY LABS LIMITED, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| *v.* ) | Civ. No. 17-2697 (CKK) |
| ) | |
| U.S. DEPARTMENT OF ) | |
| HOMELAND SECURITY; and ) | |
| KIRSTJEN NIELSEN ) | |
| *Secretary of Homeland Security* ) | |
| ) | |
| *Defendants.* ) | |

---

**EXHIBIT 3-F**

S. Hrg. 115–92

# RUSSIAN INTERFERENCE IN THE 2016 U.S. ELECTIONS

# HEARING

BEFORE THE

## SELECT COMMITTEE ON INTELLIGENCE

OF THE

## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

WEDNESDAY, JUNE 21, 2017

Printed for the use of the Select Committee on Intelligence



Available via the World Wide Web: http://www.fdsys.gov

U.S. GOVERNMENT PUBLISHING OFFICE

26–125 PDF                    WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

SELECT COMMITTEE ON INTELLIGENCE

[Established by S. Res. 400, 94th Cong., 2d Sess.]

RICHARD BURR, North Carolina, *Chairman*
MARK R. WARNER, Virginia, *Vice Chairman*

JAMES E. RISCH, Idaho
MARCO RUBIO, Florida
SUSAN COLLINS, Maine
ROY BLUNT, Missouri
JAMES LANKFORD, Oklahoma
TOM COTTON, Arkansas
JOHN CORNYN, Texas

DIANNE FEINSTEIN, California
RON WYDEN, Oregon
MARTIN HEINRICH, New Mexico
ANGUS KING, Maine
JOE MANCHIN III, West Virginia
KAMALA HARRIS, California

MITCH McCONNELL, Kentucky, *Ex Officio*
CHUCK SCHUMER, New York, *Ex Officio*
JOHN McCAIN, Arizona, *Ex Officio*
JACK REED, Rhode Island, *Ex Officio*

————

CHRIS JOYNER, *Staff Director*
MICHAEL CASEY, *Minority Staff Director*
KELSEY STROUD BAILEY, *Chief Clerk*

(II)

# CONTENTS

———

**JUNE 21, 2017**

### OPENING STATEMENTS

Burr, Hon. Richard, Chairman, a U.S. Senator from North Carolina  ...............   1
Warner, Hon. Mark R., Vice Chairman, a U.S. Senator from Virginia  ..............   2

### WITNESSES

Liles, Sam, Acting Director, Office of Intelligence and Analysis, Cyber Divi-
    sion, Department of Homeland Security  ............................................................   4
Manfra, Jeanette, Undersecretary of Homeland Security, and Acting Director,
    National Protection and Programs Directorate  ...................................................   6
    Prepared statement  ..........................................................................................   8
Priestap, Bill, Assistant Director, Counterintelligence Division, Federal Bu-
    reau of Investigation  ..........................................................................................  15
    Prepared statement  ..........................................................................................  16
Lawson, Connie, Indiana Secretary of State and President-Elect, National
    Association of Secretaries of State  ....................................................................  48
    Prepared statement  ..........................................................................................  50
Haas, Michael, Midwest Regional Representative, National Association of
    State Election Directors  .....................................................................................  59
    Prepared statement  ..........................................................................................  62
Sandvoss, Steve, Executive Director, Illinois State Board of Elections  ..............  68
    Prepared statement  ..........................................................................................  70
Halderman, J. Alex, Professor of Computer Science and Engineering, Univer-
    sity of Michigan  ..................................................................................................  72
    Prepared statement  ..........................................................................................  74

### SUPPLEMENTAL MATERIAL

Phishing email received by Billy Rinehart of DNC  .............................................  37
Report titled "Securing Elections from Foreign Interference" submitted by
    Senator Warner  ...................................................................................................  96
Questions for the record  .........................................................................................  134

42

notify our State Department in advance if they plan to travel more than 25 miles, and give that notification 48 hours in advance?

Mr. PRIESTAP. They do.

Senator COTTON. And the State Department's supposed to notify the FBI in advance of those travel arrangements, correct?

Mr. PRIESTAP. Yes.

Senator COTTON. Is it true that the Russian nationals often fail to give that notification at all, or they give it at, say, 4:55 on a Friday afternoon before a weekend trip?

Mr. PRIESTAP. I'd prefer not to go into those details here, but—I'll leave it at that.

Senator COTTON. Does it complicate you and your agents' efforts to conduct your counterintelligence mission to have Russian nationals wandering around the country more than 25 miles outside their duty assignment?

Mr. PRIESTAP. Sure. If that were to happen, that would absolutely complicate our efforts.

Senator COTTON. The Secretary of Defense recently indicated at an Armed Services Committee hearing that Russia is in violation of something called the Open Skies Treaty, a treaty we have with Russia and other nations that allow us to overfly their territory and take pictures and they do the same here. Do we see so-called Russian diplomats traveling to places that are in conjunction with Open Skies flights that Russia's conducting in this country?

Mr. PRIESTAP. I'm sorry, I just can't comment on that here.

Senator COTTON. Okay. Last summer, an American diplomat in Moscow was brutally assaulted on the doorstep of our embassy in Moscow. Did we take any steps to retaliate against Russia for that assault in Moscow? Did we declare persona non grata any of their so-called diplomats here in the United States?

Mr. PRIESTAP. If I recall correctly, we didn't immediately do anything in that regard.

Senator COTTON. Okay. This Committee passed unanimously in Committee last year something that just passed as part of the omnibus spending bill in April a provision that would require, one, the State Department to notify the FBI of any requests for Russian diplomats to travel more than 25 miles outside their embassy and to report violations to you.

It further requires the State Department to report those violations regularly to this Committee. What's the status of that provision now that it's been in law for about two months? Is the State Department cooperating more fully with you?

Mr. PRIESTAP. I guess I'd rather not comment on that here. We're still working through the implementation of that.

Senator COTTON. Well, I certainly hope they start.

Thank you.

Chairman BURR. Senator Harris.

Senator HARRIS. Thank you.

Ms. Manfra, you mentioned that you notified the owners. I'm not clear on who the owners are. Are they the vendors?

Ms. MANFRA. What I meant to clarify is in some case it may not be the secretary of state or the state election director who owns that particular system. So in some cases it could be a locality or a vendor.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                      )
KASPERSKY LAB, INC.; and              )
KASPERSKY LABS LIMITED,               )
                                      )
*Plaintiffs*,                         )
                                      )
*v.*                                  )          Civ. No. 17-2697 (CKK)
                                      )
U.S. DEPARTMENT OF                    )
HOMELAND SECURITY; and                )
KIRSTJEN NIELSEN                      )
*Secretary of Homeland Security*      )
                                      )
*Defendants.*                         )
_____)


**EXHIBIT 3-G**

# HELP OR HINDRANCE? A REVIEW OF SBA'S OFFICE OF THE CHIEF INFORMATION OFFICER

## HEARING

BEFORE THE

## COMMITTEE ON SMALL BUSINESS
## UNITED STATES
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

_____

HEARING HELD
JULY 12 , 2017

_____



Small Business Committee Document Number 115–028
Available via the GPO Website: www.fdsys.gov

_____

U.S. GOVERNMENT PUBLISHING OFFICE

26–248                    WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

HOUSE COMMITTEE ON SMALL BUSINESS

STEVE CHABOT, Ohio, *Chairman*
STEVE KING, Iowa
BLAINE LUETKEMEYER, Missouri
DAVE BRAT, Virginia
AUMUA AMATA COLEMAN RADEWAGEN, American Samoa
STEVE KNIGHT, California
TRENT KELLY, Mississippi
ROD BLUM, Iowa
JAMES COMER, Kentucky
JENNIFFER GONZALEZ-COLON, Puerto Rico
DON BACON, Nebraska
BRIAN FITZPATRICK, Pennsylvania
ROGER MARSHALL, Kansas
RALPH NORMAN, South Carolina
NYDIA VELAZQUEZ, New York, *Ranking Member*
DWIGHT EVANS, Pennsylvania
STEPHANIE MURPHY, Florida
AL LAWSON, JR., Florida
YVETTE CLARK, New York
JUDY CHU, California
ALMA ADAMS, North Carolina
ADRIANO ESPAILLAT, New York
BRAD SCHNEIDER, Illinois
VACANT

KEVIN FITZPATRICK, *Majority Staff Director*
JAN OLIVER, *Majority Deputy Staff Director and Chief Counsel*
ADAM MINEHARDT, *Staff Director*

# C O N T E N T S

## OPENING STATEMENTS

Page

Hon. Steve Chabot  .................................................................................................   1
Hon. Nydia Velázquez  ...........................................................................................   2

## WITNESS

Ms. Maria Roat, Chief Information Officer, United States Small Business
    Administration, Washington, DC  .......................................................................   4

## APPENDIX

Prepared Statement:
    Ms. Maria Roat, Chief Information Officer, United States Small Business
        Administration, Washington, DC  ..............................................................   21
Questions for the Record:
    None.
Answers for the Record:
    None.
Additional Material for the Record:
    None.

7

will definitely work with you to make improvements. And I am pleased to see that you have a positive attitude. I am not surprised after spending the time you did in such a tremendous organization as the U.S. Navy, and again, thank you for your service there.

I will now yield back my time and recognize the Ranking Member for 5 minutes.

Ms. VELAZQUEZ. Thank you, Mr. Chairman. And welcome, Ms. Roat.

We want to ensure that access to resources for small businesses of all demographic groups is important and recognize that SBA.gov serves as the primary source of such information. In the prior administration, there was a page on the site for LGBT small businesses outreach, and now it appears to no longer be available due to page updates. This information has been down since at least last January, and I would like to know when you plan to have this page back up and running?

Ms. ROAT. So we have been doing a lot of work on modernizing SBA.gov. There were a number of pages that are not available, like you indicated. Some are coming back up online. I know Tech Coalition was one of those that was taken down, as well as some of the others. The Tech Coalition is back up online. So as we are working through with the front office and with the program offices, we are evaluating all of those pages and bringing them online.

Ms. VELAZQUEZ. Okay. Recent government security breaches, such as the OPM breach and the Russian election hacking, have heightened the importance of continuously monitoring against outside threats. But in an annual evaluation of the SBA system and networks, the IG has found significant enterprise-wide vulnerabilities. How has the SBA responded to the threat of such risk?

Ms. ROAT. I would say there are several things that we have done. One I mentioned earlier was the patching, the configuration management, and the inventory; understanding what we own and what we have, as well as modernizing all of those, getting them to current levels for operating systems and those kind of things. So those specifically have taken us a long way to address security. In addition, we are in phase one of deploying the DHS CDM, the Continuous Monitoring Diagnostic and Mitigation System, so we are deploying that right now. So that will give us future capabilities as well for monitoring. We do have a security operation center and a network operation center that are now working very closely together.

Ms. VELÁZQUEZ. So it is imperative that the tools SBA offers to facilitate access to capital operate at their optimum capacity, and I heard you mention that the rebranding of the lender match will be launched soon. How soon?

Ms. ROAT. Tomorrow. We did the demo for the administrator yesterday.

Ms. VELÁZQUEZ. Very good. Ms. Roat, Kaspersky is a Moscow-based firm and one of the biggest cybersecurity firms in the world. According to reports, its software has been procured by some federal agencies. This is very concerning in light of the threat Russia poses to our government and U.S. customers. Does SBA use this

8

software? And are you coordinating with other agencies to mitigate cyber threats?

Ms. ROAT. So we have been coordinating with DHS, as have the other Federal agencies, and we do not have any Kaspersky software installed in our environment.

Ms. VELAZQUEZ. Very good. Last year, SBA established the Office of Digital Services to improve systems and capabilities. Can you please elaborate on the work this office performs and how the SBA determines the impact it has had?

Ms. ROAT. So the Office of Digital Services was stood up a little over a year ago, almost a year and a half ago. They have taken on SBA.gov, the redesign and the rebuild of that. They have done a lot of work introducing agile methodology, new and modern tools, and technologies. They have also—where we had multiple GitHub sites across SBA, whether they were contractor managed—consolidated all of that work. So the Office of Digital Services has brought a lot of benefit to SBA as far as modernizing and bringing in additional capabilities.

Ms. VELAZQUEZ. Very good. And given the fact that there is a history of a lot of turnover and eight CIOs since 2005, I would like to know what succession planning SBA engages in to ensure continuity in IT operations?

Ms. ROAT. Well, for the first time, right now we have a CIO and a Deputy together, and I also, in January, hired a CTO as well. So when you look at succession planning, we go three deep right now.

Ms. VELAZQUEZ. What would be key elements of that succession planning?

Ms. ROAT. Being engaged and being a part of the entire modernization and moving forward in planning. The CTO right now is incredibly engaged with the businesses offices as we are taking the enterprise approach to SBA, so we work together as a team, the three of us as we lay the strategy moving forward for SBA.

Ms. VELAZQUEZ. Thank you, Mr. Chairman. I yield back.

Chairman CHABOT. Thank you. The gentlelady yields back.

The gentleman from California, Mr. Knight, who is the—excuse me. Or is Mr. Kelly here? Mr. Knight, I apologize. Mr. Knight, who is Chairman of the Subcommittee on Contracting and Workforce, is recognized for 5 minutes. Thank you.

Mr. KNIGHT. Thank you, Mr. Chairman. Mr. Kelly and I look alike so——

Chairman CHABOT. You talk alike, too.

Mr. KNIGHT. We do talk alike.

I have some just basic questions. I appreciate your service in the military and information to the military is very important, but the control of that information is just as important. So I understand that your background will help with that. But my questions are very kind of simple. A lot of these questions have gone over the turnover of how many CIOs we have had over the last 5, 6, 7, 8 years, and how we continue the continuity moving forward. So can you give me an idea of—and I have heard, you know, in your statement of all of the things that are coming, all the things that have been in place, and the perfect answer to say that tomorrow is a great day, but how do we keep the continuity moving forward with your leadership?

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
|  | ) |  |
| KASPERSKY LAB, INC.; and | ) |  |
| KASPERSKY LABS LIMITED, | ) |  |
|  | ) |  |
| *Plaintiffs*, | ) |  |
|  | ) |  |
| *v.* | ) | Civ. No. 17-2697 (CKK) |
|  | ) |  |
| U.S. DEPARTMENT OF | ) |  |
| HOMELAND SECURITY; and | ) |  |
| KIRSTJEN NIELSEN | ) |  |
| *Secretary of Homeland Security* | ) |  |
|  | ) |  |
| *Defendants.* | ) |  |
|  | ) |  |

---

**EXHIBIT 3-H**

strive to make sure that our constituents have access to the ballot box and are able to have their voices heard. This is of course just one reform we must make to ensure that our citizens' voting rights are protected. In the coming weeks, I intend to reintroduce legislation to restore the full protections of the Voting Rights Act. It has now been almost 4 years since the Supreme Court's devastating decision in Shelby County v. Holder, and we have seen the effect of that disastrous ruling as States have attempted to enact discriminatory voter ID laws and other measures intended to prevent minority voters from going to the polls. That is disgraceful, and we must do better. Congress must act to ensure that millions of Americans are not disenfranchised.

The right to vote should not be a partisan issue. It is a right that forms the basis of our democracy, and it is incumbent on all Americans, Democratic and Republican, to ensure that no American's right to vote is infringed. Modernizing our voter registration system is one significant step forward.

By Mr. DAINES (for himself, Mr. GRAHAM, Mr. CORNYN, Mr. HELLER, Mr. HATCH, Mr. CRAPO, Mr. GRASSLEY, Mr. ISAKSON, and Mr. RUBIO):

S.J. Res. 46. A joint resolution proposing an amendment to the Constitution of the United States authorizing the Congress to prohibit the physical desecration of the flag of the United States; to the Committee on the Judiciary.

Mr. DAINES. Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

Mr. DAINES. Mr. President, today, June 14, 2017 marks the 240th observance of "Flag Day," a day which commemorates the adoption of the flag of the United States by a resolution of the Second Continental Congress in 1777. Deeply symbolic, our flag honors the sovereignty of each of our Nation's 50 States and the great sacrifices many Americans have made to uphold its bedrock principles of freedom and liberty. The Department of Veterans Affairs estimates that over one million military service members have given their lives in the line of duty under our flag. Title 4 of United States Code, "The Flag Code" sets specific requirements for the handling and display of the flag, as a sign of respect to the symbol of our Nation.

