**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KASPERSKY LAB, INC. | ) |
| | ) |
| and | ) |
| | ) |
| KASPERSKY LABS LIMITED | ) |
| | ) |
|           Plaintiffs, | ) Civ. Act. No. 17-cv-02697-CKK |
| | ) |
|    v. | ) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) |
| | ) |
| and | ) |
| | ) |
| KIRSTJEN NIELSEN, in her official capacity as | ) |
| Secretary of Homeland Security | ) |
| | ) |
|           Defendants. | ) |
| | ) |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' APPLICATION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

I.  Plaintiffs Have Standing to Challenge their Debarment............................... 2

    A.  Plaintiffs Have Challenged the NDAA as an Unconstitutional Bill of Attainder. ......................................................................................... 3

        1.  The NDAA Ban, Not Yet in Effect, Will be Different in Scope Than the BOD.................................................................... 5

        2.  The Loss of Plaintiffs' Legal Right to Sell to the U.S. Government Would be Redressed by a Favorable Decision Rescinding the BOD.... 5

        3.  Plaintiffs' Reputational Injury is Fairly Traceable to the BOD and Likely Would be Redressed by a Favorable Ruling. ............................ 8

    B.  Plaintiffs Had Standing to Challenge the BOD When They Filed Their Complaint. ............................................................................ 10

II.  Defendants Have Failed to Afford Sufficient Due Process........................... 12

    A.  The BOD Decision was Final at the Time of its Issuance................................ 12

    B.  Plaintiffs Suffered Injury Long Before the Final Decision. ............................ 14

    C.  Defendants Seek to Retroactively Demonstrate Due Process where None Existed........................................................................ 16

    D.  Defendants' Administrative Process Fell Short of the Well-Established Requirements in the FAR.................................................... 17

    E.  There is No Basis to Limit Plaintiffs' Procedural Protections........................ 19

III.  Defendants Overstate the Degree of Discretion Under FISMA and the Degree of Deference Under the APA ....................................................... 21

    A.  Binding Operational Directives Issued Under FISMA are Subject to APA Review. .................................................................. 21

    B.  The BOD is Primarily Based on Media Reports. ................................................. 25

CONCLUSION ................................................................................................. 29

Table of Authorities

**Page(s)**

**Cases**

*ACORN v. United States,*
618 F.3d 125 (2d Cir. 2010) .................................................................................. 6

*Advantage Media, L.L.C. v. City of Eden Prairie,*
456 F.3d 793 (8th Cir. 2006) ................................................................................. 3

*American Petroleum Tankers Parent, LLC v. United States,*
963 F. Supp. 2d 59 (D.D.C. 2013) ......................................................................... 4

*Arent v. Shalala,*
70 F.3d 610 (D.C. Cir. 1995) ............................................................................... 24

*Cobell v. Kempthorne,*
455 F.3d 301 (D.C. Cir. 2006) ............................................................................. 22

*Common Cause v. Dept. of Energy,*
702 F.2d 245 (D.C. Cir. 1983) ............................................................................... 7

*Conservation Law Found. v. Pritzker,*
37 F. Supp. 3d 234 (D.D.C. 2014) ....................................................................... 11

*Delta Air Lines v. Export-Import Bank of the U.S.,*
718 F.3d 974 (D.C. Cir. 2013) ............................................................................. 23

*Delta Const. Co. v. EPA,*
783 F.3d. 1291 (D.C. Cir. 2015) ............................................................................ 3

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988) ............................................................................................ 25

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) ............................................................................... 5

*Foretich v. United States,*
351 F.3d 1198 (D.C. Cir. 2003) .......................................................................... 8, 9

*U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.,*
318 F.3d 214 (D.C. Cir. 2003) ............................................................................. 11

*Holy Land Foundation v. Ashcroft,*
333 F. 3d 156 (D.C. Cir. 2003) ....................................................................... 26, 27

*Huntington Branch, NAACP v. Huntington,*
689 F.2d 391 (2d Cir. 1982) .................................................................................. 7

iii

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
   761 F.2d 798 (D.C. Cir. 1985)................................................................................8

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
   561 U.S. 89 (2010) ....................................................................................23

*Larson v. Valente*,
   456 U.S. 228 (1982) ....................................................................................10

*Matthews v. Eldridge*,
   424 U.S. 319 (1976) ....................................................................................20

*McBryde v. Committee to Rev. Cir. Council Conduct*,
   264 F.3d 52 (D.C. Cir. 2001)................................................................................10

*McConnell v. FEC*,
   540 U.S. 93 (2003) ....................................................................................3

*Nat'l Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001)................................................................................16, 21

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
   366 F.3d 930 (D.C. Cir. 2004)................................................................................7

*Paracha v. Obama*,
   194 F. Supp. 3d 7 (D.D.C. 2016)................................................................................3

*People's Mojahedin Organization of Iran v. Dep't of State*,
   613 F.3d 220 (D.C. Cir. 2010)................................................................................21

*People's Mojahedin Organization v. State*,
   182 F. 3d 17 (D.C. Cir. 1999)................................................................................27

*Physician's Education Network, Inc. v. Department of Health, Education & Welfare*,
   653 F.2d 621 (D.C. Cir. 1981)................................................................................5

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
   758 F.3d 296 (D.C. Cir. 2014)................................................................................12

*Renal Physicians Ass'n v. DOH*,
   489 F.3d 1267 (D.C. Cir. 2007)................................................................................6

*Scenic Am., Inc. v. DOT*,
   836 F.3d 42 (D.C. Cir. 2016)................................................................................6

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ....................................................................................2

*St. John's United Church of Christ v. FAA*,
   520 F.3d 460 (D.C. Cir. 2008)................................................................................7

iv

*Tel. & Data Sys., Inc. v. FCC*,
   19 F.3d 42 (D.C. Cir. 1994) ................................................................................................. 4

*Texas v. EPA*,
   726 F.3d 180 (2013) ........................................................................................................... 4

*U.S. Ecology, Inc. v. DOI*,
   231 F.3d 20 (D.C. Cir. 2000) ......................................................................................... 7, 12

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig*.,
   266 F. Supp. 3d 1, (D.D.C. 2017) ..................................................................................... 22

*Watervale Marine Co. v. DHS*,
   55 F. Supp. 3d 124, (D.D.C. 2014) ................................................................................... 22

*White v. United States*,
   601 F.3d 545 (6th Cir. 2010) .............................................................................................. 3

*Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*,
   492 F.3d 471 (D.C. Cir. 2007) ........................................................................................... 4

*Zevallos v. Obama*,
   793 F. 3d 106 (D.C. Cir. 2015) .................................................................................... 26, 27

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 706 et seq ................................................... *passim*

Federal Information Security Modernization Act of 2014, 44 U.S.C. § 3551 et seq.
   (2014) ...................................................................................................................... *passim*

National Defense Authorization Act for Fiscal Year 2018, Public Law No. 115-
   91 ................................................................................................ ...................... *passim*

**Other Authorities**

48 C.F.R. Part 9.406-3(c) ............................................................................................... 18

48 C.F.R. Part 9.406-3(d)(1) ........................................................................................... 18

82 Fed. Reg. 43,782 (Sept. 19, 2017) ............................................................................. 13

Fifth Amendment of the Constitution ........................................................................ *passim*

## INTRODUCTION

Binding Operational Directive 17-01 (the "BOD") bars Plaintiffs from contracting with the federal government, publicly labels them an information security threat, and results in significant reputational and financial harm. DHS effected this debarment through an unprecedented use of its information security standard-setting authority under the Federal Information Security Modernization Act of 2014, 44 U.S.C. § 3551 *et seq.* (2014) ("FISMA"). In so doing, Defendants circumvented well-established debarment processes and violated Plaintiffs' due process rights including the right to pre-deprivation notice and a meaningful opportunity to be heard.