In 1989, with a disappointing 5–4 vote, the U.S. Supreme Court held in Texas v. Johnson that the desecration of the United States flag was a form of free speech under the First Amendment to the Constitution. Here, Chief Justice Rehnquist rightly observed in his dissent that "the flag is not simply another 'idea' or 'point of view' competing for recognition in the market-

place of ideas." Justice Kennedy, in his majority concurrence, recognized that many would be dismayed by the court's decision, and himself called the result distasteful. Yet, he explained that the court was bound to its decision according to the provisions of the Constitution. The Supreme Court reaffirmed this decision in United States v. Eichman in 1990. It ruled, again by 5–4 vote, that as Constitutional free speech, desecration of the flag cannot be prohibited by Federal or State statute. At the time of the Supreme Court's ruling, 48 of the 50 States had enacted statutes prohibiting desecration of the United States Flag.

My resolution proposes an amendment to the Constitution, establishing Congressional authority to prohibit the desecration of the flag of the United States. This resolution initiates the process to amend the Constitution, which must be agreed to by two-thirds of both houses of Congress, and ratified by three-fourths of the States. A high bar to meet, similar legislation passed the House of Representatives in 2006, and fell short of passage in the Senate by only one vote.

My resolution provides Congress with the authority that the Supreme Court decided it lacked in Texas v. Johnson and United States v. Eichman. This should remove any doubt in the mind of the Supreme Court on the Constitutionality of acts of flag desecration. A matter which has been long settled in the Court of public opinion.

S.J. RES. 46

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within 7 years after the date of its submission by the Congress:

"ARTICLE—

"The Congress shall have power to prohibit the physical desecration of the flag of the United States.".

━━━━━━━━━━

## AMENDMENTS SUBMITTED AND PROPOSED

SA 235. Mr. COTTON submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table.

SA 236. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 237. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 238. Mr. RUBIO (for himself, Mr. PORTMAN, Mrs. FISCHER, Mr. MARKEY, Mr. GRAHAM, Mr. NELSON, Mr. YOUNG, Mr. WICKER, Mr. COONS, Mr. BLUMENTHAL, Mrs. CAPITO, Mr. MORAN, and Mr. HELLER) submitted an amendment intended to be pro-

posed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 239. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 240. Mr. GRAHAM (for himself, Mr. BROWN, Mr. MCCAIN, Mr. BLUMENTHAL, Mr. RUBIO, Mr. REED, Mr. TILLIS, Ms. BALDWIN, Mr. CASEY, Mr. INHOFE, Mr. COONS, Mr. PORTMAN, Mr. CORKER, Mr. WHITEHOUSE, Mr. COCHRAN, Mr. BENNET, Mr. YOUNG, Mr. FRANKEN, Mr. WICKER, Mrs. SHAHEEN, Mr. BARRASSO, Ms. KLOBUCHAR, Mr. WARNER, Mrs. GILLIBRAND, Mr. KAINE, Mr. MURPHY, Mr. MARKEY, Ms. WARREN, Mr. CARPER, Mr. BLUNT, Mr. SULLIVAN, and Mr. ALEXANDER) submitted an amendment intended to be proposed by him to the bill S. 722, supra.

SA 241. Mr. CARDIN (for himself, Mr. PORTMAN, and Mr. RUBIO) submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 242. Mrs. SHAHEEN submitted an amendment intended to be proposed by her to the bill S. 722, supra; which was ordered to lie on the table.

SA 243. Mr. SULLIVAN submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 244. Mr. SULLIVAN submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 245. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 246. Mr. TOOMEY submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 247. Mr. GARDNER (for himself, Mr. COONS, and Mr. WARNER) submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 248. Mr. PERDUE (for himself and Mr. CASEY) submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 249. Mr. GARDNER submitted an amendment intended to be proposed to amendment SA 232 proposed by Mr. MCCONNELL (for Mr. CRAPO (for himself, Mr. BROWN, Mr. CORKER, and Mr. CARDIN)) to the bill S. 722, supra; which was ordered to lie on the table.

SA 250. Mr. GARDNER (for himself, Mr. SHELBY, Mr. STRANGE, Mr. NELSON, Mr. WARNER, Mr. BENNET, and Mr. KAINE) submitted an amendment intended to be proposed by him to the bill S. 722, supra.

SA 251. Mr. CARDIN submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 252. Mr. WARNER submitted an amendment intended to be proposed to amendment SA 232 proposed by Mr. MCCONNELL (for Mr. CRAPO (for himself, Mr. BROWN, Mr. CORKER, and Mr. CARDIN)) to the bill S. 722, supra; which was ordered to lie on the table.

SA 253. Mr. LANKFORD submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

SA 254. Mr. MORAN submitted an amendment intended to be proposed by him to the bill S. 722, supra; which was ordered to lie on the table.

━━━━━━━━━━

## TEXT OF AMENDMENTS

**SA 235.** Mr. COTTON submitted an amendment intended to be proposed by

him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

SEC. 13. IMPOSITION OF SANCTIONS WITH RESPECT TO VIOLATIONS OF THE INF TREATY BY THE RUSSIAN FEDERATION.

(a) IMPOSITION OF SANCTIONS.—The President shall impose the sanctions described in subsection (b) with respect to any Russian person that the President determines, on or after the date of the enactment of this Act—

(1) knowingly directs, implements, provides support for, or otherwise participates in actions or projects of the Government of the Russian Federation that constitute a material breach of the INF Treaty;

(2) is a successor entity to a person referred to in paragraph (1);

(3) owns or controls or is owned or controlled by a person referred to in paragraph (1);

(4) forms an entity with the purpose of evading sanctions that would otherwise be imposed pursuant to paragraph (3);

(5) is acting for or on behalf of a person referred to in paragraph (1), (2), (3), or (4); or

(6) knowingly provides or attempts to provide financial, material, technological, or other support for, or goods or services in support of, a person referred to in paragraph (1), (2), (3), (4) or (5).

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) BLOCKING OF PROPERTY.—The President shall block, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), all property and interests in property of any person subject to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(2) EXCLUSION FROM UNITED STATES.—The Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any person subject to subsection (a) that is an alien.

(c) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of subsection (b)(1) or any regulation, license, or order issued to carry out that subsection shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(d) DEFINITIONS.—In this section:

(1) INF TREATY.—The term "INF Treaty" means the Treaty between the United States of America and the Union of Soviet Socialist Republics on the Elimination of their Intermediate-Range and Shorter-Range Missiles, signed at Washington December 8, 1987, and entered into force June 1, 1988.

(2) RUSSIAN PERSON.—The term "Russian person" means—

(A) an individual who is a citizen or national of the Russian Federation; or

(B) an entity organized under the laws of the Russian Federation or otherwise subject to the jurisdiction of the Government of the Russian Federation.

SEC. 14. IMPOSITION OF SANCTIONS WITH RESPECT TO EMPLOYEES AND AGENTS OF KASPERSKY LAB.

(a) IMPOSITION OF SANCTIONS.—

(1) FOUNDERS, DIRECTORS, AND SENIOR CORPORATE LEADERSHIP.—The President shall impose the sanctions described in subsection (b) with respect to any citizen or national of the Russian Federation that the President determines, on or after the date of the enactment of this Act, is a founder, director, or member of the senior corporate leadership of Kaspersky Lab.

(2) EMPLOYEES AND AGENTS.—The President shall impose the sanctions described in subsection (b)(2) with respect to any citizen or national of the Russian Federation that the President determines, on or after the date of the enactment of this Act, is an employee or agent of Kaspersky Lab.

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) BLOCKING OF PROPERTY.—The President shall block, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), all transactions in all property and interests in property of any individual subject to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(2) EXCLUSION FROM UNITED STATES.—The Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any individual subject to subsection (a).

(c) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of subsection (b)(1) or any regulation, license, or order issued to carry out that subsection shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

SA 236. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 46, between lines 6 and 7, insert the following:

SEC. 11. REPORT ON IRANIAN ACTIVITIES IN IRAQ AND SYRIA.

(a) REPORT.—Not later than 60 days after the date of the enactment of this Act, and every 180 days thereafter for a period not to exceed 5 years, the President shall submit to the appropriate congressional committees a report on Iranian activities in Iraq and Syria.

(b) MATTERS TO BE INCLUDED.—The report required by subsection (a) shall include—

(1) a description of Iran's support for—

(A) Iraqi militias or political parties, including weapons, financing, and other forms of material support; and

(B) the regime of Bashar al-Assad in Syria; and

(2) a list of referrals to the relevant United Nations Security Council sanctions committees by the United States Permanent Representative to the United Nations.

(c) FORM.—The President may submit the report required by subsection (a) in classified form if the President determines that it is necessary for the national security interests of the United States to do so.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, the Committee on Armed Services, the Committee on Ways and Means, and the Committee on Financial Services of the House of Representatives; and

(2) the Committee on Foreign Relations, the Select Committee on Intelligence, the Committee on Armed Services, the Committee on Finance, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

SA 237. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 43, between lines 19 and 20, insert the following:

SEC. 9. IMPOSITION OF SANCTIONS WITH RESPECT TO CERTAIN FOREIGN PERSONS THREATENING PEACE OR STABILITY IN IRAQ AND SYRIA.

(a) SANCTIONS REQUIRED.—The President shall impose the sanctions described in subsection (b)(1) with respect to any foreign person that—

(1) is responsible for or complicit in, or to have engaged in, directly or indirectly—

(A) actions that threaten the peace, security, or stability of Iraq or Syria;

(B) actions or policies that undermine efforts to promote economic reconstruction and political reform in Iraq; or

(C) the obstruction of the delivery or distribution of, or access to, humanitarian assistance to the people of Iraq or Syria;

(2) has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in subparagraph (A), (B), or (C) of paragraph (1); or

(3) is owned or controlled by, or has acted or purported to act for or on behalf of, directly or indirectly, a foreign person that has carried out any activity described in subparagraph (A), (B), or (C) of paragraph (1) or paragraph (2).

(b) SANCTIONS DESCRIBED.—

(1) IN GENERAL.—The sanctions described in this subsection are the following:

(A) ASSET BLOCKING.—The President shall block, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), all transactions in all property and interests in property of a person subject to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(B) ALIENS INELIGIBLE FOR VISAS, ADMISSION, OR PAROLE.—

(i) EXCLUSION FROM THE UNITED STATES.—The Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any person subject to subsection (a) that is an alien.

(ii) CURRENT VISAS REVOKED.—

(I) IN GENERAL.—The issuing consular officer, the Secretary of State, or the Secretary of Homeland Security (or a designee of one of such Secretaries) shall revoke any visa or other entry documentation issued to an alien subject to subsection (a), regardless of when issued.

(II) EFFECT OF REVOCATION.—A revocation under subclause (I) shall take effect immediately and shall automatically cancel any other valid visa or entry documentation that is in the alien's possession.

(2) INAPPLICABILITY OF NATIONAL EMERGENCY REQUIREMENT.—The requirements of

section 202 of the International Emergency Economic Powers Act (50 U.S.C. 1701) shall not apply for purposes of the imposition of sanctions under this section.

(3) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of paragraph (1)(A) or any regulation, license, or order issued to carry out that paragraph shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(4) EXCEPTION TO COMPLY WITH UNITED NATIONS HEADQUARTERS AGREEMENT.—Sanctions under paragraph (1)(B) shall not apply to an alien if admitting the alien into the United States is necessary to permit the United States to comply with the Agreement regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947, between the United Nations and the United States, or other applicable international obligations.

(c) WAIVER.—

(1) IN GENERAL.—The President may, on a case-by-case basis and for periods not to exceed 180 days, waive the application of sanctions under this section with respect to a foreign person, and may renew the waiver for additional periods of not more than 180 days, if the President determines and reports to the appropriate congressional committees at least 15 days before the waiver or renewal of the waiver is to take effect that the waiver is vital to the national security interests of the United States.

(2) FORM OF REPORT.—A report submitted under paragraph (1) shall be submitted in unclassified form but may include a classified annex.

(3) SUNSET.—The provisions of this subsection and any waivers issued pursuant to this subsection shall terminate on the date that is 3 years after the date of the enactment of this Act.

(d) IMPLEMENTATION AUTHORITY.—The President may exercise all authorities provided to the President under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) for purposes of carrying out this section.

(e) REGULATORY AUTHORITY.—

(1) IN GENERAL.—The President shall, not later than 90 days after the date of the enactment of this Act, promulgate regulations as necessary for the implementation of this section.

(2) NOTIFICATION TO CONGRESS.—Not less than 10 days before the promulgation of regulations under paragraph (1), the President shall notify and provide to the appropriate congressional committees the proposed regulations and the provisions of this Act and the amendments made by this Act that the regulations are implementing.

(f) DEFINITIONS.—In this section:

(1) ADMITTED; ALIEN.—The terms "admitted" and "alien" have the meanings given those terms in section 101(a) of the Immigration and Nationality Act (8 U.S.C. 1101(a)).

(2) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Foreign Affairs, the Committee on the Judiciary, the Committee on Ways and Means, and the Committee on Financial Services of the House of Representatives; and

(B) the Committee on Foreign Relations, the Committee on the Judiciary, the Committee on Finance, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(3) FOREIGN PERSON.—The term "foreign person" means—

(A) an individual who is not a United States person;

(B) a corporation, partnership, or other nongovernmental entity that is not a United States person; or

(C) any representative, agent or instrumentality of, or an individual working on behalf of a foreign government.

(4) GOVERNMENT OF IRAQ.—The term "Government of Iraq" has the meaning given that term in section 576.310 of title 31, Code of Federal Regulations (or any corresponding similar regulation or ruling).

(5) GOVERNMENT OF SYRIA.—The term "Government of Syria" has the meaning given that term in section 542.305 of title 31, Code of Federal Regulations (or any corresponding similar regulation or ruling).

(6) KNOWINGLY.—The term "knowingly", with respect to conduct, a circumstance, or a result, means that a person has actual knowledge, or should have known, of the conduct, the circumstance, or the result.

(7) PERSON.—The term "person" means an individual or entity.

(8) PROPERTY; PROPERTY INTEREST.—The terms "property" and "property interest" have the meanings given those terms in section 576.312 of title 31, Code of Federal Regulations (or any corresponding similar regulation or ruling).

(9) UNITED STATES PERSON.—The term "United States person" has the meaning given that term in section 576.319 of title 31, Code of Federal Regulations (or any corresponding similar regulation or ruling).

(g) SUNSET.—This section shall cease to be effective beginning on January 1, 2022.

SA 238. Mr. RUBIO (for himself, Mr. PORTMAN, Mrs. FISCHER, Mr. MARKEY, Mr. GRAHAM, Mr. NELSON, Mr. YOUNG, Mr. WICKER, Mr. COONS, Mr. BLUMENTHAL, Mrs. CAPITO, Mr. MORAN, and Mr. HELLER) submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

## TITLE II—TREATMENT OF BOYCOTT, DIVESTMENT, OR SANCTIONS ACTIVITIES TARGETING ISRAEL

### SEC. 201. SHORT TITLE.

This title may be cited as the "Combating BDS Act of 2017".

### SEC. 202. NONPREEMPTION OF MEASURES BY STATE AND LOCAL GOVERNMENTS TO DIVEST FROM ENTITIES THAT ENGAGE IN CERTAIN BOYCOTT, DIVESTMENT, OR SANCTIONS ACTIVITIES TARGETING ISRAEL.

(a) STATE AND LOCAL MEASURES.—Notwithstanding any other provision of law, a State or local government may adopt and enforce measures that meet the requirements of subsection (b) to divest the assets of the State or local government from, prohibit investment of the assets of the State or local government in, or restrict contracting by the State or local government for goods and services with—

(1) an entity that the State or local government determines, using credible information available to the public, knowingly engages in a commerce-related or investment-related boycott, divestment, or sanctions activity targeting Israel;

(2) a successor entity or subunit of an entity described in paragraph (1); or

(3) an entity that owns or controls, is owned or controlled by, or is under common ownership or control with, an entity described in paragraph (1).

(b) REQUIREMENTS.—A State or local government that seeks to adopt or enforce a measure under subsection (a) shall meet the following requirements:

(1) NOTICE.—The State or local government shall provide written notice to each entity to which a measure under subsection (a) is to be applied.

(2) TIMING.—The measure shall apply to an entity not earlier than the date that is 90 days after the date on which written notice is provided to the entity under paragraph (1).

(3) OPPORTUNITY FOR COMMENT.—The State or local government shall provide an opportunity to comment in writing to each entity to which a measure is to be applied. If the entity demonstrates to the State or local government that the entity has not engaged in a commerce-related or investment-related boycott, divestment, or sanctions activity targeting Israel, the measure shall not apply to the entity.