Defendants do not dispute that the BOD deprived Plaintiffs of their liberty interests but nevertheless contend as a threshold matter that the Court is unable to adjudicate these injuries arguing that Sections 1634 (a) and (b) of the National Defense Authorization Act for Fiscal Year 2018, Pub. Law No. 115-91, ("NDAA") preclude standing because it effects an independent debarment of Plaintiffs' products and services. This fails to acknowledge that, presently, the BOD is the only legal bar restricting Plaintiffs' property rights, and that the BOD and the NDAA have significant differences in their scope and effect. Plaintiffs clearly have standing to challenge their own debarment through the APA. This Circuit's case law makes clear that rescission of the BOD need not redress *every* injury suffered by Plaintiffs—only the discrete injury stemming from the BOD. A favorable ruling in Plaintiffs' favor would do just that.

On the merits, Defendants recast the 30-60-90 day implementation phase that followed the BOD as a pre-deprivation period for notice and review. Defendants fail, however, to recognize that the BOD effected the deprivation of Plaintiffs' liberty interests *at the time it was issued*, just as the "process" afforded after this deprivation equally fails to achieve minimum due

1

process protections as set out further below.   Additionally, Defendants' efforts to create a national security exception in order to avoid the requirement for pre-deprivation notice is not justified by the record and has no application here.   Accordingly, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion.

## I.   Plaintiffs Have Standing to Challenge their Debarment.

Defendants devote a large portion of their Opposition in support of their claim that Plaintiffs do not have standing to challenge their administrative debarment effected through the BOD, and that additional harm caused to Plaintiffs through separate Congressional action precludes standing. This argument defies well-established precedent, common sense, and would ultimately lead to the problematic use of legislative bans to shield procedurally deficient executive debarments from judicial review.

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016), *citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). Plaintiffs met the three elements of standing to challenge their own debarment at the time of the Complaint, just as they do today. Defendants do not and cannot reasonably dispute Plaintiffs' injuries-in-fact: Plaintiffs' loss of their legal right to sell to the government, and their reputational harm—either of which establishes standing. Rather, Defendants argue that those injuries are not "fairly traceable to the [BOD]" and are not "likely to be redressed by [rescission of the BOD]." Opp. at 15; *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The enactment of the NDAA simply does not foreclose the redressability of Plaintiffs' injuries.

Defendants argue that Plaintiffs lack standing on the grounds that enactment of Section 1634 of the NDAA has essentially duplicated the effect of the BOD. Defendants' argument relies upon cases holding that where an independent and *unchallenged* action will cause *the same harm*, the injury is not redressable. *See* Opp. at 17-22. Neither predicate exists here.

## A. Plaintiffs Have Challenged the NDAA as an Unconstitutional Bill of Attainder.

Plaintiffs have filed a Complaint in this Court challenging the NDAA as an unconstitutional bill of attainder. *See* Complaint, *Kaspersky Lab, Inc., et al, v. United States*, 18-cv-325 (D.D.C. Feb. 12, 2018). Nevertheless, Defendants maintain that Plaintiffs lack standing because of the NDAA's debarring effect on the Company. Defendants' cited cases are inapposite.[1] The plaintiffs in those cases failed because they challenged only one governing rule, regulation, or label, leaving another unchallenged rule that deprived them of the *same* right. In other words, those were all half-measures; to exercise the right at issue, the petitioner had to invalidate two regulations, but challenged only one; thus, a favorable ruling would leave them in precisely the same position.  Here, Plaintiffs are not asking for a half-measure and, if successful, would not obtain a hollow victory; they are seeking to invalidate both federal actions. Each action has its own discrete (but ultimately overlapping) scope and effect upon the Company.[2]

---

[1]  Plaintiffs' inapplicable authority, which turns on the existence of some *unchallenged* law, rule, or label, includes *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (unchallenged provisions of code bar proposed sign); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (unchallenged state law barred cockfighting); *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015) (unchallenged NHTSA rule caused same harm as EPA regulation);  *Paracha v. Obama*, 194 F. Supp. 3d 7, 10 (D.D.C. 2016) (unchallenged Executive decision caused same harm as statute); *McConnell v. FEC*, 540 U.S. 93 (2003)(unchallenged provision of same statute).  *See* Opp. at 15-16.

[2] Defendants' other cases at Opp. 32-33 and the Preliminary Injunction Response at 16-17 (incorporated by reference in the Opposition) are inapposite because they involve: (1) challenges to the wrong regulations—*see Texas v. EPA*, 726 F.3d 180, 199 (2013) (challenging rules instead

3

Plaintiffs have approached this matter appropriately and are "entitled to tackle one roadblock at a time." *Idaho Bldg.,* 32 F. Supp. 3d at 1153, *quoting Ibrahim v. DHS,* 699 F. 3d 983, 993 (9th Cir. 2012). Indeed, they are going further and tackling two roadblocks in tandem. *Idaho Bldg.* is not a "thinly reasoned outlier" as Defendants argue (*see* Opp. 20) but rather is entirely consistent with established precedent on standing as endorsed by this Court. *See, e.g., American Petroleum Tankers Parent, LLC v. United States,* 963 F. Supp. 2d 59 (D.D.C. 2013). Indeed it defies common sense that, when faced with multiple legal issues, plaintiffs should be foreclosed at the same time from challenging one harm simply because of another not yet realized. Here "plaintiff may not ultimately prevail if the Court vacates the [BOD]…but it cannot prevail unless the Court does so, which is sufficient to satisfy the redressability requirement for constitutional standing." *Tel. & Data Sys., Inc. v. FCC,* 19 F.3d 42, 47 (D.C. Cir. 1994).

Defendants have failed to acknowledge or address the differences between the BOD and NDAA bans and instead repeatedly and erroneously assert that the prohibitions are "identical" (*see* e.g. Opp. at 22 and 27), and that the BOD is subsumed into the NDAA. For the reasons set out below, Plaintiffs demonstrate otherwise. In short, Defendants cannot avoid their constitutional obligations in this case by using the NDAA as a shield, no matter how injurious that separate action may be to Plaintiffs. The harms are meaningfully different and the challenges properly separate.

---

of Act), (2) challenges seeking the wrong relief—*Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 477 (D.C. Cir. 2007) (challenging only agency's decision to switch to new rule when both old and new rule had same result for petitioner), (3) challenges where the harm could not be undone—*Physician's Education Network, Inc. v. Department of Health, Education & Welfare*, 653 F.2d 621, 623 (D.C. Cir. 1981) (harm from Congress relying on report no longer redressable where Congress had already relied on report), and (4) mismatches between object of challenge and claimed injury—*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("claimed injury arises from the Secretary's decision to let its permit expire, not the designation in the notice").