(4) SENSE OF CONGRESS ON AVOIDING ERRONEOUS TARGETING.—It is the sense of Congress that a State or local government should not adopt a measure under subsection (a) with respect to an entity unless the State or local government has made every effort to avoid erroneously targeting the entity and has verified that the entity engages in a commerce-related or investment-related boycott, divestment, or sanctions activity targeting Israel.

(c) NOTICE TO DEPARTMENT OF JUSTICE.—

(1) IN GENERAL.—Except as provided in paragraph (2), not later than 30 days after adopting a measure described in subsection (a), the State or local government that adopted the measure shall submit written notice to the Attorney General describing the measure.

(2) EXISTING MEASURES.—With respect to measures described in subsection (a) adopted before the date of the enactment of this Act, the State or local government that adopted the measure shall submit written notice to the Attorney General describing the measure not later than 30 days after the date of the enactment of this Act.

(d) NONPREEMPTION.—A measure of a State or local government that is consistent with subsection (a) is not preempted by any Federal law.

(e) EFFECTIVE DATE.—This section applies to any measure adopted by a State or local government before, on, or after the date of the enactment of this Act.

(f) PRIOR ENACTED MEASURES.—

(1) IN GENERAL.—Notwithstanding any other provision of this section or any other provision of law, and except as provided in paragraph (2), a State or local government may enforce a measure described in subsection (a) adopted by the State or local government before the date of the enactment of this Act without regard to the requirements of subsection (b).

(2) APPLICATION OF NOTICE AND OPPORTUNITY FOR COMMENT.—A measure described in paragraph (1) shall be subject to the requirements of subsection (b) on and after the date that is 2 years after the date of the enactment of this Act.

(g) RULES OF CONSTRUCTION.—

(1) AUTHORITY OF STATES.—Nothing in this section shall be construed to abridge the authority of a State to issue and enforce rules governing the safety, soundness, and solvency of a financial institution subject to its jurisdiction or the business of insurance pursuant to the Act of March 9, 1945 (59 Stat. 33, chapter 20; 15 U.S.C. 1011 et seq.) (commonly known as the "McCarran-Ferguson Act").

(2) POLICY OF THE UNITED STATES.—Nothing in this section shall be construed to alter the established policy of the United States concerning final status issues associated with the Arab-Israeli conflict, including border delineation, that can only be resolved through direct negotiations between the parties.

(3) SCOPE OF NONPREEMPTION.—Nothing in this section shall be construed as establishing a basis for preempting or implying preemption of State measures relating to boycott, divestment, or sanctions activity targeting Israel that are outside the scope of subsection (a).

(h) DEFINITIONS.—In this section:

(1) ASSETS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the term ''assets'' means any pension, retirement, annuity, or endowment fund, or similar instrument, that is controlled by a State or local government.

(B) EXCEPTION.—The term ''assets'' does not include employee benefit plans covered by title I of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 et seq.).

(2) BOYCOTT, DIVESTMENT, OR SANCTIONS ACTIVITY TARGETING ISRAEL.—The term ''boycott, divestment, or sanctions activity targeting Israel'' means any activity that is intended to penalize, inflict economic harm on, or otherwise limit commercial relations with Israel or persons doing business in Israel or in Israeli-controlled territories for purposes of coercing political action by, or imposing policy positions on, the Government of Israel.

(3) ENTITY.—The term ''entity'' includes—

(A) any corporation, company, business association, partnership, or trust; and

(B) any governmental entity or instrumentality of a government, including a multilateral development institution (as defined in section 1701(c)(3) of the International Financial Institutions Act (22 U.S.C. 262r(c)(3))).

(4) INVESTMENT.—The term ''investment'' includes—

(A) a commitment or contribution of funds or property;

(B) a loan or other extension of credit; and

(C) the entry into or renewal of a contract for goods or services.

(5) STATE.—The term ''State'' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, the United States Virgin Islands, and any other territory or possession of the United States.

(6) STATE OR LOCAL GOVERNMENT.—The term ''State or local government'' includes—

(A) any State and any agency or instrumentality thereof;

(B) any local government within a State and any agency or instrumentality thereof; and

(C) any other governmental instrumentality of a State or locality.

SEC. 203. SAFE HARBOR FOR CHANGES OF INVESTMENT POLICIES BY ASSET MANAGERS.

Section 13(c)(1) of the Investment Company Act of 1940 (15 U.S.C. 80a–13(c)(1)) is amended—

(1) in subparagraph (A), by striking ''; or'' and inserting a semicolon;

(2) in subparagraph (B), by striking the period at the end and inserting ''; or''; and

(3) by adding at the end the following:

''(C) engage in any boycott, divestment, or sanctions activity targeting Israel described in section 202 of the Combating BDS Act of 2017.''.

SA 239. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 43, between lines 19 and 20, insert the following:

SEC. 9. REPORT ON USE BY THE GOVERNMENT OF IRAN OF COMMERCIAL AIRCRAFT AND RELATED SERVICES FOR ILLICIT MILITARY OR OTHER ACTIVITIES.

(a) FINDINGS.—Congress finds the following:

(1) Iran is designated as the world's foremost state sponsor of terrorism and a direct threat to the national security of the United States and United States allies.

(2) Iran, through its Islamic Revolutionary Guard Corps (in this section referred to as the ''IRGC''), provides material and financial support to foreign terrorist organizations, including Hamas, Hezbollah, and Kata'ib Hezbollah, as well as to the regime of Bashar al-Assad in Syria, which is responsible for more than 400,000 civilian deaths.

(3) Iran has systematically employed its national air carrier, Iran Air, as well as numerous private and publicly owned Iranian and Syrian air carriers, including Mahan Air, to ferry weapons, troops, and military equipment on behalf of the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (in this section referred to as ''MODAFL'') to foreign terrorist organizations and rogue regimes around the world.

(4) On June 23, 2011, the United States Department of the Treasury designated Iran Air for the imposition of sanctions pursuant to Executive Order 13382 (50 U.S.C. 1701 note; relating to blocking property of weapons of mass destruction delivery system proliferators and their supporters) for providing material support and services to the IRGC, including shipping military-related equipment on behalf of the IRGC since 2006 and transporting rockets or missiles to Syria.

(5) On January 16, 2016, Iran Air was removed from the list of specially designated nationals and blocked persons by the Department of the Treasury even though Iran Air had not ceased its illicit and sanctionable activity.

(6) Iran Air remains owned and operated by the Government of Iran and has, since January 16, 2016, flown numerous unscheduled flights on well-known weapons supply routes between Iran and Syria.

(7) In correspondence with Members of Congress, the Secretary of the Treasury has refused to confirm that Iran Air has ceased its illicit activity. In a November 23, 2016, letter to Representative Peter Roskam, Thomas Patrick Maloney, Senior Advisor in the Office of Legislative Affairs of the Department of the Treasury wrote: ''The United States retains the ability to designate any individual or entity that engages in sanctionable activities outside the scope of the JCPOA, including Iran's support for terrorism, human rights abuses, ballistic missile program, and other destabilizing activities in the region.''.

(8) Evidence supports that, despite being removed from the list of specially designated nationals and blocked persons on January 16, 2016, Iran Air has continued its illicit and sanctionable activity in support of the IRGC, MODAFL, Hezbollah, and the Bashar al-Assad regime since January 16, 2016.

(b) REPORT.—Not later than 180 days after the date of the enactment of this Act, and every 180 days thereafter, the President, in consultation with the Secretary of Defense, the Secretary of State, and the Director of National Intelligence, shall submit to the appropriate congressional committees a report on use by the Government of Iran of commercial aircraft and related services for illicit military or other activities during—

(1) in the case of the first report, the 5-year period preceding submission of the report; and

(2) in the case of any subsequent report, the 180-day period preceding submission of the report.

(c) ELEMENTS OF REPORT.—The report required under subsection (b) shall include a description of the extent to which—

(1) the Government of Iran has used commercial aircraft, including aircraft of Iran Air, or related services to transport illicit cargo to or from Iran, including military goods, weapons, military personnel, military-related electronic parts and mechanical equipment, or rocket or missile components;

(2) the commercial aviation sector of Iran, including Iran Air, has provided financial, material, or technological support to the Islamic Revolutionary Guard Corps, Iran's Ministry of Defense and Armed Forces Logistics, the regime of Bashar al-Assad in Syria, Hezbollah, Hamas, Kata'ib Hezbollah, any other organization designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), or any person on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury; and

(3) foreign governments and persons have facilitated the activities described in paragraph (1), including allowing the use of airports, services, or other resources.

(d) EFFECT OF DETERMINATION.—If, in a report submitted under this section, the President determines that Iran Air or any other Iranian commercial air carrier has used commercial aircraft for illicit military purposes on or after January 16, 2016, the President shall, not later than 90 days after making that determination, include the air carrier on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury.

(e) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term ''appropriate congressional committees'' means—

(1) the Committee on Armed Services, the Committee on Foreign Relations, and the Select Committee on Intelligence of the Senate; and

(2) the Committee on Armed Services, the Committee on Foreign Affairs, and the Permanent Select Committee on Intelligence of the House of Representatives.

(f) SUNSET.—This section shall cease to be effective on the date that is 30 days after the date on which the President certifies to Congress that the Government of Iran has ceased providing support for acts of international terrorism.

SA 240. Mr. GRAHAM (for himself, Mr. BROWN, Mr. MCCAIN, Mr. BLUMENTHAL, Mr. RUBIO, Mr. REED, Mr. TILLIS, Ms. BALDWIN, Mr. CASEY, Mr. INHOFE, Mr. COONS, Mr. PORTMAN, Mr. CORKER, Mr. WHITEHOUSE, Mr. COCHRAN, Mr. BENNET, Mr. YOUNG, Mr. FRANKEN, Mr. WICKER, Mrs. SHAHEEN, Mr. BARRASSO, Ms. KLOBUCHAR, Mr. WARNER, Mrs. GILLIBRAND, Mr. KAINE, Mr. MURPHY, Mr. MARKEY, Ms. WARREN, Mr. CARPER, Mr. BLUNT, Mr. SULLIVAN, and Mr. ALEXANDER) submitted an amendment intended to be proposed

by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; as follows:

At the end, add the following:

**SEC. 13. SENSE OF SENATE ON THE STRATEGIC IMPORTANCE OF ARTICLE 5 OF THE NORTH ATLANTIC TREATY.**

(a) FINDINGS.—The Senate makes the following findings:

(1) The principle of collective defense of the North Atlantic Treaty Organization (NATO) is immortalized in Article 5 of the North Atlantic Treaty in which members pledge that "an armed attack against one or more of them in Europe or North America shall be considered an attack against them all".

(2) For almost 7 decades, the principle of collective defense has effectively served as a strategic deterrent for the member nations of the North Atlantic Treaty Organization and provided stability throughout the world, strengthening the security of the United States and all 28 other member nations.

(3) Following the September 11, 2001, terrorist attacks in New York, Washington, and Pennsylvania, the Alliance agreed to invoke Article 5 for the first time, affirming its commitment to collective defense.

(4) Countries that are members of the North Atlantic Treaty Organization have made historic contributions and sacrifices while combating terrorism in Afghanistan through the International Security Assistance Force and the Resolute Support Mission.

(5) The recent attacks in the United Kingdom underscore the importance of an international alliance to combat hostile nation states and terrorist groups.

(6) At the 2014 NATO summit in Wales, the member countries of NATO would spend an amount equal to 2 percent of their gross domestic product on defense by 2024.

(7) Collective defense unites the 29 members of the North Atlantic Treaty Organization, each committing to protecting and supporting one another from external adversaries, which bolsters the North Atlantic Alliance.

(b) SENSE OF SENATE.—It is the sense of the Senate—

(1) to express the vital importance of Article 5 of the North Atlantic Treaty, the charter of the North Atlantic Treaty Organization, as it continues to serve as a critical deterrent to potential hostile nations and terrorist organizations;

(2) to remember the first and only invocation of Article 5 by the North Atlantic Treaty Organization in support of the United States after the terrorist attacks of September 11, 2001;

(3) to affirm that the United States remains fully committed to the North Atlantic Treaty Organization and will honor its obligations enshrined in Article 5; and

(4) to condemn any threat to the sovereignty, territorial integrity, freedom, or democracy of any country that is a member of the North Atlantic Treaty Organization.

**SA 241.** Mr. CARDIN (for himself, Mr. PORTMAN, and Mr. RUBIO) submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights,

and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

**TITLE II—ISRAEL ANTI-BOYCOTT ACT**

**SEC. 201. SHORT TITLE.**

This title may be cited as the "Israel Anti-Boycott Act".

**SEC. 202. FINDINGS.**

Congress finds the following:

(1) The United Nations Human Rights Council (in this section referred to as the "UNHRC") has long targeted Israel with systematic, politically motivated, assaults on its legitimacy designed to stigmatize and isolate Israel internationally.

(2) The UNHRC maintains a permanent agenda item known as "Item 7" to ensure that Israel will be criticized at every gathering of the UNHRC.

(3) At its 31st session on March 24, 2016, the UNHRC targeted Israel with a commercial boycott, calling for the establishment of a database, such as a "blacklist", of companies that operate, or have business relations with entities that operate, beyond Israel's 1949 Armistice lines, including East Jerusalem.

(4) At its 32nd session in March 2017, the UNHRC is considering a resolution pursuant to agenda item 7 to withhold assistance from and prevent trade with "territories occupied since 1967", including East Jerusalem, the West Bank, and the Golan Heights, stating that businesses that engage in economic activity in those areas could face civil or criminal legal action.

(5) For a half century, Congress has combated anti-Israel boycotts and other discriminatory activity under the Export Administration Act of 1979 (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), under part VI of title X of the Tax Reform Act of 1976 (Public Law 94–455; 90 Stat. 1649) (commonly referred to as the "Ribicoff Amendment"), in free trade agreements with Bahrain and Oman, and in Saudi Arabia's accession negotiations to the World Trade Organization.

(6) The recent action of the UNHRC is reminiscent of the Arab League Boycott, which also called for the establishment of a "blacklist" and promoted a primary, as well as a secondary and tertiary, boycott against Israel, targeting United States and other companies that trade or invest with or in Israel, designed to harm Israel, any business operating in, or doing business with, Israel, or companies that do business with companies operating in Israel.

(7) Congress recently passed anti-boycott, divestment, and sanctions measures in the Bipartisan Congressional Trade Priorities and Accountability Act of 2015 (19 U.S.C. 4201 et seq.) and section 909 of the Trade Facilitation and Trade Enforcement Act of 2015 (19 U.S.C. 4452), which establish, among other things—

(A) the opposition of the United States to actions to boycott, divest from, or sanction Israel;

(B) requirements that the United States utilize trade negotiations to combat state-led or international governmental organization-led actions to boycott, divest from, or sanction Israel; and

(C) reporting requirements regarding the actions of foreign countries or international organizations that establish barriers to trade or investment for United States companies in or with Israel.

**SEC. 203. STATEMENT OF POLICY.**

Congress—

(1) opposes the United Nations Human Rights Council resolution of March 24, 2016, which urges countries to pressure their own companies to divest from, or break contracts

with, Israel, and calls for the creation of a "blacklist" of companies that either operate, or have business relations with entities that operate, beyond Israel's 1949 Armistice lines, including East Jerusalem;

(2) views such policies as actions to boycott, divest from, or sanction Israel; and

(3) in order to counter the effects of actions to boycott, divest from, or sanction Israel, encourages full implementation of the United States-Israel Strategic Partnership Act of 2014 (Public Law 113–296; 128 Stat. 4075) through enhanced, governmentwide, coordinated United States-Israel scientific and technological cooperation in civilian areas such as with respect to energy, water, agriculture, alternative fuel technology, civilian space technology, and security.

**SEC. 204. ADDITIONAL PROHIBITIONS RELATING TO FOREIGN BOYCOTTS UNDER EXPORT ADMINISTRATION ACT OF 1979.**

(a) DECLARATION OF POLICY.—Section 3(5) of the Export Administration Act of 1979 (50 U.S.C. 4602(5)) (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)) is amended—

(1) by amending subparagraph (A) to read as follows:

"(A) to oppose—

"(i) restrictive trade practices or boycotts fostered or imposed by foreign countries, or requests to impose restrictive trade practices or boycotts by foreign countries, against other countries friendly to the United States or against any United States person; and

"(ii) restrictive trade practices or boycotts fostered or imposed by any international governmental organization against Israel or requests to impose restrictive trade practices or boycotts by any international governmental organization against Israel;"; and

(2) in subparagraph (B), by striking "which have the effect" and all the follows and inserting the following: "which have the effect of furthering or supporting—

"(i) restrictive trade practices or boycotts fostered or imposed by any foreign country, or requests to impose restrictive trade practices or boycotts by any foreign country, against a country friendly to the United States or against any United States person; and

"(ii) restrictive trade practices or boycotts fostered or imposed by any international governmental organization against Israel or requests to impose restrictive trade practices or boycotts by any international governmental organization against Israel; and".