**1.   The NDAA Ban, Not Yet in Effect, Will be Different in Scope Than the BOD.**

One critical difference between the BOD and the NDAA is temporal: the NDAA is not yet legally effective. It has an October 1, 2018, "Effective Date." Today, the BOD is the *only* action that deprives Plaintiffs of their legal ability to sell to the government. Defendants attempt to conflate this by stating that the October 1, 2018, date "is a *deadline*, not a start date." Opp. at 17 (emphasis in original). In reality, the October 1, 2018, date is both a deadline and a start date; it is the effective date.

Defendants cannot have it both ways, arguing that the BOD "is the operative prohibition on agency use of Kaspersky [Lab] products" until October 1, 2018 (Final Information Memorandum at AR0756-AR0757), in order to justify the need for the BOD—while also arguing that the NDAA has complete and immediate effect by independently "making the prospect of doing business with Kaspersky [Lab] during the implementation period a practical (if not legal) impossibility." Opp. at 18.

The NDAA's debarment is also different than the BOD's in scope, in approach, in the manner in which it was introduced, and in the reputational harm which it has caused to Plaintiffs. For the reasons explained below, the wording of the BOD, and the manner in which it was effected, are discrete and particularly damaging to Plaintiffs' reputation, regardless of the subsequent NDAA ban. Plaintiffs continue to consistently highlight those differences, which have been brushed aside by Defendants, who continue to argue that the bans are "identical."

**2.   The Loss of Plaintiffs' Legal Right to Sell to the U.S. Government Would be Redressed by a Favorable Decision Rescinding the BOD.**

The loss of Plaintiffs' legal *right* to sell to the government will be redressed by a favorable decision in this case. Rescission and remand of DHS's determination will undo the

debarment. This relief would remove the currently operative debarment, reinstating Kaspersky Lab's right to sell to the federal government. That is all standing requires.

Defendants attack Plaintiffs' first injury—the deprivation of Plaintiffs' legal right to sell to the government—as unredressable, arguing that the BOD will have no practical effect on Plaintiffs because it is unlikely that Plaintiffs would be able to submit a winning bid for government work. Opp. at 16-18. This misses the point. The injury is the deprivation of Plaintiffs' *right* to apply for a contract with the government. Defendants do not dispute traceability on this basis—*i.e.,* that the BOD caused Plaintiffs' debarment, and hence, caused their loss of the right to sell to the government. That certain government officials may believe Plaintiffs would not be able to submit a successful bid does not diminish the right to submit that bid in the first place. What matters is that rescission of the BOD restores the loss of this legal right. *See generally, e.g.*, *ACORN v. United States*, 618 F.3d 125, 134 (2d Cir. 2010) (holding that ACORN had standing to challenge a federal appropriations law singling out ACORN by name and temporarily cutting off its eligibility to receive federal funds, even though there was no assertion that ACORN would receive federal funds, or would apply to government agencies for funding).

Defendants' cases on redressability of the loss of a legal right are irrelevant here. Defendants' so-called "status quo" cases (*see* Opp. at 18) stand for the notion that "[w]hen the existence of one or more of the essential elements of standing—in this case redressability— depends on the unfettered choices made by *independent actors not before the courts* and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes substantially more difficult to establish standing." *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50 (D.C. Cir. 2016)(emphasis added, internal quotations omitted). For example, in

*Renal Physicians Ass'n v. DOH*, 489 F.3d 1267 (D.C. Cir. 2007) (cited at Opp. 23), plaintiff's claimed injury—loss of income for doctors caused by the challenged regulatory safe-harbor— would not be redressed by invalidation of the challenged regulatory safe-harbor because there was no showing that the relevant third parties (dialysis facilities and hospitals) would actually pay more money to doctors if the safe-harbor were removed.[3] Clearly, this has no applicability here. Plaintiffs are not challenging the BOD in order to compel federal agencies to buy their products again. They are simply seeking to recover the legal *right* to sell to those agencies, which would be restored by the rescission of the BOD.

The cases Defendants cite purporting to instruct the Court on how to assess the redressability element are similarly unhelpful. For example, Defendants cite to *Common Cause v. Dept. of Energy*, 702 F.2d 245 (D.C. Cir. 1983) for the proposition that redressability turns on whether judicial intervention "will produce tangible, meaningful results in the real world"—but that case involved a lawsuit that sought to require the government to develop an energy conservation plan for government buildings, which has no bearing on the debarment in question. In their previous filings (though not in the present briefing) Defendants also cited to *Huntington Branch, NAACP v. Huntington*, 689 F.2d 391, 394 (2d Cir. 1982) (cited at Preliminary Injunction Resp. 5-6). While Defendants appear to have abandoned this case, it remains important because of the Second Circuit's holding that plaintiffs *had* standing because a contrary holding would otherwise lead to a problematic result: "[D]ismissal of a complaint because of a lack of committed financing may well prevent any litigant from challenging a zoning ordinance." Like the zoning ordinance in *Huntington*, the injuries stemming from the actions at issue may not be

---

[3] *See also, Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) (applying same rule) and *St. John's United Church of Christ v. FAA*, 520 F.3d 460 (D.C. Cir. 2008)(same); *U.S. Ecology, Inc. v. DOI*, 231 F.3d 20 (D.C. Cir. 2000)(same).

perfectly cured in the minds of all government officials who may yet be reluctant to buy Plaintiffs' products, but that does not mean that Plaintiffs lack standing to challenge those official acts.[4]

### 3. Plaintiffs' Reputational Injury is Fairly Traceable to the BOD and Likely Would be Redressed by a Favorable Ruling.

Defendants also attack the traceability and redressability of Plaintiffs' reputational injury, arguing that (1) Kaspersky Lab's reputational injury is not fairly traceable to the BOD because of other factors harming the Company's reputation (Opp. at 24), and that (2) "overturning the BOD would not redress Kaspersky [Lab's] asserted reputational harm." *Id.* at 23. However, *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003)—the seminal D.C. Circuit case concerning the traceability and redressability of reputational injuries by government action—unequivocally rejects these arguments.

In *Foretich*, the D.C. Circuit rejected the same traceability argument Defendants now advance here: "[Even if] damage to Dr. Foretich's reputation comes in part from the publicity surrounding the custody dispute and [his ex-wife's] allegations, not solely from the [Elizabeth Morgan Act]…this misses the point. The Act itself has caused significant harm to Dr. Foretich." *Id.* at 1216. Defendants mischaracterize *Foretich* as a case which "rested on a straightforward causal relationship between the government action and the asserted reputational harm." *See* Opp. at 27. But in *Foretich,* as here, there were several causes of injury to Dr. Foretich's reputation and nevertheless the Court rejected the same redressability arguments advanced by Defendants here, explaining: "[B]y vindicating Dr. Foretich's assertion that Congress unfairly and

---

[4] Defendants also cite *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985), which involved a union's challenge to an immigration policy that allowed foreign workers to come to the United States. There, the court denied relief to such "an abstract 'injury,'" disallowing the action "just because one disagrees with it, or even finds it odious, distasteful and offensive."

unlawfully rendered a judgment as to his character and fitness as a father, declaratory relief will provide a significant measure of redress sufficient to satisfy the requirements of Article III standing." *Id*. The D.C. Circuit rejected the notion that Dr. Foretich had to "parse out" the Act's harm from other negative attention—yet this is precisely what Defendants argue Kaspersky Lab must do here. *See* Opp. at 26.