(b) FOREIGN BOYCOTTS.—Section 8 of the Export Administration Act of 1979 (50 U.S.C. 4607) (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)) is amended—

(1) in subsection (a)(1)—

(A) in the matter preceding subparagraph (A)—

(i) by inserting ", or request to impose any boycott by a foreign country," after "a foreign country";

(ii) by inserting ", or support any boycott fostered or imposed by any international governmental organization against Israel or request to impose any boycott by any international governmental organization against Israel" after "pursuant to United States law or regulation";

(B) in subparagraph (A), by inserting "or international governmental organization (as the case may be)" after "of the boycotting country"; and

(C) in subparagraph (D)—

(i) by inserting ", or requesting the furnishing of information," after "Furnishing information"; and

(ii) by inserting "or with the international governmental organization (as the case may be)" after "in the boycotting country"; and

(2) in subsection (c)—

(A) by inserting ", or requests to impose restrictive trade practices or boycotts by foreign countries," after "foreign countries"; and

(B) by inserting "or restrictive trade practices or boycotts fostered or imposed by any international governmental organization against Israel or requests to impose restrictive trade practices or boycotts by any international governmental organization against Israel" before the period at the end.

(c) VIOLATIONS OF SECTION 8(a).—Section 11 of the Export Administration Act of 1979 (50 U.S.C. 4610) (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)) is amended—

(1) in subsection (a), by inserting "or (j)" after "subsection (b)"; and

(2) by adding at the end the following:

"(j) VIOLATIONS OF SECTION 8(a).—Whoever knowingly violates or conspires to or attempts to violate any provision of section 8(a) or any regulation, order, or license issued thereunder shall be fined in accordance with section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705).".

(d) DEFINITION OF INTERNATIONAL GOVERNMENTAL ORGANIZATION.—Section 16 of the Export Administration Act of 1979 (50 U.S.C. 4618) (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)) is amended—

(1) by redesignating paragraphs (7) and (8) as paragraphs (8) and (9), respectively; and

(2) by inserting after paragraph (6) the following:

"(7) the term 'international governmental organization' includes the United Nations and the European Union;".

(e) EFFECTIVE DATE.—The amendments made by this section take effect on the date of the enactment of this Act and apply with respect to actions described in section 8(a) of the Export Administration Act of 1979 (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)) taken or knowingly agreed to be taken on or after such date of enactment.

(f) IMPLEMENTATION.—The President shall implement the amendments made by this section by exercising the authorities of the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

SEC. 205. POLICY OF THE UNITED STATES RELATING TO BOYCOTT OF ISRAEL UNDER EXPORT-IMPORT BANK ACT OF 1945.

Section 2(b)(1)(B) of the Export-Import Bank Act of 1945 (12 U.S.C. 635(b)(1)(B)) is amended in the sixth sentence by inserting after "child labor)," the following: "or opposing policies and actions that are politically motivated and are intended to penalize or otherwise limit commercial relations specifically with citizens or residents of Israel, entities organized under the laws of Israel, or the Government of Israel,".

SEC. 206. DEFINITIONS.

(a) IN GENERAL.—In this title:

(1) ACTIONS TO BOYCOTT, DIVEST FROM, OR SANCTION ISRAEL.—The term "actions to boycott, divest from, or sanction Israel" has the meaning given that term in section 102(b)(20)(B) of the Bipartisan Congressional Trade Priorities and Accountability Act of 2015 (19 U.S.C. 4201(b)(20)(B)).

(2) INTERNATIONAL GOVERNMENTAL ORGANIZATION.—The term "international governmental organization" includes the United Nations and the European Union.

(3) POLITICALLY MOTIVATED.—The term "politically motivated" means actions to impede or constrain commerce with Israel that are intended to coerce political action from or impose policy positions on Israel.

(b) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to alter the established policy of the United States or to establish new United States policy concerning final status issues associated with the Arab-Israeli conflict, including border delineation, that can only be resolved through direct negotiations between the parties.

——————

SA 242. Mrs. SHAHEEN submitted an amendment intended to be proposed by her to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the end of the bill, add the following:

SEC. 13. FOREIGN AGENTS REGISTRATION MODERNIZATION AND ENFORCEMENT.

(a) SHORT TITLE.—This section may be cited as the "Foreign Agents Registration Modernization and Enforcement Act".

(b) CIVIL INVESTIGATIVE DEMAND AUTHORITY.—The Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.) is amended—

(1) by redesignating sections 8, 9, 10, 11, 12, 13, and 14 as sections 9, 10, 11, 12, 13, 14, and 15, respectively; and

(2) by inserting after section 7 (22 U.S.C. 617) the following:

"CIVIL INVESTIGATIVE DEMAND AUTHORITY

"SEC. 8. (a) Whenever the Attorney General has reason to believe that any person or enterprise may be in possession, custody, or control of any documentary material relevant to an investigation under this Act, the Attorney General, before initiating a civil or criminal proceeding with respect to the production of such material, may serve a written demand upon such person to produce such material for examination.

"(b) Each such demand under this section shall—

"(1) state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation;

"(2) describe the class or classes of documentary material required to be produced under such demand with such definiteness and certainty as to permit such material to be fairly identified;

"(3) state that the demand is immediately returnable or prescribe a return date which will provide a reasonable period within which the material may be assembled and made available for inspection and copying or reproduction; and

"(4) identify the custodian to whom such material shall be made available.

"(c) A demand under this section may not—

"(1) contain any requirement that would be considered unreasonable if contained in a subpoena duces tecum issued by a court of the United States in aid of grand jury investigation of such alleged violation; or

"(2) require the production of any documentary evidence that would be privileged from disclosure if demanded by a subpoena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged violation.".

(c) INFORMATIONAL MATERIALS.—

(1) DEFINITIONS.—Section 1 of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611) is amended—

(A) in subsection (l), by striking "Expect" and inserting "Except"; and

(B) by inserting after subsection (i) the following:

"(j) The term 'informational materials' means any oral, visual, graphic, written, or pictorial information or matter of any kind, including matter published by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or any means or instrumentality of interstate or foreign commerce or otherwise.".

(2) INFORMATIONAL MATERIALS.—Section 4 of the Foreign Agents Registration Act of 1938, as amended (22 U.S.C. 614) is amended—

(A) in section (a)—

(i) by inserting ", including electronic mail and social media," after "United States mails"; and

(ii) by striking ", not later than forty-eight hours after the beginning of the transmittal thereof, file with the Attorney General two copies thereof" and inserting "file such materials with the Attorney General in conjunction with, and at the same intervals as, disclosures required under section 2(b)."; and

(B) in subsection (b)—

(i) by striking "It shall" and inserting "(1) Except as provided in paragraph (2), it shall"; and

(ii) by inserting at the end the following:

"(2) Foreign agents described in paragraph (1) may omit disclosure required under that paragraph in individual messages, posts, or transmissions on social media on behalf of a foreign principal if the social media account or profile from which the information is sent includes a conspicuous statement that—

"(A) the account is operated by, and distributes information on behalf of, the foreign agent; and

"(B) additional information about the account is on file with the Department of Justice in Washington, District of Columbia.

"(3) Informational materials disseminated by an agent of a foreign principal as part of an activity that is exempt from registration, or an activity which by itself would not require registration, need not be filed under this subsection.".

(d) FEES.—

(1) REPEAL.—The Department of Justice and Related Agencies Appropriations Act, 1993 (title I of Public Law 102-395) is amended, under the heading "SALARIES AND EXPENSES, GENERAL LEGAL ACTIVITIES", by striking "In addition, notwithstanding 31 U.S.C. 3302, for fiscal year 1993 and thereafter, the Attorney General shall establish and collect fees to recover necessary expenses of the Registration Unit (to include salaries, supplies, equipment and training) pursuant to the Foreign Agents Registration Act, and shall credit such fees to this appropriation, to remain available until expended.".

(2) REGISTRATION FEE.—The Foreign Agents Registration Act of 1938, as amended (22 U.S.C. 611 et seq.), as amended by this Act, is further amended by adding at the end the following:

"FEES

"SEC. 16. The Attorney General shall establish and collect a registration fee, as part of the initial filing requirement and at no other time, to help defray the expenses of the Registration Unit, and shall credit such fees to this appropriation, to remain available until expended.".

(e) REPORTS TO CONGRESS.—Section 12 of the Foreign Agents Registration Act of 1938, as amended, as redesignated by subsection (b), is amended to read as follows:

"REPORTS TO CONGRESS

"SEC. 12. The Assistant Attorney General for National Security, through the FARA Registration Unit of the Counterintelligence and Export Control Section, shall submit a

semiannual report to Congress regarding the administration of this Act, including, for the reporting period, the identification of—

"(1) registrations filed pursuant to this Act;

"(2) the nature, sources, and content of political propaganda disseminated and distributed by agents of foreign principal;

"(3) the number of investigations initiated based upon a perceived violation of section 7; and

"(4) the number of such investigations that were referred to the Attorney General for prosecution.".

**SA 243.** Mr. SULLIVAN submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. PROHIBITION ON CERTAIN TRANSACTIONS WITH IRAN AND BLOCKING OF PROPERTY WITH RESPECT TO FOREIGN FINANCIAL INSTITUTIONS THAT FACILITATE CERTAIN TRANSACTIONS WITH IRAN.**

(a) PROHIBITION OF CERTAIN TRANSACTIONS.—

(1) ISSUANCE OF LICENSES TO CONDUCT OFFSHORE DOLLAR CLEARING.—The President may not issue any license under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to an offshore dollar clearing entity to conduct a transaction with an Iranian financial institution in United States dollars.

(2) U-TURN TRANSACTIONS.—Notwithstanding section 560.516 of title 31, Code of Federal Regulations (as in effect on the day before the date of the enactment of this Act), a United States person may not process any transfer of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, even if the transfer arises from, and is ordinarily incident and necessary to give effect to, an underlying transaction.

(b) BLOCKING OF PROPERTY OF FOREIGN FINANCIAL INSTITUTIONS.—The President shall, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of any foreign financial institution that serves as an offshore dollar clearing entity to conduct a transaction with an Iranian financial institution in United States dollars if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) REPORT BEFORE PROVIDING IRAN ACCESS TO THE UNITED STATES DOLLAR.—Not later than 30 days before the President implements any measure that would provide access to the United States dollar to the Government of Iran or an Iranian person, the President shall submit to Congress a report that describes the measure.

(d) TERMINATION.—This section shall terminate only on the date on which the termination criteria in the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.) has been met and the Secretary of State certifies to Congress that Iran is no longer a state sponsor of terrorism (as defined in section 301 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8541)).

(e) DEFINITIONS.—In this section:

(1) FOREIGN FINANCIAL INSTITUTION.—The term "foreign financial institution" has the meaning of that term as determined by the Secretary of the Treasury pursuant to section 104(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(i)).

(2) IRANIAN FINANCIAL INSTITUTION.—The term "Iranian financial institution" has the meaning given that term in section 104A(d) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513A(d)).

**SEC. ___. CONSOLIDATION OF REPORTS.**

Notwithstanding any other provision of this Act or section 135 of the Atomic Energy Act of 1954 (42 U.S.C. 2160e), each report required by this Act or such section 135 to be submitted to a committee or member of Congress on an on-going basis shall be combined in one report that is submitted to each such committee or member once every 180 days.

**SA 244.** Mr. SULLIVAN submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. PROHIBITION ON CERTAIN TRANSACTIONS WITH IRAN AND BLOCKING OF PROPERTY WITH RESPECT TO FOREIGN FINANCIAL INSTITUTIONS THAT FACILITATE CERTAIN TRANSACTIONS WITH IRAN.**

(a) PROHIBITION OF CERTAIN TRANSACTIONS.—

(1) ISSUANCE OF LICENSES TO CONDUCT OFFSHORE DOLLAR CLEARING.—The President may not issue any license under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to an offshore dollar clearing entity to conduct a transaction with an Iranian financial institution in United States dollars.

(2) U-TURN TRANSACTIONS.—Notwithstanding section 560.516 of title 31, Code of Federal Regulations (as in effect on the day before the date of the enactment of this Act), a United States person may not process any transfer of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, even if the transfer arises from, and is ordinarily incident and necessary to give effect to, an underlying transaction.

(b) BLOCKING OF PROPERTY OF FOREIGN FINANCIAL INSTITUTIONS.—The President shall, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of any foreign financial institution that serves as an offshore dollar clearing entity to conduct a transaction with an Iranian financial institution in United States dollars if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) REPORT BEFORE PROVIDING IRAN ACCESS TO THE UNITED STATES DOLLAR.—Not later than 30 days before the President implements any measure that would provide access to the United States dollar to the Government of Iran or an Iranian person, the President shall submit to Congress a report that describes the measure.

(d) TERMINATION.—This section shall terminate only on the date on which the termination criteria in the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.) has been met and the Secretary of State certifies to Congress that Iran is no longer a state sponsor of terrorism (as defined in section 301 of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8541)).

(e) DEFINITIONS.—In this section:

(1) FOREIGN FINANCIAL INSTITUTION.—The term "foreign financial institution" has the meaning of that term as determined by the Secretary of the Treasury pursuant to section 104(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513(i)).

(2) IRANIAN FINANCIAL INSTITUTION.—The term "Iranian financial institution" has the meaning given that term in section 104A(d) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8513A(d)).

**SEC. ___. CONSOLIDATION OF REPORTS.**

Notwithstanding any other provision of this Act or section 135 of the Atomic Energy Act of 1954 (42 U.S.C. 2160e), each report required by this Act or such section 135 to be submitted to a committee or member of Congress on an on-going basis shall be combined in one report that is submitted to each such committee or member once every 180 days.

**SA 245.** Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 37, strike lines 10 through 20, and insert the following:

(4) The IRGC meets the criteria for designation as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189).

(b) IN GENERAL.—Beginning on the date that is 90 days after the date of the enactment of this Act, the President shall impose the sanctions described in subsection (c) with respect to the IRGC and foreign persons that are officials, agents, or affiliates of the IRGC.

(c) SANCTIONS DESCRIBED.—The sanctions described in this subsection are sanctions applicable with respect to—

(1) a foreign person pursuant to Executive Order 13224 (50 U.S.C. 1701 note; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism); and

(2) an organization designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189).

**SA 246.** Mr. TOOMEY submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 43, between lines 19 and 20, insert the following:

**SEC. 9. REPORT ON BOOK ENTRY TRANSFERS CONDUCTED BY FINANCIAL INSTITUTIONS IN CONNECTION WITH ASSETS OF THE GOVERNMENT OF IRAN.**

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of the Treasury shall submit to the appropriate congressional committees a report that includes the following:

(1) An analysis of the legality of overseas book entry transfers conducted by financial institutions present in the United States in connection with assets in which the Government of Iran, or an agency or instrumentality of the Government of Iran, holds a beneficial ownership interest, under—

(A) Executive Order 13599 (77 Fed. Reg. 6659; relating to Blocking property of the Government of Iran and Iranian financial institutions);

(B) part 560 of title 31, Code of Federal Regulations (commonly known as the ''Iranian Transactions and Sanctions Regulations''); or

(C) any other relevant statutes, executive orders, regulations, or judicial orders.

(2) Recommendations, if any, on how to maintain the integrity of United States sanctions and other financial regulations in light of transfers described in paragraph (1).

(b) DEFINITIONS.—In this section:

(1) The term ''financial institution'' means any entity engaged in the business of dealing with monetary transactions, including banks, trust companies, insurance companies, brokerage firms, investment dealers, securities intermediaries, central securities depositories, and post trade services providers.

(2) The term ''overseas book entry transfers'' means a transaction in which cash is not moved from an account in the United States to an account overseas by wire or other analogous method, but instead is made accessible to an overseas client of a financial institution carrying out the transaction by entry of debits and credits in books or ledgers internal to that financial institution.

(3) The term ''present in the United States'', with respect to a financial institution, means that the financial institution has sufficient nexus with the United States so as to be subject to the regulatory authority of the Department of the Treasury.

## SA 247.

Mr. GARDNER (for himself, Mr. COONS, and Mr. WARNER) submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 43, between lines 19 and 20, insert the following:

### SEC. 9. MANDATORY SANCTIONS WITH RESPECT TO IRAN RELATING TO SIGNIFICANT ACTIVITIES UNDERMINING UNITED STATES CYBERSECURITY.