Plaintiffs have demonstrated very real and direct reputational harm stemming from the BOD, indeed Plaintiffs have submitted evidence of customers (both retail and commercial) specifically citing the BOD (rather than any other source) as the reason they decided not to make a purchase of—or decided to return—Plaintiffs' products. *See* Fayhee Decl., Ex. E; Gentile Decl. ¶¶ 19-24, 32-36, 42.

Defendants also conflate their arguments relating to the separate NDAA ban by arguing that "had the *Foretich* court faced those problems, it almost certainly would have reached a different outcome" on the question of standing based on reputational injury. *Id*. at 27. This is purely hypothetical and without basis. *Foretich* clearly supports Plaintiffs' standing based on real and traceable (though not exclusive) reputational injury caused by the BOD.

The court in *Foretich* also rejected another of Defendants' arguments advanced here: that Plaintiffs cannot establish redressability unless they show that their lost (commercial and retail) customers would re-engage with their products upon rescission of the BOD. *See* Opp. at 24. Specifically, in *Foretich*, the D.C. Circuit observed that Dr. Foretich was "[o]nce a prominent oral surgeon," that "[his] business suffered a 30% decline following adoption of the Act," that he was "[f]orced to seek employment outside of northern Virginia, denied a position at a North Carolina university in part because of the Act," and that he was "asked to resign his position as Regent of the American College of Oral and Maxillofacial Surgeons." *Foretich,* 351 F.3d at

1209. The D.C. Circuit did not, however, require Dr. Foretich to show that patients who had left his practice would return to him upon invalidation of the Act, or that other identified injuries would be redressed. Yet that is what Defendants claim Kaspersky Lab must demonstrate for the Court to resolve this case.

Plaintiffs need to demonstrate only that rescission likely would redress the discrete harm stemming from the BOD's labelling of Plaintiffs' products as "information security risks" to federal government information systems. Indeed, as the Supreme Court has stated, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will redress his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original).

Finally, Defendants' citation to *McBryde v. Committee to Rev. Cir. Council Conduct*, 264 F.3d 52 (D.C. Cir. 2001)(*see* Opp. at 24) in support of its redressability argument is equally unhelpful. In *McBryde*, the court held that a censured district judge had standing based on reputational injury to challenge his public reprimand, but lacked standing to challenge his record of suspensions, which had expired and become moot. *See id.* at 55-58. Here, the BOD is not moot, and is the type of reputational injury the *McBryde* court found *was* capable of judicial redress.

### B.  Plaintiffs Had Standing to Challenge the BOD When They Filed Their Complaint.

Defendants argue that, notwithstanding the challenge to the NDAA filed in February of this year, Plaintiffs lacked standing to challenge the BOD at the time the Complaint was filed in December 2017 because, although it had not yet taken effect, the NDAA had been enacted by that time.

Plaintiffs filed their Complaint in this case shortly after the NDAA's enactment, also having, in good faith, exhausted Defendants' proscribed process to challenge the BOD. During the course of these efforts, the U.S. Congress took additional detrimental action against the Company through the NDAA. That subsequent action, which Plaintiffs are also challenging in a timely fashion, should not be determinative of Plaintiffs' standing to challenge their earlier debarment via the BOD.

As discussed above, the NDAA is not a legally effective ban on Plaintiffs' products and services today, nor was it at the time that the Complaint was filed. Defendants fail to cite to a single case that holds parties must mount pre-enforcement challenges to any statutes that may in the future affect their rights in order to maintain standing.[5]  The BOD causes (and had caused at the time that the Compliant was filed) significant reputational harm that is discrete from the NDAA and fairly traceable to the BOD.

Defendants also argue, in the alternative, that proceeding by way of two separate claims precludes standing in either and that in order to challenge the BOD and the NDAA, Plaintiffs must have challenged them in the same action. Opp. at 21.  This argument is also without merit. For the reasons set out above, Plaintiffs had standing to challenge the BOD under the APA *at the time that the Complaint was filed*.  Plaintiffs' standing does not rest on their also having challenged the NDAA. The fact that Plaintiffs also subsequently challenged the NDAA which

---

[5] The few cases cited by the government are irrelevant.  *U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 216 (D.C. Cir. 2003) has nothing to do with standing at the time of suit; it deals with the wholly unrelated question of appeal rights and whether "a judgment entirely disposing of any one of [multiple consolidated] cases might be considered final and appealable." And, *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 234, 243-44 (D.D.C. 2014) concerned only whether any harm had occurred in the first place and, in any event, rejected a similar form-over-function standing argument.

also harms them, does not preclude that standing, nor does it concede it. Plaintiffs could have brought either of these cases without bringing the other. They chose to bring both.[6]

## II.   Defendants Have Failed to Afford Sufficient Due Process.

Defendants have failed to achieve the minimum due process protections necessary to sustain the BOD's debarment.  Due process requires pre-deprivation notice and a meaningful opportunity to be heard. *See Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). Defendants now argue that the BOD was *itself* notice and the 30-60-90 day period that followed constituted a meaningful review, during which Plaintiffs were heard, prior to the final decision issued in December 2017. Opp. at 28. Defendants argue that Plaintiffs are asking for "pre-pre" deprivation notice. Opp. at 13.  They are not.  Rather, Plaintiffs simply are relying upon well-established constitutional protections afforded to those subject to debarment from federal contracting. Defendants circumvented these protections through the use of FISMA in an unprecedented and unanticipated manner. Defendants' arguments ignore the injuries Plaintiffs suffered immediately upon issuance of the BOD. They also seek to place debarment via FISMA beyond judicial review and in so doing, over-rely on the national security context to limit their constitutional due process obligations to Plaintiffs.

### A.   The BOD Decision was Final at the Time of its Issuance.

As explained at length in Plaintiffs' Memorandum of Law in Support of Summary Judgment, the BOD was fully final and injurious at the time that it was issued. *See* Doc. No. 19 at 2, 11-16, 18, 26. No notice or opportunity to be heard was afforded by Defendants prior to that time, as was required. *See id.* at 6-10, 30-32.

---

[6] Defendant's reliance on *US Ecology, Inc. v.U.S. Dep't of Interior*, 231 F.3d 20, 25-26 (D.C. Cir. 2000) is also misplaced.  That case turned on the fact that none of the possible remedies in the parallel case would have cured the standing issue.

Defendants now seek to retroactively argue that the BOD *itself* was a pre-deprivation notice and that no decision was made or injury caused to Plaintiffs prior to the Final Decision in December 2017. Opp. at 28. This argument has no support in the administrative record and mischaracterizes the approach taken by Defendants throughout this post-BOD process. The 30-60-90 day structure was always an implementation phase and never an administrative review period. DHS's own press release accompanying issuance of the BOD makes clear the simple chain of events.  Specifically, (1) DHS determined that Kaspersky Lab products present an "information security risk," and (2) DHS then unconditionally "directs" agencies to take action:

> <u>After careful consideration of available information and consultation with interagency partners</u>, Acting Secretary of Homeland Security Elaine Duke today issued a Binding Operational Directive (BOD) <u>directing Federal Executive Branch departments and agencies to take actions</u> related to the use or presence of information security products, solutions, and services supplied directly or indirectly by AO Kaspersky Lab or related entities.