(a) INVESTIGATION.—The President shall initiate an investigation into the possible designation of an Iranian person under subsection (b) upon receipt by the President of credible information indicating that the person has engaged in conduct described in subsection (b).

(b) DESIGNATION.—The President shall designate under this subsection any Iranian person that the President determines has knowingly—

(1) engaged in significant activities undermining United States cybersecurity conducted by the Government of Iran; or

(2) acted for or on behalf of the Government of Iran in connection with such activities.

(c) SANCTIONS.—The President shall block and prohibit all transactions in all property and interests in property of any Iranian person designated under subsection (b) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(d) SUSPENSION OF SANCTIONS.—

(1) IN GENERAL.—The President may suspend the application of sanctions under subsection (c) with respect to an Iranian person only if the President submits to the appropriate congressional committees in writing a certification described in paragraph (2) and a detailed justification for the certification.

(2) CERTIFICATION DESCRIBED.—

(A) IN GENERAL.—A certification described in this paragraph with respect to an Iranian person is a certification by the President that—

(i) the person has not, during the 12-month period immediately preceding the date of the certification, knowingly engaged in activities that would qualify the person for designation under subsection (b); and

(ii) the person is not expected to resume any such activities.

(B) FORM OF CERTIFICATION.—The certification described in subparagraph (A) shall be submitted in unclassified form but may include a classified annex.

(e) REIMPOSITION OF SANCTIONS.—If sanctions are suspended with respect to an Iranian person under subsection (d), such sanctions shall be reinstated if the President determines that the person has resumed the activity that resulted in the initial imposition of sanctions or has engaged in any other activity subject to sanctions relating to the involvement of the person in significant activities undermining United States cybersecurity on behalf of the Government of Iran.

(f) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to limit the authority of the President pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.), or any other provision of law.

(g) REPORT.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and annually thereafter, the President shall submit to the appropriate congressional committees a report that describes significant activities undermining United States cybersecurity conducted by the Government of Iran, a person owned or controlled, directly or indirectly, by that Government, or any person acting for or on behalf of that Government.

(2) ELEMENTS.—Each report required by paragraph (1) shall include the following:

(A) An assessment of the extent to which a foreign government has provided material support to the Government of Iran, to any person owned or controlled, directly or indirectly, by that Government, or to any person acting for or on behalf of that Government, in connection with the conduct of significant activities undermining United States cybersecurity.

(B) A strategy to counter efforts by Iran to conduct significant activities undermining United States cybersecurity that includes a description of efforts to engage foreign governments in preventing the Government of Iran, persons owned or controlled, directly or indirectly, by that Government, and persons acting for or on behalf of that Government from conducting significant activities undermining United States cybersecurity.

(3) FORM OF REPORT.—Each report required by paragraph (1) shall be submitted in an unclassified form but may include a classified annex.

(h) CYBERSECURITY DEFINED.—In this section, the term ''cybersecurity'' means the activity or process, ability or capability, or state whereby information and communications systems and the information contained therein are protected from or defended against damage, unauthorized use or modification, or exploitation.

## SA 248.

Mr. PERDUE (for himself and Mr. CASEY) submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

### SEC. ___. SEMIANNUAL REPORT ON IRAN AND NORTH KOREA NUCLEAR AND BALLISTIC MISSILE COOPERATION.

(a) FINDINGS.—Congress makes the following findings:

(1) Iran developed a close working relationship with North Korea on many ballistic missile programs, dating back to an acquisition of Scud missiles from North Korea in the mid-1980s.

(2) By the mid-1980s North Korea reverse-engineered Scud B missiles originally received from Egypt, and developed the 500-kilometer range Scud C missile in 1991, and sold both the Scud B and Scud C, as well as missile production technology, to Iran.

(3) In 1992, then-Director of the Central Intelligence Robert Gates, in testimony to Congress, identified Iran as a recipient of North Korean Scud missiles.

(4) In 1993, then-Director of Central Intelligence James Woolsey provided more detail, stating that North Korea had sold Iran extended range Scud C missiles and agreed to sell other forms of missile technology.

(5) Annual threat assessments from the intelligence community during the 1990s showed that North Korea's ongoing export of ballistic missiles provided a qualitative increase in capabilities to countries such as Iran.

(6) The same threat assessments noted that Iran was using North Korean ballistic missile goods and services to achieve its goal of self-sufficiency in the production of medium-range ballistic missiles.

(7) The intelligence community assessed in the 1990s that Iran's acquisition of missile systems or key missile-related components could improve Iran's ability to produce an intercontinental ballistic missile (ICBM).

(8) Throughout the 2000s, the intelligence community continued to assess that North Korean cooperation with Iran's ballistic missile program was ongoing and significant.

(10) North Korea built the nuclear reactor in Syria that was bombed in 2007. Syria failed to report the construction of the reactor to the International Atomic Energy Agency (IAEA), which was Syria's obligation under its safeguards agreement with the agency.

(11) Official sources confirm that Iran and North Korea have engaged in various forms of clandestine nuclear cooperation.

(12) North Korea and Iran obtained designs and materials related to uranium enrichment from a clandestine procurement network run by Abdul Qadeer Khan.

(13) In the early 2000s, North Korea exported, with the assistance of Abdul Qadeer Khan, uranium hexafluoride (UF6) gas to Libya, which was intended to be used in Libya's clandestine nuclear weapons program.

(14) On January 6, 2016, North Korea conducted its fourth nuclear weapons test.

(15) On September 9, 2016, North Korea conducted its fifth nuclear weapons test.

(16) Iranian officials reportedly traveled to North Korea to witness its three previous nuclear tests in 2006, 2009, and 2013.

(17) Before North Korea's 2013 test, a senior American official was quoted as saying ''it's

very possible that North Koreans are testing for two countries''.

(18) In September 2012, Iran and North Korea signed an agreement for technological and scientific cooperation.

(19) In an April 2015 interview with CNN, then-Secretary of Defense Ashton Carter said that North Korea and Iran ''could be'' cooperating to develop a nuclear weapon.

(20) On March 11, 2017, Director of National Intelligence Dan Coats provided written testimony to Congress that stated that Pyongyang's ''export of ballistic missiles and associated materials to several countries, including Iran and Syria, and its assistance to Syria's construction of a nuclear reactor . . . illustrate its willingness to proliferate dangerous technologies''.

(21) A 2016 Congressional Research Service report confirmed that ''ballistic missile technology cooperation between the two [Iran and North Korea] is significant and meaningful''.

(22) Admiral Bill Gortney, Commander of United States Northern Command, testified to Congress on April 14, 2016, that ''Iran's continuing pursuit of long-range missile capabilities and ballistic missile and space launch programs, in defiance of United Nations Security Council resolutions, remains a serious concern''.

(23) There is substantial evidence that Iran and North Korea are working together on nuclear weapons development.

(24) Since the Intelligence Authorization Act for Fiscal Year 2013 (Public Law 112–277) repealed requirements for the intelligence community to provide unclassified annual report to Congress on the ''Acquisition of Technology Relating to Weapons of Mass Destruction and Advanced Conventional Munitions'', the number of unclassified reports to Congress on nuclear-weapons issues decreased considerably.

(25) Absent these reports, the President has not been required to detail to Congress the assessment of cooperation between North Korea and Iran on nuclear weapon or ballistic missile development.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the ballistic missile programs of Iran and North Korea represent a serious threat to allies of the United States in the Middle East, Europe, and Asia, members of the Armed Forces deployed in those regions, and ultimately the United States;

(2) further cooperation between Iran and North Korea on nuclear weapons or ballistic missile technology is not in the security interests of the United States or our allies;

(3) United Nations Security Council Resolution 2231 (2015), which was unanimously adopted by the United Nations Security Council and supported by the international community, called upon Iran not to undertake any activity related to ballistic missiles designed to be capable of delivering nuclear weapons, including launches of such missiles, for an eight year period beginning in 2015; and

(4) the Director of National Intelligence has assessed that Iran would use ballistic missiles as its ''preferred method of delivering nuclear weapons'' which could eventually threaten the United States.

(c) REPORT.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and every 180 days thereafter, the President, in coordination with the Secretary of Defense, the Secretary of State, and the heads of other relevant agencies, shall submit to the appropriate committees of Congress a report that includes an assessment of the extent of cooperation on nuclear programs, ballistic missile development, chemical and biological weapons development, or conventional weapons programs between the Government of Iran and the Government of the Democratic People's Republic of North Korea, including the identity of Iranian and North Korean persons that have knowingly engaged in or directed the provision of material support or the exchange of information (including through the transfer of goods, services, technology, or intellectual property) between the Government of Iran and the Government of the Democratic People's Republic of North Korea;

(2) And a determination whether any of the activities described in paragraph (1) violate United Nations Security Council Resolutions 1695 (2006), 1718 (2006), 1874 (2009), 2087 (2013), 2094 (2013), 2231 (2015), 2270 (2016) and 2321 (2016).

(3) FORM.—The report required under paragraph (1) shall be submitted in unclassified form, but may contain a classified annex.

(4) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term ''appropriate committees of Congress'' means—

(A) the Committee on Foreign Relations, the Committee on Armed Services, and the Select Committee on Intelligence of the Senate; and

(B) the Committee on Foreign Affairs, the Committee on Armed Services, and the Permanent Select Committee on Intelligence of the House of Representatives.

**SA 249.** Mr. GARDNER submitted an amendment intended to be proposed to amendment SA 232 proposed by Mr. McCONNELL (for Mr. CRAPO (for himself, Mr. BROWN, Mr. CORKER, and Mr. CARDIN)) to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 62 of the amendment, between lines 18 and 19, insert the following:

(3) Activities of the National Aeronautics and Space Administration.

At the end of the amendment, add the following:

**SEC. 292. RULE OF CONSTRUCTION ON PROCUREMENT OF PRODUCTS OR SERVICES RELATING TO SPACE LAUNCHES.**

Nothing in this title or the amendments made by this title shall be construed to authorize the imposition of any sanction or other condition, limitation, restriction, or prohibition, that directly or indirectly impedes the supply by any entity of the Russian Federation of any product or service, or the procurement of such product or service by any contractor or subcontractor of the United States or any other entity, relating to or in connection with any space launch conducted for—

(1) the National Aeronautics and Space Administration;

(2) the Department of Defense; or

(3) any other person.

**SA 250.** Mr. GARDNER (for himself, Mr. SHELBY, Mr. STRANGE, Mr. NELSON, Mr. WARNER, Mr. BENNET, and Mr. KAINE) submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; as follows:

At the appropriate place, insert the following:

**SEC. ____. EXCEPTION RELATING TO ACTIVITIES OF THE NATIONAL AERONAUTICS AND SPACE ADMINISTRATION.**

(a) IN GENERAL.—This Act and the amendments made by this Act shall not apply with respect to activities of the National Aeronautics and Space Administration.

(b) RULE OF CONSTRUCTION.—Nothing in this Act or the amendments made by this Act shall be construed to authorize the imposition of any sanction or other condition, limitation, restriction, or prohibition, that directly or indirectly impedes the supply by any entity of the Russian Federation of any product or service, or the procurement of such product or service by any contractor or subcontractor of the United States or any other entity, relating to or in connection with any space launch conducted for—

(1) the National Aeronautics and Space Administration;

(2) the Department of Defense; or

(3) any other person.

**SA 251.** Mr. CARDIN submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SECTION 2. RULE OF CONSTRUCTION.**

Nothing in this Act shall be construed to authorize the imposition of any sanction or any other condition, limitation, restriction, or prohibition, that directly or indirectly impedes the supply by any Russian Federation entity of any product or service, or the procurement of such product or service, by any United States contractor or subcontractor or any other entity, related to or in connection with any space launch conducted for the Federal Government or under a federal contract

**SA 252.** Mr. WARNER submitted an amendment intended to be proposed to amendment SA 232 proposed by Mr. McCONNELL (for Mr. CRAPO (for himself, Mr. BROWN, Mr. CORKER, and Mr. CARDIN)) to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

On page 62 of the amendment, between lines 18 and 19, insert the following:

(3) Activities of the National Aeronautics and Space Administration.

At the end of the amendment, add the following:

**SEC. 292. RULE OF CONSTRUCTION ON PROCUREMENT OF PRODUCTS OR SERVICES RELATING TO SPACE LAUNCHES.**

Nothing in this title or the amendments made by this title shall be construed to authorize the imposition of any sanction or other condition, limitation, restriction, or prohibition, that directly or indirectly impedes the supply by any entity of the Russian Federation of any product or service, or the procurement of such product or service by any contractor or subcontractor of the United States or any other entity, relating to or in connection with any space launch conducted for—

(1) the National Aeronautics and Space Administration;

(2) the Department of Defense; or

(3) any non-United States Government person.

**SA 253.** Mr. LANKFORD submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Countering Iran's Destabilizing Activities Act of 2017".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.
Sec. 3. Regional strategy for countering conventional and asymmetric Iranian threats in the Middle East and North Africa.
Sec. 4. Imposition of additional sanctions in response to Iran's ballistic missile program.
Sec. 5. Imposition of terrorism-related sanctions with respect to the IRGC.
Sec. 6. Imposition of additional sanctions with respect to persons responsible for human rights abuses.
Sec. 7. Enforcement of arms embargoes.
Sec. 8. Continuation in effect of sanctions for Iranian support relating to terrorism and Iran's ballistic missile program.
Sec. 9. Review of applicability of sanctions relating to Iran's support for terrorism and its ballistic missile program.
Sec. 10. Report on coordination of sanctions between the United States and the European Union.
Sec. 11. Report on United States citizens detained by Iran.
Sec. 12. Exceptions for national security and humanitarian assistance; rule of construction.
Sec. 13. Waiver authority; termination of sanctions.

**SEC. 2. DEFINITIONS.**

In this Act:

(1) ACT OF INTERNATIONAL TERRORISM.—The term "act of international terrorism" has the meaning given that term in section 14 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note).

(2) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" has the meaning given that term in section 14 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note).

(3) FOREIGN PERSON.—The term "foreign person" means a person that is not a United States person.

(4) IRANIAN PERSON.—The term "Iranian person" means—

(A) an individual who is a citizen or national of Iran; or

(B) an entity organized under the laws of Iran or otherwise subject to the jurisdiction of the Government of Iran.

(5) IRGC.—The term "IRGC" means Iran's Islamic Revolutionary Guard Corps.

(6) KNOWINGLY.—The term "knowingly" has the meaning given that term in section 14 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note).

(7) UNITED STATES PERSON.—The term "United States person" means—

(A) a United States citizen or an alien lawfully admitted for permanent residence to the United States; or

(B) an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an entity.

**SEC. 3. REGIONAL STRATEGY FOR COUNTERING CONVENTIONAL AND ASYMMETRIC IRANIAN THREATS IN THE MIDDLE EAST AND NORTH AFRICA.**

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and every 2 years thereafter, the Secretary of State, the Secretary of the Treasury, and the Director of National Intelligence shall jointly develop and submit to the appropriate congressional committees a strategy for deterring conventional and asymmetric Iranian activities and threats that directly threaten the United States and key allies in the Middle East, North Africa, and beyond.

(b) ELEMENTS.—The strategy required by subsection (a) shall include at a minimum the following:

(1) A summary of the near- and long-term United States objectives, plans, and means for countering Iran's destabilizing activities, including identification of countries that share the objective of countering Iran's destabilizing activities.

(2) A summary of the capabilities and contributions of individual countries to shared efforts to counter Iran's destabilizing activities, and a summary of additional actions or contributions that each country could take to further contribute.

(3) An assessment of Iran's conventional force capabilities and an assessment of Iran's plans to upgrade its conventional force capabilities, including its acquisition, development, and deployment of ballistic and cruise missile capabilities, unmanned aerial vehicles, and maritime offensive and anti-access or area denial capabilities.

(4) An assessment of Iran's chemical and biological weapons capabilities and an assessment of Iranian plans to upgrade its chemical or biological weapons capabilities.

(5) An assessment of Iran's asymmetric activities in the region, including—

(A) the size, capabilities, and activities of the IRGC, including the Quds Force;

(B) the size, capabilities, and activities of Iran's cyber operations;

(C) the types and amount of support, including funding, lethal and nonlethal contributions, and training, provided to Hezbollah, Hamas, special groups in Iraq, the regime of Bashar al-Assad in Syria, Houthi fighters in Yemen, and other violent groups across the Middle East; and

(D) the scope and objectives of Iran's information operations and use of propaganda.