*See*  www.dhs.gov/news/2017/09/13/dhs-statement-issuance-binding-operational-directive-17-01 (emphasis added). At the conclusion of the press release, DHS stated that it intended to give Kaspersky Lab an "opportunity" to respond—but this conclusory assertion in no way suggests that the directed action is somehow contingent or provisional based upon the Company' response:

> DHS is providing an opportunity for Kaspersky [Lab] to submit a written response addressing the Department's concerns or to mitigate those concerns. The Department wants to ensure that the company has a full opportunity to inform the Acting Secretary of any evidence, materials, or data that may be relevant.

*Id*. That the BOD included a proviso related to the 90-day removal date—"unless directed otherwise by DHS based on new information"—is of no moment. DHS was free to change direction with or without this proviso. And, it is telling that this did nothing to inhibit agencies from removing the software ahead of the 90-day mark. Procedural due process would be

meaningless if an agency could transform *direction* into *notice <u>and</u> pre-deprivation process* by the mere inclusion of the superfluous language: "unless directed otherwise."

In describing the BOD in their Opposition, Defendants betray their true intent: "DHS, on September 13, 2017, Issued BOD 17-01…Acting Secretary Elaine Duke issued the directive *after determining* that the presence of Kaspersky [Lab] products on federal information systems presents a 'known or reasonably suspected threat, vulnerability or risk' to federal information and information systems." Opp. at 10 (emphasis added).  Accordingly, it is clear that the relevant determinations for the purpose of this APA action had been made prior to, or immediately upon, the issuance of the BOD on September 13, 2017, without any notice to Plaintiffs or a meaningful opportunity to be heard.

In its continued series of contradictions, and just three pages later in their Opposition, Defendants argue the same decision was in fact made in December and then only "[a]fter closely reviewing the company's submission." Opp. at 13.  In so doing, Defendants again conflate the BOD as pre-deprivation "notice" and the 30-60-90 day structure as a pre-deprivation consultation period.  It was neither.  Rather, the BOD set in motion a process for the identification and removal of Plaintiffs' products from federal information systems with no genuine prospect of reversal.

**B.   Plaintiffs Suffered Injury Long Before the Final Decision.**

In issuing the BOD, Defendants announced publicly and indicated to all federal agencies that they had *determined* Kaspersky Lab products to be a "known or reasonably suspected threat, vulnerability or risk" to federal information systems.  The injury was immediate.  This is clearly evidenced by the actions taken by a number of agencies to remove Plaintiffs' software prior to the 90-day mark. *See* Memorandum of Law in Support of Summary Judgment at 11.  It makes

little difference that Defendants did not expressly direct any agency to do so, the reputational injury caused prior to the 90-day mark is self evident, and would not have occurred but for the manner in which the BOD was issued.

Indeed, Defendants make precisely this argument with respect to the effective date of the NDAA and its implementation, arguing that prior to its effective date, the impending ban makes the "prospect of doing business with Kaspersky during the implementation period a practical (if not legal) impossibility […] The NDAA ban embodies a legislative judgment that the security risk posed by Kaspersky [Lab] software on federal networks is intolerably high." Opp. at 18. Defendants cannot simultaneously argue that the BOD caused Plaintiffs no injury prior to the "Final Decision" as DHS' judgment as to Plaintiffs' products was equally clear and final at the time the BOD was issued.

Ample opportunity was available for Defendants to provide Plaintiffs notice and a meaningful opportunity to be heard prior to issuance of the BOD.  Defendants failed to engage with Plaintiffs prior to the issuance of the BOD even though Plaintiffs voluntarily and proactively offered to share information about the operation of Kaspersky Lab products two months earlier (*see* AR 749-50 [Ex. A]).  Rather, Defendants claim that "[i]n the weeks and months before the BOD, the Department engaged in extensive consultations with its cybersecurity experts and interagency partners and reviewed information from a variety of sources […]." Opp. at 11.  However, Defendants failed to consult or engage with the one source with which they were constitutionally obliged to: Plaintiffs.

If, as they now argue, the period between the issuance of the BOD and the Final Decision represented a "fact finding" or "information-gathering" stage, and a pre-deprivation opportunity for Plaintiffs to be heard (Opp. at 29), Defendants could have designed a process which fulfilled

that objective.  For example, DHS might have directed agencies to identify whether they were using Plaintiffs' products (singularly or in combination with other anti-virus software).  At the same time, Defendants could have given Plaintiffs proper pre-deprivation notice, the administrative record, and an opportunity to be heard, before instituting the debarment. Such a notice would have come closer to the type of pre-deprivation notice considered sufficient before imposing, for example, the designation of a party as a foreign terrorist organization in *Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192, 207 (D.C. Cir. 2001).

In that case, the D.C. Circuit found it was "not immediately apparent" how providing notice would work any harm to the government's interest in "national security." *Id.* at 207, 208. As set out in greater detail below, nothing in the record suggests an "extraordinary situation," or that "it would be impractical to provide pre-deprivation process," or that this is one of those "limited cases demanding prompt action." *Id.*  Based on the record before the Court, pre-deprivation process would have in no way inhibited the government's interest in national security.

During the course of such a process, DHS could have made an informed decision regarding the information security risks (if any) presented by Plaintiffs' (and others') software and notified agencies of how those risks could be properly and consistently mitigated.

The record is clear: Defendants proceeded otherwise.

### C.  Defendants Seek to Retroactively Demonstrate Due Process where None Existed.

Defendants incorrectly claim that the BOD Information was provided "at the beginning of the administrative process" (Opp. at 36), implying a level of forethought and planning on behalf of Defendants where none actually existed. Defendants failed to provide the BOD Information to Plaintiffs until September 29, 2017 (two weeks after the BOD had been issued,

and Plaintiffs were notified), and then only following request of Plaintiffs' counsel. *See* Doc.10-3, Decl. of Ryan Fayhee at ¶ 8.

Defendants also now argue that their engagement with Plaintiffs amounts to "a fully interactive process." Opp. at 13. The record demonstrates otherwise. Despite repeated requests by Plaintiffs' counsel for immediate engagement (*See* Email Correspondence between Ryan Fayhee and Daniel Sutherland, Fayhee Decl. at Ex I) plaintiffs were only afforded a meeting with DHS following its formal submission. The meeting occurred on November 29, 2017, over two months after the BOD was issued.  The meeting was clearly not planned or anticipated to be part of any due process at the time of the BOD and was intended only to give the appearance of an adequate process. The meeting was perfunctory and not indicative of meaningful consideration or due process, as shown by the issuance of the Final Decision only a week later, on December 6, 2017.