(6) A summary of United States actions, unilaterally and in cooperation with foreign governments, to counter destabilizing Iranian activities, including—

(A) interdiction of Iranian lethal arms bound for groups designated as foreign terrorist organizations under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189);

(B) Iran's interference in international commercial shipping lanes;

(C) attempts by Iran to undermine or subvert internationally recognized governments in the Middle East region; and

(D) Iran's support for the regime of Bashar al-Assad in Syria, including—

(i) financial assistance, military equipment and personnel, and other support provided to that regime; and

(ii) support and direction to other armed actors that are not Syrian or Iranian and are acting on behalf of that regime.

(c) FORM OF STRATEGY.—The strategy required by subsection (a) shall be submitted in unclassified form but may include a classified annex.

**SEC. 4. IMPOSITION OF ADDITIONAL SANCTIONS IN RESPONSE TO IRAN'S BALLISTIC MISSILE PROGRAM.**

(a) IMPOSITION OF SANCTIONS.—The President shall impose the sanctions described in subsection (b) with respect to any person that the President determines, on or after the date of the enactment of this Act—

(1) knowingly engages in any activity that materially contributes to the activities of the Government of Iran with respect to its ballistic missile program, or any other program in Iran for developing, deploying, or maintaining systems capable of delivering weapons of mass destruction, including any efforts to manufacture, acquire, possess, develop, transport, transfer, or use such capabilities;

(2) is a successor entity to a person referred to in paragraph (1);

(3) owns or controls or is owned or controlled by a person referred to in paragraph (1);

(4) forms an entity with the purpose of evading sanctions that would otherwise be imposed pursuant to paragraph (3);

(5) is acting for or on behalf of a person referred to in paragraph (1), (2), (3), or (4); or

(6) knowingly provides or attempts to provide financial, material, technological, or other support for, or goods or services in support of, a person referred to in paragraph (1), (2), (3), or (4) or (5).

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) BLOCKING OF PROPERTY.—The President shall block, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), all transactions in all property and interests in property of any person subject to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(2) EXCLUSION FROM UNITED STATES.—The Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any person subject to subsection (a) that is an alien.

(c) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of subsection (b)(1) or any regulation, license, or order issued to carry out that subsection shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(d) REPORT ON CONTRIBUTIONS TO IRAN'S BALLISTIC MISSILE PROGRAM.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report describing each person that—

(A) has, during the period specified in paragraph (2), conducted any activity that has materially contributed to the activities of the Government of Iran with respect to its ballistic missile program, or any other program in Iran for developing, deploying, or maintaining systems capable of delivering weapons of mass destruction, including any efforts to manufacture, acquire, possess, develop, transport, transfer, or use such capabilities;

(B) is a successor entity to a person referred to in subparagraph (A);

(C) owns or controls or is owned or controlled by a person referred to in subparagraph (A);

(D) forms an entity with the purpose of evading sanctions that could be imposed as a

result of a relationship described in subparagraph (C);

(E) is acting for or on behalf of a person referred to in subparagraph (A), (B), (C), or (D); or

(F) is known or believed to have provided, or attempted to provide, during the period specified in paragraph (2), financial, material, technological, or other support for, or goods or services in support of, any material contribution to a program described in subparagraph (A) carried out by a person described in subparagraph (A), (B), (C), (D), or (E).

(2) PERIOD SPECIFIED.—The period specified in this paragraph is—

(A) in the case of the first report submitted under paragraph (1), the period beginning January 1, 2016, and ending on the date the report is submitted; and

(B) in the case of a subsequent such report, the 180-day period preceding the submission of the report.

(3) FORM OF REPORT.—Each report required by paragraph (1) shall be submitted in unclassified form but may include a classified annex.

## SEC. 5. IMPOSITION OF TERRORISM-RELATED SANCTIONS WITH RESPECT TO THE IRGC.

(a) FINDINGS.—Congress makes the following findings:

(1) The IRGC is subject to sanctions pursuant to Executive Order 13382 (50 U.S.C. 1701 note; relating to blocking property of weapons of mass destruction delivery system proliferators and their supporters), the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8501 et seq.), Executive Order 13553 (50 U.S.C. 1701 note; relating to blocking property of certain persons with respect to serious human rights abuses by the Government of Iran), and Executive Order 13606 (50 U.S.C. 1701 note; relating to blocking the property and suspending entry into the United States of certain persons with respect to grave human rights abuses by the Governments of Iran and Syria via information technology).

(2) The Iranian Revolutionary Guard Corps–Quds Force (in this section referred to as the "IRGC–QF") is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC–QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia and was designated for the imposition of sanctions by the Secretary of Treasury pursuant to Executive Order 13224 (50 U.S.C. 1701 note; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism) in October 2007 for its support of terrorism.

(3) The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program.

(b) IN GENERAL.—Beginning on the date that is 90 days after the date of the enactment of this Act, the President shall impose the sanctions described in subsection (c) with respect to the IRGC and foreign persons that are officials, agents, or affiliates of the IRGC.

(c) SANCTIONS DESCRIBED.—The sanctions described in this subsection are sanctions applicable with respect to a foreign person pursuant to Executive Order 13224 (50 U.S.C. 1701 note; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism).

## SEC. 6. IMPOSITION OF ADDITIONAL SANCTIONS WITH RESPECT TO PERSONS RESPONSIBLE FOR HUMAN RIGHTS ABUSES.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and annually thereafter, the Secretary of State shall submit to the appropriate congressional committees a list of each person the Secretary determines, based on credible evidence, on or after the date of the enactment of this Act—

(1) is responsible for extrajudicial killings, torture, or other gross violations of internationally recognized human rights committed against individuals in Iran who seek—

(A) to expose illegal activity carried out by officials of the Government of Iran; or

(B) to obtain, exercise, defend, or promote internationally recognized human rights and freedoms, such as the freedoms of religion, expression, association, and assembly, and the rights to a fair trial and democratic elections; or

(2) acts as an agent of or on behalf of a foreign person in a matter relating to an activity described in paragraph (1).

(b) SANCTIONS DESCRIBED.—

(1) IN GENERAL.—The President may, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block all transactions in all property and interests in property of a person on the list required by subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(2) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of paragraph (1) or any regulation, license, or order issued to carry out paragraph (1) shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

## SEC. 7. ENFORCEMENT OF ARMS EMBARGOS.

(a) IN GENERAL.—Except as provided in subsection (d), the President shall impose the sanctions described in subsection (b) with respect to any person that the President determines—

(1) knowingly engages in any activity that materially contributes to the supply, sale, or transfer directly or indirectly to or from Iran, or for the use in or benefit of Iran, of any battle tanks, armored combat vehicles, large caliber artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems, as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts; or

(2) knowingly provides to Iran any technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, manufacture, maintenance, or use of arms and related materiel described in paragraph (1).

(b) SANCTIONS DESCRIBED.—

(1) BLOCKING OF PROPERTY.—The President shall block, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), all transactions in all property and interests in property of any person subject to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(2) EXCLUSION FROM UNITED STATES.—The Secretary of State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United States, any person subject to subsection (a) that is an alien.

(c) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of subsection (b)(1) or any regulation, license, or order issued to carry out that subsection shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(d) EXCEPTION.—The President is not required to impose sanctions under subsection (a) with respect to a person for engaging in an activity described in that subsection if the President certifies to the appropriate congressional committees that—

(1) permitting the activity is in the national security interest of the United States;

(2) Iran no longer presents a significant threat to the national security of the United States and to the allies of the United States; and

(3) the Government of Iran has ceased providing operational or financial support for acts of international terrorism and no longer satisfies the requirements for designation as a state sponsor of terrorism.

(e) STATE SPONSOR OF TERRORISM DEFINED.—In this section, the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined to be a government that has repeatedly provided support for acts of international terrorism for purposes of—

(1) section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. 4605(j)(1)(A)) (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.));

(2) section 620A(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2371(a));

(3) section 40(d) of the Arms Export Control Act (22 U.S.C. 2780(d)); or

(4) any other provision of law.

## SEC. 8. CONTINUATION IN EFFECT OF SANCTIONS FOR IRANIAN SUPPORT RELATING TO TERRORISM AND IRAN'S BALLISTIC MISSILE PROGRAM.

(a) IN GENERAL.—United States sanctions imposed with respect to a person under Executive Order 13382 (50 U.S.C. 1701 note; relating to blocking property of weapons of mass destruction delivery system proliferators and their supporters) or Executive Order 13224 (50 U.S.C. 1701 note; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism, and imposed as a result of activities described in subsection (b), that are in effect on the day before the date of the enactment of this Act, shall remain in effect until the date that is 90 days after the date on which the President submits to the appropriate congressional committees the certification described in subsection (c) with respect to the person.

(b) ACTIVITIES DESCRIBED.—An activity described in this subsection is—

(1) any activity that materially contributes to the activities of the Government of Iran with respect to its ballistic missile program; or

(2) support by the Government of Iran for acts of international terrorism.

(c) CERTIFICATION.—

(1) IN GENERAL.—A certification described in this subsection is a certification that the person with respect to which sanctions were imposed under Executive Order 13382 or Executive Order 13224 has not, during the 3-month period immediately preceding the date of the certification, provided support for or otherwise facilitated or engaged in any activity described in subsection (b).

(2) SUBMISSION TO CONGRESS.—

(A) IN GENERAL.—The President shall submit the certification described in paragraph

Case 1:17-cv-02697-CKK Document 21-4 Filed 03/26/18 Page 193 of 208

(1) to the appropriate congressional committees in writing and shall include a detailed justification for the certification.

(B) FORM OF CERTIFICATION.—The certification described in paragraph (1) shall be submitted in unclassified form but may include a classified annex.

(d) REIMPOSITION.—If sanctions are suspended with respect to a person under this section, such sanctions shall be reinstated if the President determines that the person has resumed any activity described in subsection (b).

## SEC. 9. REVIEW OF APPLICABILITY OF SANCTIONS RELATING TO IRAN'S SUPPORT FOR TERRORISM AND ITS BALLISTIC MISSILE PROGRAM.

(a) IN GENERAL.—Not later than 5 years after the date of the enactment of this Act, the President shall conduct a review of all persons on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury for activities relating to Iran—

(1) to assess the conduct of such persons as that conduct relates to—

(A) any activity that materially contributes to the activities of the Government of Iran with respect to its ballistic missile program; or

(B) support by the Government of Iran for acts of international terrorism; and

(2) to determine the applicability of sanctions with respect to such persons under—

(A) Executive Order 13382 (50 U.S.C. 1701 note; relating to blocking property of weapons of mass destruction delivery system proliferators and their supporters); or

(B) Executive Order 13224 (50 U.S.C. 1701 note; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism).

(b) IMPLEMENTATION OF SANCTIONS.—If the President determines under subsection (a) that sanctions under an Executive Order specified in paragraph (2) of that subsection are applicable with respect to a person, the President shall—

(1) impose sanctions with respect to that person pursuant to that Executive Order; or

(2) exercise the waiver authority provided under section 13.

## SEC. 10. REPORT ON COORDINATION OF SANCTIONS BETWEEN THE UNITED STATES AND THE EUROPEAN UNION.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report that includes the following:

(1) A description of each instance, during the period specified in subsection (b)—

(A) in which the United States has imposed sanctions with respect to a person for activity related to the proliferation of weapons of mass destruction or delivery systems for such weapons to or by Iran, support for acts of international terrorism by Iran, or human rights abuses in Iran, but in which the European Union has not imposed corresponding sanctions; and

(B) in which the European Union has imposed sanctions with respect to a person for activity related to the proliferation of weapons of mass destruction or delivery systems for such weapons to or by Iran, support for acts of international terrorism by Iran, or human rights abuses in Iran, but in which the United States has not imposed corresponding sanctions.

(2) An explanation for the reason for each discrepancy between sanctions imposed by the European Union and sanctions imposed by the United States described in subparagraphs (A) and (B) of paragraph (1).

(b) PERIOD SPECIFIED.—The period specified in this subsection is—

(1) in the case of the first report submitted under subsection (a), the period beginning on the date of the enactment of this Act and ending on the date the report is submitted; and

(2) in the case of a subsequent such report, the 180-day period preceding the submission of the report.

(c) FORM OF REPORT.—The report required by subsection (a) shall be submitted in unclassified form but may include a classified annex.

## SEC. 11. REPORT ON UNITED STATES CITIZENS DETAINED BY IRAN.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report on United States citizens, including United States citizens who are also citizens of other countries, detained by Iran or groups supported by Iran that includes—

(1) information regarding any officials of the Government of Iran involved in any way in the detentions; and

(2) a summary of efforts the United States Government has taken to secure the swift release of those United States citizens.

(b) FORM OF REPORT.—The report required by subsection (a) shall be submitted in unclassified form, but may include a classified annex.

## SEC. 12. EXCEPTIONS FOR NATIONAL SECURITY AND HUMANITARIAN ASSISTANCE; RULE OF CONSTRUCTION.

(a) IN GENERAL.—The following activities shall be exempt from sanctions under sections 4, 5, 6, and 7:

(1) Any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.), or to any authorized intelligence activities of the United States.

(2) The admission of an alien to the United States if such admission is necessary to comply with United States obligations under the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947, or under the Convention on Consular Relations, done at Vienna April 24, 1963, and entered into force March 19, 1967, or other applicable international obligations of the United States.

(3) The conduct or facilitation of a transaction for the sale of agricultural commodities, food, medicine, or medical devices to Iran or for the provision of humanitarian assistance to the people of Iran, including engaging in a financial transaction relating to humanitarian assistance or for humanitarian purposes or transporting goods or services that are necessary to carry out operations relating to humanitarian assistance or humanitarian purposes.

(b) EXCEPTION RELATING TO IMPORTATION OF GOODS.—A requirement or the authority to block and prohibit all transactions in all property and interests in property under this Act shall not include the authority to impose sanctions with respect to the importation of goods.

(c) IMPLEMENTATION.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this Act.

(d) RULE OF CONSTRUCTION.—Nothing in this Act shall be construed to limit the authority of the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

(e) DEFINITIONS.—In this section:

(1) AGRICULTURAL COMMODITY.—The term "agricultural commodity" has the meaning

given that term in section 102 of the Agricultural Trade Act of 1978 (7 U.S.C. 5602).

(2) GOOD.—The term "good" has the meaning given that term in section 16 of the Export Administration Act of 1979 (50 U.S.C. 4618) (as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)).

(3) MEDICAL DEVICE.—The term "medical device" has the meaning given the term "device" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(4) MEDICINE.—The term "medicine" has the meaning given the term "drug" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

## SEC. 13. WAIVER AUTHORITY; TERMINATION OF SANCTIONS.

(a) TEMPORARY WAIVER AUTHORITY.—Except as provided in subsection (b), the President may waive a requirement under this Act to impose or maintain sanctions with respect to a person for one period of not more than 120 days.

(b) TERMINATION OF SANCTIONS.—Sanctions waived under subsection (a) shall terminate if—

(1) not later than 30 days before the waiver under subsection (a) with respect to the sanctions expires, the President submits to Congress a request to terminate the sanctions; and

(2) during the 30-day period beginning on the date on which the President submits the request to Congress, a joint resolution of approval is enacted into law under subsection (c).

(c) JOINT RESOLUTION OF APPROVAL.—

(1) JOINT RESOLUTION OF APPROVAL DEFINED.—In this subsection, the term "joint resolution of approval" means a joint resolution the sole matter after the resolving clause of which is as follows: "That Congress approves the request of the President under section 12 of the Countering Iran's Destabilizing Activities Act of 2017 submitted on _____ to terminate the application of sanctions with respect to _____.", with the first blank space being filled with the date and the second blank space being filled with the name of the person to which the request applies.

(2) INTRODUCTION.—On or after the day on which the President submits to Congress a request under subsection (b)(2), a joint resolution of approval with respect to the request may be introduced—

(A) in the House, by the majority leader of the House, for the majority leader and the minority leader of the House, or by Members of the House designated by the majority leader and minority leader of the House; and

(B) in the Senate, by the majority leader of the Senate, for the majority leader and the minority leader of the Senate, or by Members of the Senate designated by the majority leader and minority leader of the Senate.

(3) COMMITTEE REFERRAL.—A joint resolution of approval shall be referred by the presiding officers of the respective Houses to the appropriate committee.

(4) AMENDMENTS PROHIBITED.—No amendment to a joint resolution of approval shall be in order in either the House of Representatives or the Senate. It shall not be in order to suspend the application of this paragraph in either House or for the Presiding Officer to entertain a request to suspend the application of this paragraph by unanimous consent.