Right up to, and including in the Final Decision and its Information, Defendants continued to introduce new materials and arguments into the administrative record (including but not limited to the "Maggs Report").  Defendants now list the Maggs Report and the supplemental National Cybersecurity and Communications Integration Center ("NCCIC") report included with the Final Decision in its list of documents forming part of the administrative record, to which they argue Plaintiffs had opportunity to respond, as if those documents had been available to Plaintiffs from the beginning. Doc. No. 20-3.

### D.  Defendants' Administrative Process Fell Short of the Well-Established Requirements in the FAR.

Defendants argue that "the process afforded to Kaspersky [Lab] not only meets [the FAR requirements], but even exceeds it in important ways" (Opp. at 29) and that "any differences

between the two procedures are not of constitutional dimension." Opp. at 31. Defendants'
comparison to the FAR process is flawed.

Pursuant to the FAR, debarring officials must provide formal notice of proposed
suspension and/or debarment, including: (1) the reasons for the proposed debarment in terms
sufficient to put the contractor on notice of the alleged conduct upon which the action is based,
(2) notice of the opportunity to submit information and arguments in opposition to the proposed
debarment within 30 days of receipt of the notice, (3) procedures that will govern the agency's
decision-making process, and (4) the effects of proposed and actual debarment. *See* 48 C.F.R.
Part 9.406-3(c).  Critically, the debarring official's decision may be made only *after* receipt of
information and argument from the contractor. *See* 48 C.F.R. Part 9.406-3(d)(1).

In defense of their process, Defendants first claim that Plaintiffs were afforded "52 days –
more than three weeks longer than the 30 days required under the FAR" to respond to the BOD.
Opp. at 30. Defendants nowhere in their comparison consider, however, that the length of time
(here an additional 22 days) to craft a response is immaterial given that the FAR process is to
conclude *before* any debarment can take effect.  Contrary to Defendants' conclusory analysis,
this difference is absolutely of a "constitutional dimension."  It is at the core of a constitutionally
sound process.

Second, Defendants argue that "debarment procedures afford less pre-deprivation process
[than the BOD], because a 'proposed debarment' results in a contractor's immediate exclusion
from federal business pending a final decision from the debarment officer." Opp. at 30. In
contrast, the BOD debarment was effective and immediate at the time that the BOD was issued
in September. The BOD debarment also goes further than a FAR debarment in requiring the
unwinding of prior engagements through the removal of existing instances of Plaintiffs' software

on federal systems in addition to the prospective debarment that would have been contemplated by the FAR.

The national security-related context alone does not sufficiently insulate Defendants from the need to provide adequate due process as Defendants suggest. *See* Opp. at 32.

Although there may be "cases where an alleged debarment implicates national security concerns [and] the procedural protections ordinarily afforded to contractors may be significantly diminished," this is no such case.   The government's reliance on a single case in order to establish a national security exception to the due process clause is unhelpful here. *See* Opp. at 32 *citing MG Altus Apache Co. v. United States*, 111 Fed. Cl. 425 (Ct. Fed. Cl. 2013) (examining due process requirements in "the environment of a warzone when the required notice would *necessarily disclose classified material* and could compromise national security.")(emphasis added).   This case is of no moment because providing notice would not "require disclosure of classified information..." DHS's decision is based on the unclassified record alone.  Opp. at 11. The Court cannot consider evidence (classified or otherwise) that is not part of the record upon which the agency decision was made.

### E.   There is No Basis to Limit Plaintiffs' Procedural Protections.

In response to Plaintiff' detailed analysis under *Matthews v. Eldridge*, 424 U.S. 319 (1976)), *see* Memorandum of Law in Support of Summary Judgment at 29-37, Defendants argue that "the government's interest in responding quickly and nimbly to imminent, potentially catastrophic cyber threats is entitled to significant weight" such that "the process that Kaspersky received was more than sufficient to satisfy the constitution." Opp. at 32. However, nothing in the administrative record or in Defendants' Opposition indicates urgency  of a degree that would outweigh the Plaintiff's right to pre-deprivation notice. To the contrary, Defendants (at Opp. 8 n.

1) cite to a 2012 *Wired* magazine article which contains many of the same arguments upon which Defendants seek to rely in support of the BOD over five years later.

The only significant recent development was intense political scrutiny and public pressure following Russia's apparent interference in the 2016 presidential election (and a wide range of other unrelated foreign policy and national security concerns involving Russia), in which there is no allegation Plaintiffs had any involvement. *See* Opp. at 15. This political pressure culminated in the issuance of the BOD and the enactment of the NDAA, both of which bowed, unconstitutionally, to that pressure in singling out and punishing Plaintiffs and depriving them of their due process rights. Defendants now conflate the fact that DHS acted quickly against Plaintiffs in that context with the necessity and justification for them to do so. *See* Opp. at 34.  None of the factors referred to by Defendants suggest that Plaintiffs' products represented any greater threat to national security at the end of 2017 than they had at any time in the past.

This Circuit has found consistently that due process, including pre-deprivation notice and a meaningful opportunity to be heard, must be provided, including in cases involving sensitive administrative decisions in the national security context.[7]  What is more, even on Defendants' own operational timeline, ample opportunities existed to provide Plaintiffs notice and a meaningful opportunity to be heard prior to the BOD being issued. Through the summer of 2017 and well before the BOD was issued in September, Plaintiffs stood ready, willing and able to engage with Defendants on any issues of concern, having proactively written to them in July 2017 (*see* AR 749-50 [Ex. A]) to do just that in response to the same media reports that came to form the basis for the BOD.

---

[7] *See, e.g.*, *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C. Cir. 2001) and *People's Mojahedin Organization of Iran v. Dep't of State*, 613 F.3d 220, 228 (D.C. Cir. 2010) discussed at Memorandum of Law in Support of Summary Judgment at 31 - 35.

Tellingly, in their Opposition, Defendants fail to address why Plaintiffs' proactive outreach to Defendants prior to the issuance of the BOD was rebuffed (see AR 940 [Ex. B]) (suggesting that no administrative action was pending), or why notice and due process could not have been provided at that time, before the BOD was issued.

### III. Defendants Overstate the Degree of Discretion Under FISMA and the Degree of Deference Under the APA

In the alternative, and assuming a deficient process, Defendants argue either that the relevant provision of FISMA renders the BOD unreviewable under the APA (claiming FISMA affords absolute discretion to DHS in issuing binding operational directives) and/or that enhanced deference ought to be granted to the Defendants in light of the national security context, urgency, and "highly technical" nature of the BOD's subject matter. Opp. at 36, 38, 40. Defendants' arguments again fall short as set out below.

### A. Binding Operational Directives Issued Under FISMA are Subject to APA Review.

Defendants argue that "numerous plaintiffs have brought APA challenges seeking to enjoin agency decisions under [FISMA]," yet "[n]ot one of these suits has prevailed, and every court to consider the issue has agreed that decisions under FISMA are committed to agency discretion and thus outside the scope of APA review." Opp. at 4. Defendants cite only three FISMA cases in support, each involving class actions seeking monetary damages, but none remotely instructive here. *See* Opp. at 38-40.[8] Defendants have not referenced a single case in

---

[8] *See* Opp. at 38-40 (*citing Welborn v. IRS*, 218 F. Supp. 3d 64 (D.D.C. 2016)(victims of cyber breaches at federal agency suing agency, alleging its failure to comply with FISMA); *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 43-44 (D.D.C. 2017)(same); and *Cobell v. Kempthorne,* 455 F.3d 301, 303 (D.C. Cir. 2006)(class action, brought prior to 2014 amendment of FISMA, by beneficiaries of American Indian money trust accounts, based on "[Department of] Interior's problems maintaining adequate computer security"). As

which a FISMA binding operational directive has been challenged under the APA, and for good reason: this is the first such challenge.