(5) PERIOD FOR COMMITTEE CONSIDERATION.—If the committee of either House to which a joint resolution of approval has been referred has not reported the resolution at the close of the 15th day after the introduction of the resolution, the committee shall be automatically discharged from further consideration

of the resolution and the resolution shall be placed on the appropriate calendar.

(6) FLOOR CONSIDERATION.—

(A) IN GENERAL.—A vote on final passage of a joint resolution of approval shall be taken in each House on or before the close of the 15th day after the resolution is reported by the committee of that House to which the resolution was referred, or after that committee has been discharged from further consideration of the resolution under paragraph (5).

(B) RESOLUTION PASSED BY OTHER HOUSE.—If, prior to the passage by one House of a joint resolution of approval of that House, that House receives the same resolution from the other House, then—

(i) the procedure in that House shall be the same as if no resolution had been received from the other House; but

(ii) the vote on final passage shall be on the resolution of the other House.

(7) FLOOR CONSIDERATION IN THE HOUSE OF REPRESENTATIVES.—

(A) MOTIONS TO PROCEED.—A motion in the House of Representatives to proceed to the consideration of a joint resolution of approval shall be highly privileged and not debatable. An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) TIME FOR DEBATE.—Debate in the House of Representatives on a joint resolution of approval shall be limited to not more than 20 hours, which shall be divided equally between those favoring and those opposing the resolution. A motion further to limit debate shall not be debatable. It shall not be in order to move to recommit a joint resolution of approval or to move to reconsider the vote by which a joint resolution of approval is agreed to or disagreed to.

(C) MOTIONS TO POSTPONE.—Motions to postpone, made in the House of Representatives with respect to the consideration of a joint resolution of approval, and motions to proceed to the consideration of other business, shall be decided without debate.

(D) APPEALS.—All appeals from the decisions of the Chair relating to the application of the Rules of the House of Representatives to the procedure relating to a joint resolution of approval shall be decided without debate.

(E) APPLICABILITY OF RULES.—Except to the extent specifically provided in the preceding provisions of this paragraph, consideration of a joint resolution of approval shall be governed by the Rules of the House of Representatives applicable to other resolutions in similar circumstances.

(8) FLOOR CONSIDERATION IN THE SENATE.—

(A) MOTIONS TO PROCEED.—A motion in the Senate to proceed to the consideration of a joint resolution of approval shall be privileged and not debatable. An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) TIME FOR DEBATE.—Debate in the Senate on a joint resolution of approval, and all debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours. The time shall be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

(C) MOTIONS AND APPEALS.—Debate in the Senate on any debatable motion or appeal in connection with a joint resolution of approval shall be limited to not more than 1 hour, to be equally divided between and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition

thereto shall be controlled by the minority leader or the minority leader's designee. Such leaders, or either of them, may, from time under their control on the passage of a joint resolution of approval, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(D) MOTIONS TO FURTHER LIMIT DEBATE.—A motion in the Senate to further limit debate on a joint resolution of approval is not debatable.

(E) MOTIONS TO RECOMMIT.—A motion to recommit a joint resolution of approval is not in order.

(9) RULES OF HOUSE OF REPRESENTATIVES AND SENATE.—This subsection is enacted by Congress—

(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of a joint resolution of approval, and supersedes other rules only to the extent that it is inconsistent with such rules; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to limit the authority of the President to impose sanctions under this Act with respect to a person with respect to which sanctions were terminated under this section.

SA 254. Mr. MORAN submitted an amendment intended to be proposed by him to the bill S. 722, to impose sanctions with respect to Iran in relation to Iran's ballistic missile program, support for acts of international terrorism, and violations of human rights, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

SEC. 13. RESTRICTIONS ON CERTAIN PAYMENTS RELATING TO CLAIMS BROUGHT BEFORE THE IRAN-UNITED STATES CLAIMS TRIBUNAL.

(a) IN GENERAL.—No amounts authorized to be appropriated or otherwise made available for any fiscal year may be obligated or expended for a payment described in subsection (b) until the President certifies to Congress that the Government of Iran has paid all compensatory damages awarded to a United States person in a final judgment—

(1) issued by a district court of the United States under Federal or State law against the Government of Iran; and

(2) arising from an act of international terrorism, for which the Government of Iran was determined not to be immune from the jurisdiction of the courts of the United States or of the States under section 1605A of title 28, United States Code, or section 1605(a)(7) of such title (as in effect on January 27, 2008).

(b) PAYMENTS DESCRIBED.—A payment described in this subsection is a payment by the United States to the Government of Iran or a national of Iran relating to the settlement of a claim before the Iran-United States Claims Tribunal.

(c) ACT OF INTERNATIONAL TERRORISM DEFINED.—In this section, the term "act of international terrorism" includes—

(1) an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking, as those terms are defined in section 1605A(h) of title 28, United States Code; and

(2) providing material support or resources, as defined in section 2339A of title 18, United

States Code, for an act described in subparagraph (A).

---

# AUTHORITY FOR COMMITTEES TO MEET

Mr. McCONNELL. Mr. President, I have 11 requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority leaders.

Pursuant to Rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

The Committee on Banking, Housing, and Urban Affairs is authorized to meet during the session of the Senate on Wednesday, June 14, 2017 at 2:15 p.m. to conduct an executive session to vote on the following nominations: Mr. Kevin Allen Hassett, to be Chairman of the Council of Economic Advisers; and the Honorable Pamela Hughes Patenaude, to be Deputy Secretary of Housing and Urban Development.

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

The Committee on Commerce, Science, and Transportation is authorized to hold a meeting during the session of the Senate on Wednesday, June 14, 2017, at 10 a.m. in room 253 of the Russell Senate Office Building.

The Committee will hold a Hearing on "Paving the Way for Self-Driving Vehicles."

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

The Committee on Environment and Public Works is authorized to meet during the session of the Senate on Wednesday, June 14, 2017, at 10 a.m. in room 406 of the Dirksen Senate office building, to conduct a hearing entitled, "Legislative Hearing on S. 517, the Consumer and Fuel Retailer Choice Act."

COMMITTEE ON FINANCE

The Committee on Finance is authorized to meet during the session of the Senate on Wednesday, June 14, 2017, at 10 a.m., in 215 Dirksen Senate Office Building, to consider favorably reporting pending nominations.

COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

The Committee on Homeland Security and Governmental Affairs is authorized to meet during the session of the Senate on Wednesday, June 14, 2017, at 10 a.m. in order to conduct a hearing titled "Ideology and Terror: Understanding the Tools, Tactics, and Techniques of Violent Extremism."

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on June 14, 2017, at 9:45 a.m., in room SD–226 of the Dirksen Senate Office Building, to conduct a hearing entitled "Nominations."

COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

The Committee on Small Business and Entrepreneurship is authorized to

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| KASPERSKY LAB, INC.; and KASPERSKY LABS LIMITED, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| *v.* | ) ) | Civ. No. 17-2697 (CKK) |
| U.S. DEPARTMENT OF HOMELAND SECURITY; and KIRSTJEN NIELSEN *Secretary of Homeland Security* | ) ) ) ) ) | |
| *Defendants.* | ) ) | |

---

**EXHIBIT 3-I**

II

**Calendar No. 165**

115TH CONGRESS
1ST SESSION
# S. 1519

**[Report No. 115–125]**

To authorize appropriations for fiscal year 2018 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

––––––––––––––––––

## IN THE SENATE OF THE UNITED STATES

JULY 10, 2017

Mr. McCAIN, from the Committee on Armed Services, reported the following original bill; which was read twice and placed on the calendar

––––––––––––––––––

# A BILL

To authorize appropriations for fiscal year 2018 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "National Defense Au-

5    thorization Act for Fiscal Year 2018".

717

1 (2) An assessment of the relative strengths and
2 weaknesses of each of such approaches relative to
3 the threat and relative to one another.

4 (3) A recommendation for a cyber deterrence
5 theory and doctrine for the Armed Forces.

6 (4) An alternative analysis or dissenting view of
7 the recommendation included under paragraph (3)
8 that explains the weaknesses of the recommended
9 theory and doctrine and offers an alternative theory
10 or doctrine.

11 (c) CONSULTATION.—In preparing the report re-
12 quired by subsection (a), the Secretary shall consult with
13 experts from the Government, industry, and academia.

14 **SEC. 1630B. PROHIBITION ON USE OF SOFTWARE PLAT-**
15 **FORMS DEVELOPED BY KASPERSKY LAB.**

16 (a) PROHIBITION.—No department, agency, organi-
17 zation, or other element of the Department of Defense
18 may use, whether directly or through work with or on be-
19 half of another organization or element of the Department
20 or another department or agency of the United States
21 Government, any software platform developed, in whole or
22 in part, by Kaspersky Lab or any entity of which
23 Kaspersky Lab has a majority ownership.

24 (b) SEVERANCE OF NETWORK CONNECTIONS.—The
25 Secretary of Defense shall ensure that any network con-

718

1  nection between a department, agency, organization, or

2  other element of the Department of Defense and a depart-

3  ment or agency of the United States Government that is

4  using or hosting on its networks a software platform de-

5  scribed in subsection (a) is immediately severed.

6      (c) EFFECTIVE DATE.—This section shall take effect

7  on October 1, 2018.

## Subtitle D—Nuclear Forces

**SEC. 1631. COLLECTION, STORAGE, AND SHARING OF DATA**

**RELATING TO NUCLEAR SECURITY ENTER-**

**PRISE.**

12     (a) IN GENERAL.—Chapter 24 of title 10, United

13  States Code, as amended by section 1624, is further

14  amended by adding at the end the following new section:

15  **"§ 499a. Collection, storage, and sharing of data relat-**

16                 **ing to nuclear security enterprise**

17     "(a) IN GENERAL.—The Secretary of Defense, acting

18  through the Director of Cost Assessment and Program

19  Evaluation, and the Administrator for Nuclear Security,

20  acting through the Director for Cost Estimating and Pro-

21  gram Evaluation, shall jointly collect and store cost, pro-

22  grammatic, and technical data relating to programs and

23  projects of the nuclear security enterprise.

24     "(b) SHARING OF DATA.—If the Director of Cost As-

25  sessment and Program Evaluation or the Director for

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
KASPERSKY LAB, INC.; and                  )
KASPERSKY LABS LIMITED,              )
                                                              )
*Plaintiffs*,                                           )
                                                              )
*v.*                                                          )            Civ. No. 17-2697 (CKK)
                                                              )
U.S. DEPARTMENT OF                      )
HOMELAND SECURITY; and          )
KIRSTJEN NIELSEN                            )
*Secretary of Homeland Security*       )
                                                              )
*Defendants.*                                        )
_____)

**<u>EXHIBIT 3-J</u>**

(ii) in subparagraph (B), by striking "being ordered to active military duty during a period of military conflict" and inserting "being ordered to perform active service for a period of more than 30 consecutive days";

(iii) in subparagraph (C), by striking "active duty" each place it appears and inserting "active service"; and

(iv) in subparagraph (G)(ii)(II), by striking "active duty" and inserting "active service"; and

(B) in subsection (n)—

(i) in the subsection heading, by striking "ACTIVE DUTY" and inserting "ACTIVE SERVICE";

(ii) in paragraph (1)—

(I) by striking subparagraph (C);

(II) by redesignating subparagraphs (A) and (B) as subparagraphs (B) and (C), respectively;

(III) by inserting before subparagraph (B), as so redesignated, the following:

"(A) ACTIVE SERVICE.—The term 'active service' has the meaning given that term in section 101(d)(3) of title 10, United States Code.";

(IV) in subparagraph (B), as so redesignated, by striking "ordered to active duty during a period of military conflict" and inserting "ordered to perform active service for a period of more than 30 consecutive days"; and

(V) in subparagraph (D), by striking "active duty" each place it appears and inserting "active service"; and

(iii) in paragraph (2)(B), by striking "active duty" each place it appears and inserting "active service'.

(2) APPLICABILITY.—The amendments made by paragraph (1)(A) shall apply to an economic injury suffered or likely to be suffered as the result of an essential employee being ordered to perform active service (as defined in section 101(d)(3) of title 10, United States Code) for a period of more than 30 consecutive days who is discharged or released from such active service on or after the date of enactment of this Act.

(3) SEMIANNUAL REPORT.—Not later than 180 days after the date of enactment of this Act, and semiannually thereafter, the President shall submit to the Committee on Small Business and Entrepreneurship and the Committee on Appropriations of the Senate and the Committee on Small Business and the Committee on Appropriations of the House of Representatives a report on the number of loans made under the Military Reservist Economic Injury Disaster Loan program and the dollar volume of those loans. The report shall contain the subsidy rate of the disaster loan program as authorized under section 7(b) of the Small Business Act (15 U.S.C. 636(b)) with the loans made under the Military Reservist Economic Injury Disaster Loan program and without those loans included.

(4) TECHNICAL AND CONFORMING AMENDMENT.—Section 8(l) of the Small Business Act (15 U.S.C. 637(l)) is amended—

(A) by striking "The Administration" and inserting the following:

"(1) IN GENERAL.—The Administration";

(B) by striking "(as defined in section 7(n)(1))"; and

(C) by adding at the end the following:

"(2) DEFINITION OF PERIOD OF MILITARY CONFLICT.—In this subsection, the term 'period of military conflict' means—

"(A) a period of war declared by the Congress;

"(B) a period of national emergency declared by the Congress or by the President; or

"(C) a period of a contingency operation, as defined in section 101(a) of title 10, United States Code.".

(b) NATIONAL GUARD AND RESERVE DEPLOYMENT SUPPORT AND BUSINESS TRAINING PROGRAM.—

(1) EXPANSION OF SMALL BUSINESS ADMINISTRATION OUTREACH PROGRAMS.—Section 8(b)(17) of the Small Business Act (15 U.S.C. 637(b)(17)) is amended by striking "and members of a reserve component of the Armed Forces" and inserting "members of a reserve component of the Armed Forces, and the spouses of veterans and members of a reserve component of the Armed Forces".

(2) ESTABLISHMENT OF PROGRAM.—Section 32 of the Small Business Act (15 U.S.C. 657) is amended by adding at the end the following:

"(g) NATIONAL GUARD AND RESERVE DEPLOYMENT SUPPORT AND BUSINESS TRAINING.—

"(1) IN GENERAL.—In making grants carried out under section 8(b)(17), the Associate Administrator shall establish a program, to be known as the 'National Guard and Reserve Deployment Support and Business Training Program', to provide training, counseling and other assistance to support members of a reserve component of the Armed Forces and their spouses.

"(2) AUTHORITIES.—In carrying out this subsection, the Associate Administrator may—

"(A) modify programs and resources made available through section 8(b)(17) to provide pre-deployment and other information specific to members of a reserve component of the Armed Forces and their spouses;

"(B) collaborate with the Chief of the National Guard Bureau or the Chief's designee, State Adjunct Generals or their designees, and other public and private partners; and

"(C) provide training, information and other resources to the Chief of the National Guard Bureau or the Chief's designee and State Adjunct Generals or their designees for the purpose of supporting members of a reserve component of the Armed Forces and the spouses of veterans and members of a reserve component of the Armed Forces.".

**SA 663.** Mrs. SHAHEEN submitted an amendment intended to be proposed by her to the bill H.R. 2810, to authorize appropriations for fiscal year 2018 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes; which was ordered to lie on the table; as follows:

Amend section 1630B to read as follows:

**SEC. 1630B. PROHIBITION ON USE OF SOFTWARE PLATFORMS DEVELOPED BY KASPERSKY LAB.**

(a) PROHIBITION.—No department, agency, organization, or other element of the United States Government may use, whether directly or through work with or on behalf of another organization or element of the United States Government, any hardware, software, or services developed or provided, in whole or in part, by Kaspersky Lab or any entity of which Kaspersky Lab has a majority ownership.

(b) EFFECTIVE DATE.—This section shall take effect on October 1, 2018.

**SA 664.** Mrs. SHAHEEN (for herself and Mr. SASSE) submitted an amendment intended to be proposed by her to the bill H.R. 2810, to authorize appropriations for fiscal year 2018 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes; which was ordered to lie on the table; as follows:

At the end of subtitle C of title XII, add the following:

**SEC. ____. SYRIA STUDY GROUP.**

(a) ESTABLISHMENT.—There is hereby established a working group to be known as the "Syria Study Group" (in this section referred to as the "Group").

(b) PURPOSE.—The purpose of the Group is to examine and make recommendations with respect to the military and diplomatic strategy of the United States with respect to the conflict in Syria.

(c) COMPOSITION.—

(1) MEMBERSHIP.—The Group shall be composed of 8 members appointed as follows:

(A) Two members appointed by the chair of the Committee on Armed Services of the Senate.