This is not a case where Plaintiffs "attempt to use the APA to police a federal agency's actions" under FISMA. Opp. at 4.   Rather, Defendants have used FISMA to effectuate an immediate debarment.  They cannot escape the availability of the APA to challenge debarment decisions, particularly where debarment is effected in a more draconian fashion through the novel use of a statute neither designed, nor intended for this purpose.  FISMA was established, and in fact specifically amended, so that DHS could establish uniform security standards through binding operational directives and to otherwise protect federal information systems[9], not as an implicit repeal of the well-established debarment processes delegated to the executive branch under the FAR.[10]

---

Defendants' lead case makes clear, these "stand[] in stark contrast and are wholly inapplicable" to the reviewability issue at hand. *See Watervale Marine Co. v. DHS*, 55 F. Supp. 3d 124, 135, 140 (D.D.C. 2014)(internal quotation omitted)("All other courts that have addressed this statutory provision have done so under markedly different circumstances").

[9] Indeed this is exactly how DHS has used its BOD authority under FISMA in the past. Prior to the BOD at issue here, DHS issued four public cybersecurity BODs.  Each of these BODs required federal agencies to mitigate critical vulnerabilities on their internet-facing systems identified by NCCIC (BOD 15-01: Critical Vulnerability Mitigation), impose technical measures designed to secure high value assets containing sensitive information or supporting critical government services (BOD 16-01: Securing High Value Assets), mitigate threats to network infrastructure devices by implementing a series of upgrades, configuration changes, inspections (BOD 16-02: Threat to Network Infrastructure Devices), and comply with a series of cybersecurity reporting requirements (BOD 16-03: 2016 Agency Cybersecurity Reporting Requirements).  BOD 17-01 is the first known BOD issued pursuant to FISMA in which the DHS banned a specific company by name, or labeled all products of a specific company an information security threat.  DHS also issued one public BOD since BOD 17-01, which was consistent with the first four BODs and required federal agencies to make a series of configuration changes to enhance email and web security (BOD 18-01: Enhance Email and Web Security).

[10] *Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 108 (2010) (statutes should be construed to be consistent with one another where the text permits).

Defendants also contend that "Kaspersky [Lab] does not meaningfully engage with the framework for considering whether an action is committed to agency discretion." Opp. at 40. This is not the case.  Plaintiffs set out at length in their Memorandum of Law in Support of Summary Judgment at 39-41 the reasons why FISMA, and in particular the provision providing for the issuance of a BOD, is not part of the very narrow category of administrative action that is intended by Congress to be entitled to absolute agency discretion under law.  In sum, the APA embodies the basic presumption of judicial review of a legal wrong because of agency action and adversely affected or aggrieved by agency action within the meaning of a relevant statute. *See generally*, *Delta Air Lines v. Export-Import Bank of the U.S.*, 718 F.3d 974, 976 (D.C. Cir. 2013)(internal quotations omitted).  This is exactly where Plaintiffs find themselves.

In an attempt to place the BOD beyond administrative review, Defendants apply a three-part test, inviting the court to evaluate: (1) "the nature of the administrative action at issue"; (2) the "language and structure of the statute that supplies the applicable legal standards for reviewing that action," and (3) "Congress' intent to commit the matter fully to agency discretion as evidenced by…the statutory scheme." *See* Opp. at 36 (*citing Watervale,* 55 F. Supp. 3d at 137-38 (internal quotations omitted)).

Under the first factor, the BOD clearly is not one of the "categories of administrative decisions that the Supreme Court and the D.C. Circuit consider presumptively unreviewable"—as in "[f]or example, an agency's refusal to take enforcement action." *Id.* at 138 (internal quotation omitted). Rather, as DHS makes clear in both its Information and Decision Memoranda, the BOD has effectuated a retroactive and prospective debarment. *See* Information Memo for Acting Secretary, Sept. 1, 2017, at AR0005-AR0006 and Acting Secretary Decision Memo, Sept. 13, 2017, at AR0631, sections entitled "**DEBARMENT.**" Debarments are a class

of administrative actions routinely subject to judicial review.  Accordingly, the novel means of this debarment cannot defeat the general presumption of reviewability.

Under the second factor, Congress need only "provide[] a meaningful—not a rigorous, but neither a meaningless—standard against which to judge the exercise of agency discretion." *Arent v. Shalala*, 70 F.3d 610, 614 (D.C. Cir. 1995). Clearly, FISMA provides meaningful standards that qualify DHS' discretion in issuing BODs, and has not "vested [DHS with] complete discretion," as Defendants claim. *See* Opp. at 37.  Nor is it determinative, as Defendants suggest, that there is no statutory construction of what constitutes a "known or reasonably suspected information security threat, vulnerability, or risk."  It is within the court's purview to interpret these qualifications based on their plain meaning or comparative legal concepts.

Applying the third factor—Congress' intent as evidenced by the statutory scheme—as discussed *supra*, Defendants simply cite to inapplicable FISMA-related class actions that are of no moment here.  Defendants seem to acknowledge these cases' inapplicability to DHS' authority under FISMA to issue BOD's, *see* Opp. at 39, but then inaccurately conclude that "the Secretary's authority to issue BOD's is at least as broad and discretionary as the authorities that these courts found to be committed to agency discretion." *Id*.  Defendants fail, however, to offer any support in favor of their broad contention and implication that Congress intended to allow DHS to effectuate a debarment beyond the reach of judicial review.

Plaintiffs' debarment through the BOD is clearly the type of administrative action subject to judicial review.  FISMA presents a standard by which the administrative decision can be tested and there is no indication that Congress intended FISMA to be used in the present manner,

24

much less that doing so would allow for the circumvention of well-established constitutional protections around the debarment process.

Finally, and again here, the national security context is not dispositive. *See* Opp. at 32, *citing Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988).  In fact, the case Defendants cite for this proposition confirms that courts must review an agency's decision where Congress provided standards governing the agency's conduct. *Egan*, 484 U.S. at 530.  Specifically, *Egan* held that courts traditionally have been reluctant to intrude upon the authority of the executive in military and national security affairs *unless Congress specifically has provided otherwise*. *Id.*  Since there was no *right* to the security clearance in *Egan*, Congress prescribed no particular standards governing their issuance, thereby allowing the executive to retain subjective and discretionary authority over the award of security clearances.   In this instance, however, Congress has provided a meaningful standard by which the exercise of DHS' BOD authority is measured under FISMA.  Thus, Plaintiffs' right to the sell to the government is afforded greater protection and is accordingly reviewable under the APA.