(B) Two members appointed by the ranking minority member of the Committee on Armed Services of the Senate.

(C) Two members appointed by the chair of the Committee on Armed Services of the House of Representatives.

(D) Two members appointed by the ranking minority member of the Committee on Armed Services of the House of Representatives.

(2) CO-CHAIRS.—

(A) The chair of the Committee on Armed Services of the Senate and the chair of the Committee on Armed Services of the House of Representatives shall jointly designate one member of the Group to serve as co-chair of the Group.

(B) The ranking minority member of the Committee on Armed Services of the Senate and the ranking minority member of the Committee on Armed Services of the House of Representatives shall jointly designate one member of the Group to serve as co-chair of the Group.

(3) PERIOD OF APPOINTMENT; VACANCIES.—Members shall be appointed for the life of the Group. Any vacancy in the Group shall be filled in the same manner as the original appointment.

(d) DUTIES.—

(1) REVIEW.—The Group shall review the current situation with respect to the United States military and diplomatic strategy in Syria, including a review of current United States objectives in Syria and the desired end state in Syria.

(2) ASSESSMENT AND RECOMMENDATIONS.—The Group shall—

(A) conduct a comprehensive assessment of the current situation in Syria, its impact on neighboring countries, resulting regional and geopolitical threats to the United States, and current military, diplomatic, and political efforts to achieve a stable Syria; and

(B) develop recommendations on a military and diplomatic strategy for the United States with respect to the conflict in Syria.

(e) COOPERATION FROM UNITED STATES GOVERNMENT.—

(1) IN GENERAL.—The Group shall receive the full and timely cooperation of the Secretary of Defense and the Director of National Intelligence in providing the Group with analyses, briefings, and other information necessary for the discharge of the duties of the Group.

(2) LIAISON.—The Secretary of Defense and the Director of National Intelligence shall each designate at least one officer or employee of their respective organizations to serve as a liaison officer to the Group.

(f) REPORT.—

(1) FINAL REPORT.—Not later than September 30, 2018, the Group shall submit to the President, the Secretary of Defense, and the Committees on Armed Services of the

Senate and the House of Representatives a report on the findings, conclusions, and recommendations of the Group under this section. The report shall do each of the following:

(A) Assess the current security, political, humanitarian, and economic situation in Syria.

(B) Assess the current participation and objectives of various external actors in Syria.

(C) Assess the consequences of continued conflict in Syria.

(D) Provide recommendations for a diplomatic resolution of the conflict in Syria, including options for a gradual political transition to a post-Assad Syria and actions necessary for reconciliation.

(E) Provide a roadmap for a United States and coalition strategy to reestablish security and governance in Syria, including recommendations for the synchronization of stabilization, development, counterterrorism, and reconstruction efforts.

(F) Address any other matters with respect to the conflict in Syria that the Group considers appropriate.

(2) INTERIM BRIEFING.—Not later than June 30, 2018, the Group shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the status of its review and assessment under subsection (d), together with a discussion of any interim recommendations developed by the Group as of the date of the briefing.

(3) FORM OF REPORT.—The report submitted to Congress under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(g) FACILITATION.—The United States Institute of Peace shall take appropriate actions to facilitate the Group in the discharge of its duties under this section.

(h) TERMINATION.—The Group shall terminate six months after the date on which it submits the report required by subsection (f)(1).

(i) FUNDING.—Of the amounts authorized to be appropriated for fiscal year 2018 for the Department of Defense by this Act, $1,500,000 is available to fund the activities of the Group.

———

**SA 665.** Mr. BROWN for himself, Mr. BOOKER, and Ms. HIRONO submitted an amendment intended to be proposed by him to the bill H.R. 2810, to authorize appropriations for fiscal year 2018 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes; which was ordered to lie on the table; as follows:

At the end of subtitle H of title V, add the following:

**SEC. 583. EXTENSION OF REPORTS ON DIVERSITY IN MILITARY LEADERSHIP UNDER ANNUAL DEFENSE MANPOWER REQUIREMENTS REPORT.**

Section 115a(g) of title 10, United States Code, is amended by striking "2017" and inserting "2022".

———

**SA 666.** Mr. BROWN (for himself and Mr. TOOMEY) submitted an amendment intended to be proposed by him to the bill H.R. 2810, to authorize appropriations for fiscal year 2018 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military

personnel strengths for such fiscal year, and for other purposes; which was ordered to lie on the table; as follows:

At the end of subtitle D of title XII, add the following:

**SEC. ____. SENSE OF CONGRESS ON CYBERSECURITY COOPERATION WITH UKRAINE.**

(a) FINDINGS.—Congress makes the following findings:

(1) There is a strong history of cyber attacks in Ukraine, including a significant attack on its power grid in December 2015 by Russia.

(2) The United States supports Ukraine and the Ukrainian Security Assistance Initiative.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the United States reaffirms support for the sovereignty and territorial integrity of Ukraine, especially as a result of Russia's invasion of Ukraine and in the face of increased Russian aggression in the region; and

(2) the United States should assist Ukraine in improving its cybersecurity capabilities.

———

**SA 667.** Mr. McCONNELL proposed an amendment to amendment SA 267 proposed by Mr. McCONNELL to the bill H.R. 1628, to provide for reconciliation pursuant to title II of the concurrent resolution on the budget for fiscal year 2017; as follows:

Strike all after the first word and insert the following:

**SHORT TITLE.**

This Act may be cited as the "Health Care Freedom Act of 2017".

**TITLE I**

**SEC. 101. INDIVIDUAL MANDATE.**

(a) IN GENERAL.—Section 5000A(c) of the Internal Revenue Code of 1986 is amended—

(1) in paragraph (2)(B)(iii), by striking "2.5 percent" and inserting "Zero percent", and

(2) in paragraph (3)—

(A) by striking "$695" in subparagraph (A) and inserting "$0", and

(B) by striking subparagraph (D).

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to months beginning after December 31, 2015.

**SEC. 102. EMPLOYER MANDATE.**

(a) IN GENERAL.—

(1) Paragraph (1) of section 4980H(c) of the Internal Revenue Code of 1986 is amended by inserting "($0 in the case of months beginning after December 31, 2015, and before January 1, 2025)" after "$2,000".

(2) Paragraph (1) of section 4980H(b) of the Internal Revenue Code of 1986 is amended by inserting "($0 in the case of months beginning after December 31, 2015, and before January 1, 2025)" after "$3,000".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to months beginning after December 31, 2015.

**SEC. 103. EXTENSION OF MORATORIUM ON MEDICAL DEVICE EXCISE TAX.**

(a) IN GENERAL.—Section 4191(c) of the Internal Revenue Code of 1986 is amended by striking "December 31, 2017" and inserting "December 31, 2020".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to sales after December 31, 2017.

**SEC. 104. MAXIMUM CONTRIBUTION LIMIT TO HEALTH SAVINGS ACCOUNT INCREASED TO AMOUNT OF DEDUCTIBLE AND OUT-OF-POCKET LIMITATION.**

(a) IN GENERAL.—Subsection (b) of section 223 of the Internal Revenue Code of 1986 is amended by adding at the end the following new paragraph:

"(9) INCREASED LIMITATION.—In the case of any month beginning after December 31, 2017, and before January 1, 2021—

"(A) paragraph (2)(A) shall be applied by substituting 'the amount in effect under subsection (c)(2)(A)(ii)(I)' for '$2,250', and

"(B) paragraph (2)(B) shall be applied by substituting 'the amount in effect under subsection (c)(2)(A)(ii)(II)' for '$4,500'.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2017.

**SEC. 105. FEDERAL PAYMENTS TO STATES.**

(a) IN GENERAL.—Notwithstanding section 504(a), 1902(a)(23), 1903(a), 2002, 2005(a)(4), 2102(a)(7), or 2105(a)(1) of the Social Security Act (42 U.S.C. 704(a), 1396a(a)(23), 1396b(a), 1397a, 1397d(a)(4), 1397bb(a)(7), 1397ee(a)(1)), or the terms of any Medicaid waiver in effect on the date of enactment of this Act that is approved under section 1115 or 1915 of the Social Security Act (42 U.S.C. 1315, 1396n), for the 1-year period beginning on the date of enactment of this Act, no Federal funds provided from a program referred to in this subsection that is considered direct spending for any year may be made available to a State for payments to a prohibited entity, whether made directly to the prohibited entity or through a managed care organization under contract with the State.

(b) DEFINITIONS.—In this section:

(1) PROHIBITED ENTITY.—The term "prohibited entity" means an entity, including its affiliates, subsidiaries, successors, and clinics—

(A) that, as of the date of enactment of this Act—

(i) is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;

(ii) is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations (as in effect on the date of enactment of this Act), that is primarily engaged in family planning services, reproductive health, and related medical care; and

(iii) provides for abortions, other than an abortion—

(I) if the pregnancy is the result of an act of rape or incest; or

(II) in the case where a woman suffers from a physical disorder, physical injury, or physical illness that would, as certified by a physician, place the woman in danger of death unless an abortion is performed, including a life-endangering physical condition caused by or arising from the pregnancy itself; and

(B) for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act in fiscal year 2014 made directly to the entity and to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity and to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $1,000,000.

(2) DIRECT SPENDING.—The term "direct spending" has the meaning given that term under section 250(c) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 900(c)).

**TITLE II**

**SEC. 201. THE PREVENTION AND PUBLIC HEALTH FUND.**

Subsection (b) of section 4002 of the Patient Protection and Affordable Care Act (42 U.S.C. 300u–11) is amended—

(1) in paragraph (3), by striking "each of fiscal years 2018 and 2019" and inserting "fiscal year 2018"; and

(2) by striking paragraphs (4) through (8).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| KASPERSKY LAB, INC.; and ) | |
| KASPERSKY LABS LIMITED, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| *v.* ) | Civ. No. 17-2697 (CKK) |
| ) | |
| U.S. DEPARTMENT OF ) | |
| HOMELAND SECURITY; and ) | |
| KIRSTJEN NIELSEN ) | |
| *Secretary of Homeland Security* ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**EXHIBIT 3-K**

# Shaheen's Legislation to Ban Kaspersky Software Government-Wide Passes Senate As Part of Annual Defense Bill

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

🌿 **shaheen.senate.gov**/news/press/shaheens-legislation-to-ban-kaspersky-software-government-wide-passes-senate-as-part-of-annual-defense-bill-

September 18, 2017

### Shaheen's Legislation to Ban Kaspersky Software Government-Wide Passes Senate As Part of Annual Defense Bill

***Shaheen's amendment works in tandem with the Trump administration's directive last week to all federal agencies to remove Kaspersky software within 90 days***

(Washington, DC)—U.S. Senator Jeanne Shaheen (D-NH) issued the following statement after her amendment that bans the use of Kaspersky Lab software across the federal government passed the Senate as part of the FY 18 National Defense Authorization Act (NDAA). Her amendment was added to the bill on Thursday through a voice vote. Last week, the Department of Homeland Security <u>announced</u> that all federal agencies must remove Kaspersky software from computers within 90 days.

"The case against Kaspersky Lab is overwhelming," said Shaheen. "The strong ties between Kaspersky Lab and the Kremlin are alarming and well-documented. I'm very pleased that the Senate has acted in a bipartisan way on my amendment that removes a real vulnerability to our national security. I applaud the Trump administration for heeding my call to remove Kaspersky Lab software from all federal computers. It's important that this prohibition also be a part of statute and be expanded to the entire federal government, as my amendment would do. Considering the strong bipartisan, bicameral support for this proposal, I'm optimistic this will soon be signed into law."

Senator Shaheen is a member of the Senate Armed Services Committee. Earlier this month, Senator Shaheen <u>authored an editorial</u> for the New York Times, warning of the dangers of the United States government using Kaspersky Lab products.

---

<u>Next Article</u>                                                                                  <u>Previous Article</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
KASPERSKY LAB, INC.; and                  )
KASPERSKY LABS LIMITED,               )
)
*Plaintiffs*,                                                )
)
*v.*                                                            )        Civ. No. 17-2697 (CKK)
)
U.S. DEPARTMENT OF                       )
HOMELAND SECURITY; and           )
KIRSTJEN NIELSEN                            )
*Secretary of Homeland Security*           )
)
*Defendants.*                                            )
_____)

**EXHIBIT 3-L**

# Kaspersky under scrutiny after Bloomberg story claims close links to FSB

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ars arstechnica.com/information-technology/2017/07/kaspersky-denies-inappropriate-ties-with-russian-govt-after-bloomberg-story/

Cyrus Farivar



Enlarge / Kaspersky Lab CEO and Chairman Eugene Kaspersky speaks at a conference in Russia on July 10, 2017.

Anton NovoderezhkinTASS via Getty Images

Shortly after Bloomberg Businessweek published an explosive story under the headline: "Kaspersky Lab Has Been Working With Russian Intelligence," the security firm released a lengthy statement noting that the company does not have "inappropriate ties with any government."

The article, which was published in the early morning hours on Tuesday, says that the Moscow-based firm "has maintained a much closer working relationship with Russia's main intelligence agency, the FSB, than it has publicly admitted. It has developed security technology at the spy agency's behest and worked on joint projects the CEO knew would be embarrassing if made public." Media organization McClatchy made seemingly similar claims in a July 3 report.

In the same statement, Kaspersky responded further: "It's important to be clear: the company never received a request from the Russian government or any affiliated organization to create or participate in ANY secret projects, including one for anti-DDoS protection."

Hours later on Tuesday, ABC News reported that the White House may strip Kaspersky of its approval on the General Services Administration's list of companies that can do business with the US government.

Sen. Jeanne Sheheen (D-N.H.) said in a statement that she was "encouraged" by the possible move as a "wise precaution."

However, on Twitter, Aleks Gostev, Chief Security Expert at Kaspersky, derided Sheheen's statement and compared it to the senator's previous change of opinion on the Iraq War over a decade ago.

> Let's invade to Iraq! We have intel! They have WMD! Oh, wait, I was wrong. Let's ban Kaspersky!
>
> — codelancer (@codelancer) July 11, 2017

CEO Eugene Kaspersky himself slammed the Bloomberg report.

> PhD for 'banya journalism' goes to Bloomberg. Numerous allegations, misinterpretations & fakes. This story is BS brewed on political agenda
>
> — Eugene Kaspersky (@e_kaspersky) July 11, 2017

The Bloomberg report also comes just weeks after Reuters reported that the FBI had visited the homes of multiple Kaspersky employees in the United States. The company has been under scrutiny by American lawmakers for months, notably as part of the most recent proposed National Defense Authorization Act.

**UPDATE 8:03pm ET**: Reuters reports that the Trump administration has removed Kaspersky from the GSA-approved list.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| KASPERSKY LAB, INC.; and | ) | |
| KASPERSKY LABS LIMITED, | ) | |
|  | ) | |
| *Plaintiffs*, | ) | |
|  | ) | |
| *v.* | ) | Civ. No. 17-2697 (CKK) |
|  | ) | |
| U.S. DEPARTMENT OF | ) | |
| HOMELAND SECURITY; and | ) | |
| KIRSTJEN NIELSEN | ) | |
| *Secretary of Homeland Security* | ) | |
|  | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**EXHIBIT 3-M**

# Best Buy stops sale of Russia-based Kaspersky products

reuters.com/article/us-usa-kasperskylab-best-buy/best-buy-stops-sale-of-russia-based-kaspersky-products-idUSKCN1BJ2M4

(Reuters) - Best Buy Co, the No.1 U.S. electronics retailer, is pulling Kaspersky Lab's cyber security products from its shelves and website, amid concerns that the Moscow-based firm may be vulnerable to Russian government influence.

FILE PHOTO: A Best Buy store is pictured in Pasadena, California U.S., February 28, 2017. REUTERS/Mario Anzuoni/File Photo

Best Buy felt there were "too many unanswered questions" and so decided to discontinue selling the antivirus products, said U.S. newspaper StarTribune, which first reported the retailer's decision, citing a source familiar with the matter. (strib.mn/2eLGd5h)

A Best Buy spokeswoman confirmed the report but declined to provide further details.

A U.S. Congressional panel had asked government agencies to share documents on the cyber security firm, saying its products could be used to carry out "nefarious activities against the United States", Reuters reported in July

The U.S. administration had in July removed Kaspersky from its lists of approved vendors used by government agencies to purchase technology equipment.

Kaspersky, which has denied ties with any government, said on Friday the companies had suspended their ties.

Reporting by Manas Mishra in Bengaluru; Editing by Arun Koyyur

Our Standards:The Thomson Reuters Trust Principles.