### B.   The BOD is Primarily Based on Media Reports.

Defendants also argue that this is a circumstance in which enhanced deference is due to their administrative decision-making process as a consequence of the "expert-driven and highly technical" nature of the BOD and its subject matter. Opp. at 40.  In reality, the BOD is neither highly technical nor expert-driven; the underlying administrative record consists almost entirely of unsubstantiated media reports and allegations against the Company, all of which the Court is well within its capability to review for their evidentiary value.  The "highly detailed" memoranda (Opp. at 3) accompanying the BOD and the Final Decision, upon which Defendants rely as the

basis for their decision, are in reality only compilations of those publications, and the "hundreds of pages of source exhibits" (*Id*. at 12) largely consist of copies of the articles themselves.

This approach is perpetuated in the Opposition, extending the page count of the Administrative Record, but lending nothing to the underlying substance (or rather lack thereof). Defendants continue to cite media articles in purported support for their Opposition (Opp. FN 1), as if they were determinative of fact, and as a substitute for genuine or meaningful agency fact-finding. What is more, Defendant's entire "Factual Background" section of their Opposition is taken from the unsubstantiated allegations made in the Administrative Record, based on media articles and are presented, without attribution, as uncontroverted facts. They are as inaccurate and speculative as they are self-serving. Since the substance of those allegations are not determinative of this Motion, and since Plaintiffs have already responded to these substantive issues in detail in the Kaspersky Lab Submission, AR 0647-0750, Plaintiffs do not intend to address or refute them here, save to note their continued objections on the same basis.

Defendants claim their reliance on media reports is appropriate by citing cases where the articles are verifiable and "part of the unclassified record" (as in *Zevallos*) or as part of "a broad range of evidence" that was the product of a meaningful investigation (as in *Holy Land Foundation*). However, as explained in the Memorandum of Law in Support of Summary Judgment at 42-43, in neither of these cases did the record reflect such a heavy reliance on the media as a substitute for an independent factual basis.

The D.C. Circuit's express rationale for permitting reliance on news articles is inapplicable here: (i) there is no need to protect confidential information, because the BOD is not "based in part on classified information;" (ii) there are no "logistical or political difficulties obtaining judicial or law enforcement records from other countries;" (iii) there are no

"diplomatic concerns…limiting what [the agency] can say publicly"—to the contrary, DHS has been frank about its views; and (iv) there is no suggestion in this case that "the safety of investigators or informants might be put at hazard." *See Zevallos v. Obama*, 793 F. 3d 106, 113 (D.C. Cir. 2015).

Moreover, in the cases allowing for such reliance, the media articles were used only to establish discrete facts—not ultimate legal conclusions, as here. *See, e.g., id.* at 112 (reliance on newspaper articles that a designated drug kingpin controlled overseas assets). *See also, People's Mojahedin Organization v. State*, 182 F. 3d 17, 24-25 (D.C. Cir. 1999)("[T]he Secretary had before her information that each of the organizations engaged in bombing and killing in order to further their political agendas. Any one of the incidents…would have sufficed under the statute."). And, in *Holy Land Foundation v. Ashcroft*, 333 F. 3d 156, 162 (D.C. Cir. 2003), the D.C. Circuit made clear that, while the terrorist designation could be based on "a broad range of evidence, including intelligence data and hearsay declarations"—Treasury's decision "was based on ample evidence in a *massive* administrative record"—including "testimony of numerous FBI sources and findings by both Israeli and Palestinian governmental authorities." (emphasis added).

In contrast, as stated in Plaintiffs' Memorandum of Law in Support of Summary Judgment, many sections of the BOD Information and key DHS findings in support of the BOD's three elements[11] (and particularly the second and most critical of those three elements, the alleged ties between certain Kaspersky officials and Russian intelligence) are supported exclusively by uncorroborated media reports.

---

[11] The three elements are: (1) the broad access to files and elevated privileges provided by antivirus products and services, including Kaspersky products, that can be exploited by malicious cyber actors to compromise information systems; (2) ties between certain Kaspersky officials and Russian intelligence and other government agencies; and (3) Russian legal provisions that allow Russian intelligence agencies to request or compel assistance from Kaspersky and to intercept communications transiting Russian networks. *See* AR 0018-0019.

Defendants also contend that to escape the BOD, Plaintiffs bear the burden of proving their own innocence by "rebut[ting] or disprov[ing]" these media reports. Opp. at 43. In responding to the BOD (AR 0647-0750), Plaintiffs did address the allegations levied against the Company and highlighted the deficiencies in the evidence presented through these media reports. Plaintiffs had no burden to do so.  To survive the "arbitrary and capricious" standard, the *defendant* is required to demonstrate that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Am. Coll. of Emergency Physicians*, 264 F. Supp. 3d at 93-94, *quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants have failed to do so.

Defendants claim that the "BOD was issued only after extensive investigation and consultation with cyber security experts inside and outside of the [DHS]." Opp. at 1. But nowhere in the administrative record is there any indication of these consultations. The only support cited are two internal reports authored by the NCCIC.  NCCIC falls under DHS' jurisdiction; it can hardly be considered an independent assessment or the product of an interagency review.

Plaintiffs explained the flaws with the NCCIC reports in their Memorandum of Law in Support of Summary Judgment at 43. Defendants' reports speak principally in generalities regarding the functionality of anti-virus software and the threat Russia and its government pose to U.S. cyber security.  Defendants perpetuate these generalities in their Opposition at 43-45 and they are insufficient for the administrative record here to survive APA review.

Once again in their Opposition, Defendants allude to classified information reviewed (but purportedly not relied upon) by the Acting Secretary, Opp. at 11-12, implying that the existence

28

of such a record, regardless of its content, lends weight to their arguments on national security grounds. They also attempt to equate the due process and administrative record requirements owed to Plaintiffs to those afforded in cases "involving national security decisions that are based in part on classified information." Opp. at 28. At the same time, Defendants also reiterate their claim, as they have done throughout this process, that "DHS believes that the BOD can be sustained on the basis of the unclassified portions of the administrative record." Opp. at FN 12. An APA challenge examines only what the agency actually considered and relied upon in making its decision.  If Defendants in fact did not rely on the classified record, they should strike their repeated references to the classified record, and comport their due process arguments to those cases where, as they contend here, the agency did not rely upon a classified record.

Plaintiffs are not asking the Court to "second guess" any determination of DHS (as Defendants allege at Opp. 45). Rather, Plaintiffs simply request that the Court give effect to the requirements of the APA and Plaintiffs' constitutional right to due process, and that Defendants be required to properly consider this matter in line with their legal and constitutional obligations.

## CONCLUSION

For the reasons set out above and those set out in Plaintiffs' Memorandum of Law in Support of Summary Judgment, Plaintiffs respectfully request that the Court grant Summary Judgment in their favor, deny Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment, and remand to DHS for further proceedings that comport with procedural due process and the evidentiary requirements of the APA.

Dated:  April 9, 2018,

Respectfully submitted,

*/s/ Ryan P. Fayhee*
Ryan P. Fayhee (Bar No. 1033852)

*/s/ Steven Chasin*
Steven Chasin (Bar No. 495853)

**Baker & McKenzie LLP**
815 Connecticut Avenue NW
Washington D.C. 20006
Tel: (202) 452 7024
Ryan.Fayhee@bakermckenzie.com
Steven.Chasin@bakermckenzie.com

*Attorneys for Kaspersky Lab, Inc. and Kaspersky Labs Limited*